UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

OLIVER JIANG, Individually and on Behalf
of All Others Similarly Situated,

               Plaintiff,

    vs.

AVAYA HOLDINGS CORP., JAMES M.
CHIRICO, JR., and KIERAN J. McGRATH,

             Defendants.

—————————————————————— x

Civil Action No.    1:23-cv-1258

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Oliver Jiang ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Avaya Holdings Corp. ("Avaya" or the "Company"), conference call transcripts, Company press releases, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the securities of Avaya between October 3, 2019 and November 29, 2022, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Avaya provides software products for business collaboration and contact center management.  The Company, which had initially been spun off from Lucent Technologies in 2000 and then acquired by private-equity firms Silver Lake and TPG in 2007 in a leveraged buyout and then over-leveraged with debt, sought bankruptcy protection in 2017.  The Company has since emerged from bankruptcy and now operates through two segments, Products & Solutions and Services.

3.      The Products & Solutions segment primarily develops, markets, and sells unified communications and collaboration and contact center solutions, offered on premise, in the cloud, or as a hybrid solution.  These integrate multiple forms of communications, including telephony, email, instant messaging, and video.  The Services segment develops, markets, and sells comprehensive end-to-end global service offerings that enable customers to evaluate, plan, design,

implement, monitor, manage, and optimize complex enterprise communications networks. Revenue from customers who upgrade and acquire new technology through the Company's subscription offerings is reported within the Services segment.

4.    Since October 2019, Avaya has been engaged in a strategic collaboration with RingCentral, Inc. ("RingCentral"), which has accelerated Avaya's transition to the cloud.  The new operating system, Avaya Cloud Office by RingCentral ("ACO"), was supposed to allow Avaya to monetize its small to medium business ("SMB") customer base immediately while concomitantly allowing it to focus on the development of a next-generation cloud contact center. ACO also accelerated Avaya's shift from a one-time, license fee-based to a recurring, subscription-based revenue model.

5.    However, misunderstood by investors – because Avaya's statements to the investment community concealed it – the RingCentral partnership came with onerous requirements that were crippling its business metrics and financial prospects during the Class Period.  Avaya granted RingCentral exclusive rights to certain products to its customers.  This meant Avaya had to discontinue certain of its own product offerings that had only recently begun achieving momentum.  This also exposed the Company to losses as RingCentral paid Avaya commissions up front, which would need to be returned if Avaya later missed on sales thresholds.  More significantly, ACO conflicted with other Avaya product offerings, causing Avaya to have to alter those offerings, resulting in it losing some important members of its executive team.

6.    Cumulatively, these factors would drive down Avaya's business metrics and financial prospects during the Class Period; yet all the while defendants claimed the transition was actually proceeding successfully and that Avaya was on track to reach $1 billion in recurring revenues by the end of fiscal year 2022 ("FY22").  Adding insult to injury, defendants were

operating the Company with defective reporting controls that would preclude Avaya's senior executives from accurately recording and reporting its financial results, significantly compromising their ability to accurately budget and forecast.  Meanwhile, with the market price of Avaya securities artificially inflated, certain of Avaya's senior executives cashed in, selling nearly 200,000 of their personally held shares of Avaya common stock and reaping more than $4.2 million in gross proceeds.  Avaya also cashed in by issuing and selling hundreds of millions of dollars' worth of bonds at artificially inflated prices because they were exchangeable into common stock.  The truth would come out in dribs and drabs thereafter, running down the market price of Avaya securities.

7.      On February 9, 2022, before the opening of trading, Avaya reported its first quarter 2022 ("1Q22") financial results for the interim period ended December 31, 2021, disclosing revenues and earnings per share ("EPS") results significantly lower than the market had been led to expect.  Defendants blamed the miss on the ongoing transition to a subscription-based revenue model, saying that more revenues had been earned that would be reported later.  Attempting to keep the market price of its securities artificially inflated, Avaya announced having signed one of the largest deals in the Company's history, a $400 million transaction with an unnamed "'large global financial services company.'"

8.      Despite these efforts to buttress the market price of Avaya securities, its common stock closed down 22% that day, falling from its close of $17.84 per share on February 8, 2022 to close down at $13.90 per share on February 9, 2022, on unusually high volume of more than 8.6 million shares traded, or 5-1/2 times the average daily volume over the preceding 10 trading days.

9.      On May 10, 2022, before the opening of trading, Avaya reported its second quarter 2022 ("2Q22") financial results for the interim period ended March 30, 2022, again disclosing

lower revenues than the investment community had been led to expect and that its earnings before interest, amortization, depreciation, taxes, and interest ("EBITDA") had declined to $0.53 per share, down more than 28% year-over-year and well below what it had led the investment community to expect. Defendants again blamed the decline on Avaya's transformation from a one-time, license-fee revenue model to a recurring subscription one. The Company also provided disappointing FY22 EBITDA guidance of between $2.09 and $2.25 per share, well below the $2.80 per share the market had been led to expect. Avaya's FY22 revenue outlook of between $2.81 billion and $2.85 billion was also well below the $3.0 billion defendants had led the market to expect.

10.     In order to keep the stock price from totally collapsing, Avaya Chief Executive Officer ("CEO") James M. Chirico, Jr. ("Chirico") – the engineer of the Company's ongoing cloud transformation – emphatically claimed that Avaya remained on track to achieve annual recurring revenue of $1 billion by the end of FY22 for its new OneCloud product offering, stating in pertinent part: "'We are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud.'" Despite the positive spin, on this news, multiple stock brokerage houses slashed their ratings on Avaya securities. Barclays cut its price target from $11 to $8. Craig-Hallum slashed its price target from $30 to $13. Despite defendants' continued efforts to support the market price of Avaya securities, its common stock declined nearly 30% over the following two trading sessions, falling 29% from its close of $8.22 per share on May 9, 2022 to close down at $5.84 per share on May 11, 2022, a decline of $2.38 per share, on unusually high trading volume of more than 4.8 million shares traded on May 10, 2022 alone, or nearly 3 times the average daily volume over the preceding 10 trading days.

11.    Then, on June 24, 2022, Avaya disclosed in an SEC filing that it would be selling $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027, bringing its total outstanding debt to more than $2.8 billion.  Avaya represented that the proceeds from the offering would be used to "to prefund the repayment of, repurchase or otherwise make certain payments in respect of the Company's existing $350.0 million of 2.25% Convertible Senior Notes due 2023," conceding that it was selling debt at 8% to replace debt only costing it 2.25% – or well more than 3 times as much – and tacitly admitting that it otherwise lacked the $350 million required to pay off the 2.25% notes in 2023.  On this news, the market price of Avaya common stock declined another more than 23%, falling from its close of $3.76 per share on June 23, 2022 to close down at $2.87 per share on June 24, 2022, on unusually high trading volume of more than 20.4 million shares traded, or nearly 6 times the average daily volume over the preceding 10 trading days.

