# EXHIBIT B

Mecklenburg County Clerk of Superior Court

23CV031985-590

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23 CVS _____

| | |
|---|---|
| ALCOF III NUBT, L.P., ALTA FUNDAMENTAL ADVISERS LLC, on behalf of funds it manages, BLACKCOMB DEBT HOLDINGS, L.P., CTC ALTERNATIVE STRATEGIES, LTD, NUVEEN ASSET MANAGEMENT, LLC, SCULPTOR SPECIAL MASTER FUND, LTD, TBK BANK, SSB, TRANSAMERICA LIFE INSURANCE COMPANY, VENTURE 28A CLO, LIMITED, VENTURE XXX CLO, LIMITED, VENTURE 31 CLO, LIMITED, VENTURE 32 CLO, LIMITED, VENTURE 33 CLO, LIMITED, VENTURE 36 CLO, LIMITED, VENTURE XV CLO, LIMITED, VENTURE XIX CLO, LIMITED, VENTURE XXII CLO, LIMITED, and VENTURE XXIII CLO, LIMITED,<br><br>               Plaintiffs,<br><br>       v.<br><br>JAMES M. CHIRICO, JR., KIERAN MCGRATH, and STEPHEN D. SPEARS.<br><br>               Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through their undersigned counsel, for their complaint against James M. Chirico, Jr., Kieran McGrath, and Stephen D. Spears (together, the "Defendants"), allege upon knowledge as to themselves and otherwise upon information and belief as follows:

PPAB 10086180v1

**NATURE OF THE ACTION**

1.      Plaintiffs seek to recover hundreds of millions of dollars in losses caused by demonstrably fraudulent and negligent misrepresentations and omissions of Defendants concerning the financial condition of Avaya, Inc. and its parent Avaya Holdings Corp. ("Holdings," and together with Avaya Inc., "Avaya").

2.      Defendants duped Plaintiffs into loaning $236 million to Avaya under a term loan (the "B-3 Term Loan") that closed only *two weeks* before Avaya publicly announced that the financial information used to market the B-3 Term Loan was false and "should no longer be relied upon."  Defendants knew—and concealed—this information before the B-3 Term Loan closed.

3.      In June 2022, Avaya launched a marketing process for the B-3 Term Loan, which would be used to repurchase Holdings' Convertible Notes (as defined below) and for general corporate purposes.  Avaya marketed the B-3 Term Loan to Plaintiffs and other lenders on the basis of a presentation, which projected $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (ending June 30, 2022, based on Avaya's fiscal year) (the "3Q22 Guidance").

4.      Privately, however, Defendants knew that Avaya's business was faltering and that it would be "impossible" and would require "more than a miracle" to meet the 3Q22 Guidance and, by extension, the FY22 Guidance (defined *infra* and, together with the 3Q22 Guidance, the "Guidance").  In fact, before the B-3 Term Loan even closed, Defendants received a report showing that it had materially underperformed the 3Q22 Guidance, confirming that it was impossible to meet the

2

projections in the Guidance. But Defendants continued to assure prospective lenders, including Plaintiffs, that the 3Q22 Guidance was accurate, and they knowingly failed to withdraw the Guidance as they were obligated to do as senior executives of Avaya.

5.     Plaintiffs funded $236 million of the $350 million B-3 Term Loan, which closed on July 12, 2022. ***Just two weeks later, however, Avaya publicly announced that its 3Q22 Guidance was materially false and overstated***. Consequently, on July 28, 2022, Avaya slashed its third quarter adjusted EBITDA guidance by 65% and its third quarter revenue guidance by nearly 20% and in a subsequent filing with the U.S. Securities and Exchange Commission (the "SEC") disclosed that substantial doubt existed about Avaya's ability to continue as a going concern.   Not surprisingly, concurrently with its corrective disclosures, Avaya announced the termination of its CEO, James M. Chirico, Jr., and disclosed that its Audit Committee commenced an internal investigation into the circumstances surrounding Avaya's financial results for the third quarter.  To have these events unfold so soon after a major financing is virtually unprecedented.

6.     Though the third quarter results and updated guidance were released publicly after the B-3 Term Loan closed, Defendants knew the third quarter results before the B-3 Term Loan closed.  Thus, Defendants knew, or should have known, that the Guidance—on which Plaintiffs relied—was materially inaccurate and misleading because the publicly-disclosed projections would be impossible to meet based on Avaya's actual performance.

7.     The misrepresentations by Defendants—included in the Lender Presentation (defined below) issued to Plaintiffs—were made knowingly and deliberately to induce Plaintiffs to extend the B-3 Term Loan.   Had they known Avaya's true financial condition, Plaintiffs would not have extended the B-3 Term Loan at all, let alone on the terms therein.

8.     Accordingly, Plaintiffs bring this action to recover the damages caused by Defendants' fraudulent and negligent misrepresentations and omissions in an amount to be determined at trial of at least $135 million.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Defendant Chirico because he is a resident of North Carolina and because he transacted business in North Carolina and was an officer of a company whose business headquarters were, during the relevant period, based in North Carolina, and the instant action arises from his transaction of business in North Carolina.

