# EXHIBIT E

**Exhibit 5**

**Governance Term Sheet**

*Execution Version*

**AVAYA INC., ET AL.**

**GOVERNANCE TERM SHEET**

This term sheet (the "Governance Term Sheet") sets forth certain preliminary material terms in respect of the corporate governance of New Avaya that would be reflected in the Governance Documents, including the certificate of incorporation, bylaws, Registration Rights Agreement (as defined below) and Stockholders Agreement (as defined below) of New Avaya, subject in all respects to the terms of the Restructuring Support Agreement. This Governance Term Sheet has been prepared for discussion purposes only and is non-binding, but shall serve as the basis for further negotiations regarding definitive agreements.

Without limiting the generality of the foregoing, this Governance Term Sheet is subject in all respects to the negotiation, execution, and delivery of definitive documentation acceptable to the Company Parties and the Ad Hoc Groups or the Required Consenting Stakeholders, as applicable. This Governance Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Governance Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Until publicly disclosed upon the prior written agreement of the Company Parties and the Ad Hoc Groups, this Governance Term Sheet shall remain strictly confidential and may not be shared with any other party or person (other than members of the Ad Hoc Groups that have signed confidentiality agreements with HoldCo) without the consent of the Ad Hoc Groups and the Company Parties.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet and the Restructuring Support Agreement, as applicable.

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.

| **General** | New Avaya shall be a Delaware corporation managed by a board of directors (the "Board"), which will be responsible for overseeing the operation of the Reorganized Debtors' business. New Avaya shall be managed on a day-to-day basis by its Chief Executive Officer and other senior executive officers with oversight from the Board. |
|---|---|
| **Common Shares** | The Governance Documents shall provide that the New Equity Interests of New Avaya will be evidenced by one class of common stock, par value $0.01 per share (each such share, a "Common Share" and each holder thereof, a "Holder"). |
| **Stock Exchange Delisting; SEC Deregistration** | HoldCo shall take all necessary or advisable steps to delist its common stock from the New York Stock Exchange (the "NYSE") and to |

| | |
|---|---|
| | deregister under the Exchange Act as promptly as practicable in compliance with SEC rules.[1] |
| **Selection Committee** | A board selection committee (the "Selection Committee") shall be formed initially consisting of one representative from each of Apollo[2], Brigade[3], Nuveen[4] and Sculptor[5]. |
| **Initial Board Composition** | As of the Plan Effective Date, the Board shall initially consist of nine directors as follows:<br><br>• The Chief Executive Officer shall serve as a director.<br>• Apollo shall have the right to appoint three directors, one of whom must be independent. Such directors appointed by Apollo pursuant to Apollo's appointment rights shall be referred to as the "Apollo Directors".<br>• Brigade shall have the right to appoint one director. Such director appointed by Brigade pursuant to Brigade's appointment right shall be referred to as the "Brigade Director".<br>• Nuveen shall have the right to appoint one director. Such director appointed by Nuveen pursuant to Nuveen's appointment right shall be referred to as the "Nuveen Director".<br>• The Selection Committee shall have the right to appoint three independent directors, who shall, for purposes of the initial Board, be unanimously appointed by the Selection Committee. Such independent directors appointed by the Selection Committee shall be referred to as the "Selection Committee Directors". Following the initial term, the |

---

[1] These steps shall include:
- HoldCo shall file post-effective amendments to terminate all currently effective Securities Act registration statements (the "Post-Effective Amendments"), and the Post-Effective Amendments shall become effective prior to the filing of HoldCo's Annual Report on Form 10-K for the fiscal year ended September 30, 2022.
- By no later than 15 calendar days after the Petition Date, HoldCo or the NYSE shall file a Form 25 (the "Form 25") with the Securities and Exchange Commission (the "SEC") to delist the common stock of HoldCo from the NYSE and deregister such common stock from Section 12(b) of the Exchange Act.
- By no later than 10 days after the filing of the Form 25 (or if such date is not a business day, the next business day), HoldCo shall file a Form 15 notifying the SEC of the suspension of HoldCo's duty to file reports under Section 15(d) of the Exchange Act.

[2] As used in this Term Sheet, "Apollo" shall mean Apollo Global Management, Inc. and/or certain of its affiliates, including but not limited to Apollo Capital Management X, LLC, Apollo Advisors X, L.P. and Blackcomb Debt Holdings, L.P.

