UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| OLIVER JIANG, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:23-cv-01258-PGG |
| Plaintiff, | : : : | CLASS ACTION |
| vs. | : : : | CITY OF PITTSBURGH COMPREHENSIVE MUNICIPAL PENSION TRUST FUND'S RESPONSE TO THE COURT'S JANUARY 19, 2024 ORDER (ECF 72) |
| JAMES M. CHIRICO, JR. and KIERAN J. McGRATH, | : : : : | |
| Defendants. | : : | |

---

## I.       INTRODUCTION

Lead plaintiff movant City of Pittsburgh Comprehensive Municipal Pension Trust Fund respectfully responds to the Court's January 19, 2024 order directing Pittsburgh to "address[] why the alleged disclosures that were made prior to Pittsburgh's . . . June 27, 2022 sale of its shares in Avaya Holdings Corp. . . . constitute 'corrective disclosures.'  *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 480 n.3 (2d Cir. 2018)."  ECF 72.  In *Ark. Teachers*, the Second Circuit reiterated long-standing precedent that a "corrective disclosure" is "an announcement or series of announcements that reveals to the market the falsity of a prior statement."  879 F.3d at 480 n.3 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005)).  The February, May, and June 2022 disclosures here are corrective because they related to the alleged misstatements and underlying scheme at issue and are consistent with the theory of liability articulated in the Complaint, which all nine lead plaintiff movants adopted in their motion papers.[1]

## II.      FACTUAL BACKGROUND

The Complaint alleges that as part of Avaya Holdings Corp.'s ("Avaya" or the "Company") collaboration with RingCentral, Inc., the Company was transitioning from a one-time license fee revenue model to a cloud computing-based recurring subscription model (the "Transition").  One of the primary allegations in the Complaint is that defendants committed securities fraud by touting the success of the Transition while concealing that the RingCentral collaboration "came with onerous requirements that were crippling [Avaya's] business metrics and financial prospects."  ECF 1 at ¶5.  The Complaint likewise alleges that, throughout the Class Period, defendants concealed that the Company had "defective reporting controls that would preclude Avaya's senior executives from

---

[1]     Attached hereto as **Exhibit A** is the Declaration of Bjorn I. Steinholt, CFA.  Unless otherwise noted, all emphasis is added and citations are omitted.

accurately recording and reporting its financial results, significantly compromising their ability to accurately budget and forecast." *Id*. at ¶6. As noted in its December 7, 2023 letter motion (ECF 69), Pittsburgh's investigation has further revealed that Avaya's deficient controls were so pervasive that these controls failed to prevent defendants from concealing Avaya's financial condition with prospective lenders.

The Complaint pleads loss causation through partial revelations. ECF 1 at ¶6 ("[t]he truth would come out in dribs and drabs thereafter, running down the market price of Avaya securities"). Three of these disclosures which are described in greater detail below – two revenue misses on February 9, 2022 and May 10, 2022 explicitly attributed by defendants to the Transition; and a June 24, 2022 upsized debt offering on deeply unfavorable terms – are the subject of the Court's Order.

## III.   ARGUMENT

Loss causation in the securities fraud context typically involves an "underlying circumstance that [was] concealed or misstated" causing "a drop in the value of a security." *Lentell*, 396 F.3d at 172. The event revealing the truth is typically referred to as a "corrective disclosure." [2] And as this Court has previously recognized: "'[L]oss causation does not require ***full*** disclosure and can be established by ***partial*** disclosure during the class period which causes the price of shares to decline.'" *In re Evolus Inc. Sec. Litig.*, 2021 WL 4251957, at *9 (S.D.N.Y. Sept. 17, 2021) (emphasis in original). Moreover, "'[t]here is no requirement that the corrective disclosure take a particular form or be of a particular quality,' such that it be a 'mirror image tantamount to a confession of fraud.'" *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *2 n.1,*14

---

[2]   *See also In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363 n. 9 (S.D.N.Y.2009) ("The Court notes that many courts in the district consider corrective disclosures to be a separate conceptual category from 'materialization of the risk' . . . and that other courts have stretched the notion of corrective disclosure to include all possible loss-inducing events.").

