EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————x   Civil Action No. 1:23-cv-01258-PGG

OLIVER JIANG, Individually and on Behalf  :
of All Others Similarly Situated,         :   <u>CLASS ACTION</u>
                                          :
            Plaintiff,                    :
                                          :
    vs.                                   :
                                          :
JAMES M. CHIRICO, JR. and KIERAN J.       :
McGRATH,                                  :
                                          :
            Defendants.                   :
                                          :
———————————————————x

## DECLARATION OF BJORN I. STEINHOLT, CFA
## JANUARY 26, 2024

**Table of Contents**

I.     INTRODUCTION AND QUALIFICATIONS..................................................................1

II.    OVERVIEW OF ASSIGNMENT.........................................................................1

III.    LOSS CAUSATION ........................................................................................2

      A.    Materiality from an Economic Point of View ........................................4

      B.    Disclosure of the Alleged Truth ...........................................................10

IV.    SUMMARY OF OPINIONS .........................................................................13

4854-9653-4176.v1

## I.   INTRODUCTION AND QUALIFICATIONS

1.   I am a Managing Director at Caliber Advisors, Inc., a full-service financial valuation and economic consulting firm.  I have more than 30 years of experience providing capital markets consulting, including analyzing and valuing investments, and 20 years of experience providing expert consulting analyzing market efficiency, materiality, loss causation, and damages in large and complex securities class actions similar to this litigation.

2.   I received a Master of International Business degree from the University of San Diego and a Bachelor of Science degree in Computer Science and Engineering from California State University, Long Beach.  I have also earned the professional designation of Chartered Financial Analyst ("CFA") awarded by the CFA Institute, a qualification for finance and investment professionals focusing on investment management and securities analysis.

3.   A more comprehensive summary of my background and qualifications is attached as Exhibit A to this declaration.  My billable rate is currently $575 per hour.  My compensation is not contingent on the outcome of this case or my findings.

## II.   OVERVIEW OF ASSIGNMENT

4.   I have been asked by Robbins Geller Rudman & Dowd LLP ("RGRD") to analyze loss causation relating to three disclosures, on February 9, 2022, on May 10, 2022, and on June 24, 2022, relating to Avaya Holdings Corp. ("Avaya" or the "Company").  For the purposes of my analysis, I have assumed that plaintiff's factual allegations, as described in the class action Complaint for Violations of the Federal Securities Laws, filed by RGRD on February 14, 2023 (ECF 1, the "Complaint"), are true.[1]

---

[1]   This is consistent with the traditional role of a damages expert.  Mark A. Allen, *et al.*, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific*

4854-9653-4176.v1

5.      The loss causation analysis below is conducted in the context of quantifying damages under §10(b) of the Securities Exchange Act of 1934.  As a result, I will cite certain legal opinions that inform my understanding about the legal issues involved. However, none of my opinions in this case should be construed as being legal opinions.

6.      Furthermore, the loss causation analysis below is limited in scope and performed prior to the motion to dismiss and discovery. As a result, my analysis and opinions are preliminary and would have to be supplemented and modified at some later point in time as additional evidence and information becomes available.[2]

## III.     LOSS CAUSATION

7.      Loss causation relates to whether an alleged fraudulent act or omission "caused the loss for which the plaintiff seeks to recover damages."[3]  In *Dura*, the Supreme Court stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[4]  Instead, loss causation is established

---

*Evidence*, at 432 (3d ed. 2011) ("In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful.").

[2]      At this time, my opinions are based on my professional experience, and my review of the following information: (a) the Complaint; (b) public filings by Avaya with the U.S. Securities and Exchange Commission ("SEC"); (c) Avaya's press releases and conference call transcripts; (d) available analyst reports relating to Avaya; (e) available contemporaneous media reports regarding Avaya; (f) price and volume data for Avaya, as well as market and industry indices; and (g) other relevant information cited in the text of this declaration.

[3]      Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(b)(4).

[4]      *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

4854-9653-4176.v1

when the "relevant truth begins to leak out," and the stock price declines as a result.[5] The "relevant truth" is generally considered to be the truth allegedly omitted or concealed by the misrepresentation.[6] While loss causation is a legal concept, below I will discuss the framework of the analysis generally used by experts to analyze loss causation from an economic point of view.

8.      In order to analyze loss causation, it is helpful to understand the various elements of the alleged fraudulent conduct.  Generally, as in this case, plaintiff alleges that defendants made false and/or misleading statements that concealed an undisclosed, material truth (including the foreseeable economic consequences that flow from this material truth).  The misrepresentations are deemed to be material if they, or the alleged or relevant truth concealed, would have been considered important by reasonable investors in making investment decisions.[7] One way to empirically show that a misrepresentation was material is to demonstrate that there was a positive price impact at the time the misrepresentation was made, also known as front-end price impact.

