UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLIVER JIANG, Individually and on Behalf of All Others Similarly Situated,<br><br>                 Plaintiff,<br><br>v.<br><br>JAMES M. CHIRICO, JR., and KIERAN J. MCGRATH,<br><br>                 Defendants. | Case No. 1:23-cv-01258-PGG<br><br>**PAUL SWEATT'S RESPONSE TO THE COURT'S JANUARY 19, 2024 ORDER (ECF 72)**<br><br><u>CLASS ACTION</u> |

Pursuant to  this Court's January 19, 2024 order (ECF No. 72) (the "Order"), Lead Plaintiff movant Paul Sweatt respectfully submits this response to the City of Pittsburgh's Comprehensive Municipal Pension Trust Fund's response filed on January 26, 2024 (ECF No. 76). Sweatt's response also clarifies the calculation of his total loss in light of the analysis applied in *Sallustro v. CannaVest Corp*., 93 F. Supp. 3d 265 (S.D.N.Y. 2015).

## I.        INTRODUCTION

 Despite having multiple rounds of briefing to do so, Pittsburgh still cannot demonstrate how the alleged disclosures that occurred prior to Pittsburgh's June 27, 2022 sale of its shares in Avaya Holdings Corp. (see Cmplt. (ECF No. 1) ¶¶7-10, 85-88, 90-93, 97; Rosenfeld Decl., Ex. D. (ECF No. 36-4)), which pertain exclusively to Avaya's earnings misses and liquidity, somehow constitute "corrective disclosures" revealing to the market the alleged falsity of Defendants' alleged prior statements concerning the "onerous" RingCentral partnership. *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.,* 879 F.3d 474, 480 n.3 (2d Cir. 2018).

Further, pursuant to the Order, movant Sweatt has clarified his loss according to the Court's analysis in *CannaVest* showing LIFO losses, minus ins-and-outs, of $511,237.53. *See* Declaration of Lucas E. Gilmore, Ex. A, filed herewith. As shown below, this amount exceeds any losses Pittsburgh may claim based on any proper reading of the supported allegations of the Complaint.

## II.        ARGUMENT

### A.        Pittsburgh Cannot Show that Events Occurring Before It Sold Out its Position on June 27, 2022 were "Corrective Disclosures"

Pittsburgh concedes that the Complaint pleads two separate undisclosed truths. The first being that Avaya hid its "onerous" contract terms with RingCentral; more specifically that:

> – the RingCentral partnership came with onerous requirements that
> were crippling its business metrics and financial prospects during

> the Class Period. Avaya granted RingCentral exclusive rights to
> certain products to its customers. This meant Avaya had to
> discontinue certain of its own product offerings that had only
> recently begun achieving momentum. This also exposed the
> Company to losses as RingCentral paid Avaya commissions up
> front, which would need to be returned if Avaya later missed on
> sales thresholds. More significantly, ACO conflicted with other
> Avaya product offerings, causing Avaya to have to alter those
> offerings, resulting in it losing some important members of its
> executive team.

*See* Pitt. Resp. at 1 citing ¶5. [1] The second being Avaya's admitted false financial statements and

lack of internal controls. *See* Pitt. Resp. at 1-2 citing ¶6.

Pittsburgh's insurmountable hurdle is that the *Jiang* complaint, drafted by its counsel,

only pleads that the second undisclosed truth relating to Avaya's false financial statements and

lack of internal controls was ever disclosed. Nowhere in the complaint is any part of the

"onerous" contract terms with RingCentral ever alleged to have been disclosed. Even Mr.

Steinholt, upon whose declaration Pittsburgh relies on, admits to having to assume the

RingCentral disclosures that were never actually pled, while noting, in contrast, that "[i]n fact"

the false financial statements were revealed when Avaya announced the "Company's annual

report filed with the SEC for fiscal year 2021 . . . on November 22, 2021 'should no longer be

relied upon.'". ECF 76-1 at ¶4, *Compare* ¶¶13-14 (Steinholt Decl.).

