UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

OLIVER JIANG, Individually and on Behalf
of All Others Similarly Situated,

                        Plaintiff,

     vs.

JAMES M. CHIRICO, JR. and KIERAN J.
McGRATH,

                      Defendants.

————————————————————— x

Civil Action No. 1:23-cv-01258-PGG

<u>CLASS ACTION</u>

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION TO MODIFY
THE PSLRA DISCOVERY STAY**

# TABLE OF CONTENTS

**Page**

I.    FACTUAL BACKGROUND ............................................................................................1

    A.    Procedural History ...........................................................................................1

    B.    Plaintiffs' Claims in the *Jiang* Action ..............................................................2

    C.    Avaya's Chapter 11 Bankruptcy Case and Confirmed Plan ...................................4

    D.    The State Court Actions ....................................................................................4

II.   ARGUMENT ...........................................................................................................8

    A.    Applicable Legal Standards ...............................................................................8

    B.    The Relevant Factors Support a Modification of the PSLRA Discovery Stay ...................................................................................................................10

        1.    Plaintiffs Seek Particularized Discovery ..................................................10

        2.    Plaintiffs Will Suffer Undue Prejudice if the PSLRA Stay Is Not Modified .............................................................................................11

        3.    The Producing Parties Would Face No Burden in Providing the Requested Limited Discovery ..................................................................13

        4.    The Request to Modify the Stay Does Not Offend the Purposes Behind the PSLRA ...............................................................................14

III.  CONCLUSION .......................................................................................................16

# TABLE OF AUTHORITIES

Page

## CASES

*Courter v. CytoDyn, Inc.*,
  2022 WL 621535
  (W.D. Wash. Mar. 3, 2022) .........................................................................................................10

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  2009 WL 4796169
  (S.D.N.Y. Nov. 16, 2009) ................................................................................9, 10, 12, 13

*In re Delphi Corp.*
  2007 WL 518626
  (E.D. Mich. Feb. 15, 2007) .......................................................................................................12

*In re FirstEnergy Corp. Sec. Litig.*,
  2021 WL 2414763
  (S.D. Ohio June 14, 2021) ........................................................................................................10

*In re FirstEnergy Corp. Sec. Litig.*,
  229 F.R.D. 541 (N.D. Ohio 2004) ...........................................................................................13

*In re LaBranche Sec. Litig.*,
  333 F. Supp. 2d 178 (S.D.N.Y. 2004)................................................................................12, 13

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  220 F.R.D. 246 (D. Md. 2004).................................................................................................10

*In re Williams Sec. Litig.*,
  2003 WL 22013464
  (N.D. Okla. May 22, 2003) .......................................................................................................13

*In re WorldCom, Inc. Sec. Litig.*,
  234 F. Supp. 2d 301 (S.D.N.Y. 2002)................................................................9, 10, 11, 14

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
  947 F. Supp. 2d 368 (S.D.N.Y. 2013).....................................................................................10

*Pension Tr. Fund for Operating Eng'rs v. Assisted Living Concepts, Inc.*,
  943 F. Supp. 2d 913 (E.D. Wis. 2013).....................................................................................10

*Singer v. Nicor, Inc.*,
  2003 WL 22013905
  (N.D. Ill. Apr. 23, 2003) ....................................................................................................12, 13

**Page**

*Waldman v. Wachovia Corp.*,
2009 WL 86763
(S.D.N.Y. Jan. 12, 2009)..............................................................................................9, 10, 12


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78u-4(a)(3)(B).......................................................................................................16
§78u-4(a)(3)(B)(ii).....................................................................................................2
§78u-4(b)(3)(B)................................................................................................1, 8, 9


**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
Pub. L. No. 104-67, 109 Stat. 737 (1995)....................................................... *passim*

Plaintiff Oliver Jiang ("Jiang") and lead plaintiff movant City of Pittsburgh Comprehensive Municipal Pension Trust Fund ("Pittsburgh," and together with Jiang, "Plaintiffs") in the above-captioned securities class action (the "*Jiang* Action") respectfully move this Court for an order modifying the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") to allow Plaintiffs to obtain documents from Avaya Holdings Corp. ("Avaya" or the "Company") and the plaintiffs in the State Court Actions (defined below).

