# EXHIBIT A

23CV031948-590

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

Case No. 23-CVS-

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Brigade Cavalry Fund Ltd.                                          :
Brigade Collective Investment Trust - Brigade                     :
Diversified Credit CIT                                             :
Brigade Credit Fund II Ltd.                                       :
Brigade High Yield Fund Ltd.                                      :    **COMPLAINT**
Brigade Leveraged Capital Structures Fund Ltd.                    :
Brigade Loan Fund Ltd.                                            :    **JURY TRIAL DEMANDED**
Brigade Opportunistic Credit LBG Fund Ltd.                        :
Brigade-SierraBravo Fund LP                                       :
FedEx Corporation Employees' Pension Trust                        :
Los Angeles County Employees Retirement                           :
Association                                                        :
Panther BCM LLC                                                   :
Platinum Peregrine A 2012 RSC Limited                            :
SAS Trustee Corporation                                           :
SC Credit Opportunities Mandate, LLC                             :
SEI Global Master Fund Plc the SEI High Yield                    :
Fixed Income Fund                                                 :
SEI Institutional Investments Trust - High Yield                 :
Bond Fund                                                         :
SEI Institutional Managed Trust - High Yield Bond                :
Fund                                                              :
SEI Institutional Managed Trust - Multi-Strategy                 :
Alternative Fund                                                  :
TCorpIM High Yield Fund                                          :
The Coca-Cola Company Master Retirement Trust                    :
U.S. High Yield Bond Fund                                        :
                         Plaintiffs                              :
        v.                                                        :
                                                                  :
James M. Chirico, Jr.                                            :
Kieran J. McGrath                                                :
                    Defendants.                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Brigade Cavalry Fund Ltd., Brigade Collective Investment Trust - Brigade Diversified Credit CIT, Brigade Credit Fund II Ltd., Brigade High Yield Fund Ltd., Brigade Leveraged Capital Structures Fund Ltd., Brigade Loan Fund Ltd., Brigade Opportunistic Credit LBG Fund Ltd., Brigade-SierraBravo Fund LP, FedEx Corporation Employees' Pension Trust, Los Angeles County Employees Retirement Association, Panther BCM LLC, Platinum Peregrine A 2012 RSC Limited, SAS Trustee Corporation, SC Credit Opportunities Mandate, LLC, SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund, SEI Institutional Investments Trust - High Yield Bond Fund, SEI Institutional Managed Trust - High Yield Bond Fund, SEI Institutional Managed Trust - Multi-Strategy Alternative Fund, TCorpIM High Yield Fund, The Coca-Cola Company Master Retirement Trust, and U.S. High Yield Bond Fund (together, "Plaintiffs" or the "Funds"), by and through their undersigned counsel, for their Complaint against Defendants James M. Chirico, Jr., and Kieran J. McGrath (collectively, "Defendants") hereby allege as follows:

## INTRODUCTION

1.     This lawsuit seeks redress for Defendants' financial fraud against the Funds.  Through a series of carefully crafted falsehoods over a three-month period in summer 2022, Defendants induced the Funds to purchase in excess of $110 million of near-worthless convertible notes issued by Avaya Inc. and guaranteed by publicly traded Avaya Holdings Corp.

("Avaya Holdings," and together with its consolidated subsidiaries, including Avaya Inc., "Avaya" or the "Company").  Defendants hid Avaya's declining business and obscured its disappointing financial results and prospects. They guaranteed in writing that Avaya was solvent.  These were lies, and Defendants knew it.  Even as Defendants were publicly painting a rosy picture of Avaya's financial state, Defendants' own employees were warning them that the Company's inflated financial projections—the very projections used to lure the Funds to invest—were unachievable.  And even as they made representations about solvency, they knew Avaya was insolvent.

2.     Defendants knew that Avaya needed an influx of cash from the Funds—and fast.  The Company had $350 million in debt coming due the following year, and its business was struggling.  If it could not raise debt financing from the Funds and others, it risked having to file for bankruptcy, and Defendants Chirico and McGrath risked losing their jobs, reputations, and the value of their stock-based compensation.

3.     So Defendants lied.  In securities filings and an earnings call on May 10, 2022, and in subsequent calls with and presentations to potential investors, Defendants claimed that, among other things, Avaya was financially healthy and was on track to earn revenue of at least $685 million and EBITDA of $140 million in the third quarter of fiscal year 2022 and $1 billion in annual recurring revenues by the end of calendar year 2022. None of that was true, and Defendants knew it.

3

4.      As a result of Defendants' fraud, on June 23, 2022, Brigade Capital Management, LP ("Brigade"), acting as investment manager on behalf of the Funds and other funds and accounts, committed to buy $125 million aggregate principal amount of 8.00% Exchangeable Senior Secured Notes due in 2027 (the "Notes"). [1]  In addition, relying on Defendants' representations (including those described above) as well as a July 12, 2022 officer's certificate from Defendant McGrath affirming that Avaya Inc. and its parent, Avaya Holdings (a guarantor of the Notes), were solvent, the Funds closed the transaction on July 12, 2022.

5.      What Brigade and the Funds did not know at the time was that while Defendants were touting the Company's financial results and projections for the second half of its fiscal year, executives and other employees of the Company were sounding the alarm to Defendants that meeting Avaya's key projections would be "impossible" and that closing the "quite substantial" gap between reality and the projections given to investors would require "more than one miracle."  Nor did Brigade and the Funds know that, on July 3, 2022, shortly after the quarter ended and actual results for the full quarter became available, Defendant Chirico directed a senior executive to draft an email to the Avaya Board, which acknowledged that the Company would not achieve its projected earnings based on such letdowns as

---

[1] A convertible note or exchangeable note is a hybrid security structured as a debt investment that can later be converted into an equity investment (*i.e.*, stock).

4

"significant gaps in execution and leadership," "significant and direct fall out in our International and Latin America businesses as a result of questions around our liquidity," and "unprecedented aggravation from the channel in [the third quarter of 2022]." That email (which apparently was never actually sent to the Board) was drafted more than a week prior to closing of the Funds' financing. Also during the first week of July, the Avaya Board and management received a whistleblower complaint accusing both Defendants of fabricating the Company's key financial projections—information that also was not shared with Brigade and the Funds prior to the closing.

6. Disclosing that information to Brigade and the Funds would have prevented Avaya from obtaining funds needed not only to provide fresh working capital but also to issue $350 million in new debt that would be used to refinance debt of Avaya Holdings that was coming due in June 2023. Faced with that consequence, Defendants misled Brigade, both through affirmative statements and by concealing information that, had it been disclosed to Brigade in advance of closing, would have caused the Funds not to purchase the Notes.

7. Knowing it was just a matter of time until the truth came out, Defendants rushed the Funds to close the transaction as quickly as possible. Just two weeks after closing, on July 28, 2022, the shocking truth emerged. Avaya Inc. and Avaya Holdings were revealed to be insolvent, and Defendant

5

Chirico was unceremoniously fired.  Avaya announced that Adjusted

EBITDA[2] for the third quarter of fiscal year 2022 would fall in the range of

just $50-55 million, about one-third of the $140-150 million range that had

been projected.  Revenue also was said to miss projections by a wide margin

of more than $100 million—a "dramatic haircut" that led JPMorgan analysts

to conclude that it was "tough to recommend" investing in Avaya.

Information contained in the accompanying press release showed that

Avaya's balance sheet liabilities exceeded its assets as of June 30, 2022—12

days *before* the Notes transaction closed—meaning that Defendant McGrath's

solvency representation was false when made.  On August 9, 2022—less than

one month after the closing of the Funds' purchase of the Notes—Avaya

admitted that there was "substantial doubt about the Company's ability to

continue as a going concern."

8.      These disclosures kicked off a dramatic and immediate slide in

Avaya's stock price, which dropped nearly 60% in one day.  The Funds'

investment, which exceeded $110 million, was severely impaired.

Discussions of Avaya's likely bankruptcy were rampant, reaching a fever

pitch when Avaya later disclosed, in November 2022, that, contrary to

---

[2] EBITDA stands for earnings before interest, taxes, depreciation, and
amortization.  Adjusted EBITDA is a financial metric that includes the
discretionary removal of various irregular or non-recurring items from
EBITDA.  Avaya's May 10, 2022 Form 10-Q explained that Adjusted EBITDA
deducted from EBITDA certain items, largely those related to Avaya's prior
restructuring, because that "present[ed] [Avaya's] financial performance in a
way that can be more easily compared to prior quarters or fiscal years."

statements and representations made to Brigade, its internal controls over financial reporting were in fact deficient and its most recent annual filing with the SEC could not be relied upon.

9.      On February 14, 2023, Avaya and the other guarantors under the Notes filed for bankruptcy protection, and the Funds ultimately recovered, on account of the Notes, a combination of debt and equity that was valued at less than a quarter of what the Funds paid for the Notes.  Thus, as a result of Defendants' misrepresentations and omissions, the Funds have suffered more than $85 million in losses.

