# EXHIBIT G

Case 1:23-cv-01258-PGG    Document 81-7    Filed 02/16/24    Page 2 of 10

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| A6 CAPITAL MANAGEMENT LP, A6 MASTER FUND LP, ANGELO, GORDON & CO., L.P., AG CATALOOCHEE, L.P., AG CC FUNDING I, LTD., AG CC FUNDING II, LTD., AG CENTRE STREET PARTNERSHIP, L.P., AG CORPORATE CREDIT OPPORTUNITIES FUND, L.P., AG MM, L.P., AG SUPER FUND MASTER, L.P., CAPITAL FOUR US INC., CANYON BALANCED MASTER FUND, LTD., CANYON DISTRESSED OPPORTUNITY MASTER FUND III, L.P., CANYON DISTRESSED TX (A) LLC, CANYON DISTRESSED TX (B) LLC, CANYON-EDOF (MASTER) L.P., CANYON ESG MASTER FUND, L.P., CANYON-GRF MASTER FUND II, L.P., CANYON IC CREDIT MASTER FUND L.P., CANYON NZ-DOF INVESTING, L.P., CANYON VALUE REALIZATION FUND, L.P., THE CANYON VALUE REALIZATION MASTER FUND, L.P., EP CANYON LTD., MARINER ATLANTIC MULTI-STRATEGY MASTER FUND, LLC, MARINER GLEN OAKS MASTER FUND, LP, and ST. JAMES'S PLACE GLOBAL HIGH YIELD BOND UNIT TRUST,<br><br>     Plaintiffs,<br><br>   v.<br><br>JAMES M. CHIRICO, JR., ALAN MASAREK, KIERAN J. McGRATH, STEPHAN SCHOLL, KEVIN SPEED, SUSAN L. SPRADLEY, JOHN P. SULLIVAN, STANLEY J. SUTULA III, ROBERT THEIS, SCOTT D. VOGEL, WILLIAM D. WATKINS, and JACQUELINE E. YEANEY,<br><br>     Defendants. | Index No. _____<br><br>**SUMMONS WITH NOTICE**<br><br>JURY TRIAL DEMANDED<br><br>Plaintiff designates New York County as the place of trial.<br><br>Venue is proper in New York County under C.P.L.R. § 503. |

Case 1:23-cv-01258-PGG    Document 81-7    Filed 02/16/24    Page 3 of 10

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to serve upon Plaintiffs' attorneys a notice of appearance within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service of this Summons is complete if it is not personally delivered to you within the State of New York. If you fail to appear, judgment will be taken against you by default for the relief demanded herein.

Defendants are current and former directors and officers of Avaya Holdings Corp. (the "Company" or "Avaya"). Plaintiffs are current or former investors in debt issued by Avaya. This Court has personal jurisdiction over Defendants under C.P.L.R. §§ 301 and 302 because, *inter alia*, certain Defendants reside in the State of New York and because, as to all Defendants, Plaintiffs' causes of action arise from Defendants' conduct of Avaya's business in this State and from their tortious acts that took place in this State and caused foreseeable injury to Plaintiffs in this State. Venue is proper under C.P.L.R. § 503 because certain Plaintiffs are located in this County and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this County, including, without limitation, certain Defendants' transaction of business at Avaya's offices in this County, their meetings with Plaintiffs in this County, and the presence of the B3 Term Loan administrative and escrow agent in this County.

## NOTICE

Plaintiffs bring this damages action to redress a massive fraud that Avaya's directors and officers perpetrated on investors in the Company's debt. Plaintiffs are current and former investors in the Company's term loan and convertible notes. Through false statements about critical details of Avaya's finances and management, Defendants induced Plaintiffs to purchase or hold hundreds

2

of millions of dollars in those debt instruments. Plaintiffs relied on Defendants' false statements and have suffered more than $125 million in losses as a result.

All Plaintiffs held certain unsecured convertible notes issued by the Company in 2018 and due 2023 ("the Convertible Notes"). Together, Plaintiffs' holdings in the Convertible Notes totaled over $100 million in face value. And certain Plaintiffs invested in (and later sold at a loss) approximately $80 million in B3 Term Loans issued in July 2022.

In May 2022, Avaya sought to raise additional financing under the pretense of refinancing the Convertible Notes. That same month, Avaya had released what seemed like rosy financial results for the second fiscal quarter of 2022 (ending March 31).[1] In discussing those results, Avaya's then-President and CEO, Defendant James M. Chirico, Jr., publicly touted the success of the Company and its various product lines. Chirico claimed that the Company had enjoyed "record growth" in its "transformational journey to a cloud and SaaS business model." He also told investors in an earnings call that "recurring revenue reached a record." The business was "obviously healthy and growing," according to Chirico. Avaya was "focus[ed] on the long game, investing in growth drivers and doing so profitably." Avaya projected third fiscal quarter revenues of "$685 million to $700 million" and adjusted EBITDA of "$140 million to $150 million."

