# Exhibit 1

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

CIVIL ACTION NO.: 23-CVS-31948

BRIGADE CAVALRY FUND LTD., et al.,

Plaintiffs,

v.

JAMES M. CHIRICO, JR. and
KIERAN MCGRATH,

Defendants.

# BRIEF OF DEFENDANT KIERAN MCGRATH
# IN SUPPORT OF MOTION TO DISMISS COMPLAINT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ................................................................................................................2

      A.    The Parties.................................................................................................2

      B.    Avaya's Business .....................................................................................2

      C.    Avaya's Operating Results......................................................................5

      D.    Alleged Misrepresentations ....................................................................8

LEGAL STANDARD.......................................................................................................10

      A.    Rule 12(b)(3)..........................................................................................10

      B.    Rule 12(b)(6)..........................................................................................10

ARGUMENT ...................................................................................................................11

I.     VENUE IS IMPROPER .........................................................................................11

II.    THE COMPLAINT FAILS TO STATE A FRAUDULENT
      INDUCEMENT CLAIM AGAINST MCGRATH..............................................12

      A.    The Complaint Fails To Allege Any False Or Misleading
            Statement Or Omission...........................................................................13

            1.    Opinion Statements About Future Earnings ...............................14

            2.    Solvency Statement ....................................................................17

            3.    Internal-Control Statements........................................................19

      B.    The Forward-Looking Statements Are Not Actionable As A
            Matter of Law ........................................................................................20

      C.    The Complaint Fails To Plead Scienter As To McGrath .......................22

      D.    The Complaint Fails To Plead Reliance .................................................25

- ii -

III.   THE COMPLAINT FAILS TO STATE A NEGLIGENT MISREPRESENTATION CLAIM AGAINST MCGRATH ..............................25

IV.   THE COMPLAINT FAILS TO STATE A STATUTORY SECURITIES FRAUD CLAIM AGAINST MCGRATH .........................................................27

CONCLUSION .............................................................................................28

RULE 7.8 CERTIFICATION ..........................................................................30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alamance Family Practice, P.A. v. Lindley,*
    2018 NCBC 82 (N.C. Super. Ct. Aug. 14, 2018)..............................................25

*Ausley v. Bishop,*
    133 N.C. App. 210 (1999) ...................................................................26

*Big League Analysis, LLC v. Off. of Comm'r of Baseball,*
    2016 NCBC 66 (N.C. Super. Ct. Aug. 29, 2016)................................. 10, 11, 12

*Bob Timberlake Collection, Inc. v. Edwards,*
    176 N.C. App. 33 (2006) .................................................................26, 27

*Bond Opportunity Fund v. Unilab Corp.,*
    2003 WL 21058251 (S.D.N.Y. May 9, 2003),
    *aff'd,* 87 F. App'x 772 (2d Cir. 2004)............................................................23

*Calloway v. Wyatt,*
    246 N.C. 129 (1957)........................................................................22

*Carmayer, LLC v. Koury Aviation, Inc.,*
    2017 NCBC 80 (N.C. Super. Ct. Sept. 11, 2017)......................................20, 26

*Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig., In re,*
    7 F.3d 357 (3d Cir. 1993) ..............................................................21

*Ellison v. Alexander,*
    207 N.C. App. 401 (2010) ................................................................12

*Est. of Vaughn v. Pike Elec., LLC,*
    230 N.C. App. 485 (2013) .............................................................. 11, 22

*Fulton v. Vickery,*
    73 N.C. App. 382 (1985) ............................................................... 19, 24

*Gvest Real Est., LLC v. JS Real Est. Invs., LLC,*
    2023 NCBC 61 (N.C. Super. Ct. Sept. 12, 2023)............................................20

*Hardin v. KCS Int'l, Inc.,*
    199 N.C. App. 687 (2009) .............................................................. 12, 13

*Karth v. Keryx Biopharmaceuticals, Inc.*,
   6 F.4th 123 (1st Cir. 2021) ...................................................................................... 13

*Kolominsky v. Root, Inc.*,
   2023 WL 3215056 (S.D. Ohio Mar. 31, 2023) ......................................................... 21

*L. Offs. of Peter H. Priest, PLLC v. Coch*,
   2014 NCBC 54 (N.C. Super. Ct. Nov. 5, 2014),
   *aff'd*, 244 N.C. App. 53 (2015) ............................................................................... 13

*Lester v. McLean*,
   242 N.C. 390 (1955) .............................................................................................. 20

*Lillian Knitting Mills Co. v. Earle*,
   237 N.C. 97 (1953) ................................................................................................ 23

*Lululemon Sec. Litig., In re*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ....................................................................... 14

*Magi XXI, Inc. v. Stato della Città del Vaticano*,
   714 F.3d 714 (2d Cir. 2013) ................................................................................... 12

*Meyer v. Walls*,
   347 N.C. 97 (1997) ................................................................................................ 22

*NNN Durham Off. Portfolio 1, LLC v. Grubb & Ellis Co.*,
   2016 NCBC 93A (N.C. Super. Ct. Dec. 29, 2016),
   *aff'd in part, rev'd in part*, 261 N.C. App. 175 (2018) ...................................... 21

*NNN Durham Off. Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*,
   2013 NCBC 12 (N.C. Super. Ct. Feb. 19, 2013),
   *aff'd*, 261 N.C. App. 185 (2018) .......................................................................... 25

*Oberlin Cap., L.P. v. Slavin*,
   147 N.C. App. 52 (2001) .......................................................................................... 3

*Oliver v. Brown & Morrison, Ltd.*,
   2022 NCBC 13 (N.C. Super. Ct. Mar. 3, 2022) ..................................................... 25

*Plasman v. Decca Furniture (USA), Inc.*,
   2016 WL 6208639 (N.C. Super. Ct. Oct. 21, 2016) ............................................... 23

*Royal Appliance Sec. Litig., In re*,
   64 F.3d 663 (6th Cir. 1995) (tbl.), 1995 WL 490131 ............................................. 26

*Sain v. Adams Auto Grp., Inc.*,
   244 N.C. App. 657 (2016) ...................................................................................... 24

*Sec. Cap. Assurance, Ltd. Sec. Litig., In re,*
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) ..................................................... 16, 17

*Sinay v. Lamson & Sessions Co.,*
    948 F.2d 1037 (6th Cir. 1991) ....................................................................... 21

*Skoog v. Harbert Priv. Equity Fund, II, LLC,*
    2013 NCBC 17 (N.C. Super. Ct. Mar. 25, 2013) ...................................... 19, 28

*Solum v. Certainteed Corp.,*
    147 F. Supp. 3d 404 (E.D.N.C. 2015) ........................................................... 16

*Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.,*
    2009 WL 406688 (N.C. Super. Ct. Feb. 18, 2009) ......................................... 12

*Stavroff v. Meyo,*
    987 F. Supp. 987 (N.D. Ohio 1995),
    *aff'd,* 129 F.3d 1265 (6th Cir. 1997) (tbl.), 1997 WL 720475. ...................... 26

*SunEdison, Inc. Sec. Litig., In re,*
    300 F. Supp. 3d 444 (S.D.N.Y. 2018) ............................................................ 24

*Trail Creek Invs. LLC v. Warren Oil Holding Co.,*
    2023 NCBC 36A (N.C. Super. Ct. May 24, 2023) .......................................... 11

*Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.,*
    385 N.C. 250 (2023) ............................................................. 10, 11, 19, 20, 22

**RULES**

N.C. Code Civ. P. 12(b)(3) ............................................................................. 10, 12

N.C. Code Civ. P. 12(b)(6) ............................................................................. 10, 22

**STATUTES**

N.C.G.S. § 1A-1:

    Rule 9(b) (2021) ........................................................................................... 11

    Rule 9(b) ....................................................................................................... 22

N.C.G.S. § 55-8-42(b) ..................................................................................... 24, 27

N.C.G.S. § 78A-56(a)(2) ....................................................................................... 27

**PRELIMINARY STATEMENT**

This Complaint is a textbook example of insufficient, imprecise, and improper pleading as to defendant Kieran McGrath ("McGrath").  It should be dismissed.  It also has no place in this Court: plaintiffs stipulated that this is an improper forum.  Plaintiffs' "agent" in evaluating and making the decision to purchase Avaya securities "████████████████████████████" agreed that any dispute "████████████████ ██" their investment would be subject to the "████████████████████ ████████████████████████████████████████."

Turning to plaintiffs' pleading deficiencies, the Complaint fails to identify any materially *false statement* made by McGrath—as opposed to inactionable forward-looking statements and opinions—much less alleges that McGrath made any statements with knowledge of their falsity.  Similarly, the Complaint fails to allege that McGrath's certification of Avaya's point-in-time solvency was false when it was made, or that he knew of the control deficiencies that were discovered six months after McGrath signed his certification.  Documents incorporated in the Complaint affirmatively establish that McGrath did not know that the challenged statements were false or misleading.  Nor does the Complaint allege *plaintiffs* relied on any alleged false statements.

The Complaint is deficient as to all counts naming McGrath for the additional reason that the extensive disclosures set forth in documents incorporated by reference in the Complaint defeat each cause of action.  Read in their totality—as this Court must do—Avaya's earnings guidance and related disclosures must be evaluated against Avaya's express warnings of "risks and uncertainties, many of which [were]

beyond [Avaya's] control."   Avaya's forward-looking statements, when evaluated against the extensive cautionary statements in Avaya's contemporaneous public disclosures, make clear that this case should not proceed against McGrath, an individual corporate officer acting on behalf of the corporation.

**BACKGROUND**

### A.    The Parties

McGrath is the former Chief Financial Officer of Avaya Holdings Corp. (with its consolidated subsidiaries, "Avaya"), who served from February 2019 until his retirement in November 2022.  Compl. ¶¶ 33, 104.

Plaintiffs are 21 investment funds, each of which independently—acting through non-party Brigade Capital Management, LP (the "Manager")—purchased Avaya's 8.00% convertible bonds pursuant to an investment agreement signed on June 23, 2022.  *Id.* ¶¶ 4, 10–30, 66; Investment Agreement (Ex. 1).  The purchase transaction closed on July 12, 2022.  Compl. ¶ 71.  The Manager had full power to act on behalf of each plaintiff in connection with the purchase.  *Id.* ¶ 31.  The Manager's alleged agency was so broad that it was not even required to consult with any plaintiff before making the investment in Avaya.  *Id.* ¶¶ 4, 31, 66.

### B.    Avaya's Business

Avaya is a digital communications company that sells software and services for enterprise telephone and call center solutions worldwide.  *Id.* ¶ 40; *10-K Annual Rep.* 25, 113 (Nov. 22, 2021) (Ex. 2).  Avaya operated in approximately 190 countries and had more than 8,000 employees.  Ex. 2 at 12, 25.  Since its emergence from a prior bankruptcy in 2017, Avaya was executing on a fundamental change in its

2

business model, transitioning from a telephone hardware company to a subscription and cloud services company. *Id.* at 2, 18, 89.

In public disclosures incorporated by reference in the Complaint,[1] Avaya highlighted the material risks and uncertainties related to this transition. For example, Avaya specifically warned investors:

> [O]ur business will remain dependent on customer decisions to migrate their legacy communications infrastructures to cloud solutions based on newer technology.
>
> If the market for cloud-based communications fails to develop, develops more slowly than we anticipate, or develops in a manner different than we expect, . . . our cloud-based solutions and services could fail to achieve market acceptance.
>
> As is typical of any new solution introduced in a rapidly evolving market, the level of demand for, and market acceptance of these new solutions is uncertain.

*Id.* at 18, 21.

Avaya disclosed that its transition from hardware sales to a subscription business involved the application of complex accounting rules for revenue recognition and that resulted in significant issues of revenue timing and deferral. Under a subscription contract, Avaya has the right to receive a monthly or yearly fee from a customer over a finite contractual period, rather than a single lump-sum payment. This creates accounting complexity: Avaya recognizes as revenue in the current period only a portion of the total contract value, based on judgments as to the

---

[1] This Court may "properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001). Plaintiffs have incorporated the investment agreement, Avaya emails, securities filings, and earnings calls, which are discussed herein.

approximate value of the right to use granted to the customer. *Id.* at 64. The upfront revenue, which Avaya typically reports in the same quarter the customer signs a subscription contract, varies significantly depending on various factors (*e.g.*, term length, early termination rights). *Id.* The remaining revenue from a subscription contract is reported in subsequent quarters. Accordingly, Avaya disclosed additional material risks that could impact its quarterly revenue and earnings:

> Our quarterly and annual revenues and operating results have **historically fluctuated** and are not necessarily indicative of results to be expected in future periods. Fluctuations in our financial results from period to period are caused by many factors, including, but not limited to, **the size and timing of new logos, changes in foreign currency exchange rates, the mix of products sold by us and general economic conditions**. In addition, **execution of sales opportunities sometimes traverses from the intended fiscal quarter to the next**.
>
> [I]f **the mix of companies that purchase our solutions, or the mix of solution components purchased by our customers, changes unfavorably**, **our revenues and gross margins could decrease** and our operating results could be harmed.

