UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVER JIANG, individually and on behalf
of all others similarly situated,

Plaintiff,

- against -

JAMES M. CHIRICO, JR., and KIERAN J.
McGRATH,

Defendants.

**MEMORANDUM
OPINION & ORDER**

23 Civ. 1258 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a putative class action brought under federal securities laws on behalf of those who purchased or otherwise acquired securities of Avaya Holdings Corp. ("Avaya" or the "Company") between October 3, 2019 and November 29, 2022 (the "Class Period"). Plaintiffs City of Pittsburgh Comprehensive Municipal Pension Trust Fund ("Pittsburgh") and Paul Sweatt have moved for appointment of lead plaintiff and approval of lead counsel.[1] (Pittsburgh Mot. (Dkt. No. 34); Sweatt Mot. (Dkt. No. 19)) For the reasons stated below, Paul Sweatt will be appointed as lead plaintiff, and Sweatt's law firm – Hagens Berman – will be appointed lead counsel.

## BACKGROUND

### I.   FACTS

Avaya is a public company headquartered in Durham, North Carolina. Its shares are listed on the New York Stock Exchange under the symbol "AVYA." (Cmplt. (Dkt. No. 1) ¶

---

[1]  Nine such motions were filed, but four movants have since withdrawn their motions, and three movants have filed notices of non-opposition to the two competing motions that are the subject of this opinion. (Dkt. Nos. 44, 46-48, 50-51, 60)

30)  Defendant James M. Chirico Jr. is the former Chief Executive Officer of Avaya.  (Id. ¶ 31)

Defendant Kieran J. McGrath is Avaya's Chief Financial Officer.  (Id. ¶ 32)

        According to the Complaint, Avaya "provides software products for business

collaboration and contact center management."  (Id. ¶ 2)  The Company's "Products &

Solutions" segment "develops, markets, and sells unified communications and collaboration and

contact center solutions, offered on premise, in the cloud, or as a hybrid solution."  (Id. ¶ 3)

### A.   The Alleged Fraud

        The Complaint alleges that since October 2019, Avaya has been

> engaged in a strategic collaboration with RingCentral, Inc. ("RingCentral"),
> which has accelerated Avaya's transition to the cloud.  The new operating system,
> Avaya Cloud Office by RingCentral ("ACO"), was supposed to allow Avaya to
> monetize its small to medium business ("SMB") customer base immediately
> while concomitantly allowing it to focus on the development of a next-generation
> cloud contact center.

(Id. ¶ 4)  The RingCentral collaboration marked "the first time Avaya offered a third-party

solution as a primary platform," and "Avaya had to compete with essentially identical offers

from other RingCentral partners."  (Id. ¶ 41)  ACO – the new operating system that Avaya

developed with RingCentral – also "accelerated Avaya's shift to a subscription-based revenue

model."  (Id.)

        The Complaint further alleges that "Avaya's statements to the investment

community conceal[ed]" that "the RingCentral partnership came with onerous requirements that

were crippling its business metrics and financial prospects during the Class Period."  (Id. ¶ 5)

According to the Complaint, many of the Company's public statements in the Class Period were

"materially false and misleading," because they "failed to disclose . . . adverse facts which were

known to defendants or recklessly disregarded by them," including

> that Avaya granted RingCentral exclusive rights to certain products to its
> customers, meaning that Avaya had to discontinue certain of its own product

offerings that had only recently begun achieving momentum, and that ACO
conflicted with other Avaya product offerings, causing Avaya to have to alter
those offerings, resulting in it losing some important members of its executive
team; [and] that the arrangement with RingCentral had exposed the Company to
losses as RingCentral paid Avaya commissions up front, which would need to be
returned if Avaya later missed on sales thresholds.

(Id. ¶ 96)  The Company's public statements were also materially false and misleading in that
they did not disclose that "Avaya had defective internal controls which prevented its senior
executives from formulating accurate budgets and forecasts."  (Id.)

The Class Period begins on October 3, 2019, when "Avaya and RingCentral
jointly issued a press release announcing Avaya's partnership with RingCentral and the creation
of ACO."  (Id. ¶ 45)  The press release

quoted defendant Chirico lauding the new arrangement, stating in pertinent part
that "'Avaya and RingCentral's joint investment and commitment to bringing
Avaya Cloud Office to market creates an unprecedented opportunity to accelerate
the transition to the cloud with attractive economics for our customers and
partners.'"  Chirico added that this "'also gives us the opportunity to unlock value
from a largely unmonetized base of our business as it brings compelling value to
our customers and partners,'" emphasizing that "'[w]e believe this highly
complementary partnership is a game changer that expands the total addressable
market for and creates meaningful value for both Avaya and RingCentral.'"

(Id.) (emphasis in original)  "The market responded positively to this news, with the market price
of Avaya common stock increasing more than $2 per share, or more than 30%."  (Id. ¶ 48)

Over the next two years, the Company's public statements repeatedly touted the
benefits of its ongoing collaboration with RingCentral.  On February 26, 2020, for example,
Avaya "provided an 'Investor Relations Update' during which it lauded the benefits of the new
partnership with RingCentral, opening its remarks by stating in pertinent part that its '[s]trategic
partnership with RingCentral broadens product portfolio and strengthens balance sheet.'"  (Id. ¶
57)  And in quarterly earnings calls with investors and stock analysts between November 2019
and November 2021, Defendants "provid[ed] additional positive commentary about the

Company's business metrics and financial prospects in light of the new partnership with RingCentral." (Id. ¶ 52; see also id. ¶¶ 55, 59, 62, 69, 72, 75, 79, 83)

**B.**  **The Corrective Disclosures**

Beginning in February 2022, "[t]he truth [about the partnership between Avaya and RingCentral] . . . c[a]me out in dribs and drabs," which "[ran] down the market price of Avaya securities." (Id. ¶ 6)

