**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLIVER JIANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JAMES M. CHIRICO, JR., and KIERAN J. MCGRATH,<br><br>Defendants. | Case No. 1:23-cv-01258-PGG<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 7

IV. SUMMARY OF THE FRAUD ..... 8

A. Avaya's Transition From Hardware to the Cloud ..... 8

B. Avaya's Looming Debt Obligations Presented a Threat to the Company. ..... 11

C. On May 10, 2022, Defendants Highlight Third-Quarter and Year-End Guidance and Emphasize the Underlying "Strength" and "Momentum" of Avaya's Business to Set the Ground for Avaya's Financing Efforts. ..... 11

D. Defendants Tout Avaya's "Tone at the Top Culture" and Internal Controls in the May 10, 2022 8-K and Earnings Call to Establish the Company as a Safe and Reliable Investment for Investors. ..... 14

E. In Advance of Seeking Additional Financing, Defendants Assuage Concerns Regarding Avaya's Debt in May and June 2022 and Continue to Tout the Strength of the Company's Business. ..... 17

F. Defendants' Efforts to Portray Avaya as a Strong, Accountable, Long-Term Company Pay Off, as the Company Secured $600 Million in Financing Commitments. ..... 21

G. Internal Avaya Documents from April-June 2022 Show that Defendants Knew the Guidance Numbers Were Inflated and Not Supported by the Current State of Avaya's Business and Avaya's "Tone at the Top Culture" Was Non-Existent. ..... 22

H. At the End of the Third Quarter, Chirico Decides Not to Update the Board About the Earnings Miss. ..... 31

I. A July 2022 Whistleblower Complaint Implicates Chirico and McGrath and Calls the Transition to a Subscription Model a "Blatant Financial Ploy." ..... 32

J. Former Employees of Avaya Corroborate the Company's Unsustainable Business Model Related to Subscription Revenue. ..... 33

K. Former Employees of Avaya Confirm Chirico's and McGrath's Access to Revenue Information. ..... 35

L. The Truth Begins to Emerge in July 2022, when Avaya Announced the Departure of Chirico, the Dismal Third-Quarter Results, and "Significant Non-Cash Impairment Charges." ..... 36

M. More Truth Comes Out on August 9, 2022, when Avaya Confirmed its Dismal Third-Quarter Earnings, the Commencement of Two Separate Audit Committee Investigations, and Raised "Substantial Doubt About its Ability to Continue as a Going Concern." ..... 38

N. Despite the Company's Issues, Avaya's New CEO Paints a Rosy Picture in August 2022 and September 2022. ..... 40

O. More Revelations Regarding Avaya's Deficient Internal Controls Come Out in November 2022. ..... 42

P. In December 2022, the Market Learns that Avaya Will Likely Enter Chapter 11 Bankruptcy and the Causes of the Company's Third Quarter Earnings Miss. ..... 45

Q. Avaya Confirms Material Weaknesses in ICFR that Were Present During the Relevant Period and Directly Connected to the Conduct of Chirico and McGrath. ..... 46

R. Avaya Declares Chapter 11 Bankruptcy in February 2023 and Emerges from Bankruptcy in May 2023. ..... 50

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 51

A. The May 10, 2022 8-K Falsely Claimed Avaya Remained on Track to Meet its $1 Billion AAR Mark in 2022 and Misrepresented Avaya's Internal Governance. ..... 51

B. The May 10, 2022 10-Q Falsely Affirmed Avaya's Disclosure Controls and Financial Health. ..... 54

C. Defendants' False Statements at the May 10, 2022 Earnings Call Misled Investors About the Progress of Avaya's Transformation to the Cloud. ..... 56

D. Defendants Misled Investors as to Avaya's Solvency and Opportunities for Continued Subscription Contracts During the June 3, 2022 Barclays' Fireside Chat. ..... 61

E. The June 2022 Investor Presentation Creates the False Impression That a Significant Percentage of the Company's Installed Base Could Transition to the OneCloud Platform. .... 63

F. Defendants Misled Investors as to Avaya's Solvency in the June 27, 2022 Press Release. .... 64

VI. ADDITIONAL ALLEGATIONS OF SCIENTER .... 65

A. Evidence Probative of Defendants' Motive to Commit the Fraud. .... 65

B. Circumstantial Evidence of Defendants' Knowledge or Recklessness of the Falsity of their Statements. .... 66

VII. LOSS CAUSATION .... 68

A. Corrective Disclosures .... 69

B. Materialization of Risks .... 70

VIII. NO SAFE HARBOR .... 72

IX. THE PRESUMPTION OF RELIANCE .... 72

X. CLASS ALLEGATIONS .... 73

XI. CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT .... 75

COUNT I FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER .... 75

COUNT II FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT .... 77

XII. PRAYER FOR RELIEF .... 79

XIII. JURY DEMAND .... 79

Lead Plaintiff Paul Sweatt ("Lead Plaintiff"), by and through his counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of himself and all persons and entities, except Defendants and their affiliates as more particularly defined below, against James M. Chirico, Jr., the former CEO of Avaya Holdings Corp. ("Avaya" or the "Company") and Kieran J. McGrath, the former CFO of Avaya, on behalf of investors who purchased or otherwise acquired Avaya securities during the period from May 10, 2022 to December 15, 2022, inclusive (the "Class Period").

Lead Plaintiff's allegations are based upon personal knowledge as to himself and his actions and, as to other matters, on the investigation of Court-appointed Lead Counsel Hagens Berman Sobol Shapiro LLP. The investigation included, without limitation: (a) review and analysis of regulatory filings made by Avaya with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) transcripts of Avaya's conference calls with analysts and investors; (c) Avaya's press releases and presentations; (d) review and analysis of news and media reports issued by and disseminated by Avaya; (e) data reflecting the trading and pricing of Avaya's securities; (f) accounts from former Avaya employees; and (g) review of other publicly available information concerning Defendants, including related litigation.

## I. INTRODUCTION

1. This securities class action arises from Defendants' false and misleading statements and omissions designed to conceal Avaya's declining business, disappointing prospects, deficient internal controls over financial reporting, and the Company's insolvency.

2. In securities filings and an earnings call on May 10, 2022, and in a subsequent interview, investor presentation, and press release in June 2022, Defendants misled investors into believing the Company was successfully transforming itself from a traditional office hardware business into a subscription-based software company by claiming that the momentum of Avaya's

new business model "remain[ed] very strong" and the Company was on track to earn at least $685 million in revenue and EBITDA of $140 million in the third quarter fiscal year 2022 and $1 billion in annual recurring revenues by the end of the calendar year 2022. In truth, Avaya's business model was doomed to fail as the Company was experiencing a declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription product, "OneCloud." Furthermore, Defendants knew Avaya was not on track to meet its Q3 2022 and FY 2022 guidance as immediately prior to announcing the guidance, Avaya executives and other employees warned that the projections would be "impossible" to meet, and before the end of Q3 2022, Avaya executives and employees discussed how closing the "quite substantial" gap between the Company's actual performance and the publicly stated projections would require "more than one miracle."

3. During the Class Period, Defendants also falsely touted Avaya's internal governance emphasizing its "Tone at the Top Culture" and certified that the Company's "disclosure controls and procedures were effective." In reality, Defendants Chirico and McGrath were setting an unethical culture within the organization by pressuring employees to come up with and meet impossible short-term sales projections thereby compromising the company's disclosure controls and processes.

4. Defendants' motive to commit the fraud was clear: survival of the Company. Defendants understood that Avaya needed a cash infusion, and the clock was ticking. Avaya had $350 million in debt coming due in June 2023, and the Company risked bankruptcy if it could not raise debt financing. Avaya going bankrupt meant Defendants could lose their jobs, reputations, and the value of their stock-based compensation. Accordingly, to raise the necessary financing, Defendants painted a picture of Avaya's strong financial health and sustainable business model

via its transformation to the cloud, with the Company on track to earn at least $685 million in revenue by the end of June 2022 and $1 billion in annual recurring revenue by the end of 2022.

5. Defendants' ruse worked. In addition to artificially propping up Avaya's stock price, on June 27, 2022, Avaya announced it was able to raise almost $600 million in debt financing from sophisticated investors including Brigade Capital Management LP and Symphony Asset Management LLC, providing the company with a lifeline. In furtherance of their scheme, during the marketing process, Chirico and McGrath told the lenders that Avaya was on track to hit its earnings guidance.

6. Defendants' fraud began to unravel on July 28, 2022, when just weeks after raising $600 million, Avaya announced that it would miss by more than 60% its previous forecasts for adjusted earnings in the third quarter, which ended June 30, 2022. The Company also said that it would miss revenue targets and announced it was removing Chirico as chief executive officer.

7. On this news, Avaya's stock price fell approximately 57%, or $1.19 per share, from its close of $2.09 per share on July 28, 2022 to a close of $0.90 per share on July 29, 2022.

8. More revelations of the falsity regarding Avaya's solvency and internal controls came out on August 9, 2022. On that day, before the opening of trading, Avaya announced its determination of "substantial doubt about the Company's ability to continue as a going concern," a disclosure cutting against Defendants' prior statements about the viability of Avaya. The Company also stated that it would not timely file its financial statements for the quarter ended June 30, 2022, and that its Audit Committee commenced two separate internal investigations into the circumstances surrounding the Company's financial results for the third-quarter and matters raised by a whistleblower.

9. On this news, Avaya's stock price fell another 45%, from its close of $1.12 per share on August 8, 2022 to a closing price of $0.61 per share on August 9, 2022.

10. Before the market opened on November 30, 2022, and just weeks after McGrath stepped down from his position as CFO, Avaya disclosed additional deficiencies with its internal controls over financial reporting, and subsequent inability to finalize its financial statements. Specifically, Avaya revealed that the Board's ongoing investigation had uncovered that "the existence of [a whistleblower's] email and the subsequent internal investigation were not included in the [Company's] whistleblower log or communicated to certain members of management and the Company's independent registered public accounting firm." The 8-K warned that more material weaknesses could be uncovered, as the Audit Committee's investigations into the 3Q FY 22 earnings results and whistleblower letter had not yet concluded. Given its inability to file its annual report and audited financial statements, Avaya disclosed that it risked breaking covenants in the Company's financing agreements that audited financial statements should be provided to the lenders by end of the 2022.

11. On this news, Avaya's stock price approximately 14%, from its close of $1.12 per share on November 29, 2022 to a closing price of $0.96 per share on November 30, 2022.

12. Additional revelations exposing the true state of Avaya's precarious financial position came on December 13, 2022, when Avaya filed with the SEC financial disclosures that it had previously provided to certain of its lenders between October 2022 and December 2022 on a confidential basis in an effort to negotiate a settlement of Avaya's obligations with the lenders. The disclosures to the lenders revealed Avaya's sales were cratering and customer conversions were abysmal – which known trends are entirely consistent with the internal Avaya documents cited herein and the information provided by former Avaya employees demonstrating that such

issues were apparent to the Defendants during the Class Period. While Avaya indicated that talks with its lenders were ongoing, the Company warned that certain lenders were not supportive of an out-of-court settlement. Leaving no doubt as to where Avaya was headed, the *Wall Street Journal* reported on December 16, 2022 that Avaya was "nearing a chapter 11 bankruptcy filing to restructure its balance sheet as it looks to turn around its business and move past problems surrounding the company's accounting[.]"

13. On this news, Avaya's stock price fell 40%, from its close of $1.16 per share on December 12, 2022 to a closing price of $0.69 per share on December 13, 2022. The stock fell an additional 54% from its closing price of $0.52 per share on December 15, 2022 to $0.24 per share on December 16, 2022.

14. During the Class Period, Avaya stock price fell nearly 97% from its close of $7.53 on May 10, 2022 to its closing price of $0.24 per share on December 16, 2022, erasing nearly $613.5 million in market capitalization.



15. In the aftermath, Avaya declared Chapter 11 bankruptcy in February 2023. The Company emerged from its bankruptcy in May 2023 with a court-approved plan of reorganization allowing it to operate as a private company with over $700 million in new capital commitments. Avaya's common equity holders, on the other hand, were wiped out as the restructuring plan provided Avaya common stockholders with no recovery.

16. This action seeks to hold Defendants accountable for their wrongful acts and omissions that resulted in a precipitous decline in the market value of Avaya's securities and significant losses and damages suffered by Lead Plaintiff and members of the Class.

## II. JURISDICTION AND VENUE

17. This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). At all relevant times, Avaya listed its common stock on the NYSE, which is located in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. During the Class Period, Avaya maintained corporate offices at 1 Penn Plaza in New York City, where certain of its senior executives were based, including its Executive Vice President, Chief Administrative Officer and General Counsel Shefali Shah and its Global Vice President, Controller, and Chief Accounting Officer Kevin Speed.

20. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the NYSE.

## III. PARTIES

21. Lead Plaintiff Paul Sweatt, as set forth in the certification filed with this Court (ECF No. 25-1), purchased Avaya common stock during the Class Period and was damaged by Defendants' conduct alleged herein.

