**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLIVER JIANG, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    v.<br><br>JAMES M. CHIRICO, JR., and KIERAN J. MCGRATH,<br><br>               Defendants. | Case No. 1:23-cv-01258-PGG<br><br>**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   SUMMARY OF THE FRAUD ................................................................. 4

    A.    Avaya's Transition from Hardware to the Cloud and Looming
       Debt Obligations. ...................................................................... 4

    B.    Prior to Announcement of 3Q FY 22 Guidance, Defendants Learn
       That Revenue Projections Are Not Obtainable. ........................ 5

    C.    Despite Knowledge of "Impossible" to Achieve Guidance, in May
       2022, Defendants Emphasize the "Strength" and "Momentum" of
       Avaya's Business, Tout Avaya's "Tone at the Top Culture," and
       Assuage Concerns Regarding Avaya's Debt. ............................ 6

    D.    Despite Knowledge that 3Q FY 22 was Progressing Poorly,
       Defendants Continue to Publicly Project Confidence in the
       Guidance and Avaya's Financial Standing. ............................... 8

    E.    Avaya's Prospects Do Not Improve as 3Q FY 22 Ends, Yet
       Defendants Raise No Alarms. ................................................... 9

    F.    The Truth is Revealed Regarding Avaya's Business, Financial
       Health, and Deficient Internal Controls. ................................. 11

    G.    Avaya Confirms Material Weaknesses in ICFR Directly Connected
       to the Conduct of Chirico and McGrath. ................................. 13

    H.    Former Avaya Employees Corroborate the Company's
       Unsustainable Business Model and Confirm Chirico and
       McGrath's Access to Revenue Information. .............................. 14

III.  ARGUMENT .......................................................................................... 16

    A.    Defendants Incorporate by Reference Several Exhibits for an
       Improper Purpose. .................................................................... 16

    B.    The Complaint Pleads Deceptive Conduct in Furtherance of a
       Scheme. .................................................................................... 17

    C.    The Complaint Alleges False and Misleading Statements. ...... 19

       1.    The PSLRA's Safe Harbor Provision Does Not Protect
           Defendants. .................................................................... 21

a.      The Statements Represented the Present State of
        Affairs. ...................................................................... 21

b.      The Boilerplate Disclosures Did Not Warn
        Investors of the Real Risks. ........................................ 22

c.      The Statements Were Made with Actual Knowledge
        of Falsity. .................................................................... 24

2.      Defendants' Statements Were Not Corporate Optimism or
        Puffery........................................................................... 28

3.      The Purported Opinions Had No Reasonable Basis in Fact. ................... 31

4.      The Remaining Challenged Statements Are Actionable. ......................... 32

D.      Chirico and McGrath Were "Makers" of the Alleged
        Misstatements. ........................................................................ 34

E.      The Complaint Adequately Alleges Defendants' Scienter. .................................. 36

1.      The Complaint Alleges the Defendants' Scienter Based on
        Conscious Misbehavior or, at a Minimum, Recklessness......................... 37

        a.      The Audit Committee's Findings of Inappropriate
                "Tone at the Top.".................................................... 37

        b.      Executive Departures and the Scope of Remediation
                Plan. ............................................................................ 38

        c.      Internal Avaya Communications Support
                Defendants' Scienter.................................................. 40

        d.      Former Avaya Employees Confirm Defendants
                Knew of Revenue Shortfall......................................... 41

        e.      Defendants' Public Statements Support Inference
                They Had Actual Knowledge of Information
                Contradicting their Statements.................................... 44

2.      The Complaint Also Alleges Defendants' Scienter Based
        on Motive and Opportunity............................................ 46

F.      The Complaint Establishes Loss Causation............................................. 48

G.      The Complaint Sufficiently Pleads Control Person Liability. .............................. 49

IV.    CONCLUSION................................................................................... 50

# TABLE OF AUTHORITIES

**Page**

### CASES

*ABN AMRO, Inc. v. Cap. Int'l Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008) ......................................................................................41

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ......................................................................................................36

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)....................................................................................33

*Afr. v. Jianpu Tech. Inc.*,
2023 WL 5432282 (S.D.N.Y. Aug. 23, 2023).........................................................................38

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003).....................................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................................................50

*In re Barclays PLC Sec. Litig.*,
2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)...........................................................................30

*Barrett v. PJT Partners Inc.*,
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)..........................................................................32

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)...........................................................................16

*In re Bear Stearns Cos., Inc. Sec. Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................22, 23, 32, 34

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)......................................................................................44

*Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .........................................................................29

*Bond Opportunity Fund v. Unilab Corp.*,
2003 WL 21058251 (S.D.N.Y. May 9, 2003) ........................................................................46

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018)..................................................................45, 50

*Carpenters Pension Tr. Fund v. Barclays PLC*,
   56 F. Supp. 3d 549 (S.D.N.Y. 2014)........................................................................47

*Chevron Corp. v. Donziger*,
   2013 WL 4045326 (S.D.N.Y. Aug. 9, 2013).........................................................24

*Chevron Crop. v. Donziger*,
   325 F. Supp. 3d 371 (S.D.N.Y. 2018).....................................................................18

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010).....................................................................44

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................41

*City of Brockton Ret. Sys. v. Avon Prods.*,
   2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)............................................30, 43, 46

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013).....................................................................44

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)................................................................26, 43

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018).....................................................................33

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................38, 46

*ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).....................................................................................30

*In re Electrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017).....................................................................30

*In re Fannie Mae 2008 Sec. Litig.*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012).....................................................................35

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009).....................................................................23

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020).....................................................................29

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ...................................................................................47

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).........................................................................37, 38, 39

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................................ *passim*

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)...................................................................................24

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010).....................................................................................22

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................28, 43

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................................................................................16

*Guevoura Fund v. Sillerman*,
  2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016)........................................................................18

*Hull v. Glob. Digital Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017)..............................................................................49

*In re Ibis Tech. Sec. Litig.*,
  422 F. Supp. 2d 294 (D. Mass. 2006) ....................................................................................47

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)..................................................................................................44

*In re Insys Therapeutics, Inc. Sec. Litig.*,
  2018 WL 2943746 (S.D.N.Y. June 12, 2018) ..................................................................37, 45

*In re Intercept Pharms., Inc. Sec. Litig.*,
  2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ............................................................................40

*Janbay v. Canadian Solar, Inc.*,
  2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ........................................................................26

*Janus Cap. Group, Inc. v. First Derivative Traders, Inc.*,
  564 U.S. 135 (2011)........................................................................................................34, 35

*Kasilingham v. Tilray*,
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021)........................................................................44

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
  528 F. Supp. 3d 192 (S.D.N.Y. 2021)........................................................................36

*In re Kidder Peabody Sec. Litig.*,
  10 F. Supp. 2d 398 (S.D.N.Y. 1998)........................................................................30

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y 2006)........................................................................30

*Lasker v. N.Y. State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) ...............................................................................29, 30

*In re Lehman Bros. Sec. Litig.*,
  2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013).............................................................36

*Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)........................................................................44

*Lopez v. CT Partners Exec. Search, Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)........................................................................33

*Lorenzo v. SEC*,
  587 U.S. 71 (2019).............................................................................................18

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014)........................................................................32

*Manavazian v. Atec Grp., Inc.*,
  160 F.Supp.2d 468 (E.D.N.Y.2001) ........................................................................29

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)..............................................................................19, 23

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020).....................................................................24, 39

*In re Nielson Holdings PLC Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021)........................................................................49

*In re Nortel Networks Corp. Secs. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003).................................................................22, 27, 31

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................................46

*Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
   517 F. Supp. 3d 196 (S.D.N.Y. 2021)..............................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................................31

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014).............................................................................38

*P. Stolz Fam. P'Ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004)............................................................................................21

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)..............................................................39

*In re Pfizer Inc. Sec. Litig.*,
   2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ...............................................................35

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   2017 WL 5312182 (S.D.N.Y. Nov. 13, 2017)..............................................................40

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015).............................................................................42

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010).....................................................................33, 46

*In re Portal Software, Inc. Sec. Litig.*,
   2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) .............................................................47

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)...........................................................................40

*Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011)...........................................................................35

*Rombach v. Chang*,
   355 F.3d 164 (2d. Cir. 2004).........................................................................................29

*Roseville Emps. Ret. Sys. v. Nokia Corp.*,
   2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)...........................................................27, 35

*Rosi v. Aclaris Therapeutics, Inc.*
   2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) .........................................................33, 41

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)..........................................................................................17

*S.E.C. v. Gruss,*
    859 F. Supp. 2d 653 (S.D.N.Y. 2012)...............................................................47

*S.S. Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.,*
    704 F. Supp (S.D.N.Y. 2023)...................................................................24, 29

*In re Sadia, S.A. Sec. Litig.,*
    643 F. Supp. 2d 521 (S.D.N.Y.2009)....................................................28, 38

*In re Salix Pharms., Ltd.,*
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................................37

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.,*
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) ...................................................37, 39

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris
    Companies, Inc.,*
    75 F.3d 801 (2d Cir. 1996)...............................................................................29

*In re Scot. Re Grp. Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).................................................................43

*SEC. Comm'n v. Fiore,*
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)................................................................17

*SEC v. Tuzman,*
    2017 WL 11606728 (S.D.N.Y. Sept. 29, 2017)....................................................41

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) .......................................................49

*Slayton v. Am. Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010)..........................................................................22, 24

*In re SLM Corp. Sec. Litig.,*
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................................48

*Stadium Cap. LLC v. Co-Diagnostics, Inc.,*
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)................................................. *passim*

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir.2008)...............................................................................17

*Steinberg v. Ericsson LM Tel. Co.,*
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ......................................................40

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007)....................................................................................36, 37

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................................22

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..........................................................30

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009).......................................................................28

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ..............................................................................39

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)......................................................................................49

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023)........................................................................22

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................................16

*Xu v. Gridsum Holding Inc.*,
624 F. Supp. 3d 352 (S.D.N.Y. 2022)........................................................................35

*Yoshikawa v. Exxon Mobil Corp.*,
2023 WL 5489054 (N.D. Tex. Aug. 24, 2023)...........................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ....................................................................................28

### OTHER AUTHORITIES

Rule 10(b)(5)............................................................................................................. *passim*

## I.    INTRODUCTION

This securities class action arises from Defendant James M. Chirico, Jr.'s and Defendant Kieran J. McGrath's ("Defendants") fraudulent scheme designed to conceal Avaya Holdings Corp.'s ("Avaya" or the "Company") declining business and disappointing financial results and prospects so that Defendants could raise much needed capital to save Avaya from imminent insolvency.

By May 2022, Defendants were acutely aware of Avaya's precarious financial situation. The Company's transition from a hardware-centric business model to a software-focused one was faltering, leaving it desperately short of cash. A looming debt payment of $350 million was due the following year, and Avaya's struggling operations made securing additional financing increasingly challenging. Facing the stark possibility of bankruptcy, Defendants Chirico and McGrath were motivated to avoid the devastating consequences to their careers and personal finances, including job loss, reputational damage, and the devaluation of their stock-based compensation.

So, Defendants deliberately hatched a deceptive scheme designed to inflate Avaya's share prices and secure much needed financing. In furtherance of the fraud, in securities filings, on an earnings call on May 10, 2022, and in subsequent communications with potential investors, Defendants falsely claimed that Avaya was financially sound and on track to generate at least $685 million in revenue and $140 million in EBITDA in the third quarter of fiscal year 2022 ("3Q FY 22), and reach $1 billion in annual recurring revenues ("ARR") by the end of calendar year 2022. To bolster confidence in these lofty projections, Defendants emphasized Avaya's pipeline of existing legacy customers eligible for migration to the Company's subscription model, the favorable market conditions and positive customer sentiment for Avaya's offerings, and Avaya's strong tone at the top. But Avaya's guidance and described factors underlying Avaya's projections

were entirely fabricated, and Defendants were fully aware of their falsity.

As revealed through internal documents, confidential witness ("CW") accounts and an Audit Committee investigation, Defendants knew that Avaya's business model – predicated on transforming from a traditional office hardware business into a subscription based software company – was doomed to fail as the Company was experiencing a declining pipeline of customers for the Company's subscription product, "OneCloud." ¶¶ 54-70, 77-88. [1] Defendants also knew that Avaya was not on track to meet its 3Q FY 2022 guidance as immediately prior to announcing the guidance, Avaya executives and other employees warned that the revenue projections would be "impossible" to meet, and before the end of the quarter, Avaya executives and employees discussed how closing the "quite substantial" gap between the Company's actual performance and publicly stated projections would require "more than one miracle." ¶¶ 60, 66-68. Prior to and during the Class Period (May 10, 2022 to December 15, 2022, inclusive), Defendants were also setting an unethical culture within the organization by pressuring employees to come up with and meet impossible short-term sales projections, thereby compromising the Company's disclosure controls and procedures. *See, e.g.,* ¶¶ 62, 73-76, 81-83.