12.    On July 28, 2022, after the close of trading, Avaya issued a press release pre-announcing disastrous third quarter 2022 ("3Q22") financial results for the interim period ended June 30, 2022, disclosing revenues and EBITDA much lower than the market had been led to expect, though not giving a reason why.  Specifically, 3Q22 revenues were reported at between $575 million and $580 million – far lower than the Company's guidance of $685 million to $700 million – and Adjusted EBITDA was reported at a range of $50 million to $55 million, well below the Company's guidance of a range of $140 million to $150 million.  Defendants disclosed an unquantified but "significant" impairment charge.  Avaya also disclosed that its Board of Directors (the "Board") had terminated defendant Chirico and that he had been replaced by former Vontage CEO Alan Masarek ("Masarek").  The Company further disclosed that it would cut costs by between $225 million and $250 million going forward.  Despite promising to conduct a conference call on August 9, 2022 to provide additional information, Avaya's quickly deteriorating business

demonstrated that the Company would face severe difficulties in funding its $3+ billion debt load going forward, leading many to fear the Company would need to again seek bankruptcy protection. On this news, the market price of Avaya common stock declined another more than 56%, falling from its close of $2.09 per share on July 28, 2022 to close down at $0.90 per share on July 29, 2022, on unusually high trading volume of more than 64.7 million shares traded, or nearly 15 times the average daily volume over the preceding 10 trading days.

13.     On August 1, 2022, *The Wall Street Journal* published a report entitled "Avaya Bonds Dive Into Distressed Territory," revealing that "Avaya Holdings Corp.'s $1 billion bond due 2028 dropped 43% [that day] to about 47 cents on the dollar, making it the worst performer in corporate bond markets on the day, according to data from MarketAxess."

14.     On August 9, 2022, before the opening of trading, Avaya issued a press release and conducted an abbreviated 3Q22 conference call with investors and stock analysts, during which it refused to answer any questions. Avaya now disclosed that there was "substantial doubt about the Company's ability to continue as a going concern" in light of an upcoming debt maturity and 3Q22 revenues that came in "substantially lower" than Avaya expected. It also disclosed that the Board's Audit Committee had opened an internal investigation "to review the circumstances surrounding" the financial results reported for the most recent quarter, and another to investigate a whistleblower letter, though it did not give details about the whistleblower letter. Avaya would not timely file its 2Q22 quarterly financial report. On the call, Chief Financial Officer ("CFO") Kieran J. McGrath ("McGrath") blamed the horrible performance on the loss of the Company's higher-margin revenue sources as the Company shifted from a licensing sales model to subscription sales for its cloud-based software offerings. Incoming CEO Masarek highlighted what he called past "'operational and executorial shortcomings'" and attributed Avaya's poor performance in part to

- 6 -

clients signing up for smaller and shorter software subscription contracts than expected.  Masarek conceded that Avaya understood very clearly that there was "a great deal of disappointment, concern and worry" among Avaya stakeholders, and thanked them in advance for their "patience."

15.     As lamented by *The Wall Street Journal* in a report published on August 9, 2022, during the spring, Avaya had "tried to raise new debt to refinance a $350 million convertible bond that was coming due in 2023," where "Goldman initially proposed a $500 million loan with a 12.6% yield but found few buyers, according to data provider LevFin Insights."  As a result, the "bank ultimately placed a $350 million secured loan yielding 15.5% with investors."  "Avaya approached JPMorgan Chase & Co. ('JPMorgan') in late June to raise additional funds, according to one of the people," and the "bank placed a $250 million secured convertible bond."  According to *The Wall Street Journal*, "[d]uring the marketing process, Avaya executives told lenders that the company was on track to hit its earnings guidance, some of the people familiar with the matter said."

16.     Citing confidential sources "familiar with the matter," *The Wall Street Journal*'s *Pro Bankruptcy* reported that same day on August 9, 2022 that Avaya was then "working with legal and financial advisors to evaluate the company's options."  *The Wall Street Journal*'s *Pro Bankruptcy* further noted in pertinent part as follows:

> Avaya sold $600 million worth of bonds and leveraged loans arranged by Goldman Sachs Group Inc. and JPMorgan Chase & Co. in June, shortly before disclosing that it would miss its earnings forecasts. ***Prices of the newly issued debt plummeted on the disclosure, leaving debt investors who participated in the deal with paper losses exceeding $100 million***.

> Lenders have engaged law firm Akin Gump Strauss Hauer & Feld LLP to represent their interests, the people familiar with the matter said.

17.     On this news, the market price of Avaya common stock declined further another 45%, falling from its close of $1.12 per share on August 8, 2022 to close down at $0.61 per share

on August 9, 2022, on unusually high trading of nearly 55.5 million shares traded, or nearly 3 times the average daily volume over the preceding 10 trading days.

18.     As reported by *The Wall Street Journal* on August 9, 2022, Avaya's 6.125% bond due 2028 fell as low as 48.50 cents on the dollar after the presentation, down from a close of 56.25 cents on August 8, 2022, citing data from MarketAxess, and its newly issued June 2022 loans were quoted at approximately 65 cents on the dollar, down from 87 cents on the dollar in late July, again, citing Advantage Data.

19.     On November 30, 2022, before the opening of trading, Avaya disclosed that it had identified defects in its internal reporting controls and that as a result, defendants' attestations to those controls in Company's annual report filed with the SEC for fiscal year 2021 ("FY21") on November 22, 2021 "should no longer be relied upon."   Specifically, Avaya revealed that the Board's ongoing investigation had revealed that "the existence of the [whistleblower's] email and the subsequent internal investigation were not included in the [Company's] whistleblower log or communicated to certain members of management and the Company's independent registered public accounting firm," and that "[b]ased on its re-assessment, management has determined that material weaknesses existed in its [internal controls] as the Company did not design and maintain effective controls."   The Avaya Board also disclosed that its "investigations [were] not yet complete and may identify additional material weaknesses or other matters."

20.     On this news, the market price of Avaya common stock declined further, declining 14.28% that day to close down at $0.96 per share on November 30, 2022.

21.     Finally, after the end of the Class Period, on December 13, 2022, Avaya filed with the SEC certain financial disclosures that it said it had provided confidentially to certain of its lenders between October 2022 and December 2022 in an effort to negotiate a settlement of its

obligations with them.  Avaya indicated that those talks were ongoing but warned that certain of the lenders had communicated they were not supporting of an out-of-court settlement.  As such, *The Wall Street Journal* reported on December 16, 2022, citing confidential sources, that Avaya was "nearing a chapter 11 bankruptcy filing to restructure its balance sheet as it looks to turn around its business and move past problems surrounding the company's accounting, people familiar with the matter said."  According to *The Wall Street Journal*, Avaya had "reviewed various restructuring proposals from competing creditor groups," including one that "would significantly reduce Avaya's debt load through chapter 11, wipe out shareholders and, pending the completion of an internal investigation into controls over financial reporting, provide directors and executives with releases from potential litigation."

22.     The market price of Avaya common stock fell further on this news, declining to close down at $0.69 per share on December 13, 2022, on unusually high trading of more than 25 million shares trading, and then declining to close down at $0.23 per share on December 16, 2022, on more than 49 million shares trading.