10.    This Court has personal jurisdiction over Defendant McGrath because he transacted business in North Carolina and was an officer of a company whose business headquarters were, during the relevant period, based in North Carolina, and the instant action arises from his transaction of business in North Carolina.

11.    This Court has personal jurisdiction over Defendant Spears because he transacted business in North Carolina and was an officer of a company whose business headquarters were, during the relevant period, based in North Carolina, and the instant action arises from his transaction of business in North Carolina.

4

12.    Venue is proper in this Court pursuant to, inter alia, N.C. Gen. Stat. § 1-82.

## PARTIES AND RELEVANT NON-PARTIES

13.    Plaintiff ALCOF III NUBT, L.P., a Delaware limited partnership, holds interests in the B-3 Term Loan.

14.    Plaintiff Alta Fundamental Advisers LLC, a Delaware limited liability company, on behalf of funds it manages, holds interests in the B-3 Term Loan.

15.    Plaintiff Blackcomb Debt Holdings, L.P., a Delaware limited partnership, holds interests in the B-3 Term Loan.

16.    Plaintiff CTC Alternative Strategies, Ltd., an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

17.    Plaintiff Nuveen Asset Management, LLC, a Delaware limited liability company, holds interests in the B-3 Term Loan.

18.    Plaintiff Sculptor Special Master Fund, Ltd., an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

19.    Plaintiff TBK Bank, SSB, a Texas state savings bank, holds interests in the B-3 Term Loan.

20.    Plaintiff Transamerica Life Insurance Company, a corporation organized and existing under the laws of the state of Iowa, holds interests in the B-3 Term Loan.

21.    Plaintiff Venture 28A CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

5

22.     Plaintiff Venture 31 CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

23.     Plaintiff Venture 32 CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

24.     Plaintiff Venture 33 CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

25.     Plaintiff Venture 36 CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

26.     Plaintiff Venture XV CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

27.     Plaintiff Venture XIX CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

28.     Plaintiff Venture XXII CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

29.     Plaintiff Venture XXIII CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

30.     Plaintiff Venture XXX CLO, Limited, an exempted company under the laws of the Cayman Islands, holds interests in the B-3 Term Loan.

31.     Defendant James M. Chirico, Jr. served as Holdings' Chief Executive Officer ("CEO") and President from October 2017 to August 2022.  Defendant Chirico was also during all relevant times a member of Avaya's Board of Directors.

32.     Defendant Kieran J. McGrath served as Holdings' Executive Vice

6

President and Chief Financial Officer ("CFO") from February 2019 to November 2022.

33.     Defendant Stephen D. Spears served as Holdings' Chief Revenue Officer from September 2020 to November 2022.

34.     Non-parties Avaya Inc. and Avaya Holdings Corp. are Delaware corporations with their headquarters located at 2605 Meridian Parkway, Suite 200, Durham, North Carolina, 27713 during the relevant period.

35.     Certain of the plaintiffs acquired interests in the B-3 Term Loan and all claims and enforcement rights related thereto.  Accordingly, all plaintiffs in the above captioned action (the "Plaintiffs"[1]) have standing to assert the claims set forth in this Complaint.

## FACTUAL BACKGROUND

### I.     Avaya's Business

36.     Avaya provides software products and related customer service for communication platforms, both on-premise and through the cloud, to more than 90,000 customers worldwide through a range of industries, including financial services, manufacturing, retail, transportation, energy, media and communications, hospitality, healthcare, education, and government.  Avaya operates with more than 6,500 employees in almost sixty countries.

37.     Avaya's business operations are divided into and derive revenue from three segments: (i) Software and Support (the "Software and Support Segment"); (ii)

---

[1] All allegations herein pertaining to Plaintiffs' original investment in the B-3 Term Loan, including Plaintiffs' reliance on Defendants' misrepresentations in connection therewith, include the Plaintiffs' predecessors in interest as applicable.

Avaya Professional Services (the "Professional Services Segment"); and (iii) Hardware (the "Hardware Segment").

38.     The Software and Support Segment primarily develops, markets, and sells unified communications and contact center software solutions, offered on-premise, in the cloud, or as a hybrid solution for customers. These software products allow customers to connect via video, audio, phone, and chat all in one centralized location. This segment derives revenue from on-premise and cloud-based subscriptions, managed services, perpetual-based software license revenues, and associated maintenance support.

39.     The Professional Services Segment provides technical support and installation services for software products purchased by end-users, as well as optimization services enabling customers to evaluate, plan, design, implement, monitor, and manage enterprise communications networks.

40.     The Hardware Segment offers hardware products, including business devices such as handsets, video conferencing units, servers, and gateways.

## II.    Avaya's 2022 Financial Outlook

41.     On May 10, 2022, Avaya published a Form 8-K with the SEC (the "May 8-K") with the third quarter earnings guidance of $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue (*i.e.*, the 3Q22 Guidance). The May 8-K was signed by Defendant McGrath.