[3] As used in this Term Sheet, "Brigade" shall mean Brigade Capital Management, L.P. and/or certain of its affiliates.

[4] As used in this Term Sheet, "Nuveen" shall mean Nuveen Asset Management, LLC and/or certain of its affiliates, including but not limited to Teachers Advisors, LLC.

[5] As used in this Term Sheet, "Sculptor" shall mean Sculptor Capital LP, solely on behalf of its and its affiliates' managed accounts.

2

<table>
<tr><td></td><td>Selection Committee Directors shall be appointed by agreement of at least three of the four members of the Selection Committee. In the event that a member of the Selection Committee ceases to be a member of the Selection Committee in accordance with this Governance Term Sheet, then the appointment of Selection Committee Directors shall be by agreement at least two of the three members of the Selection Committee. On the 4th anniversary of the Plan Effective Date, the Selection Committee shall be disbanded and the Selection Committee Directors shall be elected by vote of holders of a majority of the Common Shares.<br><br>Other than the Chief Executive Officer, none of the members of HoldCo's existing board of directors may be selected for New Avaya's initial Board.</td></tr>
<tr><td><strong>Ongoing Board Composition</strong></td><td>The term for each director shall be two years for the initial term and one year for each term thereafter. The Board shall not be staggered.<br><br>The scenarios below assume certain holdings levels of each of Apollo, Brigade and Nuveen but do not include all permutations of holdings levels of each of Apollo, Brigade and Nuveen. Each of Apollo, Brigade and Nuveen shall be entitled to its respective director appointment rights at the relative holding thresholds described below regardless of the ownership levels of other parties.<br><br><ul><li>The individual then serving as Chief Executive Officer shall serve as a director at all times.</li><li>If at any time following twelve (12) months after the Plan Effective Date Apollo holds at least 50% and Brigade and Nuveen each hold at least 5% of the Common Shares issued and outstanding (excluding equity issuances under New Avaya's Management Incentive Plan or similar management equity issuances and other specified excluded issuances (collectively, "<u>Excluded Issuances</u>")):<ul><li>There shall be five Apollo Directors, one of whom must be independent.</li><li>There shall be one Brigade Director.</li><li>There shall be one Nuveen Director.</li><li>There shall be one Selection Committee Director.</li></ul></li><li>If at any time following twelve (12) months after the Plan Effective Date Apollo holds at least 35% but less than 50% and Brigade and Nuveen each hold at least 5% of the Common Shares issued and outstanding (excluding Excluded Issuances):<ul><li>There shall be four Apollo Directors, one of whom must be independent.</li><li>There shall be one Brigade Director.</li></ul></li></ul></td></tr>
</table>

3

- o There shall be one Nuveen Director.

- o There shall be two Selection Committee Directors.

- If at any time Apollo holds at least 17.5% but less than 35% and Brigade and Nuveen each hold at least 5% of the Common Shares issued and outstanding (excluding Excluded Issuances):

  - o There shall be three Apollo Directors, one of whom must be independent.

  - o There shall be one Brigade Director.

  - o There shall be one Nuveen Director.

  - o There shall be three Selection Committee Directors.

- If at any time Apollo holds at least 10% but less than 17.5% and Brigade and Nuveen each hold at least 5% of the Common Shares issued and outstanding (excluding Excluded Issuances):

  - o There shall be two Apollo Directors.

  - o There shall be one Brigade Director.

  - o There shall be one Nuveen Director.

  - o There shall be four Selection Committee Directors.

- If at any time Apollo holds at least 5% but less than 10% and Brigade and Nuveen each hold at least 5% of the Common Shares issued and outstanding (excluding Excluded Issuances):

  - o There shall be one Apollo Director.

  - o There shall be one Brigade Director.

  - o There shall be one Nuveen Director.

  - o There shall be five Selection Committee Directors.

- If at any time any of Apollo, Brigade or Nuveen hold less than 5% of the Common Shares issued and outstanding (excluding Excluded Issuances), there shall cease to be an Apollo Director, a Brigade Director or a Nuveen Director, respectively. Such director seat(s) shall be filled by the majority of the Board or by the Holders of a majority of the Common Shares issued and outstanding (excluding Excluded Issuances) and subject to the vacancy provisions set forth below. In addition, if at any time any of Apollo, Brigade, Nuveen, or Sculptor hold less than 4.5% of the Common Shares issued and outstanding (excluding Excluded Issuances), such Holder shall no longer be a member of the Selection Committee.