(S.D.N.Y. July 10, 2019) (McMahon, J.) (finding at the class certification stage that two earnings misses were valid partial corrective disclosures because they called into question defendants' rosy statements regarding the conservatively underwritten nature of defendants' portfolio).[3]

### A.    The Pre-June 27, 2022 Disclosures Are Corrective Disclosures

On **February 9, 2022,** Avaya reported its first quarter 2022 financial results, disclosing revenue and EPS results significantly lower than the market had been led to expect.  The Complaint explicitly alleges that defendants themselves blamed the miss on ***"the ongoing transition to a subscription-based revenue model***" which is precisely the subject matter of misstatements/omissions and scheme alleged in the Complaint.  ECF 1 at ¶¶7, 87.  In other words, defendants are alleged to have knowingly or recklessly touted a shift in the Company's revenue model which – as implemented – would hurt the Company's financial prospects and business metrics.  Sure enough, on February 9, 2022, defendants announced that the Transition was an admitted cause of their poor metrics and financials.  Accepting the Complaint's allegations as true, this juxtaposition of defendants' false assurances regarding the success and prospects of the Transition with the February 9, 2022 revenue miss attributed by defendants to the Transition clearly exposes the "corrective" nature of the disclosure, regardless of how strictly the Court defines that term.[4]  There is likewise evidence of market commentary linking Avaya's February 9, 2022 share

---

[3]    *See also Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) ("a plaintiff's theory of 'loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements' where the partial disclosure 'somehow reveals to the market that a defendant's prior statements were not entirely true'") (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008)).

[4]    Separately, the February 9, 2022 earnings miss can be plausibly linked to defendants' defective internal controls – which defects the Complaint alleges implicated the Company's ability to accurately budget and forecast.  *See generally Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by showing that the stock

price decline to the Transition.[5]   The Complaint alleges that, on the news of the revenue miss, Avaya's stock price declined 22%.   The Steinholt Declaration confirms the nexus alleged in the Complaint between the February 9, 2022 disclosures and Avaya's share price decline.   *See* Exhibit A at ¶23 ("After controlling for market and industry factors, this price decline was statistically significant at the 1% level.   In my opinion, the first quarter 2022 earnings announcement caused a material decline in Avaya's stock price."). [6]

On **May 10, 2022**, Avaya reported its second quarter 2022 financial results, disclosing for the second time in two quarters that it had missed expected revenues.   In addition, the Company disclosed that its EBITDA was crippled to $0.53 per share, down more than 28% year-over-year.   The Complaint explicitly alleges that "[d]efendants again blamed the decline on Avaya's transformation from a one-time, license-fee revenue model to a recurring subscription one."   ECF 1 at ¶9.   The Company also provided disappointing fiscal year 2022 EBITDA guidance of between $2.09 and $2.25 per share.   As with the disappointing February 9, 2022 earnings which were also acknowledged by defendants and analysts to be linked to the Transition, market commentary not

---

price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.").

[5]   *See also* BWS Financial Inc. analyst report, "AVYA: Sales Slipped, ARR Grew," dated Feb. 10, 2022 ("Avaya Holdings (AVYA) continues to face revenue recognition ***challenges from transitioning to a subscription revenue model.***"); *see generally Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023) ("[M]arket commentary can provide insight into the kind of information investors would rely upon in making investment decisions  and therefore can serve as indirect evidence of price impact. . . .").

[6]   *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (finding "the sharp drops of AIG's stock price in response to certain corrective disclosures" sufficient to plead loss causation and overcome arguments at the pleading stage that "some or all of Plaintiffs' losses are attributable to forces other than . . . Defendants' material misstatements and omissions"); *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 274 (S.D.N.Y. 2010) (finding that, among other reasons, allegations of stock price drops following corrective disclosures were sufficient to plead loss causation).

only called into question defendants' Transition-related statements, but cast doubt upon the credibility of defendants' representations regarding the financial strength and prospects of the Company.[7]  The Complaint alleges Avaya's stock price "declined nearly 30% over the following two trading sessions . . . on unusually high trading volume."  ECF 1 at ¶10.  The Steinholt Declaration confirms the nexus alleged in the Complaint between the May 10, 2022 disclosures and Avaya's share price decline.  *See* Exhibit A at ¶24 ("After controlling for market and industry factors, this price decline was statistically significant at the 1% level.  In my opinion, the second quarter 2022 earnings announcement caused a material decline in Avaya's stock price.").