9.      Material misrepresentations and/or omissions artificially inflate the stock price and, thereby, cause public investors to overpay for their shares.  The artificial stock price inflation is then reduced or eliminated as information reflecting the alleged truth concealed by the fraud (including the foreseeable economic consequences thereof) is revealed, thereby causing economic

---

[5]      *Id.*; *see also Ark. Teachers Ret. Sys. v. Goldman Sachs*, 879 F.3d 474, 480 n.3 (2d Cir. 2018) ("A 'corrective disclosure' is an announcement or series of announcements that reveals to the market the falsity of a prior statement.") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("[T]o show loss causation, it is enough that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'") (citation omitted).

[6]      *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth' – the truth obscured by the fraudulent statements.").

[7]      *Infra*, n.8.

losses to public investors who overpaid for their shares and now are unable to recover this overpayment by selling their shares. To demonstrate loss causation, it is common to show that there was a negative price impact at the time the relevant truth was disclosed, also known as back-end price impact.

### A.     Materiality from an Economic Point of View

10.    Material information is often defined as information that a reasonable investor would want to consider prior to making an investment decision.[8] The issues that are important to investors, *i.e.*, the information that reasonable investors would want to consider prior to making an investment decision, are usually factors that impact the value of an investment. From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of such cash flows.[9]

11.    With respect to Avaya, its value would be based on the expected future revenues, expenses, and ultimately cash flows. It is my understanding that this case relates, in part, to Avaya's strategic collaboration with RingCentral, Inc. to fuel the Company's transition to a subscription-based model. The case also relates to Avaya's financial reporting and statements

---

[8]    In *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988), the Supreme Court quoted *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), which stated that a fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important'" in making an investment decision or if it would have "'significantly altered the 'total mix' of information made available'" to the shareholder.

[9]    *See* Jerald E. Pinto, *et al.*, *Equity Asset Valuation*, John Wiley & Sons. Inc., at 2, 18 (2d ed. 2010) ("The intrinsic value of any asset is the value of the asset given a hypothetically complete understanding of the asset's investment characteristics. . . . An absolute valuation model is a model that specifies an asset's intrinsic value. . . . The most important type of absolute equity valuation models are present value models. In finance theory, present value models are considered the fundamental approach to equity valuation. . . . A present value model or discounted cash flow model applied to equity valuation derives the value of the common stock as the present or discounted value of its expected future cash flows.").

during the Class Period (October 3, 2019-November 29, 2022) related to the Company's "success" and "significant progress" in their transition to the subscription-based model.

12.     Regarding the collaboration with RingCentral, Avaya announced at the beginning of the Class Period, that it "was supposed to allow Avaya to monetize its small to medium business ('SMB') customer base immediately," and "allow[] it to focus on the development of a next-generation cloud contact center," while "also accelerat[ing] Avaya's shift from a one-time, license fee-based to a recurring, subscription-based revenue model."[10] If material, this information, by itself, would be expected to positively impact Avaya's future revenue, and ultimately the Company's future cash flows, and thereby be expected to have a positive impact on the Company's stock price.[11] Plaintiff also alleges that defendants at various points in time misrepresented Avaya's progress in transitioning the Company towards a subscription-based cloud service through its RingCentral collaboration.[12]

13.     However, according to plaintiff's allegations, defendants concealed that the "RingCentral partnership came with onerous requirements that were crippling its business metrics and financial prospects during the Class Period," including that "Avaya granted RingCentral exclusive rights to certain products to its customers" which meant that "Avaya had to discontinue certain of its own product offerings that had only recently begun achieving momentum," and "exposed the Company to losses as RingCentral paid Avaya commissions up front, which would

---

[10]     Complaint, ¶4.

[11]     The expected positive impact of the RingCentral announcement is confirmed by the event study below, *infra*, ¶15.

[12]     *E.g.*, Complaint, ¶¶51, 71, 77.

4854-9653-4176.v1

need to be returned if Avaya later missed on sales thresholds."[13]  Furthermore, Avaya Cloud Office by RingCentral "conflicted with other Avaya product offerings, causing Avaya to have to alter those offerings, resulting in it losing some important members of its executive team."[14]  The foreseeable economic consequences of the alleged truth (obstacles to successfully transitioning to a subscription-based model) concealed by the alleged material misrepresentations would be expected to negatively impact Avaya's future revenues and cash flows, and the lower cash flows would negatively impact the Company's financial condition and in the case of highly leveraged Avaya also likely increase its cost of debt, thereby negatively impacting the Company's stock price if or when ultimately disclosed.[15]

     14.    Furthermore, plaintiff alleges that Avaya also reported financial results while concealing that defendants were "operating the Company with defective reporting controls that would preclude Avaya's senior executives from accurately recording and reporting its financial results, significantly compromising their ability to accurately budget and forecast."[16]  In fact, on November 30, 2022, Avaya announced that the "Company's annual report filed with the SEC for fiscal year 2021 . . . on November 22, 2021 'should no longer be relied upon.'"[17]

---

[13]    Complaint, ¶5.