Thus, the only actual full disclosure in the Complaint is the revelation on November 30,

2022 that Avaya's financial  statements dating back to November 2021 can no longer be relied

upon and thus are false (¶19). Plausibly, this undisclosed truth was partially revealed by the

---

[1] ¶5 is repeated in ¶¶42-43 and ¶96 as the reason why statements were false, but nowhere
does the Complaint cite to any disclosure of these purported "facts". At a minimum, one would
expect that these alleged "onerous" terms were disclosed somewhere at some point during the
Class Period, or even after. But no, the Complaint is silent leading one to conclude the drafter
was speculating.

announcement of the firing of the CEO and the disclosure of an unquantified impairment charge on July 28, 2022, and the revelation of an Audit Committee investigation on August 9, 2022. But the July 28 and August 9, 2022 corrective disclosure events occurred well *after* Pittsburgh completely sold out its position on June 27, 2022. ¶¶12, 14.

Without having pled any actual disclosure of the "onerous" RingCentral contract terms Pittsburgh cannot show any linkage with Avaya's allegedly false prior statements the Court asked Pittsburgh to explain. Specifically, the February 9, 2022, alleged statements discussed only missing revenue and earnings expectations and a generally lower transition to subscriptions. (¶¶10, 85-88). The May 10, 2022 statements similarly reveal only another revenue and earnings miss and a general slowing transition to subscriptions. (¶¶10, 90-93). The June 24, 2022 statements reveal only Avaya issuing $250 million in debt to repay existing debt, indicating liquidity issues. (¶¶11, 97). These disclosures say nothing about the RingCentral partnership. Likewise, Pittsburgh can point to no economic evidence – such as an analyst report or news article – suggesting the market understood the alleged adverse information disclosed on February 9, May 10, and/or June 24, 2022 to be a by-product of an allegedly misrepresented RingCentral partnership.

Accordingly, Pittsburgh cannot show that the Complaint properly pleads corrective disclosures prior to Pittsburgh closing out its position. The heavy reliance on the Steinholt declaration showing statistically significant price increases and decreases cannot remedy this utter lack of disclosure. Statistical correlation is a substitute for causation.

On the other hand, the disclosure of financial falsity, and partial disclosures after Pittsburgh's sales, are well pled, and need not be matched to any conclusory allegations of undisclosed RingCentral "onerous" terms. The July 28, 2022 statements (a month after

Pittsburgh closed out its position) hinted strongly at financial wrongdoing by disclosing an

unquantified but "significant" impairment charge and that its Board had terminated defendant

CEO Chirico and that he had been replaced by former Vontage CEO Masarek. (¶98). Even more

strongly, the August 9, 2022 disclosure suggested possible financial wrongdoing, revealing the

Board's Audit Committee had opened an internal investigation "to review the circumstances

surrounding" the financial results reported for the most recent quarter. (¶¶ 14, 100). Finally, on

November 30, 2022 Avaya disclosed false financials and a weakness in internal controls,

finding:

> defects in its internal reporting controls and that as a result,
> defendants' attestations to those controls in Company's annual
> report **filed with the SEC for FY21 on November 22, 2021**
> "**should no longer be relied upon.**" Specifically, Avaya revealed
> that the Board's ongoing investigation had revealed that "the
> existence of the [whistleblower's] email and the subsequent
> internal investigation were not included in the [Company's]
> whistleblower log or communicated to certain members of
> management and the Company's independent registered public
> accounting firm," and that "[b]ased on its re-assessment,
> management has determined that material weaknesses existed in its
> [internal controls] as the Company did not design and maintain
> effective controls."

(¶105)(emphasis added).

None of these disclosures rely upon the unsupported conclusory allegations of the

undisclosed "onerous" RingCentral contract terms, exclusive arrangements, commission

clawbacks, product conflicts or executive departures.

As the Supreme Court stated in *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347

(2005) a complaint must provide "some indication of the loss and the *causal connection* that the

plaintiff has in mind" (emphasis added). At minimum, a corrective disclosure must reveal "the

falsity of a prior statement." *Ark. Teachers* 879 F.3d at 480 n.3. But here, there is no allegation of

a corrective disclosure for the "onerous" RingCentral contract terms.