The unusual and unique set of circumstances here places Plaintiffs and the Class in the *Jiang* Action—whose source of recovery is primarily limited to the proceeds of Avaya's directors and officers liability insurance—at a significant disadvantage, as it appears reorganized Avaya is favoring the plaintiffs in the State Court Actions by providing them access to internal documents. Notably, pursuant to Avaya's Chapter 11 plan of reorganization, certain plaintiffs in the State Court Actions appear to collectively control reorganized Avaya's board of directors. Given the limited fund available, it is critical that Plaintiffs in the *Jiang* Action are provided the same access to those documents to place them on an equal playing field with the plaintiffs in the State Court Actions.[1]

Plaintiffs' request is particularized, will not burden Defendants, Avaya, or the plaintiffs in the State Court Actions, and is consistent with the policies underlying the PSLRA. Accordingly, Plaintiffs' motion should be granted.

## I.    FACTUAL BACKGROUND

### A.    Procedural History

The initial complaint in this action was filed on February 14, 2023 by Plaintiff Jiang (the

---

[1]  In the interests of efficiency, Plaintiffs are seeking leave from the discovery stay imposed by the PSLRA, 15 U.S.C. §78u-4(b)(3)(B), even though Defendants have yet to file a motion to dismiss. The PSLRA only provides for a stay of discovery "during the pendency of any motion to dismiss." *Id*.  Plaintiffs' request for relief from the stay is not a concession that the stay applies before the filing of a motion to dismiss but simply an effort to reduce the issues presented by this application.

"*Jiang* Complaint"). ECF No. 1. On March 6, 2023, pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(3)(B)(ii), certain members of a putative class of purchasers of Avaya securities, including Pittsburgh, filed motions for appointment as lead plaintiff. ECF Nos. 10-43. On March 27, 2023, the lead plaintiff motions were fully submitted and remain pending. ECF Nos. 61-62. On December 7, 2023, Plaintiffs filed a pre-motion letter with the Court requesting leave to file a motion for limited relief from the discovery stay imposed by the PSLRA. ECF No. 69. On December 12, 2023, Defendants James M. Chirico, Jr. ("Chirico") and Kieran J. McGrath ("McGrath") filed letters in response to Plaintiffs' pre-motion letter. ECF Nos. 70-71. On January 19, 2024, the Court ordered Pittsburgh to file a submission "addressing why the alleged disclosures that were made prior to Pittsburgh's [ ] June 27, 2022 sale of its shares in Avaya . . . constitute 'corrective disclosures.'" ECF No. 72. On the same day, the Court granted Plaintiffs' pre-motion letter and ordered Plaintiffs to file their motion to modify the discovery stay by February 2, 2024. ECF No. 73. On January 26, 2024, Pittsburgh filed its Response to the Court's January 19, 2024 Order addressing the corrective disclosures. ECF No. 76.

    **B.    Plaintiffs' Claims in the *Jiang* Action**

Plaintiffs' allegations in the *Jiang* Action concern Avaya's strategic collaboration with RingCentral, Inc., and Avaya's larger transition from a one-time license-fee revenue model to a cloud-computing-based recurring subscription-based model. *Jiang* Complaint ¶¶4, 40. The case also concerns Avaya's financial reporting and alleged misstatements during the Class Period[2] related to the Company's "success" and "significant progress" in its transition to the subscription-based model, as well as Avaya's missed financial projections. *Id*. ¶71.

---

[2] The Class Period in the *Jiang* Action is October 3, 2019 through November 29, 2022.

The *Jiang* Complaint alleges, *inter alia*, that Defendants provided investors materially false and misleading earnings projections for the third quarter of fiscal 2022 ending June 30, 2022 ("3Q22") in order to raise new debt to refinance debt that was coming due in 2023. *Id.* ¶15. The *Jiang* Complaint alleges that on June 24, 2022, Avaya disclosed that it would be selling $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027, bringing its total outstanding debt to more than $2.8 billion, and represented that the proceeds would be used "to prefund the repayment of, repurchase or otherwise make certain payments in respect of the Company's existing $350.0 million of 2.25% Convertible Senior Notes due 2023." *Id.* ¶¶11, 97. By making this announcement, Defendants conceded that Avaya was selling debt at 8% to replace debt costing it only 2.25%, tacitly admitting that it lacked the $350 million required to pay off the 2.25% notes in 2023. *Id.*