## PARTIES

10.      Plaintiff Brigade Cavalry Fund Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade Cavalry Fund Ltd. purchased $4,510,000.00 of the Notes.

11.      Plaintiff Brigade Collective Investment Trust - Brigade Diversified Credit CIT is a collective investment trust established by a Pennsylvania trustee.  On July 5, 2022, Brigade Collective Investment Trust - Brigade Diversified Credit CIT purchased $865,000.00 of the Notes.

12.      Plaintiff Brigade Credit Fund II Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade Credit Fund II Ltd. purchased $13,740,000.00 of the Notes.

13.     Plaintiff Brigade High Yield Fund Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade High Yield Fund Ltd. purchased $2,095,000.00 of the Notes.

14.     Plaintiff Brigade Leveraged Capital Structures Fund Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade Leveraged Capital Structures Fund Ltd. purchased $23,825,000.00 of the Notes.

15.     Plaintiff Brigade Loan Fund Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade Loan Fund Ltd. purchased $1,085,000.00 of the Notes.

16.     Plaintiff Brigade Opportunistic Credit LBG Fund Ltd. is a Cayman Islands exempted company.  On July 5, 2022, Brigade Opportunistic Credit LBG Fund Ltd. purchased $10,035,000.00 of the Notes.

17.     Plaintiff Brigade-SierraBravo Fund LP is a Cayman Islands exempted limited partnership.  On July 5, 2022, Brigade-SierraBravo Fund LP purchased $8,280,000.00 of the Notes.

18.     Plaintiff FedEx Corporation Employees' Pension Trust is a pension trust established by a Tennessee trustee. On July 5, 2022, FedEx Corporation Employees' Pension Trust purchased $2,605,000.00 of the Notes.

19.     Plaintiff Los Angeles County Employees Retirement Association is a California public pension fund.  On July 5, 2022, Los Angeles County Employees Retirement Association purchased $4,225,000.00 of the Notes.

20.     Plaintiff Panther BCM LLC is a North Carolina limited liability company, whose sole member is the Treasurer of the State of North Carolina on behalf of the North Carolina Retirement Systems (investments made pursuant to N.C.G.S. §147-69.2).  On July 5, 2022, Panther BCM LLC purchased $20,535,000.00 of the Notes.

21.     Plaintiff Platinum Peregrine A 2012 RSC Limited (formerly known as Blue Falcon Limited) is a United Arab Emirates restricted scope company.  On July 5, 2022, Platinum Peregrine A 2012 RSC Limited purchased $2,660,000.00 of the Notes.

22.     Plaintiff SAS Trustee Corporation is a State of New South Wales, Australia government trustee for state defined benefit public sector superannuation schemes.  On July 5, 2022, SAS Trustee Corporation purchased $2,765,000.00 of the Notes.

23.     Plaintiff SC Credit Opportunities Mandate, LLC is a Delaware limited liability company.  On July 5, 2022, SC Credit Opportunities Mandate, LLC purchased $1,370,000.00 of the Notes.

24.     Plaintiff SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund is a sub-fund of an Ireland limited liability company.  On July 5, 2022, SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund purchased $1,425,000.00 of the Notes.

25.     Plaintiff SEI Institutional Investments Trust - High Yield Bond Fund is a series of a Massachusetts business trust.  On July 5, 2022, SEI

9

Institutional Investments Trust - High Yield Bond Fund purchased $3,175,000.00 of the Notes.

26. Plaintiff SEI Institutional Managed Trust - High Yield Bond Fund is a series of a Massachusetts business trust. On July 5, 2022, SEI Institutional Managed Trust - High Yield Bond Fund purchased $1,995,000.00 of the Notes.

27. Plaintiff SEI Institutional Managed Trust - Multi-Strategy Alternative Fund is a series of a Massachusetts business trust. On July 5, 2022, SEI Institutional Managed Trust - Multi-Strategy Alternative Fund purchased $330,000.00 of the Notes.

28. Plaintiff TCorpIM High Yield Fund is a State of New South Wales, Australia government trust. On July 5, 2022, TCorpIM High Yield Fund purchased $7,850,000.00 of the Notes.

29. Plaintiff The Coca-Cola Company Master Retirement Trust is a corporate pension trust established by an Illinois trustee. On July 5, 2022, The Coca-Cola Company Master Retirement Trust purchased $765,000.00 of the Notes.

30. Plaintiff U.S. High Yield Bond Fund is a Canada unit trust. On July 5, 2022, U.S. High Yield Bond Fund purchased $700,000.00 of the Notes.

31. Each Plaintiff engaged Brigade to manage its funds. In doing so, each Plaintiff delegated full investment authority to Brigade. Brigade was not required to, and did not, consult Plaintiffs before investing in the

10

Notes.  Brigade acted as Plaintiffs' agent in evaluating and eventually making the investment in the Notes.

32.     Defendant Chirico was President and Chief Executive Officer of Avaya Holdings from December 15, 2017 through August 1, 2022.  Defendant Chirico was also, during all relevant times, a member of Avaya Holdings' Board of Directors.

33.     Defendant McGrath was the Chief Financial Officer of Avaya Holdings from approximately February 2019 through November 8, 2022.  He continued to work for the Company in an advisory capacity until December 1, 2022.

34.     Defendants made, or caused to be made, false statements that induced the Funds to invest in the Notes at inflated prices.  Defendants, because of their positions within the Company, had the power and authority to control the contents of Avaya's press releases, financial reports, and presentations to investors and other market participants.  Defendants also had the power and authority to prevent the Company from issuing misleading statements and to cause prior misleading statements to be corrected.  Defendants had, by virtue of their positions within the Company, access to material, non-public information.

**JURISDICTION AND VENUE**

35.     The instant action arises from Defendants' transaction of business in North Carolina.  Specifically, during the events described herein,

11

Defendants were employed by Avaya and caused Avaya Inc. and/or Avaya Holdings to make the misleading statements and enter into the transactions alleged herein while Avaya Inc. and Avaya Holdings were headquartered at 2605 Meridian Parkway, Suite 200, Durham, North Carolina 27713.

36.    Venue is proper in this county pursuant to North Carolina General Statute 1-79 and 1-82 because Plaintiff Panther BCM LLC 's registered agent is in Mecklenburg County.

37.    This Court has personal jurisdiction over Defendant Chirico because he is a resident of North Carolina and because he transacted business in North Carolina and was an officer of a company whose business headquarters were, during the relevant period, based in North Carolina, and the instant action arises from his transaction of business in North Carolina.

38.    This Court has personal jurisdiction over Defendant McGrath because he transacted business in North Carolina and was an officer of a company whose business headquarters were, during the relevant period, based in North Carolina, and the instant action arises from his transaction of business in North Carolina.

**FACTUAL BACKGROUND**

39.    As set forth herein, between May 10 and July 12, 2022, Defendants knowingly misrepresented Avaya's financial condition in order to secure an investment of $125 million from funds and accounts managed by Brigade, including Plaintiffs.  Again and again, Defendants explained away

the Company's disappointing financial results for the second quarter of fiscal year 2022 and claimed confidently that the Company was on track to achieve its earnings guidance for the third and fourth quarters of 2022—all while Avaya's employees were privately warning Defendants that Avaya's projections were highly inflated and "impossible" to achieve. Desperate to secure the Funds' investment in order to prop up Avaya's failing business and repay loans coming due the following year, Defendants rushed to close the transaction before the truth could come out, assuring Brigade that both Avaya Holdings and Avaya Inc. were solvent as of the date of closing. They were not, and Defendants knew it. When the ink was barely dry on the transaction documents, Avaya was forced to admit not only that it had missed its financial guidance by almost two-thirds, but also that Avaya was insolvent and had been since before the transaction closed. Within months, Defendants were fired, and Avaya filed for bankruptcy protection, leaving investors like Plaintiffs holding the bag.

**Avaya's Business.**

40.    Avaya is "a global leader in digital communications products, solutions and services for businesses of all sizes delivering its technology predominantly through software and services." It offered its software services to customers through the cloud, on-premises, or a combination of both. The Company's growth strategy centered on OneCloud, a cloud-based communications solution that consolidated the features of a traditional

13

business phone system into a single platform.  OneCloud was offered through a subscription-based service as opposed to through more traditional licensing models.

41.    By all appearances, by late 2021, Avaya's new strategy was working.  In connection with its Form 10-Q filing for the fourth quarter of fiscal year 2021, the Company reported top-line results and profitability above expectations and projected $2 billion in Annual Recurring Revenue (ARR) for OneCloud by fiscal year 2024.  On February 9, 2022, Avaya filed its Form 10-Q for the first quarter of fiscal year 2022.[3]  In connection with that filing, the Company issued a press release with a statement from Defendant Chirico:

> Our transition to the cloud continues to gain strength as our Avaya OneCloud ARR grew by 137% year over year primarily driven by our enterprise segment and contact center solutions. . . . . This quarter, we yet again closed more than 100 deals with total contract value greater than $1 million.  [A]s we closed out the quarter, we landed one of the largest deals in our history, a $400 million OneCloud Public CCaaS deal with a large global financial services company.