In late May and early June, Avaya repeated these claims to investors in both public presentations and in private meetings arranged by Avaya's investor relations department. Avaya continued to report favorably on its liquidity, working capital, and financial projections. Members of Avaya's management team, including Defendants Kieran McGrath and John Sullivan, the

---

[1] Avaya's fiscal year begins on October 1 and ends on September 30 of each year. *See* Avaya Nov. 22, 2021 Form 10-K at 5.

Company's CFO and Treasurer, repeatedly assured investors that the Company's finances and operations were sound, and that financial projections were unchanged.

Defendants then contacted Plaintiffs and other investors in the Company's existing debt about making a new secured term loan to the Company (the "B3 Term Loan"). Avaya's CFO and Treasurer repeatedly represented that the Company's finances, operations, and liquidity were sound and that prospects were great. They repeatedly touted Avaya's continued robust growth. For example, during calls on June 2, 4, and 9, Defendants McGrath and Sullivan claimed to investors, including certain Plaintiffs, that the Company was on track to meet the third-fiscal-quarter guidance in Avaya's recent earnings announcement. Avaya's management also reiterated that guidance to their financial advisors in the B3 Term Loan transaction, knowing that the guidance would be repeated to investors. And to back up their claims, management also provided detailed financial forecasts and guidance in a data room.

During negotiations, several Plaintiffs made clear that they would not invest in the B3 Term Loan on the Company's proposed terms unless the Company made a firm commitment to repurchase their Convertible Notes at or near closing of the new financing. Defendant Sullivan claimed to one Plaintiff that the securities laws prohibited the Company from repurchasing the Convertible Notes before it released its third-fiscal-quarter financial results. Through their advisors, Avaya's management and the board promised multiple Plaintiffs that Avaya would repurchase those notes as soon as practicable. In late June 2022, McGrath and Sullivan even directed holders of the Convertible Notes, including two Plaintiffs, to speak with an agent coordinating the planned repurchase.

All Plaintiffs continued to hold their Convertible Notes in reliance on the Company's statements about its finances and planned repurchases. And certain Plaintiffs – funds associated

4

with Angelo Gordon, Canyon, and Mariner (the "B3 Plaintiffs") – invested approximately $80 million of new money in the B3 Term Loan in reliance on Defendants' statements. As part of pre-closing due diligence for the B3 Term Loan and other securities transactions, Defendants reaffirmed the financial guidance yet again to the B3 Plaintiffs and claimed that there were no anticipated changes to management.

The B3 Term Loan deal closed on July 12, nearly two weeks after the end of Avaya's third fiscal quarter. Defendants' fraud began to become apparent almost immediately afterwards. In a July 14 SEC filing, Avaya disclosed it had used proceeds from the B3 Term Loan to repurchase $129 million of *other* investors' Convertible Notes. The Company provided no explanation for why, contrary to Defendants' representations that it was precluded from doing so, it was repurchasing Convertible Notes before releasing its third quarter financial results, or why the repurchase did not include Convertible Notes held by Plaintiffs. When pressed, McGrath and Sullivan reassured Plaintiffs that the Company still planned to repurchase all the Convertible Notes, and again encouraged one Plaintiff to speak with an agent coordinating the planned repurchases.

Two weeks later, Avaya shocked the market with two disclosures that further revealed the extent of Defendants' fraud. First, in a July 28 press release, management announced that the Company would miss its previous earnings forecasts for the third fiscal quarter ended June 30 by more than *60%*. While management had earlier predicted adjusted EBITDA for the quarter of $140 to $150 million – and repeatedly reassured Plaintiffs that the Company was on track to meet those predictions – the July 29 results revealed that adjusted EBITDA was, in fact, only between $50 to 55 million. Incredibly, Defendants gave no explanation for this devastating downturn.

5

Market observers called the revisions "dramatic," noting that Avaya had suddenly transformed into a "deeply distressed company" that needed to "radically restructur[e] its balance sheet." According to one investor, Avaya "did not [just] miss guidance, it *missed by an ocean*." The financial results were especially shocking because Defendants had stood behind the guidance just two weeks before, when the Company closed the B3 Term Loan transaction. An inaccurate forecast in the middle of the fiscal quarter – when financial performance was uncertain – might conceivably have been an honest mistake. But Defendants reaffirmed the guidance *after* the fiscal quarter ended, when they knew that the Company would dramatically miss that guidance.