*Id.* at 27 (emphases added).

As Avaya shifted more of its business from a traditional model (a one-time upfront payment) to a subscription model (payments made and revenue recognized over the contract term), it disclosed the risk of "more of [its] cash receipts being deferred." *Id.* at 18. Thus, Avaya cautioned its investors:

> ***The timing of our cash flows may be negatively impacted as we shift more of our business to a subscription-based model***.
>
> ***We may not be able to generate sufficient cash to service all of our indebtedness and our other ongoing liquidity needs, and we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful***.

> If we are unable to repay or otherwise refinance [our] borrowings and loans when due, the applicable secured lenders could proceed against the collateral pledged to them to secure that indebtedness, which could force us into bankruptcy or liquidation.

*Id.* at 18, 29.

Avaya also disclosed that "[i]f our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings." *Id.* at 27. With respect to its internal controls, Avaya warned that while "[m]anagement is required to provide an annual assessment on the effectiveness of our internal control over financial reporting . . . no assurance can be given that we will not discover material weaknesses in the future." *Id.* at 35.

### C.      Avaya's Operating Results

In November 2021, Avaya announced its financial results for the fiscal year ending September 30, 2021, and provided earnings guidance for the future. Compl. ¶ 107; *8-K Current Rep.* (Nov. 22, 2021) (Ex. 3). As occurred the previous year, Avaya recorded a net loss, and its quarterly adjusted EBITDA dropped year over year. Ex. 3 at 5. For fiscal year 2022, Avaya forecasted revenue in the range of $2.975 billion to $3.025 billion and an adjusted EBITDA range of $700 million to $720 million. *Id.* at 9. For the next quarter, Avaya expected its revenue and adjusted EBITDA to drop. *Id.*

Avaya thereafter missed its earnings guidance in each of the first two quarters of fiscal year 2022. Compl. ¶ 86. In an earnings call on May 10, 2022, Avaya explained that "the percentage of revenue recognized . . . was lower" due to several non-standard deals and that "the crisis and conflict in Ukraine" impacted the

company's earnings in Eastern Europe. *Q2 2022 Earnings Call* 4–5 (May 10, 2022) (Ex. 4); *see* Compl. ¶ 51. The Manager's representatives allegedly attended the May 10, 2022 earnings call and therefore knew that Avaya was unable to meet its earnings guidance for the first two quarters. Compl. ¶ 51.

That same day, Avaya lowered its revenue guidance for the year to $2.815 billion to $2.855 billion—the lowest in recent years—and estimated adjusted EBITDA of $580 million to $600 million. *Id.* ¶ 44; *8-K Current Rep.* 8 (May 10, 2022) (Ex. 5). For the third quarter, Avaya forecasted a revenue range of $685 million to $700 million—the lowest in recent quarters—and an adjusted EBITDA range of $140 million to $150 million. Ex. 5 at 8. This earnings guidance was accompanied by further cautionary statements:

> The Company has based these forward-looking statements on its current expectations, assumptions, estimates and projections. . . . **While the Company believes these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond its control**. Risks and uncertainties that may cause these forward-looking statements to be inaccurate include, among others, termination or modification of current contracts which could impair attainment of our OneCloud ARR metric; the duration, severity and impact of the coronavirus pandemic ("COVID-19"), the impact of the Russia/Ukraine conflict on the global economy and our business, . . . and other factors discussed in the Company's Annual Report on Form 10-K and subsequent quarterly reports . . . . **These risks and uncertainties may cause the Company's actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements.** . . . The Company undertakes no obligation to publicly update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law.

6

*Id.* at 10 (emphases added).  Plaintiffs' purchase of Avaya's convertible bonds closed on July 12, 2022.  Compl. ¶ 71.

On July 28, 2022, after the closing and the third quarter end, Avaya withdrew its prior earnings guidance and announced preliminarily that it expected reduced quarterly revenue of between $575 million and $580 million and an adjusted EBITDA between $50 million and $55 million.  *Id.* ¶ 92; *8-K Current Rep.* 6 (July 28, 2022) (Ex. 6).  On August 9, 2022, Avaya estimated its third quarter results at $577 million in revenues and $54 million in adjusted EBITDA.  Compl. ¶ 102; *8-K Current Rep.* 5 (Aug. 9, 2022) (Ex. 7).  Avaya explained, consistent with the risks it previously disclosed, that "total contract value was less than our internal forecast because average contract duration and average contract size declined."  *Q3 2022 Earnings Call* 2 (Aug. 9, 2022) (Ex. 8); *see* Compl. ¶ 74.  Despite having "signed nearly 120 more subscription deals in Q3 versus Q2," the company explained, "Avaya's subscription revenues are based on total contract revenues, so these declines in duration and size meaningfully depress current quarter revenue recognition."  Ex. 8 at 2.

On August 9, 2022, Avaya also announced that "in connection with its review of the financial statements for the third quarter," it undertook a reevaluation of the fair value of its goodwill based on "a significant decline in revenues during the third quarter" and market capitalization.  Ex. 7 at 2; *see* Compl. ¶ 102.  From this review, Avaya determined that its goodwill had been impaired, "caused primarily by a slowdown in the pace and trajectory of customer migration to the Company's subscription hybrid offering, and an increase in the discount rate to reflect increased risk from higher market uncertainty."  Ex. 7 at 2.  As a result, Avaya announced that

7

it expected to record a non-cash impairment charge between $1,272 million and $1,804 million. *Id.*

On November 30, 2022, Avaya announced that "control deficiencies that management had been reviewing represent material weaknesses in the Company's internal control over financial reporting." *8-K Current Rep.* 2 (Nov. 30, 2022) (Ex. 9); *see* Compl. ¶ 104. Specifically, as a result of its review of "the appropriate maintenance of its whistleblower log and the proper dissemination of related information and materials," Avaya "concluded that disclosure controls and procedures were not effective as of September 30, 2021, which continues to be the case." Ex. 9 at 2.

On February 14, 2023, Avaya filed for bankruptcy. Compl. ¶ 106. Plaintiffs became creditors of Avaya's bankruptcy estate and were able to recover approximately 24.1% of their initial investment. *Id.*

### D.    Alleged Misrepresentations

The Complaint summarily alleges that, "between May 10, 2022 and July 12, 2022, Defendants Chirico and McGrath knowingly made a series of material misrepresentations and omissions to [the Manager]." *Id.* ¶ 107. Nowhere does the Complaint allege an actionable false, knowing, misstatement made by McGrath. The vague misrepresentations alleged fall into the following three categories:

1.    ***Opinion Statements About Future Earnings.***  The Complaint generally alleges that McGrath is liable for forward-looking earnings guidance *made by* Avaya on May 10, 2022. *Id.* ¶¶ 45–47. In effect, the Complaint alleges that McGrath thereafter reaffirmed that earnings guidance. *Id.* ¶¶ 3, 39, 54, 60, 63, 88.