On February 9, 2022, Avaya released quarterly financial results that were "[f]ar below the upwards of $745 million promised." The Company reported "revenues of just $713 million and Adjusted EBITDA of just $129 million, well below the Adjusted EBITDA of $160 million to $175 million promised, and down a full 750 basis points year-over-year."[2] (Id. ¶ 85) "During the conference call held with investors later that morning, defendants blamed the miss on the ongoing transition to a subscription-based revenue model, saying that more revenues had been earned that would be reported later." (Id. ¶ 87) In response to the reported quarterly earnings results, "the price of the common stock closed down 22% that day, falling from its close of $17.84 per share on February 8, 2022 to close down at $13.90 per share on February 9, 2022." (Id. ¶ 88)

In quarterly financial results disclosed on May 10, 2022, Avaya reported "lower revenues than the investment community had been led to expect." "[I]ts EBITDA had declined to $0.53 per share, down more than 28% year-over-year and well below what it had led the investment community to expect." (Id. ¶ 90) "During the conference call held with investors and stock analysts later that morning, defendants again blamed the decline on Avaya's

---

[2] EBITDA refers to "earnings before interest, taxes, depreciation, and amortization." Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 312 (S.D.N.Y. 2022).

transformation from a one-time, license revenue model to a recurring subscription one." (Id. ¶ 92) Despite this explanation, "the price of the common stock declined nearly 30% over the following two trading sessions, falling 29% from its close of $8.22 per share on May 9, 2022 to close down at $5.84 per share on May 11, 2022." (Id. ¶ 93)

> In a June 24, 2022 SEC filing, Avaya disclosed that it

>> would be selling $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027, bringing its total outstanding debt to more than $2.8 billion. Avaya represented that the proceeds from the offering would be used to "to prefund the repayment of, repurchase or otherwise make certain payments in respect of the Company's existing $350.0 million of 2.25% Convertible Senior Notes due 2023. . . .

(Id. ¶ 97) The Company was thus "selling debt at 8% to replace debt only costing it 2.25% – or well more than 3 times as much." In doing so, Avaya was "tacitly admitting that it otherwise lacked the $350 million required to pay off the 2.25% notes in 2023." (Id.) In response to this disclosure, "the market price of Avaya common stock declined . . . more than 23%, falling from its close of $3.76 per share on June 23, 2022 to close down at $2.87 per share on June 24, 2022." (Id.)

> In a July 28, 2022 press release, Avaya "announc[ed] disastrous 3Q22 financial results for the interim period end[ing] June 30, 2022, disclosing revenues and EBITDA much lower than the market had been led to expect, though not giving a reason why." (Id. ¶ 98) The press release announced that Avaya's board of directors had "terminated defendant Chirico," the Company's chief executive officer, and that Chirico "had been replaced by former Vontage CEO [Alan] Masarek." (Id.) After this announcement, "the market price of Avaya common stock declined . . . more than 56%, falling from its close of $2.09 per share on July 28, 2022 to close down at $0.90 per share on July 29, 2022." (Id.)

In an August 9, 2022 press release, Avaya announced that it "would not timely file its 2Q22 quarterly financial report"; that "there was 'substantial doubt about the Company's ability to continue as a going concern' in light of an upcoming debt maturity and 3Q22 revenues that came in 'substantially lower' than Avaya expected"; and that "the Board's Audit Committee had opened an internal investigation 'to review the circumstances surrounding' the financial results reported for the most recent quarter, and another to investigate a whistleblower letter, though it did not give details about the whistleblower letter." (Id. ¶ 100)  That same day, "the market price of Avaya common stock declined . . . another 45%, falling from its close of $1.12 per share on August 8, 2022 to close down at $0.61 per share on August 9, 2022." (Id. ¶ 103)

Finally, on November 30, 2022 – one day after the end of the Class Period – Avaya disclosed that it had "identified defects in its internal reporting controls" and that

> as a result, defendants' attestations to those controls in [the] Company's annual report filed with the SEC for FY21 on November 22, 2021 "should no longer be relied upon." Specifically, Avaya revealed that the Board's ongoing investigation had revealed that "the existence of the [whistleblower's] email and the subsequent internal investigation were not included in the [Company's] whistleblower log or communicated to certain members of management and the Company's independent registered public accounting firm," and that "[b]ased on its re-assessment, management has determined that material weaknesses existed in its [internal controls] as the Company did not design and maintain effective controls." The Avaya Board also disclosed that its "investigations [were] not yet complete and may identify additional material weaknesses or other matters."

(Id. ¶ 105) (first bracket added; remaining brackets in original)  With this disclosure, "the market price of Avaya common stock declined further, declining 14.28% that day to close down at $0.96 per share on November 30, 2022." (Id. ¶ 106)

On February 14, 2023, Avaya filed a bankruptcy petition in Bankruptcy Court for the Southern District of Texas.  (Chapter 11 Voluntary Petition, In re: Avaya Inc., No. 23-90088 (DRJ) (S.D. Tex. Feb. 14, 2023) (Dkt. No. 1))

## II.    PROCEDURAL HISTORY

Plaintiff Jiang filed the Complaint on February 14, 2023, naming Avaya, Chirico, and McGrath as Defendants.  (Dkt. No. 1)

On February 16, 2023 – after Avaya filed its bankruptcy petition in Texas – Plaintiff Jiang moved to voluntarily dismiss his claims against Avaya.  (Dkt. No. 6)

On March 6, 2023, nine parties filed motions to be appointed lead plaintiff in this action.  (Dkt Nos. 10, 13, 17, 19, 22, 27, 31, 34, 40)

All but Pittsburgh and Sweatt have either withdrawn their motions or filed notices of non-opposition.  (Dkt. Nos. 44, 46-48, 50-51, 60)

Pittsburgh and Sweatt filed opposition briefs to the other's motion on March 20, 2023.  (Dkt. Nos. 52, 54)  Both filed reply briefs on March 27, 2023.  (Dkt. Nos. 61-62)

In a January 19, 2024 order, this Court directed Pittsburgh and Sweatt to file supplemental briefing concerning loss calculation.  (Dkt. No. 72)  Pittsburgh filed its supplemental brief on January 26, 2024 (Dkt. No. 76), and Sweatt filed a supplemental brief on February 2, 2024.  (Dkt. No. 77)