22. Defendant James M. Chirico, Jr. ("Chirico") was at all relevant times, until his termination on July 28, 2022, the CEO of Avaya and a member of its Board. During the Class Period, Chirico made materially false statements and omissions about the Company's business, operations, and prospects. Specifically, Chirico made materially false statements and omissions concerning the Company's public filings, investor presentations, and during conference calls. Chirico was also present when other Defendants made statements or omissions on these subjects without correcting them. Chirico executed certifications related to Avaya's false and misleading reports filed with the SEC, including the Form 10-Q filed on May 10, 2022. Chirico directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Chirico also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and authority, his ability to exercise power and influence over Avaya's conduct, and his access to material inside information about Avaya during the Class Period, Chirico, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

23. Defendant Kieran J. McGrath ("McGrath") was at all relevant times, until his announced retirement on November 7, 2022, the CFO of Avaya. During the Class Period, McGrath made materially false statements and omissions about the Company's business, operations, and prospects. Specifically, McGrath made materially false statements and omissions in the Company's public filings, investor presentations, and during conference calls. McGrath also was present when the other Defendants made statements or omissions on these subjects that he knew to be false or misleading, yet took no steps to correct those statements. McGrath executed certifications related to Avaya's false and misleading reports filed with the SEC, including the May 10, 2022 10-Q. McGrath directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. McGrath also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and authority, his ability to exercise power and influence over Avaya's conduct, and his access to material inside information about Avaya during the Class Period, McGrath, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

## IV. SUMMARY OF THE FRAUD

### A. Avaya's Transition From Hardware to the Cloud.

24. Avaya purported to be "a global leader in digital communications products, solutions and services for businesses of all sizes, delivering its technology predominantly through

software and services."[1] Avaya claimed its "global, experienced team of professionals delivers award-winning services from initial planning and design, to seamless implementation and integration, to ongoing managed operations, optimization, training, and support."[2] Along with hardware (*i.e.*, handsets, video conferencing units, and headsets) and professional services, Avaya offered its software services to customers through the cloud, on-premises, or a hybrid of both.[3]

25. During the Class Period, Avaya was in the midst of transforming from a traditional telecommunications hardware company into a software and services company.[4] Avaya had shifted its entire "comprehensive software portfolio to Avaya OneCloud," a cloud-based communications solution, which offered "significant capabilities across contact center (OneCloud CCaaS), unified communications and collaboration (OneCloud UCaaS), and communications platform as a service (OneCloud CPaaS)."[5] Through its OneCloud software, Avaya could offer organizations a "single app for all-channel calling, messaging, meetings, and team collaboration with the same ease of use as existing consumer apps."[6]

26. Avaya's growth strategy was predicated on OneCloud, as a "key focus[]" for the Company was "increasing our recurring revenue – revenue from products and services that are delivered pursuant to multi-period contracts, including recurring subscription-based software revenue, maintenance, global support services and enterprise cloud and managed services."[7] In

---

[1] *See* Avaya's Form 10-K dated November 22, 2021 for the period ended September 30, 2021 ("November 2021 10-K).

[2] *Id.*

[3] *Id.*

[4] *Id.* at 18.

[5] *Id.*

[6] *Id.*

[7] *Id.* at 6. In contrast, non-recurring revenue consisted of "hardware, non-recurring perpetual-based software and one-time professional services." *Id.*

fact, during fiscal 2021, Avaya introduced Avaya OneCloud ARR ("Annualized Recurring Revenue") as a key performance indicator, which per the Company "provides a leading indicator into the software solutions driving our growth."[8]

27. Defendants informed the market that its transition to Cloud was proceeding well. For example, on February 9, 2022, Avaya filed its Form 10-Q for the first quarter of fiscal year 2022. Along with the filing, the Company issued a press release with a statement from Defendant Chirico:

> Our transition to the cloud continues to gain strength as our Avaya OneCloud ARR grew by 137% year over year primarily driven by our enterprise segment and contact center solutions. . . . Market demand remains very strong, especially with large enterprises. This quarter, we yet again closed more than 100 deals with total contract value greater than $1 million. . . . [A]s we closed out the quarter, we landed one of the largest deals in our history, a $400 million OneCloud Public CCaaS deal with a large global financial services company.

28. Analyst reports reflected Chirico's confidence in the Company's transformation. A J.P. Morgan analyst report highlighted "a better than expected revenue mix heading into the back half of the year, which is supported by Avaya highlighting improving demand for OneCloud[.]"[9] Another analyst, Colliers Securities, noted in a March 16, 2022 report that after a discussion with Avaya's SVP of Strategic Operations, Dennis Kozak, "[w]e came away from the conversation more confident in the company's ability to execute on its strategy to migrate its legacy premise based customers over to a hybrid/public/private cloud model."[10]

---

[8] *Id.*

[9] J.P. Morgan, "Avaya, F1Q22 Review: Investors to be Wary of High Bar of Execution in 2H Despite Progress on Transformation" (February 9, 2022).

[10] Collier Securities, "Avaya Holdings Corp." (March 16, 2022).

**B. Avaya's Looming Debt Obligations Presented a Threat to the Company.**

29. During the Class Period, Avaya held a significant amount of debt that presented risks to the Company's ability to raise funds to support Avaya's transformation. As detailed in the November 2021 10-K, Avaya held $350 million of 2.25% convertible senior notes due June 15, 2023, as well as $1,000 million of 6.125% senior first lien notes due September 15, 2028.[11]

30. Analysts recognized the risk posed by the outstanding debt. For example, a Barclays report on May 10, 2022 noted "concern from investors on [Avaya's] convertible debt maturity next year."[12] A J.P. Morgan analyst observed that "liquidity considerations relative to repaying $350 mn of debt maturing in 2023 [would] drive investors to revisit the challenges for Avaya in the past and wait for a longer track record of growth before considering it structural."[13]

**C. On May 10, 2022, Defendants Highlight Third-Quarter and Year-End Guidance and Emphasize the Underlying "Strength" and "Momentum" of Avaya's Business to Set the Ground for Avaya's Financing Efforts.**

31. Given the looming debt maturity in June 2023, Defendants needed to paint a picture of Avaya's strong financial health and robust demand for its OneCloud software. To that end, on May 10, 2022, Avaya published a Form 8-K with the SEC (the "May 8-K") with a press release and investor presentation announcing the Company's fiscal Q2 2022 financial results, which included revenue of $716 million and Adjusted EBITDA of $145 million.[14] The May 8-K also provided guidance to investors and the public for Q3 2022 of $140-$150 million of Adjusted EBITDA and $685-$700 million of revenue, as well as full year 2022 revenue guidance of $2.815

[11] November 2021 10-K at 28.

[12] Barclays, "Avaya Holdings Corp, 2Q22: OneCloud Growth Gives and Takes Away" (May 10, 2022).

[13] J.P. Morgan, "Avaya, F2Q22 Review: 'Show-Me' Story That is Not Showing Up; Downgrade to UW" (May 11, 2022).

[14] *See* Exhibit 99.1 to May 8-K ("May 10, 2022 Press Release).

billion to $2.855 billion and Adjusted EBITDA guidance of $580 million to $600 million.[15] The May 8-K was signed by McGrath.[16]

32. Although the second-quarter financial results were below the Company's previously issued guidance, Defendants offered assurances that the Company was well-positioned to meet its 3Q 2022 guidance (and was therefore worthy of additional financing). For example, the May 8-K included a statement from Chirico that Avaya remained on track to achieve annual recurring revenue of $1 billion by the end of 2022 for OneCloud, Avaya's software product offering:

> We drove record growth for Avaya OneCloud ARR with a $130 million quarter over quarter increase and an over $400 million year over year increase, to $750 million. The path to hit the $1 billion ARR mark by the end of calendar year 2022 is well paved[.] . . . We are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud. Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business.

33. Similarly, an investor presentation included in the May 8-K included a slide touting Avaya as "A Different Company" and emphasized the Company's ability to "execute, reposition, [and] focus" to achieve "Growth and Relevance" in FY 2022[17]:

[15] *Id.*

[16] *See* May 8-K. May 8-K

[17] *See* Exhibit 99.2 to May 8-K ("May 10, 2022 Avaya Investor Presentation") at 6.




34. Another slide in the presentation highlighted the "[c]ontinued large deal activity" in the 2Q 2022[18]:

Continued large deal activity with 97 deals over $1 million, 18 over $5 million, 8 over $10 million and 2 over $25 million




[18] May 10, 2022 Avaya Investor Presentation at 22.

35. Chirico's comments during the earnings call echoed these sentiments, as he stated that Avaya was "successfully repositioning the company from our historic onetime revenue model to a recurring one," observed "[t]he path to hit $1 billion ARR mark by the end of the calendar year 2022 is well-paved," and noted that he had "increased confidence in the momentum of our business."[19]

36. Analyst reports following the earnings and guidance announcement highlighted the Company's business and growth strategy. For example, while Goldman Sachs acknowledged that "[m]argins remained under pressure due to lower revenue scale and continued supply chain impacts . . . the evidence here is actually positive for the transition of the company to recurring software sales." Goldman Sachs also noted that Avaya's "deal momentum" was "healthy."[20]

### D. Defendants Tout Avaya's "Tone at the Top Culture" and Internal Controls in the May 10, 2022 8-K and Earnings Call to Establish the Company as a Safe and Reliable Investment for Investors.

37. Along with showcasing Avaya's strong business foundation, Defendants emphasized Avaya's internal controls to assure investors (and potential debt holders) that Avaya, lead by Chirico and McGrath, could be trusted to conduct business appropriately and had proper processes and procedures to develop and execute on the Company's growth strategy and guidance.

38. To start, the investor presentation included in the May 10, 2022 8-K highlighted Avaya's "Tone at the Top Culture" and "Robust Risk Management Framework"[21]:

---

[19] *See* Q2 Earnings Call Transcript at 2, 4 (May 10, 2022).

[20] Goldman Sachs, "Avaya Holdings (AVYA): FQ2'22 Wrap: Acceleration in subscription momentum drives revenue guidance cut; ARR growth strong" (May 11, 2022).

[21] *See* May 10, 2022 Avaya Investor Presentation at 8.




39. "Tone at the top," commonly referred to in auditing, is a phrase used to reference the attitude of a company's management towards internal controls and ethics.[22] The phrase gained popularity through its use in the Sarbanes-Oxley (SOX) Act of 2002, passed in the wake of a number of highly publicized accounting scandals, such as Enron, WorldCom and Adelphia.[23] The "tone at the top" outlines that the management team should not merely pay "lip service" to compliance and upholding ethics, but embody those principles.[24] Management with appropriate "tone at the top" should be honest, show integrity, and uphold an ethically-correct corporate culture.[25]

40. A company's "tone at the top" is important to investors. A company with inappropriate "tone" is a company that is more likely to display unethical behavior, engage in

[22] *See* "Tone at the Top: The management and board of director's leadership and their commitment to being honest and ethical," (Corporate Finance Institute).

[23] *Id.*

[24] *Id.*

[25] *Id.*

fraudulent activities, and not support internal controls.[26] In instances where a company's management team disregards internal controls by not complying with a company's accounting or disclosure policies, employees, seeing this conduct, will likely tend to mimic senior management's behaviors.[27] This results in an organization that is more prone to engage in fraudulent activities, thereby increasing investment risk.[28] As stated in Strategic Finance, "[a] poor tone at the top is a strong predictor of aggressive or questionable financial reporting . . . If the tone at the top is at all suspect, a prudent investor will sell first and ask questions later or not even buy."[29]

41. To entice investors, during the May 10, 2022 earnings call, Defendants gave further assurances that the Company had proper procedures to provide accurate projections and its guidance could be trusted. Specifically, one analyst during the call questioned why Avaya could not have a "stable outlook" as the company transitioned to a "cloud-first sales approach."[30] In response, Chirico acknowledged the sentiment of "why haven't we done a better job in predicting . . . the acceleration to cloud and how [that is] affecting the overall revenue performance of the company."[31] Chirico went on to say that the cloud-based revenue was "ratable over the life of the contract and not point-in-time," which has led to "lower revenue attainment" and a "rebalancing of the [revenue] portfolio" as the Company "continue[d] to increase our overall recurring revenues as a percentage of the Avaya revenue profile."[32] To close, Chirico reassured the analyst that this

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* King, Alfred M, CMA, CFM. Strategic Finance; Montvale Vol. 94, Iss. 9, (Mar 2013): 25-31.

[30] *See* Q2 Earnings Call Transcript at 8 (May 10, 2022).

[31] *Id.*

[32] *Id.* at 8-9.

revenue was not "lost" but was "rebalanced" and "repositioned" in the "guidance update."[33] McGrath further reiterated that "we've had two quarters in a row now where we've seen lower realization rates, and that's what we've built into our model going forward," and that over time, "we'll see much more of our business become more ratable and less of these point-in-time fluctuations."[34]

42. Finally, to avoid any doubt on the propriety of Avaya's internal controls, the Form 10-Q for the period ended on March 31, 2022, filed on May 10, 2022 (the "May 10-Q"), included Chirico and McGrath's conclusion – based on their own evaluation – that the "Company's disclosure controls and procedures were effective as of March 31, 2022[.]"[35] Chirico and McGrath also certified the Form 10-Q.[36] [37]

### E. In Advance of Seeking Additional Financing, Defendants Assuage Concerns Regarding Avaya's Debt in May and June 2022 and Continue to Tout the Strength of the Company's Business.

43. In May and June 2022, Defendants made repeated efforts to downplay Avaya's debt holdings and instead focused on efforts to address the debt and the Company's long-term viability.

44. For example, in the May 2022 Form 10-Q, Avaya disclosed that its "existing cash and cash equivalents and borrowings available under the ABL Credit Agreement will be sufficient to meet our future cash requirements for at least the next twelve months from the filing of this

---

[33] *Id.* at 9.

[34] *Id.*

[35] *See* May 10-Q at 43.

[36] *See* Exhibit 31.1 to May 10-Q.

[37] *See* Exhibit. 31.2 to May 10-Q.

quarterly report on Form 10-Q."[38] In other words, there were no concerns that the Company would be insolvent in the following twelve months.