The Defendants' rouse worked. In addition to propping up Avaya's stock price, Defendants raised $600 million in funds needed not only to provide fresh working capital but also to refinance Avaya's debt that was coming due in June 2023. ¶ 158. Knowing it was just a matter of time until the truth came out, Defendants rushed lenders to close the transaction as quickly as possible, having only announced the financing efforts weeks earlier. ¶¶ 48-53.

Just a month after closing the financing deal, on July 28, 2022, Defendants' facade began to crack.  Avaya announced a dramatic miss of its 3Q EBITDA and revenue guidance, that the

---

[1] Citations to the Amended Complaint (ECF No. 93) appear as "¶ _". Furthermore, emphasis is added and internal citations and quotations are omitted unless otherwise noted.

Company expected "significant non-cash impairment charges as of June 30, 2022," and Defendant Chirico had been unceremoniously shown the door. ¶¶ 89-91. In subsequent disclosures through December 2022, Avaya would reveal "substantial doubt about the Company's ability to continue as a going concern," the commencement of two separate Audit Committee investigations to address the 3Q FY 22 results and the receipt of a whistleblower letter, internal control material weaknesses based on improper maintenance of a whistleblower log and deficient dissemination of related materials, the rescission of Chirico and McGrath's assessment of the effectiveness of Avaya's internal controls, a warning that lenders were not receptive to a settlement of Avaya's debt obligations (leading to the Company declaring bankruptcy in February 2023), and that Avaya's poor performance in 3Q FY 22 resulted from "[s]lower customer migration from maintenance to subscription [contracts]," among other issues. ¶¶ 89-100, 106-119, 132. During the Class Period, Avaya's stock price fell nearly 97%, erasing nearly $613.5 million in market capitalization. ¶ 14.

Post-Class Period, the Audit Committee disclosed findings and admissions confirming material weaknesses in Avaya's internal controls and corroborating the unsustainable business model illustrated in the internal emails and CW testimony. According to Avaya's own account, the Company had "[i]nappropriate tone at the top . . . which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections" which was remediated by the departures of Chirico and McGrath. ¶¶ 121, 123, 128. In addition, Avaya drastically missed its revenue and adjusted earnings targets in the 3Q FY 22 due to "[a] declining pipeline of existing legacy customers . . . eligible for migration to the Company's subscription model" and "[a]dverse market conditions, as well as concerns . . . about the Company's financial health, which negatively influenced customer sentiment." ¶¶ 125, 127.

-3-

Rather than grapple with Lead Plaintiff's well-pled allegations, Chirico and McGrath mischaracterize the Complaint as pleading "fraud by hindsight" based on inactionable forward-looking statements or statements involving puffery, corporate optimism, and opinions. But in doing so, Defendants ignore both that the statements are representations of current or historical fact and are verifiably false and their knowledge of falsity when making the statements. Nor do Defendants successfully establish that the safe harbor provision applies. And Defendants have nothing to say about Lead Plaintiff's scheme liability claim under Rule 10(b)(5) a and c. ¶¶ 199-201.

Similarly, in attacking scienter, Defendants ignore or distort key allegations demonstrating their knowledge or reckless disregard for the falsity of their statements. Chief among them are the findings of the Audit Committee related to Avaya's dismal 3Q FY 22 financial results and deficient internal controls and detailed internal emails and confidential witness accounts showing Defendants' awareness of, and active participation in, malfeasance related to propping up Avaya's unsustainable business model, painting a misleading picture of Avaya's financial health, and promoting a non-existent "Tone at the Top Culture." None of Defendants' remaining arguments, including that they were not "makers" of the statements and Lead Plaintiff has not sufficiently pled loss causation, warrant dismissal. Accordingly, Defendants' motions to dismiss should be denied.

## II.    SUMMARY OF THE FRAUD

### A.    Avaya's Transition from Hardware to the Cloud and Looming Debt Obligations.

Avaya, a former hardware company, was undergoing a strategic transformation to become a software and services provider. ¶¶ 24-25. During this transition, the company heavily focused on its cloud-based communication solution, Avaya OneCloud. ¶ 25. To support this growth, Avaya aimed to increase its recurring revenue through multi-period contracts, such as subscription-based software. ¶ 26. The Company introduced Avaya OneCloud ARR as a key performance indicator

to track this progress. ¶ 26.

**B.      Prior to Announcement of 3Q FY 22 Guidance, Defendants Learn That Revenue Projections Are Not Obtainable.**

In early April 2022, Avaya's transition efforts were struggling and the Company found itself in a tough spot. Although Defendants had previously expressed confidence in Avaya's transformation, the Company was poised to announce on May 10, 2022 that Avaya's 2Q FY 22 results for the period ending March 31, 2022 were below guidance. ¶¶ 27-28, 31-32. Moreover, a significant amount of debt, including $350 million in convertible notes due in 2023, posed a risk to the Company's ability to raise funds. ¶ 29. Analysts noted Avaya's liquidity concern as a factor that could influence investor decisions. ¶¶ 29-30.

Desperate to secure financing, in April 2022, Defendants and their finance team devised a plan that when delivering Avaya's disappointing 2Q FY 22 results the next month, they would characterize the quarter as an aberration and portray Avaya as a financially sound company with tremendous prospects. ¶¶ 55-60. Defendants determined that Avaya's 3Q FY 22 guidance would be the centerpiece of this narrative, intending to claim the Company would generate quarterly revenue of nearly $700 million. ¶ 31.

Internal Avaya emails show, however, that Defendants knew the rosy 3Q FY 22 projections they sought to present to investors and lenders on May 10, 2022 did not align with the stark reality of Avaya's business prospects. ¶¶ 55-60. Indeed, as early as April 11, 2022, Avaya finance executives raised concerns with Avaya's Chief Revenue Officer Stephen Spears about the need to revise the "bookings" projections down to a "more realistic starting point." ¶ 55. Avaya's finance team also raised concerns regarding the projected 3Q revenue for one of Avaya's most important regions, North America. The Senior Director of Sales Finance told Spears that the "right starting point" for 3Q North American revenue would be $415 million, not the then projected $451 million.

¶ 56. This reduced projection, however, would still be "scary" because it reflected "big ticket changes" and $45.5 million of so-called "revenue judgment" based on optimistic assumptions. ¶ 56. Spears agreed with the assessment that projected 3Q revenue was inflated, and said he would "raise" this issue" to a "much smaller audience," presumably including Defendants. ¶ 57.

Internal emails reveal that the Company ultimately elected to project 3Q North American revenue of $430 million – a figure Vice President of Sales Finance described as "impossible" to achieve and not "right" based on "current visibility." ¶ 60. The emails further reveal that finance team members directly communicated to Chirico the faulty reasoning behind the $430 million revenue projection. ¶ 59.  Additional emails show the guidance included $80 million of "revenue judgment." ¶ 58.  As described by the Senior Director of Sales Finance to the Global VP of Financial Planning and Analysis and VP of Sales Finance, this $80 million figure was "unacceptable" since "everyone knows we should not load 430M with 80M of revenue judgment in Q3." ¶ 58.

### C. Despite Knowledge of "Impossible" to Achieve Guidance, in May 2022, Defendants Emphasize the "Strength" and "Momentum" of Avaya's Business, Tout Avaya's "Tone at the Top Culture," and Assuage Concerns Regarding Avaya's Debt.

Despite their knowledge that the revenue projections embedded in the guidance would be "impossible" to achieve, thereby threatening Avaya's growth strategy and viability as a Company, on May 10, 2022, Defendants painted a rosy picture of Avaya's business, internal controls, and financial health. ¶¶ 134-152.

To start, Avaya provided optimistic guidance for 3Q FY 22 of $685-$700 million of revenue and $140-$150 million of Adjusted EBITDA, as well as full year 2022 revenue guidance of $2.815-$2.855 billion and Adjusted EBITDA guidance of $580 million to $600 million. ¶ 31. McGrath, as CFO, signed off on the Company's baseless projections. ¶ 31. Since 2Q FY 22 results fell short of expectations, on the earnings call with analysts, CEO Chirico was forced to defend

the Company's rosy outlook. ¶¶ 35, 143-44. Chirico emphasized Avaya's progress towards its $1 billion ARR goal and the successful transition to a recurring revenue model. ¶ 143. The investor presentation highlighted the "[c]ontinued large deal activity" in the 2Q FY 22, further supporting the notion of sustained demand. ¶ 136. Chirico also touted the "underlying strength" of Avaya's business and the "impressive growth" indicative of its solutions. ¶ 144.

Additionally, Defendants downplayed the disappointing 2Q FY 22 financial results, attributing them to factors such as the shift to recurring revenues and the impact of the Ukraine war. ¶¶ 145-46. Chirico and McGrath emphasized that any short-term revenue decrease due to this shift was not indicative of an overall decline, and the Company anticipated a more stable revenue stream over time. ¶¶ 150-51. Securities analysts bought into Defendants' spin, with Goldman Sachs saying that Avaya's "deal momentum" was "healthy." ¶ 36.

Defendants further emphasized Avaya's internal controls to assure investors that Chirico and McGrath could be trusted to conduct business appropriately and properly develop and execute on Avaya's growth strategy and guidance. ¶ 37. Critically, the May 10, 2022 investor presentation highlighted Avaya's "Tone at the Top Culture" and "Robust Risk Management Framework" as key factors "Enhancing Sustainable Value" for Avaya and its shareholders. ¶ 135.  During the investor call, Chirico and McGrath addressed analyst concerns and stated Avaya could provide accurate guidance as the Company transitioned to a "cloud-first sales approach." ¶¶ 150-151. Finally, the May 10, 2022 Form 10-Q included Defendants' conclusion – based on their evaluation – that Avaya's internal controls were effective as of March 31, 2022. ¶ 139.

Finally, Defendants downplayed Avaya's debt and liquidity concerns. ¶ 43. Avaya's May 2022 Form 10-Q affirmed that the Company had sufficient cash and borrowings to meet future cash needs for at least 12 months. ¶ 140. Chirico emphasized Avaya's long-term stability during

the investor call, including a "focus on the long game" and his "excite[ment] about Avaya's future" and the "team's ability to deliver on the opportunity in front of us." ¶¶ 144, 148. In turn, McGrath stated Avaya had taken steps to "strengthen" its capital structure and enhance its "financial flexibility," including by addressing the $350 million convertible notes. ¶¶ 147, 149.

**D.    Despite Knowledge that 3Q FY 22 was Progressing Poorly, Defendants Continue to Publicly Project Confidence in the Guidance and Avaya's Financial Standing.**

Emails from June 2022 demonstrate Defendants' knowledge of the poor performance in 3Q FY 22 and its potential consequences for Avaya. These emails also illustrate a highly inappropriate tone from senior leadership. On June 4, 2022, Chirico emailed Spears and others stating that "simply put, we can't afford to miss Q3." ¶ 62. Demanding revenue be found whether it existed or not, Chirico wrote that "[w]e are at 29m in [TCV] bookings and need to be [at] 160," and a "list of [bulk deals] must equal 30m dollars." ¶ 62. Later, on June 12, 2022, Chirico again told Spears and others that recent revenue projections were "clearly not good at all," and that the "number for [North American revenue] must be $420" because a number of "404 (which know [sic] appears to be a stretch) doesn't get it done." ¶ 62.

Similarly, internal Avaya documents show McGrath knew the Company would not meet its guidance. ¶ 64. Prior to a June 7, 2022 Board meeting, McGrath told Spears that Avaya needed to acknowledge risk around its $700 million revenue projection for the 3Q, with $430 million coming from North American sales. ¶ 64. Spears then sent an email to the Board on June 7, 2022 acknowledging "North America [had] experienced an unusually slow start to the quarter" and lowered the projected North American revenue to $410 million. ¶ 64.

Notably, Chirico and McGrath acknowledged risks of missing publicly announced revenue expectations *before* and *after* Avaya announced efforts on June 8, 2022 to raise $500 million in financing that relied on touting its revenue guidance. ¶¶ 48-50, 63, 65. For example, just days

before recognizing risk around the $700 million revenue figure, McGrath addressed Avaya's debt financing options in a June 3, 2022 "Fireside Chat" with Barclays that omitted any information regarding Avaya's declining business prospects and its effect on the Company's solvency. ¶ 153. And McGrath had good reason too, as Barclays noted that "removing the convert overhang [] would be a positive for the equity." ¶ 153.