23.     As of the filing of this complaint, Avaya has not filed its financial reports with the SEC for its second, third, or fourth quarter of 2022; it has not restated its FY21 annual financial report; and it has not announced the final results of the Board's ongoing investigation.  The New York Stock Exchange ("NYSE") is threatening to delist the Company's common stock both for failing to bring its financial filings current and for failing to maintain a sufficient stock price.  There is still no final word on the bankruptcy filing.

24.     As a result of defendants' wrongful acts and omissions as alleged herein, plaintiff and the Class (as defined below) purchased Avaya securities at artificially inflated prices, suffered significant losses, and were damaged thereby.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

27.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Avaya maintains corporate offices located at 1 Penn Plaza in New York City, where certain of its senior executives are based, including its Executive Vice President, Chief Administrative Officer, and General Counsel, Shefali Shah ("Shah"), and Global Vice President, Controller, and Chief Accounting Officer, Kevin Speed ("Speed").  Avaya's 2018 Chapter 11 bankruptcy proceedings were filed in the U.S. Bankruptcy Court for the Southern District of New York: *In re Avaya, Inc., et al.*, No. 17-10089(SMB), with Kirkland & Ellis LLP, New York City, serving as counsel for Avaya.

28.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## PARTIES

29.     Plaintiff Oliver Jiang, as set forth in the accompanying certification which is incorporated herein by reference, purchased Avaya securities during the Class Period and was damaged thereby.

30.     Defendant Avaya is organized under the laws of Delaware.  Between the start of the Class Period and October 1, 2020, Avaya was headquartered in Santa Clara, California.  Since October 1, 2020, the Company has been nominally headquartered in Durham, North Carolina, though it has corporate offices across the United States.  As of September 30, 2021, Avaya had 117 leased facilities located in 59 countries.  These included seven primary research and development facilities located in Canada, Czech Republic, India, Ireland, Israel, Italy, and the United States.  Its real property portfolio consists of aggregate floor space of 1.5 million square feet, substantially all of which is leased.  Avaya common stock trades in an efficient market on the NYSE under the ticker symbol "AVYA."  As of April 30, 2022, there were more than 85.8 million shares of Avaya common stock issued and outstanding.  Avaya also has billions of dollars' worth of notes issued and outstanding.

31.     Defendant Chirico was at all relevant times until his termination on June 28, 2022, the CEO of Avaya and a member of its Board.

32.     Defendant McGrath was at all relevant times the CFO of Avaya.

33.     Defendants Chirico and McGrath are sometimes referred to herein as the "Individual Defendants."

34.     The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of Avaya securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Avaya's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

35.     Defendant Avaya and the Individual Defendants are sometimes referred to herein collectively as "defendants."

36.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Avaya.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Avaya securities was a success, as it: (i) deceived the investing public regarding Avaya's prospects and business; (ii) artificially inflated the price of Avaya securities; (iii) permitted Avaya's senior management to cash in by selling millions of dollars' worth of their personally held shares at fraud-inflated prices; (iv) permitted Avaya to cash in by selling $250 million of bonds upon more lucrative terms; and (v) caused plaintiff and other members of the Class to purchase Avaya securities at artificially inflated prices.

## BACKGROUND

37.     Avaya's Products & Solutions segment offers unified communications and collaboration ("UCC") and contact center ("CC") platforms, applications, and devices.  It also provides Avaya OneCloud UCaaS solutions that enable organizations to provide their workers with a single application for all-channel calling, messaging, meetings, and team collaboration with the same use as existing consumer apps; and Avaya OneCloud CCaaS solutions, which enable customers to build a customized portfolio of applications purportedly driving customer engagement and customer value, as well as offers communications solutions including voice,

email, chat, social media, video, performance management, and third-party integration.  The Products & Solutions segment's Avaya OneCloud CPaaS solutions combine the cloud with its communications platforms, which enable developers to integrate both UCC and CC communications capabilities directly into internal and customer-facing applications and workflows.

38.    Avaya's Services segment provides global support services, enterprise cloud and managed services, and professional services.

39.    Avaya sells directly through its sales force, as well as indirectly through its network of channel partners, including distributors, service providers, dealers, value-added resellers, system integrators, and business partners.

40.    Since October 2019, Avaya has had a strategic collaboration with RingCentral which has accelerated the Company's transition to the cloud.  On October 3, 2019, Avaya and RingCentral announced a partnership that created ACO.  The idea was to allow Avaya to monetize its SMB base immediately, which would allow it to focus on the development of a next-generation cloud contact center.

41.    The RingCentral partnership was significant for Avaya in many ways.  This was the first time Avaya offered a third-party solution as a primary platform.  Avaya had to compete with essentially identical offers from other RingCentral partners.  ACO accelerated Avaya's shift to a subscription-based revenue model, which it was able to replicate with enterprise customers on OneCloud.

42.    The RingCentral partnership also came with some onerous requirements that, unbeknownst to investors, would cripple Avaya's business metrics and financial prospects throughout the Class Period.  Avaya granted RingCentral exclusive UCaaS rights to its customers.

- 13 -

This meant it had to discontinue IP Office Cloud, which had been building market momentum. Avaya also had to discontinue its UCaaS offer in Europe that it was co-developing with 2600Hz. RingCentral paid Avaya commissions up front, which will need to be returned if Avaya misses on sales thresholds.

43.     More significantly, ACO conflicted with other Avaya products.  Avaya relaunched its customizable cloud-based business phone service, Zang, as Avaya Spaces, which included messaging and video services, but they were incompatible with ACO.  RingCentral built a strong integration to the NICE CXone CCaaS, so ACO customers had conflicting contact center options. RingCentral also obtained a seat on Avaya's Board.  Soon after the partnership, former Chief Technology Officer Chris McGugan and former Cloud President Gaurav Passi left Avaya.

44.     Moreover, unbeknownst to investors, Avaya would be operating without effective internal reporting controls throughout the Class Period, significantly diminishing the ability of its senior executives to accurately prepare budgets and forecasts.

## MATERIALLY FALSE AND MISLEADING
## CLASS PERIOD STATEMENTS

45.     The Class Period starts on October 3, 2019.  On that date, Avaya and RingCentral jointly issued a press release announcing Avaya's partnership with RingCentral and the creation of ACO.  The release quoted defendant Chirico lauding the new arrangement, stating in pertinent part that "'Avaya and RingCentral's joint investment and commitment to bringing Avaya Cloud Office to market creates an unprecedented opportunity to accelerate the transition to the cloud *with attractive economics for our customers and partners*.'"  Chirico added that this "'also gives us the opportunity to unlock value from a largely unmonetized base of our business *as it brings compelling value to our customers and partners*,'" emphasizing that "'[w]e believe this highly complementary partnership is a game changer that expands the total addressable market for Avaya

and *creates meaningful value for both Avaya* and RingCentral.'"  A slide presented at the beginning of his presentation to investors that day, backed up by his comments that day, stated that ACO would permit "Avaya [to] offer with differentiated technology, services and tools," providing a "[s]eamless migration with attractive economics for customers and partners."  The "Partnership Rationale" provided that day on another slide included:

- Elevates Avaya's leadership in communications through strategic partnership with UCaaS leader;

- Provides Avaya access to the global UCaaS market, addresses significant customer and partner demand;

- Expands Avaya's leading UC and CC portfolio across full suite of public, private and hybrid cloud solutions;

- Enables Avaya to focus its investments and drive growth in CCaaS, SPaaS, collaboration and private cloud; and

- Accelerates transformation to growth, has favorable unit economics and is creative to operating margins.