42.     The May 8-K also provided an end of fiscal year earnings guidance of $580-$600 million of Adjusted EBITDA and $2.815-$2.855 billion of revenue (the "FY22 Guidance"):

**Financial Outlook – Fiscal Year 2022** – unless otherwise noted, values reflect April 30, 2022 FX rates.

- Revenue of $2.815 billion to $2.855 billion
- OneCloud ARR expected to be $940 million to $960 million by year end FY22
- CAPS revenue will represent between ~47% to 50% of Avaya's total revenue for FY22
- GAAP operating income of $76 million to $96 million; GAAP operating margin of ~3%
- Non-GAAP operating income of $466 million to $486 million; non-GAAP operating margin of ~17%
- Adjusted EBITDA of $580 million to $600 million; Adjusted EBITDA margin of ~21%

43.     The same day, May 10, 2022, Defendant McGrath reiterated the 3Q22 Guidance and FY22 Guidance on an earnings call to investors, stating that "[f]or the third quarter of fiscal year 2022, we anticipate revenues of $685 million to $700 million," and "[w]e expect full-year revenue to be between $2.815 billion and $2.855 billion."     Defendant Chirico reaffirmed McGrath's statements, saying that the "significant progress [Avaya] saw [in the second] quarter signifies our strategy is taking hold, and this shift is reflected in ***our revised second half guidance***" (*i.e.*, the 3Q22 and FY22 Guidance).

44.     Approximately two weeks later, on May 25, 2022, an employee of one of the Plaintiffs had a telephone call with Defendant McGrath where McGrath discussed the 3Q22 Guidance, a change in the FY22 Guidance,[2] and Avaya's outlook for cash flow going forward.

---

[2]     Avaya publicly announced a change to the FY22 Guidance from $2.975-$3.025 billion of revenue to $2.815-$2.855 billion of revenue.

9

45.    At no point did McGrath state that the 3Q22 Guidance was unachievable or unreasonable.  Just the opposite.  He reaffirmed the guidance.

### III.    Defendants Market the B-3 Term Loan

46.    On June 8, 2022, in a Form 8-K filed with the SEC (the "June 8-K"), Avaya announced a marketing process to raise $500 million aggregate principal amount of new secured debt, which ended up including the $350 million B-3 Term Loan, to prefund the refinancing of the Convertible Notes[3] and for general corporate purposes.  This marketing effort included presentations, SEC filings, and calls with prospective investors, including Plaintiffs.

47.    The June 8-K stated that the financing was being made pursuant to a presentation "shared [] with potential lenders" (the "June 8 Presentation"), which was available on Avaya's investor relations website.  The June 8-K further stated that the financial information "included in the lender presentation replace[d] the prior guidance provided on December 14, 2021."  The June 8-K was signed by Defendant McGrath.

48.    A few days earlier, on June 2, 2022, Defendant McGrath and Avaya's Corporate Treasurer conducted a pre-marketing call for the B-3 Term Loan with an employee of one of the Plaintiffs during which that employee received a lender presentation that was substantively the same as the June 8 Presentation (the "June

---

[3]    The term "Convertible Notes" refers to a $350 million in aggregate principal amount of Convertible 2.25% Senior Notes due June 15, 2023.

2 Presentation," and together with the June 8 Presentation, the "Lender Presentation").

49.    On June 8, 2022, when the B-3 Term Loan publicly launched, Avaya, with the approval of Defendants Chirico and McGrath as Avaya's CEO and CFO, respectively, provided the Lender Presentation to Plaintiffs, which they reviewed. The Lender Presentation listed Defendant McGrath and Avaya's Corporate Treasurer as presenters.  The Lender Presentation also touted Avaya's "Experienced Management Team," which included then-CEO, James Chirico, then-CFO, Kieran McGrath, then-Chief Revenue Officer, Stephen D. Spears, among others.

50.    The Guidance was incorporated into the Lender Presentation.  The Lender Presentation included the following representations, which included certain business segments included in the Guidance:



11



51.    In a June 8, 2022 letter uploaded to a data room for potential lenders, including Plaintiffs, Avaya further represented that (i) "[a]ny management projections, estimates, forecasts and budgets or forward-looking statements included in the Lender Presentation are based on assumptions and estimates **developed by management of [Avaya]** in good faith and **management believes** such assumptions and estimates to be reasonable"; and (ii) the information in the Lender Presentation, "taken as a whole, is complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not materially misleading."

52.    Defendant McGrath, as presenter of the Lender Presentation, liaison with Plaintiffs regarding the loan, and signatory to the May 8-K, and June 8-K, actively participated, or played an important role, in the representations contained therein.  Defendant Chirico, by virtue of his role as CEO in reviewing, approving, and

12

authorizing the release of the Guidance and financial information in the Lender Presentation, actively participated, or played an important role, in the representations contained in the Lender Presentation and May 8-K.