Each of Apollo, Brigade, Nuveen and the Selection Committee shall endeavor to select directors with an appropriate skillset. The composition of the Board will consider diversity guidelines and corporate governance best practices. For the avoidance of doubt, in no

4

| | event shall the foregoing limit any of Apollo, Brigade, Nuveen and the Selection Committee's right to select any individual as a director. |
|---|---|
| | The Board appointment rights of Apollo, Brigade and Nuveen described above shall continue after the date of an IPO, subject to the relevant stock exchange rules and consultation with the underwriters of the initial public offering, if any. |
| | For the avoidance of doubt, none of Apollo, Brigade, Nuveen or Sculptor will have a veto right over the appointment or removal of any directors (other than their own appointed director (or directors, in Apollo's case)), or over the approval of New Avaya's budget, business plan or strategic investments. |
| **Chair of the Board** | The initial Chair of the Board shall be determined unanimously by the Selection Committee (and shall not be the Chief Executive Officer). Following the initial board term, the Chair of the Board shall be determined by a majority vote of the Board; *provided,* that the Chair of the Board shall not also serve as the Chief Executive Officer nor be an employee of a stockholder of New Avaya. |
| **Committees of the Board** | As long as Apollo has the right to appoint at least one Apollo Director, Apollo shall have the right to appoint an Apollo Director as a member of any committees established by the Board. Other members of such committees shall be elected by a majority of the directors. No committee shall consist of a majority of Apollo Directors that are employed by Apollo. |
| **Independence Standard** | Directors determined to be independent directors shall be independent, with industry experience (or be an audit committee financial expert) and shall not be 'professional directors' or employees of stockholders of New Avaya. |
| **Fiduciary Duties** | Default Delaware corporate law fiduciary duties shall apply to the Board and officers of New Avaya and shall not be waived. |
| **Preemptive Rights; Equity Issuances** | Prior to an IPO,[6] Holders of 2%[7] or more of Common Shares issued and outstanding shall have the right to participate on a proportionate basis (based on the Common Shares held by all such 2% Holders, and to the |

---

[6] An IPO shall constitute any of (i) an initial public offering of Common Shares pursuant to an effective registration statement under the Securities Act, (ii) a single transaction or series of related transactions by a merger, acquisition or other business combination involving New Avaya and a publicly traded special purpose acquisition company or other similar entity in which a class of capital stock of the special purpose acquisition company or other similar entity (or its successor) is publicly traded on a national securities exchange or (iii) any other transaction or series of related transactions following consummation of which the Common Shares are listed and traded on an established United States or non-United States securities exchange; provided that an IPO shall not include any issuance of Common Shares solely to existing security holders or employees or consultants of New Avaya or it subsidiaries on Form S-4, Form F-4 or Form S-8 (or any successor form adopted by the SEC or any comparable form adopted by any foreign securities regulators).

[7] For the avoidance of doubt, the holdings of New Equity Interests held by all affiliated funds or accounts, or funds or accounts under common management, shall be aggregated for purposes of determining whether any percentage holding threshold in this term sheet has been met.

| | |
|---|---|
| | extent any Holder entitled to preemptive rights does not exercise its rights in full, the 2% Holders that fully exercised their preemptive rights shall be entitled to subscribe for the interests in respect of which the rights were not exercised) in any equity issuance (or issuance of any other security or instrument convertible into equity) by New Avaya or any of its subsidiaries (subject to customary exceptions). Preemptive rights shall be assignable by 2% Holders to affiliated parties. |
| | Notwithstanding the foregoing, New Avaya or any of its subsidiaries may issue equity (or any other security or instrument convertible into equity) without first offering 2% Holders the opportunity to participate in such issuance so long as each 2% Holder is provided the opportunity to purchase its allocated portion within sixty (60) days after consummation of the sale of equity (or any other security or instrument convertible into equity) on the same terms and conditions (including price), which offer shall be held open for ten (10) business days following delivery of a preemptive rights notice. |
| | For eighteen (18) months following the Plan Effective Date, if the liquidity (including any lines of credit) of New Avaya is greater than $450 million, New Avaya may issue equity (or any other security or instrument convertible into equity) only upon the approval of a majority of the independent directors on the Board. |
| **Strategic Alternatives** | Following twenty-four (24) months after the Plan Effective Date, the Board of New Avaya shall take commercially reasonable efforts to commence a process to confidentially evaluate and consider the undertaking of an IPO. |
| | Beginning on the 4th anniversary of the Plan Effective Date, Holders collectively holding at least a majority of the total issued and outstanding Common Shares (excluding Excluded Issuances) shall have the right to cause the Board of New Avaya to undertake a process to confidentially consider strategic alternatives; provided, that (x) no Holder shall be required to sell Common Shares in a secondary offering, (y) in the case of any direct listing or primary offering IPO, the majority of the Board also approves the direct listing or primary offering IPO, as applicable, and (z) after the 4th anniversary of the Plan Effective Date but prior to the 5th anniversary of the Plan Effective Date, the majority of the Board may elect to delay an IPO in its business judgment. |
| **Tag Rights** | Prior to an IPO, each Holder of 5% or more of the issued and outstanding Common Shares shall have customary tag rights on a transfer by one or more Holders of collectively 20% or more of the total issued and outstanding Common Shares, in one or more transactions. |
| **Apollo Consent Rights in Connection with Certain Changes** | As long as Apollo holds at least 25% of the Common Shares issued and outstanding (excluding Excluded Issuances), and prior to a Qualified |