On **June 24, 2022**, Avaya disclosed that it would be raising $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027.  ECF 1 at ¶11.  The Company told the market that it would use the proceeds from the issuance "to prefund the repayment of, repurchase or otherwise make certain payments in respect of the Company's existing $350.0 million of 2.25% Convertible Senior Notes due 2023."  *Id.*  The Complaint specifically alleges that the announcement of borrowing money at 8% to "replace debt only costing it 2.25%  or well more than 3 times as much" revealed the relevant truth that the Company was essentially experiencing a liquidity crisis because it "lacked the $350 million required to pay off the 2.25% notes in 2023" (*id.*), which truth had been concealed by defendants' misstatements and omissions regarding the Transition, the Company's

---

[7]  *See* BWS Financial Inc. analyst report, "AVYA: Burning Thru Cash, Sell," dated May 12, 2022 ("Avaya Holdings (AVYA) has exhausted investor patience in the Company's quest to transform into a subscription revenue business. ***The timeline that had been offered for reaching revenue and adjusted EBITDA growth are now difficult targets to achieve***. . . .  Liquidity overtaking the conversation from ARR could have bigger impact to the stock price as investors try to assess the timing of when AVYA could generate free cash flow."); J.P. Morgan analyst report, "F2Q22 Review: 'Show-Me' Story That Is Not Showing Up; Downgrade to UW," dated May 11, 2022 ("We are downgrading shares of Avaya from Neutral to Underweight following F2Q22 (Mar-end) earnings as ***we believe the timeline relative to the materialization of the software-subscription transformation to return the company to revenue and earnings growth has elongated beyond what was detailed at its Investor Day back in December 2021***.").

internal controls over financial reporting, and the strength of the Company's financial position. *Id* at ¶¶4, 6, 96. Analysts confirmed the revelatory nature of the note offering, as well as its nexus to the Transition and the Company's representations about its financial position.[8] The Complaint alleges that on the news of its notes offering, Avaya shares declined "more than 23% . . . on unusually high trading volume." *Id*. at ¶11. The Steinholt Declaration confirms the nexus alleged in the Complaint between the June 24, 2022 disclosures and Avaya's share price decline. *See* Exhibit A at ¶25 ("After controlling for market and industry factors, this price decline was statistically significant at the 1% level. In my opinion, the upsized debt issuance on unfavorable terms caused a material decrease in Avaya's stock price."). The contention that the June 24, 2022 debt issuance, which the Complaint alleges amounted to a concession that the Company was forced to rob Peter to pay Paul (which has since been confirmed by Pittsburgh's investigation as well as subsequent lawsuits filed against Avaya by lenders, *see* ECF 69) further revealed the falsity of defendants' positive statements regarding the Transition, the effectiveness of the Company's controls, and Avaya's financial prospects and projections.

The viability of the February 9, 2022, May 10, 2022, and June 24, 2022 corrective disclosures is further bolstered by the effects of defendants' alleged ***misrepresentations*** on Avaya's share price. The Steinholt Declaration demonstrates that, as alleged in the Complaint, there was at least $11 per share of inflation ***remaining*** in Avaya's share price following the June 24, 2022 corrective disclosure, after which Avaya's shares were trading at just under $3. Exhibit A at ¶21.

---

[8]   *See* Cowen Equity Research analyst report "LIQUIDITY CRISIS AVERTED; NOW WHAT? dated June 27, 2022 ("***The [note offering] appears far costlier than we had imagined, and with respect to its ongoing cloud transition, the crisis has raised questions that could take several quarters to answer***. . . . With two consecutive quarters of results below guidance and a materially weaker forecast for 2H22, not to mention a response that has at times sounded somewhat blasé given the scope of the recent liquidity crisis and resulting dilution, our confidence in management has been shaken.")