[14]    *Id*.

[15]    At the end of fiscal year 2019 (September 30, 2019), Avaya had more than $3 billion in long-term debt, and its total liabilities ($5.65 billion) were 81% of its total assets ($6.95 billion). Avaya 2019 Form 10-K, filed with the SEC on November 29, 2019, at 73.

[16]    Complaint, ¶6.

[17]    *Id*., ¶19.

- 6 -

15.     In this case, I first analyzed whether there was evidence that the alleged misrepresentations themselves positively impacted Avaya's stock price at the time they were made, *i.e.*, front-end price impact, using the event study methodology, a well-accepted framework for quantifying price impact and calculating class-wide damages in class action securities cases.[18] The event study *first* determines the statistical relationship between the stock price returns of the company and the returns on market and industry indices during a control period using a regression analysis.[19] In this case I used the Russell 2000 index to control for market factors and the NASDAQ Computer Index to control for industry factors, which were identified and used by the Company as a proxy for the market and industry during the relevant time period.[20]

16.     *Second*, the actual stock price return on the event day analyzed is compared to the return predicted by a regression to determine the excess (residual or abnormal) return, *i.e.*, the stock's return on the event day net of market and industry factors.  The excess return can also be used to determine the so-called p-value, the probability of an equal or greater abnormal return occurring randomly.  A price movement with a p-value of 5% or less is defined as being statistically significant at the 5% level, while a price movement with a p-value of 1% or less is defined as being statistically significant at the 1% level.[21] The 5% level is the most common level

---

[18]     *See* Marge S. Thorsen, Richard A. Kaplan & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 109 (2006) ("Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices. The gold standard, which is accepted by both courts and economists, is the event study. Other tools such as valuation analyses often aid the event study.").

[19]     For the purpose of my analysis in this case, I used a one-year (252-trading days) period prior to each event analyzed.

[20]     Avaya 2022 Form 10-K, filed with the SEC on September 8, 2023, at 37.

[21]     Similarly, a price movement with a p-value of 10% or less is defined as being statistically significant at the 10% level. Richard A. DeFusco, *et al.*, *Quantitative Investment Analysis*, John

- 7 -

used as a benchmark for statistical significance, while the 1% level is a higher level. All of the price movements discussed below meet the more stringent 1% level.

17.     The first alleged misrepresentation I analyzed was Avaya's announcement of its partnership with RingCentral, disclosed after the market closed on October 3, 2019.[22]   This announcement was allegedly false and/or misleading because it disclosed purported benefits of the RingCentral collaboration, while concealing offsetting negative factors, *i.e.*, the alleged truth.[23] Following this announcement, Avaya's stock price increased from a closing price of $10.12 per share on October 3, 2019, to a closing price of $13.23 per share on October 4, 2019, an increase of $3.11 per share or more than 30%.  After controlling for market and industry factors, this price increase was statistically significant at the 1% level.   In my opinion, the October 3, 2019, disclosure, after the market closed, caused a material increase in Avaya's stock price.

18.     The second alleged misrepresentation I analyzed was Avaya's announcement of its third quarter 2020 results before the market opened on August 10, 2020, in which defendants also stated that the "'[r]esponse to [Avaya's] Subscription offering continues to be strong,'" and that its product offering provided its customers with "'a seamless path to move to the cloud.'"[24] Following this announcement, Avaya's stock price increased from a closing price of $13.66 per share on August 7, 2020, to a closing price of $15.14 per share on August 10, 2020, an increase of

---

Wiley & Sons, Inc., at 248-49 (2d ed. 2007) ("Qualitatively, if we can reject a null hypothesis at the [10%] level of significance, we have **some evidence** that the null hypothesis is false. If we can reject a null hypothesis at the [5%] level, we have **strong evidence** that the null hypothesis is false. And if we can reject a null hypothesis at the [1%] level, we have **very strong evidence** that the null hypothesis is false.") (emphasis in original).

[22]     Complaint, ¶¶45-48.

[23]     *Supra*, ¶¶12-13.

[24]     Complaint, ¶61.

$1.48 per share or more than 10%.  After controlling for market and industry factors, this price increase was statistically significant at the 1% level.  In my opinion, the August 10, 2020, disclosure caused a material increase in Avaya's stock price.

19.     The third alleged misrepresentation I analyzed was Avaya's announcement of its first quarter 2021 results and guidance before the market opened on February 9, 2021, in which defendants also stated that the improved guidance reflected "'improved performance across key business metrics,'" and that the Company's "'success reflects the significant progress we continue to make on our transformation into an enterprise leader in cloud-based communications and collaboration solutions.'"[25]  Following this announcement, Avaya's stock price increased from a closing price of $25.83 per share on February 8, 2021, to a closing price of $29.17 per share on February 9, 2021, an increase of $3.34 per share or more than 12.9%.  After controlling for market and industry factors, this price increase was statistically significant at the 1% level.  In my opinion, the February 9, 2021, disclosure caused a material increase in Avaya's stock price.