Contrary to Pittsburgh's spin, this Court's opinion in *In re Evolus Inc. Sec. Litig*., 2021 WL 4251957, at *9 (S.D.N.Y. Sept. 17, 2021) is not supportive of their claimed corrective disclosures. In *Evolus*, while the Court recognized loss causation does not require full disclosure and can be established by partial disclosure during the class period, the complaint pled an ultimate full disclosure of the omitted facts, and the partial disclosures were closely matched to that full disclosure. Specifically, this Court noted the announcement of an investigation into misappropriation (partial disclosure) and an ITC attorney finding of misappropriation of trade secrets (the ultimate disclosure). *See Evolus* at *8. Here, the only legitimate partial disclosures start with the firing of the CEO and unspecified impairment charges followed shortly with an Audit Committee investigation, ending ultimately with a withdrawing of financial statements. *Compare Kux-Kardos v. VimpelCom, Ltd*., 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) ("The Court agrees that these disclosures 'somehow reveal[ed] to the market that a defendant's prior statements were not entirely true.' … This is because, as various courts have found, 'the announcement of ... investigations may qualify as partial disclosures for purposes of loss causation.'") citing *In re Gentiva Sec. Litig*., 932 F.Supp.2d 352, 388 (E.D.N.Y.2013) and *Take-Two Interactive Sec. Litig*., 551 F. Supp. 2d 247,at 287 (collecting cases starting with partial disclosures as being the announcement of an investigation).

*In re Signet Jewelers Ltd. Sec. Litig*., 2019 WL 3001084, at *2 n.1,*14 (S.D.N.Y. July 10, 2019)  also does not support Pittsburgh's attempts. There, the court found a sufficient link between an earnings miss (partial disclosure) and a disclosed financial fraud (final full disclosure) at the class certification stage. Here, not only were the supposed "onerous" contract terms never disclosed (at least in the complaint), but there also exists no allegation in the complaint that the financial fraud in November 2022 was partially revealed in any of the pre-

June 27th disclosures. *See* ¶¶5, 96. *Compare In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 389 ("Speculation will not suffice to link the explanations actually given in the disclosures—the softness in home health episodic volumes and new regulatory requirements—and Gentiva's allegedly fraudulent billing.").

Finally, *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 274 (S.D.N.Y. 2010) does not support Pittsburgh's position. There, the Court had no trouble finding a relationship between disclosures of billions of dollars of CDO losses and Defendant's failure to disclose the lowering underwriting standards of those CDOs and GAAP violations. No such clear, non-speculative match is pled here or shown in Pittsburg's response.

**B.      Even if the Pre-June 27th Statements are Corrective Disclosures of Financial Fraud, Pittsburgh's Legitimate Losses are Smaller than those of Sweatt**

Pittsburgh has another insurmountable hurdle – even if the Court were to accept the February 9, May 10, and/or June 24, 2022 as partial disclosures of Avaya's improper accounting and deficient internal controls, Pittsburgh's legitimate losses are much smaller than those of Sweatt.

In Sweatt's opening motion (ECF No. 19 at 1 fn.1) Sweatt pointed out that the first filed complaint (*Fletcher*, now voluntarily dismissed) alleged an original one-year class period beginning in **November 22, 2021 and ending on November 29, 2022**. This class period and alleged false and misleading statements matched Avaya's November 30, 2022 disclosure that its annual report filed one year earlier with the SEC on November 22, 2021 "should no longer be relied upon." *See Fletcher* complaint ECF 25-7 ¶¶1, 8), *Compare Jiang* complaint ¶105.

In applying to be the lead plaintiff, Pittsburgh relied upon the *Fletcher* complaint and statutory notice as starting the 60-day PSLRA time period for lead plaintiffs to move. ECF No.