On July 28, 2022, Avaya issued a press release pre-announcing its financial results for 3Q22, disclosing much lower revenues and earnings before interest, taxes, depreciation, and amortization ("EBITDA") than expected and far lower than the Company's guidance. *Id.* ¶¶12, 98. Defendants also disclosed a significant impairment charge and that its CEO, defendant Chirico, had been terminated. *Id.*

On August 9, 2022, Avaya announced that there was "substantial doubt about the Company's ability to continue as a going concern" in light of an upcoming debt maturity and 3Q22 revenues that came in "substantially lower" than Avaya expected. *Id.* ¶¶14, 100. It also disclosed that the Audit Committee of the Board of Directors had opened an internal investigation "to review the circumstances surrounding" the financial results reported for 3Q22, and another to investigate a whistleblower letter. *Id.* During a conference call, Avaya's CFO, defendant McGrath, blamed the horrible performance on the loss of Avaya's higher-margin revenue sources as the Company shifted

from a licensing sales model to subscription sales for its cloud-based software offerings.  The incoming CEO highlighted what he called past "operational and executorial shortcomings," and attributed Avaya's poor performance in part to clients signing up for smaller and shorter software subscription contracts than expected.  *Id.*

### C.    Avaya's Chapter 11 Bankruptcy Case and Confirmed Plan

Avaya was originally named as a defendant in the *Jiang* Action, *id*. ¶30, but was subsequently dismissed because it filed for Chapter 11 bankruptcy protection on February 14, 2023.  *See* ECF No. 6; *see generally In re: Avaya Inc*., No. 4:23-bk-90088 (MI) (Bankr. S.D. Tex.) (the "Bankruptcy Case").  Contemporaneous with the filing of the Bankruptcy Case, Avaya filed a Chapter 11 plan of reorganization (Bankr. Case ECF No. 325, the "Plan").  On March 22, 2023, the bankruptcy court confirmed the Plan and on May 1, 2023, Avaya emerged from bankruptcy.  Bankr. Case ECF No. 350.

### D.    The State Court Actions

On October 26, 2023, two actions were filed in Mecklenburg County, North Carolina on behalf of purchasers of Avaya convertible notes and lenders under Avaya's Tranche B-3 Term Loan.  *See Brigade Cavalry Fund Ltd. v. James M. Chirico, Jr.*, No. 23CV031948-590 (N.C. Super. Ct. Mecklenburg Cnty. Oct. 26, 2023) (the "*Brigade* Action"), complaint annexed hereto as Exhibit A,[3] and *ALCOF III NUBT, L.P. v. James M. Chirico, Jr.*, No. 23CV031985-590 (N.C. Super. Ct. Mecklenburg Cnty. Oct. 26, 2023) (the "*ALCOF* Action"), complaint annexed hereto as Exhibit B (collectively, the "State Court Actions").  The State Court Actions allege, *inter alia*, fraud claims against Chirico and McGrath, the same defendants as those named in the *Jiang* Action.[4]

---

[3]  Exhibits are attached to the Declaration of Alan I. Ellman, filed herewith.

[4]  The *ALCOF* Action also names Stephen D. Spears ("Spears"), Avaya's former Chief Revenue Officer, as a defendant.

The *Brigade* complaint alleges that Defendants induced the plaintiffs to purchase more than $110 million of near-worthless convertible notes issued by Avaya while hiding its declining business. Ex. A ¶1. According to the *Brigade* complaint, Defendants knew that Avaya needed an influx of cash fast due to $350 million in debt coming due the following year, and that if it could not raise debt financing, it risked having to file for bankruptcy. *Id.* ¶2. The *Brigade* complaint details Defendants' misstatements in securities filings, a May 10, 2022 earnings call, and in subsequent calls with and presentations to potential investors, where Avaya claimed it was financially healthy and on track to earn revenue of at least $685 million and EBITDA of $140 million in 3Q22, and $1 billion in annual recurring revenues by the end of calendar year 2022. *Id.* ¶3. While Avaya was touting its financial results and its projections for the second half of fiscal year 2022, however, Avaya executives were sounding the alarm to Defendants that meeting the projections would be "impossible" and that closing the "quite substantial" gap between reality and the projections given to investors would require "more than one miracle." *Id.* ¶5. "Knowing it was just a matter of time until the truth came out, Defendants rushed the [plaintiffs] to close the transaction as quickly as possible," and just "two weeks after closing, on July 28, 2022, the shocking truth emerged" that Avaya was insolvent and Chirico had been fired. *Id.* ¶7. In support of these allegations, the *Brigade* complaint includes images of internal emails between Spears and other senior Avaya finance personnel discussing Avaya's inability to meet its guidance for fiscal year 2022, revealing that Defendants knew about Avaya's actual financial condition and hid that information from the *Brigade* plaintiffs. *See id.* ¶¶73-75, 77-78, 81-83.