42.    These results led JPMorgan analysts to conclude that investors could "expect positives in the form of Avaya continuing to over execute towards its ARR target," despite a drop in the Company's share price.  Similarly, Barclays analysts noted that the announced $400 million deal

---

[3] In its Form 10-Q filings, Avaya specified that the terms "'we,' 'us,' 'our,' 'Avaya,' or the 'Company'" meant "Avaya Holdings Corp., a Delaware corporation, and its consolidated subsidiaries taken as a whole, unless the context otherwise indicates."  At all relevant times, Avaya Inc. was a wholly owned subsidiary of Avaya Holdings.

boded well for OneCloud's success, as it "sp[oke] to the largest enterprises looking to do more in cloud contact center" and that, "since the deal was a financial services org[anization]," which are "generally slower [in] moving to [the] cloud," the deal showcased OneCloud's "durable growth opportunity with enterprise customers."

**Avaya Induces Brigade to Purchase Exchangeable Notes**

Avaya's May 10, 2022 Second-Quarter Earnings Announcement and Earnings Call

43.    On May 10, 2022, Avaya Holdings filed a quarterly financial report with the SEC on Form 10-Q. As with the other Form 10-Q filings referenced herein, Defendants Chirico and McGrath signed and certified the May 10, 2022 filing pursuant to the Sarbanes-Oxley Act, both attesting as to the accuracy of the Company's financial results and as to the effectiveness of the Company's internal reporting controls. In particular, Defendants Chirico and McGrath certified that they were personally "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," that they had implemented disclosure controls and procedures to "ensure that material information relating to the [Company], including its consolidated subsidiaries, is made known to [them]," and that they had implemented "internal control over financial reporting . . . regarding the reliability of financial reporting and the preparation of financial statements." Defendants Chirico and McGrath executed equivalent

15

certifications for the Company's financial statements for the year 2021 and the first quarter of fiscal year 2022.

44.     On that same date, Avaya Holdings filed a Form 8-K report, signed by Defendant McGrath, announcing the Company's financial results for the second quarter of its 2022 fiscal year, which included revenue of $716 million and Adjusted EBITDA of $145 million.  Although these second-quarter financial results were below the Company's previously issued guidance by about $24 million in revenue and $10 million in Adjusted EBITDA, Defendants assured the market that the second-quarter guidance miss would not be repeated, and that the Company's guidance for the third quarter and for fiscal year 2022 was materially accurate.  For example, the 8-K filing included a statement from Defendant Chirico claiming that Avaya remained on track to achieve annual recurring revenue of $1 billion by the end of 2022 for OneCloud, Avaya's software product offering:

> We drove record growth for Avaya OneCloud ARR with a $130 million quarter over quarter increase and an over $400 million year over year increase, to $750 million.  The path to hit the $1 billion ARR mark by the end of calendar year 2022 is well paved . . . . we are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud.  Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business.

45.     Consistent with that outlook, the filing also provided the following financial guidance to investors and the public for the third quarter and the remainder of fiscal year 2022:

Financial Outlook – 3Q Fiscal 2022

16

- Revenue of $685 million to $700 million

- Adjusted EBITDA of $140 million to $150 million; Adjusted EBITDA margin[4] of 20% to 21%

Financial Outlook – Fiscal Year 2022

- Revenue of $2.815 billion to $2.855 billion

- Adjusted EBITDA of $580 million to $600 million; Adjusted EBITDA margin of ~ 21%

46.    In addition, following Avaya's earnings release on May 10, 2022, at approximately 8:30 am, Defendants spoke on a conference call with financial analysts and investors, during which they highlighted Avaya's successes across a range of financial metrics and explained why the second-quarter earnings miss would not be repeated.  Defendant Chirico reaffirmed this, saying that "significant progress [Avaya] saw [in the second] quarter signifies our strategy is taking hold and this shift is reflected in our revised second-half guidance," referring to the third-quarter and fiscal year 2022 guidance set forth in the Form 8-K filing.

47.    During the call, Defendant McGrath noted that the Company had "generated $130 million of new ARR" that quarter and reiterated that it was "well-positioned to achieve [its] calendar year-end target of $1 billion of ARR," the bulk of which was coming from existing customers who were quickly adopting Avaya's new subscription services.  He touted the

---

[4] Adjusted EBITDA margin is the Adjusted EBITDA calculated as a percentage of Adjusted Revenue.  It is a widely used measure of a company's profitability, as it allows for investors to compare a business's performance to other, similar businesses.

17

Company's "record subscription TCV [total contract value forward] bookings of $328 million" and its addition of "200 new logo subscription customers." Defendant Chirico added that the Company's new customers were "mostly five-year deals" that would be long-term revenue sources for the Company. Finally, Defendant McGrath told listeners that the Company "expect[ed] to maintain quarter-end cash balances in the $250 million to $300 million range."

48.     Defendants Chirico attributed the Company's disappointing second-quarter results to the Russia/Ukraine conflict and GAAP accounting requirements for recognizing subscription-fee revenue.  With regard to the Russia/Ukraine conflict, both Defendants explained that sanctions on Russia had reduced revenue by about $5 million in the second quarter and by about $60 million for the full-year guidance.  They explained away the remainder of the second-quarter earnings miss as a function of Avaya's successful transition to a software subscription business model.  In particular, Defendant McGrath stated that Avaya had been unable to recognize $40 million in revenue in the second quarter because that revenue was attributable to subscription contracts, and accounting rules prevented Avaya from recognizing subscription revenue beyond the then-current subscription period.  By contrast, revenue from licensing contracts can be fully recognized once the contract is executed.

49.     Defendants Chirico and McGrath assured participants that this shift would not affect the Company's bottom line.  Defendant McGrath insisted that the subscription-fee revenue that could not be booked in the second quarter was "not lost" but, rather, would "be recognized in future periods."  Defendant Chirico underscored this point during the question-and-answer portion of the call, stating that subscription revenues that were not recognized in the second quarter "will hit in Q3 and Q4."  He went on to state that, although the transition to subscriptions "has had a result in lower revenue attainment," those "revenues . . . [we]re not lost," but would be recognized in future quarters as part of "the rebalancing of the portfolio . . . as we continue to increase our overall recurring revenues as a percentage of the Avaya revenue profile."  To soothe investors that the second-quarter miss would not recur, Defendant Chirico offered the following assurance:  "We believe we're over th[e] hurdle" of learning to predict the pace of customers' transition to private cloud and subscription services.

50.     Finally, in response to an investment analyst's question about the Company's plan to address the fact that the Company had issued $350 million of debt that would reach maturity in June 2023, Defendant McGrath, then Executive Vice President and Chief Financial Officer ("CFO"), indicated that the Company was "working with our banking colleagues" to address the matter "in the reasonably near future" and over "the next several months."

19

Brigade Explores an Investment in Avaya's Debt Securities

51.     Joining the May 10, 2022 call were two employees of Brigade: Sumit Sablok, a Partner in Research, and Matthew D'Ambrisi, a Director in Research.  Brigade is an SEC-registered investment adviser and alternative asset manager focused on credit investing.  It manages a diverse capital base for its investors over a variety of sectors, including media, communications, and emerging technologies.  Brigade's investors can access Brigade's credit strategies by putting funds in commingled accounts or in discrete, separately managed accounts managed by Brigade.  Regardless of the type of account, all investors, including the Funds, delegate full investment authority to Brigade.

52.     Mr. Sablok and Mr. D'Ambrisi left the earnings call with increasing confidence in Avaya's business.  Defendants' explanations for the second-quarter earnings miss assured them that the miss had been an aberration that was unlikely to be repeated in the third quarter.  In addition, Defendants' repeated, specific representations painted a picture of a successful transition to a software-subscription business model, which gave Brigade confidence in Avaya's future growth and quality of revenue.  Based on their extensive experience investing in technology companies, Mr. Sablok and Mr. D'Ambrisi understood that companies with subscription models tend to be more highly valued because, among other things, subscription contracts

tend to have greater staying power, creating a more predictable stream of long-term revenue with higher margins than traditional licensing models.

53.    Accordingly, following the May 10, 2022 announcement and investor call, Brigade reached out to industry participants to discuss its potential involvement in a financing transaction with Avaya.  Mr. Sablok and Mr. D'Ambrisi were quickly connected with Defendant McGrath to discuss the matter further.  Over the next several weeks, Brigade closely reviewed Avaya's financial statements and other publicly available materials and participated in multiple calls with Defendant McGrath about a potential debt investment.  During those calls—participation in which was limited to a small group of potential debt investors—Defendant McGrath provided specific information and made specific representations to Brigade. Everything that Brigade employees learned from Defendants led them to conclude that Avaya was poised for growth and was looking forward to a stronger second half of its fiscal year.