Second, Avaya disclosed in an SEC filing that it had just removed Defendant Chirico as CEO and replaced him with an outsider, Defendant Alan Masarek. The Company gave no explanation for this sudden change. But as Defendant Sullivan later admitted, Avaya had been searching for a new CEO long before and during its marketing of the B3 Term Loan. The Company's board of directors at the time – Defendants Chirico, Scholl, Spradley, Sutula, Theis, Vogel, Watkins, and Yeaney (the "Director Defendants") – were undoubtedly involved in that search and aware of management's efforts to obtain financing at the same time. Still, Defendants never disclosed, or even hinted, to Plaintiffs or other investors to whom they were marketing hundreds of millions of dollars in loans that the company would change CEOs. Defendants intentionally hid this material information to induce the B3 Plaintiffs into investing and to induce all Plaintiffs to continue to hold their Convertible Notes.

Predictably, the prices for both the B3 Term Loan debt and Convertible Notes plummeted upon these disclosures. Seeking more information about the catastrophic financial results and management change, certain Plaintiffs spoke with Company representatives between July 29 and

6

August 8. Defendant Sullivan tried to assuage investors' concerns by claiming that, notwithstanding the severe earnings downgrade, the Company had sufficient cash and still intended to repurchase the Convertible Notes. Defendant McGrath and the new CEO, Defendant Masarek, publicly repeated these claims. Plaintiffs continued to hold the Convertible Notes in reliance on these representations.

But the bad news continued. On August 9, 2022, Avaya announced in an SEC filing that there was "substantial doubt about the Company's ability to continue as a going concern." It also disclosed that the board's audit committee had started an internal investigation into the dramatically revised financials for the previous quarter, as well as "matters related to a whistleblower letter." And in November 2022, the Company admitted that there were "material weaknesses" in its financial reporting, and elaborated that in November 2021 – months *before* the Company's financing efforts – a whistleblower had warned the board of financial irregularities. But the Director Defendants withheld those allegations from "members of the management and . . . [Avaya's] accounting firm." Instead, the Director Defendants continued to approve rosy financial projections and colluded with, or at the very least allowed, management to communicate false forecasts to investors.

Defendants' false statements and omissions went to the heart of Plaintiffs' investments in the B3 Term Loan and their decision to hold the Convertible Notes. Those false statements covered such fundamental matters as the accuracy and trustworthiness of the Company's financial statements, whether the Company would repurchase its debt, and who would lead the Company as CEO. The Company's management made these statements with the knowledge of, and at the direction of, the Director Defendants. And all Plaintiffs justifiably relied on Defendants' misrepresentations. As a result, the B3 Plaintiffs lent a further $80 million to Avaya to protect

their existing investments, and all Plaintiffs bought or held more than $100 million in Convertible Notes, convinced Avaya would fulfill Defendants' promises to repurchase the notes. But once the truth about the Company's financial and management problems came out, those investments lost significant value. Each Plaintiff has sold B3 Term Loans, Convertible Notes, or both at sharply reduced prices. In addition, the Convertible Notes have been rendered substantially worthless, given that their trading prices have collapsed to near zero and given that there is substantial doubt about whether Avaya can continue as a going concern. Together, Plaintiffs have incurred over $125 million in losses.

To remedy Defendants' fraud, in this action Plaintiffs seek:

- An award of compensatory, consequential, and/or punitive damages, in an amount to be determined at trial, for the losses caused by Defendants' fraud, but in no event less than $125,000,000;

- Pre- and post-judgment interest; and

- Such other and further relief as is just and proper.

Upon your failure to appear, judgment will be taken against you by default for the relief requested above and any other relief the Court may award.

8

Case 1:23-cv-01258-PGG    Document 81-7    Filed 02/16/24    Page 10 of 10

Dated:    February 1, 2023                    Respectfully submitted,
          New York, New York


                                              /s/ Steven F. Molo
                                              Steven F. Molo
                                              Justin M. Ellis
                                              Ryan Yeh
                                              MOLO LAMKEN LLP
                                              430 Park Avenue
                                              New York, New York  10022
                                              Tel.: (212) 607-8160
                                              Fax: (212) 607-8161
                                              smolo@mololamken.com

                                              Matthew J. Fisher (*pro hac vice* forthcoming)
                                              MOLO LAMKEN LLP
                                              300 North LaSalle Street
                                              Chicago, Illinois  60654
                                              Tel.: (312) 450-6700
                                              Fax.: (312) 450-6701
                                              mfisher@mololamken.com

                                              *Attorneys for Plaintiffs*

9