8

In particular, the Complaint alleges McGrath signed Avaya's public filing on Form 8-K which contained the May 10 guidance. *Id.* ¶ 62; Ex. 5 at 3. The Complaint alleges that McGrath repeated this guidance on May 10, May 26, and June 2, 2022 to investors. Compl. ¶¶ 49, 59, 60. It further alleges that on June 8, 2022, McGrath "reviewed and approved" Avaya's investor presentation that also repeated this guidance. *Id.* ¶ 62. Significantly, the Complaint nowhere plausibly alleges that McGrath *himself* prepared these earnings projections.

   **2.     *Solvency Statement.*** The Complaint alleges that on July 12, 2022, at the time of the closing of plaintiffs' respective investments, McGrath, "███████████ ██████████████████████████████████████," certified "███████████████ ██" that Avaya was "Solvent." *Id.* ¶ 69; *Officer's Certificate* 1 (July 12, 2022) (Ex. 10). The term "Solvent" in that certification was limited to the following specific test for solvency: "the fair value (and present fair saleable value) of the assets of [Avaya] is not less than the total amount *required to pay the probable liability* of [Avaya] on its total existing debts and liabilities (including contingent liabilities) *as they become absolute and matured.*" Compl. ¶ 69; Ex. 10 at 4 (emphases added). In other words, the solvency statement the Complaint alleges to be false was expressly based on *future projections*: i.e., the likelihood of Avaya's ability to pay liabilities as they become absolute and matured in the future.

   **3.     *Internal-Control Statements.*** The Complaint alleges that an officer certification filed with Avaya's quarterly report in May 2022, signed by McGrath pursuant to the obligations imposed on corporate officers under the Sarbanes-Oxley Act, was false. *Id.* ¶ 43; *Ex. 31.2 to 10-Q Quarterly Rep.* (May 10, 2022) (Ex. 11). That

9

representation was specific:   McGrath certified that, "[b]ased on [his] knowledge, th[e] report d[id] not contain any untrue statement of a material fact or omit to state a material fact" and that he and other certifying officers "[d]esigned . . . internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements." Ex. 11 ¶¶ 2, 4(b).   Nowhere does the Complaint allege that McGrath believed this specific statement to be untrue at the time he gave this certification.

**LEGAL STANDARD**

**A.   Rule 12(b)(3)**

A Rule 12(b)(3) motion is the proper method by which to seek dismissal of a complaint under a forum-selection clause.  *Big League Analysis, LLC v. Off. of Comm'r of Baseball*, 2016 NCBC 66, ¶ 26 (N.C. Super. Ct. Aug. 29, 2016).   "The general rule in North Carolina, as elsewhere, is that where a demand for removal for improper venue is timely and proper, the trial court has no discretion as to removal." *Kiker v. Winfield*, 234 N.C. App. 363, 364 (2014).

**B.   Rule 12(b)(6)**

Under Rule 12(b)(6), a complaint must be dismissed when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263 (2023).   A court is not required to accept "mere conclusory allegations, unwarranted deductions of fact, or

10

unreasonable inferences as true." *Est. of Vaughn v. Pike Elec., LLC*, 230 N.C. App. 485, 493 (2013).

The Complaint must allege "the circumstances constituting fraud" with "particularity" by "alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health*, 385 N.C. at 263; *see* N.C.G.S. § 1A-1, Rule 9(b) (2021). This requirement applies to all three counts in the Complaint. *See Value Health*, 385 N.C. at 264–65; *Trail Creek Invs. LLC v. Warren Oil Holding Co.*, 2023 NCBC 36A (N.C. Super. Ct. May 24, 2023).

## ARGUMENT

### I.    VENUE IS IMPROPER

This action should be dismissed for improper venue. Through their alleged agent, plaintiffs unambiguously agreed that the exclusive venue for any disputes relating to their investment in Avaya is the United States District Court for the Southern District of New York. North Carolina courts "generally enforce mandatory forum selection clauses." *Big League*, 2016 NCBC 66, ¶ 27. "Mandatory forum selection clauses . . . have contained words such as 'exclusive' or 'sole' or 'only.'" *Id.*

Plaintiffs allege (at ¶ 31) that the Manager had "full" agency authority to act on their behalf in connection with their purchase of Avaya securities. They further allege (at ¶ 4) that the Manager executed the investment agreement on their behalf on June 23, 2022, pursuant to which each plaintiff "███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

11

██████████████████████████████████████████████████ " Ex. 1 § 6.9.    Clearly,

plaintiffs' claims against McGrath " ████████████ " and " ████████ " their investment

in Avaya securities.  *See* Compl. ¶ 1.

The forum-selection clause is binding on plaintiffs.   Their claims against

McGrath arise exclusively from actions undertaken in his corporate, rather than

personal, capacity as Avaya's officer.   Under the "closely related" party doctrine, *see*,

*e.g.*, *Big League*, 2016 NCBC 66, ¶¶ 31, 35; *Magi XXI, Inc. v. Stato della Città del

Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *see also Ellison v. Alexander*, 207 N.C.

App. 401, 409 (2010) (enforcing arbitration agreement under agency principles); and

equitable estoppel principles, *see Speedway Motorsports Int'l Ltd. v. Bronwen Energy

Trading, Ltd.*, 2009 WL 406688, at *6 (N.C. Super. Ct. Feb. 18, 2009), plaintiffs

agreed to commence any litigation with respect to their investment in Avaya in

federal court in the Southern District of New York.   That Court is already handling

a putative class action against McGrath and Chirico alleging federal securities law

claims based on allegations substantially similar to those here.  *See Jiang v. Chirico*,

No. 1:23-cv-01258-PGG (S.D.N.Y.).   Plaintiffs have no basis to file this case in this

Court.  The Complaint must be dismissed on this ground alone under Rule 12(b)(3).

## II.    THE COMPLAINT FAILS TO STATE A FRAUDULENT INDUCEMENT CLAIM AGAINST MCGRATH

To plead a fraud claim, a complaint must allege with requisite particularity:

"(1) [f]alse representation or concealment of a past or existing material fact, (2)

reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in

fact deceive, (5) resulting in damage to the injured party."  *Hardin v. KCS Int'l, Inc.*,

12

199 N.C. App. 687, 696 (2009) (brackets omitted).  The complaint must allege facts constituting "reasonable reliance *on the part of the complaining party*."  *Plasman v. Decca Furniture (USA), Inc.*, 2016 WL 6208639, at \*11 (N.C. Super. Ct. Oct. 21, 2016). The fraudulent inducement claim against McGrath must be dismissed because the Complaint fails to allege that he made any actionable false statement, that he acted with fraudulent intent, or that plaintiffs relied on his statements.