## DISCUSSION

## I.    APPOINTMENT OF LEAD PLAINTIFF

### A.    Presumptive Lead Plaintiff:  Largest Financial Interest

#### 1.    Legal Standard

The Private Securities Litigation Reform Act (the "PSLRA") directs courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The PSLRA creates a "[r]ebuttable presumption" that "the most adequate plaintiff . . . is the person or group of persons" that "has the largest financial interest in

the relief sought by the class," provided that such person or group "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" Id. § 78u-4(a)(3)(B)(iii)(I). This presumption may be rebutted upon a showing that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

"The PSLRA does not specify a method for calculating which plaintiff has the 'largest financial interest.'" In re Fuwei Films Sec. Litig., 247 F.R.D. 432, 436 (S.D.N.Y. 2008) (quoting Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc., 229 F.R.D. 395, 404 n.15 (S.D.N.Y. 2004)). Many courts in this District, however, have determined a prospective lead plaintiff's financial interest by looking to "(1) the number of shares purchased; (2) the number of net shares purchased; (3) total net funds expended by the plaintiff[] during the class period; and (4) the approximate losses suffered by the plaintiff[]." In re CMED Sec. Litig., No. 11 Civ. 9297 (KBF), 2012 WL 1118302, at *3 (S.D.N.Y. Apr. 2, 2012) (citing Richman v. Goldman Sachs Grp., Inc., 274 F.R.D. 473, 475 (S.D.N.Y. 2011); Foley v. Transocean Ltd., 272 F.R.D. 126, 127–28 (S.D.N.Y. 2011); Pirelli, 229 F.R.D. at 404; Lax v. First Merchs. Acceptance Corp., No. 97 C 2715 et al., 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).

These courts "'place[d] the most emphasis on the last of the four factors:  the approximate loss suffered by the movant.'" In re Orion Sec. Litig., No. 08 Civ. 1328 (RJS), 2008 WL 2811358, at *5 (S.D.N.Y. July 8, 2008) (quoting Kaplan v. Gelfond, 240 F.R.D. 88, 93 (S.D.N.Y. 2007)). And in calculating loss, "[c]ourts in this [D]istrict have a 'very strong

preference' for the 'last-in, first-out' ['LIFO'] method of calculating losses."[3]  Rosian v.

Magnum Hunter Res. Corp., Nos. 13 Civ. 2668 (KBF) et al., 2013 WL 5526323, at *1 (S.D.N.Y.

Oct. 7, 2013) (quoting Richman, 274 F.R.D. at 476).

### 2.   Lead Plaintiff Candidates

As noted above, Pittsburgh and Sweatt each seek appointment as lead Plaintiff.

(Dkt. Nos. 19, 34)

The parties have reported their relevant financial interest as follows:

| Movant | Shares Purchased During Class Period | Net Shares Retained | Net Funds Expended | Approximate Loss |
|--------|-----------------------------|-------------|------------------|------------------|
| Pittsburgh | 59,500 | 0 | $1,191,596.28 | $1,016,828.94 |
| Paul Sweatt | 650,000 | 650,000 | $1,080,397.00 | $511,237.53 |

(Rosenfeld Decl., Ex. D (Dtk. No. 36-4); Gilmore Suppl. Decl., Ex. A (Dkt. No. 77-2))[4]

---

[3]  "LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale." Foley, 272 F.R.D. at 129. "'The main advantage of LIFO is that . . . it takes into account gains that might have accrued to plaintiffs during the class period due [to] the inflation of the stock price.'" Id. (quoting In re eSpeed, Inc. Sec. Litig., 232 F.R.D. 95, 101 (S.D.N.Y. 2005)).

[4]  Sweatt's financial interest is based on his most recent reported loss calculation, which was submitted on February 2, 2024.  (See Gilmore Supp. Decl., Ex. A (Dkt. No. 77-2))  That submission does not reflect (1) 180,000 shares in Sweatt's TD Ameritrade IRA account that he purchased and re-sold in August 2022 (see id. at 9); or (2) option contracts that Sweatt purchased on September 8, 2022 and October 31, 2022, for 2,250 shares of Avaya stock.  The options "expired as worthless prior to an alleged corrective disclosure."  (Sweatt Opp. (Dkt. No. 52) at 11 n.3; Gilmore Supp. Decl., Ex. A (Dkt. No. 77-2) at 12-14)

While Sweatt acknowledges that Pittsburgh's reported loss is much larger than his own, he contends that Pittsburgh's alleged loss is inflated, and that its true recoverable loss is much less than Sweatt's recoverable loss.  (Sweatt Opp. (Dkt. No. 52) at 7-13; Sweatt Supp. Br. (Dkt. No. 77) at 2-9)[5]  Sweatt argues, <u>inter alia</u>, that Pittsburgh "sold its entire Avaya position on June 27, 2022, prior to any plausible partial disclosure of the fraud," and that under <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005), it has no recoverable loss.  (Sweatt Opp. (Dkt. No. 52) at 5-6)

Pittsburgh responds that it sold its holdings on June 27, 2022, "after three alleged partial disclosures" on February 9, 2022, May 10, 2022, and June 24, 2022, respectively, and that as a result all of its reported losses are recoverable under <u>Dura</u>.  (Pittsburgh Reply (Dkt. No. 61) at 5-7)

a.      <u>Pittsburgh 's Loss</u>

Sweatt does not dispute that Pittsburgh acquired 59,550 shares of Avaya stock within the Class Period at a cost of $1,191,596.28.  (Rosenfeld Decl., Ex. D (Dtk. No. 36-4))  Pittsburgh made eight purchases of Avaya stock between January 11, 2021 and February 9, 2022.  (<u>Id.</u>)  On June 27, 2022 – prior to the end of the Class Period on November 29, 2022 – Pittsburgh sold its holdings – all 59,550 shares – for $174,767.34.  (<u>Id.</u>)  Pittsburgh's sale thus took place after the alleged partial disclosures in February, May, and June 2022, but before the alleged partial disclosures in July, August, and November 2022.  According to Pittsburgh, it suffered a total loss of $1,016,828.94, representing the difference between the total purchase

---

[5]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

price of its shares and the total proceeds it received from the sale of those shares on June 27, 2022. (Id.)