45. Chirico's comments during the earnings call on May 10, 2022 further emphasized Avaya's long-term stability: "we continue to focus on the long game, investing in growth drivers and doing so profitably."[39] Near the close of his prepared remarks, Chirico stated his "excite[ment] about Avaya's future" and the "team's ability to deliver on the opportunity in front of us."[40]

46. Regarding Avaya's cash flow from operations, McGrath added during the earnings call that the Company had taken steps to "strengthen our capital structure and enhance our financial flexibility," along with "currently evaluating options to boost liquidity and to address the convertible notes" coming due in June 2023.[41] In response to an analyst question regarding the convertible notes, McGrath reiterated that the Company was working with its "banking colleagues" and expected that Avaya would be "able to address the prepayment of the convert" in the next several months.[42]

47. During a June 3, 2022 "Fireside Chat" with Barclays, McGrath further addressed the convertible debt coming due in June 2023. McGrath noted that the best option would be a $450-$500 million term loan add-on, which would "provid[e] additional liquidity beyond the $350

---

[38] *See* May 10-Q at 6.

[39] *See* Q2 Earnings Call Transcript at 4 (May 10, 2022).

[40] *Id.* at 6.

[41] *Id.* at 5.

[42] *Id.* at 8.

mil. due."[43] The Barclays note stated that "removing the convert overhang (without dilution) would be a positive for the equity."[44]

48. On June 8, 2022, Avaya filed a Form 8-K, signed by McGrath, announcing that it had "launched a financing . . . seeking to raise $500.0 million aggregate principal amount of new secured debt, which will be used to prefund the refinancing of the Company's existing $350.0 million of 2.25% Convertibles Notes due June 15, 2023 and for general corporate purposes."[45] The announcement also stated that "[i]n connection with the Financing, Avaya Inc. shared a presentation with potential lenders, which presentation is available on the Company's investor relations website," and that the "forecasts included in the lender presentation replace the prior guidance provided on December 14, 2021."[46]

49. In the June 8, 2022 presentation, Defendants provided annual guidance that was entirely on track with the guidance provided on May 10, 2022.[47]

---

[43] Barclays, "Avaya Holdings Corp, Takeaways from Fireside Chat with AVYA's CFO & Treasurer" (June 3, 2022).

[44] *Id.*

[45] *See* June 8, 2022 Form 8K.

[46] *Id.*

[47] *See* Q2 Earnings Call Transcript at 5 (May 10, 2022) ("Turning to revenue, we expect full-year revenue to be between $2.815 billion and $2.855 billion. This has year-on-year revenue declining between minus 5% and minus 4% on an as reported basis and down minus 4% to minus 3% on a constant currency basis.").




50. As support for its annual guidance, the June 8, 2022 presentation touted the "Positive Shift of Installed Base Seats to OneCloud" and noted that currently only "~12% of Seat Base [was] on OneCloud." Thus, Defendants conveyed the impression to investors that Avaya had a viable path to succeed in its transformation to a cloud company, as a significant percentage of its installed base could purportedly transition to its subscription-based OneCloud platform.



### F. Defendants' Efforts to Portray Avaya as a Strong, Accountable, Long-Term Company Pay Off, as the Company Secured $600 Million in Financing Commitments.

51. Defendants' efforts to convince investors of Avaya's strong financial health, sustainable business model, and ethical leadership by Chirico and McGrath paid off, as Avaya on June 27, 2022 announced $600 million in aggregate financing commitments.[48]

52. The press release stated that the previously announced offering size of $500 million was raised "due to increased demand."[49] The press release quoted McGrath, who stated that "[t]his funding supports and accelerates our business model transformation and addresses our convertible notes maturing in June of next year."[50]

53. As detailed in a case filed in North Carolina Superior Court by lenders who purchased the convertible notes issued by Avaya in June 2022, Defendants successfully raised this financing by telling lenders the Company was on track to meet guidance. Specifically, in private conversations with the lenders in June 2022, McGrath reiterated Avaya's publicly disclosed guidance, stated that the Company remained on track to achieve $1 billion ARR for OneCloud, noted Avaya just completed its two strongest quarters on subscription signings, and explained that the second half of the year should see a 3% improvement in EBITDA margins, among other statements detailing his confidence in Avaya's business and improving financial position.[51]

---

[48] *See* Business Wire, "Avaya Announces $600M Financing" (June 27, 2022).

[49] *Id.*

[50] *Id.*

[51] Complaint ¶¶ 54-60, *Brigade Calvary Fund Ltd., et al. v. James M. Chirico Jr. and Kieran J. McGrath*, Case No. 23-cv-031948-590 (N.C. Super. Ct., Mecklenburg Cty., October 26, 2023) ("*Brigade Calvary*").

## G. Internal Avaya Documents from April-June 2022 Show that Defendants Knew the Guidance Numbers Were Inflated and Not Supported by the Current State of Avaya's Business and Avaya's "Tone at the Top Culture" Was Non-Existent.

54. As shown through internal Avaya documents disclosed in separate cases filed in North Carolina Superior Court, Defendants ignored warnings by other Avaya executives and employees that the rosy financial projections and public pronouncements of "strength" and "momentum" of the Company's business were not supported by the current state of Avaya's business. Despite these warnings, Defendants knowingly touted Avaya's strong foundation and its ability to execute on its growth strategy and continue as a viable company.

55. For example, one month before Defendants announced the 3Q FY 22 guidance, members of Avaya's finance team were concerned about inflated projections. On April 11, 2022, the Senior Director of Sales Finance emailed Stephen Spears, the Executive Vice President and Chief Revenue Officer, as well as others on the Avaya finance team, about his efforts to revise the "bookings" projections down to a "more realistic starting point."[52]

**From:** [redacted]@avaya.com>
**Date:** Monday, April 11, 2022 at 10:54 AM
**To:** Spears, Stephen D (Stephen) <sspears@avaya.com>, [redacted]@avaya.com>
**Cc:** [redacted]@avaya.com>, [redacted]@avaya.com>
**Subject:** Initial Q3'22 OL

Stephen,

In lieu of having a bookings OL from the sales field as discussed on Friday afternoon's call (outside of impacting the [redacted] seats down from 55/85K in Q3/4 respectively to 50/65K), I had a follow up with [redacted] later on Friday to try and manage some of the other booking categories down to a more realistic starting point. The attached takes into account some of those high level adjusted booking assumptions (again, not a commitment or submission from the sales field or the ops leaders), some updates to the core #'s across services such as APS, core GSS and PCMS and the revised revenue judgment [redacted] communicated as the starting points for Q3 to chase.

[52] *See Brigade Calvary* Complaint ¶ 73.

56. In the April 11, 2022 email, the Senior Director of Sales Finance told Spears that the "right starting point" for third-quarter North American revenue would be $415 million, not the then-current $451 million projection.[53] Even then, the $415 million projection was still "scary" because it reflected "big ticket changes" and $45.5 million of so-called "revenue judgment" that optimistically assumed the Company could generate new business and other revenue.[54]

> The number of **415M** for Q3 revenue inclusive of 45.5M in revenue judgment (detailed below) is scary but I believe the right starting point for us to build back to where you need/want to be through the set of actions items resulting from the off-site this week. The 415M compares to the 451M previously carried. The big ticket changes for Q3 from a March OL compare are:
>
> - [redacted] revenue down 5.7M for move to 50K seats from 65K and drop in stock price to $120 from $190
> - 14M product BTR drop across all 3 channels coming off an equal booking drop
> - 8M reduction in APS revenue from lower H1 booking and revised linearity assumption
> - 4M impact to Q3 sub x revenue driven by a drop in sub x tcv from 188.2M to 180M
> - 3M reduction to previously assumed core GSS coming off revised expected run rate impact from Q2 deals
> - 1.5M reduction assumption in new OCP revenue assumption based on early schedule (still TBD)
>
> […]
>
> **Third**: The revised revenue judgment pool reviewed with [redacted] on Friday afternoon resulted in 45.5M of judgment included in that Q2#:
>
> - 10M for add'l [redacted]
> - 10M for increased [redacted] contribution; 28.9M in the core revenue call plus 10M in upside
> - 10M for [redacted] upgrade initiative (10M is above the core 17M [redacted] revenue which dropped from 54M in Q2)
>
> - 10M for the proposed bulk sub x seat pre-buy for [redacted]
> - 2M for accelerated OCP activations
> - 2.2M APS revenue coming off new sales team creation
> - 1.3M of revenue coming from other sources, tbd

[53] *Id.*, ¶ 74. Upon information and belief, Lead Plaintiff understands the revenue projection figures referred to in the internal Avaya documents to be for North American revenue.

[54] *Id.*

57. In response, Spears agreed that the Company's projections were inflated. Notably, Spears said he would "raise" this issue to a "much smaller audience," which likely included senior management like Chirico and McGrath.[55]

**From:** Spears, Stephen D (Stephen) <sspears@avaya.com>
**Sent:** Monday, April 11, 2022 11:13 AM
**To:** [redacted]@avaya.com>; [redacted]@avaya.com>
**Cc:** [redacted]@avaya.com>; [redacted]
<[redacted]@avaya.com>
**Subject:** Re: Initial Q3'22 OL

Thanks for this [redacted]. Given the very broad audience here, I wont share the 415 in this meeting. [redacted] had given me a back of the napkin of 438-440 over the weekend. I believe your adjustments and concerns are spot on, but I will need to raise this in the much smaller audience…

Stephen

58. Indeed, the internal Avaya emails demonstrate that Chirico and McGrath received information conveying doubts surrounding the Company's third-quarter revenue projections. On May 11, 2022, the day after Avaya announced its guidance, the Senior Director of Sales Finance told the Global Vice President of Financial Planning and Analysis and the Vice President of Sales Finance:

> "I reiterated to [the former Global Vice President of Sales Operations] again yesterday that ***80M of judgment in Q3 i[s] not acceptable.*** It did not change anything (he said he knows but it is what it is). . . . I need help with Stephen/[the Global Vice President of Sales Operations] to ***have someone better than me speak with them on why the 80M is unacceptable and drive a change*** (this goes for both revenue and ICE). I am not getting through, not even getting a meeting or time with Stephen[.]."

The frustrated Senior Director of Finance went on to ask how his team was struggling to convince senior management to change Avaya's projections even though "***everyone knows we should not load 430M with 80M of revenue judgment in Q3***."[56]

[55] *Id.*, ¶ 75. *See also infra*, ¶¶ 85-88 (detailing Chirico and McGrath's access to revenue information and participation in meetings where such issues were discussed).

[56] *Id.*, ¶ 76.

59. Hours later, the Global Vice President of Financial Planning and Analysis followed up, and ***confirmed that Chirico (referred to as "Jim" in the email) received information showing that the $430 million projection rested on shaky assumptions***. The Global Vice President of Financial Planning and Analysis was "not sure how to proceed."[57]

**From:** [redacted]@avaya.com>
**Sent:** Wednesday, May 11, 2022 5:58 PM
**To:** [redacted]@avaya.com>; [redacted]
<[redacted]@avaya.com>
**Subject:** RE: Before our May OL

[redacted] I really need your guidance on next steps here. The walk to $430M was identified and shared with Stephen and [redacted] – and ultimately made its way to Jim: we can choose to align to this…very specifically: put the $10M from [redacted] to the "NW" line, the [redacted] 50K to the [redacted] line, the Product upsides to Product, the [redacted] 2.7M to product, the [redacted] $1.8M to APS, the [redacted] PIT upside to the Subscription line, etc. But we made a conscious effort to not do that, and instead, plug to "Other/Judge". I'm trying to understand this…is this our way of saying "I don't believe we'll get any of this upside?" If so, then why the plug to $430M? I am just not sure how to proceed with this OL. Please advise.

60. In response, the Vice President of Sales Finance said she agreed with the Global Vice President of Financial Planning and Analysis, and would "try to get alignment with Stephen." She also described the revenue projection – which made its way to Chirico and was presumably baked into the guidance delivered the prior day – as "***impossible***" to achieve and was not "***right***" based on "***current visibility***."[58]

---

[57] *Id.*, ¶ 77.

[58] *Id.*, ¶ 78.

**From:** [redacted][/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F0003F3FAA214337ABE35F0D1BA82583-[redacted]
**Sent:** Wed 5/11/2022 10:12:46 AM (UTC-04:00)
**To:** [redacted]@avaya.com]; [redacted]@avaya.com]
**Subject:** RE: Before our May OL

Hi [redacted], I am writing a response and saw yours.... fully understand your point, especially as it relates to the revenue assumption by LOB, vs ICE assumptions. ( and I cannot disagree at all).
At the same time, I fully appreciate [redacted]'s points as we are unfortunately not getting a firm answer on how (if even possible), we will be covering the gap.

Here is my suggestion and I will document it to Stephen/[redacted], and execute accordingly.

1. Agree with Stephen to lower the $430M (at least from an OL perspective; we can continue to drive the team to $430M) down to realistic number; as the $430M at this stage, with the current visibility we have is impossible. ( yes, I am afraid at this stage, the answer is : we do not believe that this number is right).
2. Assuming we are successful in agreeing to a lower number, we will assign the split by LOB.
3. Assuming we are keeping the $430M, we will still go ahead and assign a gap to each LOB ( this will surely complicate the way we address the gap, as the gap would be housed in almost every line item).
   a. Regardless, I get your point, we will assign the same and the relevant ICE impact.

I will try again to get alignment with Stephen and revert back asap.