Nor did Chirico or McGrath make any changes to the guidance figures presented to potential lenders, as reflected in the June 8, 2022 investor presentation. ¶¶ 48-49. That same presentation echoed McGrath's discussion with Barclays, where Defendants continued to perpetuate the notion that Avaya had a greenfield of recurring revenue opportunity, emphasizing that only 12% of the installed base legacy customers had been migrated to OneCloud. ¶¶ 154, 156.

## E.   Avaya's Prospects Do Not Improve as 3Q FY 22 Ends, Yet Defendants Raise No Alarms.

Avaya's situation had not improved near the end the quarter. On June 14, 2022, Avaya's Revenue Director responded to an email providing an update on 3Q revenue and observed that it "looks like the numbers still don't add all up" and "another miracle quarter" would be needed to hit the revenue goals. ¶ 67. The VP of Sales Finance said Avaya would need "more than one miracle" to close the "quite substantial" gap. ¶ 68.

Despite these dire prospects, by June 27, 2022, Defendants tricked lenders into agreeing to provide the Company with $600 million in aggregate financing through assurances that Avaya was on track to meet the 3Q FY 22 guidance and affirming that Avaya was financially sound. ¶ 53. In announcing the deal, McGrath stated the financing "supports and accelerates [Avaya's] business model transformation." ¶158. McGrath made this comment despite his prior recognition weeks earlier that rather than accelerating, Avaya's business model transformation was sputtering and the Company would fall well-below the publicly announced guidance. ¶ 64.

Days later, June 30, 2022, the Senior Director of Sales Finance estimated that 3Q North American revenue would be about $350 million, below the projection provided to the Board. ¶ 69. The next day, the Global VP of Financial Planning and Analysis and the VP of Sales Finance received a report indicating that 3Q gross revenue was only $604 million, down from the $685-$700 million guidance figure. ¶ 70.

Recognizing the magnitude of the problem, on or about July 1, 2022, Chirico directed Spears to draft an email to the Board about the earnings miss. ¶ 71. The draft acknowledged "significant gaps in execution and leadership," "a significant and direct fall out in our International and Latin America businesses as a result of questions around our liquidity," and "unprecedented aggravation from the channel in Q3" caused in part by "accelerated shifts to the cloud [] leaving our partners out of future revenue streams[.]" ¶ 71. Spears never sent the draft email. ¶ 72.

On July 3, 2022 , the Board received an email from an anonymous whistleblower who was a "senior and longtime employee of Avaya." ¶ 73. The whistleblower claimed that the "story of [the Company's transition to a] subscription" revenue model was "a blatant financial engineering ploy" to preserve Chirico's job and buy time to sell the Company. ¶73.  The email stated that "[Chirico] and his executives totally failed in all of their investments in R&D and products to deliver the streams that cover for the dip in revenue[.]" ¶ 75. The whistleblower called McGrath "one of the most overpaid and overrated CFOs in the industry, [whose] only forte is coming up with lies and fabrications[.]" ¶ 74. The whistleblower raised concerns about "Jim [Chirico] and his mafia" and confirmed the email did not first go to Avaya's compliance team because "[any message] will get swept under the carpet by one of Jim [Chirico's] goons." ¶ 73.

Despite recognition that 3Q FY 22 results were well-below guidance, and the receipt of the whistleblower email implicating Chirico and McGrath, none of these facts were conveyed to

lenders or investors. ¶¶ 72, 76. As detailed in complaints filed in North Carolina Superior Court by lenders who purchased the convertible notes issued by Avaya in June 2022, which are referenced in the Complaint, Avaya's financing closed on July 12, 2022, with an officer's certificate signed by McGrath attesting to Avaya's solvency.[2]

**F.      The Truth is Revealed Regarding Avaya's Business, Financial Health, and Deficient Internal Controls.**

Defendants' fraudulent scheme began to unravel on July 28, 2022, when Avaya slashed its estimated 3Q revenue to $575-$580 million, stated that it expected "significant non-cash impairment charges as of June 30, 2022," and cautioned that prior guidance "should no longer be relied upon." ¶¶ 89-91. The Company further disclosed that Chirico was being "removed" as President and CEO and was resigning from the Board. ¶ 91. Avaya's stock fell 57%. ¶ 92.

Then, on August 9, 2022, Avaya reported 3Q FY 22 revenue of $577 million, below the guidance of $685-$700 million. ¶ 94. New CEO Alan Masarek attributed the shortfall to "operational and executional shortcomings." ¶ 94. Avaya also revealed there was "substantial doubt about the Company's ability to continue as a going concern," with Masarek adding that "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." ¶ 96. Finally, Avaya announced two separate internal investigations related to the Company's 3Q FY 22 results and a recently received whistleblower letter. ¶ 97.  Along with these investigations, Avaya disclosed it was assessing potential material weaknesses in internal controls over financial reporting ("ICFR") related to the maintenance of its whistleblower log and dissemination of related materials. ¶ 98. Avaya's stock price fell another 45%. ¶ 100.

More revelations continued to dribble out. On November 7, 2022, Avaya announced

---

[2] *Brigade Calvary* Complaint, ¶¶  68-69; *Alcof III* Complaint, ¶ 53.

McGrath's retirement. ¶ 107. Then, on November 30, 2022, Avaya issued a Form 8-K disclosing previously unknown material deficiencies in ICFR. ¶¶ 108-109. The previously disclosed review determined that the Company did not appropriately log an email received prior to the filing of the Form 10-K in November 2021 and did not "convey" the existence of email or the investigation undertaken in response to certain members of management or Avaya's accounting firm. ¶ 109. Based on this failure, Avaya decided to reassess its ICFR for material weaknesses, and found that Avaya "did not design and maintain effective controls to assure appropriate communication between certain functions within the Company" and "did not design and maintain effective controls over the ethics and compliance program." ¶ 110. Therefore, Avaya's "disclosure controls and procedures were not effective as of September 30, 2021," and Chirico and McGrath's assessment of ICFR "should no longer be relied upon." ¶ 112. Avaya warned that its other investigations were ongoing and could identify more issues. ¶ 113. Avaya's stock price fell approximately 14%. ¶ 115.

Near the end of the year, new disclosures left no doubt of Avaya's precarious position. On December 13, 2022, Avaya filed with the SEC financial disclosures that it had provided confidentially to lenders to aid settlement negotiations and warned certain lenders were not supportive of an out-of-court settlement. ¶¶ 116-117. The *Wall Street Journal* then reported on December 16, 2022 that Avaya was "nearing a chapter 11 bankruptcy filing." ¶ 117. Avaya declared bankruptcy in February 2023, emerging in May 2023 under a court-approved plan of reorganization that wiped out any interest held by common stock holders. ¶¶ 132-33.

The SEC filing also addressed Avaya's poor performance in 3Q FY 22. ¶ 118. The presentation to the lenders confirmed the results were due to "[h]istorically low funnel (pipeline) conversion rates" that led to "lower Perpetual software revenue" and "[s]lower customer migration

from maintenance to subscription coupled with shorter contract duration" that "negatively impacted recognizable revenue." ¶ 118. On this news, Avaya's stock price fell 40% on December 13, 2022, and additional 54% on December 16, 2022. ¶ 119.

### G.    Avaya Confirms Material Weaknesses in ICFR Directly Connected to the Conduct of Chirico and McGrath.

On February 10, 2023, Avaya revealed potential control deficiencies, including the failure to set "an appropriate 'tone at the top.'" ¶¶ 121-22. To address these deficiencies, Avaya said it was "committed to transforming its culture to embrace transparency and open communication," and identified the departures of Chirico and McGrath as part of this transformation.  ¶ 121.

On September 8, 2023, Avaya disclosed the results of the Audit Committee investigations. ¶ 122. The Audit Committee found that there was "[i]nappropriate tone at the top among certain members of senior management, which resulted in a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters throughout the organization and with others outside of the organization." ¶ 123. The Audit Committee determined that this "[i]nappropriate tone at the top" contributed to Avaya's failure to properly maintain a whistleblower log and disseminate information related to an whistleblower investigation to certain members of senior management and Avaya's external auditor. ¶ 124.

The investigation also found that the vast discrepancy between the 3Q FY 22 guidance and actual results were due to "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model"; Avaya's "business model in which a significant portion of quarterly revenue is generated at the end of each quarter," making accurate forecasting "difficult"; and "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, which

negatively influenced customer sentiment." ¶¶ 125-127.

The September 2023 Form 10-Q further detailed Avaya's "Remediation Plan," and noted that Avaya had already made "enhancements to our internal control over financial reporting," including the removal of Chirico and McGrath. ¶ 128. Additional remediation activities also appeared to correct internal control deficiencies caused by Defendants' conduct. ¶ 129.

**H.    Former Avaya Employees Corroborate the Company's Unsustainable Business Model and Confirm Chirico and McGrath's Access to Revenue Information.**

CW accounts corroborate the internal Avaya emails and the Audit Committee findings, further illustrating Defendants' access to contemporaneous internal reports that would have exposed the Company's unsustainable business model and faulty revenue projections.

CW-1 confirms that the notion that transitioning legacy customers to the cloud would generate sustainable recurring revenue was widely understood to be a fallacy. ¶¶ 78-79. CW-1 was a manager who ensured accurate revenue booking and recognition and reported to a finance director. ¶ 78. Per CW-1, in 2021 and early 2022, existing customers were enticed through steep discounts (as much as 50%) to cancel existing "maintenance" contracts and sign "new" upgraded software subscription contracts. ¶ 78. The new contracts had higher monthly rates and represented an increase in revenue to Avaya. ¶ 78. Accordingly, the revenues got a one-time boost during a quarter when Avaya recognized a significant portion of the new contract upon signing.  ¶ 79. The recognizable revenue would then drop significantly to a pro rata amount each month over the contract's life. ¶ 79.  As such, Avaya could not project revenue into future quarters consistent with the boosted revenue numbers. ¶ 79.

CW-2, an Avaya Regional Sales Leader of a sales team focused on transitioning existing customers from perpetual software license contracts to software subscription contracts, provided a similar account. ¶ 80.  CW-2, who left Avaya in April 2022, confirmed that sales personnel felt

intense pressure to transition existing customers to subscription contracts in recent years. ¶¶ 80-81. Customers, however, would only agree to one-year subscription contracts, and rejected contracts with longer terms (*i.e.,* three years) because they were considering leaving Avaya. ¶ 81. Avaya sales managers recognized the "margins were shitty" on these contracts because salespeople needed to offer steeper discounts or greater concessions than normally permitted to close the deals. ¶¶ 82-83. CW-2 said it was known these discounts and concessions were necessary to close deals and meet Wall Street expectations. ¶ 83.

Both CWs confirm that Chirico and McGrath had access to information tracking Avaya's sales pipeline and financial performance. ¶ 84. CW-1 attended sales meetings near the end of 3Q FY 22 that McGrath also attended.  ¶ 85. At the meetings, sales leaders presented regional reports generated from Avaya's salesforce.com database showing all the contracts that had closed in the quarter and which remained open. ¶ 85. The discussions included requests for approval of additional discounts to secure contracts before the end of the quarter and estimates of potential revenue recognition.  ¶ 86.

CW-2 confirmed that McGrath often attended, and Chirico sometimes attended, "deal desk" meetings where sales team members sought approval for steeper discounts or greater concessions than normally offered to close deals. ¶ 82. Area Sales Managers ("ASLs") also met weekly with executives, including Chirico and McGrath, for revenue forecasting meetings. ¶ 87. CW-2 did not attend these meetings, but understood that ASLs would report on expected closed deals and pending deals in their territories. ¶ 87. These discussions would highlight how close to or far off each territory was to hitting quarterly revenue targets. ¶ 87.

Finally, CW-2 detailed that McGrath had a "spreadsheet" that allowed him to plainly see how many existing customers who were still in perpetual license agreements could be converted

to subscription contracts. ¶ 88. The spreadsheet also showed an expected conversion rate for those customers. ¶ 88. In other words, "[McGrath] knew what was left. That was part of the smoking gun. The math." ¶ 88.

### III.    ARGUMENT

To state a claim for securities fraud under Rule 10(b)-5(b), Lead Plaintiff must allege "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *5 (S.D.N.Y. Apr. 1, 2015). To state a claim for securities fraud under Rule 10b-5(a) and (c), the complaint must allege that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance. 17 C.F.R. § 240.10b-5(a), (c); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004). When considering such motions, the Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003). The test is whether the complaint contains "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    Defendants Incorporate by Reference Several Exhibits for an Improper Purpose.