46.    Another slide emphasized that "Avaya Cloud Portfolio Wins Across all Segments and Markets."  Summarizing defendant Chirico's comments, one slide emphasized that the partnership "Completes Major Milestones in Our Cloud Strategy," including "Aggressively Serving Our Customer Base," and another that defendants were "Delivering on Our Commitment to Long-Term Value Creation," including by:



47. As part of the transaction which was touted as a supposed "Strategic Partnership," the release issued that day said that "RingCentral is contributing $500 million to its partnership with Avaya, including a $125 million investment of 3% redeemable preferred equity that is convertible at $16 per share, representing an approximate 6% position in Avaya on as-converted basis," and that "RingCentral will also pay Avaya an advance of $375 million primarily in stock for future payments and certain licensing rights."

48. The market responded positively to this news, with the market price of Avaya common stock increasing more than $2 per share, or more than 30%, on unusually high trading volume of more than 28 million shares traded, or nearly 21 times the average daily volume over the preceding 10 trading days.

49. On October 31, 2019, Avaya and RingCentral jointly issued a press release announcing that "RingCentral and Avaya Announce Closing of Strategic Partnership," emphasizing that it "[e]mpowers Avaya's global sales & partner network with RingCentral's leading technology platform." The release quoted defendant Chirico, his counterpart at RingCentral, and an industry analyst all praising the supposed benefits to Avaya and its customers, stating in pertinent part as follows:

> "Our ***game-changing partnership*** with RingCentral and the introduction of Avaya Cloud Office have generated ***tremendous excitement with our partners and customers***," said Jim Chirico, Avaya President and CEO. "Avaya Cloud Office is a continuation of our stated strategy to be a cloud-first company, and we believe the addition of this UCaaS solution to our portfolio is a key differentiator ***that provides customers with a seamless journey to cloud communications***. We, together with our global partner community, are excited to work with RingCentral in bringing this unique solution to market, ***building on the highly complementary strengths of our two industry-leading companies***."
>
> "As a leader in cloud communications, we're laser-focused on bringing the power of the cloud to more enterprise customers," said Vlad Shmunis, RingCentral Founder, Chairman, and CEO. "With the growth of the mobile and distributed workforce, cloud communications solutions can deliver the capabilities enterprises need to effectively connect with customers, partners, and employees. This strategic

partnership accelerates the transition of one of the world's largest on-premise unified communications installed bases to the cloud. *We're excited for the long-term benefits this partnership will bring to customers and partners, as well as the growth opportunities that we expect it will drive for both our companies*."

"The strategic partnership is *a winning combination for both Avaya* and RingCentral, and it has the potential to disrupt the business communications industry as Avaya accelerates its transformation to the cloud. *Careful consideration clearly went into designing the partnership framework to ensure maximum benefits for customers, partners, and both Avaya* and RingCentral," said Elka Popova, Vice President and Senior Fellow, Information and Communications Technologies, Frost & Sullivan.

50. On November 19, 2019, Avaya announced that Gaurav Passi had "departed Avaya . . . as its Senior Vice President and President, Cloud, *upon the elimination of the position*," noting that "Mr. Passi will be eligible to receive benefits under the Avaya Inc. Involuntary Separation Plan for Senior Executives."

51. On November 20, 2019, Avaya issued a press release announcing its fourth quarter and fiscal year 2019 financial results for the period ended September 30, 2019. The release quoted defendant Chirico as stating that "'Avaya made significant progress positioning the company for future growth and accelerating our relevance in cloud during fiscal 2019,'" adding that the Company had "'announced three important initiatives to accelerate growth and deliver shareholder value,'" emphasizing that "'the partnership with RingCentral is *a game changer* for Avaya and is expected to fundamentally change the industry landscape.'" Based on these purported new advantages, the release stated that Avaya then expected to report first quarter 2020 ("1Q20") "GAAP revenue of $698 million to $718 million" and "Adjusted EBITDA of $165 million to $175 million; Adjusted EBITDA margin of ~24%," and fiscal year 2020 ("FY20") "GAAP revenue of $2.81 billion to $2.89 billion" and "Adjusted EBITDA $650 million to $700 million; Adjusted EBITDA margin of 23% to 24%."

52.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the new partnership with RingCentral.

53.     On November 29, 2019, Avaya filed its annual financial report with the SEC on Form 10-K, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

54.     On February 10, 2020, Avaya issued a press release announcing its 1Q20 financial results.  The release quoted defendant Chirico as stating that Avaya "'***continued to strengthen [its] position*** in public, private, and hybrid cloud communications markets, including [its] newest cloud-based UCaaS offering, Avaya Cloud Office, which is on schedule for introduction at the end of March,'" emphasizing that "'[t]he increased breadth and depth in our portfolio ***enable us to deliver innovative and tailored solutions using consumption models, such as subscription, that facilitates our customers transition to the cloud using Avaya technology***.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report second quarter 2020 ("2Q20") "GAAP revenue of $673 million to $698 million" and "Adjusted EBITDA of $140 million to $150 million; Adjusted EBITDA margin of ~21%," and FY20 "GAAP revenue of $2.83 billion to $2.91 billion" and "Adjusted EBITDA $650 million to $700 million; Adjusted EBITDA margin of 23% to 24%."

55.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the new partnership with RingCentral.

56.     On February 10, 2020, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

57.     On February 26, 2020, Avaya provided an "Investor Relations Update" during which it lauded the benefits of the new partnership with RingCentral, opening its remarks by stating in pertinent part that its "*[s]trategic partnership* with RingCentral *broadens product portfolio and strengthens balance sheet*."  Another slide once again stated that ACO would permit "Avaya [to] offer with differentiated technology, services and tools," providing a "[s]eamless migration with attractive economics for customers and partners."

58.     On May 11, 2020, Avaya issued a press release announcing its 2Q20 financial results.  The release quoted defendant Chirico as stating that "'[t]he company has improved on all key strategic metrics as we continue the deliberate move to a SaaS and Cloud model,'" adding that "'[r]ecurring revenue was 64%, up five points sequentially and year over year, our CAPS revenue increased to 23% from 18% in the prior quarter, and software and services as a percent of revenue was 88% – all new highs for the company,'" and that "'[t]he continued mix shift of our revenue *reflects that the vision and strategy we laid out is taking hold and that our transformation to a software, SaaS, and Cloud focused company is irreversible*.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report third quarter 2020 ("3Q20") "GAAP revenue of $674 million to $704 million" and "Adjusted EBITDA of $150 million to $170 million; Adjusted EBITDA margin of ~22% to 24%," but stated that "[i]n light of the uncertainties in the global business environment arising from the effects of COVID-19, the company [was] withdrawing its prior annual guidance for fiscal year 2020."