53. The representations in the Lender Presentation and the May 8-K were made with the specific purpose of inducing Plaintiffs to extend the B-3 Term Loan. Based on these representations and Defendants' ongoing failure to correct the materially false disclosures to Plaintiffs, on July 12, 2022, Plaintiffs entered into and funded the B-3 Term Loan twelve days after the close of Avaya's fiscal third quarter (*i.e.*, June 30, 2022).

54. Given Defendants Chirico's and McGrath's roles as high-ranking senior executives with peculiar knowledge and access to Avaya's financial condition, Plaintiffs' reliance on the representations in Lender Presentation and the May 8-K was reasonable and foreseeable. These representations also were material to Plaintiffs' decision to extend the B-3 Term Loan. Without those representations, the Plaintiffs would not have extended the B-3 Term Loan at all, let alone under the terms therein.

## IV.    Avaya's Undisclosed True Financial Condition

55. While Avaya was publicly projecting \$140-\$150 million of Adjusted EBITDA and \$685-\$700 million of revenue for the third quarter of 2022, behind closed doors, Defendants knew it would be "impossible" and a "miracle" for Avaya to meet its projections. And in fact, Defendants learned nearly two weeks before the B-3 Term

13

Loan closed that Avaya had materially underperformed the 3Q22 Guidance. Yet, Defendants disclosed none of this to Plaintiffs prior to closing.

56.    These troubles emerged long before the closing of the B-3 Term Loan. On April 11, 2022, the then Senior Director of Sales Finance emailed Defendant Spears stating that the "number of 415M for Q3" theatre revenue (*i.e.*, revenue for Avaya's largest business segment) "***is scary***."

57.    Spears responded: "***I believe your . . .  concerns are spot on***, ***but I will need to raise this in the much smaller audience***." Presumably, this "smaller audience" meant Avaya's senior management, including Defendants Chirico and McGrath.

58.    On May 11, 2022, a day after Avaya released the 3Q22 Guidance, the frustrated Senior Director of Sales Finance emailed the Global Vice President of Financial Planning and Analysis stating, "I reiterated to [the former Global Vice President of Sales Operations] again ***yesterday*** [that] 80M of judgment in Q3 in ***not acceptable***." The Senior Director of Sales Finance continued, "[a]ll I can do now it [sic] ***yell from the mountain top what the . . . risks are***" and "if ***everyone knows*** we should not load 430M [of theatre revenue] with 80M of revenue judgment in Q3 then how do we change it?"

59.    The Global Vice President of Financial Planning and Analysis responded by confirming that Defendant Chirico (*i.e.*, "Jim") was made aware that the 3Q22 Guidance was based on faulty assumptions: "[t]he walk to $430M [of theatre

14

revenue] was identified and shared with Stephen and [the former Global Vice President of Sales Operations] – and ultimately *made its way to Jim*."

60.    Another member of Avaya's finance team (the Vice President of Sales Finance) responded to the Global Vice President of Financial Planning and Analysis, stating that he agreed with a suggestion "to lower the $430M…down to [a] realistic number" because "the $430M at this stage, with the current visibility we have is *impossible*. (*yes, I am afraid at this stage, the answer is: we do not believe that this number is right.*)"

61.    Therefore, by May 10, 2022, (*i.e.*, the day before the release of the 3Q22 Guidance) Defendant Chirico had already been on notice that the 3Q22 Guidance was unachievable.  It is highly unlikely that the foregoing information reached Defendant Chirico without also reaching Defendant McGrath, who was responsible for managing the finance employees involved in the discussions above and reported to Defendant Chirico.

62.    Nearly a month later, on June 14, 2022, and just days after Avaya launched the marketing of the B-3 Term Loan, the Director of Global Revenue, echoing the concerns of his colleagues from a month prior, emailed the Vice President of Sales Finance regarding the "latest Q3 outlook," stating that it looked "like another tight quarter running to the wire with high volume at the end," and that "*the numbers still don't add all up*, so hopefully another miracle quarter.  I don't think we can afford to miss another quarter like Q1 & Q2."  The Vice President of Sales Finance replied, "*I hate to be the bearer of bad news [], but the delta requires*

15

*more than one miracle*. We will keep pushing, but *the gap is quite substantial*."

All the financial information underlying these statements was known to Defendants when these statements were made.

63.     At the same time Avaya's finance team was sending panicked emails stating it would be "impossible" and a "miracle" to meet the 3Q22 Guidance, Defendants Chirico and McGrath reaffirmed the Guidance in the Lender Presentation that was ultimately provided to the Plaintiffs for the purpose of extending the B-3 Term Loan.

64.     Avaya's finance team's concerns were validated when, on July 1, 2022 (a day after the fiscal third quarter closed), Avaya received a report showing that it had materially underperformed its 3Q22 Guidance (the "Flash Report").