| | |
|---|---|
| | IPO[8] the approval of Apollo in its capacity as a stockholder will be required for the following actions:<br><br>• the incurrence of debt in excess of $100 million;<br>• the payment of any dividend on the Common Shares or other distribution on New Avaya securities;<br>• a transaction that would result in a change-of-control, including any sale of New Avaya (whether by sale of all or substantially all assets, merger or otherwise); and<br>• any acquisitions or divestitures for a fair value in excess of $100 million.<br><br>As long as Apollo holds at least 25% of the Common Shares issued and outstanding (excluding Excluded Issuances), and prior to a Qualified IPO, the Board shall consult with Apollo in connection with the termination or hiring of a Chief Executive Officer, and Apollo shall be entitled to recommend candidates to the Board for consideration in connection with any hiring process for a Chief Executive Officer.<br><br>Prior to the consummation of an IPO, New Avaya may not take any of the following actions without the consent of Holders holding at least 75% of the Common Shares of New Avaya issued and outstanding (excluding Excluded Issuances):<br><br>• non-pro rata redemptions or reclassifications of equity (other than redemptions or repurchases of departing employees or other service providers); or<br>• the declaration of dividends or other distributions other than on a pro rata basis. |
| **Corporate Opportunities** | The Governance Documents shall provide for the renunciation of New Avaya's interest in business opportunities that are presented to directors or Holders, in each case, other than such directors or Holders that are employees, consultants or officers of New Avaya (and the renunciation shall apply to any Chair of the Board that is not otherwise an employee, consultant or officer of New Avaya).<br><br>This renunciation shall not limit the confidentiality obligations of Holders under the Stockholders Agreement. |
| **Affiliate Transactions** | Any Affiliate Transaction shall be approved by a majority of the independent directors on the Board (excluding fund employee directors, if any, appointed by an entity with Board appointment rights with respect to any Affiliate Transaction involving such affiliate); provided, that any transaction involving a sale of New Avaya, (or all or substantially all of its subsidiaries, including by merger) to an |

---

[8] "Qualified IPO" means a firm commitment underwritten initial public offering of Common Shares on a recognized national securities exchange with aggregate gross proceeds of at least $375 million.