The Steinholt Declaration logically asserts that "any damages analysis that credits the potential inflationary impact of the alleged misrepresentations using the price increases discussed above would also have to have a substantial portion of this inflation removed from the stock price prior to the end of June 24, 2022 (because the true value, i.e., the stock price minus inflation, cannot be negative)." *Id*. The Steinholt Declaration concludes that "the potential inflation created by the alleged misrepresentations is so great that at least some portion of it would have to have been removed prior to the end of June 24, 2022." *Id*. In other words, if Mr. Sweatt agrees that defendants' misrepresentations prior to market close on June 24, 2022 (at which time Avaya shares were trading at just under $3) injected at least $11 of artificial inflation into Avaya's share price, common sense dictates that roughly $8 balance of that inflation had to come out at some point before the end of June 24, 2022. And while the front-end and back-end price impact analysis contained in the Steinholt Declaration present powerful evidence of the soundness of ***all three*** of these corrective disclosures, Pittsburgh's recoverable losses under this Court's decision in *Sallustro v. CannaVest Corp*., 93 F. Supp. 3d 265, 276 (S.D.N.Y. 2015), are far greater than Mr. Sweatt's if any ***one*** of the three corrective disclosures are not excised from the case at this early stage.

At bottom, the February 9, 2022, May 10, 2022, and June 24, 2022 disclosures expressly alleged in the Complaint (and in both Pittsburgh and Mr. Sweat's moving papers) to have revealed the truth regarding defendants' alleged misrepresentations constitute corrective disclosures. They are consistent with the underlying theories articulated in the Complaint.

This Court's analysis and conclusion in *Evolus* is directly on point. There, the Court assessed the partial disclosures of the alleged wrongdoing in the complaint as well as facts asserted in the presumptive lead plaintiff's reply brief and concluded that the "'partial disclosures revealed some aspect of [defendant's] misconduct and that the partial disclosures caused an immediate

- 7 -

material stock decline.'"  2021 WL 4251957, at *6.  And, just like in *Evolus*, a few competing movants conceded that at least one statement was "a partial corrective disclosure."  *Compare id.* at *7 *with* ECF 20 at 4 (Mr. Sweatt conceding that "[t]he Complaint alleges that the truth emerged over a series of partial disclosures beginning first on February 9, 2022.").  Moreover, this Court also was not persuaded by another competing movant's form over substance recasting of a relevant partial corrective disclosure as another false statement based on which section of the complaint the allegation appeared in.  *Compare* 2021 WL 4251957, at *7 *with* ECF 52 at 7 (Mr. Sweatt suggesting that partial disclosures do not qualify as such based on placement in the Complaint).

As in *Evolus*, this Court should easily conclude that the Complaint and movants' lead plaintiff motions adequately identified at least three partial corrective disclosures before Pittsburgh's June 27, 2022 sales.  And, because Pittsburgh sold its shares ***after*** those disclosures, its "losses could be found to have been proximately caused by Defendants' fraudulent conduct."  2021 WL 4251957, at *8.  Consequently, the Court should accept Pittsburgh's calculation of its losses and conclude it has alleged the greatest loss and the largest financial interest among the movants.

## IV.    CONCLUSION

The three disclosures alleged in the Complaint which pre-date Pittsburgh's sales of its Avaya shares comport with the theories of wrongdoing alleged in the Complaint and are further developed by Pittsburgh's investigation.  The revelatory and "corrective" nature of these disclosures comports with *Goldman* and its progeny.  As demonstrated herein and in the Steinholt Declaration, they are logically and economically sound.  As such, Pittsburgh still has the largest financial interest in this matter, is typical and adequate of the  class; and the most adequate plaintiff presumption, which lies in its favor, has not been rebutted.  Pittsburgh respectfully requests that its lead plaintiff motion (ECF 34) be granted.

DATED:  January 26, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ALAN I. ELLMAN
MARY K. BLASY


*s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
aellman@rgrdlaw.com
mblasy@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead Plaintiff

- 9 -

4865-0072-7455.v1