20.     The fourth alleged misrepresentation I analyzed was Avaya's announcement of its fiscal year 2021 results and guidance before the market opened on November 22, 2021.  One year later, on November 30, 2022, Avaya disclosed that as a result of defects in its internal reporting controls, these results "'should no longer be relied upon.'"[26]  While allegedly concealing Avaya's internal control problems, the Company also announced new guidance, which analysts considered in forming their investment opinions.[27]  Following this disclosure, Avaya's stock price increased

---

[25]     Complaint, ¶71.

[26]     *Id.*, ¶19.

[27]     November 23, 2021, Barclays analyst report, "OneCloud and LT Guide Highlights 4Q21 Print" ("Avaya's FY23/FY24 guidance should help give investors more confidence, with growth re-emerging due to on-premise maintenance revenue becoming less of a drag on overall growth.").

4854-9653-4176.v1

from a closing price of $17.98 per share on November 19, 2021, to a closing price of $22.00 per share on November 22, 2021, an increase of $4.02 per share or more than 22%. After controlling for market and industry factors, this price increase was statistically significant at the 1% level. In my opinion, the November 22, 2021 disclosure caused a material increase in Avaya's stock price.

21.     Depending on further analysis and information yet to be obtained from discovery, the statistically significant price increases following the above alleged misrepresentations demonstrates front-end price impact and could be used to establish potential inflation of more than $11 per share.[28] Importantly, Avaya's June 24, 2022, closing price following the last of the "corrective" disclosures discussed below, was only $2.87 per share, *i.e.*, much lower than the potential $11 per share inflation. Consequently, any damages analysis that credits the potential inflationary impact of the alleged misrepresentations using the price increases discussed above would also have to have a substantial portion of this inflation removed from the stock price prior to the end of June 24, 2022 (because the true value, *i.e.*, the stock price minus inflation, cannot be negative). In fact, the price impact of the first alleged misrepresentation on October 3, 2019, alone of more than $3 per share is greater than Avaya's June 24, 2022, closing price. In other words, the potential inflation created by the alleged misrepresentations is so great that at least some portion of it would have to have been removed prior to the end of June 24, 2022.

### B.     Disclosure of the Alleged Truth

22.     Loss causation relates to the question of whether an alleged fraud caused plaintiff to suffer economic losses. In other words, there has to be some causal relationship between the alleged misrepresentations and the economic loss that a plaintiff seeks to recover. Consequently,

---

[28]     It should be noted that the specific misrepresentations discussed and analyzed do not necessarily represent all the alleged misrepresentations that could possibly be used to establish front-end price impact.

as part of the loss causation analysis, it is common to also analyze the price declines following disclosures of the alleged truth. In this case, I have been specifically asked to analyze the three alleged "corrective" disclosures below.

23. The first disclosure of the alleged truth, or "corrective" disclosure, I analyzed is Avaya's February 9, 2022, announcement of its first quarter 2022 results, including that revenues had missed analysts' forecasts and the Company's guidance.[29] Plaintiff points out that the revenue miss, at least partly, related to problems with "the ongoing transition to a subscription-based revenue model," which the RingCentral collaboration was supposed to accelerate.[30] Following this disclosure, Avaya's stock price declined from a closing price of $17.84 per share on February 8, 2022, to a closing price of $13.90 per share on February 9, 2022, a price decline of $3.94 per share or 22%. After controlling for market and industry factors, this price decline was statistically significant at the 1% level. In my opinion, the first quarter 2022 earnings announcement caused a material decline in Avaya's stock price.

24. The second disclosure of the alleged truth, or "corrective" disclosure, I analyzed is Avaya's May 10, 2022, announcement of its second quarter 2022 results, including that revenues again had missed analyst forecasts and guidance.[31] Plaintiff points out that the revenue miss, at

---

[29] February 9, 2022, J.P. Morgan analyst report, "F1Q22 Quick Take: Margins Miss to Drive Negative Reaction; However, Raised ARR Target Supports Transformation Progress" ("Avaya's F1Q22 (Dec-end) revenue tracked below both JPM and consensus forecast, and below the low-end of management's guidance range. The lower revenue in combination with much lower EBITDA margin led to an earnings miss relative to JPM and consensus.").

[30] Complaint, ¶¶4, 7. *See also* February 10, 2022, BWS Financial analyst report, "AVYA: Sales Slipped, ARR Grew" ("Avaya Holdings (AVYA) continues to face revenue recognition challenges from transitioning to a subscription revenue model.").