35 at 3 (Pittsburgh Brief) and ECF No. 36-1 (Pomerantz PSLRA notice of class action attached to Rosenfeld Declaration, Ex. A).

But, as reflected in Pittsburgh's certification – which was executed almost two weeks before its counsel filed the *Jiang* complaint – the bulk of Pittsburgh's purchases of Avaya shares ***pre-dated*** the *Fletcher* class period, which commenced with the admittedly false November 22, 2021 financial statement matching the November 30, 2022 corrective disclosure. Specifically, out of 59,550 shares purchased by Pittsburg, 42,350 pre-date that November 22, 2021 statement. Importantly, Pittsburgh purchased 29,000 over 10 months earlier on January 11, 2021. ECF No. 36-3 at 3. Thus, Pittsburgh purchased a mere 17,200 shares during the class period alleged in *Fletcher*, with LIFO losses of only $259,530.00. *See Gilmore* Decl. Ex. B

 The *Jiang* complaint, drafted by Pittsburgh's counsel, pushed the class period back to pre-January 11, 2021, statements to capture Pittsburgh's greatest share of losses. The *Jiang* complaint does so by creatively crafting a never disclosed "corrective disclosure" to justify the *Jiang* complaint's implausible long class period beginning on October 3, 2019. Under the *Jiang* complaint, the allegedly false statements made prior to November 22, 2021, relate solely to the never disclosed RingCentral partnership "onerous" terms. ¶¶1, 45-47. None have anything to do with the false financial statements disclosed on November 30, 2022.

Thus, if this Court agrees that the *Jiang* complaint's allegations of the undisclosed RingCentral "onerous" contract terms are conclusory and unsupported, but that the corrective pre-June 27, 2022 statements concerning earnings misses and liquidity might still plausibly have some relationship to the November 22, 2021 false financial statements, then only Pittsburgh's purchases ***after*** November 22, 2021 are eligible for losses. Even then, Pittsburgh's losses of

**$259,530.00** on purchases made between November 22, 2021 and November 29, 2022, inclusive, are much small than Sweatt's losses of **$511,237.53** during the same period.

C.      **Movant Paul Sweatt's Clarification of Losses Following *CannaVest***

Finally, to comply with this Court's January 19th Order, Mr. Sweat adjusted his loss calculations following the methodology applied by this Court in *CannaVest. See* Gilmore Decl., Exhibit A. The loss calculations follow the LIFO methodology originally submitted, minus in-and-out trades between corrective disclosures in one of Sweatt's accounts and the two option trades. The adjustments slightly increase Mr. Sweat's recognizable loss as a result of removing in-and-out trades between corrective disclosures which had been profitable. With these adjustments, Sweatt's losses are $511,237.53.

### III.      CONCLUSION

In conclusion, because the Complaint is devoid of any corrective disclosures about the undisclosed RingCentral "onerous" contract terms, Pittsburgh cannot and has not met the Second Circuit requirement for pleading partial corrective disclosures relating to missed earning guidance or liquidity. Even if the statements made prior to Pittsburgh's sale June 27, 2022 sale of its shares in Avaya are considered to be partial "corrective disclosures" of the well pled November 22, 2021 false financial statements, Pittsburgh's recognizable LIFO losses are much smaller than Mr. Sweatt's losses.

DATED: February 2, 2024                      Respectfully submitted,

                                             HAGENS BERMAN SOBOL SHAPIRO LLP

                                             By  */s/ Lucas E. Gilmore*
                                                 Lucas E. Gilmore, *pro hac vice*
                                             Reed R. Kathrein, *pro hac vice* forthcoming
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             715 Hearst Avenue, Suite 300

Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Nathaniel A. Tarnor
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
nathant@hbsslaw.com

*Counsel for [Proposed] Lead Plaintiff Paul Sweatt*

Brian J. Schall, *pro hac vice* forthcoming
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192
brian@schallfirm.com

*Additional Counsel for [Proposed] Lead Plaintiff Paul Sweatt*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Lucas E. Gilmore*
LUCAS E. GILMORE

011154-11/2436330 V2