Similar to the allegations in the *Brigade* complaint, the *ALCOF* complaint alleges that Defendants duped the plaintiffs into loaning $236 million to Avaya under a term loan that closed two weeks before Avaya publicly announced that the financial information used to market the term loan

was false and should no longer be relied upon. *See* Ex. B ¶1. Like the *Brigade* complaint, the *ALCOF* complaint explains that Defendants knew that Avaya's business was faltering and that it would be "impossible" and would require "more than a miracle" to meet their previous guidance. *Id*. ¶4. The *ALCOF* complaint explains that before the B-3 Term Loan even closed, Defendants received a report showing that Avaya had materially underperformed previous guidance and "confirming that it was impossible to meet" the previous projections. *Id*. According to the *ALCOF* complaint, "[p]laintiffs funded $236 million of the $350 million B-3 Term Loan, which closed on July 12, 2022. ***Just two weeks later, however, Avaya publicly announced that its 3Q22 Guidance was materially false and overstated.***" *Id*. ¶5 (emphasis in original). Like the *Brigade* complaint, the *ALCOF* complaint quotes from internal emails between Spears, the Senior Director of Sales Finance, and other senior Avaya finance personnel evidencing Defendants' knowledge of the true nature of Avaya's financial condition. *See id*. ¶¶56-60, 62, 65-67, 80-82.[5]

Based upon a review of the complaints in the State Court Actions, it is obvious that the plaintiffs in those cases have obtained internal documents from Avaya.[6] The *Brigade* complaint includes actual images of internal emails between Spears and the Senior Director of Sales Finance, and between other senior Avaya finance personnel (Ex. A ¶¶73-75, 77-78, 81-83) and the *ALCOF* complaint quotes from internal emails between the same individuals (*see* Ex. B ¶¶56-60, 62, 65-67, 80-82), revealing that multiple, high-level Avaya employees were sounding the alarm regarding

---

[5] The allegations in the *Jiang* Complaint are similar to the allegations in the State Court Actions in that they involve alleged misstatements to investors concerning Avaya's projections for 3Q22 and fiscal year 2022, as well as Chirico and McGrath's concealment of the true state of Avaya's business and operations during the Class Period.

[6] In an email dated November 29, 2023 (available upon the Court's request), counsel for McGrath stated that neither McGrath nor Chirico provided any documents to the plaintiffs in the State Court Actions.

Avaya's actual financial condition and that Defendants were aware of it and hid that information from the plaintiffs in the State Court Actions.

It appears that the plaintiffs in the State Court Actions have access to information and documents pertaining to pre-bankruptcy Avaya's business dealings because they presently control the reorganized company following the resolution of the Bankruptcy Case. Based on filings in the Bankruptcy Case, certain plaintiffs in the State Court Actions collectively control reorganized Avaya's board of directors. All of the plaintiffs in the *ALCOF* Action but one were members of either of two ad hoc groups of lenders and bondholders in Avaya's Chapter 11 proceedings (the "Ad Hoc Groups"). Similarly, many of the plaintiffs in the *Brigade* Action were members of an Akin Gump-represented Ad Hoc Group.[7] Upon Avaya's emergence from bankruptcy on May 1, 2023, members of the Ad Hoc Groups affiliated with various plaintiffs in the State Court Actions were entitled to appoint eight of the nine members of the initial board of directors of reorganized Avaya, as follows:

- Apollo (member of the Akin Gump Ad Hoc Group and affiliate of Blackcomb Debt Holdings, L.P., a plaintiff in the *ALCOF* Action): three directors;

- Brigade (member of the Akin Gump Ad Hoc Group and affiliate, manager, or sub-manager of various plaintiffs in the *Brigade* Action): one director;

- Nuveen (member of the Paul Weiss Ad Hoc Group and plaintiff in the *ALCOF* Action): one director; and

- a Selection Committee (comprised of representatives of Apollo, Brigade, Nuveen, and Sculptor, each affiliated with one or more plaintiffs in the State Court Actions): three directors.