May 23, 2022 Call with Defendant McGrath

54.    On May 23, 2022, Mr. Sablok and Mr. D'Ambrisi participated in a call with Defendant McGrath with the specific purpose of discussing the Company's business and a potential investment.  During that call, Defendant McGrath did not give any indication that the third-quarter and fiscal year 2022 guidance or any other information provided to the public on May 10 was no longer correct.  Instead, he doubled down on prior statements, re-affirming

21

the rosy picture that he and Defendant Chirico had painted for investors on the May 10 call.

55.    When Mr. Sablok and Mr. D'Ambrisi asked for further clarification about the second-quarter guidance miss, Defendant McGrath pointed once again to the impact of sanctions against Russian companies and re-affirmed the guidance and overall picture of Avaya's business that he and Defendant Chirico had provided on May 10.  He reiterated that Avaya remained on track to achieve $1 billion in ARR for OneCloud and noted further that OneCloud ARR was even accelerating since the Company first announced the $1 billion projection.  He also claimed that the Company had just had its two strongest quarters on subscriptions signings and added 1,400 "new logos," or new customers.

56.    During the call, Defendant McGrath also provided additional guidance for 2023 and 2024 revenues, stating that the Company anticipated revenue growth in 2023 to be in the low-single-digit percent, and revenue growth in 2024 would be higher.  He further stated that cash flow from operations would hit its lowest point in fiscal year 2022 and then improve in 2023, when it would be in the low to mid-single digits as a percentage of revenue, further improving to 10%-15% of revenue in 2024.

57.    Asked about the timing of a potential debt investment, Defendant McGrath told them that Avaya was hoping to complete a refinancing transaction before the Company's next quarterly filing in August,

as the overhang of the debt due in 2023 was creating downward pressure on the Company's stock price.

<u>May 26, 2022 Call</u>

58.     Three days later, on May 26, 2022, Mr. Sablok and Mr. D'Ambrisi participated in another call with Defendant McGrath, who was joined by Avaya's then Treasurer and a small group of other investment firms.  The purpose of this call was to discuss potential debt financing through the issuance of term loans.

59.     During that meeting, Defendant McGrath provided additional projections for fiscal years 2022 through 2024, which again made clear that the Company had reason to believe that its profitability was increasing, not decreasing.  Specifically, he stated that Avaya projected: negative cash flow from operations of $200 million and negative free cash flow of $300 million for fiscal year 2022; cash flow from operations of positive $40-50 million and negative free cash flow of $40-50 million for 2023; and free cash flow of $250-300 million in 2024.  Defendant McGrath explained that these increases would be driven by a significant step down in working capital headwind.  In 2022, working capital headwind would be $540 million, dropping to just $270 million in 2023.  Defendant McGrath also described various actions that the Company had implemented in the second quarter to reduce costs and expenses, which he claimed were leading to 300 basis points of improved EBITDA margins for the second half of the fiscal year and into the first

quarter of 2023. These comments further cemented Brigade's confidence in the accuracy of Defendants' projections.

June 2, 2022 Call

60.     On June 2, 2022, Mr. Sablok and Mr. D'Ambrisi joined a call with Defendant McGrath and the Treasurer organized by Barclays for potential debt investors. On that call, Defendant McGrath once again touted Avaya's recent successes, noting that, in the second quarter, the Company had added 1,400 "new logos," with one deal at over $70 million total contract value. He further explained that, if not for accounting requirements mandating when Avaya could recognize revenue from subscription sales, second-quarter revenue would have been $755 million and EBITDA would have been $185 million, as opposed to $716 million in revenue and $145 million EBITDA. He then stated again that the second half of the year should see a 3% improvement in EBITDA margins on the same revenue basis. Defendant McGrath assured call participants that he had tried to be conservative in the guidance that the Company provided. These statements further cemented Brigade's belief that Avaya's financials would improve after the second quarter and that the Company's guidance first issued on May 10 was materially accurate.

June 8, 2022 8-K and Investor Presentation

61.     On June 8, 2022, Avaya announced in a Form 8-K filed with the SEC that it had "launched a financing . . . seeking to raise $500.0 million

24

aggregate principal amount of new secured debt, which will be used to prefund the refinancing of the Company's existing $350.0 million of 2.25% Convertibles Notes due June 15, 2023 and for general corporate purposes." In connection with the financing, Avaya posted a presentation for potential lenders on its website (the "June 8 Presentation"). The June 8 Presentation, which Mr. Sablok and Mr. D'Ambrisi at Brigade reviewed, provided the following guidance for fiscal year 2022:

FY 2022 Guidance

- Revenue: ~ (4)%

- Adj. EBITDA margin: ~ 21%

62. Defendant McGrath signed the 8-K and, upon information and belief, both Defendants Chirico and McGrath, as Avaya's CEO and CFO, respectively, reviewed and approved the information contained in the June 8 Presentation.

63. The revised annual guidance in the June 8 Presentation was entirely on track with the outlook provided on May 10, 2022, both as to revenue and Adjusted EBITDA margin. In terms of revenue, a 4% decrease in year-over-year revenue would have resulted in revenue for fiscal year 2022 of $2.854 billion, which was at the high end of the guidance range provided on May 10. The Adjusted EBITDA margin of about 21% was likewise at the high end of the range provided on May 10. In addition, the June 8 Presentation highlighted Avaya's "continued large deal activity," as well as

25

the five- and three-year duration of multiple recent transactions with various customers.

64.    These statements, which showed that as the third quarter progressed, Avaya had gained increasing confidence that it would achieve the high end of its guidance, further assured Brigade that the guidance was materially accurate.  As Avaya's CEO and CFO, respectively, Defendants Chirico and McGrath would both have reviewed and authorized the statements in the June 8 Presentation, including the revised annual guidance for fiscal year 2022 and statements about recent transaction activity.

65.    Based on Defendants' statements described above, Brigade decided, on Plaintiffs' behalf, to invest in Avaya's Notes.  Although the term loans had a higher annual interest rate payment than the Notes, Brigade believed that the Notes offered more compelling economics because they would allow Plaintiffs to capture the upside of the growth in Avaya's equity value if Brigade were to elect to convert the Notes to shares in Avaya. Brigade would not have made this investment decision had it not believed and relied on Defendants' repeated statements about the strength of Avaya's business and the accuracy of its financial statements and guidance.

**Defendants Push Brigade to Close Its Investment as Fast as Possible.**

66.    On June 23, 2022, in reliance on the information it had received from Defendants, Brigade entered into an Investment Agreement with Avaya Inc., on behalf of the Funds and other funds and accounts managed by

Brigade, to purchase $125 million in the Notes due to be issued by Avaya Inc. and guaranteed by Avaya Holdings and various of its other subsidiaries.

67.    The Investment Agreement specified that notices or other communications to Avaya Inc. were to be directed to Avaya's headquarters in Durham, North Carolina.

68.    After Brigade signed the Investment Agreement, Avaya and its professionals, including its lawyers and financial advisors—presumably acting at Defendant Chirico and Defendant McGrath's direction—pushed Brigade to complete the transaction as quickly as possible, hoping an injection of cash from the Funds would stave off disaster before the reality of their dire situation became public.  Although Defendant McGrath had previously stated that the Company wanted to close by August, attorneys for the Company informed Brigade's counsel that they sought to close the transaction by June 30—barely a week after signing.  In an apparent haste to close, Avaya's counsel gave Brigade's counsel just two days to review a draft of the Indenture before the intended closing date.  Brigade's counsel refused to close the transaction without adequate time to review the definitive documentation.  Brigade also insisted upon receiving, as further assurance of Avaya's financial condition, an officer's certificate containing various certifications, one of which was a certification by an officer that Avaya Inc. and each of the guarantors, including Avaya Holdings, were "Solvent," which Avaya agreed to provide.

27

69.    The Omnibus Officer's Certificate, executed on July 12, 2022 by Defendant McGrath prior to closing, certified that, in connection with the closing of the sale of the Notes:

On and immediately after the date hereof, the Issuer and each Guarantor (after giving effect to the issuance and sale of the Notes, the issuance of the Guarantees and the other transactions related thereto) will be Solvent (as defined below). As used in this paragraph, the term "Solvent" means, with respect to a particular date and entity, that on such date (i) the fair value (and present fair saleable value) of the assets of such entity is not less than the total amount required to pay the probable liability of such entity on its total existing debts and liabilities (including contingent liabilities) as they become absolute and matured; (ii) such entity is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business; (iii) assuming consummation of the issuance and sale of the Notes and the issuance of the Guarantees as contemplated by the Transaction Documents, such entity does not have, intend to incur or believe that it will incur debts or liabilities beyond its ability to pay as such debts and liabilities mature; and (iv) such entity is not engaged in any business or transaction, and does not propose to engage in any business or transaction, for which its property would constitute unreasonably small capital.