### A.    The Complaint Fails To Allege Any False Or Misleading Statement Or Omission

There is a shocking "absence of facts" with respect to the fraud claim against McGrath.  The "determination of truth or falsity must be made *at the time of the representation*."  *L. Offs. of Peter H. Priest, PLLC v. Coch*, 2014 NCBC 54, ¶ 55 (N.C. Super. Ct. Nov. 5, 2014) (emphasis added), *aff'd*, 244 N.C. App. 53 (2015).  "[A] complaint may not simply contrast a defendant's past optimism with less favorable actual results in support of a claim of securities fraud."  *Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 135 (1st Cir. 2021) (quotation marks omitted).

Fraud by hindsight is improper, yet that is all the Complaint alleges against McGrath.  The Complaint posits:  Because Avaya was unable to meet financial guidance, McGrath's earlier repetition of Avaya's guidance was false.  Similarly, because, after Avaya's disappointing third quarter, Avaya *later decided* to write down goodwill on its financial statement, McGrath's earlier certification of Avaya's solvency was false.  Similarly, because Avaya later identified control deficiencies, McGrath's earlier Sarbanes-Oxley Act certification in a quarterly report filed *five months earlier* was false.  The law is to the contrary:  "[W]ithout *contemporaneous* falsity, there can

13

be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). This fundamental pleading error requires dismissal.

### 1.    Opinion Statements About Future Earnings

The Complaint alleges no facts supporting an inference that McGrath's repetition of Avaya's earnings guidance between May 10 and June 8, 2022 was false or misleading. First, the Complaint identifies the timing of Avaya's post-quarter announcements, in which Avaya disclosed it would not meet prior earnings guidance. Compl. ¶¶ 92, 97–99. On July 28, 2022, Avaya withdrew its prior guidance and pre-announced expected quarterly earnings, all subject to the completion of the quarterly closing process. *Id.* ¶ 92. On August 9, 2022, Avaya disclosed additional details of the earnings miss. *Id.* ¶ 96. Neither of these later announcements provides any reasonable inference that McGrath's earlier repetition of the company's guidance was —*at the time*—false or misleading.

The Complaint pastes portions from a handful of internal emails—none of which was sent or received by McGrath—to suggest that McGrath "presumably" knew that Avaya would underperform its projections. *See, e.g., id.* ¶ 75. It cites an email chain from April 11, 2022, in which some members of Avaya's finance team expressed "▮▮▮▮▮" views on "▮▮▮▮▮▮▮▮" for the quarterly earnings guidance with respect to a specific sales region, North America. *Id.* ¶¶ 73–75; Apr. 11, 2022 Email (Ex. 12). But the Complaint includes no allegation that McGrath knew about these opinions. Nor does the Complaint explain how this regional discussion among lower-level finance personnel adequately demonstrates that Avaya's worldwide

14

guidance, issued a month later (i.e., after additional revenue information was available), was false.

Similarly, the Complaint cites an email chain from May 11, 2022, in which some members of Avaya's finance team discussed whether to confer with Stephen Spears—head of the *sales teams worldwide*—regarding a *regional forecast*. Compl. ¶¶ 76–78; May 11, 2022 Email (Ex. 13). Again, nowhere does the Complaint allege facts that support a reasonable inference that these musings undermine the accuracy of the *worldwide financial projections* prepared by others at Avaya. Nor does the Complaint include allegations sufficient to demonstrate that opinions about lower-than-expected sales in North America (during the first half of the quarter) rendered Avaya's opinions about its expected worldwide results unfounded. These sloppy and misleading allegations are utterly insufficient to make the entirety of Avaya's May 10 guidance false—any suggestion to the contrary is an "unwarranted deduction[] of fact." *Vaughn*, N.C. App. at 493. Moreover, again, the Complaint includes no allegation that McGrath even knew about these discussions.

The June 7, 2022 draft email from Spears to the Board of Directors and McGrath is fatal to any fraud claim. In that email, which is cited in the Complaint but not excerpted, June 7, 2022 Email (Ex. 14); Compl. ¶ 80, ████████████

████████████████████████████████████████████

██████████████████████████████████████. Ex. 14

at 2, 4 ("████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████.").  The Complaint highlights (at ¶ 80) that McGrath raised "risk around its projection" with Spears, but the document unambiguously establishes that McGrath was referring to a risk of missing the *higher end* of the guidance range of $685 million to $700 million.  Ex. 14 at 1–2.  Nothing in the email remotely suggests that anyone—much less McGrath—believed that as of early June 2022, Avaya would be unable to meet earnings guidance.  To the contrary, this document shows the opposite.

The remaining allegations postdate the allegedly inflated earnings guidance. Compl. ¶¶ 81–87.  They do not support any reasonable inference that earlier opinions about third-quarter earnings projections were knowingly false when they were released (or later repeated by McGrath).  *Id.* ¶¶ 81–84 (June 14 & 30, 2022 emails), 85–87 (July 2022 post-quarter emails).

The remaining alleged misrepresentations relating to earning guidance fare no better.  The Complaint identifies statements by McGrath during the May 10 earnings call, stating that revenue from a subscription contract may not be recognized in the current period but was "not lost" because it would "be recognized in future periods."  *Id.* ¶ 49; Ex. 4 at 4.  This statement is true:  subscription revenue is allocated over the life of the contract, and the Complaint nowhere alleges otherwise. The Complaint also sets forth a statement by McGrath during a June 2 call, in which he allegedly stated that Avaya's guidance was "conservative."  Compl. ¶ 60.  This is a statement of opinion that is inactionable as a matter of law.  *See Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 412 (E.D.N.C. 2015) ("General statements of comparison or superiority are puffery and are not actionable as a matter of law."); *In re Sec. Cap.*

16

*Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010) (finding the term "conservative" a "classic example[] of puffery").

### 2.    *Solvency Statement*

The Complaint alleges (at ¶ 94) that Avaya was "insolvent" "as of June 30, 2022," suggesting that McGrath's certification as of July 12, 2022 that the company was "Solvent" was untrue. According to the Complaint, the "estimated impairment charges"—which Avaya later decided to take based on the disappointing third quarter—reduced the value of Avaya's assets to create "balance sheet insolvency." Compl. ¶ 100.

This, again, is an improper attempt to plead fraud by hindsight.

Equally important, the actual language of the certificate demonstrates that McGrath's certification was true at the time it was made:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████

. . .