The Second Circuit has identified "two requirements necessary to establish loss causation:  1) the loss must be foreseeable, and 2) the loss must have been caused by the materialization of the concealed risk." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)). Under Dura, losses incurred before a defendant's misconduct is revealed to the public "are not recoverable in a securities fraud action because the losses are not proximately caused by the defendant's misstatements." LightInTheBox Holding Co., Ltd. Sec. Litig., No. 13 Civ. 6016(PKC), 2013 WL 6145114, at *3 (S.D.N.Y. Nov. 21, 2013).  Therefore, "when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit . . . do not take into account losses from shares sold prior to corrective disclosures." Sallustro v. CannaVest Corp., 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) (collecting cases).

A "corrective disclosure" is an "announcement or series of announcements that reveals to the market the falsity of a prior statement." Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 480 n.3 (2d Cir. 2018) (citing Lentell, 396 F.3d at 175 n.4).  In order to constitute a "corrective disclosure," an announcement must show more than "a negative characterization of already-public information." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010).  And while the announcement need not "come from the Company itself," it must reveal to the market "the truth with respect to the specific misrepresentations alleged." In re Flag Telecom Holdings, 574 F.3d at 40 n.5, 41; see also Bensley v. FalconStor Software, Inc., 277 F.R.D. 231, 240 (E.D.N.Y. 2011) ("In proving causation, there must be more than just a decline in price as a result of a disclosure by the company that the company is doing

poorly; there must be some identification of a disclosure of the fraud that causes a drop in the stock price."); Galmi v. Teva Pharms. Indus. Ltd., 302 F. Supp. 3d 485, 503 (D. Conn. 2017) (public statements that a company's affiliates "were being investigated for potential anticompetitive practices" were not "partial disclosures," even though the statements "might have contributed to a decline in [the company's] stock price," because the statements did not "reveal[] any indication that [the company] itself was engaged in a price fixing conspiracy with other drug manufacturers that it fraudulently concealed").

A plaintiff's "theory of 'loss causation may[, however,] be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements' where the partial disclosure 'somehow reveals to the market that a defendant's prior statements were not entirely true.'" Kux-Kardos v. VimpelCom, Ltd., 151 F. Supp. 3d 471, 476 (S.D.N.Y. 2016) (quoting In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

Here, Pittsburgh argues that the truth about the "onerous requirements" of the RingCentral partnership and the Company's "defective reporting controls" was disclosed "in dribs and drabs" on three occasions prior to Pittsburgh's June 27, 2022 sale of its Avaya shares:

1.   on February 9, 2022, Avaya reported "first quarter 2022 financial results, disclosing revenue and EPS results significantly lower than the market had been led to expect," which the Company blamed in part on "the ongoing transition to a subscription-based revenue model," after which "Avaya's stock price declined 22%";

2.   on May 10, 2022, Avaya reported "second quarter 2022 financial results, disclosing for the second time in two quarters that it had missed expected revenues," and the Company again "blamed the decline on Avaya's transformation from a one-time, license-fee revenue model to a recurring subscription one," after which Avaya's stock price "declined nearly 30%"; and

3.   on June 24, 2022, Avaya disclosed "that it would be raising $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027," which it would use to "prefund the repayment of, repurchase or otherwise make certain payments in

respect of the Company's existing $350.0 million of 2.25% Convertible Senior
Notes due 2023," after which Avaya shares declined "more than 23%."

(Pittsburgh Supp. Br. (Dkt. No. 76) at 2-7 (quoting Cmplt. (Dkt. No. 1) ¶¶ 5-7, 9-11))

The Company's February 9, 2022 and May 10, 2022 disclosures do not contain
any reference to the allegedly "onerous requirements" of the RingCentral partnership, however.
For example, these disclosures do not address the fact that "Avaya [had] granted RingCentral
exclusive rights to certain products to its customers"; that "ACO conflicted with other Avaya
product offerings"; or that "the arrangement with RingCentral had exposed the Company to
losses as RingCentral paid Avaya commissions up front," and Avaya was obligated to return
those commissions if it missed sales targets. (Cmplt. (Dkt. No. 1) ¶ 96)  Indeed, the February 9,
2022 and May 10, 2022 disclosures make no mention of RingCentral whatsoever.  Nor do the
Company's February and May statements disclose that it lacked effective internal controls.  (Id.)

Pittsburgh argues, however, that one of the alleged purposes of the ACO product
that Avaya developed with RingCentral was to "accelerate[] Avaya's shift from a one-time,
license fee-based to a recurring, subscription-based revenue model." (Cmplt. (Dkt. No. 1) ¶ 4)
And Pittsburgh points out that during the February 9, 2022 earnings call, the Company "blamed
the miss on the ongoing transition to a subscription-based revenue model, saying that more
revenues had been earned that would be reported later." (Id. ¶ 87)  And during the May 10, 2022
earnings call, the Company again blamed its disappointing financial results on its ongoing
"transformation from a one-time, license revenue model to a recurring subscription one." (Id. ¶
92) Pittsburgh also cites to analyst reports from February 10, 2022 and May 10–11, 2022 that
attribute Avaya's poor earnings results in part to the Company's transition to a subscription-
based model. (Pittsburgh Supp. Br. (Dkt. No. 76) at 5 n.5, 6 n.7)  Pittsburgh contends that
because Avaya linked its poor earnings results in February and May 2022 to its transition to a

subscription-based revenue model, these statements constitute "corrective disclosures" vis-à-vis

Avaya's alleged fraud regarding the consequences of the RingCentral collaboration.  (Pittsburgh

Supp. Br. (Dkt. No. 76) at 4-6)

As discussed above, however, Avaya's February and May disclosures contain no

reference whatsoever to the Company's RingCentral partnership.  Given these circumstances, the