[redacted]

61. The foregoing emails demonstrate that by May 10, 2022, when Chirico and McGrath discussed the publicly disclosed 3Q FY 22 guidance, they knew certain revenue projections were based on dubious assumptions. Avaya's internal emails show that concerns were raised as early April 11, 2022, "everyone kn[ew] that [Avaya] should not load 430M with 80M of revenue judgment in Q3," and in the case of Chirico, the reasoning behind the $430 million revenue figure – that was "impossible" to achieve – "ultimately made its way" to him. The notion that McGrath received information concerning the revenue projections is further corroborated by CW-1 and CW-2, who provided accounts of McGrath's attendance at sales team meetings where such

issues were discussed and McGrath's access to revenue information. *See infra*, ¶¶ 85-88. It is also highly unlikely, given his position as CFO and overseeing the work of Avaya's finance department, that McGrath would not receive the same information as Chirico regarding Avaya's revenue projections.

62. Regardless, subsequent internal emails demonstrate Chirico was fully aware how the third quarter was progressing and its potential impact on Avaya's business and future prospects. These emails, moreover, illustrate the "improper" tone at the top through "a corporate culture characterized by significant pressure to meet aggressive sales projections" uncovered by the Audit Committee after its investigations. *See infra*, ¶ 123. For example, on June 4, 2022, Chirico sent an email to Spears and others stating that, "***simply put, we can't afford to miss Q3***."[59] Ignoring prior warnings that the revenue projections would be "impossible" to meet, Chirico demanded revenue be found whether it existed or not. For example, Chirico wrote that "[w]e are at 29m in [TCV] bookings and ***need to be [at] 160***," and that a "list of [bulk deals] ***must equal 30m dollars of revenue***."[60] Later, on June 12, 2022, Chirico again told Spears and others that recent revenue projections were "***clearly not good at all***," and that the "***number for [North American revenue] must be 420***."[61] Per Chirico, a revenue number of "***404 (which know [sic] appears to be a stretch) doesn't get it done***."[62]

63. When Chirico wrote that the revenue projections were "clearly not good at all," Avaya had already announced on June 8, 2022 that it was seeking to raise $500 million in secured

---

[59] First Amended Complaint ¶ 65, *Alcof III Nubt, L.P., et al v. James M. Chirico, Jr., Kieran McGrath, and Stephen D. Spears*, Case No. 23-CV-031985-590 (N.C. Super. Ct. Mecklenburg Cty. Mar. 22, 2024) ("*Alcof III*").

[60] *Id.*

[61] *Id.*

[62] *Id.*

debt. Avaya's investor presentation as part of this financing effort detailed revenue and EBITDA guidance in line with the figures provided on May 10, 2022.[63] Such guidance was clearly at odds with Chirico's pessimistic view of revenue guidance at this time.

64. Internal Avaya documents also show that McGrath knew the Company was unlikely to meet its 3Q FY 22 revenue guidance. In advance of a Board meeting on June 7, 2022, Spears was preparing a financial update for the Board.[64] As part of that update, McGrath told Spears that Avaya needed to acknowledge risk around its $700 million revenue projection for the third quarter, with $430 million of that coming from North American sales.[65] Ultimately, Spears sent an email to the Board on June 7, 2022 acknowledging that "***North America [had] experienced an unusually slow start to the quarter***" and lowered the projected North American revenue to $410 million.[66]

65. Like Chirico, McGrath knew that Avaya risked not meeting its revenue projections for the third quarter. Yet despite McGrath's knowledge, Avaya still marketed its financing efforts beginning on June 8, 2022 with full-year revenue projections in line with the guidance announced on May 10, 2022.

66. On June 14, 2022, a little less than one week after Avaya announced its financing efforts and provided potential lenders with unachievable revenue projections, the Vice President of Sales Finance sent the Vice President of Quote-to-Cash and Global Business Operations and the Director of Global Revenue ("Revenue Director") an update on third-quarter revenue. In response, the Revenue Director said it looked "***like another tight quarter running to the wire with***

[63] *See supra*, ¶ 49.

[64] *See Brigade Calvary* Complaint ¶ 80.

[65] *Id.*

[66] *Id.*

***high volume at the end***." The Vice President of Sale Finance wrote back that "***[t]ight is an understatement***."[67]

**From:** [redacted]@avaya.com>
**Sent:** Tuesday, June 14, 2022 4:47 AM
**To:** [redacted]@avaya.com>
**Subject:** RE: week 9 commit

Tight is an understatement [redacted]... ☹

67. The Revenue Director observed that it "***looks like the numbers still don't add all up***," and that "***another miracle quarter***" would be needed to achieve the numbers.[68]

**From:** [redacted]@avaya.com>
**Sent:** Tuesday, June 14, 2022 12:55 PM
**To:** [redacted]@avaya.com>
**Subject:** RE: week 9 commit

I know [redacted]. I also talked with [redacted] & [redacted], and it looks like the numbers still don't add all up, so hopefully another miracle quarter. I don't think we can afford to miss another quarter like Q1 & Q2.

68. In response, the Vice President of Sales Finance noted that the third-quarter results were even worse than the Revenue Director expected, and that Avaya would need "***more than one miracle***" to close the "***quite substantial***" gap and meet the guidance.[69]

[67] *Id.*, ¶ 81.

[68] *Id.*, ¶ 82.

[69] *Id.*, ¶ 83.

| | |
|---|---|
| **From:** | [redacted][/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F0003F3FAA214337ABE35F0D1 BA82583[redacted] |
| **Sent:** | Tue 6/14/2022 6:26:24 AM (UTC-04:00) |
| **To:** | [redacted]@avaya.com] |
| **Subject:** | RE: week 9 commit |

I hate to be the bearer of bad news[redacted], but the delta requires more than one miracle.. We will keep pushing, but the gap is quite substantial.

69. The last day of Avaya's third quarter was June 30, 2022. By that day, the Senior Director of Sales Finance estimated that third-quarter North American revenue would be about $350 million, down from the $410 million that had been provided to the Board per McGrath's instruction.[70] Therefore, Avaya's May 10, 2022 guidance was overstated by $60 million at a minimum, and that assumed Avaya met its targets in every other sales market. McGrath received this estimate from the Senior Director of Finance.[71]

70. The next day, July 1, 2022, the Global Vice President of Financial Planning and Analysis, the Vice President of Sales Finance, and another Avaya employee received a report indicating that third-quarter gross revenue was only $604 million.[72] This figure was down from the $685-700 million figure Avaya had announced to the investing public on May 10, 2022, and was well below where Avaya needed to be in order to achieve its revenue guidance for the full year, a projection it gave when soliciting additional secure debt financing in June 2022.

---

[70] *Id.*, ¶ 84.

[71] *Id.*

[72] *Id.*

### H. At the End of the Third Quarter, Chirico Decides Not to Update the Board About the Earnings Miss.

71. On or about July 1, 2022, Chirico directed Spears to draft an email to the Board about an earnings miss based on the then currently available information about Avaya's financial performance. Spears sent Chirico a draft communication to the Board which would come from Spears, which stated in part:

> ***I am writing to let you know that we had a significant fallout across the globe that will prevent us from achieving the objectives or prognosis I shared just a few short weeks ago. I am clearly disappointed, and I take accountability for the challenges in execution, as well as those shortfalls*** that are the result of organizational shifts and recent changes to the GTM. I am fully cognizant of the strain caused by our inability to execute, and will look to you for further guidance on the how we alter the course ahead. I would like to report on four major categories of the business and its impact upon the qtr. …
>
> ***We saw significant gaps in execution and leadership.…***
>
> We saw significant and direct fall out in our International and Latin America businesses ***as a result of questions around our liquidity***. …
>
> ***We witnessed unprecedented aggravation from the channel in Q3. This is a result of at least two major factors. 1) accelerated shifts to the cloud are leaving our partners out of future revenue streams. 2) changes to product mix, and continued erosion of hardware is changing partnering behavior.***[73]

72. Chirico knew that Avaya's actual financial results for the third quarter would be lower than its public projections. Yet, he hid this fact from the Board, investors, and the lenders the Company depended on for its survival, and did nothing to correct these false statements. Spears' draft email was never sent, and the Board, investors, and lenders did not receive any other notification regarding the Company's under performance.[74]

[73] *Id.*, ¶ 85.

[74] *Id.*, ¶ 86.

### I. A July 2022 Whistleblower Complaint Implicates Chirico and McGrath and Calls the Transition to a Subscription Model a "Blatant Financial Ploy."

73. On July 3, 2022, Avaya's Board, including Chirico, received an email from an anonymous whistleblower alleging fraud by senior management.[75] The whistleblower was a "senior and longtime employee of Avaya" who felt compelled "to bring [] attention to the dire situation Avaya is in for the past 6 quarters."[76] While the whistleblower considered first alerting Avaya's compliance team, the whistleblower "kn[ew] that [any message] will get swept under the carpet by one of Jim [Chirico's] . . . goons" so the whistleblower instead emailed Avaya's Board.[77]

74. The whistleblower email called McGrath "***one of the most overpaid and overrated CFOs in the industry, [whose] only forte is coming up with lies and fabrications in front of the street and the analysts***."[78]

75. The whistleblower further claimed that "the story of [the Company's transition to a] subscription" revenue model was "***a blatant financial engineering ploy that bought [Chirico] time while fooling no one from the analyst community***, and at the same time [Chirico] and his executives totally failed in all of their investments in R&D and products to deliver the streams that cover for the dip in revenue, hoping that the fake EBITDA numbers will buy time to sell the company."[79] The whistleblower also raised concerns about conflicted transactions involving Chirico, Spears being "the laughing stock of the company" due to hiring mishaps under his watch, and "Jim [Chirico] and his mafia."[80]

---

[75] *Alcof III* Complaint, ¶ 83.

[76] *Id.*

[77] *Id.*

[78] *See Brigade Calvary* Complaint ¶ 87.

[79] *Id.*

[80] *Alcof III* Complaint, ¶ 85.

76. Management responded to the whistleblower email by assuring that the allegations would be investigated.[81] The whistleblower responded on July 10, 2022: "The consensus [among employees] is that, despite all of the massive problems and issues, the shameless 4 [presumably including Chirico and McGrath] continue to live in denial while arrogantly keep bullying their way thru."[82]

### J. Former Employees of Avaya Corroborate the Company's Unsustainable Business Model Related to Subscription Revenue.

77. Reliable former employees of Avaya provided first-hand accounts of Avaya's unsustainable business model with subscription revenue. The accounts from CW-1 and CW-2 are consistent with the results from the Audit Committee investigation into the circumstances behind the third-quarter financial results, which found that there was "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model." *See infra*, ¶ 125. CW-2 also describes an environment within Avaya consistent with the Audit Committee's finding that Avaya's culture was "characterized by significant pressure to meet aggressive sales projections." *Id.*, ¶ 123.

78. CW-1 was a manager who ensured the accurate booking of revenue and revenue recognition and reported to a finance director. CW-1 described how Avaya was recognizing a significant portion of revenue upfront for "new" contracts signed with existing customers who were enticed through steep discounts to cancel their existing "maintenance" contracts during 2021 and early 2022 and sign upgraded software subscription contracts. CW-1 estimated that the discounts for existing contracts were about 50 percent. CW-1 stated that new contracts were signed

---

[81] *See Brigade Calvary* Complaint ¶ 87.

[82] *Id.*

at higher monthly rates than the existing contracts, which represented an increase in revenue to Avaya.

79. Per CW-1, Avaya's revenues got a one-time boost during a quarter when the Company recognized a large portion of the new contract upon signing. This one-time boost, however, meant that Avaya could not project revenue into future quarters consistent with the boosted revenue numbers. Specifically, once Avaya recognized a large portion of revenue upon a contract signing, the recognizable revenue for those contracts would drop significantly to a pro rata amount each month over the life of the contracts.

80. Another former Avaya Regional Sales Leader, CW-2, further elaborated on the "house of cards" upon which Avaya's subscription business relied. CW-2 was a frontline regional sales manager of a team of individual salespeople focused on transitioning existing customers from perpetual software license contracts to software subscription contracts. CW-2 left Avaya immediately before the Class Period in April 2022.

81. CW-2 confirmed that sales personnel felt intense pressure to transition existing customers from perpetual software license agreements to software-as-a-subscription contracts in recent years. Customers, however, would only agree to one-year subscription contracts, rejecting Avaya's contracts that had longer terms (*i.e.*, three years), because they were considering leaving the Company. Per CW-2, customers were "telling us in black and white, plainly telling us, I'm planning on leaving – why would I sign up for this [subscription contract]?"

82. During his time at Avaya, CW-2 participated in "deal desk" meetings. During these meetings, which sometimes took place twice a week, sales team members would request approval for steeper discounts or greater concessions for customers than they were normally permitted to

offer. CW-2 confirmed that McGrath often attended the “deal desk” meetings, while Chirico sometimes attended the meetings.

83. CW-2 said that Avaya sales managers recognized the “margins were shitty” on many of the deals that existing customers demanded before agreeing to switch to the software subscription model. During the “deal desk” meetings, senior sales managers conveyed to higher level sales leadership that the profit-shredding discounts and concessions were a “take it or leave it” situation if they wanted to close the deals and meet target numbers expected by Wall Street. Per CW-2, “[e]verybody would hold their nose and approve it.”

## K. Former Employees of Avaya Confirm Chirico’s and McGrath’s Access to Revenue Information.

84. Both CW-1 and CW-2 confirm that Chirico and McGrath had access to information tracking Avaya’s financial performance, including revenue. This information strongly indicates that the issues raised by the finance personnel in the internal Avaya emails described in ¶¶ 55-60 and 66-68 would have been known by McGrath and Chirico given their access to information regarding the state of Avaya’s sales and revenue.