As part of their motions, Defendants collectively attach nineteen (19) exhibits totaling over 600 pages. *See* Hull Decl. and Han Decl. Lead Plaintiff does not contest these documents' authenticity or that they were publicly available. Lead Plaintiff, however, object to McGrath's and Chirico's improper application of the incorporation by reference and judicial notice doctrines with respect to certain exhibits. In several instances, Defendants ask the Court to accept the *truth* of the matters asserted in certain exhibits to undermine Lead Plaintiff's well-pled factual allegations

and support their counter-narrative of events.  This is an improper tactic in the Second Circuit, as the Court should only take notice of the fact that the exhibits "contained certain information, without regard to the truth of their contents." *See, e.g., Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir.2008); *see also Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) (addressing "incorporation-by-reference" doctrine).

For example, McGrath cites Exhibit 2 to negate allegations that he was pushed out as a result of findings from the Audit Committee's investigation, and argue that since he purportedly elected to "delay his retirement" to support the new CEO's transition, Lead Plaintiff has not alleged "highly unusual and suspicious" circumstances for his resignation. McGrath MTD at 14. Similarly, McGrath relies on Exhibits 5 and 7 – which detailed growth in ARR – to argue that Defendants' statement regarding the "well paved" path to $1 billion ARR is not false and misleading. *Id.* at 11-12. Both McGrath (Exhibit 3) and Chirico (Exhibits B and C) cite SEC filings and an earnings call transcript describing Avaya's accounting as it relates to recurring revenue to support their claim that the explanation for the 2Q FY 22 guidance miss was not false and misleading.  Chirico MTD at 3, 13-14; McGrath MTD at 2-3.  Finally, McGrath cites Exhibit 12, and Avaya's note that none of the identified material weaknesses in internal controls resulted in any "material misstatements" to assert his assessment of the effectiveness of Avaya's internal controls was not false.  McGrath MTD at 17. Of course, the Complaint disputes each of these facts.  It would be inappropriate at this stage for the Court to consider these exhibits for these points.  *See SEC. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 328–29 (S.D.N.Y. 2019).

**B.**     **The Complaint Pleads Deceptive Conduct in Furtherance of a Scheme.**

Defendants do not dispute that the Complaint pleads the existence of a fraudulent scheme

for purposes of Rule 10b-5(a) and (c).[3] ¶¶ 199-201. The Exchange Act's scheme liability "provisions capture a wide range of conduct." *See Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Since *Lorenzo*, courts have sustained scheme liability claims covering a menagerie of fraudulent conduct contributing to the dissemination of false and misleading information. *See, e.g.*, *Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023). Allegations of deceptive conduct need only satisfy Rule 9(b) by "plead[ing] with particularity the nature, purpose, and effect of the fraudulent conduct and the role of the defendants," which can be done "in broad strokes." *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016). The Complaint's allegations easily satisfy this standard.

Here, Defendants faced $350 million in debt, and understood Avaya risked bankruptcy absent debt financing. ¶¶ 29-30. Bankruptcy meant Defendants could lose their jobs, reputations, and the value of their stock-based compensation. ¶¶ 161-62. As such, Defendants hatched a scheme to raise the necessary financing under false pretenses. Defendants bolstered the scheme by painting a picture of Avaya's strong financial health, effective internal controls, and sustainable business model via its transformation to the cloud. ¶¶ 134-159. In furtherance of their scheme, during the marketing process for additional debt financing, Chirico and McGrath told the lenders that Avaya was on track to hit its earning guidance and affirmed that Avaya Inc. and its parent, Avaya Holdings (a guarantor of the Notes), were solvent. ¶¶ 48-49, 53; *supra*, § II.E n.2. To keep up the charade, Defendants pushed staff to support "impossible" guidance goals they knew were based on dubious assumptions. ¶¶ 55-60, 62, 64. McGrath further signed SEC documents to disseminate deceptive information to investors through the SEC's website. ¶ 31, 48, 208. And in July 2022,

---

[3] If Defendants address their scheme liability on reply, such arguments should be rejected and deemed waived by the Court because they would be raised for the first time on reply. *See Chevron Crop. v. Donziger*, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018).

Chirico hid news of Avaya's stark earnings miss from the Board to conceal the scheme. ¶¶ 71-72. Defendants' scheme worked, as in addition to artificially propping up the stock price, Avaya raised almost $600 million in debt financing as a lifeline. ¶¶ 51-52. The Complaint therefore states a claim for scheme liability under Rule 10b-5(a) and (c). ¶¶ 199-201.

## C.     The Complaint Alleges False and Misleading Statements.

In addition to stating a claim based on Defendants' deceptive conduct, the Complaint also alleges a multitude of false and misleading statements made by Defendants in violation of Rule 10b-5(b). A statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). Likewise, while Rule 10b-5(b) does not create an affirmative duty to disclose any and all information, once Defendants speak on an issue, they have a duty to be accurate and complete and can be liable for material omissions. *See Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

***Defendants Misled Investors About the Strength of Avaya's Business and Avaya's Financial Health.*** In May and June 2022, Defendants misled investors and falsely portrayed Avaya as "successfully repositioning" itself to a recurring subscription revenue model through a "strategy" that was "taking hold faster than [] anticipated" and with a "well paved" path to $1 billion ARR. ¶¶ 134, 143. Defendants emphasized the underlying "strength" and "momentum" of Avaya's business and untapped demand due to only "12%" of the installed base having been moved to OneCloud. ¶¶ 136, 144, 154, 156. Disappointing 2Q FY 22 financial results were blamed on "two dynamics" that were not long-term concerns. ¶¶ 145-46, 150-51.

Defendants also falsely affirmed Avaya's long-term financial stability by certifying in the May 2022 Form 10-Q that Avaya had "sufficient" cash for at least "twelve months" and through Chirico's emphasis on his "excite[ment] about Avaya's future" and "focus on the long game." ¶¶

140, 144, 148. McGrath gave no indication of the underlying issues with the business that would ultimately lead to Avaya's insolvency when addressing Avaya's pending debt maturities. ¶¶ 96, 149, 153, 158. Defendants even raised financing based on the faulty guidance figures. ¶¶ 48-53.

These statements were false and misleading when made. Defendants knew Avaya could not execute on its growth strategy and meet 3Q FY 22 guidance. Beginning as early as April 11, 2022 – one month before Avaya announced the guidance –the Chief Revenue Officer acknowledged the need to revise the "bookings" projections to a more realistic starting point and said he would raise the issue to a "much smaller audience," presumably Chirico and McGrath. ¶¶ 55-57. Prior to the public announcement, Chirico was made aware of the shaky assumptions underlying the guidance, which included a revenue projection described as "impossible" to achieve. ¶¶ 59-60. McGrath even told the Chief Revenue Officer that Avaya needed to acknowledge risk around the $700 million revenue projection in advance of a June 7, 2022 board meeting. ¶ 64.

As detailed by former Avaya employees, Avaya's migration of legacy customers to subscription contracts were facilitated by offering shorter contract durations and steep discounts and concessions that led to poor margins. ¶¶ 78-79, 81-83, 86. The former employees confirmed Defendants access to information regarding these issues through reports generated by Avaya's internal Salesforce.com database, attending meetings with sales personnel, and a spreadsheet accessible by McGrath. ¶¶ 82-83, 85-88. Defendants' knowledge is further corroborated by the Audit Committee's findings that Avaya had "[a] declining pipeline of existing legacy customers" who could transition to the "subscription model" and that "concerns . . . about the Company's financial health . . . negatively influenced customer sentiment." ¶¶ 125-127.

*Defendants Falsely Affirmed Avaya's "Tone at the Top Culture" and Internal Controls*

***Over Financial Reporting.*** Defendants emphasized Avaya's "Tone at the Top Culture" and "Robust Risk Management" as key factors "Enhancing Sustainable Value" in the May 10, 2022 investor presentation. ¶ 135. Avaya's 10-Q confirmed that Chirico and McGrath had evaluated Avaya's disclosure controls and procedures and found them effective. ¶ 139. Defendants assured investors during the investor call that Avaya had proper procedures to provide accurate guidance as the Company transitioned to a "cloud-first sales approach." ¶¶ 150-151.

These statements were false and misleading. In truth, due to material weaknesses in ICFR, including issues with maintaining a whistleblower log, "disclosure controls and procedures were not effective as of September 30, 2021." ¶¶ 110-112. As uncovered by the Audit Committee, Defendants did not disclose senior management's "[i]nappropriate tone at the top," a finding consistent with Chirico's internal emails telling Avaya employees that the Company "can't afford to miss Q3" and demanded revenue to be found whether it existed or not, as well as the July 2022 whistleblower complaint accusing McGrath and Chirico of improprieties related to their roles as CEO and CFO. ¶¶ 62, 74-75 123. Finally, these ICFR material weaknesses led to the departure of Chirico and McGrath as part of Avaya's commitment to "transform[] its culture to embrace transparency and open communication." ¶ 121.

1.    **The PSLRA's Safe Harbor Provision Does Not Protect Defendants.**

a.    **The Statements Represented the Present State of Affairs.**

Defendants identify the following purported forward-looking statements: the "well paved" path to $1 billion ARR, Avaya's business transformation "strategy taking hold faster than . . . anticipated," and "excite[ment] about Avaya's future" and the "team's ability to deliver on the opportunity[.]" Chirico MTD at 11-12 (citing ¶¶ 134, 143, 148); McGrath MTD at 6 (citing ¶ 134). These statements, however, represented present facts about Avaya's business and are not forward looking. *See P. Stolz Fam. P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or

present fact . . . is a different matter. Such facts exist and are known; they are not unforeseen or contingent.").

*Gissin v. Endres*, 739 F. Supp. 2d 488 (S.D.N.Y. 2010), cited by Chirico, is distinguishable. The statement in *Gissin* included the word "current," but it modified "expectation" and plaintiffs "ignore[d] the forward-looking 'we feel we will be' conclusion." 739 F. Supp. 2d at 506. Here, Chirico's statements contain present tense false assurances, including that the "[t]he path to hit $1 billion ARR mark by the end of calendar year 2022 *is well paved***,**" "the strategy is *taking hold faster than we anticipated*," and "*excited* about Avaya's future and . . . *our team's ability to deliver on the opportunity*[.]"  ¶¶ 134, 143, 148. Similarly, McGrath cites *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022), which addressed the expected timeline and budget of an underground expansion project and "contain[ed] no detail about [the] current situation." 625 F. Supp. 3d at 211. In contrast, the statement that the path to $1 billion ARR is "well paved" reflected the current state of Avaya's business and ability to hit that figure. ¶ 134.

Since the above statements represent present facts, they are not protected by the PSLRA. *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023) (statements grounded in "reliable customer base" not protected by safe harbor); *In re Nortel Networks Corp. Secs. Litig.*, 238 F. Supp. 2d 613, 628-29 (S.D.N.Y. 2003) (statement that "[l]ooking forward to 2001, we continue to expect" overall market growth "in excess of 20[%]" not forward-looking).

### b.    The Boilerplate Disclosures Did Not Warn Investors of the Real Risks.

To rely on the PSLRA's safe harbor, Defendants must show that forward-looking statements were accompanied by "meaningful" cautionary language that "was not boilerplate." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). Such language "must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Bear Stearns Cos., Inc. Sec. Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011).

McGrath points to disclosure language from the May 10, 2022 press release, which also incorporates the risk factors from the November 2021 10-K, but it is not meaningful. McGrath MTD at 10-11. The disclosures, for example, failed to warn investors of Avaya's "[i]nappropriate tone at the top . . . characterized by significant pressure to meet aggressive sales projections" which threatened the "well paved" path to 1 billion ARR. ¶ 123. The disclosures did not highlight that to entice existing customers to transition to subscription contracts, Avaya would accede to customer demands for shorter contracts, which "negatively impacted recognizable revenue." ¶¶ 81, 118. In his motion, McGrath quotes no language that addresses the risk of Avaya's debt maturity affecting customer sentiment, which the new Avaya CEO cited as a factor in August 2022 for the poor 3Q FY 22. ¶ 96; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) (noting that because "presales" appeared nowhere in the cautionary language, the court could not rule it sufficiently warned "of the risks of relying on presales as a measure of demand"). Avaya's cautionary language could apply to any technology company – which provides no guidance at all. *See In re Bear Stearns*, 763 F.Supp.2d at 495 ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").