59.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

60.     On May 11, 2020, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

61.     On August 10, 2020, Avaya issued a press release announcing its 3Q20 financial results.  The release quoted defendant Chirico as stating in pertinent part that "'[r]esponse to our Subscription offering continues to be strong, with just over $200 million of TCV having been booked since its launch back in Q1,'" and that "'[t]his offering differentiates Avaya within the enterprise segment and answers a very clear demand from our customers for flexibility, access to our latest innovations and to provide a seamless path to move to the cloud at a time and pace they choose.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report fourth quarter 2020 ("4Q20") "GAAP revenue of $719 million to $739 million" and "Adjusted EBITDA of $170 million to $190 million; Adjusted EBITDA margin of ~24% to 26%," and provided FY20 guidance of "GAAP revenue of $2.84 billion to $2.86 billion" and "Adjusted EBITDA of $680 million to $700 million; Adjusted EBITDA margin of ~24%."

62.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

63.     On August 10, 2020, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual

Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

64.    On August 10, 2020, Avaya also filed a registration statement and prospectus with the SEC on Form S-3, which was withdrawn and refiled with the SEC on Form S-3ASR on August 28, 2020, registering for resale by RingCentral 22,123,022 shares of Avaya common stock, all of which were then issuable upon the conversion of 125,000 shares of Series A Avaya Convertible Preferred Stock that were acquired by RingCentral as part of the "Strategic Partnership" with Avaya announced on October 3, 2019.

65.    On September 8, 2020, Avaya issued a press release announcing that its wholly owned subsidiary, Avaya Inc., was offering $750 million in aggregate principal amount of Senior First Lien Notes due 2028 in a private offering.  The notes would bear cash interest semi-annually beginning in 2021.  The notes would be the Company's senior secured obligations and would be guaranteed on a senior secured basis by Avaya and each of the Company's wholly owned domestic subsidiaries that guarantee the Company's term loan and asset-based revolving credit facilities. According to the release, Avaya intended "to use the proceeds from the offering to repay, repurchase or otherwise make certain payments in respect of outstanding indebtedness under its term loan credit facility and pay related fees, costs, and expenses."

66.    On September 25, 2020, Avaya announced that Avaya Holdings Corp. closed its previously announced offering, though actually selling $1 billion aggregate principal amount of its 6.125% Senior First Lien Notes due 2028 in the offering.

67.    On October 9, 2020, Avaya announced that it had determined that its corporate headquarters would be relocated from Santa Clara, California, to Raleigh-Durham, North Carolina, effective as of October 1, 2020.

68.     On November 18, 2020, Avaya issued a press release announcing its fourth quarter and FY20 financial results for the period ended September 30, 2020.  The release quoted defendant Chirico as stating that Avaya's "'performance throughout the year demonstrates that our investments in innovation and execution of our cloud-first strategy for enterprises have positioned us in the right place, at the right time'" and that "'[w]e are enabling new ways of work and collaboration that are solving organizations' most pressing business challenges, and our highly differentiated solutions are driving strong demand across our installed base and attracting new customers.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report first quarter 2021 ("1Q21") "GAAP revenue of $710 million to $730 million" and "Adjusted EBITDA of $165 million to $180 million; Adjusted EBITDA margin of ~23% to 25%," and FY21 "GAAP revenue of $2.875 billion to $2.925 billion" and "Adjusted EBITDA of $660 million to $710 million; Adjusted EBITDA margin of 23% to 24%."

69.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

70.     On November 25, 2020, Avaya filed its annual financial report with the SEC on Form 10-K, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

71.     On February 9, 2021, Avaya issued a press release announcing its 1Q21 financial results and raising guidance "***reflecting improved performance across key business metrics***."  The release quoted defendant Chirico as stating in pertinent part that "'[n]avigating a very challenging business environment, we emerged from 2020 even stronger,'" and emphasizing that "'[t]his

success reflects ***the significant progress we continue to make on our transformation into an enterprise leader in cloud-based communications and collaboration solutions***.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report second quarter 2021 ("2Q21") "Revenue of $710 million to $725 million" and "Adjusted EBITDA of $160 million to $175 million; Adjusted EBITDA margin of 23% to 24%," and FY21 "Revenue of $2.90 billion to $2.94 billion" and "Adjusted EBITDA $680 million to $720 million; Adjusted EBITDA margin of 23% to 24%."

72.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

73.     On February 9, 2021, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

74.     On May 6, 2021, Avaya issued a press release announcing its 2Q21 financial results and raising guidance.  The release quoted defendant Chirico as stating in pertinent part that "'[w]e drove solid second quarter results which highlight the company's continuing momentum,'" "'[b]ut more importantly, they represent the significant work and strategic investments we have been making over the last few years to reshape our company and portfolio to be a leader in enterprise communications and collaboration,'" adding that "'[t]he playbook for our industry is not a secret. It is all about how you execute and I couldn't be more delighted with our performance, which is why we are again raising guidance across several key financial metrics.'"  Based on the purported then-present business metrics, the release stated that Avaya then expected to report third quarter

2021 ("3Q21") "Revenue of $720 million to $735 million" and "Adjusted EBITDA of $160 million to $170 million; Adjusted EBITDA margin of 22% to 23%," and FY21 "Revenue of $2.920 billion to $2.955 billion" and "Adjusted EBITDA $690 million to $720 million; Adjusted EBITDA margin of ~24%."

75.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

76.     On May 10, 2021, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

77.     On August 9, 2021, Avaya issued a press release announcing its 3Q21 financial results.  The release quoted defendant Chirico as stating in pertinent part as follows:

> "Our third quarter represents the fifth consecutive quarter of year over year revenue growth and speaks volumes to the ***significant progress we've made on our transformational strategy***.  We are ***executing ahead of plan*** and I could not be prouder of the Avaya team . . . .  Annual recurring revenue, a key indicator of our progress, is outperforming our expectations, up over 275% percent from a year ago to $425 million, 64% of which is from deals greater than $1 million, consistent with ***our strong traction in large enterprises***.  Given this performance, we are again raising our ARR guidance and now expect to cross the $1 billion mark by the end of calendar 2022, about a year ahead of schedule."

78.     Based on the purported then-present business metrics, the release stated that Avaya then expected to report fourth quarter 2021 ("4Q21") "Revenue of $720 million to $750 million" and "Adjusted EBITDA of $160 million to $175 million; Adjusted EBITDA margin of 22% to 23%," and FY21 "Revenue of $2.930 billion to $2.960 billion" and "Adjusted EBITDA $700 million to $715 million; Adjusted EBITDA margin of ~24%."