65.     On July 3, 2022, following receipt of the Flash Report, Defendant Spears sent Defendant Chirico a draft email that was directed to Avaya's Board of Directors (the "Board"), acknowledging that Avaya had fallen woefully short of its Q322 Guidance:

> As you may recall, I was bullish on the way the QTR had developed, and even optimistic based upon the forecasts rolled up by each of the regions, that we would land within the guidance given to the capital markets.
>
> ***I am writing to let you know that we had a significant fallout across the globe that will prevent us from achieving the [numbers] I shared just a few short weeks ago***. I am clearly disappointed, and I take accountability for the challenges in execution . . . . ***I am fully cognizant of the strain caused by our inability to execute*** . . .

16

66.     The draft email ascribed the erroneous guidance to "significant gaps in execution and leadership," "unprecedented worsening in the channel," "significant and direct fall out in our International and Latin America businesses," and a shift in business "at an accelerated pace to the cloud."

67.     On July 4, 2022, Chirico forwarded this draft to the VP of Corporate Development.  And the next day, July 5, 2022, the VP of Corporate Development circulated to Chirico an updated draft email that was meant to be sent to Avaya's Board.  On information and belief, Defendants intentionally concealed this draft email from Avaya's Board.

68.     Therefore, over a week before the B-3 Term Loan closed, Defendants Chirico and Spears knew that the Guidance was materially false, inaccurate, and misleading because its projections would be impossible to meet.  Defendants Chirico and Spears did nothing to correct these false statements.

69.     Moreover, given Defendant McGrath's peculiar knowledge of Avaya's financial condition, there can be no legitimate doubt that he was also aware that the Guidance was materially false, inaccurate, and misleading.  McGrath served as Avaya's Chief Financial Officer at all relevant times, including prior to and after the B-3 Term Loan closed.  As CFO, he was responsible for Avaya's internal and external financial reporting and forecasting.

70.     To this end, he reviewed, approved, and signed off on the May 8-K, which included the 3Q22 Guidance, and the June 8-K, which annexed the Lender

17

Presentation that marketed the loan and also incorporated the 3Q22 Guidance. He also participated in calls with Plaintiffs where he affirmed the 3Q22 Guidance.

71. Given McGrath's role as CFO and point person interfacing with Plaintiffs regarding the loan, including 3Q22 Guidance, there can be no sincere dispute that McGrath received and was aware of the Flash Report showing that Avaya had materially underperformed the 3Q22 Guidance, and, by extension, would necessarily materially underperform the FY22 Guidance. Taken together, this provides a strong inference that McGrath was aware that the 3Q22 Guidance was materially false, inaccurate, and misleading.

72. Defendants had a duty to impart truthful and accurate information to Plaintiffs, but they said nothing.

## V.    **Defendants' Misrepresentations are Exposed**

73. On July 28, 2022, ***only two weeks after the B-3 Term Loan closed***, Avaya released preliminary 3Q22 financial results that simultaneously (i) slashed its third quarter adjusted EBITDA guidance by 65% to $50-$55 million and its third quarter revenue by nearly 20% to $575-$580 million and (ii) announced the termination of its CEO, Defendant Chirico.

74. Avaya also announced that its prior earnings guidance (*i.e.*, the Lender Presentation and May 8-K) "should no longer be relied upon" even though that is exactly what Defendants intended Plaintiffs to do in extending their B-3 Term Loan. During its August 9, 2022 earnings call, Avaya explained that its earnings miss was due to (i) customers signing shorter-term contracts or renewing maintenance

18

agreements instead of signing long-term software subscription agreements, and (ii) CapEx license deals that were either delayed into the fourth quarter, downsized, or lost.

75.     Avaya's explanation and statements made in its third quarter Form NT 10-Q filed with the SEC (as required when a firm is unable to file its Form 10-Q in a timely manner) demonstrate that the circumstances of its earnings miss occurred "during the third quarter" before the B-3 Term Loan closed.  Moreover, through the Flash Report, Defendants knew that Avaya had already materially underperformed its projections before the end of the fiscal quarter on June 30, 2022, and that the revenue and EBITDA misses were not attributable to accounting adjustments made after the quarter ended.

76.     On August 9, 2022, Avaya further disclosed that (i) there was substantial doubt about Avaya's ability to continue as a going concern (that is, a potential inability to pay its debts over the next year); (ii) Avaya's Audit Committee had commenced an internal investigation into the circumstances surrounding its financial results for the third quarter of fiscal year 2022; and that (iii) its Audit Committee had commenced an internal investigation concerning material weaknesses in internal controls raised by a whistleblower.

77.     The completeness and accuracy of the Guidance and the truthfulness of Defendants' representations regarding Avaya's financial condition were material to Plaintiffs' decision to enter into the B-3 Term Loan.

19

78.    Plaintiffs, who relied on the Lender Presentation, the May 8-K, and other oral material representations made by Defendants Chirico and McGrath before the closing of the B-3 Term Loan, would not have entered into the B-3 Term Loan at all, let alone on the terms therein, had they known of Avaya's true financial condition, which Defendants intentionally concealed from Plaintiffs and prevented them from discovering in order to induce them to enter into the loan.