7

| | |
|---|---|
| | affiliate shall be approved by Holders collectively holding at least a majority of the total issued and outstanding Common Shares held by unaffiliated Holders. |
| | Any Affiliate Transaction involving an acquisition of or divestiture to an affiliate of New Avaya with a value in excess of $350 million shall be approved by a majority of the disinterested directors on the Board. |
| | "<u>Affiliate Transaction</u>" means any transaction (including issuances of equity or debt) involving New Avaya or any of its subsidiaries, on the one hand, and any 5% or larger Holder or any affiliated entity of such Holder (including any entity where such Holder has voting control of 20% or more) on the other hand; <u>provided</u> that an "Affiliate Transaction" shall not include (i) a transaction or series of related transactions involving less than $2,000,000 in aggregate payments if in the ordinary course of business consistent with past practice with a portfolio company of such Holder or its affiliates on an arms-length basis (i.e., terms no less favorable in the aggregate to New Avaya or its subsidiaries than could be obtained from an unaffiliated third party) and (ii) debt financings with respect to which all Holders of Common Shares are offered the opportunity to participate on a pro rata basis on the same terms (including with respect to price) and financings in accordance with preemptive rights set forth in this Governance Term Sheet. |
| **Amendments** | The Governance Documents shall not be amended without the approval of a majority of the Board and Holders of a majority of the issued and outstanding Common Shares. Amendments to Drag Rights, Tag Rights, Preemptive Rights, Registration Rights, Affiliate Transactions, Fiduciary Duties and amendment provisions, or any amendments which would impose new limitations or conditions on transferability of Common Shares (other than contractual lock-up agreements) shall require the approval of 75% of the Holders of Common Shares; it being understood that amendments to Affiliate Transactions and Fiduciary Duties in a manner favorable to affiliates or to officers and directors of New Avaya shall also be approved by a majority of the Holders of Common Shares excluding affiliates at the time. |
| | Any amendments that materially disproportionately and adversely affect rights specified in this term sheet of one or more Holders relative to the impact on one or more other Holders (or that disproportionately benefit one or more Holders relative to the rights of other Holders), shall require approval of a majority of the disproportionately adversely affected Holders. |
| **Board Vacancies** | Upon the resignation, removal for cause, death or incapacity of each of an Apollo Director, Brigade Director, Nuveen Director or Selection Committee Director, the vacancy resulting from such resignation, removal for cause, death or incapacity may be filled, in each case until the next annual meeting of Holders, by each of Apollo, Brigade, |

| | Nuveen and the Selection Committee, respectively, as long as each has rights to appoint such Apollo Director, Brigade Director, Nuveen Director or Selection Committee Director, and if there are no such rights, then by a majority of the remaining directors. |
|---|---|
| **Stockholder Action by Written Consent** | Holders may act by written consent with respect to any matter that may be acted upon by such Holders at an annual or special meeting. |
| **Special Meetings** | Holders of at least a majority of the issued and outstanding Common Shares shall have the ability to call special meetings of Holders. |
| **Stockholders Agreement** | The Plan shall provide that the Holders and New Avaya will be deemed to have entered into a stockholders agreement (the "Stockholders Agreement").<br><br>The Stockholders Agreement, in addition to reflecting the terms in this Governance Term Sheet, shall contain customary provisions regarding confidentiality of New Avaya information. |
| **Information Rights** | The Stockholders Agreement shall provide that at any time that New Avaya is not required to file periodic and current reports with the SEC, New Avaya will make available to Holders and bona fide prospective purchasers of Common Shares, on a password protected website, subject to customary confidentiality arrangements:<br><br>• all financial information provided to, or that is required to be provided to, lenders under the Exit ABL Facility Credit Agreement (as defined in the Plan) and the Exit Term Loan Facility Credit Agreement (as defined in the Plan), with such rights surviving the repayment or refinancing of such debt facilities; and<br>• the information required pursuant to Rule 144(c)(2) under the Securities Act, Rule 144A(d)(4) under the Securities Act and Section 4(d)(3) of the Securities Act or such other information necessary to allow Holders to rely on Rule 144 under the Securities Act ("Rule 144"), Rule 144A under the Securities Act and Section 4(a)(7) of the Securities Act (or any applicable successor provisions). |
| **Transfers/Resales** | The information required for brokers to make markets pursuant to Rule 15c2-11 under the Exchange Act (or any applicable successor provision) shall not be publicly available prior to any potential IPO and accordingly it is not expected that the Common Shares shall be quoted on a traditional over-the-counter market. It is expected that the Common Shares will be freely transferable (subject to tag rights described above, securities laws and reasonable restriction on the number of registered Holders).<br><br>The Common Shares issued under the Plan will be DTC-eligible, and (i) each Holder which is currently a holder of First Lien Claims (other |