[31] May 10, 2022, J.P. Morgan analyst report, "F2Q22 Quick Take: Miss to Drive Negative Reaction; However, Raised ARR/OneCloud Targets Support Transformation Progress" ("Avaya's F2Q22 (Mar-end) revenue tracked below both JPM and consensus forecasts, and below the low

4854-9653-4176.v1

least partly, related to "transformation from a one-time, license-fee revenue model to a recurring subscription one," which the RingCentral collaboration was supposed to accelerate.[32]  Following this disclosure, Avaya's stock price declined from a closing price of $8.22 per share on May 9, 2022, to a closing price of $7.53 per share on May 10, 2022, a price decline of $0.69 per share or 8.4%.  After controlling for market and industry factors, this price decline was statistically significant at the 1% level.  In my opinion, the second quarter 2022 earnings announcement caused a material decline in Avaya's stock price.

25.     The third disclosure of the alleged truth, or "corrective" disclosure, I analyzed is Avaya's June 24, 2022, disclosure that it would increase its issuance of 8% Exchange Senior Secured Notes to $250 million, with the proceeds used in part to repurchase its 2.25% convertible senior notes due 2023.  Plaintiff states that "selling debt at 8% to replace debt only costing it 2.25%" tacitly admits the problems the Company now had paying off its debt.[33]  In other words,

---

end of management's guidance range, for the second sequential quarter in a row. The lower revenue in combination with the much lower operating margin led to an earnings miss relative to JPMe and consensus. . . .  The combination of a second consecutive quarter of year-over-year revenue decline (as well as an outlook for a third) with the lower margins and earnings forecast from Avaya will likely continue to add to investor concerns. . . .").

[32]     Complaint, ¶¶4, 9.  *See also* May 12, 2022, BWS Financial Inc. analyst report, "AVYA: Burning Thru Cash, Sell" ("Avaya Holdings (AVYA) has exhausted investor patience in the Company's quest to transform into a subscription revenue business.  The timeline that had been offered for reaching revenue and adjusted EBITDA growth are now difficult targets to achieve. . . . Liquidity overtaking the conversation from ARR could have bigger impact to the stock price as investors try to assess the timing of when AVYA could generate free cash flow.").

[33]     Complaint, ¶11.  *See also* June 27, 2022, Cowen analyst report, "LIQUIDITY CRISIS AVERTED; NOW WHAT?" ("Although we never doubted Avaya would survive its short-term liquidity crisis . . . the terms of the rescue are substantially more dilutive than we had previously modeled.  Instead of $500 million of incremental 1L term debt, Avaya was only able to raise $350 million (at S+1,000, priced at par but with a 10-point fee payable to lenders), which it supplemented with $250 million of 8% 1L Secured Exchangeable Notes.").

the inability of Avaya to successfully transition to a subscription-based model contributed to its poor financial health, and the Company being forced to raise capital on even more unfavorable terms further reflects the increased magnitude of the problem.[34]   Following this disclosure, Avaya's stock price declined from a closing price of $3.76 per share on June 23, 2022, to a closing price of $2.87 per share on June 24, 2022, a price decline of $0.89 per share or 23%.   After controlling for market and industry factors, this price decline was statistically significant at the 1% level.   In my opinion, the upsized debt issuance on unfavorable terms caused a material decrease in Avaya's stock price.

## IV.   SUMMARY OF OPINIONS

26.   The above three alleged "corrective" disclosures demonstrate back-end price impact and could potentially be used to remove more than $7.50 per share from the inflation created by the alleged misrepresentations.   The stated benefits of the collaboration between RingCentral and Avaya (the initial misrepresentation) clearly were viewed by investors as important information that would help the Company's transition to a subscription-based model and significantly increase future cash flows, as evidenced by the $3.11 per share increase in Avaya's stock price to $13.23, per share, and the statistically significant price increase of approximately 30%.   Despite reporting "success" and "significant progress" in their transition to the subscription-based model throughout the Class Period, by the end of June 24, 2022, investors knew that the touted benefits had not materialized, as evidenced by Avaya's closing price of only $2.87 per share (less than the October 4, 2019 price increase when the RingCentral collaboration

---

[34]   On September 30, 2019, Avaya's total liabilities ($5.65 billion) were 81% of its total assets ($6.95 billion). Avaya 2019 Form 10-K, filed with the SEC on November 29, 2019, at 73. By June 30, 2022, Avaya had total liabilities ($5.1 billion) far exceeding its total assets ($3.97 billion). Avaya Form 10-Q, filed with the SEC on September 8, 2023, at 3.

4854-9653-4176.v1

was announced). Furthermore, investors now also knew that Avaya's guidance was unreliable, as evidenced by the Company's failure to meet it, despite the fact that the Company had not yet admitted that its internal reporting controls were defective and that its 2021 annual report should no longer be relied upon. The failure to successfully transition to a subscription-based model negatively impacted Avaya's revenues and cash flows, negatively impacted the Company's financial condition, which also resulted in Avaya having to raise capital on more unfavorable terms, as evidenced by the June 24, 2022, disclosure.