---

[7] Verified statements of counsel for the Ad Hoc Groups represented by the Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") law firms setting forth the membership of each Ad Hoc Group and their respective holdings of Avaya's debt and equity are attached hereto as Exhibits C and D, respectively.

*See* Governance Term Sheet, attached hereto as Exhibit E. [8]

Thus, certain of the plaintiffs in the State Court Actions, or their affiliates, collectively control reorganized Avaya. Additionally, following Avaya's emergence from Chapter 11 bankruptcy, its board of directors includes two Apollo partners and the managing partner of Brigade, among others. *See* Members of the New Board, attached hereto as Exhibit F.[9]

Even before Avaya filed for bankruptcy protection, the Ad Hoc Groups apparently recognized they had claims against Defendants and intended to sue them. Pursuant to a Restructuring Support Agreement[10] dated February 14, 2023, certain consenting stakeholders (including members of the Ad Hoc Groups) agreed to support confirmation of the Plan, which was filed concurrently therewith. The Plan, in turn, contains broad releases of various creditors' claims against an assortment of non-Avaya parties, but expressly excludes the claims that are now being pursued in the State Court Actions. *See* Plan, Article VIII.D, E (Bankr. Case ECF No. 325 at 45).

## II.    ARGUMENT

### A.    Applicable Legal Standards

The PSLRA provides for an automatic stay of discovery "during the pendency of any motion to dismiss" in a private securities class action. 15 U.S.C. §78u-4(b)(3)(B). Congress enacted the

---

[8] The Governance Term Sheet was attached as Exhibit 5 to the Restructuring Term Sheet that was attached as Exhibit B to Avaya's Restructuring Support Agreement, which was, in turn, attached as Exhibit B to the disclosure statement for Avaya's Chapter 11 plan of reorganization. Because the full disclosure statement with exhibits comprises 409 pages, only the Governance Term Sheet is attached here. The full document with all exhibits is available upon request of the Court, or is available at: https://www.kccllc.net/avaya/document/2390088230214000000000070.

[9] The "Members of the New Board" document was attached as Exhibit B to Avaya's amended Chapter 11 plan supplement. Because the plan supplement comprises 952 pages, only the "Members of the New Board" document is attached here. The full document with all exhibits is available upon request of the Court, or is available at: https://www.kccllc.net/avaya/document/2390088230428000000000004.

[10] Available at: https://www.kccllc.net/avaya/document/2390088230214000000000070, at 167.

discovery stay "to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that corporate defendants will settle those actions rather than bear the high cost of discovery . . . or that the plaintiff will find during discovery some sustainable claim not alleged in the complaint." *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (internal citations omitted). The statute, however, expressly provides courts with discretion to allow limited discovery during the stay "upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. §78u-4(b)(3)(B); *see also Waldman v. Wachovia Corp.*, 2009 WL 86763, at *1 (S.D.N.Y. Jan. 12, 2009) (finding that the PSLRA discovery stay is not absolute and may be lifted "when the request is sufficiently particularized *and* when maintenance of the stay would either generate an impermissible risk of the destruction of evidence or create undue prejudice") (emphasis in original).

Undue prejudice in the context of the PSLRA has been interpreted to mean "improper or unfair treatment amounting to something less than irreparable harm," and can exist where "plaintiffs would be unable to make informed decisions about their litigation strategy in a rapidly shifting landscape because they are the only major interested party without documents forming the core of their proceedings." *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) (internal quotations and citations omitted); *see also WorldCom*, 234 F. Supp. 2d at 306. "Courts weigh the burden to defendants against the potential prejudice to plaintiffs, focusing on the production costs to defendants and plaintiffs' need for early review of the documents." *Bank of Am.*, 2009 WL 4796169, at *2. In determining whether to modify the discovery stay, other factors include "the defendants' financial state, settlement negotiations, case management, and the effect of delay." *Id.* at *2; *see also WorldCom*, 234 F. Supp. 2d at 306

- 9 -

(acknowledging the risk plaintiffs face of "pursu[ing] [an] action against defendants who no longer have anything or at least as much to offer").