As Avaya's CEO, Defendant Chirico would, upon information and belief, have been aware of and approved this certification.

70.    As Defendants were aware, this solvency certification was integral to Brigade's willingness to invest in the Notes on the Funds' behalf. And Defendants needed the Funds' investment to repay the Company's debt coming due in June 2023 and to prop up Avaya's business.

28

71.    The transaction ultimately closed on July 12, 2022.  The Funds paid in excess of $110 million to purchase a total of over $110 million of principal amount of the Notes.

### Chirico and McGrath Knew Their Representations Were False When They Made Them and Intended to Deceive Plaintiffs.

72.    Unbeknownst to Brigade, the representations made by Defendants Chirico and McGrath were false and misleading, and Defendants omitted material facts necessary to make their statements not misleading. Internal Company documents reveal that, at every opportunity, Defendants ignored the warnings of executives and other employees of the Company that higher projections were not achievable and knowingly disclosed inflated and unsupported financial information to Brigade and other investors.

73.     A month or more before the Company's May 10 quarterly filing,

Avaya's finance team was already sounding the alarm that the Company's

projections for Q3 were inflated.  On April 11, 2022, the then Senior Director

of Sales Finance emailed Stephen Spears, the then Executive Vice President

and Chief Revenue Officer, and others on Avaya's finance team about his

efforts to revise Avaya's projections to a more "realistic starting point."[5]

> **From:** ███████████████████████ @avaya.com>
> **Date:** Monday, April 11, 2022 at 10:54 AM
> **To:** Spears, Stephen D (Stephen) <sspears@avaya.com>, ███████████████
> <███ @avaya.com>
> **Cc:** ████████████████████████ @avaya.com>, ████████████████
> <████████ @avaya.com>
> **Subject:** Initial Q3'22 OL
>
> Stephen,
>
> In lieu of having a bookings OL from the sales field as discussed on Friday afternoon's call (outside of impacting the ███ seats down from 65/85K in Q3/4 respectively to 50/65K), I had a follow up with ██████ later on Friday to try and manage some of the other booking categories down to a more realistic starting point.  The attached takes into account some of those high level adjusted booking assumptions (again, not a commitment or submission from the sales field or the ops leaders), some updates to the core #'s across services such as APS, core GSS and PCMS and the revised revenue judgment ███ communicated as the starting points for Q3 to chase.

74.     In that email, the Senior Director of Sales Finance explained to

Spears that "the right starting point" for third-quarter revenue would be

$415 million, not the $451 million that the Company was projecting.  But

even the reduced $415 million projection, reflecting certain "big ticket

changes," was still "scary" in the Senior Director of Sales Finance's view,

given that it included $45.5 million of so-called "revenue judgment"

_____

[5] Plaintiff has redacted, from the images of documents included in this complaint, the names and email addresses of employees and customers of Avaya.  Unredacted versions of such documents shall, upon written request, be made available to Defendants.

comprising a number of optimistic assumptions about, among other things,

the Company's ability to generate new and additional sales and other

revenue.

The number of **415M** for Q3 revenue inclusive of 45.5M in revenue judgment (detailed below) is scary but I believe the right starting point for us to build back to where you need/want to be through the set of actions items resulting from the off-site this week.  The 415M compares to the 451M previously carried.  The big ticket changes for Q3 from a March OL compare are:
- ▇▇ revenue down 5.7M for move to 50K seats from 65K and drop in stock price to $120 from $190
- 14M product BTR drop across all 3 channels coming off an equal booking drop
- 8M reduction in APS revenue from lower H1 booking and revised linearity assumption
- 4M impact to Q3 sub x revenue driven by a drop in sub x tcv from 188.2M to 180M
- 3M reduction to previously assumed core GSS coming off revised expected run rate impact from Q2 deals
- 1.5M reduction assumption in new OCP revenue assumption based on early schedule (still TBD)

[…]

**Third**:  The revised revenue judgment pool reviewed with ▇▇ on Friday afternoon resulted in 45.5M of judgment included in that Q2#:
- 10M for add'l ▇▇▇▇▇▇▇
- 10M for increased ▇▇▇▇ contribution; 28.9M in the core revenue call plus 10M in upside
- 10M for ▇▇▇ upgrade initiative (10M is above the core 17M ▇▇ revenue which dropped from 54M in Q2)

- 10M for the proposed bulk sub x seat pre-buy for ▇▇▇
- 2M for accelerated OCP activations
- 2.2M APS revenue coming off new sales team creation
- 1.3M of revenue coming from other sources, tbd

75.    Spears responded that he agreed that the Company's projections

were too high and that he would raise the matter to a smaller audience,

presumably including senior management:

**From:** Spears, Stephen D (Stephen) <sspears@avaya.com>
**Sent:** Monday, April 11, 2022 11:13 AM
**To:** ███████████████████ @avaya.com>; ███████████████ @avaya.com>
**Cc:** ███████████████ @avaya.com>; ███████████████
< ██████ @avaya.com>
**Subject:** Re: Initial Q3'22 OL

Thanks for this ███. Given the very broad audience here, I wont share the 415 in this meeting. ███ had given me a back of the napkin of 438-440 over the weekend. I believe your adjustments and concerns are spot on, but I will need to raise this in the much smaller audience...

Stephen

76.    By May 10, however, Defendant Chirico had already received information casting doubt on the Company's third-quarter revenue projections. On May 11, 2022, the frustrated Senior Director of Sales Finance conveyed to the Global Vice President of Financial Planning and Analysis and the Vice President of Sales Finance: "I reiterated to [the former Global Vice President of Sales Operations] again yesterday [that is, on May 10, that] 80M of judgment in Q3 i[s] not acceptable. It did not change anything (he said he knows but it is what it is). . . . I need help with Stephen/[the Global Vice President of Sales Operations] to have someone better than me speak with them on why the 80M is unacceptable and drive a change (this goes for both revenue and ICE). I am not getting through, not even getting a meeting or time with Stephen[.]" The exasperated Senior Director of Sales Finance continued, asking how it could be the case that, even though "***everyone knows*** we should not load 430M with 80M of revenue judgment in Q3," his team was struggling to convince senior management to change the Company's public-facing projections to reflect that reality.

32

77.    The Global Vice President of Financial Planning and Analysis followed up hours later, stating that Defendant Chirico (*i.e.*, "Jim") was given information showing that the $430 million projection rested on dubious assumptions:

**From:** ████████████████████████@avaya.com>
**Sent:** Wednesday, May 11, 2022 5:58 PM
**To:** ██████████████████████@avaya.com>; ████████████████
<████████@avaya.com>
**Subject:** RE: Before our May OL

████, I really need your guidance on next steps here. ==The walk to $430M was identified and shared with Stephen and ████ – and ultimately made its way to Jim:== we can choose to align to this...very specifically: put the $10M from ██████████████ to the "NW" line, the ████ 50K to the ████ line, the Product upsides to Product, the ████ 2.7M to product, the ████ $1.8M to APS, the ████ PIT upside to the Subscription line, etc.  But we made a conscious effort to not do that, and instead, plug to "Other/Judge".  I'm trying to understand this...is this our way of saying "I don't believe we'll get any of this upside?"  If so, then why the plug to $430M?   I am just not sure how to proceed with this OL. Please advise.

78.    The Vice President of Sales Finance agreed, responding that she would try again to make senior management appreciate the risk surrounding their revenue projections, which she regarded as "not . . . right" and "impossible" to achieve:

| From: | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F0003F3FAA214337ABE35F0D1 BA82583- ▬▬▬▬ ] |
|---|---|
| Sent: | Wed 5/11/2022 10:12:46 AM (UTC-04:00) |
| To: | ▬▬▬▬ @avaya.com]; ▬▬▬▬ @avaya.com] |
| Subject: | RE: Before our May OL |

Hi ▬, I am writing a response and saw yours…. fully understand your point, especially as it relates to the revenue assumption by LOB, vs ICE assumptions. ( and I cannot disagree at all).
At the same time, I fully appreciate ▬'s points as we are unfortunately not getting a firm answer on how (if even possible), we will be covering the gap.

Here is my suggestion and I will document it to  Stephen/ ▬, and execute accordingly.

1. Agree with Stephen to lower the $430M (at least from an OL perspective; we can continue to drive the team to $430M) down to realistic number; as the $430M at this stage, with the current visibility we have is  impossible. ( yes, I am afraid at this stage, the answer is : we do not believe that this number  is right).
2. Assuming we are successful in agreeing to a lower number, we will assign the split by LOB.
3. Assuming we are keeping the $430M, we will still go ahead and assign a gap to each LOB ( this will surely complicate the way we address the gap, as the gap would be housed in almost every line item).
    a. Regardless, I get your point, we will assign the same and the relevant ICE impact.

I will try again to get alignment with Stephen and revert back asap.

▬.