> On and immediately after the date hereof, [Avaya] will be Solvent (as defined below). As used in this paragraph, the term "Solvent" means, with respect to a particular date and entity, that **on such date** (i) **the fair value** (and present fair saleable value) **of the assets** of such entity **is not less than the total amount** *required to pay* **the probable liability of such entity** on its total existing debts and liabilities (including contingent liabilities) *as they become absolute and matured* . . . .

Ex. 10 at 1, 4 (emphases added). By its terms, McGrath's certification merely repeated Avaya's determination as of July 12, 2022 that the "fair value" of Avaya's assets exceeded the amount necessary to "pay" its "probable liabilit[ies]" *as they*

17

*become due.* Read fairly, the certification is limited to an opinion that, as of July 12, 2022, Avaya did not anticipate that it would be unable to pay its obligations as they became due. There is no allegation remotely suggesting that Avaya faced any liquidity issues as of that date, or that it projected non-payment in the future.

Avaya's determination weeks later to recognize a goodwill impairment charge does not undermine this obvious point. The Complaint summarily alleges (at ¶ 89) that Avaya hid from its investors "the fact that the trigger for an impairment analysis had occurred and remained ongoing when the transaction with the Funds closed in mid-July." But Avaya's securities filings expressly disclosed that its "[g]oodwill and indefinite-lived intangible assets . . . are subject to *annual testing for impairment each July 1st*." Ex. 2 at 51 (emphasis added). Avaya also cautioned that "[i]f our goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings." *Id.* at 27. The Complaint conspicuously lacks any allegation that anyone at Avaya—much less McGrath—determined on July 12, 2022, that a goodwill write-down was inevitable, much less the amount of that write-down.

Fundamentally, the estimated impairment charges Avaya later announced were due to "a significant decline in revenues during the third quarter." Ex. 7 at 2. When McGrath executed the Officer's Certificate on July 12, 2022, Avaya's third-quarter financial results were not yet available, no impairment testing had been completed, and no impairment changes had been estimated. *See* Compl. ¶¶ 92, 94 (impairment analysis "not yet finalized" as of July 28, 2022). The Complaint then references a balance sheet from August 9, 2022, suggesting that McGrath knew that Avaya would be "insolvent" a month later. *Id.* ¶ 100. The law does not countenance

18

this approach. *See Value Health*, 385 N.C. at 274 (observing that fraud claim must allege false "existing or ascertainable facts") (quotation marks omitted).

### 3.    *Internal-Control Statements*

Finally, the Complaint alleges that McGrath made a false statement when he signed the Sarbanes-Oxley Act certification in Avaya's quarterly report filed on May 10, 2022. Compl. ¶ 107. McGrath certified only that, "[b]ased on [his] knowledge, th[e] report d[id] not contain any untrue statement of a material fact or omit to state a material fact" and that he and other certifying officers "[d]esigned . . . internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements." Ex. 11 ¶¶ 2, 4(b).

The Complaint fails to identify any reason to infer that this certification was knowingly false. At most, the Complaint points to Avaya's announcement on November 30, 2022 (more than six months after the certification) when it identified material weaknesses in its disclosure controls and procedures. Compl. ¶ 104. Again, it is improper to allege falsity based on facts that did not exist until after the statement was made. *See Skoog v. Harbert Priv. Equity Fund, II, LLC*, 2013 NCBC 17, ¶ 35 (N.C. Super. Ct. Mar. 25, 2013) (holding that defendant's "statement could not be made misleading by [defendant's] failure to disclose events . . . which had not yet occurred"); *Fulton v. Vickery*, 73 N.C. App. 382, 389 (1985) ("[W]e fail to see how defendants could be chargeable with knowledge of [decisions] before they were rendered.").

19

**B.**    **The Forward-Looking Statements Are Not Actionable As A Matter of Law**

Virtually all of the purportedly false statements by McGrath are forward-looking statements, which must be evaluated under the law applicable to opinion statements and meaningful cautionary disclosures.  "Statements of opinion, predictions of future events, and promises of future intent generally do not give rise to an action for fraud."  *Gvest Real Est., LLC v. JS Real Est. Invs., LLC*, 2023 NCBC 61, ¶ 46 (N.C. Super. Ct. Sept. 12, 2023); *Value Health*, 385 N.C. at 274; *see also Carmayer, LLC v. Koury Aviation, Inc.*, 2017 NCBC 80, ¶ 49 (N.C. Super. Ct. Sept. 11, 2017) (holding that plaintiff "could not have justifiably relied on a contingent estimate of future profits and expenses").

The challenged statements about future earnings attributed to McGrath are opinions involving a prediction of future events.  *See Gvest*, 2023 NCBC 61, ¶ 49 (holding that "projections of net rental income" were "a statement of opinion"); *Lester v. McLean*, 242 N.C. 390, 397 (1955) ("The value of the property . . . was necessarily a matter of opinion.").  Indeed, those statements were identified as forward-looking statements and accompanied by extensive cautionary disclosures, *see*, *e.g.*, Exs. 4, 5; *supra* pp.3–5, 6–7, undermining any legitimate claim these were statements of fact or promises of any future.  *See Value Health*, 385 N.C. at 275 (affirming dismissal of plaintiff's fraud claim when representation "contain[ed] fulsome disclaimers making it clear that its contents should not be relied upon").

Courts are wary of imposing liability for forward-looking economic projections, particularly when the projections are accompanied by cautionary disclosures.  "Under

20

the bespeaks caution doctrine, [d]efendants are excused from liability for projections, statements of plans and objectives, and estimates of future economic performance so long as the statement is identified as forward-looking and is accompanied by meaningful cautionary statements." *Kolominsky v. Root, Inc.*, 2023 WL 3215056, at *7 (S.D. Ohio Mar. 31, 2023) (quotation marks omitted); *see NNN Durham Off. Portfolio 1, LLC v. Grubb & Ellis Co.*, 2016 NCBC 93A, ¶ 199 (N.C. Super. Ct. Dec. 29, 2016) (applying bespeaks caution doctrine), *aff'd in part, rev'd in part*, 261 N.C. App. 175 (2018). The doctrine is "essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993). "[T]o impose liability in this situation would unduly restrain management from disseminating useful information to the market," and "[s]uch a result would not protect investors, but rather would be deleterious to investors because it would prevent the freeflow of information." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991).