Company's general references to the challenges it faced during the transition to a subscription-

based revenue model do not constitute "corrective disclosures."  And the analyst reports that

Pittsburgh cites as evidence of the contemporaneous views of the investing community likewise

contain no reference to RingCentral or to ACO.  (See Pittsburgh Supp. Br. (Dkt. No. 76) at 5 n.5,

6 n.7)  In sum, Pittsburgh has not demonstrated that the February and May 2022 earnings calls

"reveal[ed] to the market that [Avaya's] prior statements [concerning the RingCentral

partnership] were not entirely true."  Kux-Kardos, 151 F. Supp. 3d at 476 (citations and

quotation mark omitted)

It is also worth noting that Pittsburgh's arguments regarding the February and

May disclosures are entirely inconsistent with the Complaint's allegations.  The Complaint

alleges that Avaya's February 9, 2022 and May 10, 2022 earnings calls were "materially false

and misleading" because "they failed to disclose . . . adverse details" regarding the "onerous

requirements" of the RingCentral partnership and the Company's "defective internal controls."

(Cmplt. (Dkt. No. 1) ¶ 96)  In other words, while the Complaint alleges that the February and

May 2022 disclosures were "materially false and misleading" because they did not disclose

"adverse details" about the RingCentral partnership and the Company's "defective internal

controls," Pittsburgh now argues that these same disclosures were sufficiently specific to

constitute "corrective disclosures" for purposes of loss causation.  Thus, Pittsburgh – whose

counsel drafted the Complaint – is trying to "have it both ways."  See In re Flag Telecom Holdings, 574 F.3d at 41 ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure. . . .").

Finally, Pittsburgh relies on the "nexus alleged in the Complaint" between the February and May 2022 disclosures and declines in Avaya's stock price.  (Pittsburgh Supp. Br. (Dkt. No. 77) at 4-6)  The Complaint alleges that on February 9, 2022 "the price of the common stock closed down 22% that day, falling from its close of $17.84 per share on February 8, 2022 to close down at $13.90 per share."  (Cmplt. (Dkt. No. 1) ¶ 88)  And after the May 10, 2022 disclosures, "the price of the common stock declined nearly 30% over the following two trading sessions, falling 29% from its close of $8.22 per share on May 9, 2022 to close down at $5.84 per share on May 11, 2022."  (Id. ¶ 93)  But in order to show loss causation, a plaintiff must allege "more than just a decline in price as a result of a disclosure by the company that the company is doing poorly."  Bensley, 277 F.R.D. at 240.  The disclosures must "reveal[] the truth with respect to the specific misrepresentations alleged."  In re Flag Telecom Holdings, 574 F.3d at 41.  Here, Avaya's disclosures in February and May 2022 do not meet this requirement. Accordingly, they do not constitute "corrective disclosures."

As to the June 24, 2022 disclosure that Avaya intended to "sell[] $250 million worth of its 8.00% Exchangeable Senior Secured Notes due 2027" to pre-fund the repayment of existing debt funded at a much lower interest rate, this disclosure likewise does not mention the RingCentral partnership or any defect in the Company's internal controls.  (Cmplt. (Dkt. No. 1) ¶ 97)  Nor does the Complaint explain how this refunding announcement constitutes a disclosure of the truth regarding the RingCentral partnership or Avaya's defective internal controls.  (See

id.) The Complaint instead merely alleges that – in issuing the refunding announcement – the Company was "conceding that it was selling debt at 8% to replace debt only costing it 2.25% – or well more than 3 times as much – and tacitly admitting that it otherwise lacked the $350 million required to pay off the 2.25% notes in 2023." (Id.)

Accepting this interpretation, the June 24, 2022 announcement does not constitute a "corrective disclosure," because it did not "reveal the truth" – or begin to reveal the truth – about the alleged misrepresentations concerning the RingCentral partnership or the Company's defective internal controls.  See In re Flag Telecom Holdings, 574 F.3d at 41.[6]

---

[6] In arguing that the February, May and June 2022 disclosures constitute "corrective disclosures," Pittsburgh also cites the "front-end price impact" of several alleged misrepresentations during the Class Period, as calculated by its financial consultant, Bjorn Steinholt.  (Steinholt Decl. (Dkt. No. 76-1) ¶ 21)  Steinholt contends that the "front-end price impact" of the Company's alleged misrepresentations prior to February 9, 2022 "could be used to establish potential inflation of more than $11 per share." (Id.)  According to Steinholt, because

> Avaya's June 24, 2022, closing price following the last of the "corrective" disclosures discussed below[] was only $2.87 per share, i.e., much lower than the potential $11 per share inflation[,] . . . any damages analysis that credits the potential inflationary impact of the alleged misrepresentations using the price increases discussed above would also have to have a substantial portion of this inflation removed from the stock price prior to the end of June 24, 2022 (because the true value, i.e., the stock price minus inflation, cannot be negative).

(Id.) Steinholt goes on to argue that "the potential inflation created by the alleged misrepresentations is so great that at least some portion of it would have to have been removed prior to the end of June 24, 2022." (Id.)  Pittsburgh argues that Steinholt's analysis constitutes "powerful evidence of the soundness of all three . . . corrective disclosures" from February, May, and June 2022.  (Pittsburgh Supp. Br. (Dkt. No. 76) at 8)

"In Dura, [however,] the Supreme Court rejected the view that an inflated purchase price is sufficient to plead loss causation." In re Flag Telecom Holdings, 574 F.3d at 40.  As discussed above, to plead loss causation a plaintiff must demonstrate that his, her, or its loss was "caused by the materialization of the concealed risk." Id.  This rule flows from a recognition that, "[w]hen [a] purchaser subsequently resells [its] shares . . . at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." Dura, 554 U.S. at 342-

Because Pittsburgh sold all of the Avaya shares that it acquired during the Class Period on June 27, 2022 – prior to any "corrective disclosure" – its loss in connection with the June 27, 2022 sale transaction "will not be considered in calculating recoverable loss or in determining lead plaintiff status." Sallustro, 93 F. Supp. 3d at 275.  As a result, Pittsburgh's loss for purposes of determining lead plaintiff status is zero.[7]

### b.   Sweatt's Loss

While the parties' lead plaintiff motions have been pending, Sweatt has reported three different loss amounts.  In papers filed on March 6, 2023, Sweatt reported a loss of $486,814.95.  (Gilmore Decl., Ex. B (Dkt. No. 25-2) at 2)  In his opposition and reply papers, Sweatt reported a loss of $438,944.96.[8]  (Sweatt Opp. (Dkt. No. 52) at 7, 10; Sweatt Reply (Dkt.