85. Per CW-1, as Avaya approached the end of 3Q FY 22, the sales team met once a week to report on and discuss the status of contracts they hoped to close before the quarter ended. CW-1 stated that he attended sales meetings at the end of 3Q FY 22 where McGrath was also in attendance. During those meetings, sales leaders presented reports generated from Avaya’s internal salesforce.com database that showed all the contracts that had closed in the quarter and which remained open. “Usually, the reports were generated by region,” CW-1 said, and “each region has a target number.”

86. During these meetings, which McGrath sometimes attended, the sales team discussed their efforts to secure contracts before the end of the quarter and in some cases requested

approval for additional discounts for customers to entice them to close before the quarter ended. CW-1 also recalled discussions regarding how much revenue could be recognized for the quarter.

87. CW-2 also described the information available to Chirico and McGrath regarding Avaya's financial performance. Specifically, Area Sales Managers ("ASLs") met weekly with executives, including Chirico and McGrath, for revenue forecasting meetings. While CW-2 did not personally attend these meetings, he understood that ASLs would report on the deals in their territories that were expected to close and those that were pending. These discussions would have highlighted how close to or far off each territory was to its quarterly revenue targets as the quarter progressed.

88. CW-2 further detailed that McGrath had a "spreadsheet" that listed Avaya's existing customers who were still in perpetual license agreements and who were Avaya's targets for switching to subscription contracts. The spreadsheet also showed an expected conversion rate for those existing customers. By looking at the spreadsheet, McGrath would have been able to plainly see how many existing customers were left who could be converted to subscription contracts. Or as CW-2 put it, "[McGrath] knew what was left. That was part of the smoking gun. The math."

## L. The Truth Begins to Emerge in July 2022, when Avaya Announced the Departure of Chirico, the Dismal Third-Quarter Results, and "Significant Non-Cash Impairment Charges."

89. Defendants' misrepresentations to investors were partially revealed on July 28, 2022. That day, a press release revealed the truth of the actual state of Avaya's business and ability to execute on its growth strategy when the Company announced its preliminary Q3 2022 financial results, which fell well below the guidance announced on May 10, 2022. The press release stated, in relevant part:

> Based on the information currently available for the third quarter ended June 30, 2022, the company expects revenue to be between \$575 million and \$580 million, compared to guidance of \$685 million to \$700 million, and Adjusted EBITDA to be between \$50 million and \$55 million, compared to guidance of \$140 million to \$150 million.[83]

90. That same press release disclosed that Avaya was "also finalizing testing of its goodwill and intangible assets that is expected to result in significant non-cash impairment charges as of June 30, 2022," providing a far different picture regarding the state of Avaya's financial position then had been previously disclosed to investors.[84]

91. In a separate Form 8-K filed on July 28, 2022, the truth about Avaya's deficient internal controls began to emerge, when Avaya announced that Chirico was being "removed . . . from his role as President and Chief Executive Officer of the Company, effective August 1, 2022" and was "resigning from his role as a member of the Board."[85] Chirico would be replaced by Alan Masarek, the former CEO of Vonage Holdings Corp.[86] Avaya further disclosed in its announcement of the preliminary 3Q FY 22 results that the "company's prior financial guidance should no longer be relied upon," shattering any illusion that the Company had sufficient internal controls, including an appropriate "tone at the top" previously touted by Defendants.[87]

92. On this news, Avaya's stock price fell approximately 57%, or \$1.19 per share, from its close of \$2.09 per share on July 28, 2022 to a close of \$0.90 per share on July 29, 2022.

---

[83] Business Wire, "Avaya Announces Certain Preliminary Third Quarter Financial Results" (July 28, 2022).

[84] *Id.*

[85] *See* July 28, 2022 Form 8-K.

[86] *Id.*

[87] Business Wire, "Avaya Announces Certain Preliminary Third Quarter Financial Results" (July 28, 2022).

**M. More Truth Comes Out on August 9, 2022, when Avaya Confirmed its Dismal Third-Quarter Earnings, the Commencement of Two Separate Audit Committee Investigations, and Raised "Substantial Doubt About its Ability to Continue as a Going Concern."**

93. More truth correcting Defendants' misrepresentations were disclosed in a press release issued on August 9, 2022.

94. The Company confirmed that its 3Q FY 22 results were well below the previously issued guidance: Avaya had $577 million in revenue, compared to guidance of $685 million to $700 million, and EBITDA was $54 million, compared to guidance of $140 million to $150 million.[88] In discussing the results, new CEO Alan Masarek said the poor financial results "reflect[ed] operational and executional shortcomings," directly contradicting Chirico's statements from May 2022 of his "increased confidence in the momentum of [Avaya's] business" and confirming the accounts from the internal emails that the guidance was "impossible" to achieve.[89]

95. During the earnings call that same day, Masarek further addressed the "operational and executional shortcomings," and noted that he came to Avaya with "eyes wide open" because he "fundamentally believe[d] that we can fundamentally improve the performance going forward."[90] He cautioned, however, that the Company had "lots of work to do."[91]

96. Despite stating only three months earlier that the Company's "existing cash and cash equivalents and borrowings available under the ABL Credit Agreement will be sufficient to meet our future cash requirements for at least the next twelve months," the August 9, 2022 press

[88] *See* Exhibit 99.1 to August 9, 2022 8-K ("August 9, 2022 Press Release").

[89] *Id.*

[90] Q3 2022 Earnings Call Transcript at 4.

[91] *Id.*

release now confirmed that there was "substantial doubt about the Company's ability to continue as a going concern."[92] The press release cited uncertainty regarding its 2023 convertible notes, the decline in revenues during the third quarter, and the "negative impact of significant operating losses on the Company's cash balance in the year to date" as leading to Avaya's potential insolvency.[93] During the earnings call, Masarek underscored these statements, noting that "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities."[94]

97. Avaya further disclosed that the Audit Committee "has commenced an internal investigation to review the circumstances surrounding the Company's financial results" for the 3Q FY 22.[95] Acknowledging issues with the Company's previously hailed "tone at the top," Avaya announced that the Audit Committee had also commenced an internal investigation related to a "whistleblower letter."[96]

98. Given the ongoing Audit Committee investigations, the company would not timely file its Form 10-Q for the quarter ended June 30, 2022. Avaya's Form 12b-25 notification of late filing of the Form 10-Q repeated the announcements of the Audit Committee investigations into the 3Q FY 22 guidance and whistleblower letter.[97] The Form 12b-25 also disclosed that the Company was "reviewing matters related to potential material weaknesses in the Company's internal control over financial reporting with respect to the appropriate maintenance of its

[92] *See* August 9, 2022 Press Release.

[93] *Id.*

[94] *See* Q3 2022 Earnings Call Transcript at 2.

[95] *See* August 9, 2022 Press Release.

[96] *Id.*

[97] August 9, 2022 Form 12b-25.

whistleblower log and the proper dissemination of materials and correspondences related thereto to certain parties other than its Board of Directors."[98]

99. Echoing these concerns about Avaya's internal controls, Masarek said that "[m]oving forward, we need to accelerate our contract booking and corresponding revenue recognition assessment and recording so we can more quickly report guidance or more quickly report performance."[99] Masarek stated his belief that a "cultural revitalization" at Avaya was "necessary."[100]

100. On this news, Avaya's stock price fell another 45%, from its close of $1.12 per share on August 8, 2022 to a closing price of $0.61 per share on August 9, 2022.

### N. Despite the Company's Issues, Avaya's New CEO Paints a Rosy Picture in August 2022 and September 2022.

101. In August 2022 and September 2022, Avaya's new CEO, Alan Masarek, participated in multiple interviews and gave several public statements acknowledging the issues at Avaya while also emphasizing the Company's bright future even in the face of poor financial results, multiple Audit Committee investigations related to Avaya's internal controls, and "substantial doubt" that the Company could continue as a "going concern."

102. For example, in an August 15, 2022 interview with CRN, Masarek described wanting to join Avaya because he "always believed that Avaya's opportunity for future success is better than its past performance."[101] Alluding to the departure of Chirico, he described the "final

---

[98] *Id.*

[99] *See* Q3 2022 Earnings Call Transcript at 2.

[100] *Id.* at 3.

[101] CRN, "New CEO Masarek: 'Avaya's Opportunity for Future Success is Stronger Than its Past Performance" (August 15, 2022).

piece of the puzzle" to be a "cultural revitalization" which he believed was "necessary" at Avaya.[102]

103. On August 30, 2022, Masarek participated in an interview with UC Today News.[103] Masarek acknowledged the "financial upset" that led the Company to not file its 10-Q, but stated he was "confident" that the Company "would get through" those issues. Masarek described the events that would eventually lead to Avaya's bankruptcy as a "distracting set of noise" but reiterated that he came to Avaya because the assets were "remarkable" and "irreplaceable."




104. Weeks later, a September 13, 2022 tweet detailed Masarek's comment at the PCC Americas Conference that he did not see "Chapter 11" in Avaya's future and his belief that the Company had "adequate liquidity."[104]

[102] *Id.*

[103] A recording of the interview is available at https://www.youtube.com/watch?v=5XZg-59yjPE.

[104] *See* https://twitter.com/SteveForcum/status/1569684854358278147

**Steve Forcum** 🦇🦸
@SteveForcum
Follow

"Do I see Chapter 11 in our future? I do not. Do I believe that we have adequate liquidity? I do." @alanmasarek #AvayaPartner #PCCAmericas #ExperienceBuilders




8:50 AM · Sep 13, 2022

105. The Company would eventually enter bankruptcy in February 2023 (*see infra*, ¶ 132), although not before investors took Masarek's assurances to heart and continued to invest in a rapidly declining company.

**O. More Revelations Regarding Avaya's Deficient Internal Controls Come Out in November 2022.**

106. The truth regarding Avaya's deficient internal controls continued to dribble out in November 2022.

107. First, on November 7, 2022, Avaya announced that McGrath would retire as Executive Vice President and CFO. The Company characterized this "change[] to its executive

team" as part of its plan to "execut[e] on its transformation to subscription and cloud-delivered services."[105]

108. Then on November 30, 2022, Avaya issued a Form 8-K ("November 8-K") disclosing previously unknown material deficiencies in the Company's internal control over financial reporting ("ICFR").

109. The uncovering of these material weaknesses resulted from the Company's review of issues with the "appropriate maintenance of [Avaya's] whistleblower log and the proper dissemination of related information and materials."[106] The Form 8-K revealed additional details regarding this specific ICFR issue, noting that a member of the Board received an email prior to the filing of the 2021 Form 10-K in November 2021.[107] Upon receiving the email, the Board decided to perform an independent investigation assisted by outside counsel.[108] Although the investigation concluded the claims in the email were unsubstantiated, Avaya revealed "the Company did not appropriately log the email in accordance with the Company's whistleblower policy, nor did the Company convey to certain members of management or the Company's independent registered public accounting firm the existence of the email or the fact that the Board determined to undertake an independent investigation into the matter."[109]

110. Based on the "failure to appropriately communicate and log the email and related independent investigation," Avaya decided to "re-assess the effectiveness of its ICFR as of

[105] *See* Exhibit 99.1 to November 7, 2022 Form 8-K.

[106] *See* November 30, 2022 Form 8-K at 2.

[107] *Id.*

[108] *Id.*

[109] *Id.*

September 30, 2021" as reported in the November 2021 10-K.[110] Based on this reassessment of Avaya's ICFR:

> [M]anagement has determined that material weaknesses existed in its ICFR as the Company did not design and maintain effective controls related to the information and communication component of the COSO (Committee of Sponsoring Organizations of the Treadway Commission) framework. . . . More specifically, the Company did not design and maintain effective controls to ensure appropriate communication between certain functions within the Company. This material weakness contributed to an additional material weakness, that the Company did not design and maintain effective controls over the ethics and compliance program.[111]

111. To address these material weaknesses – which were later confirmed to relate to the Company's "tone at the top" (*see infra,* ¶ 124) – Avaya was developing a "remediation plan" that included the following:

> [B]roadening its policies and procedures related to appropriate maintenance of its whistleblower log and the proper dissemination of related information and materials, including those received by members of the Board, and providing additional and continuing training for employees and members of management to ensure information is appropriately communicated to all relevant personnel in connection with SEC filings and/or the preparation of our consolidated financial statements or other matters.[112]

112. In light of these material weaknesses, Avaya concluded that its "disclosure controls and procedures were not effective as of September 30, 2021, which continues to be the case."[113] Avaya, moreover, stated that Chirico and McGrath's assessment of ICFR included in the November 2021 10-K "should no longer be relied upon."[114]

113. These material weaknesses, however, were likely just the tip of the iceberg. The Form 8-K noted the other ongoing Audit Committee investigations related to the 3Q FY 22

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

guidance and whistleblower letter, which "may result in the conclusion that other material weaknesses exist in the Company's ICFR."[115] Since those investigations were "not yet complete" they could "identify additional material weaknesses or other matters."[116]

114. The Company's Form 12b-25, providing a late filing notification for the 2022 Form 10-K, similarly stated that the Audit Committee investigations "may also result in the conclusion by the Company that one or more material weaknesses exist in the Company's internal control over financial reporting in addition to those disclosed" in the November 2022 Form 8-K.[117]

115. On this news, Avaya's stock price fell approximately14%, from its close of $1.12 per share on November 29, 2022 to a closing price of $0.96 per share on November 30, 2022.

### P. In December 2022, the Market Learns that Avaya Will Likely Enter Chapter 11 Bankruptcy and the Causes of the Company's Third Quarter Earnings Miss.