Even if not boilerplate, the language is still insufficient. First, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *See Meyer*, 761 F.3d at 25. For example, CW-2 observed the issue with customers requesting shorter contract durations up until April 2022, before Avaya offered the purported cautionary language. ¶¶ 80-83. Issues with Avaya's business were known before the May 10, 2022 "well paved" statement and were likely "raise[d]" to Chirico and McGrath. ¶¶ 55-60. As such, these cautionary disclosures were made when the risk had already materialized, meaning they provide no safe

harbor. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 288-289 (S.D.N.Y. 2020) (crediting CW testimony to find cautionary language insufficient). The materialized risk further distinguishes this case from *S.S. Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp, 3d 429, 443-44 (S.D.N.Y. 2023), where the court held there was no showing that the risks laid out in the disclosures had already materialized. McGrath MTD at 10-11. Second, while McGrath relies upon the cautionary language found in the November 2021 10-K, the failure to modify the language to reflect new risks that arose, including negative customer sentiment related to Avaya's debt maturities, "belies any contention that the cautionary language was 'tailored to the specific future projection.'" *See Slayton*, 604 F.3d at 773.[4]

### c.    The Statements Were Made with Actual Knowledge of Falsity.

If Defendants' statements actually were forward looking, the safe harbor does not "protect[] a defendant from liability if a statement was knowingly false when made." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003). In this context, actual knowledge of falsity does not mean actual knowledge, to a certainty, that a projection is impossible to meet. Rather, a forward-looking statement is made with actual knowledge of falsity if the speaker has actual knowledge that one or more of the following implicit factual assertions is untrue: (i) that the statement is genuinely believed, (ii) that there is a reasonable basis for that belief, and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *See Slayton,* 604 F.3d at 774; *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 391 (S.D.N.Y. 2012) ("[U]nder *Slayton*, a forward-looking statement is made with actual knowledge of falsity if, *inter alia*, a company has actual knowledge

---

[4] Chirico does not specifically identify which cautionary language satisfies the safe harbor requirements, thereby waiving any such argument. Chirico MTD at 11; *Chevron Corp. v. Donziger*, 2013 WL 4045326, at *1 n. 3 (S.D.N.Y. Aug. 9, 2013).

of 'undisclosed facts tending to seriously undermine the accuracy' of the projection."). As described in § III.E., Defendants knew that the alleged forward-looking statements were directly contradicted by information showing Avaya's declining business and disappointing prospects. In other words, this is not a "fraud by hindsight" case, and Lead Plaintiff is not challenging Defendants' "lack of clairvoyance." *See* Chirico MTD at 20 (citing cases); McGrath MTD at 11 (citing cases). Their arguments do not warrant a different conclusion.

**Internal Emails.** Defendants argue that the internal emails detailed in the complaint do not reference ARR or suggest that Avaya's business strategy was not taking hold. *See* McGrath MTD at 12; Chirico MTD at 19-20. These arguments ignore how critical OneCloud ARR (*i.e.*, the measure of tracking Avaya's transition to a subscription model) was to *overall revenues*, as $1 billion ARR for 2022 represented over one-third of Avaya's projected revenue guidance. ¶ 31. It is not dispositive that the emails make no specific reference to "ARR," because from at least April 2022, the Chief Revenue Officer discussed raising concerns with the forthcoming guidance to a "much smaller audience" (presumably Defendants), "everyone kn[ew] we should not load 430M with 80M of revenue judgment in Q3," and Chirico reportedly received information prior to the guidance announcement that it included "impossible" to achieve revenue projections. ¶¶ 55-60. This information from the internal emails is relevant to Avaya's "well paved" path to $1 billion ARR and subscription model growth strategy and demonstrates that Defendants had actual knowledge of falsity when they made the statements. ¶¶ 134, 143.

Defendants, moreover, mischaracterize the Complaint. Lead Plaintiff is not challenging the falsity of the ARR figure announced, or alleging that Avaya was not actually pursuing its transition to the cloud. *See* Chirico MTD at 19-20; McGrath MTD at 12. Nor is falsity undermined by the announced increase in ARR between the 2Q and 3Q FY 22. McGrath MTD at 12. Rather, the

thrust of Lead Plaintiff's case is Defendants gave the false impression that Avaya was *successfully transitioning* from a traditional hardware business into a subscription-based software company, when in reality, the rosy 3Q and year-end financial projections would be "impossible" to meet and the transition required unsustainable substantial concessions and discounts to get existing customers on subscription contracts. ¶¶ 55-60, 77-83, 134, 143.

*CW Testimony.* The argument that the CW testimony does not support a finding of falsity can be similarly dismissed. *See* McGrath MTD at 12-13; Chirico MTD at 19. The CW testimony does not show that "Avaya focused on its transition to a subscription business," as McGrath contends, but rather concerns Defendants' knowledge of Avaya's unsustainable business model dependent on dwindling customer demand, steep discounts and concessions, and short contract durations that negatively impacted revenue. ¶¶ 77-83, 118. Such testimony shows the purported forward-looking statements were false when made. ¶¶ 134, 143, 148. The later admission that Avaya had "[a] declining pipeline of existing legacy customers" that could migrate to subscription software corroborates this testimony. ¶ 125.

Furthermore*, Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013), cited by McGrath (MTD at 13) to argue that CW-1 and CW-2 lack first hand knowledge, is distinguishable. In *Janbay*, the confidential witnesses "gleaned information from 'general conversation'[], other employees[], and notes 'read' to and by CW3." *Id.* at *8. Here, given the CWs' positions, personal knowledge, and attendance at key meetings, the attempt to characterize their knowledge as "second-hand" fails. ¶¶ 77-88; *see also Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-39 (S.D.N.Y. 2010) (crediting CW testimony when witnesses provided relevant contrary information to defendants, attended meetings about issues with defendants, and supported allegations of "widespread knowledge" of problems).

*Audit Committee Investigation Findings.* McGrath also challenges the inference of falsity offered by the Audit Committee's finding that Avaya had a "declining pipeline of existing legacy customers" who could transition to subscription contracts. McGrath MTD at 13-14. But McGrath ignores: (i) senior finance personnel under his direction were raising concerns regarding Avaya's revenue projections leading up to the May 10, 2022 "well paved" statement (¶¶ 55-60); (ii) ARR made up a significant portion of Avaya's revenue, so any concerns regarding revenue projections would invariably include ARR (*see supra* at 25); and (iii) the CWs described the steep concessions and short contract durations needed to entice existing customers (¶¶ 77-83). These allegations are specific and demonstrate falsity, and cut against McGrath's reliance on *Roseville Emps. Ret. Sys. v. Nokia Corp.*, 2011 WL 7158548, at *9 (S.D.N.Y. Sept. 6, 2011), where the plaintiff did not plead "existing fact[s]" showing falsity. The allegations also support a falsity finding for the statements concerning the 12% of Avaya's installed base on OneCloud (¶ 154) – which represented that Avaya had a greenfield of recurring revenue opportunity – given Defendants' knowledge of struggles to transition existing customers. *In re Nortel*, 238 F. Supp. 2d at 629; *see also* McGrath MTD at 7, 18 (citing ¶¶ 154, 156).

Moreover, McGrath is wrong that the Audit Committee's "tone at the top" finding is irrelevant to the falsity of the "well paved" statement. McGrath MTD at 13-14. The investigation did not claim that the missed guidance in 3Q FY 22 resulted from mere forecasting or judgement errors by Defendants. Rather, the investigation identified "[i]nappropriate tone at the top" among senior management "characterized by significant pressure to meet aggressive sales projections." ¶¶ 122-23. The nature of this finding suggests intentional misconduct throughout the Class Period, including that Chirico and McGrath pushed "aggressive sales projections" with knowledge of the underlying issues with customer demand. *See, e.g.,* ¶¶ 62, 82-83, 85-86. In addition, post-Class

Period fact revelations can support falsity. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (crediting post-class period revelation from audit committee member that "internal control problems" were "more serious" than publicly conveyed).

The "tone at the top" admission also shows that Chirico's and McGrath's departures are "highly unusual and suspicious" because they were cited as part of Avaya's efforts to "remediate the control deficiencies" and "transform[] its culture." ¶ 121. For these reasons, McGrath's authorities on this point are inapposite. McGrath MTD at 14.[5] Finally, taking all allegations as true, the Court can discount McGrath's assertion that he "delay[ed] his retirement" to November 2022 at the new CEO's request and therefore it had nothing to do with this remediation. *Id.*; *see also In re Sadia, S.A. Sec. Litig.,* 643 F. Supp. 2d 521, 523–24, 534 (S.D.N.Y.2009).

### 2. Defendants' Statements Were Not Corporate Optimism or Puffery.

Chirico argues that the alleged misstatements relating to the state of Avaya's business (*e.g.*, the Company was "exceed[ing] expectations," "successfully repositioning," the "underlying strength" and "momentum of the business," and "well paved" path to $1 billion ARR) are corporate puffery. Chirico MTD at 15 (citing ¶¶ 134, 143-44, 148). These statements are not puffery, however, because they communicated that Avaya had a sustainable business model and strong financial health via its transformation to the cloud, important facts regarding the cornerstone of Avaya's business strategy that investors and analysts considered important. *See, e.g.,* ¶ 28; *see also Freudenberg*, 712 F. Supp. 2d at 191 ("'Organic growth' was also actionable because it was represented by Defendants to be the focus of E*TRADE's business."). Moreover, they are verifiable statements of fact and cannot simply be cast as optimistic statements. *See Stadium Cap.*

---

[5] *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (a resignation is "highly unusual and suspicious" when "independent facts indicate" resignation "tied to the fraud alleged"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (the "bare fact" the CFO retired "just prior to" disclosure of "lack of financial controls" did not support scienter).

*LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*3 (S.D.N.Y. Feb. 5, 2024) ("fluctuations in order patterns" was a "determinate, verifiable statement").

Chirico also made these statements when, in truth, Avaya was experiencing a declining pipeline of existing customers who could transition to subscription contracts, and he knew that Avaya's revenue projections – incorporated into the guidance – were built on such shaky assumptions that they were described as "impossible" to achieve. ¶¶ 55-60, 62, 77-88. Statements are not puffery if they contradict facts known to a defendant. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements describing retailer's inventory as "in good shape" were not puffery when defendants "allegedly knew the contrary was true"). As such, these statements are actionable. *See Manavazian v. Atec Grp., Inc.*, 160 F.Supp.2d 468, 480–81 (E.D.N.Y.2001) ("extremely positive" statements about "new organizational structure" that provided "framework" for "organic growth" were actionable). Since the purported "puffery" statements misrepresented existing facts, Chirico's cited cases are inapposite, as those courts found no allegations of contradictory facts or found that the statements did not address present facts. Chirico MTD at 14-15.[6]

Defendants are also incorrect that the "Tone at the Top Culture" statement is non-actionable puffery or fails to make a make an *actual* representation. Chirico MTD at 16; McGrath MTD at 15. Defendants touted Avaya's "Tone at the Top Culture" as a competitive advantage because it was part of Avaya's framework to "[e]nhanc[e] sustainable value in an evolving

---

[6] *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211-12 (S.D.N.Y. 2020) (no "sufficient facts to show defendants could not have reasonably believed" the statements); *S.S. Trade*, 704 F. Supp. 3d at 445 (no argument "defendants knew contradictory facts"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements lacked "definit[ive] positive projections that might require later correction"); *Rombach v. Chang*, 355 F.3d 164, 174 (2d. Cir. 2004) (failure to "allege with particularity any actual falsity"); *Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*, 2022 WL 784017, at \*16 (S.D.N.Y. Mar. 15, 2022) (no allegations of "contradictory" information); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (challenged statements were "in no way insuring that dividend rates would remain constant, or that the stock price would not decline").

landscape." ¶ 135. This assured investors Chirico and McGrath could be trusted to conduct business appropriately and had proper processes and procedures to execute on Avaya's growth strategy. ¶ 37. Statements concerning a company's business and compliance practices are actionable if they relate to aspects of a company's brand or reputation that are touted as sources of its success. *See, e.g., In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (noting company statements that "emphasize its reputation for integrity or ethical conduct" and "are clearly designed to distinguish the company" could violate the securities laws); *City of Brockton Ret. Sys. v. Avon Prods.*, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (Gardephe, J.) (finding statements related to "elaborate internal controls … reflecting concrete steps" actually taken in that area actionable); *Lapin v. Goldman Sachs Grp., Inc.,* 506 F. Supp. 2d 221, 240 (S.D.N.Y 2006). This context – touting the "Tone the Top Culture" in an investor presentation – distinguishes this case and those cited by Defendants in support of their "puffery" argument.[7] The statement was also false as it misrepresented existing facts, as in reality senior management like Chirico and McGrath had "[i]nappropriate tone at the top" and their departures "transform[ed] [Avaya's] culture to embrace transparency and open communication." ¶¶ 121, 123; *see also In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *12-13 (S.D.N.Y. Feb. 23, 2024) (characterizations of internal controls were actionable by omission of lack of controls for issuing certain securities).