79.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

80.     On August 9, 2021, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

81.     On November 22, 2021, Avaya issued a press release announcing its fourth quarter and FY21 financial results for the period ended September 30, 2021, and providing both fiscal year 2023 ("FY23") and fiscal year 2024 ("FY24") guidance.  The release quoted defendant Chirico as stating in pertinent part as follows:

> "Fiscal year 2021 for Avaya was a year marked by many firsts, and the outstanding results we delivered exceeded expectations on most every front.  Most impressive is the fact that we reversed over a decade of annual revenue declines, delivering year over year growth closing up approximately $100 million, while we also grew ARR 177% to $530 million . . . .  This year marked a real and substantive milestone for the company and I couldn't be prouder of the performance or more thankful for the commitment of our customers and partners and performance of our global team as ***we've navigated a purposeful and deliberate journey of transformation to be an enterprise cloud leader***."

82.     Based on the purported then-present business metrics, the release stated that Avaya then expected to report first quarter 2022 ("1Q22") "Revenue of $725 million to $745 million" and "Adjusted EBITDA of $160 million to $175 million; Adjusted EBITDA margin of ~23%," and FY22 "Revenue of $2.975 billion to $3.025 billion" and "Adjusted EBITDA of $700 million to $720 million; Adjusted EBITDA margin of ~24%."

83.     Later that morning, defendants conducted a conference call with investors and stock analysts providing additional positive commentary about the Company's business metrics and financial prospects in light of the partnership with RingCentral.

84.     On November 22, 2021, Avaya filed its annual financial report with the SEC on Form 10-K, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

85.     On February 9, 2022, before the opening of trading, Avaya reported its 1Q22 financial results, disclosing revenues and EPS results significantly lower than the market had been led to expect.  Far below the upwards of $745 million promised, Avaya reported revenues of just $713 million and Adjusted EBITDA of just $129 million, well below the Adjusted EBITDA of $160 million to $175 million promised, and down a full 750 basis points year-over-year.  The release quoted defendant Chirico as stating in pertinent part as follows:

> "Our transition to the cloud continues to gain strength as our Avaya OneCloud ARR grew by 137% year over year primarily driven by our enterprise segment and contact center solutions.  ***Market demand remains very strong, especially with large enterprises*** . . . .  This quarter, we yet again closed more than 100 deals with total contract value greater than $1 million.  The breadth of our solutions, scale on which they operate, and global reach are unparalleled and ***as we closed out the quarter, we landed one of the largest deals in our history, a $400 million OneCloud Public CCaaS deal with a large global financial services company***."

86.     Based on the purported then-present business metrics, for 2Q22, Avaya stated it then expected to report "Revenue of $730 million to $745 million" and "Adjusted EBITDA of $155 million to $165 million; Adjusted EBITDA margin of 21% to 22%," and for FY22 it then expected to report "Revenue of $2.975 billion to $3.025 billion" and "Adjusted EBITDA of $680 million to $700 million; Adjusted EBITDA margin of ~23%."

87.     During the conference call held with investors later that morning, defendants blamed the miss on the ongoing transition to a subscription-based revenue model, saying that more revenues had been earned that would be reported later.

- 26 -

88.     Despite defendants' efforts to buttress the market price of Avaya securities by announcing the anonymous new customer, the price of the common stock closed down 22% that day, falling from its close of $17.84 per share on February 8, 2022 to close down at $13.90 per share on February 9, 2022, on unusually high volume of more than 8.6 million shares traded, or 5-1/2 times the average daily volume over the preceding 10 trading days.

89.     On February 9, 2022, Avaya filed a quarterly financial report with the SEC on Form 10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

90.     On May 10, 2022, before the opening of trading, Avaya reported its 2Q22 financial results, again disclosing lower revenues than the investment community had been led to expect and that its EBITDA had declined to $0.53 per share, down more than 28% year-over-year and well below what it had led the investment community to expect.  Rather than the "Revenue of $730 million to $745 million" Avaya had claimed to be on track to receive, it reported revenue of just $716 million, down 2% year-over-year, and rather than the "Adjusted EBITDA of $155 million to $165 million; Adjusted EBITDA margin of 21% to 22%," Avaya reported Adjusted EBITDA of just $145 million, down 370 basis points year-over-year.  The release quoted defendant Chirico as stating in pertinent part as follows:

> "We drove record growth for Avaya OneCloud ARR with a $130 million quarter over quarter increase and an over $400 million year over year increase, to $750 million.  The path to hit the $1 billion ARR mark by the end of calendar year 2022 is well paved . . . .  ***We are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud.  Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business***."

91.     Based on the purported then-present business metrics, Avaya provided 3Q22 revenue guidance of between $685 million and $700 million, Adjusted EBITDA guidance of $140

million to $150 million, and Adjusted EBITDA margin guidance of 20% to 21%.  Avaya's FY22

revenue outlook of between $2.81 billion and $2.85 billion was also well below the $2.975 billion

to $3.025 billion defendants previously promised, and the FY22 Adjusted EBITDA guidance of

$580 million to $600 million, or between $2.09 to $2.25 per share, was well below the between

$680 million and $700 million, or $2.80 per share, the market had been led to expect.

92.     During the conference call held with investors and stock analysts later that morning,

defendants again blamed the decline on Avaya's transformation from a one-time, license revenue

model to a recurring subscription one.  In order to keep the stock price from totally collapsing,

defendant Chirico emphatically claimed that Avaya remained on track to achieve annual recurring

revenue of $1 billion by the end of FY22 for its new OneCloud product offering, stating in pertinent

part that "75% of new bookings came from Avaya OneCloud" and "we are successfully

repositioning the company from our historic onetime revenue model to a recurring one."

93.     Despite the positive spin, on this news, multiple stock brokerage houses slashed

their ratings on Avaya securities.  Barclays cut its price target from $11 to $8.  Craig-Hallum

slashed its price target from $30 to $13.  Despite defendants' continued efforts to support the

market price of Avaya securities, the price of the common stock declined nearly 30% over the

following two trading sessions, falling 29% from its close of $8.22 per share on May 9, 2022 to

close down at $5.84 per share on May 11, 2022, a decline of $2.38 per share, on unusually high

trading volume of more than 4.8 million shares traded on May 10, 2022 alone, or nearly 3 times

the average daily volume over the preceding 10 trading days.

94.     On May 10, 2022, Avaya filed a quarterly financial report with the SEC on Form

10-Q, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by the Individual

Defendants, both as to accuracy of the above financial results and as to the effectiveness of the Company's internal reporting controls.

95.     On June 8, 2022, Avaya announced that Avaya Inc. had "launched a financing . . . seeking to raise $500.0 million aggregate principal amount of new secured debt, which will be used to prefund the refinancing of the Company's existing $350.0 million of 2.25% Convertibles Notes due June 15, 2023 and for general corporate purposes," noting that "[t]he consummation of the secured debt financing is subject to market conditions and other factors and no assurance can be given as to if or when the financing will be consummated" and that "[d]uring the marketing of the Financing, the Company may increase or decrease the amount to be raised in the Financing and change the terms thereof."  The release also stated that "[i]n connection with the Financing, Avaya Inc. shared a presentation with potential lenders, which presentation is available on the Company's investor relations website" and that "[t]he forecasts included in the lender presentation replace the prior guidance provided on December 14, 2021."