79.    Defendants knew or should have known that the Guidance, when presented to Plaintiffs, was false, unreasonable, and not based on Avaya's actual financial condition, and that Avaya could not meet such guidance based on events that had already occurred.  Indeed, Defendants' misrepresentations were not based on projections; rather, Defendants' misrepresentations were based on historical financial performance because *Avaya's third quarter ended 12 days before the B-3 Term Loan was funded*, by which time Defendants knew for certain the Guidance would be impossible to attain as a matter of fact.  Furthermore, the circumstances of the earnings miss occurred "during" the quarter, which the third quarter NT 10-Q explicitly confirms.

80.    A month earlier, on July 3, 2022 (yet again, prior to the B-3 Term Loan closing), a whistleblower emailed the Board, including Defendant Chirico, alleging fraud by senior management.  The whistleblower was a "senior and longtime employee of Avaya" who felt compelled "to bring [] attention to the dire situation Avaya is in for the past 6 quarters."  The whistleblower considered first alerting Avaya's compliance team, but "knowing that [any message] will get swept under the

20

carpet by one of Jim [Chirico] . . . goons," the whistleblower opted to email Avaya's Board instead.

81.    The email called Defendant McGrath "one of the most overpaid and overrated CFOs in the industry, who's *only forte is coming up with lies and fabrications in front of the street and the analysts*."

82.    The whistleblower also raised concerns over "fake EBITDA numbers" due to Defendant Chirico's "blatant financial engineering," conflicted transactions involving Defendant Chirico, Defendant Spears being "the laughing stock of the company" due to hiring mishaps under his watch, and "Jim [Chirico] and his mafia."

83.    Again, none of this information was communicated to Plaintiffs prior to the close of the B-3 Term Loan.

## VI.    Avaya Files Chapter 11

84.    Defendants fraudulently misrepresented and concealed material information, which had the actual and intended effect of convincing Plaintiffs that Avaya was a viable company with more than enough cash to repay the B-3 Term Loan.

85.    Instead, Avaya collapsed into bankruptcy just months after the loan closed. On February 14, 2023, Avaya, Inc. and twenty affiliated entities filed petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court of the Southern District of Texas. *See In re Avaya Inc.*, *et al.*, No. 23-90088 (Bankr. S.D. Tex. filed February 14, 2023).

21

86.     According to Avaya's "First Day" declaration submitted to the Bankruptcy Court, in early 2022, Avaya's revenue began to decrease, which was driven by a decline in the CapEx business and delayed revenue generation from the cloud investments.  These headwinds were compounded in the second half of fiscal year 2022 by a deceleration in the growth of Avaya's subscription revenue.

87.     These challenges were exacerbated by Avaya's announcement on July 28, 2022 that its third quarter results were significantly below prior guidance (*i.e.*, its third quarter revenue and EBITDA guidance missed by 20% and 65%, respectively).

88.     The decline in revenue, EBITDA, and resulting strain on Avaya's cash balance due to significant operating losses and fast approaching debt maturities, led to substantial doubts that Avaya could continue as a going concern.

## FIRST CAUSE OF ACTION
### (Against Defendants Chirico and McGrath For Fraudulent Misrepresentation)

89.     Plaintiffs repeat and re-allege paragraphs 1 through 88 hereof as though fully set forth herein.

90.     To induce Plaintiffs to enter into the B-3 Term Loan, Defendants Chirico and McGrath knowingly made misrepresentations regarding Avaya's financial condition in the Lender Presentation, May 8-K, and orally, that Avaya projected $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

91.     At the time Defendants Chirico and McGrath made the foregoing representations, they knew or recklessly disregarded the fact that they were false or,

22

at a minimum, incomplete and misleading without the disclosure of additional information.

92.    Specifically, after Defendants Spears and Chirico received the Flash Report, they circulated a draft email to the Board amongst themselves and David Austin, acknowledging that Avaya had significantly underperformed its 3Q22 Guidance.  Critically, the draft email to the Board was circulated prior to the close of the B-3 Term Loan but was never sent to the Board.

93.    Moreover, given McGrath's role as CFO and role interfacing with Plaintiffs regarding the loan, there can be no sincere dispute that McGrath received and was aware of the Flash Report showing that Avaya had materially underperformed the 3Q22 Guidance, and, by extension, would necessarily materially underperform the FY22 Guidance.

94.    Defendants Chirico's and McGrath's misrepresentations were material to Plaintiffs' decision to provide their portion of the B-3 Term Loan.  Had Plaintiffs known, for example, that achieving the 3Q22 Guidance would be "impossible" and a "miracle" or that Avaya had in fact materially unperformed the 3Q22 Guidance prior to the closing of the loan, Plaintiffs would not have entered into the B-3 Term Loan at all, let alone on the terms therein.

95.    The Lender Presentation, which incorporated the 3Q22 Guidance, was prepared and delivered to Plaintiffs at the direction of Defendants Chirico and McGrath for the express purpose of inducing their reliance to enter into and fund the B-3 Term Loan.