9

| | than B-3 Escrow Claims) shall receive such Common Shares on account of such ownership of First Lien Claims (other than B-3 Escrow Claims) through DTC, (ii) each participant in the Rights Offering shall receive its New RO Common Stock (as defined in the Rights Offering Term Sheet) through DTC, and (iii) each Holder which is a party to the Backstop Agreement for the Rights Offering and/or a DIP Commitment party shall receive its RO Backstop Shares, Premium Shares and DIP Commitment Shares (in each case, if any) on the books of New Avaya's transfer agent unless the RO Backstop Shares, Premium Shares and DIP Commitment Shares may be issued in book-entry form in accordance with the practices and procedures of DTC.<br><br>The Governance Documents shall provide language to restrict any sale, exchange, assignment, pledge, encumbrance or other transfer of Common Shares that would result in New Avaya's obligation to register a class of securities under Section 12(g) of the Exchange Act or to be required to file reports with the SEC under Section 15(d) of the Exchange Act. |
|---|---|
| **Registration Rights[9]** | The Plan shall provide that the Holders and New Avaya will be deemed to have entered into a registration rights agreement (the "Registration Rights Agreement") which shall include the following provisions:<br><br>• *General.* Any Holder of Common Shares may transfer (in connection with any such transfer) its rights under the Registration Rights Agreement to any person to whom it transfers Common Shares, subject to the transferee's execution and delivery of a customary joinder (in a form to be attached as an exhibit thereto) to the Registration Rights Agreement.<br><br>• *Demand Registration—S-1.* After the date of an IPO (but subject to any lock-up agreements executed in connection with an IPO) and at such time as New Avaya is ineligible to file a registration statement on Form S-3, one or more Holders of Common Shares that are "restricted securities" or "control securities" under Rule 144 ("Registrable Securities") that hold, in the aggregate, Registrable Securities that constitute at least 10% of the issued and |

---

[9] Except as provided in the next paragraph, the New Equity Interests issued pursuant to the Plan (including the New RO Common Stock) shall be exempt from the registration requirements of the securities laws as a result of section 1145 of the Bankruptcy Code to the maximum extent available by law or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act and any other applicable securities laws. Securities issued under section 1145 are generally freely tradable, without registration, unless held by affiliates or "underwriters."

The RO Backstop Shares, Premium Shares and DIP Commitment Shares issued pursuant to the Plan shall be exempt from registration requirements of the securities laws pursuant to Section 4(a)(2) of the Securities Act, Regulation S under the Securities Act or another available exemption. Securities issued pursuant to these exemptions are generally freely tradable, without registration, by non-affiliates 12 months after issuance for a non-SEC reporting company, and may be traded pursuant to other exemptions from registration during such time.

outstanding Common Shares, may demand that New Avaya file a registration statement under the Securities Act on Form S-1 (or similar or successor form), covering Registrable Securities held by such Holders. Such Holders may (at their option) request that such Registrable Securities be sold in an underwritten offering or a block trade. The demand right described in this paragraph includes the right to require the filing of a shelf registration statement for sales of Registrable Securities on a delayed or continuous basis pursuant to Rule 415 under the Securities Act (or any applicable successor provisions) and/or to conduct an unlimited number of shelf takedowns off of such shelf registration statement, including for an underwritten offering or a block trade of Registrable Securities, subject to customary proposed size of offering and demands per year limitations.

- *Demand Registration—S-3.* At such time as New Avaya is eligible to file a registration statement on Form S-3, one or more Holders of Registrable Securities that hold, in the aggregate, Registrable Securities that constitute at least 5% of the issued and outstanding Common Shares, may demand that New Avaya file a shelf registration statement under the Securities Act on Form S-3 (or similar or successor form), covering Registrable Securities held by such Holders for sales on a delayed or continuous basis pursuant to Rule 415 under the Securities Act. The demand right described in this paragraph includes the right to conduct an unlimited number of shelf takedowns off of such shelf registration statement, including for an underwritten offering or block trade of Registrable Securities, subject to customary proposed size of offering and demands per year limitations.

- *Piggyback Registration.* After an IPO, each Holder of Registrable Securities which owns at least 1% of the issued and outstanding Common Shares shall have the right to include its Common Shares each time New Avaya proposes for any reason to register any of its Common Shares under the Securities Act (including but not limited to registrations pursuant to demands by Holders). The rights to piggyback registration shall be available with respect to all Registrable Securities and to all Holders of Registrable Securities that are party to the Registration Rights Agreement. The rights to piggyback registration may be exercised on an unlimited number of occasions. The rights to piggyback registration shall be subject to exceptions and limitations (including as to exceptions for employee plan Form S-8 filings and acquisition transactions).

- *Percentage Calculations.* With respect to any Registration Rights Agreement provisions that are tied to a minimum ownership threshold, a Holder's percentage ownership shall include all Common Shares or Registrable Securities, as applicable, held by such Holder's Affiliates, and by managed funds and accounts of such Holder and its Affiliates.

11