27.     There is admittedly much more work to be done to determine more precisely how much of the underperformance at Avaya was attributable to the problems allegedly concealed by defendants versus unrelated factors. However, based on my preliminary review and analysis of the above information, it is my opinion that at least some portion of the inflation created by the alleged misrepresentations was removed by the above alleged "corrective" disclosures prior to the end of June 24, 2022.

Executed this 26th day of January, 2024, in San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT, CFA

- 14 -

# EXHIBIT A

# Bjorn I. Steinholt, CFA

**Caliber Advisors, Inc.**
10620 Treena Street, Suite 230, San Diego, CA 92131
Telephone: (858) 549-4900   •   Facsimile: (858) 549-9317
Bjorn@CaliberAdvisors.com

---

## Employment History

**Caliber Advisors, Inc.**
_Managing Director_ (2014 to present)

Caliber Advisors is a full-service valuation and economic consulting firm. Mr. Steinholt provides a broad range of capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure, securities analysis and financial valuations, including litigation consulting and expert testimony relating to the economic issues that arise in large complex securities fraud cases.

**Financial Markets Analysis, LLC**
_Principal_ (2000 to 2014)

Financial Markets Analysis was a financial valuation and economic consulting firm that primarily focused on providing economic analyses and expert testimony relating to securities analysis and financial economics. Mr. Steinholt provided capital markets consulting, financial valuation services, and various litigation consulting and expert testimony in large complex securities fraud cases.

**Business Valuation Services, Inc. (subsidiary of CBIZ, Inc.)**
_Principal_ (1999 -2000)
_Vice President_ (1998-1999)

Business Valuation Services was a national full-service financial valuation firm. Mr. Steinholt provided valuations of businesses and financial securities, including common stock, warrants, options, preferred stock, debt instruments and partnership interests, as well as intangible assets such as patents, trademarks, software, customer lists, work-force and licensing agreements. Mr. Steinholt also provided litigation support in shareholder disputes.

**Princeton Venture Research, Inc.**
_Senior Vice President_ (1996-1998)
_Vice President_ (1993-1996)
_Financial Analyst_ (1990-1993)

Princeton Venture Research was a venture capital, investment banking and economic consulting firm.  Mr. Steinholt provided various financial and economic analyses for venture capital, investment banking and consulting assignments, including shareholder disputes.  Among other things, he helped identify and evaluate prospective emerging technology companies in need of venture capital funding.

**University of San Diego**
_Research Assistant, Graduate Fellow_ (1988-1989)

Mr. Steinholt assisted with research regarding the performance of international equity markets following the 1987 stock market crash.  He also developed computer programs related to the portfolio theory, including risk minimization and portfolio optimization based on quadratic programming techniques.

## Educational Background

- **Chartered Financial Analyst**
  CFA Institute, 1997

- **Master of International Business**
  University of San Diego, 1989

- **Sivilingeniør -** (Norwegian graduate level engineering designation)
  University of Trondheim, Norway, 1987

- **Bachelor of Science in Computer Science,**
  **Computer Science and Engineering**
  California State University, Long Beach, 1987

## Professional Affiliations

- **Member, CFA Institute**

- **Member, Financial Analysts Society of San Diego**

### Publications

"Price Impact Analysis – Where The Halliburton Court Erred," Expert Analysis Section, *Law360* (August 25, 2015).

### Testimony

*In re: New England Health, et al v. Qwest Comm Intl Inc, et al.,* Case No. 1:01-cv-01451 (United States District Court for the District of Colorado). QwestDex Hearing Testimony relating to Section 11 damages: January 28, 2003. Mr. Steinholt was retained to opine on potential Section 11 damages.

*In re: King, et al v. CBT Group PLC, et al.,* Case No. 98-cv-21014 (United States District Court, Northern District of California, San Jose Division). Deposition Testimony: November 5, 2003. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.,* Case No. 99-cv-399 (United States District Court, District of Arizona). Deposition Testimony: October 28, 2004. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara). Deposition Testimony: July 28, 2005. Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara). Deposition Testimony: August 9, 2005. Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: AB Liquidating Corp., fka Adaptive Broadband Corporation v. Ernst & Young, LLP* (American Arbitration Association). Arbitration, March 23, 2006. Mr. Steinholt was retained to analyze the share turnover in Adaptive Broadband Corporation in connection with the liquidation of the company's assets.

*In re: AOL Time Warner, Inc. Securities and "ERISA" Litigation, Consolidated Opt-Out Action*, Case No. 1:06-cv-00695 (United States District Court, Southern District of New York). Deposition Testimony: September 28, 2006. Mr. Steinholt was retained to opine on materiality and loss causation in a Section 11 context.

*In re: Ohio Public Employees Retirement System vs. Richard Parsons, et al.,* Case No. 03-CVH07-7932 (Court of Common Pleas of Franklin County, Ohio).  Deposition Testimony: March 22, 2007.  Mr. Steinholt was retained to quantify Section 11 damages for various institutional investors.