"Even when a court finds undue prejudice, the stay will only be lifted on a 'clearly defined universe of documents.'" *Bank of Am.*, 2009 WL 4796169, at *3 (quoting *WorldCom*, 234 F. Supp. 2d at 301). The burden "is slight when a [producing party] 'has already found, reviewed and organized the documents.'" *Id.* at *2 (quoting *Waldman*, 2009 WL 86763, at *2).

### B.    The Relevant Factors Support a Modification of the PSLRA Discovery Stay

#### 1.    Plaintiffs Seek Particularized Discovery

The discovery sought by Plaintiffs is particularized and comprises a clearly defined universe of documents. Courts in this District and across the country have modified the discovery stay where, like here, the documents sought were the same documents already produced in related litigation. *See Kaplan v. S.A.C. Cap. Advisors, L.P.*, 947 F. Supp. 2d 368, 370 (S.D.N.Y. 2013) (modifying PSLRA discovery stay "for the limited purpose of allowing the plaintiffs to obtain all document discovery now or hereafter produced to the defendants" by governmental authorities); *Bank of Am.*, 2009 WL 4796169, at *3 ("motion to lift the stay on discovery is granted as to the documents already produced in the related matters"); *see also Courter v. CytoDyn, Inc.*, 2022 WL 621535, at *2 (W.D. Wash. Mar. 3, 2022) (finding that plaintiffs adequately specified the particularized discovery because it was "already assembled and produced" and was a "closed universe of materials"); *In re FirstEnergy Corp. Sec. Litig.*, 2021 WL 2414763, at *3-*5 (S.D. Ohio June 14, 2021) (holding that plaintiff's "specific request for already-produced discovery is sufficiently particularized"); *Pension Tr. Fund for Operating Eng'rs v. Assisted Living Concepts, Inc.*, 943 F. Supp. 2d 913, 915 (E.D. Wis. 2013) (agreeing that requested discovery was particularized because the request was "limited solely to relevant materials that have already been produced in other proceedings"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004) (finding particularity in a request

describing a "clearly defined universe of documents" produced to governmental, regulatory, or self-regulatory agencies).

Plaintiffs' request here is particularized as it is limited to the documents shared by Avaya with the plaintiffs in the State Court Actions (or their affiliates), which are directly relevant to the claims in the *Jiang* Complaint. Specifically, if the Court grants Plaintiffs' motion, Plaintiffs intend to serve subpoenas on: (i) Avaya for the documents that it produced, shared or otherwise provided to the plaintiffs in the State Court Actions (or their affiliates) and/or their attorneys; and (ii) the plaintiffs in the State Court Actions (or their affiliates) and/or their attorneys for the documents they received from Avaya, or anyone related thereto, in connection with the drafting and prosecution of the *Brigade* and *ALCOF* complaints.

### 2. Plaintiffs Will Suffer Undue Prejudice if the PSLRA Stay Is Not Modified

There will be undue prejudice to Plaintiffs and the Class if they do not have access to the documents cited and relied upon in the State Court Actions. The State Court Actions are moving forward since they are not subject to a discovery stay,[11] and Plaintiffs and the Class will be prejudiced by their "inability to make informed decisions about [their] litigation strategy in a rapidly shifting landscape." *WorldCom*, 234 F. Supp. 2d at 305. This is especially so because Avaya is not a party to the *Jiang* Action due to its bankruptcy and, therefore, any potential recovery is limited to Chirico, McGrath, and whatever insurance policies and coverage are available to them.[12]  *See*

---

[11]  Although McGrath and Spears anticipate seeking a discovery stay in the State Court Actions, *see Brigade* Action, Scheduling Order and Notice of Joint BCR 10.9 Conference, dated and filed January 31, 2024, that is of no moment because Avaya has already provided the plaintiffs in those actions with internal documents, causing undue prejudice to Plaintiffs.