79.     By May 10, 2022,  Defendants Chirico and McGrath plainly knew that their publicly disclosed earnings projections for the third quarter and fiscal year 2022 were materially inflated.  It is highly unlikely that the information described in the Global Vice President of Financial Planning and Analysis's email reached Defendant Chirico without also reaching Defendant McGrath, who was responsible for managing the finance employees involved in the discussions above and reported to Defendant Chirico.  In addition, on information and belief, around the May 10 earnings announcement, Defendant Chirico began expressing his concern about the state of the

Company's booking and revenue and began pressuring the sales team to close the gap, including by setting unachievable sales targets.  He pushed the sales team increasingly hard into June, to no avail.

80.    In advance of a Board meeting on June 7, 2022, Defendant McGrath told Spears, who was preparing a financial update for the Board, that the Company needed to acknowledge risk around its projection that it would generate $700 million in revenue in the third quarter, with $430 million of that coming from North American sales.  The email that Spears ultimately sent to the Board on June 7, 2022 acknowledged that "North America [had] experienced an unusually slow start to the quarter" and lowered the projected North American revenue to $410 million.

81.    On June 14, 2022, the Vice President of Sales Finance sent the Vice President of Quote-to-Cash and Global Business Operations and the Director of Global Revenue ("Revenue Director") an update on third-quarter revenue, to which the Revenue Director responded:  "[It looks] like another tight quarter running to the wire with high volume at the end."  The Vice President of Sales Finance wrote back:

> **From:** ███████████████████████ @avaya.com>
> **Sent:** Tuesday, June 14, 2022 4:47 AM
> **To:** ███████████████████ @avaya.com>
> **Subject:** RE: week 9 commit
>
> Tight is an understatement ███████ ... 🙁

82.    In response, the Revenue Director observed that "another miracle quarter" would be needed to achieve the numbers:

From: ████████████████ @avaya.com>
Sent: Tuesday, June 14, 2022 12:55 PM
To: ████████████████ @avaya.com>
Subject: RE: week 9 commit

I know ████. I also talked with ██ & ████, and it looks like the numbers still don't add all up, so hopefully another miracle quarter. I don't think we can afford to miss another quarter like Q1 & Q2.

83.    The Vice President of Sales Finance responded that the third-quarter results were even worse than the Revenue Director expected, and that meeting the Company's guidance would require "**more than one miracle**" to close the "**quite substantial**" gap:

From:        ████████████████ [/O=EXCHANGELABS/OU=EXCHANGE
             ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F0003F3FAA214337ABE35F0D1
             BA82583-████████ ]
Sent:        Tue 6/14/2022 6:26:24 AM (UTC-04:00)
To:          ████████████████ @avaya.com]
Subject:     RE: week 9 commit

I hate to be the bearer of bad news ████████, but the delta requires more than one miracle.. We will keep pushing, but the gap is quite substantial.

84.    By June 30, 2022, the last of Avaya's third quarter, the Senior Director of Sales Finance was estimating that third-quarter North American revenue would be about $350 million, down from the $410 million that had been provided to the Board. This would have meant that the Company's May 10 guidance was overstated by, at minimum, $60 million—and even then, that would assume the Company met its targets in every other jurisdiction.

36

The Senior Director of Sales Finance's estimate was provided to Defendant McGrath, who—even though the financing transaction with the Funds had not yet closed—failed to disclose to Brigade that the guidance he had repeatedly provided to Brigade had in fact been significantly overstated. The following day, on July 1, 2022, the Global Vice President of Financial Planning and Analysis, the Vice President of Sales Finance, and another Avaya employee received a report indicating that third-quarter gross revenue was only $604 million, down from the $685-700 million figure the Company had given Brigade.

85. Also on or about July 1, 2022, Defendant Chirico directed Spears to draft an email to the Board about an earnings miss based on the information then available about actual financial performance. Spears sent Chirico a draft communication to the Board from Spears, which stated, among other things:

> I am writing to let you know that we had a significant fallout across the globe that will prevent us from achieving the objectives or prognosis I shared just a few short weeks ago. I am clearly disappointed, and I take accountability for the challenges in execution, as well as those shortfalls that are the result of organizational shifts and recent changes to the GTM. I am fully cognizant of the strain caused by our inability to execute, and will look to you for further guidance on the how we alter the course ahead. I would like to report on four major categories of the business and its impact upon the qtr. . . .
>
> We saw significant gaps in execution and leadership. . . .
>
> We saw significant and direct fall out in our International and Latin America businesses as a result of questions around our liquidity. . . .

37

We witnessed unprecedented aggravation from the channel in Q3. This is a result of at least two major factors. 1) accelerated shifts to the cloud are leaving our partners out of future revenue streams. 2) changes to product mix, and continued erosion of hardware is changing partnering behavior.

86.    Although Defendant Chirico knew well that the Company's actual financial results for the third quarter (which had closed June 30, 2022) would be lower than its public projections, he hid that fact from the Board and investors, including Brigade. Neither Spears's draft e-mail nor any similar notification was sent to the Board. Nor did Defendant Chirico or anyone else from Avaya disclose the earnings miss to Brigade, even though the financing transaction with the Funds had not yet closed and that information was necessary to make Defendants' prior representations to Brigade not misleading.

87.    On July 3, 2022, Avaya's Board, including Defendant Chirico, received an email from an anonymous whistleblower alleging fraud by senior management. The email called Defendant McGrath "one of the most overpaid and overrated CFOs in the industry, [whose] **only forte is coming up with lies and fabrications in front of the street and the analysts**." It further claimed that "the story of [the Company's transition to a] subscription" revenue model was "a blatant financial engineering ploy that bought Jim time while fooling no one from the analyst community, and at the same time Jim and his executives totally failed in all of their investments in R&D and products to deliver the streams that cover for the dip in revenue, hoping that the **fake EBITDA** numbers will buy time to sell the company[.]"

38

Management responded to the whistleblower email with boilerplate assurances that the allegations would be investigated, to which the whistleblower responded on July 10, 2022: "The consensus [among employees] is that, despite all of the massive problems and issues, the shameless 4 [presumably including Defendants] continue to live in denial while arrogantly keep bullying their way thru."

88.    None of the information described above was communicated to Brigade. Although by mid-April, Company executives and employees were questioning the Company's third-quarter forecasts, Defendants confidently presented their inflated guidance to the market on May 10. And, although by early June, Defendant McGrath was urging a senior executive to acknowledge the risk that the Company's forecasted revenues were overstated, he provided Brigade with the overstated guidance on June 2, and he and Defendant Chirico re-affirmed that guidance in the June 8 Presentation. Defendants concealed the information—including from the Company's board of directors—even after the quarter ended and they knew that Avaya had materially missed its financial projections.

89.    Making matters worse, Defendants concealed from Brigade the fact that Avaya's financial condition had triggered a goodwill impairment analysis, which under accounting rules is required "when an event occurs or circumstances change" that indicate a "more likely than not" possibility that the fair value is below carrying value. On June 23, 2022, the Global Vice

President, Controller and Chief Accounting Officer at Avaya, shared proposed responses to an audit questionnaire with the General Counsel.  In response to a question regarding contemplated write-offs, the Global Vice President, Controller and Chief Accounting Officer wrote, "[o]ur understanding is that this assessment [of goodwill and trade names for potential impairment] is in-process and no conclusions have been reached at this time."  Ultimately, the impairment analysis did result in a massive write-down of goodwill in July 2022.  Defendants did not disclose to Brigade the fact that the trigger for an impairment analysis had occurred and remained ongoing when the transaction with the Funds closed in mid-July, even though Defendant McGrath provided an officer's certificate certifying that Avaya was "Solvent." Instead, Defendant McGrath either willfully disregarded the ongoing impairment analysis or negligently and recklessly failed to confirm that Avaya Inc. and Avaya Holdings were "Solvent" before executing the solvency certification.

90.    Defendants knew that Brigade and a limited group of other debt investors were relying on Defendants' superior knowledge of Avaya's business to decide whether to invest in Avaya's debt securities.  And, rather than disclosing information that contradicted the representations made to Brigade, or pausing to investigate a whistleblower complaint accusing Defendants and other senior executives of "coming up with lies and fabrications" to fool investors and engaging in "blatant financial engineering,"

40

Defendants pushed Brigade to complete the transaction as fast as possible—no doubt hoping that Plaintiffs' investment would facilitate the refinancing of the maturing debt and help cushion the impact of the blow that the Company's impending earnings miss would have on the Company's financial condition.

**After Closing, Defendants' Representations Are Publicly Revealed to Have Been False, and the Notes' Value Plummets.**

91.    Just two weeks after the Funds' purchase of the exchangeable notes closed, the reason for Avaya's apparent haste to close the transaction became clear to the public:  Defendants' repeated assurances of Avaya's financial outlook had been false, and the Company's guidance had been severely inflated.  Avaya was not a healthy company that was successfully overcoming a challenging transition period and poised for growth.  The Company was forced to admit that it was insolvent and had been so since well before the transaction closed.