Avaya's cautionary statements warned investors that its earnings guidance was based on the company's "current expectations, assumptions, estimates and projections" and that the "actual results" may "differ materially from any future results . . . expressed or implied by these forward-looking statements." Ex. 5 at 10. Avaya called the investors' attention to specific material risks that could impact its financial results. *See supra* pp.3–5, 6–7. These disclosures are incorporated by reference in the Complaint and must be considered in connection with the alleged

21

misrepresentations by McGrath.  In light of the cautionary disclosures that identified the specific risk of inaccuracy with respect to opinions about future events, the challenged forward-looking statements were neither false nor misleading.  *See Value Health*, 385 N.C. at 275.

### C.    The Complaint Fails To Plead Scienter As To McGrath

Even if the Complaint alleges an actionable misrepresentation or omission by McGrath—which it does not—it wholly fails to allege McGrath knew those statements were false or that he otherwise acted with fraudulent intent.  "A complaint which contains no allegation of a fraudulent intent, *or facts from which it may reasonably be inferred*, fails to state a cause of action for [fraud]."  *Calloway v. Wyatt*, 246 N.C. 129, 133 (1957) (emphasis added).  And while intent, knowledge, and "other condition[s] of mind" may be "averred generally," N.C.G.S. § 1A-1, Rule 9(b), the bedrock rule remains that the Court must not accept as true "conclusory allegations" and "unwarranted deductions of fact."  *See Vaughn*, 230 N.C. App. at 493 (holding conclusory allegations as to company's knowledge and intent insufficient to show employer intentionally engaged in misconduct); *Meyer v. Walls*, 347 N.C. 97, 114 (1997) (holding "conclusory allegation[s]" about officials acting "willfully and wantonly should not be sufficient" to survive Rule 12(b)(6) and "[t]he facts alleged in the complaint must support such a conclusion").

Here, the Complaint—at most—includes conclusory allegations that McGrath somehow "knew" various statements "were lies" when made.  Compl. ¶¶ 1, 3, 39, 79. But the Complaint alleges no facts to support these conclusory statements.

22

The Complaint sets forth emails that McGrath never sent or received.  *See id.* ¶¶ 73–89.  The Complaint improperly speculates that McGrath must have known about the documents solely by virtue of his position as Chief Financial Officer of a company with more than 8,000 employees.  *See id.* ¶¶ 75 ("*presumably* including senior management"), 79 ("It is *highly unlikely* that the information . . . reached Defendant Chirico without also reaching Defendant McGrath[.]") (emphases added).

This is speculation and supposition, not fact.  It is well-settled that a complaint may not impute knowledge to a defendant solely on the basis of his position as an officer of a company.  *See, e.g., Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004); *see also Lillian Knitting Mills Co. v. Earle*, 237 N.C. 97, 104 (1953) (holding that an officer "is not liable, merely because of his official character").  The Complaint lacks any non-conclusory allegations that McGrath knew the challenged statements were false.  *See, e.g.*, Compl. ¶¶ 81–83, 85–87 (discussing emails between Messrs. Chirico and Spears, not McGrath, and a whistleblower letter allegedly sent to Avaya's Board of Directors, on which McGrath did not serve).

Moreover, one internal document McGrath allegedly *did* receive contradicts these conclusory allegations.  As discussed above, *see supra* pp.15–16, Spears' June 7, 2022 report is flatly inconsistent with the allegation that McGrath knew (or should have known) that Avaya's guidance was misleading or false or that the company was not on track to meet it.  In that report, ███████████████████████████████

███████████████████████████████████████████████

███████.  Ex. 14 at 2, 4.  This email effectively pleads plaintiffs out of court:  the

23

Complaint cannot sufficiently allege McGrath acted with scienter when it cites evidence that ███████████████████████████████████████████ ██████. *See Sain v. Adams Auto Grp., Inc.*, 244 N.C. App. 657, 667 (2016) (concluding that plaintiffs failed to allege scienter about sale of defective car when CarFax report defendant reviewed did not reveal damage); *see also* N.C.G.S. § 55-8-42(b) (an officer is "entitled to rely on information, opinions, [or] reports" from other officers or employees of the corporation).  The Complaint includes allegations about Avaya's decision to withdraw its prior guidance after the quarter closed, *see* Compl. ¶ 84, but those allegations do not support any reasonable inference that McGrath knowingly provided false guidance when he repeated Avaya's guidance during the quarter.

The allegations about Avaya's solvency and internal-control statements suffer from the same defects.  Even if the text of the July 12 Officer's Certificate was false—which it is not, *see supra* pp.17–19—there are no allegations tending to show that McGrath knew the amount of any goodwill impairment charges at the time.  Compl. ¶ 100 (impairment charges remained "estimate[s]" on August 9, 2022).  *See Fulton*, 73 N.C. App. at 389.  Similarly, the Complaint fails to allege McGrath's knowledge of any weaknesses in Avaya's internal controls, which the Complaint alleges Avaya discovered six months later.  *See* Compl. ¶ 104 (announcing the company's findings of material weaknesses on November 30, 2022); *see also In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 469 (S.D.N.Y. 2018) ("To be actionable, a defendant's certification about the adequacy of internal controls must have been knowingly false at the time that it was made.").

24

### D.    The Complaint Fails To Plead Reliance

The fraud claim must be dismissed also because the Complaint fails to allege reliance *by any plaintiffs*.  The Complaint alleges that plaintiffs' Manager relied on the challenged statements.  Compl. ¶¶ 66, 107, 126.  But the Manager is not a party to this litigation.  There is no allegation that any plaintiff saw, reviewed, heard, or otherwise knew about any of the challenged statements by McGrath.

Courts do not permit fraud claims based on "third-party reliance."  *Alamance Family Practice, P.A. v. Lindley*, 2018 NCBC 82, ¶ 69 (N.C. Super. Ct. Aug. 14, 2018); *NNN Durham Off. Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC 12, ¶ 94 (N.C. Super. Ct. Feb. 19, 2013), *aff'd*, 261 N.C. App. 185 (2018).  The alleged reliance by the non-party Manager cannot, as a matter of law, suffice to allege that plaintiffs acted in reliance on McGrath's statements.  A plaintiff "cannot transfer [another party's] reliance" to serve as their own."  *NNN Durham Off. Portfolio 1, LLC*, 2013 NCBC 12, ¶ 94.  The Court must dismiss plaintiffs' fraud claim as to McGrath on this separate and independent ground.

## III.   THE COMPLAINT FAILS TO STATE A NEGLIGENT MISREPRESENTATION CLAIM AGAINST MCGRATH

For similar reasons, the claim of negligent misrepresentation against McGrath must be dismissed.  "[T]he tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care."  *Oliver v. Brown & Morrison, Ltd.*, 2022 NCBC 13, ¶ 84 (N.C. Super. Ct. Mar. 3, 2022).  "[O]missions

25

cannot serve as a basis for a negligent misrepresentation claim under North Carolina law." *Carmayer*, 2017 NCBC 80, ¶ 60.