---

43.  In sum, Pittsburgh's evidence of price inflation prior to the February, May and June 2022 disclosures is insufficient, standing alone, to demonstrate loss causation.

[7]  Pittsburgh complains that Sweatt "did not raise any issue with the alleged disclosures in the complaint until after opening briefs were submitted and he learned that Pittsburgh has the largest financial interest."  (Pittsburgh Reply (Dkt. No. 61) at 5; see Sweatt Br. (Dkt. No. 20) at 7 ("The Complaint alleges that the truth emerged over a series of partial disclosures beginning first on February 9, 2022. . . ."))  Pittsburgh therefore argues that "the Court should hold Mr. Sweatt to what he already claimed and admitted is alleged in the complaint, before he saw Pittsburgh's larger loss."  (Pittsburgh Reply (Dkt. No. 62) at 6)

What matters, however, is not what Sweatt argued in his opening brief, but rather which party has the greatest financial interest under relevant case law.

In any event, Sweatt also argues that Pittsburgh is "inadequate to represent the Class," because if the pre-June 27, 2022 disclosures do "not constitute . . . corrective disclosure[s], none of Pittsburgh's alleged losses would qualify as proximately linked to the alleged fraud in this case." (Sweatt Opp. (Dkt. No. 52) at 14)  Because Pittsburgh is "subject to unique defenses" with respect to loss causation, the presumption that it is the "most adequate plaintiff" is rebutted, even if the pre-June 27, 2022 disclosures are considered. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)–(II); see Bensley, 277 F.R.D. at 241 (lead plaintiff candidate had "failed to demonstrate that it will be an adequate lead plaintiff because it was a total in-and-out trader and may be unable to demonstrate loss causation").

[8]  In connection with submitting the lesser loss figure of $438,944.96, Sweatt notes that "[u]nder the PSLRA, [his] damages are limited to his actual out-of-pocket losses," and that the revised

No. 62) at 4)  In calculating a loss of $438,944.96, Sweatt relied in part on loss calculation methodology employed in Espinoza v. Whiting, 2013 WL 171850 (E.D. Mo. Jan. 16, 2013). This Court rejected that methodology in Sallustro, 93 F. Supp. 3d at 276-77, however. Accordingly, in a January 19, 2024 order, this Court directed Sweatt to "clarify the calculation of his total loss in light of the analysis applied in Sallustro." (Dkt. No. 72)  Sweatt then reported a loss amount of $511,237.53.[9]  (Gilmore Supp. Decl., Ex. A (Dkt. No. 77-2) at 2)

While Sweatt has reported varying loss amounts, the history of his purchases and sales of Avaya stock is not in dispute.  By all accounts, Sweatt purchased 830,000 shares of Avaya stock in several transactions between August 10, 2022 and October 18, 2022, at a cost of $1,227,166.[10]  (Gilmore Decl., Ex. B (Dkt. No. 25-2) at 3-11)  Sweatt sold 180,000 Avaya shares in August 2022 for approximately $219,061, but kept the remaining 650,000 shares through the end of the Class Period on November 29, 2022.  (Id.)  On December 19, 2022, Sweatt sold 620,000 shares for $558,000, realizing a substantial loss.[11]  (Id.)

---

figure "excludes losses Mr. Sweat suffered on transactions in Avaya option contracts that expired as worthless prior to an alleged corrective disclosure, and therefore not recoverable under Dura." (Sweatt Opp. (Dkt. No. 52) at 11 n.3)

[9]  In arriving at this loss figure, Sweatt reports that he "follow[ed] the LIFO methodology originally submitted [on March 6, 2023], minus in-and-out trades between corrective disclosures in one of Sweatt's accounts and the two option trades."  (Sweatt Supp. Br. (Dkt. No. 77) at 9)

[10]  As noted above, on September 8, 2022 and October 31, 2022, Sweatt purchased option contracts for an additional 2,250 shares of Avaya stock.  (Gilmore Decl., Ex. B (Dkt. No. 25-2) at 12-14)  Sweatt reports that these option contracts "expired as worthless" within the Class Period "prior to an alleged corrective disclosure."  (Sweatt Opp. (Dkt. No. 52) at 11 n.3)

[11]  In calculating his December 19, 2022 sale proceeds at $558,000, Sweatt utilizes a share price of $0.90.  The actual per share price that Sweatt received on December 19, 2022 was reportedly lower than $0.90, however.  (See Gilmore Decl., Ex. B (Dkt. No. 25-2) at 3-11)  In utilizing a share price of $0.90, Sweatt relies on the statutory damages cap set forth in the PSLRA, which provides that "plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price

In sum, Sweatt purchased Avaya shares during the Class Period at a cost of more than $1 million; held 650,000 of those shares through the final alleged corrective disclosure on November 30, 2022[12]; and sold all but 30,000 shares at a loss on December 19, 2022.

Given that (1) Pittsburgh and Sweatt are the only parties seeking appointment as lead plaintiff; (2) Pittsburgh's loss for purposes of determining lead plaintiff status is zero; and (3) Sweatt's total loss is at least $438,944.96, the Court concludes that Sweatt has the greatest loss and the "largest financial interest" in this lawsuit. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Accordingly, and subject to Rule 23 requirements, there is a rebuttable presumption that Sweatt is the "most adequate plaintiff." See 15 U.S.C. § 78u-4(a)(3)(B)(iii).