116. On December 13, 2022, new disclosures further exposed the true state of Avaya's precarious financial position. That day, Avaya filed with the SEC financial disclosures that it had provided confidentially to certain of its lenders between October 2022 and December 2022 in an effort to negotiate a settlement of Avaya's obligations with the lenders.[118]

117. While Avaya indicated that talks with its lenders were ongoing, the Company warned that certain lenders were not supportive of an out-of-court settlement.[119] Leaving no doubt as to where Avaya was headed, the *Wall Street Journal* reported on December 16, 2022 that Avaya

---

[115] *Id.*

[116] *Id.*

[117] *See* November 30, 2022 Form 12b-25 at 2.

[118] *See* December 13, 2022 Form 8-K.

[119] *Id.*

was "nearing a chapter 11 bankruptcy filing to restructure its balance sheet as it looks to turn around its business and move past problems surrounding the company's accounting[.]"[120]

118. The December 13, 2022 SEC filing also revealed new information showing that Defendants' statements regarding the strength of Avaya's business and growth strategy were false. A presentation given to the lenders detailed, among other things, the Company's performance in the second half of 2022. On a slide with the heading "Q3 FY22 Commentary," Avaya detailed that its poor performance resulted from "[h]istorically low funnel (pipeline) conversion rates" that led to "lower Perpetual software revenue" and "[s]lower customer migration from maintenance to subscription coupled with shorter contract duration" that "negatively impacted recognizable revenue."[121] These disclosures align with the internal documents cited herein and the information provided by CW-1 and CW-2 that such issues were present at Avaya and apparent to the Defendants during the Class Period.

119. On this news, Avaya's stock price fell 40%, from its close of $1.16 per share on December 12, 2022 to a closing price of $0.69 per share on December 13, 2022. The stock fell an additional 54% from its closing price of $0.52 per share on December 15, 2022 to $0.24 per share on December 16, 2022.

### Q. Avaya Confirms Material Weaknesses in ICFR that Were Present During the Relevant Period and Directly Connected to the Conduct of Chirico and McGrath.

120. On February 10, 2023, Avaya filed a Form 12b-25 detailing the reasons why it could not timely file its Form 10-Q for the period ended December 31, 2022. The filing referenced the November 2022 Form 8-K, in which the Company "determined that material weaknesses

---

[120] Alexander Gladstone, et. al, "Avaya Veers Toward Bankruptcy Filing," WALL STREET JOURNAL (December 16, 2022).

[121] Exhibit 99.1 to December 13, 2022 Form 8-K at 30.

existed in its [ICFR] and that disclosure controls and procedures were not effective as of September 30, 2021, which continues to be the case."[122]

121. Specifically, Avaya revealed that it was "assessing a potential material weakness related to designing and maintaining an effective control environment and to the setting of an appropriate 'tone at the top.'"[123] Avaya stated it was "actively engaged in taking steps necessary to remediate the control deficiencies," including a commitment to "transform[] its culture to embrace transparency and open communication."[124] Crucially, Avaya identified the "remov[al] of James M. Chirico, Jr. as Chief Executive Officer" and McGrath "stepp[ing] down as Chief Financial Officer" as "personnel changes" related to its cultural transformation.[125]

122. On September 8, 2023, after significant delay, Avaya filed its Form 10-Q for the period ended December 31, 2022. The 10-Q detailed the results of the Audit Committee investigations. The investigation into the 3Q 2022 results identified "several contributing factors for the significant differences between the Company's forecasts and actual financial results for the third quarter of fiscal 2022."[126] The factors uncovered by the Audit Committee corroborate the facts and allegations supporting the claims cited herein that Chirico and McGrath knowingly made false and misleading statements during the Class Period.

123. First, the Audit Committee found that there was "[i]nappropriate tone at the top among certain members of senior management, which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment

---

[122] *See* February 10, 2023 Form 12b-25 at 2.

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] *See* September 8, 2023 Form 10-Q for period ended December 31, 2022 at 7.

of appropriate and open communication of significant matters throughout the organization and with others outside of the organization."[127]

124. Second, Avaya's inappropriate "tone at the top" contributed to "additional material weaknesses," including that "the Company did not design and maintain effective controls over the information and communication component of the Committee of Sponsoring Organizations of the Treadway Commission ('COSO') framework which led to an additional material weakness with respect to the ethics and compliance program." Specifically, "the Company did not maintain a complete and accurate whistleblower log and did not inform certain members of senior management and its external auditor about an investigation undertaken by a committee of the Board of Directors." [128]

125. Third, there was "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model."[129]

126. Fourth, Avaya had a "business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to accurately forecast revenue."[130]

127. Fifth, "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, which negatively influenced customer sentiment."[131]

---

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

128. Critically, the Form 10-Q detailed Avaya's "Remediation Plan" to address the control deficiencies. In relevant part, Avaya stated that it had "made the following enhancements to our internal control over financial reporting," and specifically identified the removal of Chirico and McGrath:

- On July 28, 2022, Avaya removed James M. Chirico, Jr. as Chief Executive Officer and appointed Alan B. Masarek as new Chief Executive Officer, effective August 1, 2022;
- It was determined that Stephen D. Spears would step down from his role as Chief Revenue Officer on October 18, 2022 and he departed the Company effective November 1, 2022;
- Kieran McGrath stepped down as Chief Financial Officer, effective November 9, 2022, and retired from the Company, effective December 1, 2022;
- Avaya appointed Rebecca A. Roof as Interim Chief Financial Officer, effective November 9, 2022, and on June 16, 2023, the Company appointed Amy O'Keefe as its Chief Financial Officer;
- Alan B. Masarek has held multiple 'All Hands' meetings with Avaya employees where he reinforces his expectations of an environment grounded in transparency;
- Alan B. Masarek has held executive coaching sessions with leadership team to align on effective communication and a culture that includes a safe environment for transparent communication; and
- Enhanced inquiries within the scope of internal management representation letters.[132]

129. The Form 10-Q further listed the following additional remediation activities, which appear to correct the internal control deficiencies caused by Chirico's and McGrath's conduct reflected in the internal documents and CW testimony discussed herein, including:

- Providing additional and continuing training for employees and members of management to ensure information is appropriately communicated to all relevant personnel in connection with SEC filings and/or the preparation of our consolidated financial statements or other matters.
- To ensure employees fully understand the Company's commitment to establishing and maintaining an effective control environment and appropriate tone at the top, management will continue to execute against a communications plan that includes the following:

[132] *Id.* at 61.

- Board level participation in messaging across the organization that reinforces a safe environment for raising concerns without fear of retaliation;
- Conducting in-depth special training courses for the Company's entire sales team and personnel involved in the forecasting process regarding the importance of the Company establishing and maintaining effective disclosure controls. Management intends to include these principles as an ongoing component of our new hire training and other on-going training courses; and
- Enhancement of future employee engagement surveys to monitor for negative indicators of tone at the top.[133]

130. Avaya also filed its late Form 10-K for the period ended September 30, 2022 on September 8, 2023. The 10-K repeated the above disclosures from the Form 10-Q.[134] Avaya confirmed that because of the material weaknesses, "management concluded that the Company did not maintain effective internal control over financial reporting as of September 30, 2022."[135]

131. The Form 10-K also confirmed the extent of Avaya's dismal performance in 2022. Avaya generated $2.490 billion in revenue, nearly $500 million less than the year before and well-below the full-year revenue guidance of $2.815 billion to $2.855 billion.[136] Avaya's ARR was also well below the $1 billion target, coming in at $896 million.[137]

### R. Avaya Declares Chapter 11 Bankruptcy in February 2023 and Emerges from Bankruptcy in May 2023.

132. On February 14, 2023, Avaya filed for Chapter 11 bankruptcy protection. *See generally In re: Avaya, Inc.*, No. 4:23-bk-90088 (MI) (Bankr. S.D. Tex.) (the "Bankr. Case"). Along with the filing of the bankruptcy case, Avaya filed a Chapter 11 plan of reorganization

---

[133] *Id.*

[134] *See* September 8, 2023 Form 10-K for period ended September 30, 2022 at 67-68, 136,

[135] *Id.* at 136.

[136] *Id.* at 5.

[137] *Id.* at 6.

(Bankr. Case ECF No. 325). On March 22, 2023, the bankruptcy court confirmed the plan and on May 1, 2023, Avaya emerged from bankruptcy. *See* Bankr. Case ECF No. 350.

133. Under the plan of reorganization approved by the Court, "Existing Avaya Interests" – meaning holders of Avaya's securities before the Company entered Chapter 11 – would "not receive any distribution" pursuant to the bankruptcy proceedings. *See* Bankr. Case ECF No. 350 at 91. In other words, the plan wiped out any interest held by common stock holders and they received no compensation from the Company in which they invested.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. The May 10, 2022 8-K Falsely Claimed Avaya Remained on Track to Meet its $1 Billion AAR Mark in 2022 and Misrepresented Avaya's Internal Governance.

134. The Class Period begins on May 10, 2022, when Avaya filed a Form 8-K. The Form 8-K included a press release announcing 2Q 2022 earnings and 3Q 2022 guidance. The press release quoted Chirico, who emphasized that the Company was successfully executing its transition to becoming a cloud-based company and that in light of new bookings it remained on track to achieve $1 billion ARR by the end of 2022 for OneCloud, Avaya's software product offering:

> We drove record growth for Avaya OneCloud ARR with a $130 million quarter over quarter increase and an over $400 million year over year increase, to $750 million. ***The path to hit the $1 billion ARR mark by the end of calendar year 2022 is well paved***," said Jim Chirico, President and CEO of Avaya. "***We are successfully repositioning the company from our historic one-time revenue model to a recurring one***, ***in fact 75% of our new bookings were Avaya OneCloud***. ***Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business.***

135. In an investor presentation filed under the Form 8-K, Defendants emphasized Avaya's "***Tone at the Top Culture***" and "***Robust Risk Management***" as key factors "***Enhancing Sustainable Value***" for the Company and its shareholders:




136. Another slide in the presentation highlighted the "***[c]ontinued large deal activity***" in 2Q 2022, a statement underscoring Defendants' claims that demand will remain strong and the Company had a robust pipeline:



137. Defendants' statements in the May 10, 2022 Form 8-K alleged in paragraphs 134-136 above were false and misleading. In truth, as discussed above and detailed in internal Avaya communications, Defendants knew at the time that they made the false and misleading statements that Avaya was not well-positioned to execute on its growth strategy and meet the 3Q FY 2022 guidance based on concerns raised internally by Avaya senior personnel. In addition, as corroborated by former Avaya employees, Avaya's business model of migrating legacy customers' maintenance contracts to subscription contracts allowed for a one-time boost of revenue, but meant that the Company could not project revenue into future quarters consistent with the boosted revenue numbers. Such subscription contracts, moreover, were short in duration and had poor margins given the variety of discounts and incentives Avaya had to offer to get legacy customers on a subscription contract. Furthermore, as uncovered by subsequent Audit Committee investigations, Defendants did not disclose to investors that Avaya senior management had inappropriate "tone at the top . . . which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters throughout the organization and with others outside of the organization"; and that Avaya had "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model" and a "business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to forecast revenue." These factors led to the departure of Chirico and McGrath as part of Avaya's "commit[ment] to transforming its culture to embrace transparency and open communication." As a result of the foregoing, Defendants' statements about Avaya's business and operations, management, and internal controls were materially misleading.

## B. The May 10, 2022 10-Q Falsely Affirmed Avaya's Disclosure Controls and Financial Health.

138. Avaya also filed a quarterly report on Form 10-Q on May 10, 2022, which reported on the Company's financial and operating results for the quarter ended March 31, 2022.

139. With respect to the Company's disclosure controls and procedures, the Form 10-Q stated Chirico and McGrath had evaluated Avaya's disclosure controls and procedures, and "[b]ased on this evaluation, the Company's disclosure controls and procedures were effective as of March 31, 2022":

> As of March 31, 2022, the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, that evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). ***Based on this evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of March 31, 2022 to provide reasonable assurance that information required to be disclosed by the Company in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (ii) accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.***

140. The Form 10-Q also discussed Avaya's cash position, and stated that the Company had sufficient "cash and cash equivalents . . . for at least the next twelve months" from the filing of the Form 10-Q:

> ***We believe that our existing cash and cash equivalents of $324 million as of March 31, 2022 and borrowings available under the ABL Credit Agreement will be sufficient to meet our future cash requirements for at least the next twelve months from the filing of this quarterly report on Form 10-Q.*** Our ability to meet these requirements will depend on our ability to generate cash in the future, which is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our cash flow from operations continues to be negatively impacted by our transition from an ownership model with an existing on-premise solution, to a usage model with our OneCloud portfolio.

> Customers purchasing a solution in our OneCloud portfolio generally pay cash over time rather than up front. ***We believe that our financial resources, along with appropriate management of discretionary expenses, will allow us to manage the temporary impacts of our business transformation, COVID-19 and the Russia/Ukraine conflict on our business operations, and specifically our liquidity, for the foreseeable future.*** We expect to seek incremental financing to fund the maturity of the $350 million Convertible 2.25% Senior Notes due June 15, 2023. There can be no assurance we will be able to obtain such financing on acceptable terms.