---

[7]*See Avon Prods.*, 2014 WL 4832321, at *16 (statements do not "suggest" compliance systems gave a "competitive advantage"); *ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("set[ting] the standard" for risk management statement non-actionable because other banks make similar statements); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *36 (S.D.N.Y. Sept. 28, 2012) (no assertion that defendant's "financial success was attributable to its adherence to laws"); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 413 n.15 (S.D.N.Y. 1998) (no allegations of competitive advantage offered by company's "integrity"); *Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 209 (S.D.N.Y. 2021) ("positive assertions" about culture" which did not address alleged "sexual harassment or misconduct" at issue were "too hazy to be misleading"); *Lasker*, 85 F.3d at 59 (statement regarding "financial integrity" was not representation that company's actions would not impact finances).

### 3.   The Purported Opinions Had No Reasonable Basis in Fact.

Chirico argues the statements touting Avaya's business and the reasons for missing the Q2 FY 22 guidance constitute inactionable opinions. *See* Chirico MTD at 13 (citing ¶¶ 143-145, 148, 150). McGrath likewise asserts that two other opinion statements – Avaya's belief regarding its liquidity and best refinancing option – are inactionable. McGrath MTD at 17 (citing ¶¶ 140, 153).

Even if these statements are properly characterized as "opinions" or "projections," which Lead Plaintiff does not concede, the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) held opinion statements are actionable where: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] she supplied were untrue"; or (3) the speaker omits information that was "necessary to make the statements therein not misleading." *Id.* at 185-86.

Under the *Omnicare* standard, these statements are actionable. Indeed, Chirico *was aware* when he made these statements that Avaya was not well-positioned to execute on its growth strategy and achieve $1 billion ARR. ¶¶ 54-70, 77-88; *see also In re Nortel*, 238 F. Supp. 2d at 627-28 (statements regarding expected revenues were not "soft opinion[s]" because they were made with "actual knowledge" of "adverse contrary facts"). Also, per CW testimony, Defendants attended meetings where sales teams members requested approval for steeper discounts/concessions for existing customers, indicating that the cause of the 2Q FY 22 guidance miss went beyond the Ukraine war or one time issues with revenue recognition. ¶¶ 78-79, 81-83, 85-87, 118. Such information undermines Chirico's belief in the statements, and is also evidence that he omitted material information. *See also Stadium Cap.*, 2024 WL 456745, at *3 (statement not an opinion where in responding to "direct question about whether sales had declined," defendant "picked a side, emphasizing the 'timing' issue and downplaying the 'demand' issue"). This information also cuts against McGrath's claim that Lead Plaintiff has not detailed why these

explanations for the 2Q FY 22 miss were false. McGrath MTD at 7 (citing ¶¶ 146, 151). Finally, Chirico's knowledge of facts contradicting his "opinions" distinguishes the circumstances here from those in his cited case law. Chirico MTD at 12-14; *see also supra* at 29 n.6.

As for McGrath's purported opinions regarding Avaya's solvency and financing options, he ignores these statements were made with the knowledge that due to the state of Avaya's business, it would be "impossible" to meet the guidance and the Company was having less success in enticing current customers to sign on to subscription contracts absent steep discounts and short contract durations. ¶¶ 54-70, 77-88.  These material facts were known to McGrath and omitted, meaning investors did not get the full picture regarding the ability of Avaya's business to remain solvent and make the statements actionable. *Id.; see also In re Bear Stearns*, 763 F.Supp.2d at 497.

### 4.    The Remaining Challenged Statements Are Actionable.

*Sarbanes-Oxley ("SOX") Statements* **(¶¶ 139, 141).** McGrath challenges the falsity of the SOX statement that "disclosure controls and procedures were effective as of March 31, 2022." McGrath MTD at 16. But Lead Plaintiff is not challenging the accuracy of whether McGrath *in fact* evaluated internal controls or whether McGrath *in fact* reached his conclusion of effectiveness. Rather, Lead Plaintiff alleges falsity due to the later revelation of an "[i]nappropriate "tone at the top" requiring the departures of Defendants to "transform[] [Avaya's] culture. ¶¶ 121, 123.

McGrath claims that *Barrett v. PJT Partners Inc.*, 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) "reject[ed] similar allegations." But *Barrett* did not have the evidence of falsity alleged by Lead Plaintiff here. ¶¶ 121, 123; *see also Barrett*, 2017 WL 3995606, at *6 (no allegations that defendants were "aware of a deficiency or material weaknesses"). Similarly, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014) is inapposite, as the court noted that the confidential witnesses did not "assert[] that any of the named individual defendants had personal knowledge of accounting problems." 26 F. Supp. 3d at 285. In this case, Lead Plaintiff

plausibly alleges that McGrath was aware of the material weaknesses as of May 10, 2022. ¶¶ 121, 123. Nor does McGrath cite any authority for his apparent argument that ICFR material weaknesses must have resulted in "material misstatements" of previously filed financial statements for the internal control statements to be actionable. McGrath MTD at 17.

McGrath also claims his SOX certification in the May 2022 Form 10-Q cannot serve as a "stand-alone basis for liability." McGrath MTD at 16.  But Lead Plaintiff successfully alleges the Form 10-Q contains actionable material misrepresentations, including that Avaya had sufficient cash, as well as *McGrath himself* had knowledge at the time he certified that the Form 10-Q did not "fairly present[]" Avaya's true financial health. *See infra* § III.E. As such, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) and *Rosi v. Aclaris Therapeutics, Inc.* 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021) are distinguishable.

Similarly, based on the "tone at the top" finding, as well as his removal as CEO which was credited as part of Avaya's efforts to "transform[] its culture" (¶¶121, 123), Chirico cannot credibly argue his lack of knowledge regarding internal control issues when making the 10-Q statements. Chirico MTD at 20. These circumstances also distinguish the case law Chirico cites to argue that later revelations "do not change that the statements were truthful representations" when made. *Id.*[8]

***Slide in June 2022 Investor Presentation*** **(¶ 136).** McGrath contends the statement regarding "continued large deal activity" is not false and misleading because it "merely report[s] [a] historical number." McGrath MTD at 18. But this statement is actionable because Defendants had knowledge that "large deal activity" would not continue based on, among other things, the fact that new subscription contracts were short in duration and had poor margins. ¶¶ 77-83; *see In re*

---

[8] *See Lopez v. CT Partners Exec. Search, Inc.,* 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) (finding that correction to projection from a gain to a loss one week later not sufficient to plead falsity); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (rejecting "fraud by hindsight" claim).

*Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173 (S.D.N.Y. 2021) (statements actionable when "grounded in historical facts[] and plausibly designed to mislead investors into believing that [the company's] present (as well as its future) was rosier than reality").

***Statements Related to Avaya's Solvency* (¶¶ 147, 149, 158)**. McGrath asserts the statements concerning Avaya's pending debt maturities and financing are not false and misleading because Lead Plaintiff fails to allege "solvency issues" or "substantial doubt about [Avaya's] ability to continue as a going concern" existed or were known prior to the end of 3Q FY 22. McGrath MTD at 18. But McGrath distorts Lead Plaintiff's complaint. Defendants raised no concerns about the Company's solvency, and painted a picture that things were business as normal as part of their scheme. ¶¶ 134-157, 199-201.  This created a false impression because Defendants had knowledge that  Avaya was not on track to executing its growth strategy. ¶¶ 54-70, 77-81. This omission meant the statements were false. *See In re Bear Stearns*, 763 F.Supp.2d at 497.

**D.    Chirico and McGrath Were "Makers" of the Alleged Misstatements.**

Defendants believe they can evade liability by claiming that they were not the "makers" of certain misstatements. McGrath MTD at 8; Chirco MTD at 17, 18 n.3.[9] Since Chirico and McGrath make similar arguments, Lead Plaintiff addresses McGrath's in full and asserts that Chirico's are similarly flawed for the reasons described below.

McGrath first claims Chirico was the primary maker of the false statement that Avaya was on track to meet a $1 billion ARR from the May 10, 2022 press release. McGrath MTD at 6, 9. But the fact that Chirico was quoted does not exculpate McGrath. *Janus Cap. Group, Inc. v. First*

---

[9] Chirico also submits a chart summarizing his views on the false statements and their speakers, but it is not reliable. *See* Hull Decl., Appendix A. For example, the chart claims the Complaint identifies no speaker for the misstatement alleged in ¶ 154, when in the preceding paragraph, it is clear that McGrath is the speaker. The Court must defer to the Complaint.

*Derivative Traders, Inc.*, 564 U.S. 135 (2011) did not "imply that there can be only one 'maker' of a statement in the case of express or implicit attribution." *See Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011). And *Janus* did not address "how corporate officers . . . can be held jointly responsible on a theory of primary liability." *Pontiac Gen. Empls. Ret. Sys.*, 875 F. Supp. 2d at 373-74.

The ARR misstatement concerned Avaya's current and projected financials that (i) fell under the purview of McGrath, as CFO and (ii) provided the necessary support for Chirico's ARR quote. Indeed, McGrath signed the SEC filings that published the press release on the SEC's website. *EnergySolutions, Inc.*, 814 F. Supp. 2d at 417 ("no dispute" that signatories to public filings "made" the misleading statements contained therein). And on the earnings call, McGrath discussed Avaya's financials, repeating the misleading information and ratifying Chirico's false statements without any corrections.[10] Given McGrath's ken and his echoing of the misleading information from the press release, his citation to *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352 (S.D.N.Y. 2022), works against him. *Id.* at 360-61(finding a CEO was a maker given "a number of indicia of control."). He is thus liable. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) (an executive may be held accountable where he signed or ratified the company's statement, or has the statement attributed to him).

McGrath also argues he is not liable for Avaya's investor presentations, *see* McGrath MTD at 15, but fails to engage with the indicia of his control over these documents "implicit from [the] surrounding circumstances." *See In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). Given Defendants' direct involvement in a scheme to prop up their desired

_____

[10] *See, e.g.*, May 10, 2022 Earnings Call Tr. (Hull Decl. Ex. C) ("As [Chirico] noted in his remarks, we generated $130 million of new ARR, ending the quarter with a balance of $750 million, and we are well-positioned to achieve our calendar year-end target of $1 billion of ARR.").

guidance numbers (¶¶ 54-70), their dual roles as officers and directors, the investor facing nature of the misleading statements (¶¶ 135-36) , the publication of these statements alongside other SEC-mandated filings which Defendants oversaw and certified (Hull Decl. Ex. A at 3), and Defendants' demonstrated knowledge of falsity (*see infra* § III.E.), they are liable under Section 10(b) for false statements in the investor presentations. *See In re Lehman Bros. Sec. Litig*., 2013 WL 5730020, at *2 (S.D.N.Y. Oct. 22, 2013) ("[CEO and CFO] undoubtedly had 'ultimate authority' over the[] content [of misstatements]."); *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 208 (S.D.N.Y. 2021) (noting "a presumption that . . . SEC filings and press releases" are made by "all individuals with direct involvement in the everyday business of the company").

Finally, as noted above, Defendants are liable for their schemes under Rule 10b-5(a)&(c) for any false statements regarding Avaya's business, financial health, and governance, regardless of who the "makers" were. ¶¶ 199-201.

**E.      The Complaint Adequately Alleges Defendants' Scienter.**

"To adequately plead scienter, plaintiffs must 'alleg[e] facts establishing a motive to commit fraud and an opportunity to do so, or alleg[e] facts constituting circumstantial evidence of either reckless or conscious misbehavior.'" *Acito v. IMCERA Grp., Inc*., 47 F.3d 47, 53 (2d Cir. 1995)). Defendants, however, advance scienter pleading challenges that run afoul of *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 309 (2007) in two material respects. First, Defendants critique the scienter allegations in isolation. Chirico MTD at 21-25; McGrath MTD at 21-22. But when assessing scienter under *Tellabs*, this Court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 322-23.