96.     The statements referenced above in ¶¶45-46, 49, 51-63, 68-87, 89-92, and 94-95 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)     that the RingCentral partnership came with onerous requirements that were crippling Avaya's business metrics and financial prospects, including that Avaya granted RingCentral exclusive rights to certain products to its customers, meaning that Avaya had to discontinue certain of its own product offerings that had only recently begun achieving momentum, and that ACO conflicted with other Avaya product offerings, causing Avaya to have to alter those offerings, resulting in it losing some important members of its executive team;

(b)     that the arrangement with RingCentral had exposed the Company to losses as RingCentral paid Avaya commissions up front, which would need to be returned if Avaya later missed on sales thresholds;

(c)     that Avaya had defective internal controls which prevented its senior executives from formulating accurate budgets and forecasts; and

(d)     that as a result of the foregoing, defendants' positive statements during the Class Period about the Company's business metrics and financial prospects were false and misleading and/or lacked a reasonable basis.

97.     On June 24, 2022, Avaya disclosed in a filing with the SEC that it would be selling $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027, bringing its total outstanding debt to more than $2.8 billion.  Avaya represented that the proceeds from the offering would be used to "to prefund the repayment of, repurchase or otherwise make certain payments in respect of the Company's existing $350.0 million of 2.25% Convertible Senior Notes due 2023," conceding that it was selling debt at 8% to replace debt only costing it 2.25% – or well more than 3 times as much – and tacitly admitting that it otherwise lacked the $350 million required to pay off the 2.25% notes in 2023.  On this news, the market price of Avaya common stock declined another more than 23%, falling from its close of $3.76 per share on June 23, 2022 to close down at $2.87 per share on June 24, 2022, on unusually high trading volume of more than 20.4 million shares traded, or nearly 6 times the average daily volume over the preceding 10 trading days.

98.     On July 28, 2022, after the close of trading, Avaya issued a press release pre-announcing disastrous 3Q22 financial results for the interim period ended June 30, 2022, disclosing revenues and EBITDA much lower than the market had been led to expect, though not giving a reason why.  Specifically, 3Q22 revenues were reported at between $575 million and

$580 million – far lower than the Company's guidance of $685 million to $700 million – and Adjusted EBITDA was reported at a range of $50 million to $55 million, well below the Company's guidance of a range of $140 million to $150 million.  Defendants disclosed an unquantified but "significant" impairment charge.  Avaya also disclosed that its Board had terminated defendant Chirico and that he had been replaced by former Vontage CEO Masarek. The Company further disclosed that it would cut costs by between $225 million and $250 million going forward.  Despite promising to conduct a conference call on August 9, 2022 to provide additional information, Avaya's quickly deteriorating business demonstrated that the Company would face severe difficulties in funding its $3+ billion debt load going forward, leading many to fear the Company would need to again seek bankruptcy protection.  On this news, the market price of Avaya common stock declined another more than 56%, falling from its close of $2.09 per share on July 28, 2022 to close down at $0.90 per share on July 29, 2022, on unusually high trading volume of more than 64.7 million shares traded, or nearly 15 times the average daily volume over the preceding 10 trading days.

99.     On August 1, 2022, *The Wall Street Journal* published a report entitled "Avaya Bonds Dive Into Distressed Territory," revealing that "Avaya Holdings Corp.'s $1 billion bond due 2028 dropped 43% [that day] to about 47 cents on the dollar, making it the worst performer in corporate bond markets on the day, according to data from MarketAxess."

100.     On August 9, 2022, before the opening of trading, Avaya issued a press release and conducted an abbreviated 3Q22 conference call with investors and stock analysts, during which it refused to answer any questions.  Avaya would not timely file its 2Q22 quarterly financial report. Avaya now disclosed that there was "substantial doubt about the Company's ability to continue as a going concern" in light of an upcoming debt maturity and 3Q22 revenues that came in

"substantially lower" than Avaya expected.  It also disclosed that the Board's Audit Committee had opened an internal investigation "to review the circumstances surrounding" the financial results reported for the most recent quarter, and another to investigate a whistleblower letter, though it did not give details about the whistleblower letter.  On the call, CFO McGrath blamed the horrible performance on the loss of the Company's higher-margin revenue sources as the Company shifted from a licensing sales model to subscription sales for its cloud-based software offerings.  Incoming CEO Masarek highlighted what he called past "'operational and executorial shortcomings'" and attributed Avaya's poor performance in part to clients signing up for smaller and shorter software subscription contracts than expected.  Masarek conceded that Avaya understood very clearly that there was "a great deal of disappointment, concern and worry" among Avaya stakeholders, and thanked them in advance for their "patience."

101.    As lamented by *The Wall Street Journal* in a report published on August 9, 2022, during the spring, Avaya had "tried to raise new debt to refinance a $350 million convertible bond that was coming due in 2023," where "Goldman initially proposed a $500 million loan with a 12.6% yield but found few buyers, according to data provider LevFin Insights."  As a result, the "bank ultimately placed a $350 million secured loan yielding 15.5% with investors."  "Avaya approached JPMorgan in late June to raise additional funds, according to one of the people," and the "bank placed a $250 million secured convertible bond."  According to *The Wall Street Journal*, "[d]uring the marketing process, Avaya executives told lenders that the company was on track to hit its earnings guidance, some of the people familiar with the matter said."

102.    Citing confidential sources "familiar with the matter," *The Wall Street Journal*'s *Pro Bankruptcy* reported that same day on August 9, 2022 that Avaya was then "working with

legal and financial advisors to evaluate the company's options." *The Wall Street Journal*'s *Pro Bankruptcy* further noted in pertinent part as follows:

> Avaya sold $600 million worth of bonds and leveraged loans arranged by Goldman Sachs Group Inc. and JPMorgan Chase & Co. in June, shortly before disclosing that it would miss its earnings forecasts. ***Prices of the newly issued debt plummeted on the disclosure, leaving debt investors who participated in the deal with paper losses exceeding $100 million***.

> Lenders have engaged law firm Akin Gump Strauss Hauer & Feld LLP to represent their interests, the people familiar with the matter said.

103.    On this news, the market price of Avaya common stock declined further another 45%, falling from its close of $1.12 per share on August 8, 2022 to close down at $0.61 per share on August 9, 2022, on unusually high trading of nearly 55.5 million shares traded, or nearly 3 times the average daily volume over the preceding 10 trading days.

104.    As reported by *The Wall Street Journal* on August 9, 2022, Avaya's 6.125% bond due 2028 fell as low as 48.50 cents on the dollar after the presentation, down from a close of 56.25 cents on August 8, 2022, citing data from MarketAxess, and its newly issued June 2022 loans were quoted at approximately 65 cents on the dollar, down from 87 cents on the dollar in late July, again, citing Advantage Data.