23

96.     Plaintiffs reasonably relied on Defendants Chirico's and McGrath's misrepresentations in deciding to enter into the B-3 Term Loan and had no reason to suspect that the representations might be false.

97.     Defendants Chirico and McGrath also knew that Plaintiffs would have no reasonable way to fully investigate or otherwise discover the falsity of these statements even with the exercise of due diligence prior to the close of the B-3 Term Loan because Chirico and McGrath hid the information from anyone they could, including the Board.

98.     Defendants Chirico and McGrath, as officers and executives of Avaya, owed Plaintiffs a duty and thus can and should be held liable to Plaintiffs because they were actively involved in and/or played an important role in the representations contained in the Lender Presentation and May 8-K.

99.     Defendant McGrath, by virtue of him reaffirming the 3Q22 Guidance to Plaintiffs, being a presenter of the Lender Presentation, and signatory to the May 8-K, and June 8-K, actively participated, or played an important role, in the representations contained therein, including that Avaya projected $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

100.    Defendant Chirico, by virtue of his role as CEO in reviewing and approving the 3Q22 Guidance and financial information in the Lender Presentation, actively participated, or played an important role, in the representations contained in the Lender Presentation and May 8-K, including that Avaya projected $140-$150

24

million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

101.   As a direct and proximate result of the foregoing, Plaintiffs have been damaged and are entitled to recover compensatory damages in an amount to be determined at trial of at least $135 million.

102.   Defendants Chirico's and McGrath's conduct was intentional, fraudulent, oppressive, malicious, and done with reckless disregard of its consequences, entitling Plaintiffs to an award of exemplary damages under North Carolina law.

## SECOND CAUSE OF ACTION
### (Against All Defendants For Fraudulent Omission)

103.   Plaintiffs repeat and re-allege paragraphs 1 through 88 hereof as though fully set forth herein.

104.   Defendants knew and intentionally failed to disclose to Plaintiffs information concerning the financial condition of Avaya, which was not known to, or reasonably discoverable by, Plaintiffs, including that it would be impossible for Avaya to achieve the 3Q22 Guidance or that Avaya had in fact materially unperformed the 3Q22 Guidance prior to the closing of the loan.

105.   Specifically, Defendant Spears "believed [] concerns" that the "number of 415M for Q3" theatre revenue (*i.e.*, revenue for Avaya's largest business segment) "*[was] scary*."

106.   After Defendants Spears and Chirico received the Flash Report, they circulated a draft email to the Board amongst themselves and David Austin,

25

acknowledging that Avaya had significantly underperformed its Q322 Guidance. Critically, the draft email to the Board was circulated prior to the close of the B-3 Term Loan but was never sent to the Board.

107.    Moreover, given McGrath's role as CFO and role interfacing with Plaintiffs regarding the loan, there can be no sincere dispute that McGrath received and was aware of the Flash Report showing that Avaya had materially underperformed the 3Q22 Guidance, and, by extension, would necessarily materially underperform the FY22 Guidance.

108.    Defendants had a duty to disclose to Plaintiffs their knowledge concerning the financial condition of Avaya because (i) Defendants took affirmative steps to conceal from Plaintiffs, and (ii) Defendants had exclusive knowledge, which Plaintiffs were in no position to discover, of:  the fact that Avaya had no chance of meeting the 3Q22 Guidance or that Avaya had in fact materially unperformed the 3Q22 Guidance prior to the closing of the B-3 Term Loan; and (iii) Defendants were actively involved in and/or played an important role in the representations contained in the Lender Presentation and May 8-K.

109.    Moreover, when Plaintiffs asked Defendant McGrath, he reaffirmed the 3Q22 Guidance and other information included in the Lender Presentation.

110.    Plaintiffs reasonably relied on Defendants' misrepresentations and material omissions and had no reason to believe that the Defendants had knowingly failed to disclose information concerning the financial condition of Avaya.  Before the signing of the B-3 Term Loan, Plaintiffs were in no position to discover the true

26

financial condition of Avaya even with the exercise of due diligence because Defendants hid the information from anyone they could, including the Board.

111.    Had Plaintiffs known, for example, that achieving the 3Q22 Guidance would be "impossible" and a "miracle" or that Avaya had in fact materially unperformed the 3Q22 Guidance prior to the closing of the loan, Plaintiffs would not have entered into the B-3 Term Loan at all, let alone on the terms therein.

112.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged and are entitled to recover compensatory damages in an amount to be determined at trial of at least $135 million.

113.    Defendants' conduct was intentional, fraudulent, oppressive, malicious, and done with reckless disregard of its consequences, entitling Plaintiffs to an award of exemplary damages under North Carolina law.