*In re: Ryan v. Flowserve Corporation et al.,* Case No. 3:03-cv-01769 (United States District Court, Northern District of Texas, Dallas Division).  Deposition Testimony: June 15, 2007.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Nursing Home Pension Fund et al v. Oracle Corporation et al.,* Case No. 3:01-cv-00988 (United States District Court, Northern District of California).  Deposition Testimony: July 2, 2007.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Carson, et al v. Neopharm Inc, et al.,* Case No. 1:02-cv-02976 (United States District Court, Northern District of Illinois, Eastern Division).  Deposition Testimony: January 22, 2008.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division).  Deposition Testimony: February 1, 2008.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Robert Kelleher, et al. v. ADVO, Inc., et al.*, Case No. 3:06-cv-01422 (United States District Court, District of Connecticut).  Deposition Testimony: September 16, 2008.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation in a class certification context.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division).  Deposition Testimony: January 30, 2009.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Huffy Corporation Securities Litigation*, Case No. 3:05-cv-00028 (United States District Court, Southern District of Ohio, Western Division (at Dayton)).  Deposition Testimony: November 12, 2009.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and potential damages for lead plaintiff.

*Lori Weinrib v. The PMI Group, Inc. et al*., Case No. 3:08-cv-01405, (United States District Court for the Northern District of California).  Deposition Testimony: June 14, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Kenneth McGuire, et al. v. Dendreon Corporation, et al*., Case No. 2:07-cv-00800 (United States District Court, Western District of Washington at Seattle).  Deposition Testimony: June 18, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Livonia Employees' Retirement System v. The Boeing Company et al*., Case No. 1:09-cv-07143, (United States District Court, Northern District of Illinois, Eastern Division).  Deposition Testimony: November 5, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al*., Case No.08-cv-1689 (United States District Court, Southern District of California).  Deposition Testimony: February 1, 2011.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Paul Luman, et al. v. Paul G. Anderson, et al*. (*FCStone Group Securities Litigation*), Case No. 4:08-cv-00514 (United States District Court, Western District of Missouri, Western Division).  Deposition Testimony: January 5, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*T Grocery & Food Employees Welfare Fund v. Regions Financial Corporation et al*., Case No. 2:10-cv-02847 (United States District Court, Northern District of Alabama).  Deposition Testimony: May 8, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al*., Case No. 1:11-cv-05026, (United States District Court, Southern District of New York).  Deposition Testimony: May 18, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*United Food and Commercial Workers Union et al v. Chesapeake Energy Corporation et al*., Case No. 5:09-cv-01114 (United States District Court, Western District of Oklahoma).  Deposition Testimony: August 14, 2012.  Mr. Steinholt was retained to opine on loss causation in a Section 11 context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al.*, Case No. 1:11-cv-05026, (United States District Court, Southern District of New York). Deposition Testimony: October 4, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Western Pennsylvania Electrical Employees Pension Fund, et al. v. Dennis Alter, et al.*, (*Advanta International Inc. Securities Litigation*) Case No. 2:09-cv-04730 (United States District Court, Eastern District of Pennsylvania). Deposition Testimony: May 1, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Southern Avenue Partners LP v. The Perot Family Trust et al.*, (*Parkcentral Global Litigation*) Case No. 3:09-cv-00765 (United States District Court, Northern District of Texas, Dallas Division). Deposition Testimony: May 6, 2013. Mr. Steinholt was retained to opine on the calculation of potential damages.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al.*, Case No. 08-cv-1689 (United States District Court, Southern District of California). Deposition Testimony: June 25, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Garden City Employees' Retirement System v. Psychiatric Solutions, Inc. et al.*, Civil Action No. 3:09-cv-00882 (United States District Court, Middle District of Tennessee, Nashville Division). Deposition Testimony: June 6, 2014. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al.*, Case No. 12-cv-05162 (United States District Court, Western District of Arkansas (Fayetteville)). Deposition Testimony: November 9, 2015. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Alan B. Marcus, et al. v. J.C. Penney Company, Inc., et al.*, Case No. 13-cv-00736 (United States District Court, Eastern District of Texas (Tyler Division)). Deposition Testimony: March 4, 2016. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, Index No: 652996/2011 (Supreme Court of the State of New York, County of New York). Deposition Testimony: April 1, 2016. Mr. Steinholt was retained to analyze loss causation related to two CDO-squared securities purchased by Basis Yield Alpha Fund (Master) from Goldman Sachs.

*John Sender v. Franklin Resources, Inc.*, Case No. 11-cv-03828 (United States District Court, Northern District of California).   Deposition Testimony: June 17, 2016.   Mr. Steinholt was retained to analyze ERISA damages related to plaintiff's participation in defendant's Employee Stock Ownership Plan.