[12]  Further underscoring the competition for limited funds, on February 1, 2023, a group of investors in debt issued by Avaya filed a summons seeking damages for losses related to the issuance of the B-3 Term Loans and Avaya's missed earnings projections. *See* Exhibit G. Three months later, the

*Waldman*, 2009 WL 86763, at *2 (finding undue prejudice where the "unavailability of the documents plaintiffs have requested places a burden on their ability to make" a determination regarding continuing with the case).

The undue prejudice here is particularly egregious because Avaya has favored certain bond purchasers—including those who sit on its board—over the Class by providing them documents. Avaya should not be permitted to use Chapter 11 bankruptcy protection as both a sword to allow its directors to pursue claims against Chirico and McGrath, and a shield to protect itself from litigation by Plaintiffs.

In *In re Delphi Corp.*, the court addressed a similar situation with a bankrupt issuer. *See* 2007 WL 518626, at *6-*7 (E.D. Mich. Feb. 15, 2007). There, the plaintiffs argued that "without discovery of documents already made available to other litigants and the federal authorities, they will be unfairly disadvantaged in pursuing litigation and settlement strategies." *Id*. at *6. The court agreed, explaining that the plaintiffs faced "'being left with nothing' if this litigation does not keep pace with the bankruptcy and the SEC action." *Id*. at *7. The court found that the plaintiffs adequately demonstrated that the discovery sought was necessary to prevent undue prejudice and granted their motion for partial modification of the discovery stay. *Id*. at *8.

The requested discovery is essential to Plaintiffs, particularly as it relates to their ability to make informed decisions regarding pursuing litigation and settlement strategies to benefit the Class due to the limited fund available. *See In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 184 (S.D.N.Y. 2004); *see also Bank of Am.*, 2009 WL 4796169, at *3 (finding undue prejudice where "[d]iscovery is moving apace in parallel litigation"). Plaintiffs "will suffer undue prejudice in having to defer such decisions." *LaBranche*, 333 F. Supp. 2d at 184; *see also Singer v. Nicor, Inc.*,

plaintiffs discontinued their action with prejudice, *see* Exhibit H, presumably because they reached a settlement with Avaya.

2003 WL 22013905, at *2 (N.D. Ill. Apr. 23, 2003) (finding that a partial lifting of the PSLRA stay was necessary "to prevent the securities plaintiffs from being left with nothing if their litigation did not keep pace with the bankruptcy and other proceedings"); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) (holding that "[w]ithout discovery of documents already made available to government entities, Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement strategies").

As the Court has not yet appointed a lead plaintiff, an amended complaint has not been filed, and associated motion to dismiss briefing has not commenced, it will likely be many months before discovery commences (assuming the lead plaintiff is able to survive any motion to dismiss). By that time, the State Court Actions will be significantly advanced and may even be resolved, potentially leaving a Class in this securities class action without monetary recourse.

### 3. The Producing Parties Would Face No Burden in Providing the Requested Limited Discovery

Additionally, the documents sought by Plaintiffs "have already [been] collected, reviewed, and organized . . . for production in other proceedings, and the burden of making another copy for [Plaintiffs] will be slight." *Bank of Am.*, 2009 WL 4796169, at *3.[13] Courts have found there to be no prejudice where the requested documents "have already been found and compiled and plaintiffs will pay production costs." *LaBranche*, 333 F. Supp. 2d at 183; *see also In re Williams Sec. Litig.*, 2003 WL 22013464, at *2 (N.D. Okla. May 22, 2003) (finding no hardship on producing party when the "information sought is readily available for copying and possible production"). Thus, the requested documents would pose no burden to Defendants, Avaya, or the State Court Action

---

[13] The burden analysis here applies to Avaya (a former party) and the plaintiffs in the State Court Actions, not to Defendants. However, Plaintiffs would also seek documents from Defendants and Spears to the extent they produce any documents to the plaintiffs in the State Court Actions in the future.

plaintiffs as the production to Plaintiffs will require minimal effort since the documents have already been shared with the State Court Action plaintiffs.