92.    On July 28, 2022, just two weeks after the transaction closed, Avaya issued a press release announcing a material change to its guidance. It stated that its prior financial guidance "should no longer be relied upon." It further announced that "based on the information currently available," it expected its revenue for the third quarter of fiscal year 2022 to be between $575 million and $580 million—over $100 million lower than the Company's guidance of $685 million to $700 million—and Adjusted EBITDA to be between $50 million and $55 million, well below the Company's guidance of a

41

range of $140 million to $150 million. That put the Company's Adjusted EBITDA margin at less than 10%, or less than half of its guidance of 21% announced in the June 8 Presentation. No explanation was provided as to how the Company's projection could have been cut in half in a matter of weeks and indeed, the only reasonable inference is that the June 8 projections were false when made.

93. Although the Company did not identify a cause of its disastrous financial results, it announced that the Board had terminated Defendant Chirico, and that he would be replaced by former Vonage CEO Alan Masarek, effective August 1, 2022. The Company further announced that it would undertake drastic cost-cutting initiatives in an effort to get back on track.

94. The press release further disclosed that, as a result of triggering events (primarily Avaya's sharply reduced stock price) that occurred during the third quarter of fiscal year 2022, ending in June 2022, Avaya had performed impairment testing and, while such testing was not yet finalized, it estimated that non-cash impairment charges for the third quarter would be between $650 million and $1.8 billion. Either way, this was enough impairment to cause the liabilities on Avaya Holdings' balance sheet (and, at the mid to upper end of the range, Avaya Inc.'s balance sheet) to exceed the value of its assets as of June 30, 2022. In other words, Avaya Holdings was definitely insolvent, and Avaya Inc. was likely insolvent and had been so since well before Defendant McGrath executed the officer's certificate that

represented that both Avaya Holdings and Avaya Inc. were solvent, which induced Brigade to enter into the transaction.

95.    On the heels of these announcements, JPMorgan analysts decried the "dramatic haircut" in earnings and speculated that the announcement of a cost-cutting initiative meant that the headwinds that the Company was facing were "longer-term in nature" than Defendants had previously admitted.  Overall, the JPMorgan analyst report concluded, it was "tough to recommend" Avaya to investors.

96.    On August 9, 2022, Avaya made available to investors a presentation (the "August 9 Presentation") with updated information concerning the Company's third-quarter earnings and solvency.  The August 9 Presentation announced that revenue for the third quarter was $577 million, down 20% year-over-year in constant currency.  Adjusted EBITDA was $54 million, and the Adjusted EBTIDA margin was 9.4%, less than half the forecast that the Company communicated in June.

97.    Whereas Defendant Chirico and Defendant McGrath had previously attributed declines in revenue to the Russia/Ukraine conflict and to accounting rules regarding subscription-based revenue, and assured investors that subscription revenue not booked in the second quarter would be booked in the third and fourth quarters, the August 9 Presentation made clear that the causes of Avaya's declining revenue were far more serious and endemic:  Avaya was rapidly losing customers, and its licensing revenue was

43

declining relative to expectations.  Specifically, the August 9 Presentation attributed a revenue decline of $44 million to lower subscription bookings, $20 million to lower subscription duration, and $43 million to lower capex licensing revenue.



98.    Whereas Defendant McGrath had represented during the May 10, 2022 earnings call that Avaya was on track to maintain cash balances in the $250 million to $300 million range at the end of the third quarter of 2022, Avaya revealed in a press release on August 9, 2022 that ending cash and cash equivalents balances were only $217 million.

99.    In remarks to investors, Avaya's new CEO, Alan Masarek, stated that the largest component of the "revenue miss," totaling $64 million, was attributable to declines in average contract size and average contract duration—information that was notably omitted from the June 8 Presentation, notwithstanding the fact that Defendants trumpeted both the size and duration of contracts.  And, on the earnings call following the release

of the August 9 Presentation, Defendant McGrath again blamed the Company's massive earnings miss on the loss of the Company's higher-margin revenue sources as the Company shifted from a licensing model to a subscription sales model for its cloud-based software offerings. That is, he blamed the very same transition process that he and Defendant Chirico had touted on prior calls as the key to Avaya's success.

100. With regard to the Company's solvency, the August 9 Presentation confirmed that the worst-case scenario outlined in the Company's July 28 press release was true: both Avaya Inc. and Avaya Holdings were insolvent. The August 9 Presentation disclosed an increase in estimated impairment charges to a range of $1.272 billion to $1.804 billion, resulting in balance sheet insolvency for both Avaya Inc. and Avaya Holdings, as plainly shown in the preliminary balance sheet attached to the press release also issued on August 9.

101. Avaya further announced that it had determined that, based upon a combination of factors—including the debt maturity in June 2023, the decline in revenues during the third quarter, and the negative impact of significant operating losses on the company's cash balance—there was "substantial doubt about the Company's ability to continue as a going concern." As the Company had just successfully raised $600 million to refinance that debt, however, the June 2023 maturity date could not be the

reason for the Company's insolvency. Instead, the apparent culprit was the Company's staggering earnings miss.

102. Finally, the Company also announced in a Form 8-K filed on August 9, 2022, that the Audit Committee of the Board of Directors had begun an internal investigation to review, among other things, the circumstances surrounding the Company's financial results for the quarter ending on June 30, 2022 and items related to a whistleblower claim (a claim that was lodged more than a month earlier and before the closing of the Funds' investments in the Notes).

103. Following these announcements, the value of the Notes dropped to less than two-thirds of what Plaintiffs paid, with a secondary value relative to par of $61.138 on August 24, 2022 (with $100 representing the Notes' trading at a price equal to their principal amount).

104. Bad news continued to trickle out. On November 9, 2022, Avaya announced that Defendant McGrath had been replaced as CFO. Then, the other shoe dropped: on November 30, 2022, before the opening of trading, Avaya announced that it was unable to file its annual 10-K report. It further disclosed that management "has determined that material weaknesses existed in its ICFR [internal controls over financial reporting] as the Company did not design and maintain effective controls," and that "the Company also concluded that disclosure controls and procedures were not effective as of September 30, 2021, which continues to be the case."

46

105.    For investors, including Brigade, which had reasonably assumed that Avaya's financial statements filed with the SEC were accurate and reliable, this news was both crushing and shocking.  Following this announcement, trading of the Notes stopped until January 5, 2023, when they were valued at $35.55.  The price dropped further on January 13, 2023 to $27.00.

106.    On February 14, 2023, Avaya filed for bankruptcy.  The Funds thereby became creditors of Avaya's bankruptcy estate, holding secured claims that were grouped in Class 4 – First Lien Claims, of which there was a total amongst all creditors in Class 4 of $3,006 million, with estimated percentages of recovery under the plan at 17.33%–24.1%.  This meant that the Funds were able to recover, at most, 24.1% of their initial investment in excess of $110 million, or about $26.51 million.

47

# Timeline of Defendants' Deception



## Summary of Defendants' Material Misrepresentations

107.    As set out in the chart below and in further detail in the preceding paragraphs, between May 10, 2022 and July 12, 2022, Defendants Chirico and McGrath knowingly made a series of material misrepresentations and omissions to Brigade.  Brigade relied on these misrepresentations and omissions in purchasing the Notes on Plaintiffs' behalf, and Plaintiffs were damaged as a result.

| Material Statement | Source | Falsity/Material Facts Omitted |
|---|---|---|
| Avaya's financial outlook for the third quarter of fiscal year 2022 included revenue of $685 million to $700 million, Adjusted EBITDA of $140 million to $150 million, and Adjusted EBITDA margin of 20% to 21%. ¶45. | Avaya's Form 8-K filing dated May 10, 2022, which Defendant McGrath signed and Defendant Chirico signed off on in his capacity as CEO of Avaya. ¶44. | As set forth herein, by May 10, 2022 and continuing through July 2022, executives and other employees of the Company were warning that Avaya's projections for the third quarter of fiscal year 2022 were inflated and/or unachievable, and that information was communicated to Defendants Chirico and McGrath.  ¶¶73-90.  Consistent with these warnings, third-quarter revenues and Adjusted EBITDA were over $100 million lower than the May 10, 2022 projections, as publicly revealed on July 28, 2022. These facts were not disclosed to Plaintiffs prior to closing. ¶92. |
| Avaya was on track to maintain cash balances in the $250 million to $300 million range at the end of the third quarter of 2022. ¶47. | Statement by Defendant McGrath during the May 10, 2022 earnings call. ¶47. | McGrath did not reasonably expect Avaya to maintain such cash balances for the end of the third quarter.  Avaya was insolvent as of June 30, 2022, which was the end of the third quarter of 2022.  ¶¶94, 96-102. It closed the third quarter of 2022 with ending cash and cash |