As set forth above, the Complaint fails to allege any actionable misrepresentation by McGrath. *See supra* pp.13–22; *Ausley v. Bishop*, 133 N.C. App. 210, 218 (1999) (negligent misrepresentation claim requires falsity); *Stavroff v. Meyo*, 987 F. Supp. 987, 1002 (N.D. Ohio 1995) (applying bespeaks caution doctrine to negligent misrepresentation claim), *aff'd*, 129 F.3d 1265 (6th Cir. 1997) (tbl.), 1997 WL 720475. The Complaint does not allege plaintiffs relied upon any alleged misrepresentations. *See supra* p.25; *NNN Durham*, 261 N.C. App. at 196–98 (disallowing negligent misrepresentation claim based on third-party reliance). Moreover, the cautionary statements that accompanied the challenged forward-looking statements render any alleged misrepresentations inactionable and any purported reliance unreasonable. *In re Royal Appliance Sec. Litig.*, 64 F.3d 663 (6th Cir. 1995) (tbl.), 1995 WL 490131, at *4-5 (affirming dismissal of negligent misrepresentation claims under bespeaks caution doctrine).

In addition, the Complaint fails to sufficiently allege that McGrath acted without reasonable care. Other than conclusory assertions, the Complaint alleges no facts tending to show that McGrath was negligent in making any of the statements about future earnings or the solvency and internal-control statements at issue. *See Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 40 (2006) (affirming dismissal of negligent misrepresentation claim for failure to allege facts showing lack of reasonable care). Plaintiffs' core theory of liability is that McGrath *knew* the

26

alleged falsity of the challenged statements, but the Complaint does not, and cannot, plead such knowledge, as set forth above. *See supra* pp.22–24.

Rather, the Complaint and the documents incorporated by reference unequivocally establish that McGrath *could not have known* any alleged falsity at the time that the statements were made. *See, e.g.,* Ex. 14 (████████████████████ ██████████████████████████████████████████ ); Compl. ¶¶ 92, 94 (impairment testing "not yet finalized" as of July 28, 2022), 104; Ex. 9 (Avaya discovered material weaknesses in internal controls as of November 30, 2022). McGrath was "entitled to rely on information" provided by "officers or employees of the corporation whom" he reasonably "believe[d] to be reliable and competent." N.C.G.S. § 55-8-42(b). There are no allegations that McGrath negligently prepared the company's global financial forecast. Nor does the Complaint support any reasonable inference that McGrath lacked a basis to rely on the report from the company's head of sales that Avaya was on track to meet its earnings guidance. Plaintiffs' negligent misrepresentation claim should be dismissed as to McGrath.

## IV.    THE COMPLAINT FAILS TO STATE A STATUTORY SECURITIES FRAUD CLAIM AGAINST MCGRATH

The statutory securities fraud claim against McGrath must also be dismissed. Section 78A-8(2) is made actionable by N.C.G.S. § 78A-56(a)(2). *See Bob Timberlake*, 176 N.C. App. at 40–41. To establish a claim under Section 78A-56(a)(2), a plaintiff must allege "(1) a false or misleading statement, or a statement which, because of the circumstances under which it was made, was made false or misleading because of the omission of other facts; (2) that such statement was material; and (3) that such

statement was made by one who offered or sold a security." *Skoog*, 2013 NCBC 17, ¶ 27. "An omission must be tied to an affirmative statement, because there is no general duty of disclosure imposed by either federal or North Carolina securities laws." *Id.* ¶ 28.

As with plaintiffs' fraud and negligence claims, the failure to allege that any statement made by McGrath was false or misleading is fatal to their statutory securities fraud claim. Again, for the reasons set forth above, *see supra* pp.13–22, the Complaint lacks any non-conclusory allegation that any of the challenged statements was false or misleading at the time it was made. *Skoog*, 2013 NCBC 17, ¶ 35. Moreover, Avaya's securities filings upon which plaintiffs rely plainly show that the challenged statements were inactionable forward-looking statements that were accompanied by meaningful cautionary statements. *See supra* pp.20–22. The Court should dismiss plaintiffs' North Carolina Securities Act claim against McGrath and decline their invitation to extend this statutory claim to hold an officer liable for forward-looking statements if the company subsequently falls short of its earnings projections.

## CONCLUSION

The Court should dismiss the Complaint as to McGrath with prejudice.

This 22nd day of January, 2024.

/s/ David C. Wright, III
David C. Wright, III
N.C. Bar No. 11161
dwright@robinsonbradshaw.com
Adam K. Doerr
N.C. Bar No. 37807
adoerr@robinsonbradshaw.com
Ethan R. White
N.C. Bar No. 52456
ewhite@robinsonbradshaw.com

ROBINSON BRADSHAW
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone:  704.377.8352
Facsimile:  704.378.4000

Reid M. Figel (*pro hac vice*)
rfigel@kellogghansen.com
Minsuk Han (*pro hac vice*)
mhan@kellogghansen.com
Jordan R. G. González (*pro hac vice*)
jgonzalez@kellogghansen.com

KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  202.326.7900
Facsimile:  202.326.7999

*Attorneys for Defendant Kieran
McGrath*

29

## RULE 7.8 CERTIFICATION

I certify that the foregoing **BRIEF OF DEFENDANT KIERAN MCGRATH IN SUPPORT OF MOTION TO DISMISS COMPLAINT** is less than 7,500 words (as reported by the word-count feature of Microsoft Word) and is therefore in compliance with the length and formatting requirements set forth in BCR 7.8 of the North Carolina Business Court Rules.

This 22nd day of January, 2024.

> */s/ David C. Wright, III*
> David C. Wright, III

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed this day using the Court's electronic filing system, which will automatically and electronically notify the Court and counsel of record as follows:

> Raymond M. Bennett
> Jesse A. Schaefer
> Womble Bond Dickson (US) LLP
> 555 Fayetteville Street, Suite 1100
> Raleigh, NC  27601
> ray.bennett@wbd-us.com
> jesse.schaefer@wbd.us.com
>
> *Attorneys for Plaintiffs*
>
> Kenneth Lautenschlager
> Austin R. Walsh
> William McClelland
> Johnston, Allison & Hord, P.A.
> 1065 East Morehead Street
> Charlotte, NC  28204
> klauten@jahlaw.com
> awalsh@jahlaw.com
> bmcclelland@jahlaw.com
>
> *Attorneys for Defendant James M. Chirico, Jr.*

This 22nd day of January, 2024.

/s/ *David C. Wright, III*
David C. Wright, III