**B.      Rule 23 Requirements**

**1.      Legal Standard**

Fed. R. Civ. P. 23 states that a party may serve as a class representative only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In order for the rebuttable

---

of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security." 15 U.S.C. § 78u-4(e)(2).

[12] No party has disputed that Avaya's November 30, 2022 announcement that "it had identified defects in its internal reporting controls and that[,] as a result, defendants' attestations to those controls in [the] Company's annual report filed with the SEC for FY21 on November 22, 2021 'should no longer be relied upon,'" constitutes a "corrective disclosure." (Cmplt. (Dkt. No. 1) ¶ 105)

This Court agrees that the November 30, 2022 announcement constitutes a "corrective disclosure." The Court makes no finding as to whether the Complaint adequately alleges any other post-June 24, 2022 "corrective disclosure."

presumption to apply, courts have required only "a prima facie showing that the requirements of Rule 23 are met." In re KIT Digital, Inc. Sec. Litig., 293 F.R.D. 441, 445 (S.D.N.Y. 2013). Furthermore, "[t]ypicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA." In re Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42, 49 (S.D.N.Y. 1998); see also Simmons v. Spencer, Nos. 13 Civ. 8216 (RWS), et al., 2014 WL 1678987, at *4 (S.D.N.Y. Apr. 25, 2014); In re KIT Digital, 293 F.R.D. at 445; Varghese v. China Shenghuo Pharms. Holdings, Inc., 589 F. Supp. 2d 388, 397 (S.D.N.Y. 2008); Kaplan, 240 F.R.D. at 94 ("[A]t this stage of litigation, only a preliminary showing of typicality and adequacy is required.").

"Typicality is established where each class member's claim 'arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Freudenberg v. E*Trade Fin. Corp., Nos. 07 Civ. 8538, et al., 2008 WL 2876373, at *5 (S.D.N.Y. July 16, 2008) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The lead plaintiff's claims 'need not be identical to the claims of the class to satisfy the [necessary preliminary showing of] typicality.'" In re Fuwei Films, 247 F.R.D. at 436 (quoting Pirelli, 229 F.R.D. at 412).

The adequacy requirement is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." Foley, 272 F.R.D. at 131.

Once a party establishes a presumption that he, she, or it is the "most adequate plaintiff," the presumption "may be rebutted only upon proof by a member of the purported

plaintiff class" that the party "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)–(II).

2.      **Analysis**

Here, Pittsburgh contends that Sweatt will not adequately represent the class because his "post[s] on [the] internet investment forum StockTwits" show "'a level of carelessness' that should cause absent class members and the Court 'to doubt whether [Sweatt] possesses the necessary adequacy and sophistication to be lead plaintiff.'" [13]  (Pittsburgh Opp. (Dkt. No. 54) at 12 (quoting Plaut v. Goldman Sachs Grp., Inc., No. 18-cv-12084, 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019))

Citing three of Sweatt's posts from November 2022, Pittsburgh contends that his investment in Avaya was "entirely speculative," such that he is "'vulnerable to attacks that he did not rely on the market price in trading [Avaya stock], which could "sever[] the link between the alleged misrepresentation and . . . [Sweatt's] decision to trade at a fair market price."'" (Pittsburgh Opp. (Dkt. No. 54) at 13 (quoting Rodriguez v. DraftKings Inc., No. 21 CIV. 5739 (PAE), 2021 WL 5282006, at *10 (S.D.N.Y. Nov. 12, 2021) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 248 (1988))))

In a November 4, 2022 post, Sweatt states that he "want[ed] a big profit to get out with and move on" from his purchase of Avaya stock. (Id. at 13)  And in a November 21, 2022 post, Sweatt reports that he is "HOLD[ing]" Avaya stock, which purportedly stands for "Hold[ing] On for Dear Life" and "implies being unwilling to sell a security when that security

---

[13]  Sweatt does not dispute that he authored the posts at issue.  (See Sweatt Reply (Dkt. No. 62) at 6)

declines in value or becomes volatile." (Id. at 13 (citing

https://www.investopedia.com/terms/h/hodl.asp))  And on November 28, 2022, Sweatt posts that

he "'made' and 'lost' about $65k in 10 minutes" from his Avaya shares.  (Id.)

        Sweatt's transaction history does not support Pittsburgh's assertion that his

investments in Avaya stock were "entirely speculative," however.  As discussed above, Sweatt

purchased 830,000 shares of Avaya between August 10, 2022 and October 18, 2022.  (Gilmore

Decl., Ex. B (Dkt. No. 25-2) at 3-11)  Apart from the 180,000 Avaya shares that Sweatt sold in

August 2022 – months before the posts in question – he held the remainder of his 650,000 shares

through the end of the Class Period and up until December 19, 2022, when he sold 620,000

shares.  (Gilmore Decl., Ex. B. (Dkt. No. 25-2) at 3-11)

        Unlike the prospective lead plaintiff in Draft Kings, Inc., 2021 WL 5282006, at

*7, Sweatt was not a "day trader . . . who bought and sold [Avaya] stock repeatedly even on

single trading days."  Nor was he "unwilling to sell a security when that security decline[d] in

value or bec[ame] volatile," as evidenced by his sale of 620,000 Avaya shares on December 19,

2022.  (Pittsburgh Opp. (Dkt. No. 54) at 13)  In sum, there is no evidence that Sweatt "did not

rely on the integrity of the market price" when making his trades.  Chauhan v. Intercept Pharms.,

No. 21-CV-00036 (LJL), 2021 WL 235890, at *6 (S.D.N.Y. Jan. 25, 2021).