141. Appended to the May 10, 2022 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Chirico and McGrath, attesting that "[i]nformation contained in the [Q2 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

142. Defendants' statements in the May 10, 2022 Form 10-Q alleged in paragraphs 139-141 above were false and misleading. In truth, as uncovered by subsequent Audit Committee investigations, Defendants did not disclose to investors that Avaya senior management had inappropriate "tone at the top . . . which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters throughout the organization and with others outside of the organization." The Audit Committee further found that the inappropriate "tone at the top" contributed to "additional material weaknesses," including that "the Company did not design and maintain effective controls over the information and communication component of the Committee of Sponsoring Organizations of the Treadway Commission ('COSO') framework," including that "the Company did not maintain a complete and accurate whistleblower log and did not inform certain members of senior management and its external auditor about an investigation undertaken by a committee of the Board of Directors." These material weaknesses led to the departure of Chirico and McGrath as part of Avaya's "commit[ment] to transforming its culture to embrace transparency and open communication." Moreover, Defendants certified a statement that

the Company would remain solvent through the end of 2022 with the knowledge that due to the state of Avaya's business, it would be "impossible" to meet the 3Q FY 2022 guidance. Months later, in August 2022, Avaya disclosed "substantial doubt" about "its ability to continue as a going concern" and new CEO Masarek conceded "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." The Audit Committee investigation also found that "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, [] negatively influenced customer sentiment." As a result of the foregoing, Defendants' statements about Avaya's business and operations, management, and internal controls were materially misleading.

### C. Defendants' False Statements at the May 10, 2022 Earnings Call Misled Investors About the Progress of Avaya's Transformation to the Cloud.

143. Avaya also hosted an earnings call on May 10, 2022. In his opening comments, Chirico described how Avaya's team had "continue[d] to exceed expectations in implementing and driving the strategy we've laid out" and the "path to hit $1 billion ARR mark by the end of the calendar year 2022 is well-paved":

> Thanks, Ralph (00:02:30). Hello, everyone, and thank you for joining today's call. I'm pleased to report Avaya's second quarter results this morning. ***Let me begin by thanking our global team as they continue to exceed expectations in implementing and driving the strategy we've laid out.*** We are delivering Avaya OneCloud solutions to our customers at an accelerated rate, and continue to make significant headway on our multiyear transformational journey to a cloud and SaaS business model.
>
> It's important to highlight a number of key indicators of the progress of our transformation. First is Avaya OneCloud ARR. We drove record growth for this key industry KPI with a $130 million quarter-over-quarter increase and over $400 million year-over-year increase to $750 million. ***The path to hit $1 billion ARR mark by the end of calendar year 2022 is well-paved***. Second, recurring revenue reached a record for us, growing from 66% a year ago to 69% in Q2. This is a strong indicator that our focus, investment and actions are paying off. Third, software and services as a percent of revenue came in at 89%. Fourth, 75% of new bookings came from Avaya OneCloud, the first time we reached that threshold, and we had

> record private cloud bookings as well. And finally, our CAPS metric, ended the quarter at 54%, up from 40% a year ago.
>
> ***These metrics serve as proof positive that we are successfully repositioning the company from our historic onetime revenue model to a recurring one. Our strategy is taking hold faster than we had anticipated, leading to a significant shift in our fundamental business model.***

144. Throughout the call, Chirico also made various statements emphasizing the "strength" and "momentum" of Avaya's business:

> Now, I'd like to emphasize some key performance highlights ***that will further demonstrate the underlying strength of our business***. Avaya OneCloud ARR is our most important performance metric. It holistically measures the overall strength of our cloud portfolio, whether delivered in a hybrid, private, or public model. Our OneCloud ARR grew 21% sequentially and is up 118% year-over-year. In addition, we yet again signed over 1,400 new logos this quarter. There's no better proof that Avaya is well-positioned to be the brand of choice for digital communication solutions. ***This impressive growth underscores the strength of our solutions, and the commitment of our customers as we move them to cloud-based solutions.***
>
> . . .
>
> ***We have increased confidence in the momentum of our business. We are committed to delivering business impacting innovation, maintaining our competitive edge, and we continue to focus on the long game, investing in growth drivers and doing so profitably.***

145. In an attempt to downplay Avaya's missing its 2Q FY 2022 guidance, and give the impression that the miss was unrelated to any fundamental issues with the business and the Company's execution, Chirico blamed "***two dynamics***." First, Chirico cited "the shift away from onetime and point-in-time revenue to recurring revenues," which caused a "$40 million impact on revenue for the quarter." Chirico made sure to note that the "revenue isn't lost," but would "materialize over the life of these long-term contracts." Second, Chirico blamed Avaya's "significant customer base in Russia" and the war in Ukraine as "creat[ing] top line pressure" that reduced "revenue by roughly $5 million for the quarter."

146. McGrath echoed these comments during the earnings call, and cited the same two reasons for the lower revenue in Q2 FY 2022:

> Shifting to revenue, Q2 revenue of $716 million was below our guidance ***due to two primary reasons***. First, in spite of our record OneCloud subscription bookings, the percentage of revenue recognized in quarter from those subscription bookings was lower again this quarter. It's important to note that this revenue is not lost. Instead, it will be recognized in future periods.
>
> . . .
>
> The second revenue impact versus our guidance was related to the crisis and conflict in Ukraine, which impacted our Q2 revenue in Eastern Europe by approximately $5 million. This is expected to have a much more significant second half impact to Avaya's business due to the announced sanctions, and the adverse economic conditions created in Eastern Europe.

147. McGrath also commented on Avaya's cash position, and described efforts to "strengthen [Avaya's] capital structure and enhance [Avaya's] financial flexibility":

> In the quarter, cash flow from operation was aided by a restructuring of our interest rate swap contracts, which extended our interest rate protection for an additional three years, now extended to cover the period from 2024 to 2027 and resulted in net cash proceeds of $52 million. ***This is the most recent in a series of actions taken by Avaya over the last 2.5 years to strengthen our capital structure and enhance our financial flexibility, including the measures taken to improve our weighted average debt maturity profile. We are also currently evaluating options to boost liquidity and to address the convertible notes, which come due in June of 2023.***

148. Belying any impression that Avaya had an uncertain future, Chirico closed his prepared comments by stating the "the significant progress we saw this quarter signifies our strategy is taking hold and this shift is reflected in our revised second-half guidance" and he was "excited about Avaya's future and even more excited about our team's ability to deliver on the opportunity in front of us."

149. During the Q&A portion of the earnings call, one analyst asked McGrath about the Company's plan to address the $350 million convertible notes that were due in June 2023.

McGrath's response gave no indication of underlying solvency issues that put the entire Company at risk:

> Sure. So, I mean obviously we are well aware that in June of 2023, we had the $350 million convert coming due. ***We're working with our banking colleagues to address the convert. We expect to actually act here in the reasonably near future on doing that. I should also – just also point out that we also have the ABL of $100 million to $150 million that we also have on hand to leverage it. But I think that we should be able to address the prepayment of the convert, if you will, or the prefunding of the convert coming up in the next several months.***

150. Another analyst during the call questioned why Avaya could not have a "stable outlook" as the company transitioned to a "cloud-first sales approach." In response, Chirico acknowledged the sentiment of "why haven't we done a better job in predicting . . . the acceleration to cloud and how [that is] affecting the overall revenue performance of the company" and added:

> And as you look at that, deals of this magnitude more times than not, it's not unusual to have increased contract flexibility as part of the solution for the contract. We've learned this over the last couple of quarters in fairness as we've been accelerating the move to cloud, and as I mentioned, we had record bookings last quarter.
>
> ***So, we saw that hit us a bit, if you will, in the first quarter. And as we pointed out here, a rather significant point-in-time decrease, not an overall revenue decrease, just that that revenue is now ratable over the life of the contract and not point-in-time.*** So, we historically have had roughly around 60% or so ability to recognize that revenue within quarter.
>
> Going forward, we've taken that percentage and we've now aligned it more to the larger deals and really what we're seeing as far as some of the flexibility we need in these larger contracts and as well with that percentage down into lower 50% range. So that has had a result in lower revenue attainment. Again, revenues that are not lost, but just the rebalancing of the portfolio and the profile moving further as we develop – as we continue to increase our overall recurring revenues as a percentage of the Avaya revenue profile.
>
> ***So, again, it's really more of a reflection of what we – the flexibility we're building into these long-term contracts with our enterprise customers but not a loss of demand. So we've taken it. We've rebalanced it. We've repositioned it. And that's the guidance update that Kieran provided to you all.***

151. Addressing the same question, McGrath noted that the Company's "model" now addressed this revenue recognition issue:

> It's a complication that at least I, no doubt, understand we need to get a better arm around that. And I think we have now, if you will, we've had two quarters in a row now where we've seen lower realization rates, and ***that's what we've built into our model going forward. I think the real point here is that we are signing significant deals both on the subscription hybrid contracts, as well as in our public and private clouds. And there we'll start to roll out as we go through time, and we'll see much more of our business become more ratable and less of these point-in-time fluctuations.*** So, I understand that we need to do a better job of getting insight into this. And I do think this 606 accounting has unnecessarily complicated things, but that's the rules we have to live with, so.

152. Defendants' statements in the May 10, 2022 earnings call alleged in paragraphs 143-151 above were false and misleading. In truth, as discussed above and detailed in internal Avaya communications, Defendants knew at the time that they made the false and misleading statements that Avaya was not well-positioned to execute on its growth strategy and meet the 3Q FY 2022 guidance based on concerns raised internally by Avaya senior personnel. In addition, as corroborated by former Avaya employees, Avaya's business model of migrating legacy customers' maintenance contracts to subscription contracts allowed for a one-time boost of revenue, but meant that the Company could not project revenue into future quarters consistent with the boosted revenue numbers. Such subscription contracts, moreover, were short in duration and had poor margins given the variety of discounts and incentives Avaya had to offer to get legacy customers on a subscription contract. Furthermore, as uncovered by subsequent Audit Committee investigations, Defendants did not disclose to investors that Avaya senior management had inappropriate "tone at the top . . . which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters throughout the organization and with others outside of the organization"; and that Avaya had "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model" and a "business model in which a significant portion of quarterly revenue is

generated at the end of each quarter, making it difficult to forecast revenue." These factors led to the departure of Chirico and McGrath as part of Avaya's "commit[ment] to transforming its culture to embrace transparency and open communication." Defendants also certified a statement that the Company would remain solvent through the end of 2022 with the knowledge that due to the state of Avaya's business, it would be "impossible" to meet the 3Q FY 2022 guidance. Months later, in August 2022, Avaya disclosed "substantial doubt" about "its ability to continue as a going concern" and new CEO Masarek conceded "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." The Audit Committee investigation also found that "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, [] negatively influenced customer sentiment." As a result of the foregoing, Defendants' statements about Avaya's business and operations, management, and internal controls were materially misleading.

### D. Defendants Misled Investors as to Avaya's Solvency and Opportunities for Continued Subscription Contracts During the June 3, 2022 Barclays' Fireside Chat.

153. A June 3, 2022 report from Barclays published a summary of a "Fireside Chat" with "AVYA's CFO" (*i.e.,* McGrath) and "treasurer." Per the report, no indication was given that Avaya was facing insolvency. Rather, "AVYA management discussed ***progress on their path to refinancing 2023's $350 mil. in convertible debt coming due. They noted the company believes the 'best option' is a $450-$500 mil. term loan add on (providing additional liquidity beyond the $350 mil. due)***.**"** And McGrath had good reason to omit any issues with Avaya's debt, as Barclays noted that "removing the convert overhang (without dilution) would be a positive for the equity."

154. The Barclays report also noted that management indicated that ***"[a]pproximately 12% of AVYA's overall installed-base has been moved to part of its OneCloud offering,***" creating

the impression that the Company still had the opportunity to transition a significant percentage of its legacy customers to OneCloud.

155. Defendants' statements on June 3, 2022 alleged in paragraphs 153-154 above were false and misleading. In truth, as discussed above and detailed in internal Avaya communications, Defendants knew at the time that they made the false and misleading statements that Avaya was not well-positioned to execute on its growth strategy and meet the 3Q FY 2022 guidance based on concerns raised internally by Avaya senior personnel. In addition, as corroborated by former Avaya employees, Avaya's business model of migrating legacy customers' maintenance contracts to subscription contracts allowed for a one-time boost of revenue, but meant that the Company could not project revenue into future quarters consistent with the boosted revenue numbers. Such subscription contracts, moreover, were short in duration and had poor margins given the variety of discounts and incentives Avaya had to offer to get legacy customers on a subscription contract. Furthermore, as uncovered by subsequent Audit Committee investigations, Defendants did not disclose to investors that Avaya had "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model" and a "business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to forecast revenue." Moreover, Defendants' statements about the viability of the Company's future were made with the knowledge that due to the state of Avaya's business, it would be "impossible" to meet the 3Q FY 2022 guidance. Months later, in August 2022, Avaya disclosed "substantial doubt" about "its ability to continue as a going concern" and new CEO Masarek conceded "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." The Audit Committee investigation also found that "[a]dverse market conditions, as well as concerns that

arose during the third quarter about the Company's financial health, [] negatively influenced customer sentiment." As a result of the foregoing, Defendants' statements about Avaya's business and operations were materially misleading.

**E. The June 2022 Investor Presentation Creates the False Impression That a Significant Percentage of the Company's Installed Base Could Transition to the OneCloud Platform.**

156. In an effort to solicit debt financing, a June 2022 investor presentation included a slide detailing the "Positive Shift of Installed Base Seats to OneCloud[.]" The slide made specific reference to the purported fact that ***"~12% of [the installed] Seat base [was] on OneCloud***," misleading investors as to the Company's opportunities to transition a significant majority of its installed base to the OneCloud platform and meet its revenue guidance.




157. Defendants' statement in the June 2022 investor presentation alleged in paragraph 156 above was false and misleading. In truth, as discussed above and detailed in internal Avaya communications, Defendants knew at the time that they made the false and misleading statement that Avaya was not well-positioned to execute on its growth strategy and meet the 3Q FY 2022

guidance based on concerns raised internally by Avaya senior personnel. In addition, as corroborated by former Avaya employees, Avaya's business model of migrating legacy customers' maintenance contracts to subscription contracts allowed for a one-time boost of revenue, but meant that the Company could not project revenue into future quarters consistent with the boosted revenue numbers. Such subscription contracts, moreover, were short in duration and had poor margins given the variety of discounts and incentives Avaya had to offer to get legacy customers on a subscription contract. Furthermore, as uncovered by subsequent Audit Committee investigations, Defendants did not disclose to investors that Avaya had "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model" and a "business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to forecast revenue." As a result of the foregoing, Defendants' statement about Avaya's business and operations was materially misleading.

**F. Defendants Misled Investors as to Avaya's Solvency in the June 27, 2022 Press Release.**

158. Weeks later, on June 27, 2022, Avaya announced $600 million in financing, well above the $450-$500 million described by management in the Barclays Fireside Chat. In the press release, McGrath gave no indication that Avaya was facing a serious issue and would disclose a little over a month later that there was "substantial doubt about the Company's ability to continue as a going concern" but rather stated that "[***t]his funding supports and accelerates our business model transformation*** and addresses our convertible notes maturing in June of next year."

159. Defendants' statement in the June 27, 2022 press release alleged in paragraph 158 above was false and misleading. In truth, Defendants' statement about the viability of the Company's future was made with the knowledge that due to the state of Avaya's business, it would

be "impossible" to meet the 3Q FY 2022 guidance. Months later, in August 2022, Avaya disclosed "substantial doubt" about "its ability to continue as a going concern" and new CEO Masarek conceded "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." The Audit Committee investigation also found that "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, [] negatively influenced customer sentiment." As a result of the foregoing, Defendants' statement about Avaya's business and operations was materially misleading.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

160. The allegations in this Section allege scienter as to each Defendant. The inference and conclusion that Defendants acted with scienter – *i.e.*, that they intended to mislead the investing public or were reckless as to the possibility of misleading the investing public – is supported by the following facts.

### A. Evidence Probative of Defendants' Motive to Commit the Fraud.

161. Defendants' misrepresentations were necessary to secure financing commitments from third-parties to address $350 million in debt coming due in June 2023, hold off impending insolvency, and avoid bankruptcy (¶¶ 29-30). Without such representations about the Company's ability to meet its financial projections, the "Tone at the Top" culture, and the Avaya's long-term viability, Defendants likely would not have been able to raise the $600 million financing announced in June 2022 (¶¶ 51-52).

162. In addition, pursuant to Avaya's Stock Bonus Program, Chirico and McGrath elected to receive 70% and 60%, respectively, of their earned Fiscal 2021 bonus in the form of

Bonus Shares.[138] Avaya's Compensation Committee approved a Stock Bonus Program for Fiscal 2022 AIP, meaning Chirico and McGrath had incentive to inflate Avaya's common stock price by making material misrepresentations about the Company's business and future prospects.[139]

**B. Circumstantial Evidence of Defendants' Knowledge or Recklessness of the Falsity of their Statements.**

163. ***The False and Misleading Statements Concerned the Most Significant Initiatives and Issues in Avaya's Business.*** Defendants' false and misleading statements concerned the most significant initiatives and issues in Avaya's business, including the transformation to a cloud company, the Company's robust internal controls, and Avaya's viability in the face of looming debt obligations, which support a strong inference of scienter (¶¶ 134-159).

164. ***Defendants had access to information that contradicted their statements to investors.*** Internal Avaya emails indicate that Chirico was informed before the announcement of the May 10, 2022 guidance that the revenue projections were inflated (¶¶ 55-61). Per CW-1 and CW-2, McGrath attended sales meetings where revenue projections were discussed, and also had access to a spreadsheet listing Avaya customers who were targets for switching to subscription contracts, as well as the expected conversion rate for those customers (¶¶ 85-88). Whatever information was provided to Chirico, moreover, presumably made its way to McGrath, who as CFO was responsible for managing the finance employees involved in the internal discussions cited herein and who reported to Chirico.

165. Despite knowledge that their revenue figures were well below-guidance, Defendants continued to rely on the publicly disclosed 3Q FY 22 guidance to market its latest round of debt financing. Internal Avaya emails and confidential witness information demonstrate

---

[138] *See* January 18, 2022 Proxy Statement Pursuant to Section 14(a) at 47.

[139] *Id.*

that before the announcement of guidance, McGrath and Chirico both knew that revenue projections were inflated and likely "impossible" to achieve (¶¶ 55-61). After Defendants announced the guidance, and actual revenue figures were known, Defendants understood that Avaya would not be able to meet its publicly disclosed guidance (¶¶ 62-64). Despite this knowledge, Defendants continued to rely on the publicly disclosed 3Q FY 22 guidance in public filings related to their efforts to secure additional debt financing as well as in private meetings with funds they solicited to participate in the financing (¶¶ 48-50, 53).

166. ***Defendants' Knowledge About Avaya's Accounting and Disclosure Policies and Procedures.*** Defendants were highly sophisticated and in positions to know that their statements concerning Avaya's internal controls and "Tone at the Top Culture" were false and misleading. The sophistication of Defendants strengthens the allegations of scienter by undermining an exculpating explanation for the fraud.

167. ***The Audit Committee Findings Focus on Chirico and McGrath, Which Explain Their Departures***. The admissions and findings of the Audit Committee investigations do not attribute Avaya's poor 3Q FY 22 results to mere forecasting error or judgment errors, but rather to inappropriate "tone at the top . . . which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters throughout the organization and with others outside of the organization," as well as the fact that Avaya had "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model" and a "business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to forecast revenue" (¶¶ 123, 125-126). To address these issues, Avaya stated that it "made [] enhancements to our internal control over

financial reporting" and explicitly identified Chirico and McGrath's departure as part of those "enhancements" (¶ 128). Given these disclosures, it is implausible that Chirico and McGrath did not know about these material weaknesses and factors – and their effect on the Company's business – when making their misstatements and omissions.

168. ***The Scope of Avaya's Remediation Plan After the Audit Committee Investigation.*** As discussed above, Avaya disclosed a "Remediation Plan" to address the material weaknesses in internal controls. Several aspects of the Plan address issues directly related to Chirico and McGrath's inappropriate conduct, including "Board level participation in messaging across the organization that reinforces a safe environment for raising concerns without fear of retaliation"; "[c]onducting in-depth special training courses for the Company's entire sales team and personnel involved in the forecasting process regarding the importance of the Company establishing and maintaining effective disclosure controls"; and "[e]nhancement of future employee engagement surveys to monitor negative indictors of tone at the top" (¶ 129).

## VII. LOSS CAUSATION

169. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Avaya's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

170. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a fraudulent course of conduct that artificially inflated the price of Avaya's securities and operated as fraud or deceit on Class Period purchasers of Avaya's securities. By failing to disclose the true state of Avaya's business and operations, Defendants presented a misleading picture of Avaya's condition and value, which had the intended effect and caused Avaya's stock to trade at artificially inflated prices during the Class Period. Shareholders

invested based on these false premises. And Avaya stock would have been sold at dramatically lower prices had investors been aware of Defendants' fraudulent scheme.

171. Because Lead Plaintiff was unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose that Avaya's financial results were achieved through a fraudulent scheme), Lead Plaintiff paid an artificially inflated and unreasonable price for his purchases of Avaya stock.

**A. Corrective Disclosures**

172. As Defendants' materially false, misleading, and incomplete statements, and fraudulent scheme were partially disclosed, the price of Avaya's securities fell, as the prior inflation came out of the Company's stock price as set forth above on at least July 28, 2022 and August 9, 2022 These partial disclosures did not reveal the full extent of Defendants' omissions.

173. On November 30, 2022, Avaya revealed its assessment of its internal controls had uncovered material weaknesses. That day, Avaya's stock price fell approximately 14%. Weeks later, on December 13, Avaya disclosed that it was seeking to settle its debt obligations with lenders, but certain lenders were not willing to negotiate an out-of-court settlement. The Company also detailed specific reasons leading to its poor performance in Q3 FY 22. On these disclosures, Avaya's stock price fell 40%. On December 16, 2022, the *Wall Street Journal* reported that Avaya was "nearing a chapter 11 bankruptcy filing," which led the share price to fall an additional 54%.

174. The declines in the price of Avaya's stock on July 28, August 9, November 30, December 13, and December 16, 2022 were a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The timing and magnitude of Avaya's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' fraudulent conduct.

175. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Avaya's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Avaya securities and that corrective disclosures of Defendants' misrepresentations and omissions would cause the price of Avaya securities to decline.

**B. Materialization of Risks**

176. As detailed herein, Defendants made misleading statements and omitted material information to deceive Lead Plaintiff and investors, which artificially inflated the price of Avaya stock and operated as a fraud or deceit on Lead Plaintiff, investors and shareholders by failing to disclose and misrepresenting the adverse facts detailed herein.

177. Avaya's financial results and future business prospects were based upon false and misleading statements and omissions.

178. Throughout the period during which Lead Plaintiff and investors purchased Avaya's securities, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

179. Defendants' false statements served to conceal the risks that the fraud scheme would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, and interviews.

180. It was foreseeable that public exposure of the material information would lead to negative financial impact to Defendants, including Avaya's bankruptcy and the loss of their jobs

and the value of their stock-based compensation. The materialization of any one or more of these factors would lead to a significant decline in the price of Avaya's stock.

181. The value of Avaya stock was negatively impacted when the concealed risks materialized in at least the following respects: Avaya's 3Q FY 22 results were well below the previously issued guidance, as Avaya had $577 million in revenue, compared to guidance of $685 million to $700 million, and EBITDA was $54 million, compared to guidance of $140 million to $150 million. These revelations, along with the announcement of Chirico's departure in July 2022, the additional material weaknesses in internal controls disclosed in November 2022, and reports in December 2022 that Avaya was negotiating a settlement with its debt holders and was nearing Chapter 11 bankruptcy, caused significant drops in Avaya's stock price.

182. The declines in the price of the Avaya stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants. Had Lead Plaintiff and other investors known of the material adverse information not disclosed by Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Avaya stock at artificially inflated prices.

183. As a result of their purchases of Avaya stock, Lead Plaintiff, and other members of the Class, suffered economic loss and damages, as contemplated by the federal securities laws.

184. During the Class Period, Lead Plaintiff and the Class purchased Avaya's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII. NO SAFE HARBOR

185. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Avaya's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

186. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Avaya's financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Avaya were insufficient to insulate Defendants from liability for their materially false and misleading statements.

## IX. THE PRESUMPTION OF RELIANCE

187. At all relevant times, the market for Avaya's securities was efficient for the following reasons, among others:

a. Avaya's shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Avaya filed periodic reports with the SEC and the NYSE;

c. Avaya regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Avaya was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

188. As a result of the foregoing, the market for Avaya's securities reasonably promptly digested current information regarding Avaya from all publicly available sources and reflected such information in the price of Avaya's securities. All purchasers of Avaya's securities during the Class Period suffered similar injury through their purchase of Avaya securities at artificially inflated prices, and a presumption of reliance applies.

189. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. CLASS ALLEGATIONS

190. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Avaya securities during the period from May 10, 2022 to December 15, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Defendant; (iii) any person who was

an officer or director of Avaya; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Avaya; (viii) all Avaya plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

191. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Avaya shares were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class. Class members who purchased Avaya common stock may be identified from records maintained by Avaya or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

192. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

193. Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

194. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are whether:

a. the federal securities laws were violated by Defendants' acts as alleged herein;

b. Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c. Defendants acted with scienter; and

d. Class members suffered compensable damages.

195. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT

### COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER

196. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197. This Count is asserted on behalf of all members of the Class against Defendants Chirico and McGrath, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

198. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

199. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Avaya securities during the Class Period.

200. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Avaya securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class; (b) artificially inflate and maintain the market price of Avaya securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Avaya securities at artificially inflated prices and suffer losses when the true facts became known.

201. Defendants Chirico and McGrath, as top executive officers of Avaya during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Chirico and McGrath are liable for the false and misleading statements they personally approved, made, and/or signed, as alleged above.

202. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Avaya securities, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

203. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Avaya securities, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the Class would not have purchased Avaya securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

204. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Avaya securities during the Class Period.

**COUNT II**

**FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT**

205. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

206. This Count is asserted on behalf of all members of the Class against Defendants Chirico and McGrath, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

207. During their tenures as officers and/or directors of Avaya, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange

Act. *See* ¶¶ 22-23. By reason of their positions of control and authority as officers and/or directors of Avaya, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Avaya during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

208. In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶ 22-23, Defendants Chirico and McGrath had direct involvement in the day-to-day operations of the Company. Defendants Chirico and McGrath signed certain of the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Avaya during the Class Period. As a result of the foregoing, Defendants Chirico and McGrath, as a group and individually, were controlling persons of Avaya within the meaning of Section 20(a) of the Exchange Act.

209. By virtue of their positions as controlling persons of Avaya and as a result of their own aforementioned conduct, Defendants Chirico and McGrath are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Avaya securities. As detailed above, during the respective times these Defendants served as officers and/or directors of Avaya, each of these Defendants was culpable for the material misstatements and omissions made by Avaya.

210. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Avaya securities.

## XII. PRAYER FOR RELIEF

211. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated May 6, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Lucas E. Gilmore*
Lucas E. Gilmore, *pro hac vice*
Reed R. Kathrein, *pro hac vice* forthcoming
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Nathaniel A. Tarnor
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

*Counsel for Lead Plaintiff Paul Sweatt*

Brian J. Schall, *pro hac vice* forthcoming
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Paul Sweatt*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Lucas E. Gilmore*
LUCAS E. GILMORE