Second, Defendants suggest that the complaint must present conclusive evidence of their knowledge. Chirico MTD at 21; McGrath MTD at 20-22. But the inference of scienter need only

be "cogent and at least as compelling as any opposing inference," and there is no requirement that it is "irrefutable, i.e., of the smoking-genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. If competing inferences are equal, "the tie ... goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

> **1.** **The Complaint Alleges the Defendants' Scienter Based on Conscious Misbehavior or, at a Minimum, Recklessness.**

> **a.** **The Audit Committee's Findings of Inappropriate "Tone at the Top."**

The starting point for the scienter analysis is the Audit Committee's September 8, 2023 admissions attributing the "significant differences" between Avaya's forecasts and actual results for 3Q FY 22 to an "[i]nappropriate tone at the top among certain members of senior management." ¶¶ 122-23; *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *10 (S.D.N.Y. May 1, 2024) (improper tone at the top supports scienter). This disclosure places the blame directly with the Defendants by clarifying the fraud flowed from the top-down. *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017).

In addition, the Audit Committee made factual findings as to Avaya's customer base, business model and market conditions that directly conflicted with Defendants' public statements. *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018). For example, in contrast to Chirico's statement of Avaya's "successfully repositioning" to a recurring revenue model, in actuality there was "[a] declining pipeline of existing legacy customers . . . eligible for migration to the Company's subscription model." ¶ 125. Similarly, the Audit Committee found that "[a]dverse market conditions [and] concerns that arose during the third quarter about the Company's financial health [] negatively influenced customer sentiment" (¶ 127), a sharp divergence from Defendants' positive statements about the economic backdrop and

customer demand (*see, e.g.,* ¶¶ 134, 136, 143-46, 154). The "stark" discrepancies support scienter. *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012).

Further, Defendants' misrepresentations did not result from mere forecasting or judgment errors occurring solely within 3Q FY 22. Rather, the Board identified as the cause "a corporate culture characterized by significant pressure to meet aggressive sales projections and a failure to foster an environment of appropriate and open communication of significant matters" within and outside the organization. ¶ 123. Based on the time it takes to cultivate a corporate culture, "it is plausible that the misconduct stretched through the Class Period." *comScore, Inc.*, 268 F. Supp. 3d at 551. Absent any substantive arguments to the contrary – which Defendants do not advance (McGrath MTD at 23) – the Audit Committee's findings are strong evidence of scienter.

### b. Executive Departures and the Scope of Remediation Plan.

The key executive departures suggest "a higher level of wrongdoing approaching recklessness or even conscious malfeasance." *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014). This is because the Complaint links the resignations "to the alleged fraud." *See Afr. v. Jianpu Tech. Inc.*, 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023).

First, the timing of Defendants' departures was unusual and suspicious. *In re Sadia*, 643 F. Supp. 2d at 523–24, 534 (the resignations of executives occurring less than two weeks after revelation of fraud supported corporate scienter). On July 28, 2022, immediately upon revealing the falsity of Defendants' misrepresentations by announcing dismal preliminary results, withdrawal of previous guidance and significant impairments, Avaya announced that Chirico was being "removed" as President and CEO and was "resigning" as a member of the Board. ¶ 91. And on November 7, 2022, during the pendency of the Audit Committee's investigation, Avaya announced that McGrath would "retire." ¶ 107. Weeks later, on November 30, 2022, Avaya disclosed internal control deficiencies with respect to documentation of a November 2021

whistleblower email and related failures to design and maintain effective controls over Avaya's ethics and compliance program.  The timeline itself is suggestive of fraud.  *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at \*17 (S.D.N.Y. Aug. 11, 2021) (collecting cases for the idea that the "timing of terminations and resignations ... can [support] a strong inference of scienter"). The fact that Avaya's Chief Revenue Officer Stephen D. Spears similarly stepped down (¶ 127) offers further evidence of "systemic and fraudulent abuse of internal financial controls." *Dentsply Sirona Inc.*, 2024 WL 1898512, at \*11.

Second, in disclosing Avaya's "Remediation Plan" to address the control deficiencies, Avaya specifically identified the removal of Chirico, McGrath and Spears as "enhancements." ¶ 128; *Moshell*, 481 F. Supp. 3d at 290.

Finally, contrary to McGrath's assertions (McGrath MTD at 23), the subscribed remediation activities all point to correcting the internal control deficiencies caused by Defendants' misconduct. ¶¶ 128-29; *see also comScore,* 268 F. Supp. 3d at 542, 551 (remedial plan directed at executive defendants supported scienter). Among these remedial steps were Avaya's new CEO holding multiple "All Hands" meetings with Avaya  employees and "executive coaching sessions" with the "leadership team" to set expectations and align on setting a corporate environment and culture "grounded in transparency." ¶ 128. These control weaknesses point squarely at Defendants. *See In re Veeco Instruments, Inc. Sec. Litig*., 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that executives' "failure to maintain sufficient internal controls to avoid fraud" indicates scienter).

Defendants' suggestions that the key executive departures do not support scienter because Avaya did not declare their resignations as being related to the alleged fraud are frivolous and cite no relevant authority in support. Chirico MTD at 24. The cases they do cite are irrelevant, as here the resignations of Defendants, as well as the Chief Revenue Officer were specifically identified

by Avaya as *remedial* steps taken to address material weaknesses in Avaya's ICFR, directly tying the executive departures to the fraud. ¶¶ 121, 128.

### c.    Internal Avaya Communications Support Defendants' Scienter.

The internal emails exchanged between Avaya's finance team and cited in the Complaint are further evidence of Defendants' scienter. ¶¶ 54-70; *see In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *7-8 (S.D.N.Y. Mar. 4, 2015) (finding scienter where complaint cited numerous emails warning defendants of risk). The Complaint quotes internal emails amongst high-level finance team members demonstrating that by May 10, 2022, when Chirico and McGrath discussed the publicly disclosed 3Q FY 22 guidance, the finance team knew certain revenue projections built into the guidance were based on dubious assumptions. ¶¶ 55-60; *see Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 5312182, at *2 (S.D.N.Y. Nov. 13, 2017) (scienter met where high-level corporate official received emails suggesting certain actions were not in compliance).

Defendants characterize the internal emails as mere communications between other Avaya employees (Chirico MTD at 22) and further claim there is no evidence Defendants received contradictory information. Chirico MTD at 23; McGrath MTD at 24. But this argument ignores the emails' references to informing Chirico and McGrath of the faulty inputs built into Avaya's guidance. ¶¶ 55-60; *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]pecific allegations of various reasonably available facts, or red flags, that should have put the officers on notice" support scienter.).[11]

---

[11] Chirico's authorities (Chirico MTD at 23) are readily distinguishable given the Complaint's citation to internal Avaya communications showing Defendants were informed of faulty inputs undergirding Avaya's 3Q guidance. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020) (complaint relied on "speculative allegations about 'what really happened'"); *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (complaint did not identify any communication where information was provided to defendants that was contrary to public statements).

Defendants also claim that the internal emails merely reflect "differences of opinion" and that "even stark differences between employees do not reveal scienter." Chirico MTD at 22 (quoting *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013)). The argument again ignores the Complaint's specific factual allegations. The internal emails show not only that concerns regarding the 3Q guidance were communicated to Defendants, but also that they were notified of the specific reasons why the projections were considered to be misleading. *See Rosi*, 2021 WL 1177505, at *23 (distinguishing *City of Austin* on same grounds).

Moreover, the internal Avaya emails in June 2022 corroborate the Audit Committee's findings of an "[i]nappropriate tone at the top" by painting a picture of a leadership team that was fully aware of the Company's deteriorating financial health but consistently misled investors and lenders. *Cf.* ¶¶ 62 and 67 with ¶¶ 48-50.[12]

Overall, this powerful collection of internal emails alone typically suffices to establish scienter at the pleading stage. *SEC v. Tuzman*, 2017 WL 11606728, at *14 (S.D.N.Y. Sept. 29, 2017) (finding that SEC properly pleaded scienter where complaint included "excerpted emails" showing defendant's knowledge of falsity).

### d.    Former Avaya Employees Confirm Defendants Knew of Revenue Shortfall.

The inference of Defendants' scienter is further strengthened by the former Avaya employees cited in the Complaint, who corroborate and support the Audit Committee's findings, the internal Avaya emails, and allegations that Chirico and McGrath were aware of critical revenue shortfalls during the Company's 3Q FY 22. ¶¶ 77-88.

---

[12] Chirico takes issue with Lead Plaintiff's reliance on excerpts of a June 4, 2022 email sent by Chirico, as alleged in the *Alcof III* case. Chirico MTD at 22 (addressing ¶ 64). But Chirco does not claim the *Alcof III* complaint misquotes him, and a securities plaintiff may plead excerpts of emails in a complaint. *See ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 843 (N.D. Ill. 2008) (considering conversation excerpts and emails alleged in the complaint).

First, consistent with the Audit Committee's findings, CW-1 and CW-2 make clear that the Company's subscription-based business model was propped up by unsustainable concessions and discounts (around 50%) to customers and a disregard for long-term profitability through short contract durations. ¶¶ 78-81, 83. Indeed, "deal desk" meetings, attended by senior executives, revealed a culture of desperation where sales teams were frequently granted excessive discounts and concessions to meet aggressive sales targets. ¶ 82. While Avaya received a one-time boost to revenue, this boost compromised the Company's ability to sustain future growth. ¶¶ 78-81, 83.

Second, the CWs' accounts confirm that Chirico and McGrath had access to information regarding Avaya's financial performance, including attendance at meetings where sales team members presented reports generated from Avaya's internal database, Salesforce.com, and discussions focused on efforts to secure last minute deals before the quarter ended and how close each region was to hitting quarterly targets. ¶¶ 85-87. McGrath also had access to a spreadsheet that allowed him to see how many existing customers were left who could be transitioned to subscription contracts. ¶ 88. This information strengthens the plausibility of claims made by finance team members in internal emails that Defendants knew 3Q guidance was based on unsupported assumptions and inputs. ¶ 58.

Defendants argue that the Court should not credit the CWs because they do not provide direct evidence of Chirico's and McGrath's knowledge of falsity. Chirico MTD at 22; McGrath at MTD at 22. This argument is without merit, as "there is no baseline requirement" that CWs provide direct evidence of scienter. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015). For purposes of scienter, information from CWs is credited if "the witnesses 'are described in the complaint with sufficient particularity to support the probability that a person in the position . . . would possess [ ] the information alleged.'"

-42-

*Cornwell*, 689 F. Supp. 2d at 637. Such information is provided here. CW-1 was a manager who ensured the accurate booking and recognition of revenue and reported to a finance director. ¶ 78. CW-2 was a former Avaya Regional Sales Leader who led a sales team focused on transitioning existing customers to software subscription contracts. ¶ 80. The described roles and responsibilities of the CWs are sufficiently particular to make it probable that they possessed the information alleged about Avaya's declining pipeline, the types of internal reports and spreadsheets Chirco and McGrath received, and the meetings Chirico and McGrath would attend. *See In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392–93 (S.D.N.Y. 2007) (crediting witnesses who "occupied positions that would have allowed for relevant hands-on experience in . . . the Company").

The cases Defendants cite in opposition are distinguishable. In *The9, Ltd.*, 772 F. Supp. 2d 573 (Chirico MTD at 22), the court held that three confidential witnesses' allegations regarding the defendant company were insufficient where they did not work for the defendant company and "plaintiffs make no allegation" that the CWs ever had contact with any defendant. *Id*. at 594. Similarly, in *Avon Prods., Inc.*, 2014 WL 4832321, at *22 (Chirico MTD at 22), this Court rejected the CW's speculation that the executive defendant would have been aware of alleged FCPA violations because he would have needed to approve the severance package of an Internal Audit Director who allegedly received a draft audit report detailing illegal activities. This Court reasoned that the CW's illogical conclusions did not tend to show the executive defendant was actually aware of the alleged FCPA violations or that he approved the severance package because of them. *Id*. Here, by contrast, the CWs worked at Avaya and interacted with the most senior level of executives. ¶¶ 82, 85-86. Moreover, the CWs do not ask the Court to make speculative leaps but rather provide first-hand information. ¶¶ 77-88. Defendants' remaining cases regarding the CW testimony are not on-point as they concern scienter allegations not as encompassing as those here,

which include internal emails evidencing Defendants' knowledge and Audit Committee investigation findings addressing Defendants' conduct that corroborate the testimony. McGrath MTD at 21-22.[13]

### e.   Defendants' Public Statements Support Inference They Had Actual Knowledge of Information Contradicting their Statements.

Defendants made specific, concrete statements to investors about the "strength" and "momentum" of the Company's business, its solvency, and the sufficiency of Avaya's internal controls while either: (i) knowing then-existing facts contradicting their statements; or (ii) recklessly disregarding that their statements were false and misleading. The content and context of Defendants' statements are themselves "powerful evidence of scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

For example, after Avaya missed its 2Q FY 2022 guidance, Chirico quelled fears by proclaiming the miss had nothing to do with fundamental issues with the business or the Company's execution, citing "the shift away from onetime and point-in-time revenue to recurring revenues," which caused a "$40 million impact on revenue for the quarter." ¶ 145. Chirico made sure to note that the "revenue isn't lost," but would "materialize over the life of these long-term contracts." ¶ 145.   McGrath echoed these comments, stating that while "the percentage of revenue recognized in quarter from those subscription bookings was lower again this quarter," it was "important to note that this revenue is not lost" but would be "recognized in future periods." ¶ 146.

---

[13] *See Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (evidence of scienter included only one CW who had contact with individual defendants and reports undercutting defendants' knowledge); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (scienter alleged solely based on "smattering of circumstantial theories" and CWs did not "specifically detail what the [defendants knew], when they learned it, or from whom"); *Kasilingham v. Tilray*, 2021 WL 4429788, at *13 (S.D.N.Y. Sept. 27, 2021) ("no non-conclusory allegations" of defendants' knowledge); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (CW testimony regarding knowledge of individual defendants not corroborated by other sources); *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800-01 (S.D.N.Y. 2013) (rejecting "fraud by hindsight" assertion of scienter).

Of course, at the time these statements were made, Avaya had a "declining pipeline of existing legacy customers eligible" to migrate to OneCloud. ¶ 125. Likewise, McGrath repeatedly downplayed analysts concerns about Avaya's solvency when he knew that Avaya's guidance (and the business model supporting it) was unsustainable. ¶¶ 55-60, 64, 77-88, 149, 153.

Defendants' detailed statements about Avaya's business model and solvency support the inference of scienter, as "[t]he specificity of [the defendants'] statements ... is strong circumstantial evidence that [they] were receiving some form of specific information on [these topics]." *Pontiac Gen. Emps.' Ret. Sys.*, 875 F. Supp. 2d at 372; *see also*; *Stadium Cap.*, 2024 WL 456745, at *5.

On top of these statements, Defendants emphasized Avaya's "Tone at the Top Culture" and "Robust Risk Management" as key factors "Enhancing Sustainable Value" for the Company and its shareholders. ¶ 135.  In addition, Chirico and McGrath submitted SOX certifications with Avaya's May 10, 2022 10-Q attesting that they had personally supervised and participated in the evaluation of Avaya's financial controls and procedures, and that the Company's financial reports fairly and accurately presented its financial condition. ¶¶ 139, 140. But, as the Company later admitted, its internal controls had material weakness related to designing and maintaining an effective control environment. ¶¶ 109-114, 120-130. Moreover, Chirico and McGrath had personally instituted an improper tone at the top. ¶¶ 121, 123-124.

As such, Defendants could not have monitored and attested to the efficacy of Avaya's controls without noticing and disregarding the blatant deficiencies. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("weak internal controls will support an inference of scienter"); *Insys*, 2018 WL 2943746, at *6 ("officers failed 'to maintain sufficient internal controls to avoid fraud[, which is] sufficiently indicative of scienter'"); *Dobina*, 909 F. Supp. 2d at 246 (scienter alleged where company had "inadequate internal controls" and defendant

"'designed' or caused such controls to be designed under his supervision"). It is telling that the Company needed to appoint a new CEO, a new CFO and a new Chief Revenue Officer to remediate the material weaknesses – directly tying Defendants to the fraud and deficient controls. ¶ 128.

Finally, Defendants' false and misleading statements concerned the most significant initiatives and issues in Avaya's business, including the transformation to a cloud company, the Company's robust internal controls, and Avaya's viability in the face of looming debt obligations, which support a strong inference of scienter (¶¶ 134-159). *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37–38 (S.D.N.Y. 2019) ("primary profit engine"); *Stadium Cap.*, 2024 WL 456745, at *5 (the core-operations doctrine "reflects the commonsense assumption that executives are likely to know more about things central to their business").

Defendants make no attempt to grapple with this law or these facts, but instead claim the Complaint seeks to allege scienter based only on Defendants' "high-level" positions. Chirico MTD at 23; McGrath at 22. This is clearly wrong. *See, e.g.,* ¶¶ 54-70, 77-88. Given these facts showing Defendants' knowledge of and access to adverse, undisclosed information, their authorities all miss the mark. *Avon Prods.*, 2014 WL 4832321, at *20 (no scienter inference where only basis for defendants' knowledge of allegedly corrupt events was their corporate positions); *Canadian Imperial Bank*, 694 F. Supp. 2d at 299 (no scienter where the plaintiff alleged "perfunctorily that Defendants received information contradicting their public statements because they held management roles"); *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (under Section 14(a) claim, no evidence that directors were negligent where plaintiffs themselves allege directors were affirmatively misled).

2.    **The Complaint Also Alleges Defendants' Scienter Based on Motive and Opportunity.**

While "[m]otive is not required to plead scienter" (*Freudenberg*, 712 F. Supp. 2d at 200),

its presence only strengthens the already strong inference of scienter.

**Defendants Desperately Needed to Raise Capital to Keep Avaya Afloat.** A motive to raise capital to get out of a liquidity crisis supports an inference of scienter. *See, e.g., Carpenters Pension Tr. Fund v. Barclays PLC*, 56 F. Supp. 3d 549, 555 (S.D.N.Y. 2014) (motive "to counter negative perceptions about ...financial condition [and] liquidity problems" supported scienter); *S.E.C. v. Gruss*, 859 F. Supp. 2d 653, 670 (S.D.N.Y. 2012) (motive to address "liquidity constraints" supported scienter).

Here, Defendants' misrepresentations were necessary to secure financing commitments from third parties to address $350 million in debt coming due in June 2023, hold off impending insolvency, and avoid bankruptcy (¶¶ 29-30). *See In re Portal Software, Inc. Sec. Litig*., 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (allegations that "defendants were motivated to inflate artificially [the] stock price in the short term…and obtain much-needed capital" evidenced "a palpable motive for fraud" that was "stronger than the generic 'desire to raise capital'"); *see also Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding scienter because the company "was…sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional [FDA recommended] clinical trial"); *In re Ibis Tech. Sec. Litig*., 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (scienter adequately alleged in part because stock offering "was necessary to ensure that [the company] . . . could fund ongoing operations"). Without such representations about the Company's ability to meet its financial projections, the "Tone at the Top Culture," and Avaya's long-term viability, Defendants likely would not have been able to raise the $600 million financing announced in June 2022 (¶¶ 51-52).

**Defendants' Stock-Heavy Executive Compensation Provided Additional Motivation to Commit the Alleged Fraud.** Pursuant to Avaya's Stock Bonus Program, Chirico and McGrath

elected to receive 70% and 60%, respectively, of their earned Fiscal 2021 bonus in the form of Bonus Shares. ¶ 162 Avaya's Compensation Committee further approved a Stock Bonus Program for Fiscal 2022 AIP, meaning Chirico and McGrath had incentive to inflate Avaya's common stock price. ¶ 162. Lead Plaintiff concedes that the mere existence of executive compensation dependent upon stock value alone does not give rise to a strong inference of scienter, and there are no allegations that either Defendant made insider trades during the Class Period. *See* Chirico MTD at 24; McGrath MTD at 19-20, 23. But when considered alongside other evidence to infer a motive to commit fraud,  Defendants' unique compensation structure further explains their motivation to commit the alleged fraud. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 552 (S.D.N.Y. 2010).

**F.     The Complaint Establishes Loss Causation.**

The Complaint pleads loss causation by laying out how the truth Defendants concealed about Avaya's declining demand, diminished business prospects, inappropriate "tone at the top" and impending insolvency was partially revealed through five corrective events. ¶¶ 89-119. These events progressively exposed "the 'truth' about the company's underlying condition, [which] when revealed, cause[d] the 'economic loss.'" *Freudenberg.*, 712 F. Supp. 2d at 202. With each alleged corrective event, Avaya's share price fell. ¶¶ 7-14. These allegations suffice.

McGrath's loss causation attacks distort these well-pled allegations. McGrath MTD at 23-24. For July 28, 2022, he asserts that the disclosures revealed only that Avaya had "overestimated the amount of revenue that could be realized during the quarter." McGrath MTD at 24. In doing so, he ignores Lead Plaintiff's insider-supported allegations showing the link between these disclosures and the alleged fraud—that Defendants knew that the false and misleading guidance they published was "impossible" to achieve. ¶¶ 54-72. McGrath's argument also omits that the same day, the Company disavowed its prior guidance in tandem with disclosing Chirico's removal. ¶ 90. This followed a July 3, 2022 whistleblower letter accusing McGrath of "blatant financial

engineering"—the very subject of the false statements at issue here. ¶¶ 72-73. These revelations are thus sufficiently related to satisfy loss causation's test for proximate cause.[14] *See, e.g.*, *In re Vivendi, S.A. Sec. Litg.*, 838 F.3d 223, 262 (2d Cir. 2016) (loss causation met where "[the] alleged misstatements concealed [the] liquidity risk, and a series of events . . . made the truth about that liquidity crisis come to light").

McGrath's attacks on other loss causation dates similarly fail. McGrath MTD at 24-25. For each date, McGrath provides his spin on what was disclosed and then concludes the event did not explicitly reveal any fraud. But "[t]here is no requirement that [a] corrective disclosure [need] take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Signet Jewelers Ltd. Sec. Litg.*, 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019). For this reason, courts commonly reject the argument that "disclosure of that one thing" – for example, poor performance of one aspect of the business – "in no way indicates or reveals a problem with [an]other thing []," *i.e.,* "no revelation of fraud." *Id.* The Complaint explains how each corrective event revealed the concealment of the Company's underling condition. *See Freudenberg*, 712 F. Supp. 2d at 202.

**G.     The Complaint Sufficiently Pleads Control Person Liability.**

The Complaint adequately alleges Section 20(a) violations by alleging (1) Avaya's primary violation of Section 10(b), (2) Defendants' control of Avaya by virtue of their power to direct and cause the direction of the management of Avaya, and (3) Defendants' culpable participation in Avaya's fraud. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007).

---

[14] McGrath's cited authorities are inapt. In both *In re Nielson Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 233 n.2 (S.D.N.Y. 2021) and *Hull v. Glob. Digital Sols., Inc.,* 2017 WL 6493148, at *13 (D.N.J. Dec. 19, 2017), the plaintiffs failed to draw the link between the innocuous disclosures and the fraud.

Defendants dispute that they are "control persons" for Avaya. Chirico MTD at 25; McGrath MTD at 25. But the Complaint pleads that Chirico was a director and CEO of Avaya and McGrath was Avaya's CFO (¶¶ 22-23); that they "participated in the management and day-to-day operations of the Company" (*id.*); and that they had "the power and authority to direct the management and activities of the Company . . . and were able to and did control, directly and indirectly, the content of the public statements made by Avaya" (¶ 207). The Complaint couples these allegations with facts illustrating Defendants' power over Avaya, including their signing of SEC filings on its behalf (¶¶ 31, 48, 141), certifying that they were responsible for evaluating the Company's internal controls (¶ 139), hosting of Avaya conferences at which they made public statements to investors on the Company's behalf (¶¶ 143-151) and their day-to-day executive management over Avaya's business (¶¶ 22-23, 82, 85-87). These allegations suffice. *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d at 253.

## IV.    CONCLUSION

Defendants' motions to dismiss should be denied. If any claims are dismissed, Lead Plaintiff respectfully requests leave to replead. *See* Fed. R. Civ. P. 15(a)(2).

Dated September 6, 2024                  Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Lucas E. Gilmore*
     Lucas E. Gilmore, *pro hac vice*
Reed R. Kathrein, *pro hac vice* forthcoming
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Nathaniel A. Tarnor
68 3rd Street, Suite 249
Brooklyn, NY 11231

Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
nathant@hbsslaw.com

*Counsel for Lead Plaintiff Paul Sweatt*

Brian J. Schall, *pro hac vice* forthcoming
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Paul Sweatt*

-51-

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on September 6, 2024 by providing counsel of record copies via electronic mail.

/s/ Lucas E. Gilmore
Lucas E. Gilmore, *pro hac vice*
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
lucasg@hbsslaw.com


*Counsel for Lead Plaintiff Paul Sweatt*