105.    On November 30, 2022, before the opening of trading, Avaya disclosed that it had identified defects in its internal reporting controls and that as a result, defendants' attestations to those controls in Company's annual report filed with the SEC for FY21 on November 22, 2021 "should no longer be relied upon."  Specifically, Avaya revealed that the Board's ongoing investigation had revealed that "the existence of the [whistleblower's] email and the subsequent internal investigation were not included in the [Company's] whistleblower log or communicated to certain members of management and the Company's independent registered public accounting firm," and that "[b]ased on its re-assessment, management has determined that material

- 33 -

weaknesses existed in its [internal controls] as the Company did not design and maintain effective controls." The Avaya Board also disclosed that its "investigations [were] not yet complete and may identify additional material weaknesses or other matters."

106.   On this news, the market price of Avaya common stock declined further, declining 14.28% that day to close down at $0.96 per share on November 30, 2022.

107.   Finally, after the end of the Class Period, on December 13, 2022, Avaya filed with the SEC certain financial disclosures that it said it had provided confidentially to certain of its lenders between October 2022 and December 2022 in an effort to negotiate a settlement of its obligations with them. Avaya indicated that those talks were ongoing but warned that certain of the lenders had communicated they were not supporting of an out-of-court settlement. As such, *The Wall Street Journal* reported on December 16, 2022, citing confidential sources, that Avaya was "nearing a chapter 11 bankruptcy filing to restructure its balance sheet as it looks to turn around its business and move past problems surrounding the company's accounting, people familiar with the matter said." According to *The Wall Street Journal*, Avaya had "reviewed various restructuring proposals from competing creditor groups," including one that "would significantly reduce Avaya's debt load through chapter 11, wipe out shareholders and, pending the completion of an internal investigation into controls over financial reporting, provide directors and executives with releases from potential litigation."

108.   The market price of Avaya common stock fell further on this news, declining to close down at $0.69 per share on December 13, 2022, on unusually high trading of more than 25 million shares trading, and then declining to close down at $0.23 per share on December 16, 2022, on more than 49 million shares trading.

109.    As of the filing of this complaint, Avaya has not filed its financial reports with the SEC for its second, third, or fourth quarter of 2022; it has not restated its FY21 annual financial report; and it has not announced the final results of the Board's ongoing investigation.  The NYSE is threatening to delist the Company's common stock both for failing to bring its financial filings current and for failing to maintain a sufficient stock price.  There is still no final word on the bankruptcy filing.

110.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Avaya securities at artificially inflated prices, suffered significant losses, and were damaged thereby.

### ADDITIONAL SCIENTER ALLEGATIONS

111.    As alleged herein, Avaya and the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Avaya, their control over, and/or receipt and/or modification of Avaya's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Avaya, participated in the fraudulent scheme alleged herein.

112.    Additionally, with the market price of Avaya securities artificially inflated, certain of Avaya's senior executives and/or directors cashed in, selling nearly 200,000 of their personally held shares of Avaya common stock and reaping more than $4.2 million in gross proceeds:

| Executive and/or Director | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Defendant Chirico** | 11/24/2021 | $21.41 | 50,000 | $1,070,500 |
| | 12/8/2021 | $21.09 | 30,000 | $632,700 |
| | | | **80,000** | **$1,703,200** |
| **Defendant McGrath** | 11/24/2021 | $21.83 | 35,000 | $764,050 |
| | | | **35,000** | **$764,050** |
| **Shah** | 11/24/2021 | $21.74 | 25,000 | $543,500 |
| | | | **25,000** | **$543,500** |
| **Stephen Spears** | 9/15/2021 | $19.20 | 13,000 | $249,600 |
| Chief Revenue Officer | 12/9/2021 | $20.58 | 23,748 | $488,734 |
| | | | **36,748** | **$738,334** |
| **Speed** | 11/30/2021 | $20.03 | 10,000 | $200,300 |
| | | | **10,000** | **$200,300** |
| **Susan Louise Spradley** | 1/15/2021 | $20.86 | 12,847 | $267,988 |
| Director | | | **12,847** | **$267,988** |
| **Total** | | | **199,595** | **$4,217,372** |

113.    Avaya also cashed in by issuing and selling hundreds of millions of dollars' worth of bonds at artificially inflated prices because they were exchangeable into common stock.

## NO SAFE HARBOR

114.    The "Safe Harbor" warnings accompanying Avaya's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.   *See* 15 U.S.C. §78u-5(b)(2)(A).

115.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Avaya who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not

- 36 -

stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

116.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Avaya securities and operated as a fraud or deceit on purchasers of Avaya securities.  As detailed above, when the truth about Avaya's misconduct was revealed, the value of Avaya securities declined precipitously as the prior artificial inflation no longer propped up the securities price.  The decline in the price of Avaya securities was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Avaya securities and the subsequent significant decline in the value of Avaya securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

117.   At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Avaya's business, operations, and financial results as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements

and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Avaya securities to be artificially inflated. Plaintiff and other Class members purchased Avaya securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

118. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

119. Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Avaya securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Avaya common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) Avaya regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Avaya was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

120. As a result of the foregoing, the market for Avaya securities promptly incorporated current information regarding the Company from publicly available sources and reflected such

information in the prices of the stock.  Under these circumstances, all those who transacted in Avaya securities during the Class Period suffered similar injury through their transactions in Avaya securities at artificially inflated prices and a presumption of reliance applies.

121.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Avaya securities between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Avaya securities, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

**CLASS ACTION ALLEGATIONS**

122.     Plaintiff brings this action on behalf of all purchasers of Avaya securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the defendants have or had a controlling interest.

123.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Avaya common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Avaya or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or

thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

124.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)    whether the prices of Avaya securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

127.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

128.    Plaintiff incorporates ¶¶1-127 by reference.

129.    During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Avaya securities during the Class Period.

131.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Avaya securities.  Plaintiff and the Class would not have purchased Avaya securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

132.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Avaya securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

133.     Plaintiff incorporates ¶¶1-132 by reference.

134.     During the Class Period, defendants acted as controlling persons of Avaya within the meaning of §20(a) of the 1934 Act.  By virtue of their stock holdings, their positions with the Company, and their power to control public statements about Avaya, the Individual Defendants had the power and ability to control the actions of Avaya and its employees.  Avaya controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 14, 2023                    ROBBINS GELLER RUDMAN
                                                     & DOWD, LLP
SAMUEL H. RUDMAN
MARY K. BLASY

*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Oliver B. Jiang ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __9th__ day of February, 2023.

DocuSigned by:

*Oliver B. Jiang*

764EE3BC2ED3407...

Oliver B. Jiang

AVAYA

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Option**

| Date Acquired | Type of Option | Contract Amount | Price |
|---|---|---|---|
| 02/10/2021 | AVYA US 01/20/23 Call $40 | 21 | $6.10 |

Prices listed are rounded up to two decimal places.