## THIRD CAUSE OF ACTION
### (Against Defendants Chirico and McGrath For Negligent Misrepresentation)

114.    Plaintiffs repeat and re-allege paragraphs 1 through 88 hereof as though fully set forth herein.

115.    Defendants Chirico and McGrath made material misrepresentations concerning Avaya's financial condition, or, at the very least, made those representations without reasonable grounds for believing such statements to be true. These misrepresentations were in the Lender Presentation, May 8-K, and communicated orally, stating that Avaya projected $140-$150 million of Adjusted

27

EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

116.    At the time that Defendants Chirico and McGrath made the foregoing representations, they knew or should have known these statements were inaccurate and misleading based on Defendants' peculiar knowledge of Avaya's financial condition. As such, Defendants Chirico and McGrath had a duty to impart correct and truthful information on Plaintiffs.

117.    Specifically, after Defendants Spears and Chirico received the Flash Report, they circulated a draft email to the Board amongst themselves and David Austin, acknowledging that Avaya had significantly underperformed its 3Q22 Guidance.  Critically, the draft email to the Board was circulated prior to the close of the B-3 Term Loan but was never sent to the Board.

118.    Moreover, given McGrath's role as CFO and role interfacing with Plaintiffs regarding the loan, there can be no sincere dispute that McGrath received and was aware of the Flash Report showing that Avaya had materially underperformed the 3Q22 Guidance, and, by extension, would necessarily materially underperform the FY22 Guidance.

119.    Defendants Chirico and McGrath, as officers and executives of Avaya, also owed Plaintiffs a duty and thus can and should be held liable to Plaintiffs because they were actively involved in and/or played an important role in the representations contained in the Lender Presentation and May 8-K.

28

120.    Defendant McGrath, by virtue of him reaffirming the 3Q22 Guidance to Plaintiffs, being a presenter of the Lender Presentation, and signatory to the May 8-K, and June 8-K, actively participated, or played an important role, in the representations contained therein, including that Avaya projected $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

121.    Defendant Chirico, by virtue of his role in reviewing and approving the 3Q22 Guidance and financial information in the Lender Presentation, actively participated, or played an important role, in the representations contained in the Lender Presentation and May 8-K, including that Avaya projected $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue for the third quarter of 2022 (*i.e.*, the 3Q22 Guidance).

122.    Defendants Chirico and McGrath failed to exercise reasonable care or competence in communicating the information in the Lender Presentation and, May 8-K, and in oral representations regarding the 3Q22 Guidance to Plaintiffs.

123.    The Lender Presentation, which incorporated the 3Q22 Guidance, was prepared and delivered to Plaintiffs for the express purpose of inducing their reliance to enter into and fund the B-3 Term Loan.

124.    Plaintiffs reasonably relied on Defendants Chirico and McGrath's misrepresentations in deciding to enter into the B-3 Term Loan and had no reason to suspect that Defendants' representations in the Lender Presentations might be false.

125. Defendants Chirico and McGrath also knew that Plaintiffs would have no reasonable way to fully investigate or otherwise discover the falsity of these statements even with the exercise of due diligence prior to the closing of the B-3 Term Loan because Defendants hid the information from anyone they could, including the Board.

126. As a direct and proximate result of the foregoing, Plaintiffs have been damaged and are entitled to recover compensatory damages in an amount to be determined at trial of at least $135 million.

127. Defendants Chirico's and McGrath's conduct was intentional, fraudulent, oppressive, malicious, and done with reckless disregard of its consequences, entitling Plaintiffs to an award of exemplary damages under North Carolina law.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

a. against Defendants Chirico and McGrath on Plaintiffs' first and third causes of action, awarding Plaintiffs compensatory damages in an amount to be determined at trial;

b. against all Defendants on Plaintiffs' second cause of action, awarding Plaintiffs compensatory damages in an amount to be determined at trial;

c. punitive and special damages in the maximum amount permitted by law;

d. interest, costs, and expenses incurred in this action;

e. a jury trial on all matters that may be tried to a jury; and

f. such other and further relief as the Court deems just and proper.

Dated: October 26, 2023        PARKER POE ADAMS & BERNSTEIN LLP

/s/  Melanie Black Dubis
Melanie Black Dubis
NC State Bar No. 22027
Andrew P. Tabeling
NC State Bar No. 58243
301 Fayetteville Street
Suite 1400
Raleigh, NC 27601
T: 919-890-4158  |  F: 919-834-4564
melaniedubis@parkerpoe.com
andytabeling@parkerpoe.com

GLENN AGRE BERGMAN & FUENTES LLP

/s/  Andrew K. Glenn
Andrew K. Glenn (Pro Hac Admission Forthcoming)
Trevor J. Welch (Pro Hac Admission Forthcoming)
Marissa E. Miller (Pro Hac Admission Forthcoming)
George L. Santiago (Pro Hac Admission Forthcoming)
Eric J. Carlson (Pro Hac Admission Forthcoming)

1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
T: 212-970-1600
aglenn@glennagre.com
twelch@glennagre.com
memiller@glennagre.com
gsantiago@glennagre.com
ecarlson@glennagre.com

*Attorneys for Plaintiffs*

31