*Alan Willis, et al. v. Big Lots, Inc., et al.*, Case No. 12-cv-00604 (United States District Court, Southern District of Ohio (Columbus)).   Deposition Testimony: July 21, 2016.   Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*In re: Beaver County Employees Retirement Fund vs. Cyan, Inc., et al.,* Lead Case No. CGC-14-538355   (Superior Court of the State of California, County of San Francisco). Deposition Testimony: October 14, 2016.  Mr. Steinholt was retained to opine on potential damages pursuant to §§11 and 12 of the Securities Act of 1933.

*In Re Willbros Group, Inc. Securities Litigation*, Case No. 14-cv-3084 (United States District Court, Southern District of Texas, Houston Division).   Deposition Testimony: April 14, 2017.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Shankar v. Imperva, Inc. et al.*, Case No. 14-cv-01680 (United States District Court, Northern District of California (Oakland)).   Deposition Testimony: May 5, 2017.   Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Glitz et al. v. Sandridge Energy Inc et al.*, Case No. 12-cv-01341 (United States District Court, Western District of Oklahoma).  Deposition Testimony: May 3, 2018.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Gary Curran, et al. v. Freshpet, Inc., et al.*. Case No. 16-cv-02263 (United States District Court, District of New Jersey).  Deposition Testimony: July 25, 2018.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Megan Villella , et al. v. Chemical & Mining Co. of Chile, Inc., et al.*, Case No. 15-cv-02106 (United States District Court, Southern District of New York).   Deposition Testimony: November 9, 2018.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Glitz et al. v. Sandridge Energy Inc et al.*, Case No. 12-cv-01341 (United States District Court, Western District of Oklahoma).  Deposition Testimony: June 12, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Gary Curran, et al. v. Freshpet, Inc., et al.*. Case No. 16-cv-02263 (United States District Court, District of New Jersey).  Deposition Testimony: June 27, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) and Section 11 damages.

*Scheufele et al v. Tableau Software, Inc. et al.*, Case No. 17-cv-05753 (United States District Court, Southern District of New York).  Deposition Testimony: September 24, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Douglas S. Chabot, et al. v. Walgreens Boots Alliance, Inc., et al.*, Case No. 18-cv-02118 (United States District Court, Middle District of Pennsylvania).  Deposition Testimony: October 11, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Jon D. Gruber, et al. v. Dakota Plains Holdings, Inc., et al.*, Case No. 16-cv-09727 (United States District Court, Southern District of New York).  Deposition Testimony: July 2, 2020.  Mr. Steinholt was retained to opine on economic issues relating to materiality, loss causation and Section 10(b) damages.

*Scheufele et al v. Tableau Software, Inc. et al.*, Case No. 17-cv-05753 (United States District Court, Southern District of New York).  Deposition Testimony: July 28, 2020.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Purple Mountain Trust v. Wells Fargo & Company et al.*, Case No. 18-cv-03948 (United States District Court, Northern District of California).  Deposition Testimony: November 13, 2020.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Gordon v. Vanda Pharmaceuticals Inc. et al*, Case No. 19-cv-01108 (United States District Court, Eastern District of New York).  Deposition Testimony: November 5, 2021.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation et al.*, Case No. 20-cv-00576 (United States District Court, Southern District of Texas).  Deposition Testimony: November 17, 2021.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Bjorn Steinholt, CFA*                                                                                          Page   8

*Douglas S. Chabot, et al. v. Walgreens Boots Alliance, Inc., et al.*, Case No. 18-cv-02118 (United States District Court, Middle District of Pennsylvania).  Deposition Testimony: January 14, 2022.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Jon D. Gruber, et al. v. Dakota Plains Holdings, Inc., et al.*, Case No. 16-cv-09727 (United States District Court, Southern District of New York).  Trial Testimony: June 9-10, 2022.  Mr. Steinholt provided trial testimony on economic issues relating to loss causation and Section 10(b) damages.

*In re: Cloudera, Inc. Securities Litigation,* Lead Case No. CV348674 (Superior Court of the State of California, County of Santa Clara).  Deposition Testimony: September 22, 2022.  Mr. Steinholt was retained to opine on potential damages pursuant to §§11 and 12 of the Securities Act of 1933.

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation et al.*, Case No. 20-cv-00576 (United States District Court, Southern District of Texas).  Deposition Testimony: December 21, 2022.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation et al.*, Case No. 20-cv-00576 (United States District Court, Southern District of Texas).  Deposition Testimony: March 13, 2023.  Mr. Steinholt was retained to review and critique opinions by opposing expert.

*Luna v. Carbonite, Inc. et al.*, Case No. 19-cv-11662 (United States District Court, District of Massachusetts). Deposition Testimony: May 8, 2023.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Funko, Inc. Securities Litigation,* Case No. 17-2-29838-7 SEA (Superior Court of Washington in and for King County).  Deposition Testimony: August 1, 2023. Mr. Steinholt provided testimony regarding the quantification of class wide damages under §§11 and 12 of the Securities Act of 1933.