> ### 4.   The Request to Modify the Stay Does Not Offend the Purposes Behind the PSLRA

Congress enacted the PSLRA "to minimize the incentives for plaintiffs to file frivolous securities class actions." *WorldCom*, 234 F. Supp. 2d at 305. That purpose is not frustrated by a modification of the discovery stay because the allegations in the *Jiang* Complaint are strongly supported by the internal emails contained in the State Court Action complaints, which will be incorporated in a forthcoming amended complaint. The emails demonstrate falsity and scienter by revealing that senior Avaya personnel were discussing internally that the Company's projections were inflated and unachievable, while Defendants were contemporaneously providing those projections to investors and publicly touting Avaya's financial state. For example, one email dated April 11, 2022 sent by the Senior Director of Sales Finance to Spears explained that the "right starting point" for third quarter revenue was $415 million, not $451 million which the company was projecting. Ex. A ¶¶73-74. Spears responded to this email explaining that someone "had given [him] a back of the napkin of 438-440 over the weekend," but also that he agreed and would "raise [the matter with a] much smaller audience." *Id*. ¶75. On May 10, 2022, Avaya filed a Form 8-K with projections for 3Q22, signed by McGrath. *Id*. ¶44. Avaya projected revenue of $685 million to $700 million and adjusted EBITDA of $140 million to $150 million for 3Q22 and revenue of $2.815 billion to $2.855 billion and adjusted EBITDA of $580 million to $600 million for Fiscal Year 2022. *Id*. ¶45. On May 11, 2022, the Senior Director of Sales Finance conveyed to the Global Vice President of Financial Planning & Analysis and the Vice President of Sales Finance that he told the Global Vice President of Sales Operations that "80M of judgment in Q3 i[s] not acceptable," that "everyone knows we should not load 430M with 80M of revenue judgment in Q3," and that his team

was struggling to convince senior management to change the Company's projections. *Id.* ¶76. In an email dated May 11, 2022, the Global Vice President of Financial Planning & Analysis stated that Chirico was given information showing that there were major issues with the $430 million projection. *Id.* Additionally, on June 14, 2022, the Vice President of Sales Finance shared an update with the Vice President of Quote-to-Cash & Global Business Operations and the Director of Global Revenue regarding 3Q22 revenue, to which both recipients responded that it would be another tight quarter and that "hopefully" it would be "another miracle quarter." *Id.* ¶¶81-82. In an email dated the same day, the Vice President of Sales Finance responded that "the delta requires more than one miracle," and that "the gap is quite substantial." *Id.* ¶83.

Ultimately, on July, 28, 2022, Avaya issued a press release stating that its prior financial guidance "should no longer be relied upon" and that it expected its revenue for 3Q22 to be between $575 million and $580 million, which was more than $100 million lower than the Company's previous guidance. *Id.* ¶92. On this news, the market price of Avaya common stock declined more than 56%, on unusually high trading volume of more than 64.7 million shares traded, or nearly 15 times the average daily volume over the preceding 10 trading days. *Jiang* Complaint ¶¶12, 98. Further, in a Form 8-K filed on August 9, 2022, Avaya announced that the Audit Committee of the Board of Directors had opened an internal investigation to review the circumstances surrounding Avaya's financial results for 3Q22, and another to investigate a whistleblower claim. *Id.* ¶100.

The internal emails show that Defendants' statements regarding Avaya's financial projections were materially false and misleading and demonstrate that Defendants were aware of and ignored repeated warnings from Avaya executives that the projections provided to investors were not achievable.

III.    **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs limited relief from the PSLRA discovery stay pursuant to 15 U.S.C. §78u-4(a)(3)(B) to serve document subpoenas on Avaya and on counsel for the plaintiffs in the State Court Actions.

DATED:  February 2, 2024                    ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                   SAMUEL H. RUDMAN
                                                   ALAN I. ELLMAN

                                                            */s/ Alan I. Ellman*
                                                      ALAN I. ELLMAN

                                                 58 South Service Road, Suite 200
                                                 Melville, NY  11747
                                                 Telephone:  631/367-7100
                                                 631/367-1173 (fax)
                                                 srudman@rgrdlaw.com
                                                 aellman@rgrdlaw.com

                                                 *Proposed Lead Counsel for*
                                                 *Proposed Lead Plaintiff*

CERTIFICATE OF SERVICE

I, Magdalene Economou, hereby certify that on February 2, 2024, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

*/s/ Magdalene Economou*
MAGDALENE ECONOMOU

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
meconomou@rgrdlaw.com