49

| Material Statement | Source | Falsity/Material Facts Omitted |
|---|---|---|
| | | equivalents of $217 million. ¶98. These facts were not disclosed to Plaintiffs prior to closing. |
| Avaya's disappointing second-quarter 2022 financial results were largely attributable to accounting rules concerning subscription revenue, and subscription revenue not booked in the second quarter would be booked in the third and fourth quarters. ¶¶48-49. | Statements by Defendant Chirico and Defendant McGrath during the May 10, 2022 earnings call. ¶¶48-50. | Avaya's disappointing second-quarter 2022 financial results were attributable to fundamental weaknesses in Avaya's businesses and would not be remedied in the third and fourth quarters. By May 10, 2022 and continuing through July 2022, executives and other employees were sounding the alarm that Avaya's projections for the third quarter of 2022 were inflated and/or not achievable, and that information was communicated to Defendants Chirico and McGrath. ¶¶73-90. Consistent with those expectations, third-quarter revenues and Adjusted EBITDA were over $100 million lower than the projections disclosed on the May 10, 2022 earnings call. ¶92. On August 9, 2022, Avaya conceded that Avaya's revenue miss was attributable to declines in subscription bookings and duration—not merely the way that revenue was being accounted for—and lower licensing revenue. ¶¶97, 99. These facts were not disclosed to Plaintiffs prior to closing. |
| Avaya's actions to reduce costs and expenses were leading to 300 basis points (or 3%) of improved | Statement by Defendant McGrath during the May 26, 2022 call with Brigade. | Avaya's EBITDA margins were not improving. On July 28, 2022, the Company disclosed information demonstrating that its Adjusted EBITDA margin |

50

| Material Statement | Source | Falsity/Material Facts Omitted |
|---|---|---|
| EBITDA margins for the second half of fiscal year 2022.  ¶59. | ¶59.<br><br>Statement by Defendant McGrath during the June 2, 2022 call with Brigade.  ¶60. | was below 10%, which was less than half of the projection (21%) included in the June 8 Presentation and the May 10, 2022 Form 8-K filing.  ¶92.  These facts were not disclosed to Plaintiffs prior to closing.  Such a dramatic change could not reasonably have happened in a matter of weeks, strongly indicating that this statement was false when made. |
| The Company's financial guidance for the third quarter and year-end of fiscal year 2022 was conservative.  ¶60. | Statement by Defendant McGrath during the June 2, 2022 call with Brigade.  ¶60. | The Company's financial guidance for the third quarter and year-end of fiscal year 2022 was severely overstated, as executives and other employees of the Company warned Defendants Chirico and McGrath beginning May 10, 2022, if not earlier.  ¶¶73-90.  These facts were not disclosed to Plaintiffs prior to closing. |
| Avaya anticipated Adjusted EBITDA margin of about 21% for fiscal year 2022.  ¶61. | 8-K signed by defendant McGrath and June 8 Presentation, which was reviewed and approved by Defendants Chirico and McGrath.  ¶62. | On July 28, 2022, the Company disclosed information demonstrating that its Adjusted EBITDA margin was below 10%, which was less than half of the figure (21%) included in the June 8 Presentation and the May 10, 2022 Form 8-K filing.  ¶92.  These facts were not disclosed to Plaintiffs prior to closing.  Such a dramatic change could not reasonably have happened in just a few weeks, strongly indicating that this statement was false when made. |
| Avaya and Avaya Holdings were solvent | Officer's Certificate | Avaya Holdings and Avaya Inc. were insolvent as of July 12, |

51

| Material Statement | Source | Falsity/Material Facts Omitted |
|---|---|---|
| as of July 12, 2022. ¶69. | executed July 12, 2022 by Defendant McGrath and on behalf of Avaya, which, upon information and belief, Defendant Chirico approved. ¶¶69-70. | 2022, and had been so since June 30, 2022.  ¶¶94, 96-102. In addition, Avaya was undergoing an impairment analysis, triggered by events that called into question the fair value of Avaya's assets, at the time Defendant McGrath executed the Officer's Certificate.  ¶89.  Those facts were not disclosed to Plaintiffs prior to closing. |
| Avaya's financial results as set forth in its securities filings were accurate, and it maintained effective internal controls over its financial reporting. ¶43. | Certifications by Defendants Chirico and McGrath in Avaya Holdings' 2021 securities filings.  ¶¶43-46. | Avaya did not maintain effective internal controls over financial reporting.  ¶104.  That fact was not disclosed to Plaintiffs prior to closing. |

**FIRST CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**

108.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

109.   Defendants communicated or caused the communication of the materially misleading statements and omissions specified above to Plaintiffs via Brigade.

110.   Defendants failed to exercise reasonable care or competence in communicating or causing the communication of those misleading statements and omissions to Plaintiffs via Brigade.

111. The information that would have revealed the truth of Defendants' misleading statements and omissions was uniquely within Defendants' specialized knowledge or expertise by virtue of their positions within the Company.

112. Defendants formed a special relationship of trust and confidence with Brigade giving rise to a duty to speak. And even if Defendants did not have a duty to speak, Defendants made omissions of material fact necessary to make the affirmative statements made by Defendants, in light of the circumstances under which they were made, not misleading.

113. Brigade reasonably relied on Defendants' misrepresentations and omissions, which caused Brigade to purchase the Notes on Plaintiffs' behalf, and Plaintiffs were harmed as a result.

114. Defendants knew and intended that Brigade would so rely. Defendants understood that Brigade managed funds on whose behalf Brigade would determine whether to invest in the Notes.

## SECOND CLAIM FOR RELIEF
## FRAUDULENT INDUCEMENT

115. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

116. Defendants communicated or approved the communication of the materially misleading statements and omissions specified above to Plaintiffs via Brigade.

117.    Defendants did so with knowledge or reckless disregard of those statements and omissions' falsity and with the intent to deceive Brigade into relying on those statements and omissions.

118.    Brigade reasonably relied on Defendants' misrepresentations and omissions, which caused Brigade to purchase the Notes on Plaintiffs' behalf, and Plaintiffs were harmed as a result.

**THIRD CLAIM FOR RELIEF**
**NORTH CAROLINA SECURITIES ACT**

119.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

120.    Section 78A-8(2) of the North Carolina Securities Act makes it illegal to offer or sell a security by means of an "untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

121.    Section 78A-56(a)(2) of the North Carolina Securities Act provides that anyone who "[o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person

purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security."

122.    Defendants Chirico and McGrath offered the Notes, which were securities, for sale within the meaning of Section 78A-56(a)(2) by soliciting Brigade to make the investment in the Notes on Plaintiffs' behalf.

123.    The offers or sales were made from Avaya's headquarters in Durham, North Carolina by means of the material misrepresentations and omissions described herein, and the Investment Agreement specified that all notices were to be directed to Avaya Inc. in Durham, North Carolina.

124.    In addition, Defendants Chirico and McGrath controlled Avaya, were officers and/or directors of Avaya, and were employees of Avaya who materially aided in the unlawful transactions described herein within the meaning of Section 78A-56(c).

125.    Defendants Chirico and McGrath communicated or approved the communication of the material misrepresentations and omissions specified above to Plaintiffs via Brigade.

126.    Brigade, lacking knowledge of the untruth of Defendants' misleading statements and omissions, relied on Defendants' misstatements

55

and omissions, which caused Brigade to purchase the Notes on Plaintiffs'

behalf, and Plaintiffs were harmed as a result.

127.    Defendants Chirico and McGrath cannot show that they did not

know, or in the exercise of reasonable care could not have known, of the

untruth of the misstatements and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Awarding Plaintiffs damages in an amount to be determined at
    trial together with pre- and post-judgment interest as may be
    provided by contract or law;

B.  Awarding Plaintiffs' reasonable costs and fees, including
    attorneys' fees;

C.  Awarding Plaintiffs punitive damages against Defendants for
    their willful, fraudulent, and/or malicious conduct; and

D.  Awarding such equitable/injunctive or other relief as the Court
    may deem just and proper.

Dated: October 26, 2023
Raleigh, North Carolina


By: /s/ *Raymond M. Bennett*
Raymond M. Bennett


WOMBLE BOND DICKINSON           DEBEVOISE & PLIMPTON LLP
(US) LLP

Raymond M. Bennett (N.C. Bar No.    Maeve O'Connor
36341)                              Sidney P. Levinson
Jesse A. Schaefer (N.C. Bar No.     Erica S. Weisgerber
44773)                              Morgan A. Davis
555 Fayetteville Street, Suite 1100 66 Hudson Boulevard
Raleigh, NC 27601                   New York, NY 10001

56

Phone: (919) 755-2158
Email: ray.bennett@wbd-us.com
      jesse.schaefer@wbd-us.com

*Counsel for Plaintiffs*

Phone: (212) 909-6000
Email: mloconnor@debevoise.com
      slevinson@debevoise.com
      eweisberger@debevoise.com
      mdavis@debevoise.com

*Counsel for Plaintiffs*
*Pro Hac Applications Forthcoming*

57