        Pittsburgh also cites two posts from December 13, 2022, in which Sweatt states

that he would sell some of his Avaya shares if he faced a margin call.  Pittsburgh contends that

"defendants will undoubtedly probe [Sweatt about these posts] in an attempt to determine

whether [his] financial interest is overstated, and whether his investment decisions were made

voluntarily (as opposed to an automatic margin account liquidation, for example)."  (Pittsburgh

Opp. (Dkt. No. 54) at 15)  Although Sweatt sold most of his Avaya shares on December 19, 2022

– a few days later – there is no evidence in the record as to whether Sweatt in fact faced a margin call before selling his shares.  In any event, Pittsburgh cites no case suggesting that the sale of shares on a margin call raises adequacy or typicality issues.  Indeed, the weight of authority appears to be to the contrary.  See KB Partners I, L.P. v. Barbier, 2013 WL 2443217, at *13 (W.D. Tex. June 4, 2013); LaGrasta v. First Union Sec., Inc., No. 2:01-CV-251-FTM29DNF, 2005 WL 1875469, at *6 (M.D. Fla. Aug. 8, 2005); In re THQ, Inc. Sec. Litig., No. CV 00-1783AHM(EX), 2002 WL 1832145, at *5 (C.D. Cal. Mar. 22, 2002).[14]

In sum, Pittsburgh has not demonstrated that Sweatt's online posts render him an inadequate lead plaintiff or render his claims atypical.

Finally, Pittsburgh argues that Sweatt's purchase of "'out of the money' call options"[15] on September 8, 2022 and October 31, 2022 "confirms the speculative nature of his Avaya investment" and cuts against his adequacy to serve as lead plaintiff.  (Pittsburgh Opp. (Dkt. No. 54) at 14)

---

[14] Pittsburgh argues that a handful of other Sweatt posts show a "lack of sophistication and experience."  (Pittsburgh Opp. (Dkt. No. 54) at 14-17).  For example, Pittsburgh cites the following September 20, 2022 Sweatt post:  "There has been enough recent document statements from Avaya that they do not expect to file for BK that if they did, you'd eventually get your losses back in the immediately filed shareholder lawsuits."  (Id. at 14)  And in a November 24, 2022 post cited by Pittsburgh, Sweatt expresses concern that the United States government will "send [his capital gains tax] $ to Israel and Ukraine."  (Id. at 16)  Pittsburgh also notes that many of Sweatt's posts are "expletive-filled."  (Id. at 17.)

Sweatt's lack of familiarity with bankruptcy law, his views about foreign aid, and his use of profanity do not disqualify him from serving as lead plaintiff.

[15] An option is "out of the money" when the strike price is higher than the market price. Accordingly, the purchaser of a stock option is "betting that the market price will rise over the strike price within the limited time period [of the stock option]."  United States v. Grossman, 843 F.2d 78, 81 n.1 (2d Cir. 1988))

Acknowledging that the purchase of a stock option is nothing more than a bet as to whether the market price of the stock will increase above the strike price within the life of the option, Sweatt's option purchases account for a very small percentage of his total trading in Avaya securities.  At a cost of $48,760, Sweatt obtained options to purchase 2,250 Avaya shares. By contrast, Sweatt expended more than $1 million in purchasing 650,000 shares of Avaya common stock.  (Gilmore Decl., Ex. B (Dkt. No. 25-2) at 12-14)  Moreover, Sweatt's most recent loss calculation excludes his option purchases.  (Gilmore Supp. Decl., Ex. A (Dkt. No. 77-2) at 2); see Chauhan, 2021 WL 235890, at *7 (appointing a lead plaintiff who made options trades where (1) "the majority of [plaintiff's] losses, or trades, were [not] through options" and (2) plaintiff did "not claim any losses from options trading").  In sum, Sweatt's comparatively small purchases of options to purchase Avaya stock do not render his much larger overall investment in Avaya stock speculative, so as to render his claims atypical or raise questions about whether he can serve as an adequate plaintiff.

The Court concludes that Sweatt has made the requisite showings of typicality and adequacy within the meaning of the PSLRA and Rule 23(a)(3).

As to typicality, Sweatt purchased Avaya stock within the Class Period, suffered damages as a result of Defendants' allegedly false and misleading statements, and seeks relief under the federal securities laws.  Sweatt's claims and legal arguments appear similar to those of other investors and therefore representative of the putative class.  Accordingly, Sweatt has made the preliminary showing required for a finding of typicality at this stage of the proceedings.

As to adequacy, Sweatt has retained experienced class action counsel and alleged a significant loss that gives him a sufficient stake in this litigation to ensure vigorous prosecution on behalf of all class members.  See Sallustro, 93 F. Supp. 3d at 278; Sweatt Br. (Dkt. No. 20) at

11-12)  Moreover, there is no apparent conflict between Sweatt's interests and those of other

class members.  (Id.)  And, as discussed above, Pittsburgh has not shown that Sweatt's claims are

subject to unique defenses.

Accordingly, Sweatt will be appointed lead plaintiff.

## II.     <u>APPOINTMENT OF LEAD COUNSEL</u>

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of

the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  There

is a "strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to

counsel selection."  In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MDL 1529

(LMM), 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting In re Cendant Corp. Litig.,

264 F.3d 201, 276 (3d Cir. 2001)).

Here, Sweatt has selected Hagens Berman as his counsel.  In support of the

request to appoint lead counsel, Sweatt and his counsel have submitted a firm resume, which

provides a detailed description of the educational backgrounds and legal experience of the

attorneys at the firm.  (See Gilmore Decl., Ex. D (Dkt. No. 25-2))  Hagens Berman's resume

demonstrates that it possesses experience litigating securities class actions and that it has had

success in these matters in the past.  Having reviewed Sweatt's brief and the firm resume, this

Court concludes that Hagens Berman is qualified to serve as lead counsel in this matter.

## <u>CONCLUSION</u>

For the reasons stated above, Sweatt's motion for appointment as lead plaintiff

and of lead counsel (Dkt. No. 19) is granted.  Pittsburgh's competing motion is denied.  (Dkt.

No. 34)  The Clerk of Court is directed to terminate the motions.  (Dkt. Nos. 10, 13, 17, 19, 22,

27, 31, 34, 40)

The parties are directed to meet and confer, and by **March 12, 2024**, they will file a joint letter setting out a proposed schedule for next steps in this case, including proposed dates for the filing of (1) an amended complaint and (2) Defendants' response.

Dated: New York, New York
        March 5, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge