# EXHIBIT 1

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 2 of 77

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: TRIAL TERM PART 60
- - - - - - - - - - - - - - - - - - - - - - X

Brigade Cavalry Fund Ltd., Brigade Collective Investment Trust - Brigade, Diversified Credit CIT Brigade Credit Fund II Ltd., Brigade High Yield Fund ltd., Brigade Leveraged Capital Structures Fund Ltd., Brigade Loan Fund Ltd., Brigade Opportunistic Credit LBG Fund Ltd., Brigade-SierraBravo Fund LP, FedEx Corporation Employees' Pension Trust, Los Angeles County Employees Retirement Association, Panther BCM LLC, Platinum Peregrine A 2012 RSC Limited, SAS Trustee Corporation, SC Credit Opportunities SAS Trustee Corporation, SC Credit Opportunities Mandate, LLC, SEI Global Master Fund Plc the SEI High Yield, Fixed Income Fund, SEI Institutional Investments Trust - High, Yield Bond Fund, SEI Institutional Managed Trust - High Yield, Bond; Fund, SEI Institutional Managed Trust - Multi - Strategy Alternative Fund, TCorpIM High Yield Fund, The Coca-Cola Company Master Retirement, Trust U.S. High Yield Bond Fund,

                              Plaintiffs,

                                              INDEX NO.
        - against -                           655678/24

JAMES M. CHIRICO, JR., KIERAN J. McGRATH,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - X
                    60 Centre Street
                    New York, New York
                    May 6, 2025
                    **VIA MICROSOFT TEAMS**


BEFORE:

        HONORABLE MELISSA A. CRANE,
                              Justice




                Bonnie Piccirillo - Official Court Reporter

                        1 of 76

2

Appearances

APPEARANCES:


        DEVEVOISE & PLIMPTON LLP
        Attorneys for the Plaintiffs
        66 Hudson Boulevard
        New York, New York  10001
        BY:   MAEVE O'CONNOR, ESQ.


        IZOWER LEFTON, LLP
        Attorneys for Defendant James J. Chirico
        1325 Franklin Avenue
        Garden City, New York  11530
        BY:   RACHEL IZOWER-FADDÉ, ESQ.

        THOMAS O. GORMAN, ESQ.
        Attorney for Defendant James J. Chirico
        513 G Street N.E.
        Washington, D.C.  20002

        SHER TREMONTE LLP
        Attorneys for Defendant Kieran J. McGrath
        90 Broad Street, 23rd Floor
        New York, New York  10004
        BY:  DOUGLAS R. JENSEN, ESQ.

        KELLOGG, HANSEN, TODD,
        FIGEL & FREDERICK, P.L.L.C.
        Attorneys for Defendant Kieran J. McGrath
        1615 M Street, N.W., Suite 400
        Washington, D.C.  20036
        BY:  MINSUK HAN, ESQ., *Pro hac vice*


                              Bonnie Piccirillo
                              Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 4 of 77

3

Proceedings

THE COURT:  Can I have appearances starting with plaintiff.

MS. O'CONNOR:  Yes, good morning, your Honor. Maeve O'Connor, Debevoise & Plimpton for the Plaintiffs.

THE COURT:  Okay.

MR. HAN:  Your Honor, my name is Minsuk Han for Defendant, Kieran McGrath.  I'm joined by my co-counsel, Doug Jensen, and colleagues from Kellogg, Hansen also here with me.

THE COURT:  Mr. Han, did you get the e-mail saying we were switching over to Teams?

MR. HAN:  My colleague, Mr. Jensen, forwarded it to me.

THE COURT:  So, you didn't get it actually.  That means you're probably not registered on e-filing, and that's how we create the links so make sure you're registered for next time, if there is.

MR. HAN:  Thank you, your Honor.

THE COURT:  Who else is putting on an appearance?

MR. GORMAN:  This is Tom Gorman on behalf of Jim Chirico, the former CEO of the company; and I'm supposed to be joined by Rachel Izower-Faddé who is registered in the case.  She doesn't seem to be showing up here.

THE COURT:  She was on the phone a minute ago,

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 5 of 77

4

Proceedings

right?

MR. GORMAN:  Yes, your Honor.

THE COURT:  Okay, so I don't know what happened.

MR. GORMAN:  She seemed to be getting on through the original connections as was I, and then the original connections disappeared.

THE COURT:  She was on this, too, just a minute ago.

MR. GORMAN:  Yes.

THE COURT:  So, do you want to contact her and I'll wait?

MR. GORMAN:  Yes.  If you can give me a second, I'll send her an e-mail.

(Brief pause)

THE COURT:  Ms. Izower, why don't you put your appearance and then we'll get started.  I'd like to start with negligent misrepresentation, but why don't you put your appearance on.

MS. IZOWER:  Rachel Izower of Izower Lefton, LLP.  We're co-counsel with Mr. Gorman on behalf of James Chirico, and Mr. Gorman will be the one doing the argument today.

THE COURT:  So, first claim for relief is negligent misrepresentation.

So, I'd ask plaintiff how you have a special relationship here?  Isn't this just an arm's length business

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 6 of 77

5
Proceedings

transaction?

MS. O'CONNOR:  No, your Honor.  I think that under New York law and under North Carolina law when defendants spoke about the financial health of the company, they incurred a duty to make a full disclosure and we cite the *Ragsdale* case for that as well as the *NovaGold* case.  And, in addition, a duty arises under both states' laws when a party knows and intends for the other to rely on their statements.

There are cases that plaintiffs cite that talk about a debtor-creditor relationship in some instances I think not giving rise to a special relationship; but, fundamentally, it's a question of fact whether such a relationship has arisen in a particular case.  And we think, here, it clearly is an intent to make statements to Brigade in order to induce these investments.  And then the statements that we allege were false and misleading were, you know, intended for Brigade to rely on and, in fact, the plaintiffs knew Brigade would rely on them and they were partial truths.

THE COURT:  So, how did that not transform every single arm's length business transaction into a cause of action for negligent misrepresentation?

MS. O'CONNOR:  Well, I think there has to be something in the nature of a special relationship where one

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 7 of 77

6

Proceedings

party knows the other is relying on what they said, and that's not always the case. And sometimes there's, you know, as is or there's different types of diligence; but in a situation like this where the defendants knew that Brigade and the other defendants were relying on them and they had specialized knowledge of what was going on in the company because of their roles. They had extreme insight that there was no way for Brigade to get from the outside, and so that creates the special relationship.

THE COURT: Who's arguing on the other side of it?

MR. GORMAN: I am, your Honor, Tom Gorman for Jim Chirico.

I would disagree with what was said here. Before this case started, the parties signed an Investment Agreement. In the Investment Agreement, in Paragraph 6.9, which is part of the record, it says, specifically, that "Brigade is coming into this case. They will not rely on anyone else."

THE COURT: Hold on, hold on. Are you talking about the Investment Agreement, which is at E-DOC 48?

MR. GORMAN: I am, your Honor I don't know if it's is E-DOC 48, your Honor, but that's what I'm talking about.

THE COURT: Section 6.9 is governing law.

MR. GORMAN: Governing law. There's an earlier section that's 4-point something.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 8 of 77

7

Proceedings

THE COURT: Okay, so that's 6.9. So, I need to know what actual section you meant.

MR. GORMAN: All right. You're correct, 6.9. I don't have the document in front of me unfortunately.

6.9 is governing law. It is an earlier section. I believe it is 4-point something. In that section it says specifically --

THE COURT: 4.7, Purchaser understands and conducted its own investigation; that one?

MR. GORMAN: Yes, your Honor. That section I think if you read it says they're relying only on themselves. Nobody else, no other people, nothing. It directly contradicts what was just said by defense (sic.) counsel, and that's the basis on which they entered into this -- that representation agreement was key to everybody going into this deal.

So, there was an arm's length transaction here. The defendant (sic.) -- I'm sorry -- the plaintiff was relying on himself. He was doing all of his own investigation, and the record shows that that is probably the way that they did this because the advisory papers prospectus, if you will, for this bond deal which is the center of this case wasn't published until early June of 2022, less than three weeks after that thing was published --

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG Document 119-1 Filed 05/16/25 Page 9 of 77

8

Proceedings

THE COURT: Okay, so how on earth do you get past Section 4.7 for the purposes of a cause of action for negligent misrepresentation? I mean, this cries a special relationship.

MS. O'CONNOR: I disagree with that, your Honor, and I think that Mr. Gorman is not actually correctly reading that provision. It does not disclaim reliance on defendants at all. It simply says we've conducted our own investigation, but it says purchaser in the very last sentence has not relied on any statements or other information provided by any placement agent.

That's not -- it doesn't say purchaser hasn't relied on any statements provided by the defendants in this matter or by Avaya, so I'm not sure why they think this disclaims anything.

Secondly, the case of *Basis Yield* which we cite, the First Department held that the law is abundantly clear that Avaya's disclaimer of reliance cannot preclude a claim of justifiable reliance on the seller's misrepresentations or omissions unless (A) the disclaimer is sufficiently specific, and, (B) the purchaser can't be precluded from claiming reliance on misrepresentations of facts peculiarly within the seller's knowledge.

THE COURT: And that was negligent misrepresentation or was it fraud? Was that negligent

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 10 of 77

Proceedings

misrepresentation or fraud that part of that decision?

MS. O'CONNOR:  That part of that decision, I would have to -- I would have to check that, your Honor, and I can do that.  We're saying that on page 31 of the opposition.

So, I just don't think that that provision says what Mr. Gorman says it says at all.  It just says we have been provided the opportunity to ask questions and receive answers.  That doesn't say, therefore, you can defraud us if you give us a false answer, and it doesn't say that we don't rely on them.  And many provisions -- which I'm sure your Honor has seen in other cases -- would specifically disclaim reliance in the way that Mr. Gorman is suggesting this one does, but it doesn't.

MR. HAN:  Your Honor, if I may?  Minsuk Han for Defendant Kieran McGrath.

This reliance point in the last sentence of Section 4.7 is beside the point.  The point is whether there was a special relationship of trust or confidence to be a basis for a negligent misrepresentation claim, and the sentence to focus on is the penultimate sentence of Section 4.7 where it says "Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating independently the merits and risks of its investment and it -- and any account for which it is acting is able to bear the economic risk of complete loss of its

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 11 of 77

investment in any notes."

If you flip one page behind in Section 4.4, it says, "Purchaser is a qualified institutional buyer."

So, when you think about this arm's length transaction between debtor and creditor and combine that with an acknowledgment in Section 4.7 that they are sophisticated parties with independent diligence and independent valuation of the risk in its investments; as a matter of law, there's no special relationship to hold that Mr. McGrath owed a duty to its contract counterparties.

THE COURT:  I agree with you a hundred percent, and I am dismissing the first claim for relief for negligent misrepresentation on that basis.  There is no special relationship here.  We have two sophisticated parties, and I'm not willing to turn this arm's length business transaction to a whole different thing.  Fraud may be a different story.

So, let's go on to the next cause of action.  So, let me hear from, I guess you, Mr. Han, on that one.

MR. HAN:  Yes, your Honor.  Thank you.

The complaint challenges Avaya's financial projections issue on May 10, 2022, and as a matter of law --

THE COURT:  I'm sorry, one second.  Okay, go ahead.  Sorry, continue.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 12 of 77

11

Proceedings

MR. HAN:  So, as a matter of law, those financial projections are not actionable, and we cite First Department cases such as *ESBE Holdings* and *Cimen* from 2024 that held statements of predictions and expectations are not actionable.

And, here, the allegations in the complaint and documents that the complaint relies on shows that Avaya explicitly warning investors that projections were, quote, only predictions, end quote.  I'm quoting from the actual document in which the financial outlook appeared at Exhibit 6; and that, and specifically disclosed risks and uncertainties could cause the actual results to be materially different.

So, one important factual background that I'd like to note here is that complaint alleges facts showing that Avaya had experienced difficulties in forecasting its revenues for the quarter as it underwent a fundamental business transformation from the hardware sales company to a cloud-base subscription company.  And the business transformation triggered complex accounting rules about how much of a total contract value could be recognized as a quarterly revenue as opposed to what should be deferred to following quarters.

A quick example, if you may allow me.  Let's say there's a Netflix subscription contract, $10 per month; and

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 13 of 77

12

Proceedings

if it is a two-year commitment for that subscription, it could be a total contract value of 240 dollars. And the accounting judgment that is required to be made by accountants based on the review of contract terms such as renewal terms, early termination rights and how much the actual term can be recognized revenue, that involves the careful accountant's judgment based on the terms of the contract.

So, that was the cause for difficulties in forecasting. So, after missing revenue projections two quarters in a row, Avaya on May 10th lowered its projections for the then current quarter and the following -- that full fiscal year; and those lower projections from May 10th are those that the complaints challenges in this lawsuit.

So, there is a narrow exception to the rule that projections are inactionable as a matter of law, and that exception is a narrow one. If it's the speaker knew that the projections were false at the time, but lied. So, that requirement that the contemporaneous knowledge of falsity is a narrow one that has been applied in limited exceptional circumstances.

The two cases cited in the brief *CPC International versus McKesson*, Court of Appeals case from 1987, and *Cristillina versus Christie*, First Department case from 1986, are illustrating how narrow an exception it is.

Bonnie Piccirillo - Official Court Reporter

13

Proceedings

There, defendants -- the complaint alleges sufficient facts to show that the defendants put together fictitious projections that were inflated compared to the actual projections they possessed.

So, in *CPC* --

THE COURT:  I have a chronology question.  This investment was placed on June 23, 2022, or am I wrong?

MR. HAN:  June 23 is when they committed to make investments by signing the Investment Agreement, but the actual closing took place on June 12th.  And in the June 23rd contract, it already priced the notes, 8 percent secured notes in the amount of $150 million.  And there was no closing condition in the Investment Agreement about actual quarterly results where they didn't ask for any updates.  They didn't reserve any right to condition the closing on the actual quarter results.  They didn't ask for additional updates.

THE COURT:  But May 10th, right, there's a little bit of discussion in the background that maybe the financial projections should have been lower; right?  And then time goes on and then it really starts snowballing, right, and this is all before June 23rd.  So, there was no effort made to correct the May 10th -- you know, I don't know what -- I guess too high or unrealistic financials, right?  There's, also, people in the background starting to say that this was

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 15 of 77

14

Proceedings

wrong, that it was too optimistic.

MR. HAN:  The complaint alleges that there were internal e-mails, but none of them goes to Mr. McGrath's state of mind at the time because those were not received or sent by Mr. McGrath or any way references Mr. McGrath. But --

THE COURT:  Certainly, it would raise an issue of fact, and only Mr. McGrath knows his own state of mind. That's not something the plaintiffs can plead, and that's why you have the *Houbigant* line of cases where scienter can be inferred.  And isn't it enough that you have all these people he's in charge of, right, saying that there's a problem.

MR. HAN:  We can -- sorry, your Honor.

THE COURT:  Go ahead.

MR. HAN:  We think there's a huge logical jump that is required here to infer contemporaneous knowledge that the projections were false.

So, the e-mails that are referenced in the complaint at best shows that the financial team members disagreed with sales team's forecast for the North American region.  So, from that e-mail, you have to infer that the sales team's North American forecast was wrong, where the sales team is the one that has visibility into sales opportunities, the sales force is pursuing.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 16 of 77

15

Proceedings

So, you go from financial team's disagreement to the inference that the North American regional forecast was wrong; and then from there, you go to the inference that the worldwide -- company-wide projection was wrong; and from there you still have to infer that Mr. McGrath knew that it was false.

So, we think there are logical jumps. And one point we would like to make on *Houbigant* cases is that First Department made it clear in that case that plaintiffs are entitled only to reasonably inferences, and the complaint must contain -- this is a quote from the opinion -- specific supported factual allegations, end quote, about the defendant's knowledge of falsity.

And in that case, *Deloitte*, the defendant, they wrote a letter to the company listing all the accounting deficiencies that make their financial statement inaccurate; and a few weeks later, they issued a certified opinion that the financial statements were inaccurate. So, the defendant having written a letter about accounting deficiencies, the First Department found to be sufficient to count as a specific supported factual allegation.

Here, all we have is speculations and conclusory allegations. The only contemporaneous e-mail that goes to Mr. McGrath's knowledge, an e-mail from June 7th which we filed as Exhibit 14 and discussed in complaint paragraph 88;

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG Document 119-1 Filed 05/16/25 Page 17 of 77

16

## Proceedings

if you flip to the second page where the company's chief revenue officer's e-mail, it says that the company's head of sales in charge of global sales force was reporting to Mr. McGrath and the board of directors that the company expected to meet the guide that was issued in May 10th. And if you look at the last pages, he says he remains very optimistic the company will meet the guidance.

So, we think that June 7th e-mail precludes any reasonable inference that Mr. McGrath knew that projections were fictitious. There are no allegations that Mr. McGrath repeated the company financial projections after June 8th, the day after he received this June 7th e-mail. So, the last alleged misrepresentation in the complaint on the projections is from June 8th PowerPoint that the complaint alleges that Mr. McGrath approved.

So, between the announcement of the projections on May 10th and the June 8th, there are no e-mails that go to Mr. McGrath's contemporaneous knowledge of falsity. And *Houbigant* instruct the court to see whether there's a specific supported factual allegations. We think the complaint failed to make those points in the form of specific supported factual allegations.

And one thing that we would like to note is that the absence of nonspeculative factual allegations here about Mr. McGrath's knowledge stands out even more in light of the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 18 of 77

fact that plaintiffs already have received a substantial document production from Avaya or 200,000 company e-mails, including Mr. McGrath's company e-mails and text messages.

So, the allegations here really is that which it would be unreasonable for this Court apply the narrow exception to the protection over projections because there are really no contemporaneous allegations that goes to his knowledge that the projections were fictitious; and, therefore, the projections should be held inactionable as a matter of law, and this applies to all three counts.

THE COURT: Mr. Gorman.

MR. GORMAN: One additional point, if I could, your Honor. Just one sentence.

If you read all of those e-mails that are scattered through the plaintiff's complaint, time after time after time whoever is writing the e-mails says, "We need to take these up the chain for the company." They say that every single time, which demonstrate that, in fact, those e-mails were just internal chats about where are we going with this? At some points in time they say --

THE COURT: They did take it up the chain. You're just raising issues of fact for later. You may be right; you may be wrong. "We need to take this up the chain" suggests to me they did. They said they needed to and they did, so that's a bad argument.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 19 of 77

18

Proceedings

Ms. O'Connor.

MS. O'CONNOR:  Thank you, your Honor.

If I may just take a brief step back.  I think to hear my friends on the other side describe this it's like we're really stretching to suggest anything untoward happened here, and really the defendants were the CEO and CFO of a public company that within two weeks of closing this investment admitted it was insolvent, fired it's CEO. Shortly thereafter, said its guidance couldn't be relied upon; and, in fact, and didn't have effective disclosure controls which goes to all of the statements made since the prior September and then filed for bankruptcy protection.

So, the magnitude of this issue as well as this stunning speed of the utter collapse of the company supports an inference in this case of fraud and an inference of scienter and an inference of knowledge.  It is just -- I can't think of another case I've seen like this where the truck is driven straight off the cliff, and the CEO and CFO are saying, Well, we didn't know where the truck was going, we didn't know there was a conflict of interest there.

It just doesn't make sense.  It is not credible.  I don't see how to avoid its preclusion otherwise.

So, Mr. Han started with forward-looking statements.  We also have statements of present fact, and we have a solvency certificate.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 20 of 77

19

Proceedings

THE COURT:  What are the present statements of fact?

MS. O'CONNOR:  Sure.  So, the solvency certificate is the main one; and there, Mr. McGrath on July 12th certified that Avaya was solvent on a balance-sheet basis and on a liquidity basis in terms of the ability to pay its debts they came due.

I'm happy to parse that language as Mr. McGrath's counsel spent a lot of time trying to make arguments about what the language means.

THE COURT:  Well, there's a fight about what solvent means; right?

MS. O'CONNOR:  Yeah, I guess I would submit the second question is then -- then that one goes to the plaintiff I would say, but I also don't think there is any question.  I think the first prong is very clearly talking about solvency on a balance-sheet basis because it's looking at whether the fair value of the assets is not less than the total amount required to pay the liabilities.  That is a balance-sheet question.  That's fundamentally what it is.

The second prong is about liquidity.  Does the -- are we in a liquidity crisis, or can the entity pay its debts as they come due?  Separate issue.

Mr. McGrath says, Well, it doesn't say balance sheet.  I would note it also doesn't say liquidity.

Bonnie Piccirillo - Official Court Reporter

Case 1.23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 21 of 77

20

Proceedings

That's the way these things are written, right; but it literally writes the definition of balance sheet, solvency and Mr. McGrath's certified that that was true as of that date.

So, Mr. McGrath has a couple of arguments to try to avoid this. One argument is to say, basically, I didn't know it was false as of that date to which I say, that doesn't matter. You didn't certify that as far as I know it's true today. You certified that it is true.

Secondly, how was I supposed to know there was an issue? Well, we've alleged that there was an impairment analysis under way already by June 23rd and this is the very impairment analysis that resulted in the company's statement a couple weeks later that it was insolvent.

I think it is a very reasonable inference that the CFO of the company and the CEO knew that an impairment analysis of this magnitude had been triggered and was happening; and at a minimum, he was reckless in not knowing that or disclosing that in the course of just blankly certifying that the company is solvent when as a matter of fact it was not and two weeks later they had to admit it was not.

So, to me, this is a very easy one, and it is a clear statement of present fact. I don't think that any of Mr. McGrath's efforts to argue his way out of it, like

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 22 of 77

21

Proceedings

Chirico said it's like a retroactive scienter -- I can't remember how he puts it, but this notion that maybe he didn't know it. It was his job to know. Is the company solvent? Is there a risk that the company is not solvent? That was his job to know that before certifying that, and a failure to know that is recklessness and that suffices for fraud.

THE COURT: So, the officer's certificate is after you entered into the Agreement, though; right?

MS. O'CONNOR: Yes, but it was a condition to closing the deal, and so we required that as of the date of the closing. So that's kind of -- that's one, I think, very big bucket.

There are also other statements that I think are statements of present fact. One is Mr. McGrath saying on May 10th Avaya is well positioned to achieve its calendar-year target.

And we cite, you know, there's obviously a very helpful -- which I'm sure your Honor has seen -- a very helpful description in the Supreme Court's *Omnicare* case of kind of when it is an opinion versus when it is a statement of fact. And the example, one of the examples the Supreme Court gives is the coffee is hot versus I think the coffee is hot.

There's nothing surrounding this Avaya is well

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 23 of 77

22

Proceedings

positioned to make it a statement of opinion. Look, I think Avaya is well positioned. From my perspective it's looking good, right? He just said it is well positioned, and that is something we can prove to be false and I think would readily prove to be false at the time it was said because there was already chatter as your Honor noted that as of that time, that the 430 million projected for revenue for North America was impossible, was not right, couldn't be achieved and that everyone was saying this. And these are people who reported up, and who I think Mr. McGrath can reasonably be inferred to have been in contact with about what the projections should be and what the outlook was.

Fundamentally, the company -- this risk of failure was already materializing, and the company was already coming up short; and he went out and said, "We're well positioned." So, I think that is clearly a factual statement that is actionable.

Mr. McGrath also said that "We're on a well-paved path, but we're toward the high end of our revenue." That was a statement as of June 8th.

And, again, are you on a well-paved path because the e-mail chatter suggests that it is chaotic, and people don't think you're going to get there and there's a lot of concern being expressed. And just a couple days later, Mr. Chirico gets a report from some people and he said,

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 24 of 77

23

Proceedings

That's what I thought, that's just what I thought.  This is not working.

I could find the exact words, but we quote this e-mail of June 12th.  It's just a couple days later.  So, all of this chatter is happening in the same time period, and I think the shortness of time, the compressed period and the magnitude of the issue, as I said, really supports these inferences that makes it very reasonable under the circumstances.

So, those are probably the factual present statements that I would point the Court to.

If then we go to the projections, forward-looking statements and the like.

Again, I think we have to look at all of this in the context of a company that imploded in a spectacular manner prior to this investment.  And so even starting in May, as your Honor noted to begin with which is when we have the first forward-looking statements, there was already very significant chatter, "impossible to achieve," "not right," "everybody's saying," et cetera, and defendants are saying, "Oh, I wasn't on that e-mail."

Well, it was your job to know what people were saying, and I think we've raised an inference that everyone is saying that the projections are impossible; and they're, nonetheless, going out with projections, that that's an

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 25 of 77

24

Proceedings

issue.

I will note for clarity of the record one of the e-mails I'm referencing is disclosures of the 10th and one of the e-mails is dated the 11th, I think that that is not at all material in the context of this conversation with this company and what was going on internally.

So, then we get to this period from June 2nd to June 23rd when Brigade signs the Investment Agreement, and it tells quite a story. You know, first on June 2nd, Mr. McGrath gets on a call with Brigade and other potential debt investors; and he says that he's tried to be conservative with the guidance he provided.

But just a few days later he's telling Mr. Spears, the chief revenue officer, that the company needs to acknowledge more risks so I don't know what conservative means in that setting.

June 6th, Mr. Chirico e-mails members of the global sales team in a panic. He says, "You committed to 80 million. We have three weeks left in its quarter, and you're at 13 million." Okay, this is June 6th.

June 7th, this is the e-mail that Mr. Han referenced. Before a board meeting, Mr. McGrath says "We need to acknowledge more risk around the numbers."

I don't agree that that is somehow exonerating. I think that reflects that Mr. McGrath understood that the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 26 of 77

25

Proceedings

numbers were too aggressive and not likely to be achieved.

June 8th, the Form 8-K goes out. There's a that Mr. Chirico and Mr. McGrath worked on together that is delivered to the investors to help them get on board.

On June 12th, Mr. Chirico gets information from his team basically showing that Avaya is going to miss its targets. And this is the language I was looking for earlier, your Honor, where he says -- as of June 12th Mr. Chirico says, "Unfortunately, this confirms what I thought. This clearly is not good at all. The actions are not closing. The bookings are not closing."

I mean, this is like -- you know, he sees the truck is going to off the cliff, he sees it as of June 12th and presumably saw it before; and I think it is a reasonable inference that he saw it before June 8th when this information went to the investors because, again, this timeframe is super compressed.

I think that the defendants want a lot of factual argumentation and inferences in their favor. We heard a lot of argument about, Oh, well this group is disagreeing with the sales team, but here's what the sales team does and this is how it works.

That's all outside the pleadings. That's subject to discovery. That might be true, that might not be true; but that's just argumentation from outside of this complaint

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 27 of 77

based on facts not before the Court.

June 14th, you have a bunch of e-mails among the other executives, the vice president of sales finance, the revenue director. "We're going to need a miracle. It is going to take more than one miracle to close this quarter. There's a quite substantial gap."

And by June 23rd, there's an impairment analysis under way that a few weeks later makes clear the company is not solvent.

So, all of this together I believe supports a reasonable inference that plaintiffs as to the forward-looking statement -- I'm sorry -- the defendants could be inferred to have had knowledge of falsity.

And I will point out, also, that in an opinion statement -- I just want to look for the case I wanted to cite. *Israel discount Bank of N.Y. versus EisnerAmper*, First Department 2016, held that an opinion is actionable if it's based on grounds so flimsy as to lead to a conclusion there was no genuine belief in its truth or amounted to a reckless misstatement. And I think that's where we are with these projections.

So, we're in a situation where this is a catastrophic failure of a company in a blanketly fast period; and the defendants sort of say, Well, it's not fair to make any inference that I knew anything. And I would

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 28 of 77

say, your Honor, that it is almost absurd not to. Obviously, whatever the Court does is not absurd; but my own view is that under the circumstances like this, the plane doesn't fall out of the sky for no reason. Somebody drove the truck off the cliff and knew the cliff was there.

I think we very clearly stated a claim for fraud.

THE COURT: Does someone want to respond?

MR. HAN: Minsuk Han, your Honor, for Mr. McGrath.

So, the opposing counsel, like, focuses on a chain of events that led to bad news after the quarter; but the case law is clear that the bad outcome doesn't make a fraud case. And they are saying that Mr. McGrath knew the projections were wrong and lied to the investors.

And so the contemporaneous knowledge of falsity piece is what needs to be examined here. And because this is not run-of-the-mill pre-discovery complaint, but a complaint they filed, this puts forward the best case they have against these individual defendants.

And if you look at the specific misrepresentations, the alleged misrepresentations alleged in the complaint and look at the factual support that they point to, you can actually say that the old e-mails they cherry picked are not the ones that go to Mr. McGrath's contemporaneous knowledge; and the only one that actually that went to Mr. McGrath shows that he was assured by the company head of sales that

Proceedings

the company was expecting to meet the guidance.

And so we wanted to kind of invite the Court to make a close examination of the individual alleged misrepresentations and the factual support that they point to that actually does not show that Mr. McGrath knew and lied.

So, to fall into the narrow exception to the projections, reckless is not enough. There has to be specific supported factual allegations, not speculations that he knew that they were false. So, these claims that he should have known, that doesn't make a fraud case.

And the notion that company's forward-looking projections could be false and could be knowable as a false statement is a really high bar because all the cases where projections were actionable are dealing with specific, like, two set of projections where the actual projections were received and they prepared fictitious projections.

All these e-mails that opposing counsel points to go to the internal disagreements about the sales team's judgments about what can be achieved, and there's a huge logical jump that opposing counsel is asking the Court to make to get a contemporaneous knowledge of falsity. And they point to what Mr. Chirico wrote, but that should not be used to infer Mr. McGrath's contemporaneous knowledge of falsity.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 30 of 77

29

Proceedings

THE COURT: Of course it can. They were working together, and then you have all this e-mail chatter in the background. This is a motion to dismiss. Of course it can.

MR. HAN: But the cases where those -- knowledge was inferred, there were specific factual allegations supported by certain facts where the defendants could be inferred as had knowledge about the falsity; but, here, the only one that is referenced in the complaint is the June 7th e-mail where he -- he was assured that about the company's expectation with respect to forward-looking projections.

So, we think that actually precludes reasonable inference that he knew.

THE COURT: Let's put this out of its misery. I am sustaining the fraud claim against both defendants. There is more than enough here to show a present misrepresentation of fact. There is the e-mail background saying that the numbers were wrong, and these two individuals were in charge of them.

There is e-mail saying "We have to go up the chain," and that indicates -- that raises a possibility that it did.

We have a panicked e-mail on June -- was it June 6th or June 7th? June 6th. You're just cherry picking one little thing that he received a report from the head of sales that was confident that Avaya would meet its

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG Document 119-1 Filed 05/16/25 Page 31 of 77

30

Proceedings

projections.  Maybe you'll be right in the end, but everything else goes to the opposite.

And then you have June 12th from Chirico that Avaya was going to miss targets and yet they kept going.

So, I don't see this as being dismissible on a motion to dismiss.  You might be right at summary judgment, but, no, not now.

MR. HAN:  Your Honor, may I present arguments about the officer's certificate to the extent the complaint's theory it relies on that certificate?

THE COURT:  Sure.

MR. HAN:  So, plaintiff's argument is that Avaya decided the following month after the officer certificate was signed in August to recognize a non-cash write-off of the value of the goodwill and because that happened a month later, the certification was false when it was signed a month prior; we think that theory has no supporting law or facts.

So, the law is clear that the complaint needs to allege a contemporaneous falsehood, something that was false when the statement was made, not a statement that might have been rendered false or misleading by future events.  And, here, that is all that it does.  There's no specific allegations in the complaint that Mr. McGrath knew that there would be a huge write-down in the goodwill for the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 32 of 77

31

Proceedings

quarter.

And, more importantly, we think that the plaintiff's theory is based on a, a textual reading of the certificate. If you read the certificate, it makes specific representation about its judgment that the total value of assets is no higher than, no less than the value of -- total value of probable liability as they become absolute and mature.

The plaintiffs are saying that means comparing the book value of the assets against the book value of liability; but the document plainly shows that it is comparing the fairer value of the assets to a total probable liability as they become absolute and mature. It is not about balance sheet solvency as plaintiffs are arguing.

And, also, Mr. McGrath would not have been able to make the representation of a balance sheet as of this date of July 12th first because the balance sheet post profits for the quarter that just ended as of June 30th was still ongoing for another month, and there was no pro forma balance sheet that was prepared as of July 12th.

So, the type of solvency representation that the plaintiffs say that this made has no support in the text of this definition of the solvency or the fact about the -- what the company was at the time.

So, the theory that this was rendered false by a

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 33 of 77

32

Proceedings

later company's decision a month later to recognize a non-cash write-off is just not supported by the document that the complaint relies.

MR. GORMAN: Your Honor, if I can make a short statement.

If you put together all of these e-mails, there's a handful of them, and they're scattered executives around the company. This is not the group that does guidance for the company. The company writes the guidance, and the company told investors when they put their money on the table for these bonds; they said, Look, you're doing this at your own risk. That's, period, what they're supposed to be doing.

This is just a bunch of the people who inside this company, it's like a bunch of kids on the playground arguing about this and that and who won the last spitting match and that's what they're doing here. There's no detail here. There's no explanation how they're coming up with these calculations. We have no idea where they're coming from, and they're not people that do guidance.

Guidance is a specific kind of function for the company. The company had specific people who are skilled in learning how to do this; and these people are just people who want the guidance to be over. Why? We don't know.

THE COURT: You're arguing under a summary-judgment

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 34 of 77

33

Proceedings

standard, not in a motion-to-dismiss standard.  That's the problem.  You may end up being right, but that's not how I have to look at this at this juncture.

MR. GORMAN:  I would question more than that you have to look at this in the lens of one or two or three people of this company.

If this is the standard, anybody can get a lawyer, have a case dismissed and can bring a case by getting one or two or three e-mails that disagree with the position company has; and then the company winds up having to spend all this time, all the effort to get to summary judgment to show.  There's only three e-mails.  That's all we're talking about.

THE COURT:  What about the June 6th e-mail?

MR. GORMAN:  The June 6th e-mail is simply a supervisor going to work and say, Look, we have to do this.  We have to roll up the company's numbers for the quarter.  This company uses a hand-done individual account process to do this.  So that means they have to roll up every single account that they got before they get there.  You're early in the period.  You haven't got the numbers in.  What you've got is a couple people saying, hey, these may not roll up.

They say that every quarter.  Why?  Because it looks that way in the beginning if the contracts come in towards the end of the quarter; and in this company, it appears that that's the way it is.  If you go back and look

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 35 of 77

34

Proceedings

at the earlier quarters, they don't get the numbers out until the end of the period.

So, you're looking at the beginning.  Even in the middle of it, they're still nowhere in terms of doing this rollup.  They're not going to get anywhere with this rollup until early July at the best and probably early August; and to judge this company based on that kind of analysis is simply inappropriate, your Honor, because it's only -- it's not even partial.  It's a fraction of what's going on here, and we don't even know why these people are making these statements.

So, I respectfully --

THE COURT:  Well, that's what we have to find out. That begs the question.  I mean, paragraph 89 of the complaint, it says plain as day, "On June 12th, 2022, Defendant Chirico again received information from his team demonstrating that Avaya was going to miss its targets.  In response to an update on the state of the North American sales that month, Chirico stated, quote, unfortunately, this confirms what I thought.  This clearly is not good at all. The actions are not closing, the bookings are not booking. Guys, this number must be 420."

MR. GORMAN:  That's right.  They contradict those, your Honor, by saying that we may need a miracle here and they tell you, they've had miracles before.  This is the way

Bonnie Piccirillo - Official Court Reporter

Proceedings

this works.  It doesn't come out --

THE COURT:  They didn't get that miracle, did they? I don't know what to tell you.  You're not arguing -- you're not even arguing a summary-judgment standard.  You're making a closing argument at trial.  That's where credibility would be assessed.  This is --

MR. GORMAN:  Your Honor --

THE COURT:  -- well past a motion to dismiss.

So, does anyone want to say anything else?

MS. O'CONNOR:  Your Honor, I don't want to take time if it's not necessary.  If it would be helpful for me to respond on the opposition, if it did I'm happy to do that.

THE COURT.  On the solvency issue, maybe.

MS. O'CONNOR:  I think that we can go to that language.  I think that -- you know, I don't, frankly, even fully understand what his argument is, this notion that Mr. McGrath couldn't possibly have made a balance sheet solvency rep because he didn't have the information.

Well, exactly, that's our argument.  An impairment analysis was under way and had been triggered.  He shouldn't have made the rep, but he did.  He made it and as a factual matter, he didn't make it as based on what I know at this moment.  And so I think it just doesn't make any sense.  If I can find the rep itself, maybe somebody could hand it to

Bonnie Piccirillo - Official Court Reporter

Proceedings

me.  Oh, here it is.

So, balance sheet solvency is a something that looks at the overall value of the company's assets versus the overall value of its liabilities.  That is absolutely clearly what the first prong is doing; and as I said before, your Honor, if they think --

THE COURT:  I don't think it even matters considering what happened.  I mean, they were insolvent by any definition a few months later.  So, that begs the question about whether this certificate, this omnibus officer certificate was true or not and whether they knew it or not on the date it was rendered.  So, I'm not dismissing that part of it.

So, now let's move on to the North Carolina Act.

MS. IZOWER:  My apologies, your Honor, just because we're remote, I am not able to hand a case or a note to my colleague.  There were a couple of points that I just feel should be mentioned.

One is that at the May 10th call where the guidance that is really the center -- central issue in this case where it opened up with the disclaimer that said specifically that the company will not update guidance for later information.  I can quote it to you.

THE COURT:  But under the circumstances here, they just left that lying out there knowing it was totally wrong,

Bonnie Piccirillo - Official Court Reporter

probably knew it was wrong at the time or allegedly knew it was wrong at the time. I don't think that gets you very far. If they knew it was wrong at the time, they should have corrected it; and what came out after just lends fire to the allegation that the May 10th representation was a false.

MR. HAN: Your Honor, on the --

THE COURT: Let Ms. Izower finish.

MS. IZOWER: I'm sorry, because this was the other point that I wanted to make, which is that guidance is sort of a special thing, projections, opinions. All of those things are not -- you know, there's all this case law out there that says those are not things that you can reasonably rely upon in making an investment decision, and part of that reason is that they are opinions.

And, you know, Ms. O'Connor made this point in saying, oh, she doesn't think it is a big difference to learn something on the 11th versus the 10th; but the fact is if you're speaking on the 10th and this is the guidance that has been provided to you on the 10th and you don't learn until later that there may be reasons that that guidance is not as well calculated as you had thought before, and you're in a circumstance where a guidance is not something that is reasonably relied upon in an investment decision which there is abundant case law out there that says, and you've

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 39 of 77

38

Proceedings

expressly disclaimed any -- that this guidance will ever be updated. It shouldn't have been relied upon. That's not something that you're supposed to rely upon, and that disclaimer was also made. So --

THE COURT: So, May 11th is so close in time that it leads to the inference that the May 10th representations were utterly fabricated. So, that's your problem.

MS. O'CONNOR: Your Honor, if I may add to that, the May 11th e-mail says "I reiterated to this executive yesterday --" which is May 10th and then it goes through the issues. So, in any event.

MR. HAN: Your Honor, I just wanted to make a small point about the e-mails between June 8th and then June 23rd. Your Honor earlier talked the duty to update. We just wanted to make the point that McGrath did not owe a duty to update the projections before the transaction -- before the Investment Agreement was signed because when Avaya issued the projections, it explicitly disclaimed any duty to update -- this is in Exhibit 6 where it said, quote, "The company undertakes no obligation to publicly update or revise any forward-looking statements." And in Section 4.7, of the Investment Agreement, plaintiffs acknowledge that they had access to such information concerning the company as they had considered necessary or appropriate, they didn't ask for additional disclosures.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 40 of 77

39

Proceedings

And then, finally, there is a well-developed body of law which we discuss in our briefs, that decline to impose a duty to update the company financial projections; and we cite *In re Burlington* case where the Court declined to recognize a duty to update because imposing such duty would drastically reduce the disclosure of internal forecast contrary to securities regulatory framework that encourages such disclosure.

So, to the extent you're looking at a June 13th or 12 e-mails, those are after the alleged representations about the projections that took place. There are no allegations that Mr. McGrath repeated or reaffirmed the projections after June 8th.

So, we wanted to make the point about duty to update because that is not -- that should not be recognized. The Court should not be the first court to recognize such duty to update the earnings projections.

THE COURT: Please, please, there is a sufficient allegation here that the May 10th was fabricated. So the rest of it, those cases are when something changes. This is saying that the May 10th initial projections were lies, okay, and they've done that successfully. So, then nobody changed it. So, it is just lies compounded on more allegedly.

You may be right at summary judgment that they

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 41 of 77

40

Proceedings

didn't know anything and it's not their fault; but right now, I have sufficient allegations to successfully get past a motion to dismiss on fraud, okay, and that's the way it goes with motions to dismiss.  Okay, I do not think the First Department would want me to dismiss given the level and extreme particularity that this complaint very well pled has accomplished.

I don't know, you're parsing it too much; and I can't do that, and I'm not going to.  So, I don't want to talk about this anymore.

Fraudulent inducement has been successfully pled.  You may be right on summary judgment.  You may very well be right on summary judgment know, but I have allegations supporting a fraud claim in great detail starting with the May 10th misrepresentation.

So, can we please move on to North Carolina.

MR. HAN:  Yes, your Honor.

The third count, North Carolina Securities Act claim should get dismissed because the New York law applies here.  Plaintiffs do not dispute that they agreed to a choice-of-law provision here in the Investment Agreement that covers explicitly tort claims and any questions or issues raising the validity of -- like, questions or issues concerning the validity of the contract.

Here, North Carolina statutory claims sound in tort

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 42 of 77

41

Proceedings

because it is based on misrepresentations, so that's one reason why it falls into the tort that is explicitly referenced in the choice-of-law provision.

The other reason is the remedy that the North Carolina Securities Act provides is that a refund of the consideration paid for the securities offered. So, that is a recission that they're seeking. They're invalidating the Investment Agreement by --

THE COURT: So, is this -- would the damages be any different under fraud, though?

MR. HAN: They are saying they're seeking damages from their fraud count, and they didn't articulate any different remedy. They're seeking only solely based on the North Carolina claim. So because the North Carolina statutory claim is providing for rescissory remedy, that is the refund of the payments, so that goes to questions and issues concerning validity and enforcement of the Agreement and the choice of law clause is clear that it covers claims like this.

So, there's a well-settled policy that New York courts enforce choice-of-law provisions as drafted. Here, they do not dispute it's invalid or they -- they do not dispute that they are bound by it. So, therefore, New York courts should apply the choice-of-law provision; and, here, the North Carolina statutory claim would not -- cannot lie.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 43 of 77

42

Proceedings

For that reason it should be dismissed.

And they don't cite any cases where another state's claim could remain when the parties agreed to apply New York law to that issue.

THE COURT: Well, isn't the argument, though, that there's no contract because it was fraudulently induced so, therefore, you can -- it's outside the contract?

MR. HAN: That's the theory that they are advancing in the fraud inducement count.

THE COURT: Right, but wouldn't it be the same analysis for the North Carolina Securities Act?

MR. HAN: Because the contract provision explicitly references whether it's in contract or through otherwise, it is much broader than other cases that opposing counsel cites where it is only about in the petition of the contract. But this is drafted a lot more broadly to explicitly cover tort. And the plaintiffs cite know cases that say the courts should ignore the explicit wording in the choice-of-law provision that they are bound by.

THE COURT: All right, Ms. O'Connor.

MS. O'CONNOR: Thank you, your Honor. So --

MR. GORMAN: Your Honor, just one sentence. I'd like to agree with that point because this is a very broadly worded thing, and we've got to go back to what this case is about. This is not two consumers who don't know what

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 44 of 77

43

Proceedings

they're doing.

This case is centered on actions taken by very sophisticated longtime investors who know what they're doing. That's why --

THE COURT: That's negligent misrepresentation. Let me -- excuse me, let me ask Ms. O'Connor. North Carolina, like where does it get you; right? Even is there something -- you know, I'm not that familiar with the North Carolina statute. Does it get you attorney's fees or something? Where does it get you beyond your fraud claim?

MS. O'CONNOR: Well, it's a different claim, your Honor. I don't have to prove scienter and I don't have to prove reliance. It's a negligence-based claim, which I think is why the defendants want it to be gone from the case.

But, I think, first of all, I can talk about the choice-of-law clause. I don't think there's any way this choice-of-law clause is intended to preclude a claim like this or a negligent misrepresentation of fraud under a state's blue sky law in connection with the purchase or sale of securities.

I guess taking this in a couple of pieces, it's very clear that even if you assume your law applies -- which I dispute -- it is very clear the Martin Act does not preclude another state's blue sky law. We cite multiple

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 45 of 77

Proceedings

cases for that, *Assured Group* is one of them, *Silvercreek*.

And then, also, various courts have held that New York does not have any interest in precluding claims under other state's blue sky laws, and we cite a couple of cases for that, including *Hatteras Enterprises*.

So, I think the defendants are trying to get to a place where North Carolina can no longer pursue its interest in policing transactions, offers for sale by a North Carolina corporation that caused harm outside the state that is not an interest -- New York courts in various cases have said they don't have an interest in precluding other states from doing that.

North Carolina clearly has a strong interest in this one. It was a North Carolina-based CEO. They were both officers of a North Carolina corporation. The securities were issued from North Carolina, and one of the very biggest holders is the state of North Carolina. In fact, it's an entity called Panther, and the sole partner is the treasurer of the State of North Carolina on behalf of a North Carolina pension fund.

So, North Carolina does have a strong interest in this matter, and I think stronger than New York.

If we back up to the choice-of-law provision, I don't think there's any chance that provision is meant to be written in a way that would preclude this claim. And, so,

Bonnie Piccirillo - Official Court Reporter

Proceedings

the -- the provision applies to only to claims concerning the construction, validity, enforcement and interpretation of the Agreement.

Nothing about our claim under the North Carolina Securities Act involves interpreting or anything to do with that Agreement. It has to do with the representations made on behalf of the North Carolina company in order to induce the purchase of securities. It's not about this Agreement or the like.

And, notably, the venue provision in that same part of the Investment Agreement, if we assume that Agreement is even valid, right, it is Section 6.9, has a choice-of-law clause that is limited to claims; you know, it can be a tort or otherwise, but relating to the construction, validity, enforcement and interpretation of the Agreement.

The venue provision in that same paragraph says anything relating in any way to this Agreement or the transactions contemplated thereby. They knew how to write it more broadly when they meant more broadly. It's not what they meant here. They didn't mean to write a provision that encompassed any aspect of the relationship between these parties.

I might have misspoken. The corporation's headquarters are in North Carolina. I didn't mean to suggest that it's incorporated there.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 47 of 77

THE COURT:  Okay.  Let Mr. Gorman speak.  Then you can respond, Mr. Han.

MR. GORMAN:  Your Honor --

MR. HAN:  Your Honor --

MR. GORMAN:  Your Honor, I listened to all of these reasons that they want to disregard what the Agreement says.  There's no reason to disregard what the parties who set this case up agreed to.  They wrote down and they said we're going to use New York law, period.  We don't need to know anything else about what New York's interests are, what North Carolina's interests are or what Hawaii's interests are.  It doesn't make any difference.

The point is this is the deal these parties made.  They were sophisticated parties, and they had reasons to do this and they shouldn't disregard it now at the last minute for the convenience of one party over another.

THE COURT:  What about the clause concerning the construction, validity, enforcement and interpretation of this Agreement?  Does that limit it to the Agreement, itself, and not, let's say, blue sky law?

MR. GORMAN:  That doesn't allow you to just simply disregard the Agreement.  Because doing that litany of you can do this and you can do, and then it uses the phrase "and otherwise."  It leaves it completely open so that you don't have to go and do the analysis.  There's no reason to do

Bonnie Piccirillo - Official Court Reporter

Proceedings

this. This is simply disregarding a written deal made by two very sophisticated investors. It should stand.

THE COURT: Well, it does say --

MS. IZOWER: That language -- I apologize. Sorry, your Honor, just the *Capital Z* case, which is a First Department case, the language of our agreement at issue here is very similar to the one in *Cap Z*. I can put that language in the meeting chat if that's helpful.

THE COURT: No, just remind me the cite.

MS. IZOWER: The *Capital Z* case -- hold on one second -- it is 840 N.Y.S.2d 16 and it's a First Department 2007 case; and that provision says "shall govern all issues concerning the validity of this agreement, the construction of its terms and the interpretation and enforcement of the rights and duties of the parties," and which is very similar to our provision, but our provision is broader because it says "whether in contract, tort or otherwise."

And, in addition, when Ms. O'Connor referenced that the section about venue at the end of the provision has that broader -- what she says, you know, they know how to write broader language when they want to. The *Boss* case which is a Court of Appeals case that we cite in our brief for Chirico in the reply brief, it has the same setup where that last sentence is broader.

And in that case, the Court of Appeals even though

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 49 of 77

48

Proceedings

the main language that was for the governing law said that this is a Minnesota contract governed by Minnesota law without any of the broad implications, the Court of Appeals determined "the contractual language here provides unambiguously that any disputes are to be decided in the courts of Minnesota and that Minnesota law shall govern."

So, I would -- I would encourage you to look at the clause there, and I think the setup is very much like our clause in terms of the venue portion of the clause having a bit more of that broad language; and yet, here, the Court of Appeals said that it is unambiguous, that the law of Minnesota is going to apply to everything.

And they sent that case away, even though what it almost definitely meant was that New York State Labor Laws would be disregarded for workers, New York-based workers working in New York for this entity.

And I also -- there's a couple of -- there's another case that collects examples of cases where once the fraudulent-inducement claim end up being covered by a choice-of-law provision. The statutory -- the out-of-state statutory claim that plaintiffs in these cases are attempting to pursue is also dismissed because that choice-of-law provision once it included the tort claim was broad enough that it also included the statutory claim; and those cases also don't involve choice-of-law provision.

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 50 of 77

49

Proceedings

That includes not just contract tort, but the word "other".

And I feel that there's another point that really should be made here, which is that the North Carolina court, even though it only -- it dismissed plaintiff's case that had originally been brought there for lack of venue which resulted in this case now being brought that's before your Honor, there's a couple of quotes from that decision that I think are informative here because, essentially, what the plaintiffs have to argue to try to avoid the choice-of-law clause is that these -- that their claims here are not interwoven in the contract itself. But what the North Carolina court said, for example, in its opinion was, "In fact --"

THE COURT: Are you talking about the North Carolina case that dismissed and sent it here?

MS. IZOWER: Yes.

THE COURT: I don't want to hear that. They specifically said "without prejudice." Okay, so I don't really care anything in there. It doesn't hold by me at all without prejudice.

MS. IZOWER: Okay, it wasn't about the legal decision. It was a couple of comments they made about the content of the claims themselves.

THE COURT: Well, your only argument here is that the Section 6.9 calls for New York law, so we can't have

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 51 of 77

50

Proceedings

this North Carolina statute.  So, did they comment on that?

MS. IZOWER:  Well, they had a statutory claim there as well, but I won't go on with that, your Honor, as I can see that that's not a point that you're receptive to and I appreciate that, and I had one more choice-of-law point.

The *Boss* case, that I said -- oh, yes, which was the preclusion point which is really a red herring.  Nobody is arguing that this is a preclusion matter.  We're arguing that they had the right to contract.  They made a decision as to what law would govern in the contract; and based on what I think is pretty well-settled New York law here, the -- and I would suggest not just the *Cap Z*, but also the *Avnet* case, which is also another First Department case that reaffirmed the holding in *Cap Z* that's just more recent.

THE COURT:  I was looking for that, actually. That's important because I've got the Federal Court saying *Capital Z* is unsettled, which makes me very nervous.

MS. IZOWER:  Right, I think that because *Boss* also gives you that separate avenue; but the *Avnet* case is *Avnet* v. *Deloitte Consulting*, 187 A.D.3d 430 and it is from First Department 2020.

MR. HAN:  Your Honor, I just want to make one point.  The choice-of-law provision at issue here is broader than the one in *Cap Z*.  *Cap Z* doesn't have the word "tort." Here, there's an explicit reference to tort.

Bonnie Piccirillo - Official Court Reporter

51

THE COURT:  It is more than that.  It says "or otherwise" as Mr. Gorman pointed out.  So --

MR. HAN:  And --

THE COURT:  Let Mr. Han finish and then Ms. O'Connor can speak to this.

MR. HAN:  And as I pointed out, there's North Carolina statutory claim is seeking to invalidate this investment agreement.  So it raises the questions and issue concerning the validity of this agreement.

If you look at Section 1, the first page of Investment Agreement says they agreed to pay $125 million for the purchase of the notes.  And that all the cases that opposing counsel references is with respect to whether other states, blue sky law claims could proceed in New York.  Those cases do not involve the choice-of-law provision that the parties agreed.

MS. O'CONNOR:  So, if I can just respond to a couple of points that my colleagues made.

First of all, I think that they are way over-reading this provision.

THE COURT:  Hold on one second.  I'm so sorry.  I have an argument at 11 that I'm going to have to put off, and I'm worried about VCAP, so hold on.

(Brief pause)

Okay, we're going to go over.  I'm going to have to

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 53 of 77

52

put off the second oral argument.  Go ahead, sorry.

MS. O'CONNOR:  Thank you, your Honor.

So, first of all, I think they're way over-reading this provision.  They have not cited any other provision that reads this way where it has a gating issue, which is the validity, interpretation, construction and performance of the contract.  So, then there's a broader beginning that says any issues in contract for otherwise fact, they have to fit into this box.

So the question courts ask on this when they look at how broad is this provision meant to be is whether it's meant to encompass the entirety of the parties' relationship.  And there are cases where there's a choice-of-law clause that's meant to encompass the entirety of the parties' relationship.  They tend to say anything at all to do with this contract or the transactions under it.

That's really not what this says.  It's a very narrow tort exception.  It is not any tort, but it is a tort that -- so, negligent performance of the contract, for example, it's a tort that goes to this issue.

So, they cite *Twinlab versus Paulson*, and I think this is important and maybe we cite it.  In the *Twinlab* case, Second Department 2001, there's an almost identical provision.  The validity, interpretation, construction performance of the agreement would be under New York law,

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 54 of 77

and the court said this does not encompass broader claims. It doesn't encompass the whole relationship. And of course New York courts are very reluctant as we cite in the *J&R Multifamily Group* case, very reluctant to construe contractual choice-of-law clauses broadly to encompass extra contractual causes of action.

So, *Twinlab* case holds that almost an identical provision does not broadly encompass the entirety of the relationship.

Here, we add some language on the front of it anything to do with the contract or otherwise; but it has to go down that same funnel and it is the exact funnel *Twinlab* interpreted to not be the entirety of the relationship, but something narrower.

So, I think that's an important piece.

My colleague cited the *Avnet* case. In *Avnet* the choice-of-law provision was much broader than here. It said "This agreement and each work order and all matters relating to this agreement and each work order shall be governed by the laws of New York," and the claim was about a work order. So, this is a very different type of case.

*Capital Z*, which also spoke about the court found that turned on a contractual obligation; and in this case, our claims did not turn on a contractual obligation. We're not seeking to invalidate an agreement. We're not seeking

Bonnie Piccirillo - Official Court Reporter

54

to enforce an agreement. We are bringing a claim under the law that regulates Avaya, specifically the North Carolina securities law that protects investors in Avaya through the State of North Carolina; and it is not a claim that is related to the contract. It's not the entirety of our relationship.

The *Boss* case I think is not even relevant. In the *Boss* case, the plaintiff was challenging the legality of a contract provision. That is not at issue here.

So, the plaintiff's are sort of saying we're trying to avoid agreement; meanwhile they're trying to read this agreement explodingly broadly without regard to the language, and they have not cited a case like with some kind of broad language that then goes down a funnel that has already been interpreted by the First Department to be a narrowing funnel, not a broad funnel that goes to the entirety of the parties' relationship.

So to interpret this to mean we have no claim under North Carolina securities laws, especially when New York has no interest in precluding parties from bringing claims under other states' blue sky laws I think is a very extreme provision.

Finally, we cited a few cases that in which the court allowed claims under other states' securities or other laws to proceed even where other claims were governed by New

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 56 of 77

55

York law.

One is the *Silvercreek* case, *Silvercreek Management versus Citigroup*. One is *NRO Boston versus Yellowstone*, which allowed a claim under Massachusetts Consumer Protections statute to proceed despite a choice-of-law clause applying to other claims.

So, what we're asking for here is there's a very well-tried path here for this type of conclusion that even if a choice-of-law clause governs certain claims, it doesn't preclude others under state law.

THE COURT: I think if you were in Federal Court you'd be right. I'm not sure about whether they're interpreting New York law correctly the way the First Department would want me to. So, I need to take a closer look at this. So, I'm taking the last cause of action in, and I'll try to get you a decision as soon as I can.

Can you order the transcript, please, and split the costs and get that to me. Anything else anybody wants to put on the record before we break?

MS. O'CONNOR: Not for plaintiff. Thank you, your Honor.

MR. GORMAN: Not for Defendant. Thank you, your Honor.

THE COURT: So at the very least, we have a fraud claim that's going forward.

Bonnie Piccirillo - Official Court Reporter

So, I had stayed discovery, so now I'm not.

Oh, what's the status of the federal action?

MR. HAN:  The federal action -- federal securities class action, the motion to dismiss is fully briefed and it's pending before Judge Gardephe.

And one additional thing that changed was there was another related state complaint that had been filed here.  That case was removed and that case is before Judge Gardephe as well.  So, there are two related proceedings that are before Judge Gardephe there.

And we briefed in February.  There is a strong federal policy that the related state proceeding should not get ahead of federal securities class action in terms of discovery.  That given that the motion to dismiss is still pending in the federal securities action, I think we would submit that the discovery should be stayed.

THE COURT:  Well, that I'm not doing.  I can't -- I don't know what took so long to get that before Judge Gardephe.  So, it was fully submitted in February?

MR. HAN:  I don't have the -- it was submitted -- the motion to dismiss in the securities class action I believe was fully briefed last year.

THE COURT:  Well, I'm not waiting anymore.  So, you're going to need to talk to each other about discovery.  I can put off a date for a PC if you want.  We can do it the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 58 of 77

57

end of this week or next week if you'd like or that will give you a chance to digest this and come up with some dates.

MR. HAN:  Your Honor, with respect we are entitled to seek discovery stay from Federal Court in the related state case under Securities Litigation Uniform Standards Act.  So, if you deny staying the discovery in this case while the pending securities class action is at the pleading stage, we would like to seek a stay of the denial of the discovery stay until we had a chance to --

THE COURT:  Deny discovery stay.  Is that clear enough?

MR. HAN:  I'm sorry, I didn't hear you, your Honor.

THE COURT:  I am denying the discovery stay.  Is that clear enough?

MR. HAN:  May I request a stay of that denial until we had chance to seek --

THE COURT:  Absolutely.

MR. HAN:  The discovery stay from the Federal Court?

THE COURT:  I see what you're saying because it's a class action, no.  This went -- so, you're saying -- I see what you're saying, but that wasn't your basis for seeking a stay before.

MR. HAN:  Because the Court granted here to stay

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 59 of 77

58

the discovery until --

THE COURT:  Hold it.  Are you seeking a stay differently now?

MR. HAN:  Yes.

THE COURT:  Under different grounds than you did before?

MR. HAN:  Yes, your Honor.

THE COURT:  Then you need to make a motion because that's right a different ground.  That's the one that we had a split, and Judge Borrok was right?  Right, you remember this?  I don't know, I do because I live it.  You know, I live with these people.  So, and I absolutely adore Judge Borrok and I absolutely agree with him.

So, if that's the grounds you're thinking about, then I would grant a stay; but that's different than what you said before.  So, can you make that motion?  I don't know if you're following me.

MR. HAN:  I'm sorry, your Honor --

THE COURT:  I'm assuming -- so, it's a securities class action under the 34 Act?

MR. HAN:  Yes, your Honor.

THE COURT:  So then I have to stay based on the First Department affirming Judge Borrok?

MR. HAN:  That's my understanding, and we are seeking to stay discovery here because your Honor -- your

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 60 of 77

Honor, you were muted for a brief period of time.

THE COURT: If I'm recalling correctly, you didn't ask me on that basis before.

MR. HAN: We referenced the power granted under SLUSA for a federal court to stay discovery in a state court as part of the factual background; but we didn't need to go down that route because your Honor granted stay until the motion to dismiss stayed. And then you asked us what happens if the motion to dismiss is denied, and we stated our position that it should still be stayed; but your Honor stated that we can cross that bridge when it gets to it.

THE COURT: Now we are at that bridge. So, I guess since you already made the motion for a stay, I need letter briefs on this issue that the First Department affirmed Judge Borrok's view and said, no, on -- there was a split among the judges. I forget who the other one was.

So, obviously, that's what I have to follow; but I wasn't clear that that was your grounds. So, if you can make it clear in a letter brief that that's what you want, a stay for -- I mean, maybe we can just call it a day, that that is grounds for a stay. Like, I can't do anything about that. That's what the First Department wants. There would be no reason. I'd get reversed if I didn't institute the stay under those grounds.

Can we agree that there's a stay so we don't have

to have a motion on it or letter briefs?

MS. O'CONNOR:  I would prefer to have a letter brief.  I don't want to make unnecessary work, but I'm also, your Honor, not entirely sure if I'm following the entirety of this conversation and I don't want to prejudice any rights.

So, I may be able to consent with Mr. Han as to whether we need a letter brief; and then if we do, we can proceed.  I'm not going to brief things unnecessarily, but I do want to make sure that I'm clear on this particular issue.

THE COURT:  All right, so if Mr. Han is right about the parameters of the class action, then I absolutely must impose a stay here.  But I don't -- I don't know exactly what's going on there, so that is something for you guys to discuss, try to avoid this; and then if you're going to do letter briefs, maybe Mr. Han and you could give me one in a week.  Is that enough time?

MR. HAN:  Yes, your Honor.

THE COURT:  And then, and then another week for a response to that?

MS. O'CONNOR:  That's fine, your Honor.

THE COURT:  If I need to talk to you again, I will; but my understanding is that's pretty much -- that's -- I hope I don't have it backwards.  I don't think I do.  It's

Bonnie Piccirillo - Official Court Reporter

Case 1.23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 62 of 77

been awhile, but that's a stay right there.

MS. O'CONNOR: And we are saying definitely are not within the claims in the class because they're --

THE COURT: You're right. I may have it backwards.

MS. O'CONNOR: So we will discuss it and we will brief if we need to brief it.

THE COURT: Okay, perfect.

MS. IZOWER: Your Honor, if we -- as counsel for Chirico -- pardon?

THE COURT: No discovery yet. I want to hear out this issue.

MS. IZOWER: Okay. But, your Honor, I was just saying that if we want to file something on this point as counsel for Chirico I assume that we should coordinate and do it on the same date as Mr. Han?

THE COURT: Yes.

MS. IZOWER: So one week from today.

THE COURT: But try not to repeat anything.

MS. IZOWER: I was actually wondering if perhaps we made it a week and a half, that would give us an opportunity. I have never met Mr. Han before today, and I'm merely new to the case still. Thank you, your Honor.

THE COURT: That's fine. And then a week and a half later for a response. Just make sure you e-mail them because I don't always get noticed if you just put it on the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG Document 119-1 Filed 05/16/25 Page 63 of 77

62

e-file docket.  So just e-mail the letter to the part.

MS. IZOWER:  Both e-file and e-mail it to you?

THE COURT:  Yes.

MS. IZOWER:  Okay.  Because it is really attendant to that other motion you made.  It's going to be further argument on Motion 03.

MS. IZOWER:  Thank you, your Honor.

MR. EVANS:  Judge, did you want the cite for Judge Borrok's case they got affirmed?  I think it's *Camelot Event*.

THE COURT:  It is.

MR. EVANS:  The one that got affirmed, and the cite for that is 221 A.D.3d 403.

THE COURT:  Okay, thank you.

MR. HAN:  The defendants will file and send a letter motion by May 16th.

THE COURT:  Perfect.

MS. IZOWER:  And, your Honor, since you were going to consider, I had mentioned a case before that gathered some cases where the statutory claims ended up being out of state statutory claims were not allowed where the provision covered a tort claim.  Did you want the cite?  I didn't provide the cite of the case that gathered those before.

THE COURT:  But I'm going to be doing a lot of my own research on this one because I'm seeing a split, and the

Bonnie Piccirillo - Official Court Reporter

Case 1:23-cv-01258-PGG    Document 119-1    Filed 05/16/25    Page 64 of 77

63

federal courts are very critical of our approach.  So, I want to run that down before I make a decision.

MS. IZOWER:  Okay, your Honor.

THE COURT:  So, your cite is what?

MS. IZOWER:  The cite is, it's -- sorry, I just have to move the screen over.  It's *SEC v. Bronson*, 246 F.Supp.3d 956, and it's an SDNY 2017.  It's affirmed sub nom, and then there's further cites.

It's the portion I'm talking about is on pages 972 to 973.  The main part of the case doesn't have anything to do with this.  It's really just that portion on 972 to 973 that may be of interest.

THE COURT:  Okay, thank you.  Anything else?

MR. HAN:  Nothing, your Honor.

MR. GORMAN:  Nothing.

THE COURT:  All right, I don't want an answer until I figure out the North Carolina claims, so that's on hold also.

All right, thanks, everyone.

MR. HAN:  Thank you, your Honor.

MS. O'CONNOR:  Thank you, your Honor.

MR. GORMAN:  Thank you, your Honor.

            *     *     *     *

(Certification on next page)

Bonnie Piccirillo - Official Court Reporter

64

**C E R T I F I C A T I O N**

INDEX 655678/24   BRIGADE CAVALRY v. JAMES CHIRICO et al

---

THIS IS HEREBY CERTIFIED TO BE A
TRUE AND CORRECT TRANSCRIPT.

*Bonnie Piccirillo*

BONNIE PICCIRILLO
OFFICIAL COURT REPORTER

**$**

**$10** [1] - 11:25
**$125** [1] - 51:11
**$150** [1] - 13:12

**0**

**03** [1] - 62:6

**1**

**1** [1] - 51:10
**10** [1] - 10:22
**10001** [1] - 2:5
**10004** [1] - 2:14
**10th** [18] - 12:11, 12:13, 13:18, 13:23, 16:5, 16:17, 21:16, 24:3, 36:19, 37:5, 37:18, 37:19, 37:20, 38:6, 38:10, 39:19, 39:21, 40:15
**11** [1] - 51:22
**11530** [1] - 2:9
**11th** [4] - 24:4, 37:18, 38:5, 38:9
**12** [1] - 39:10
**12th** [10] - 13:10, 19:4, 23:4, 25:5, 25:8, 25:13, 30:3, 31:17, 31:20, 34:15
**13** [1] - 24:20
**1325** [1] - 2:8
**13th** [1] - 39:9
**14** [1] - 15:25
**14th** [1] - 26:2
**16** [1] - 47:11
**1615** [1] - 2:17
**16th** [1] - 62:16
**187** [1] - 50:20
**1986** [1] - 12:25
**1987** [1] - 12:24

**2**

**200,000** [1] - 17:2
**20002** [1] - 2:12
**2001** [1] - 52:23
**20036** [1] - 2:18
**2007** [1] - 47:12
**2012** [1] - 1:8
**2016** [1] - 26:17
**2017** [1] - 63:7
**2020** [1] - 50:21
**2022** [4] - 7:24, 10:22, 13:7, 34:15
**2024** [1] - 11:3
**2025** [1] - 1:19
**221** [1] - 62:13

**23** [2] - 13:7, 13:8
**23rd** [7] - 2:14, 13:11, 13:22, 20:12, 24:8, 26:7, 38:13
**240** [1] - 12:2
**246** [1] - 63:6
**2nd** [2] - 24:7, 24:9

**3**

**30th** [1] - 31:18
**31** [1] - 9:4
**34** [1] - 58:20

**4**

**4-point** [2] - 6:25, 7:6
**4.4** [1] - 10:2
**4.7** [6] - 7:8, 8:2, 9:17, 9:20, 10:6, 38:21
**400** [1] - 2:17
**403** [1] - 62:13
**420** [1] - 34:22
**430** [2] - 22:7, 50:20
**48** [2] - 6:20, 6:22

**5**

**513** [1] - 2:11

**6**

**6** [3] - 1:19, 11:11, 38:19
**6.9** [7] - 6:15, 6:23, 7:1, 7:3, 7:5, 45:12, 49:25
**60** [2] - 1:1, 1:18
**655678/24** [1] - 1:15
**66** [1] - 2:5
**6th** [6] - 24:17, 24:20, 29:23, 33:13, 33:14

**7**

**7th** [6] - 15:24, 16:8, 16:12, 24:21, 29:8, 29:23

**8**

**8** [1] - 13:11
**8-K** [1] - 25:2
**80** [1] - 24:18
**840** [1] - 47:11
**88** [1] - 15:25
**89** [1] - 34:14
**8th** [8] - 16:11, 16:14, 16:17, 22:20, 25:2, 25:15, 38:13, 39:13

**9**

**90** [1] - 2:14
**956** [1] - 63:7
**972** [2] - 63:9, 63:11
**973** [2] - 63:10, 63:11

**A**

**A.D.3d** [2] - 50:20, 62:13
**ability** [1] - 19:6
**able** [4] - 9:25, 31:15, 36:16, 60:7
**absence** [1] - 16:24
**absolute** [2] - 31:7, 31:13
**absolutely** [5] - 36:4, 57:18, 58:12, 58:13, 60:13
**absurd** [2] - 27:1, 27:2
**abundant** [1] - 37:25
**abundantly** [1] - 8:17
**access** [1] - 38:23
**accomplished** [1] - 40:7
**account** [3] - 9:24, 33:17, 33:19
**accountant's** [1] - 12:7
**accountants** [1] - 12:4
**accounting** [4] - 11:20, 12:3, 15:15, 15:19
**achieve** [2] - 21:16, 23:19
**achieved** [3] - 22:9, 25:1, 28:20
**acknowledge** [3] - 24:15, 24:23, 38:22
**acknowledgment** [1] - 10:6
**Act** [8] - 36:14, 40:18, 41:5, 42:11, 43:24, 45:5, 57:7, 58:20
**acting** [1] - 9:24
**action** [15] - 5:23, 8:2, 10:18, 53:6, 55:15, 56:2, 56:3, 56:4, 56:13, 56:15, 56:21, 57:8, 57:22, 58:20, 60:13
**actionable** [5] - 11:2, 11:5, 22:17, 26:17, 28:15
**actions** [3] - 25:10, 34:21, 43:2
**actual** [9] - 7:2, 11:9, 11:12, 12:6, 13:4, 13:10, 13:14, 13:16,
28:16
**add** [2] - 38:8, 53:10
**addition** [2] - 5:7, 47:18
**additional** [4] - 13:17, 17:12, 38:25, 56:6
**admit** [1] - 20:21
**admitted** [1] - 18:8
**adore** [1] - 58:12
**advancing** [1] - 42:8
**advisory** [1] - 7:21
**affirmed** [4] - 59:14, 62:9, 62:12, 63:7
**affirming** [1] - 58:23
**agent** [1] - 8:11
**aggressive** [1] - 25:1
**ago** [2] - 3:25, 4:8
**agree** [5] - 10:11, 24:24, 42:23, 58:13, 59:25
**agreed** [5] - 40:20, 42:3, 46:8, 51:11, 51:16
**Agreement** [24] - 6:15, 6:20, 13:9, 13:13, 21:9, 24:8, 38:17, 38:22, 40:21, 41:8, 41:17, 45:3, 45:6, 45:8, 45:11, 45:15, 45:17, 46:6, 46:19, 46:22, 51:11
**agreement** [12] - 7:15, 47:6, 47:13, 51:8, 51:9, 52:25, 53:18, 53:19, 53:25, 54:1, 54:11, 54:12
**ahead** [4] - 10:24, 14:15, 52:1, 56:13
**allegation** [3] - 15:21, 37:5, 39:19
**allegations** [15] - 11:6, 15:12, 15:23, 16:10, 16:20, 16:22, 16:24, 17:4, 17:7, 28:9, 29:5, 30:24, 39:12, 40:2, 40:13
**allege** [2] - 5:17, 30:20
**alleged** [6] - 16:13, 20:11, 27:20, 28:3, 39:10
**allegedly** [2] - 37:1, 39:24
**alleges** [4] - 11:15, 13:1, 14:2, 16:15
**allow** [2] - 11:24, 46:21
**allowed** [3] - 54:24, 55:4, 62:21
**almost** [4] - 27:1, 48:14, 52:23, 53:7

**Alternative** [1] - 1:12
**America** [1] - 22:8
**American** [4] - 14:21, 14:23, 15:2, 34:18
**amount** [2] - 13:12, 19:19
**amounted** [1] - 26:19
**analysis** [8] - 20:12, 20:13, 20:17, 26:7, 34:7, 35:21, 42:11, 46:25
**Angeles** [1] - 1:7
**announcement** [1] - 16:16
**answer** [2] - 9:9, 63:16
**answers** [1] - 9:8
**apologies** [1] - 36:15
**apologize** [1] - 47:4
**Appeals** [5] - 12:23, 47:22, 47:25, 48:3, 48:11
**appearance** [3] - 3:20, 4:16, 4:18
**appearances** [1] - 3:2
**APPEARANCES** [1] - 2:2
**appeared** [1] - 11:10
**applied** [1] - 12:20
**applies** [4] - 17:10, 40:19, 43:23, 45:1
**apply** [4] - 17:5, 41:24, 42:3, 48:12
**applying** [1] - 55:6
**appreciate** [1] - 50:5
**approach** [1] - 63:1
**appropriate** [1] - 38:24
**approved** [1] - 16:15
**argue** [2] - 20:25, 49:9
**arguing** [8] - 6:10, 31:14, 32:15, 32:25, 35:3, 35:4, 50:8
**argument** [13] - 4:21, 17:25, 20:6, 25:20, 30:12, 35:5, 35:17, 35:20, 42:5, 49:24, 51:22, 52:1, 62:6
**argumentation** [2] - 25:19, 25:25
**arguments** [3] - 19:9, 20:5, 30:8
**arisen** [1] - 5:14
**arises** [1] - 5:7
**arm's** [5] - 4:25, 5:22, 7:17, 10:4, 10:15
**articulate** [1] - 41:12
**aspect** [1] - 45:21
**assessed** [1] - 35:6
**assets** [5] - 19:18, 31:6, 31:10, 31:12,

BP

FILED: NEW YORK COUNTY CLERK 05/13/2025 12:38 PM
INDEX NO. 655678/2024
NYSCEF DOC. NO. 96
Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 67 of 77
RECEIVED NYSCEF: 05/13/2025

2

36:3
**Association** [1] - 1:7
**assume** [3] - 43:23, 45:11, 61:14
**assuming** [1] - 58:19
**assured** [2] - 27:25, 29:9
**Assured** [1] - 44:1
**attempting** [1] - 48:22
**attendant** [1] - 62:4
**Attorney** [1] - 2:11
**attorney's** [1] - 43:9
**Attorneys** [4] - 2:4, 2:8, 2:13, 2:17
**August** [2] - 30:14, 34:6
**Avaya** [17] - 8:14, 11:7, 11:16, 12:11, 17:2, 19:5, 21:16, 21:25, 22:2, 25:6, 29:25, 30:3, 30:12, 34:17, 38:17, 54:2, 54:3
**Avaya's** [2] - 8:18, 10:21
**avenue** [1] - 50:19
**Avenue** [1] - 2:8
**Avnet** [5] - 50:13, 50:19, 53:16
**avoid** [5] - 18:22, 20:6, 49:9, 54:11, 60:16
**awhile** [1] - 61:1

**B**

**background** [6] - 11:14, 13:19, 13:25, 29:3, 29:16, 59:6
**backwards** [2] - 60:25, 61:4
**bad** [3] - 17:25, 27:10, 27:11
**balance** [11] - 19:5, 19:17, 19:20, 19:24, 20:2, 31:14, 31:16, 31:17, 31:20, 35:18, 36:2
**balance-sheet** [3] - 19:5, 19:17, 19:20
**Bank** [1] - 26:16
**bankruptcy** [1] - 18:12
**bar** [1] - 28:14
**base** [1] - 11:19
**based** [14] - 12:4, 12:7, 26:1, 26:18, 31:3, 34:7, 35:23, 41:1, 41:13, 43:13, 44:14, 48:15, 50:10, 58:22
**basis** [8] - 7:14, 9:18,

10:13, 19:5, 19:6, 19:17, 57:23, 59:3
**Basis** [1] - 8:16
**BCM** [1] - 1:7
**bear** [1] - 9:25
**become** [2] - 31:7, 31:13
**BEFORE** [1] - 1:21
**begin** [1] - 23:17
**beginning** [3] - 33:23, 34:3, 52:7
**begs** [2] - 34:14, 36:9
**behalf** [4] - 3:21, 4:20, 44:19, 45:7
**behind** [1] - 10:2
**belief** [1] - 26:19
**beside** [1] - 9:17
**best** [3] - 14:20, 27:17, 34:6
**between** [4] - 10:5, 16:16, 38:13, 45:21
**beyond** [1] - 43:10
**big** [2] - 21:13, 37:17
**biggest** [1] - 44:17
**bit** [2] - 13:19, 48:10
**blanketly** [1] - 26:23
**blankly** [1] - 20:19
**blue** [6] - 43:20, 43:25, 44:4, 46:20, 51:14, 54:21
**board** [3] - 16:4, 24:22, 25:4
**body** [1] - 39:1
**bond** [1] - 7:22
**Bond** [3] - 1:10, 1:11, 1:13
**bonds** [1] - 32:11
**Bonnie** [1] - 2:23
**book** [2] - 31:10
**booking** [1] - 34:21
**bookings** [2] - 25:11, 34:21
**Borrok** [3] - 58:10, 58:13, 58:23
**Borrok's** [2] - 59:15, 62:9
**Boss** [5] - 47:21, 50:6, 50:18, 54:7, 54:8
**Boston** [1] - 55:3
**Boulevard** [1] - 2:5
**bound** [2] - 41:23, 42:19
**box** [1] - 52:9
**break** [1] - 55:19
**bridge** [2] - 59:11, 59:12
**brief** [11] - 12:22, 18:3, 47:22, 47:23, 59:1, 59:19, 60:3, 60:8, 60:9, 61:6

**Brief** [2] - 4:14, 51:24
**briefed** [3] - 56:4, 56:11, 56:22
**briefs** [4] - 39:2, 59:14, 60:1, 60:17
**Brigade** [17] - 1:3, 1:3, 1:4, 1:4, 1:5, 1:6, 5:15, 5:18, 5:19, 6:4, 6:8, 6:17, 24:8, 24:10
**Brigade-SierraBravo** [1] - 1:6
**bring** [1] - 33:8
**bringing** [2] - 54:1, 54:20
**Broad** [1] - 2:14
**broad** [6] - 48:3, 48:10, 48:24, 52:11, 54:14, 54:16
**broader** [9] - 42:14, 47:16, 47:20, 47:21, 47:24, 50:23, 52:7, 53:1, 53:17
**broadly** [7] - 42:16, 42:23, 45:19, 53:5, 53:8, 54:12
**Bronson** [1] - 63:6
**brought** [2] - 49:5, 49:6
**bucket** [1] - 21:13
**bunch** [3] - 26:2, 32:14, 32:15
**Burlington** [1] - 39:4
**business** [6] - 4:25, 5:22, 9:22, 10:15, 11:18, 11:19
**buyer** [1] - 10:3
**BY** [4] - 2:6, 2:9, 2:15, 2:18

**C**

**calculated** [1] - 37:22
**calculations** [1] - 32:19
**calendar** [1] - 21:17
**calendar-year** [1] - 21:17
**Camelot** [1] - 62:9
**cannot** [2] - 8:18, 41:25
**Cap** [5] - 47:7, 50:12, 50:14, 50:24
**capable** [1] - 9:22
**Capital** [5] - 1:5, 47:5, 47:10, 50:17, 53:22
**care** [1] - 49:19
**careful** [1] - 12:7
**Carolina** [34] - 5:3, 36:14, 40:16, 40:18,

40:25, 41:5, 41:14, 41:25, 42:11, 43:7, 43:9, 44:7, 44:9, 44:13, 44:14, 44:15, 44:16, 44:17, 44:19, 44:20, 44:21, 45:4, 45:7, 45:24, 49:3, 49:12, 49:15, 50:1, 51:7, 54:2, 54:4, 54:19, 63:17
**Carolina's** [1] - 46:11
**Carolina-based** [1] - 44:14
**case** [67] - 3:24, 5:6, 5:14, 6:2, 6:14, 6:17, 7:23, 8:16, 12:23, 12:24, 15:9, 15:14, 18:15, 18:17, 21:20, 26:15, 27:11, 27:12, 27:17, 28:11, 33:8, 36:16, 36:20, 37:12, 37:25, 39:4, 42:24, 43:2, 43:15, 46:8, 47:5, 47:6, 47:10, 47:12, 47:21, 47:22, 47:25, 48:13, 48:18, 49:4, 49:6, 49:15, 50:6, 50:13, 50:19, 52:23, 53:4, 53:7, 53:16, 53:21, 53:23, 54:7, 54:8, 54:13, 55:2, 56:8, 57:6, 57:7, 61:22, 62:9, 62:19, 62:23, 63:10
**cases** [23] - 5:10, 9:11, 11:3, 12:22, 14:10, 15:8, 28:14, 29:4, 39:20, 42:2, 42:14, 42:17, 44:1, 44:4, 44:10, 48:18, 48:21, 48:25, 51:12, 51:15, 52:13, 54:23, 62:20
**cash** [2] - 30:14, 32:2
**catastrophic** [1] - 26:23
**caused** [1] - 44:9
**causes** [1] - 53:6
**Cavalry** [1] - 1:3
**center** [2] - 7:23, 36:20
**centered** [1] - 43:2
**central** [1] - 36:20
**Centre** [1] - 1:18
**CEO** [6] - 3:22, 18:6, 18:8, 18:18, 20:16, 44:14
**certain** [2] - 29:6, 55:9
**certainly** [1] - 14:7
**certificate** [10] - 18:25, 19:3, 21:8, 30:9,

30:10, 30:13, 31:4, 36:10, 36:11
**certification** [1] - 30:16
**Certification** [1] - 63:24
**certified** [4] - 15:17, 19:5, 20:3, 20:9
**certify** [1] - 20:8
**certifying** [2] - 20:20, 21:5
**cetera** [1] - 23:20
**CFO** [3] - 18:7, 18:18, 20:16
**chain** [5] - 17:17, 17:21, 17:23, 27:9, 29:20
**challenges** [2] - 10:21, 12:14
**challenging** [1] - 54:8
**chance** [4] - 44:24, 57:2, 57:10, 57:17
**changed** [2] - 39:23, 56:6
**changes** [1] - 39:20
**chaotic** [1] - 22:22
**charge** [3] - 14:12, 16:3, 29:17
**chat** [1] - 47:8
**chats** [1] - 17:19
**chatter** [5] - 22:6, 22:22, 23:5, 23:19, 29:2
**check** [1] - 9:3
**cherry** [2] - 27:22, 29:23
**chief** [2] - 16:1, 24:14
**CHIRICO** [1] - 1:16
**Chirico** [18] - 2:8, 2:11, 3:22, 4:20, 6:12, 21:1, 22:25, 24:17, 25:3, 25:5, 25:9, 28:23, 30:3, 34:16, 34:19, 47:23, 61:9, 61:14
**choice** [22] - 40:21, 41:3, 41:18, 41:21, 41:24, 42:18, 43:17, 43:18, 44:23, 45:12, 48:20, 48:23, 48:25, 49:9, 50:5, 50:23, 51:15, 52:14, 53:5, 53:17, 55:5, 55:9
**choice-of-law** [21] - 40:21, 41:3, 41:21, 41:24, 42:18, 43:17, 43:18, 44:23, 45:12, 48:20, 48:23, 48:25, 49:9, 50:5, 50:23, 51:15, 52:14, 53:5,

53:17, 55:5, 55:9
**Christie** [1] - 12:24
**chronology** [1] - 13:6
**Cimen** [1] - 11:3
**circumstance** [1] - 37:23
**circumstances** [4] - 12:21, 23:9, 27:3, 36:24
**CIT** [1] - 1:4
**cite** [22] - 5:5, 5:10, 8:16, 11:2, 21:18, 26:16, 39:4, 42:2, 42:17, 43:25, 44:4, 47:9, 47:22, 52:21, 52:22, 53:3, 62:8, 62:12, 62:22, 62:23, 63:4, 63:5
**cited** [5] - 12:22, 52:4, 53:16, 54:13, 54:23
**cites** [2] - 42:14, 63:8
**Citigroup** [1] - 55:3
**City** [1] - 2:9
**claim** [31] - 4:22, 8:18, 9:19, 10:12, 27:6, 29:14, 40:14, 40:19, 41:14, 41:15, 41:25, 42:3, 43:10, 43:11, 43:13, 43:18, 44:25, 45:4, 48:19, 48:21, 48:23, 48:24, 50:2, 51:7, 53:20, 54:1, 54:4, 54:18, 55:4, 55:25, 62:22
**claiming** [1] - 8:22
**claims** [21] - 28:10, 40:22, 40:25, 41:18, 44:3, 45:1, 45:13, 49:10, 49:23, 51:14, 53:1, 53:24, 54:20, 54:24, 54:25, 55:6, 55:9, 61:3, 62:20, 62:21, 63:17
**clarity** [1] - 24:2
**class** [8] - 56:4, 56:13, 56:21, 57:8, 57:22, 58:20, 60:13, 61:3
**clause** [12] - 41:18, 43:17, 43:18, 45:13, 46:17, 48:8, 48:9, 49:10, 52:14, 55:6, 55:9
**clauses** [1] - 53:5
**clear** [14] - 8:17, 15:9, 20:24, 26:8, 27:11, 30:19, 41:18, 43:23, 43:24, 57:11, 57:15, 59:18, 59:19, 60:10
**clearly** [8] - 5:15, 19:16, 22:16, 25:10,

27:6, 34:20, 36:5, 44:13
**cliff** [4] - 18:18, 25:13, 27:5
**close** [3] - 26:5, 28:3, 38:5
**closer** [1] - 55:14
**closing** [10] - 13:10, 13:13, 13:16, 18:7, 21:11, 21:12, 25:11, 34:21, 35:5
**cloud** [1] - 11:19
**cloud-base** [1] - 11:19
**co** [2] - 3:8, 4:20
**co-counsel** [2] - 3:8, 4:20
**Coca** [1] - 1:12
**Coca-Cola** [1] - 1:12
**coffee** [2] - 21:23
**Cola** [1] - 1:12
**collapse** [1] - 18:14
**colleague** [3] - 3:13, 36:17, 53:16
**colleagues** [2] - 3:9, 51:18
**Collective** [1] - 1:3
**collects** [1] - 48:18
**combine** [1] - 10:5
**coming** [4] - 6:17, 22:15, 32:18, 32:19
**comment** [1] - 50:1
**comments** [1] - 49:22
**commitment** [1] - 12:1
**committed** [2] - 13:8, 24:18
**Company** [1] - 1:12
**company** [47] - 3:22, 5:4, 6:6, 11:18, 11:19, 15:4, 15:15, 16:4, 16:7, 16:11, 17:2, 17:3, 17:17, 18:7, 18:14, 20:16, 20:20, 21:3, 21:4, 22:13, 22:14, 23:15, 24:6, 24:14, 26:8, 26:23, 27:25, 28:1, 31:24, 32:8, 32:9, 32:10, 32:15, 32:22, 33:6, 33:9, 33:10, 33:17, 33:24, 34:7, 36:22, 38:19, 38:23, 39:3, 45:7
**company's** [8] - 16:1, 16:2, 20:13, 28:12, 29:9, 32:1, 33:16, 36:3
**company-wide** [1] - 15:4
**compared** [1] - 13:3
**comparing** [2] - 31:9,

31:12
**complaint** [24] - 10:21, 11:6, 11:7, 11:15, 13:1, 14:2, 14:20, 15:10, 15:25, 16:13, 16:14, 16:21, 17:15, 25:25, 27:16, 27:17, 27:20, 29:8, 30:19, 30:24, 32:3, 34:15, 40:6, 56:7
**complaint's** [1] - 30:9
**complaints** [1] - 12:14
**complete** [1] - 9:25
**completely** [1] - 46:24
**complex** [1] - 11:20
**compounded** [1] - 39:23
**compressed** [2] - 23:6, 25:17
**concern** [1] - 22:24
**concerning** [7] - 38:23, 40:24, 41:17, 45:1, 46:17, 47:13, 51:9
**conclusion** [2] - 26:18, 55:8
**conclusory** [1] - 15:22
**condition** [3] - 13:13, 13:15, 21:10
**conducted** [2] - 7:9, 8:8
**confidence** [1] - 9:18
**confident** [1] - 29:25
**confirms** [2] - 25:9, 34:20
**conflict** [1] - 18:20
**connection** [1] - 43:20
**connections** [2] - 4:5, 4:6
**consent** [1] - 60:7
**conservative** [2] - 24:12, 24:15
**consider** [1] - 62:19
**consideration** [1] - 41:6
**considered** [1] - 38:24
**considering** [1] - 36:8
**construction** [6] - 45:2, 45:14, 46:18, 47:13, 52:6, 52:24
**construe** [1] - 53:4
**Consulting** [1] - 50:20
**Consumer** [1] - 55:4
**consumers** [1] - 42:25
**contact** [2] - 4:10, 22:11
**contain** [1] - 15:11
**contemplated** [1] - 45:18
**contemporaneous**

[10] - 12:19, 14:17, 15:23, 16:18, 17:7, 27:14, 27:23, 28:22, 28:24, 30:20
**content** [1] - 49:23
**context** [2] - 23:15, 24:5
**continue** [1] - 10:25
**contract** [26] - 10:10, 11:21, 11:25, 12:2, 12:4, 12:8, 13:11, 40:24, 42:6, 42:7, 42:12, 42:13, 42:15, 47:17, 48:2, 49:1, 49:11, 50:9, 50:10, 52:7, 52:8, 52:16, 52:19, 53:11, 54:5, 54:9
**contracts** [1] - 33:23
**contractual** [5] - 48:4, 53:5, 53:6, 53:23, 53:24
**contradict** [1] - 34:23
**contradicts** [1] - 7:13
**contrary** [1] - 39:7
**controls** [1] - 18:11
**convenience** [1] - 46:16
**conversation** [2] - 24:5, 60:5
**coordinate** [1] - 61:14
**Corporation** [3] - 1:6, 1:8, 1:9
**corporation** [2] - 44:9, 44:15
**corporation's** [1] - 45:23
**correct** [2] - 7:3, 13:23
**corrected** [1] - 37:4
**correctly** [3] - 8:6, 55:13, 59:2
**costs** [1] - 55:18
**counsel** [11] - 3:8, 4:20, 7:14, 19:9, 27:9, 28:18, 28:21, 42:14, 51:13, 61:8, 61:14
**count** [4] - 15:20, 40:18, 41:12, 42:9
**counterparties** [1] - 10:10
**counts** [1] - 17:10
**COUNTY** [1] - 1:1
**County** [1] - 1:7
**couple** [12] - 20:5, 20:14, 22:24, 23:4, 33:21, 36:17, 43:22, 44:4, 48:17, 49:7, 49:22, 51:18
**course** [4] - 20:19,

29:1, 29:3, 53:2
**Court** [20] - 2:23, 12:23, 17:5, 21:23, 23:11, 26:1, 27:2, 28:2, 28:21, 39:4, 39:16, 47:22, 47:25, 48:3, 48:10, 50:16, 55:11, 57:5, 57:20, 57:25
**court** [9] - 16:19, 39:16, 49:3, 49:12, 53:1, 53:22, 54:24, 59:5
**COURT** [94] - 1:1, 3:2, 3:6, 3:11, 3:15, 3:20, 3:25, 4:3, 4:7, 4:10, 4:15, 4:22, 5:21, 6:10, 6:19, 6:23, 7:1, 7:8, 8:1, 8:24, 10:11, 10:24, 13:6, 13:18, 14:7, 14:15, 17:11, 17:21, 19:1, 19:11, 21:8, 27:7, 29:1, 29:13, 30:11, 32:25, 33:13, 34:13, 35:2, 35:8, 35:14, 36:7, 36:24, 37:8, 38:5, 39:18, 41:9, 42:5, 42:10, 42:20, 43:5, 46:1, 46:17, 47:3, 47:9, 49:14, 49:17, 49:24, 50:15, 51:1, 51:4, 51:21, 55:11, 55:24, 56:17, 56:23, 57:11, 57:14, 57:18, 57:21, 58:2, 58:5, 58:8, 58:19, 58:22, 59:2, 59:12, 60:12, 60:20, 60:23, 61:4, 61:7, 61:10, 61:16, 61:18, 61:23, 62:3, 62:11, 62:14, 62:17, 62:24, 63:4, 63:13, 63:16
**Court's** [1] - 21:20
**courts** [9] - 41:21, 41:24, 42:17, 44:2, 44:10, 48:6, 52:10, 53:3, 63:1
**cover** [1] - 42:16
**covered** [2] - 48:19, 62:22
**covers** [2] - 40:22, 41:18
**CPC** [2] - 12:22, 13:5
**CRANE** [1] - 1:22
**create** [1] - 3:17
**creates** [1] - 6:9
**credibility** [1] - 35:5
**credible** [1] - 18:21

**Credit** [5] - 1:4, 1:6, 1:8, 1:9
**creditor** [2] - 5:11, 10:5
**cries** [1] - 8:3
**crisis** [1] - 19:22
**Cristillina** [1] - 12:24
**critical** [1] - 63:1
**cross** [1] - 59:11
**current** [1] - 12:12

**D**

**D.C** [2] - 2:12, 2:18
**damages** [2] - 41:9, 41:11
**date** [7] - 20:4, 20:7, 21:11, 31:16, 36:12, 56:25, 61:15
**dated** [1] - 24:4
**dates** [1] - 57:3
**days** [3] - 22:24, 23:4, 24:13
**deal** [5] - 7:16, 7:22, 21:11, 46:13, 47:1
**dealing** [1] - 28:15
**Debevoise** [1] - 3:5
**debt** [1] - 24:11
**debtor** [2] - 5:11, 10:5
**debtor-creditor** [1] - 5:11
**debts** [2] - 19:7, 19:23
**decided** [2] - 30:13, 48:5
**decision** [10] - 9:1, 9:2, 32:1, 37:14, 37:24, 49:7, 49:22, 50:9, 55:16, 63:2
**decline** [1] - 39:2
**declined** [1] - 39:4
**Defendant** [8] - 2:8, 2:11, 2:13, 2:17, 3:8, 9:15, 34:16, 55:22
**defendant** [3] - 7:18, 15:14, 15:18
**defendant's** [1] - 15:13
**defendants** [18] - 5:3, 6:4, 6:5, 8:8, 8:13, 13:1, 13:2, 18:6, 23:20, 25:18, 26:12, 26:24, 27:18, 29:6, 29:14, 43:14, 44:6, 62:15
**Defendants** [1] - 1:17
**defense** [1] - 7:13
**deferred** [1] - 11:22
**deficiencies** [2] - 15:16, 15:19
**definitely** [2] - 48:14,

61:2
**definition** [3] - 20:2, 31:23, 36:9
**defraud** [1] - 9:8
**delivered** [1] - 25:4
**Deloitte** [2] - 15:14, 50:20
**demonstrate** [1] - 17:18
**demonstrating** [1] - 34:17
**denial** [2] - 57:9, 57:16
**denied** [1] - 59:9
**deny** [2] - 57:7, 57:11
**denying** [1] - 57:14
**Department** [17] - 8:17, 11:2, 12:24, 15:9, 15:20, 26:17, 40:5, 47:6, 47:11, 50:13, 50:21, 52:23, 54:15, 55:14, 58:23, 59:14, 59:22
**describe** [1] - 18:4
**description** [1] - 21:20
**despite** [1] - 55:5
**detail** [2] - 32:17, 40:14
**determined** [1] - 48:4
**developed** [1] - 39:1
**DEVEVOISE** [1] - 2:4
**difference** [2] - 37:17, 46:12
**different** [11] - 6:3, 10:16, 10:17, 11:13, 41:10, 41:13, 43:11, 53:21, 58:5, 58:9, 58:15
**differently** [1] - 58:3
**difficulties** [2] - 11:16, 12:9
**digest** [1] - 57:2
**diligence** [2] - 6:3, 10:7
**directly** [1] - 7:13
**director** [1] - 26:4
**directors** [1] - 16:4
**disagree** [3] - 6:13, 8:5, 33:9
**disagreed** [1] - 14:21
**disagreeing** [1] - 25:20
**disagreement** [1] - 15:1
**disagreements** [1] - 28:19
**disappeared** [1] - 4:6
**disclaim** [2] - 8:7, 9:11
**disclaimed** [2] - 38:1, 38:18
**disclaimer** [4] - 8:18,

8:20, 36:21, 38:4
**disclaims** [1] - 8:15
**disclosed** [1] - 11:11
**disclosing** [1] - 20:19
**disclosure** [4] - 5:5, 18:10, 39:6, 39:8
**disclosures** [2] - 24:3, 38:25
**discount** [1] - 26:16
**discovery** [16] - 25:24, 27:16, 56:1, 56:14, 56:16, 56:24, 57:5, 57:7, 57:10, 57:11, 57:14, 57:19, 58:1, 58:25, 59:5, 61:10
**discuss** [3] - 39:2, 60:16, 61:5
**discussed** [1] - 15:25
**discussion** [1] - 13:19
**dismiss** [12] - 29:3, 30:6, 33:1, 35:8, 40:3, 40:4, 40:5, 56:4, 56:14, 56:21, 59:8, 59:9
**dismissed** [6] - 33:8, 40:19, 42:1, 48:22, 49:4, 49:15
**dismissible** [1] - 30:5
**dismissing** [2] - 10:12, 36:12
**dispute** [4] - 40:20, 41:22, 41:23, 43:24
**disputes** [1] - 48:5
**disregard** [4] - 46:6, 46:7, 46:15, 46:22
**disregarded** [1] - 48:15
**disregarding** [1] - 47:1
**Diversified** [1] - 1:3
**DOC** [2] - 6:20, 6:22
**docket** [1] - 62:1
**document** [5] - 7:4, 11:10, 17:2, 31:11, 32:2
**documents** [1] - 11:7
**dollars** [1] - 12:2
**done** [2] - 33:17, 39:22
**Doug** [1] - 3:9
**DOUGLAS** [1] - 2:15
**down** [6] - 30:25, 46:8, 53:12, 54:14, 59:7, 63:2
**drafted** [2] - 41:21, 42:16
**drastically** [1] - 39:6
**driven** [1] - 18:18
**drove** [1] - 27:4
**due** [2] - 19:7, 19:23

**duties** [1] - 47:15
**duty** [11] - 5:5, 5:7, 10:10, 38:14, 38:15, 38:18, 39:3, 39:5, 39:14, 39:17

**E**

**E-DOC** [2] - 6:20, 6:22
**e-file** [2] - 62:1, 62:2
**e-filing** [1] - 3:16
**e-mail** [23] - 3:11, 4:13, 14:22, 15:23, 15:24, 16:2, 16:8, 16:12, 22:22, 23:4, 23:21, 24:21, 29:2, 29:9, 29:16, 29:19, 29:22, 33:13, 33:14, 38:9, 61:24, 62:1, 62:2
**e-mails** [19] - 14:3, 14:19, 16:17, 17:2, 17:3, 17:14, 17:16, 17:18, 24:3, 24:4, 24:17, 26:2, 27:22, 28:18, 32:6, 33:9, 33:12, 38:13, 39:10
**early** [5] - 7:23, 12:5, 33:19, 34:6
**earnings** [1] - 39:17
**earth** [1] - 8:1
**easy** [1] - 20:23
**economic** [1] - 9:25
**effective** [1] - 18:10
**effort** [2] - 13:22, 33:11
**efforts** [1] - 20:25
**EisnerAmper** [1] - 26:16
**Employees** [1] - 1:7
**Employees'** [1] - 1:6
**encompass** [6] - 52:12, 52:14, 53:1, 53:2, 53:5, 53:8
**encompassed** [1] - 45:21
**encourage** [1] - 48:7
**encourages** [1] - 39:7
**end** [10] - 11:9, 15:12, 22:19, 30:1, 33:2, 33:24, 34:2, 47:19, 48:19, 57:1
**ended** [2] - 31:18, 62:20
**enforce** [2] - 41:21, 54:1
**enforcement** [5] - 41:17, 45:2, 45:15, 46:18, 47:14
**entered** [2] - 7:14,

21:9
**Enterprises** [1] - 44:5
**entirely** [1] - 60:4
**entirety** [7] - 52:12, 52:14, 53:8, 53:13, 54:5, 54:17, 60:4
**entitled** [2] - 15:10, 57:4
**entity** [3] - 19:22, 44:18, 48:16
**ESBE** [1] - 11:3
**especially** [1] - 54:19
**ESQ** [5] - 2:6, 2:9, 2:10, 2:15, 2:18
**essentially** [1] - 49:8
**et** [1] - 23:20
**evaluating** [1] - 9:23
**EVANS** [2] - 62:8, 62:12
**event** [1] - 38:11
**Event** [1] - 62:10
**events** [2] - 27:10, 30:22
**exact** [2] - 23:3, 53:12
**exactly** [2] - 35:20, 60:14
**examination** [1] - 28:3
**examined** [1] - 27:15
**example** [4] - 11:24, 21:22, 49:12, 52:20
**examples** [2] - 21:22, 48:18
**exception** [6] - 12:15, 12:17, 12:25, 17:6, 28:7, 52:18
**exceptional** [1] - 12:20
**excuse** [1] - 43:6
**executive** [1] - 38:9
**executives** [2] - 26:3, 32:7
**Exhibit** [3] - 11:11, 15:25, 38:19
**exonerating** [1] - 24:24
**expectation** [1] - 29:10
**expectations** [1] - 11:4
**expected** [1] - 16:5
**expecting** [1] - 28:1
**experience** [1] - 9:21
**experienced** [1] - 11:16
**explanation** [1] - 32:18
**explicit** [2] - 42:18, 50:25
**explicitly** [6] - 11:8, 38:18, 40:22, 41:2,

BP

42:12, 42:16
**explodingly** [1] - 54:12
**expressed** [1] - 22:24
**expressly** [1] - 38:1
**extent** [2] - 30:9, 39:9
**extra** [1] - 53:6
**extreme** [3] - 6:7, 40:6, 54:21

## F

**F.Supp.3d** [1] - 63:7
**fabricated** [2] - 38:7, 39:19
**fact** [19] - 5:13, 5:18, 14:8, 17:1, 17:18, 17:22, 18:10, 18:24, 19:2, 20:21, 20:24, 21:15, 21:22, 29:16, 31:23, 37:18, 44:18, 49:13, 52:8
**facts** [6] - 8:22, 11:15, 13:2, 26:1, 29:6, 30:18
**factual** [15] - 11:14, 15:12, 15:21, 16:20, 16:22, 16:24, 22:16, 23:10, 25:18, 27:21, 28:4, 28:9, 29:5, 35:22, 59:6
**FADDÉ** [1] - 2:9
**Faddé** [1] - 3:23
**failed** [1] - 16:21
**failure** [3] - 21:6, 22:13, 26:23
**fair** [2] - 19:18, 26:24
**fairer** [1] - 31:12
**fall** [2] - 27:4, 28:7
**falls** [1] - 41:2
**false** [16] - 5:17, 9:9, 12:18, 14:18, 15:6, 20:7, 22:4, 22:5, 28:10, 28:13, 30:16, 30:20, 30:22, 31:25, 37:6
**falsehood** [1] - 30:20
**falsity** [8] - 12:19, 15:13, 16:18, 26:13, 27:14, 28:22, 28:25, 29:7
**familiar** [1] - 43:8
**far** [2] - 20:8, 37:3
**fast** [1] - 26:23
**fault** [1] - 40:1
**favor** [1] - 25:19
**February** [2] - 56:11, 56:19
**Federal** [4] - 50:16, 55:11, 57:5, 57:19

**federal** [8] - 56:2, 56:3, 56:12, 56:13, 56:15, 59:5, 63:1
**FedEx** [1] - 1:6
**fees** [1] - 43:9
**few** [5] - 15:17, 24:13, 26:8, 36:9, 54:23
**fictitious** [4] - 13:3, 16:10, 17:8, 28:17
**FIGEL** [1] - 2:16
**fight** [1] - 19:11
**figure** [1] - 63:17
**file** [4] - 61:13, 62:1, 62:2, 62:15
**filed** [4] - 15:25, 18:12, 27:17, 56:7
**filing** [1] - 3:16
**finally** [2] - 39:1, 54:23
**finance** [1] - 26:3
**financial** [12] - 5:4, 9:22, 10:21, 11:1, 11:10, 13:19, 14:20, 15:1, 15:16, 15:18, 16:11, 39:3
**financials** [1] - 13:24
**fine** [2] - 60:22, 61:23
**finish** [2] - 37:8, 51:4
**fire** [1] - 37:4
**fired** [1] - 18:8
**First** [16] - 8:17, 11:2, 12:24, 15:8, 15:20, 26:17, 40:5, 47:5, 47:11, 50:13, 50:20, 54:15, 55:13, 58:23, 59:14, 59:22
**first** [12] - 4:22, 10:12, 19:16, 23:18, 24:9, 31:17, 36:5, 39:16, 43:16, 51:10, 51:19, 52:3
**fiscal** [1] - 12:13
**fit** [1] - 52:9
**Fixed** [1] - 1:10
**flimsy** [1] - 26:18
**flip** [2] - 10:2, 16:1
**Floor** [1] - 2:14
**focus** [1] - 9:20
**focuses** [1] - 27:9
**follow** [1] - 59:17
**following** [5] - 11:23, 12:12, 30:13, 58:17, 60:4
**force** [2] - 14:25, 16:3
**forecast** [4] - 14:21, 14:23, 15:2, 39:6
**forecasting** [2] - 11:16, 12:10
**forget** [1] - 59:16
**form** [1] - 16:21
**Form** [1] - 25:2

**forma** [1] - 31:19
**former** [1] - 3:22
**forward** [9] - 18:23, 23:12, 23:18, 26:12, 27:17, 28:12, 29:10, 38:21, 55:25
**forward-looking** [7] - 18:23, 23:12, 23:18, 26:12, 28:12, 29:10, 38:21
**forwarded** [1] - 3:13
**fraction** [1] - 34:9
**framework** [1] - 39:7
**Franklin** [1] - 2:8
**frankly** [1] - 35:16
**fraud** [17] - 8:25, 9:1, 10:16, 18:15, 21:7, 27:6, 27:11, 28:11, 29:14, 40:3, 40:14, 41:10, 41:12, 42:9, 43:10, 43:19, 55:24
**fraudulent** [2] - 40:11, 48:19
**fraudulent-inducement** [1] - 48:19
**fraudulently** [1] - 42:6
**FREDERICK** [1] - 2:16
**friends** [1] - 18:4
**front** [2] - 7:4, 53:10
**full** [2] - 5:5, 12:12
**fully** [4] - 35:17, 56:4, 56:19, 56:22
**function** [1] - 32:21
**Fund** [14] - 1:3, 1:4, 1:4, 1:5, 1:5, 1:6, 1:6, 1:9, 1:10, 1:10, 1:11, 1:12, 1:12, 1:13
**fund** [1] - 44:20
**fundamental** [1] - 11:17
**fundamentally** [3] - 5:13, 19:20, 22:13
**funnel** [5] - 53:12, 54:14, 54:16
**future** [1] - 30:22

## G

**gap** [1] - 26:6
**Garden** [1] - 2:9
**Gardephe** [4] - 56:5, 56:8, 56:10, 56:19
**gathered** [2] - 62:19, 62:23
**gating** [1] - 52:5
**genuine** [1] - 26:19
**given** [2] - 40:5, 56:14
**global** [2] - 16:3,

24:17
**Global** [1] - 1:9
**goodwill** [2] - 30:15, 30:25
**Gorman** [10] - 3:21, 4:20, 4:21, 6:11, 8:6, 9:6, 9:12, 17:11, 46:1, 51:2
**GORMAN** [24] - 2:10, 3:21, 4:2, 4:4, 4:9, 4:12, 6:11, 6:21, 6:24, 7:3, 7:10, 17:12, 32:4, 33:4, 33:14, 34:23, 35:7, 42:22, 46:3, 46:5, 46:21, 55:22, 63:15, 63:22
**govern** [3] - 47:12, 48:6, 50:10
**governed** [3] - 48:2, 53:19, 54:25
**governing** [4] - 6:23, 6:24, 7:5, 48:1
**governs** [1] - 55:9
**grant** [1] - 58:15
**granted** [3] - 57:25, 59:4, 59:7
**great** [1] - 40:14
**ground** [1] - 58:9
**grounds** [6] - 26:18, 58:5, 58:14, 59:18, 59:21, 59:24
**Group** [2] - 44:1, 53:4
**group** [2] - 25:20, 32:8
**guess** [5] - 10:19, 13:24, 19:13, 43:22, 59:12
**guidance** [16] - 16:7, 18:9, 24:12, 28:1, 32:8, 32:9, 32:20, 32:21, 32:24, 36:19, 36:22, 37:10, 37:19, 37:21, 37:23, 38:1
**guide** [1] - 16:5
**guys** [2] - 34:22, 60:15

## H

**hac** [1] - 2:18
**half** [2] - 61:20, 61:24
**HAN** [42] - 2:18, 3:7, 3:13, 3:19, 9:14, 10:20, 11:1, 13:8, 14:2, 14:14, 14:16, 27:8, 29:4, 30:8, 30:12, 37:7, 38:12, 40:17, 41:11, 42:8, 42:12, 46:4, 50:22, 51:3, 51:6, 56:3, 56:20, 57:4, 57:13,

57:16, 57:19, 57:25, 58:4, 58:7, 58:18, 58:21, 58:24, 59:4, 60:19, 62:15, 63:14, 63:20
**Han** [14] - 3:7, 3:11, 9:14, 10:19, 18:23, 24:21, 27:8, 46:2, 51:4, 60:7, 60:12, 60:17, 61:15, 61:21
**hand** [3] - 33:17, 35:25, 36:16
**hand-done** [1] - 33:17
**handful** [1] - 32:7
**HANSEN** [1] - 2:16
**Hansen** [1] - 3:9
**happy** [2] - 19:8, 35:12
**hardware** [1] - 11:18
**harm** [1] - 44:9
**Hatteras** [1] - 44:5
**Hawaii's** [1] - 46:11
**head** [3] - 16:2, 27:25, 29:24
**headquarters** [1] - 45:24
**health** [1] - 5:4
**hear** [5] - 10:19, 18:4, 49:17, 57:13, 61:10
**heard** [1] - 25:19
**held** [5] - 8:17, 11:3, 17:9, 26:17, 44:2
**help** [1] - 25:4
**helpful** [4] - 21:19, 21:20, 35:11, 47:8
**herring** [1] - 50:7
**High** [6] - 1:4, 1:9, 1:10, 1:11, 1:12, 1:13
**high** [3] - 13:24, 22:19, 28:14
**higher** [1] - 31:6
**himself** [1] - 7:19
**hold** [9] - 6:19, 10:9, 47:10, 49:19, 51:21, 51:23, 58:2, 63:17
**holders** [1] - 44:17
**holding** [1] - 50:14
**Holdings** [1] - 11:3
**holds** [1] - 53:7
**Honor** [71] - 3:4, 3:7, 3:19, 4:2, 5:2, 6:11, 6:21, 6:22, 7:10, 8:5, 9:3, 9:11, 9:14, 10:20, 14:14, 17:13, 18:2, 21:19, 22:6, 23:17, 25:8, 27:1, 27:8, 30:8, 32:4, 34:8, 34:24, 35:7, 35:10, 36:6, 36:15, 37:7, 38:8, 38:12,

38:14, 40:17, 42:21, 42:22, 43:12, 46:3, 46:4, 46:5, 47:5, 49:7, 50:3, 50:22, 52:2, 55:21, 55:23, 57:4, 57:13, 58:7, 58:18, 58:21, 58:25, 59:1, 59:7, 59:10, 60:4, 60:19, 60:22, 61:8, 61:12, 61:22, 62:7, 62:18, 63:3, 63:14, 63:20, 63:21, 63:22

**HONORABLE** [1] - 1:22
**hope** [1] - 60:25
**hot** [2] - 21:23, 21:24
**Houbigant** [3] - 14:10, 15:8, 16:19
**Hudson** [1] - 2:5
**huge** [3] - 14:16, 28:20, 30:25
**hundred** [1] - 10:11

### I

**idea** [1] - 32:19
**identical** [2] - 52:23, 53:7
**ignore** [1] - 42:18
**II** [1] - 1:4
**illustrating** [1] - 12:25
**impairment** [5] - 20:11, 20:13, 20:16, 26:7, 35:20
**implications** [1] - 48:3
**imploded** [1] - 23:15
**important** [4] - 11:14, 50:16, 52:22, 53:15
**importantly** [1] - 31:2
**impose** [2] - 39:3, 60:14
**imposing** [1] - 39:5
**impossible** [3] - 22:8, 23:19, 23:24
**inaccurate** [2] - 15:16, 15:18
**inactionable** [2] - 12:16, 17:9
**inappropriate** [1] - 34:8
**included** [2] - 48:23, 48:24
**includes** [1] - 49:1
**including** [2] - 17:3, 44:5
**Income** [1] - 1:10
**incorporated** [1] - 45:25
**incurred** [1] - 5:5

**independent** [2] - 10:7, 10:8
**independently** [1] - 9:23
**INDEX** [1] - 1:14
**indicates** [1] - 29:20
**individual** [3] - 27:18, 28:3, 33:17
**individuals** [1] - 29:17
**induce** [2] - 5:16, 45:7
**induced** [1] - 42:6
**inducement** [3] - 40:11, 42:9, 48:19
**infer** [4] - 14:17, 14:22, 15:5, 28:24
**inference** [13] - 15:2, 15:3, 16:9, 18:15, 18:16, 20:15, 23:23, 25:15, 26:11, 26:25, 29:12, 38:6
**inferences** [3] - 15:10, 23:8, 25:19
**inferred** [5] - 14:11, 22:11, 26:13, 29:5, 29:7
**inflated** [1] - 13:3
**information** [7] - 8:11, 25:5, 25:16, 34:16, 35:19, 36:23, 38:23
**informative** [1] - 49:8
**initial** [1] - 39:21
**inside** [1] - 32:14
**insight** [1] - 6:7
**insolvent** [3] - 18:8, 20:14, 36:8
**instances** [1] - 5:11
**institute** [1] - 59:23
**institutional** [1] - 10:3
**Institutional** [3] - 1:10, 1:11, 1:11
**instruct** [1] - 16:19
**intended** [2] - 5:18, 43:18
**intends** [1] - 5:8
**intent** [1] - 5:15
**interest** [9] - 18:20, 44:3, 44:7, 44:10, 44:11, 44:13, 44:21, 54:20, 63:12
**interests** [3] - 46:10, 46:11
**internal** [4] - 14:3, 17:19, 28:19, 39:6
**internally** [1] - 24:6
**International** [1] - 12:23
**interpret** [1] - 54:18
**interpretation** [6] - 45:2, 45:15, 46:18, 47:14, 52:6, 52:24

**interpreted** [2] - 53:13, 54:15
**interpreting** [2] - 45:5, 55:13
**interwoven** [1] - 49:11
**invalid** [1] - 41:22
**invalidate** [2] - 51:7, 53:25
**invalidating** [1] - 41:7
**investigation** [3] - 7:9, 7:20, 8:9
**Investment** [13] - 1:3, 6:14, 6:15, 6:20, 13:9, 13:13, 24:8, 38:17, 38:22, 40:21, 41:8, 45:11, 51:11
**investment** [8] - 9:24, 10:1, 13:7, 18:8, 23:16, 37:14, 37:24, 51:8
**Investments** [1] - 1:10
**investments** [3] - 5:16, 10:8, 13:9
**investors** [9] - 11:8, 24:11, 25:4, 25:16, 27:13, 32:10, 43:3, 47:2, 54:3
**invite** [1] - 28:2
**involve** [2] - 48:25, 51:15
**involves** [2] - 12:6, 45:5
**Israel** [1] - 26:16
**issue** [19] - 10:22, 14:7, 18:13, 19:23, 20:11, 23:7, 24:1, 35:14, 36:20, 42:4, 47:6, 50:23, 51:8, 52:5, 52:20, 54:9, 59:14, 60:11, 61:11
**issued** [4] - 15:17, 16:5, 38:17, 44:16
**issues** [7] - 17:22, 38:11, 40:23, 41:17, 47:12, 52:8
**itself** [3] - 35:25, 46:20, 49:11
**Izower** [5] - 3:23, 4:15, 4:19, 37:8
**IZOWER** [21] - 2:7, 2:9, 4:19, 36:15, 37:9, 47:4, 47:10, 49:16, 49:21, 50:2, 50:18, 61:8, 61:12, 61:17, 61:19, 62:2, 62:4, 62:7, 62:18, 63:3, 63:5
**IZOWER-FADDÉ** [1] - 2:9
**Izower-Faddé** [1] -

3:23

### J

**J&R** [1] - 53:3
**JAMES** [1] - 1:16
**James** [3] - 2:8, 2:11, 4:20
**JENSEN** [1] - 2:15
**Jensen** [2] - 3:9, 3:13
**Jim** [2] - 3:21, 6:11
**job** [3] - 21:3, 21:5, 23:22
**joined** [2] - 3:8, 3:23
**JR** [1] - 1:16
**Judge** [9] - 56:5, 56:8, 56:10, 56:18, 58:10, 58:12, 58:23, 59:15, 62:8
**judge** [2] - 34:7, 62:8
**judges** [1] - 59:16
**judgment** [10] - 12:3, 12:7, 30:6, 31:5, 32:25, 33:11, 35:4, 39:25, 40:12, 40:13
**judgments** [1] - 28:20
**July** [4] - 19:4, 31:17, 31:20, 34:6
**jump** [2] - 14:16, 28:21
**jumps** [1] - 15:7
**juncture** [1] - 33:3
**June** [42] - 7:23, 13:7, 13:8, 13:10, 13:11, 13:22, 15:24, 16:8, 16:11, 16:12, 16:14, 16:17, 20:12, 22:20, 23:4, 24:7, 24:8, 24:9, 24:17, 24:20, 24:21, 25:2, 25:5, 25:8, 25:13, 25:15, 26:2, 26:7, 29:8, 29:22, 29:23, 30:3, 31:18, 33:13, 33:14, 34:15, 38:13, 39:9, 39:13
**Justice** [1] - 1:23
**justifiable** [1] - 8:19

### K

**KELLOGG** [1] - 2:16
**Kellogg** [1] - 3:9
**kept** [1] - 30:4
**key** [1] - 7:15
**kids** [1] - 32:15
**KIERAN** [1] - 1:16
**Kieran** [4] - 2:13, 2:17, 3:8, 9:15
**kind** [6] - 21:12, 21:21,

28:2, 32:21, 34:7, 54:13
**knowable** [1] - 28:13
**knowing** [2] - 20:18, 36:25
**knowledge** [18] - 6:6, 8:23, 9:21, 12:19, 14:17, 15:13, 15:24, 16:18, 16:25, 17:8, 18:16, 26:13, 27:14, 27:23, 28:22, 28:24, 29:4, 29:7
**known** [1] - 28:11
**knows** [3] - 5:8, 6:1, 14:8

### L

**Labor** [1] - 48:14
**lack** [1] - 49:5
**language** [14] - 19:8, 19:10, 25:7, 35:16, 47:4, 47:6, 47:8, 47:21, 48:1, 48:4, 48:10, 53:10, 54:13, 54:14
**last** [9] - 8:9, 9:16, 16:6, 16:13, 32:16, 46:15, 47:24, 55:15, 56:22
**law** [60] - 5:3, 6:23, 6:24, 7:5, 8:17, 10:9, 10:23, 11:1, 12:16, 17:10, 27:11, 30:17, 30:19, 37:12, 37:25, 39:2, 40:19, 40:21, 41:3, 41:18, 41:21, 41:24, 42:4, 42:18, 43:17, 43:18, 43:20, 43:23, 43:25, 44:23, 45:12, 46:9, 46:20, 48:1, 48:2, 48:6, 48:11, 48:20, 48:23, 48:25, 49:9, 49:25, 50:5, 50:10, 50:11, 50:23, 51:14, 51:15, 52:14, 52:25, 53:5, 53:17, 54:2, 54:3, 55:1, 55:5, 55:9, 55:10, 55:13
**laws** [6] - 5:7, 44:4, 53:20, 54:19, 54:21, 54:25
**Laws** [1] - 48:14
**lawsuit** [1] - 12:14
**lawyer** [1] - 33:7
**LBG** [1] - 1:6
**lead** [1] - 26:18
**leads** [1] - 38:6
**learn** [2] - 37:18,

37:20

**learning** [1] - 32:23
**least** [1] - 55:24
**leaves** [1] - 46:24
**led** [1] - 27:10
**left** [2] - 24:19, 36:25
**Lefton** [1] - 4:19
**LEFTON** [1] - 2:7
**legal** [1] - 49:21
**legality** [1] - 54:8
**lends** [1] - 37:4
**length** [5] - 4:25, 5:22, 7:17, 10:4, 10:15
**lens** [1] - 33:5
**less** [3] - 7:24, 19:18, 31:6
**letter** [10] - 15:15, 15:19, 59:13, 59:19, 60:1, 60:2, 60:8, 60:17, 62:1, 62:16
**level** [1] - 40:5
**Leveraged** [1] - 1:5
**liabilities** [2] - 19:19, 36:4
**liability** [3] - 31:7, 31:11, 31:13
**lie** [1] - 41:25
**lied** [3] - 12:18, 27:13, 28:6
**lies** [2] - 39:21, 39:23
**light** [1] - 16:25
**likely** [1] - 25:1
**limit** [1] - 46:19
**Limited** [1] - 1:8
**limited** [2] - 12:20, 45:13
**line** [1] - 14:10
**links** [1] - 3:17
**liquidity** [4] - 19:6, 19:21, 19:22, 19:25
**listened** [1] - 46:5
**listing** [1] - 15:15
**litany** [1] - 46:22
**literally** [1] - 20:2
**Litigation** [1] - 57:6
**live** [2] - 58:11, 58:12
**LLC** [2] - 1:7, 1:9
**LLP** [4] - 2:4, 2:7, 2:13, 4:19
**Loan** [1] - 1:5
**logical** [3] - 14:16, 15:7, 28:21
**longtime** [1] - 43:3
**Look** [2] - 32:11, 33:15
**look** [13] - 16:6, 22:1, 23:14, 26:15, 27:19, 27:21, 33:3, 33:5, 33:25, 48:7, 51:10,

52:10, 55:15
**looking** [13] - 18:23, 19:17, 22:2, 23:12, 23:18, 25:7, 26:12, 28:12, 29:10, 34:3, 38:21, 39:9, 50:15
**looks** [2] - 33:23, 36:3
**Los** [1] - 1:7
**loss** [1] - 9:25
**lower** [2] - 12:13, 13:20
**lowered** [1] - 12:11
**LP** [1] - 1:6
**Ltd** [5] - 1:3, 1:4, 1:5, 1:5, 1:6
**ltd** [1] - 1:4
**lying** [1] - 36:25

## M

**MAEVE** [1] - 2:6
**Maeve** [1] - 3:5
**magnitude** [3] - 18:13, 20:17, 23:7
**mail** [23] - 3:11, 4:13, 14:22, 15:23, 15:24, 16:2, 16:8, 16:12, 22:22, 23:4, 23:21, 24:21, 29:2, 29:9, 29:16, 29:19, 29:22, 33:13, 33:14, 38:9, 61:24, 62:1, 62:2
**mails** [19] - 14:3, 14:19, 16:17, 17:2, 17:3, 17:14, 17:16, 17:18, 24:3, 24:4, 24:17, 26:2, 27:22, 28:18, 32:6, 33:9, 33:12, 38:13, 39:10
**main** [3] - 19:4, 48:1, 63:10
**Managed** [2] - 1:11, 1:11
**Management** [1] - 55:2
**Mandate** [1] - 1:9
**manner** [1] - 23:16
**Martin** [1] - 43:24
**Massachusetts** [1] - 55:4
**Master** [2] - 1:9, 1:12
**match** [1] - 32:16
**material** [1] - 24:5
**materializing** [1] - 22:14
**materially** [1] - 11:13
**matter** [11] - 8:14, 10:9, 10:22, 11:1, 12:16, 17:10, 20:8, 20:20, 35:23, 44:22,

50:8
**matters** [3] - 9:22, 36:7, 53:18
**mature** [2] - 31:8, 31:13
**McGrath** [34] - 1:16, 2:13, 2:17, 3:8, 9:15, 10:10, 14:5, 14:8, 15:5, 16:4, 16:9, 16:10, 16:15, 19:4, 19:24, 20:5, 21:15, 22:10, 22:18, 24:10, 24:22, 24:25, 25:3, 27:8, 27:12, 27:24, 28:5, 30:24, 31:15, 35:18, 38:15, 39:12, 55:22
**McGrath's** [10] - 14:3, 15:24, 16:18, 16:25, 17:3, 19:8, 20:3, 20:25, 27:23, 28:24
**McKesson** [1] - 12:23
**mean** [8] - 8:3, 25:12, 34:14, 36:8, 45:20, 45:24, 54:18, 59:20
**means** [6] - 3:16, 19:10, 19:12, 24:16, 31:9, 33:18
**meant** [8] - 7:2, 44:24, 45:19, 45:20, 48:14, 52:11, 52:12, 52:14
**meanwhile** [1] - 54:11
**meet** [4] - 16:5, 16:7, 28:1, 29:25
**meeting** [2] - 24:22, 47:8
**MELISSA** [1] - 1:22
**members** [2] - 14:20, 24:17
**mentioned** [2] - 36:18, 62:19
**merely** [1] - 61:22
**merits** [1] - 9:23
**messages** [1] - 17:3
**met** [1] - 61:21
**MICROSOFT** [1] - 1:20
**middle** [1] - 34:4
**might** [5] - 25:24, 30:6, 30:21, 45:23
**mill** [1] - 27:16
**million** [5] - 13:12, 22:7, 24:19, 24:20, 51:11
**mind** [2] - 14:4, 14:8
**minimum** [1] - 20:18
**Minnesota** [5] - 48:2, 48:6, 48:12
**MINSUK** [1] - 2:18
**Minsuk** [3] - 3:7, 9:14,

27:8
**minute** [3] - 3:25, 4:7, 46:15
**miracle** [4] - 26:4, 26:5, 34:24, 35:2
**miracles** [1] - 34:25
**misery** [1] - 29:13
**misleading** [2] - 5:17, 30:22
**misrepresentation** [13] - 4:17, 4:23, 5:23, 8:3, 8:25, 9:1, 9:19, 10:13, 16:13, 29:15, 40:15, 43:5, 43:19
**misrepresentations** [6] - 8:19, 8:22, 27:19, 27:20, 28:4, 41:1
**miss** [3] - 25:6, 30:4, 34:17
**missing** [1] - 12:10
**misspoken** [1] - 45:23
**misstatement** [1] - 26:20
**moment** [1] - 35:24
**money** [1] - 32:10
**month** [7] - 11:25, 30:13, 30:15, 30:17, 31:19, 32:1, 34:19
**months** [1] - 36:9
**morning** [1] - 3:4
**Motion** [1] - 62:6
**motion** [16] - 29:3, 30:6, 33:1, 35:8, 40:3, 56:4, 56:14, 56:21, 58:8, 58:16, 59:8, 59:9, 59:13, 60:1, 62:5, 62:16
**motion-to-dismiss** [1] - 33:1
**motions** [1] - 40:4
**move** [3] - 36:14, 40:16, 63:6
**MR** [66] - 3:7, 3:13, 3:19, 3:21, 4:2, 4:4, 4:9, 4:12, 6:11, 6:21, 6:24, 7:3, 7:10, 9:14, 10:20, 11:1, 13:8, 14:2, 14:14, 14:16, 17:12, 27:8, 29:4, 30:8, 30:12, 32:4, 33:4, 33:14, 34:23, 35:7, 37:7, 38:12, 40:17, 41:11, 42:8, 42:12, 42:22, 46:3, 46:4, 46:5, 46:21, 50:22, 51:3, 51:6, 55:22, 56:3, 56:20, 57:4, 57:13, 57:16,

57:19, 57:25, 58:4, 58:7, 58:18, 58:21, 58:24, 59:4, 60:19, 62:8, 62:12, 62:15, 63:14, 63:15, 63:20, 63:22
**MS** [41] - 3:4, 4:19, 5:2, 5:24, 8:5, 9:2, 18:2, 19:3, 19:13, 21:10, 35:10, 35:15, 36:15, 37:9, 38:8, 42:21, 43:11, 47:4, 47:10, 49:16, 49:21, 50:2, 50:18, 51:17, 52:2, 55:20, 60:2, 60:22, 61:2, 61:5, 61:8, 61:12, 61:17, 61:19, 62:2, 62:4, 62:7, 62:18, 63:3, 63:5, 63:21
**Multi** [1] - 1:11
**Multifamily** [1] - 53:4
**multiple** [1] - 43:25
**must** [3] - 15:11, 34:22, 60:13
**muted** [1] - 59:1

## N

**N.E** [1] - 2:11
**N.W** [1] - 2:17
**N.Y** [1] - 26:16
**N.Y.S.2d** [1] - 47:11
**name** [1] - 3:7
**narrow** [7] - 12:15, 12:17, 12:20, 12:25, 17:5, 28:7, 52:18
**narrower** [1] - 53:14
**narrowing** [1] - 54:16
**nature** [1] - 5:25
**necessary** [2] - 35:11, 38:24
**need** [15] - 7:1, 17:16, 17:23, 24:23, 26:4, 34:24, 46:9, 55:14, 56:24, 58:8, 59:6, 59:13, 60:8, 60:23, 61:6
**needed** [1] - 17:24
**needs** [3] - 24:14, 27:15, 30:19
**negligence** [1] - 43:13
**negligence-based** [1] - 43:13
**negligent** [11] - 4:17, 4:22, 5:23, 8:3, 8:24, 8:25, 9:19, 10:12, 43:5, 43:19, 52:19
**nervous** [1] - 50:17
**Netflix** [1] - 11:25

BP

**never** [1] - 61:21
**New** [29] - 1:19, 2:5, 2:9, 2:14, 5:3, 40:19, 41:20, 41:23, 42:3, 44:2, 44:10, 44:22, 46:9, 46:10, 48:14, 48:15, 48:16, 49:25, 50:11, 51:14, 52:25, 53:3, 53:20, 54:19, 54:25, 55:13
**new** [1] - 61:22
**NEW** [2] - 1:1, 1:1
**news** [1] - 27:10
**next** [4] - 3:18, 10:18, 57:1, 63:24
**NO** [1] - 1:14
**nobody** [3] - 7:12, 39:22, 50:7
**nom** [1] - 63:8
**non** [2] - 30:14, 32:2
**non-cash** [2] - 30:14, 32:2
**none** [1] - 14:3
**nonetheless** [1] - 23:25
**nonspeculative** [1] - 16:24
**North** [40] - 5:3, 14:21, 14:23, 15:2, 22:8, 34:18, 36:14, 40:16, 40:18, 40:25, 41:4, 41:14, 41:25, 42:11, 43:6, 43:8, 44:7, 44:8, 44:13, 44:14, 44:15, 44:16, 44:17, 44:19, 44:20, 44:21, 45:4, 45:7, 45:24, 46:11, 49:3, 49:11, 49:14, 50:1, 51:6, 54:2, 54:4, 54:19, 63:17
**notably** [1] - 45:10
**note** [5] - 11:15, 16:23, 19:25, 24:2, 36:16
**noted** [2] - 22:6, 23:17
**notes** [4] - 10:1, 13:11, 13:12, 51:12
**nothing** [5] - 7:12, 21:25, 45:4, 63:14, 63:15
**noticed** [1] - 61:25
**notion** [3] - 21:2, 28:12, 35:17
**NovaGold** [1] - 5:6
**nowhere** [1] - 34:4
**NRO** [1] - 55:3
**number** [1] - 34:22
**numbers** [6] - 24:23, 25:1, 29:17, 33:16, 33:20, 34:1

## O

**O'CONNOR** [23] - 2:6, 3:4, 5:2, 5:24, 8:5, 9:2, 18:2, 19:3, 19:13, 21:10, 35:10, 35:15, 38:8, 42:21, 43:11, 51:17, 52:2, 55:20, 60:2, 60:22, 61:2, 61:5, 63:21
**O'Connor** [7] - 3:5, 18:1, 37:16, 42:20, 43:6, 47:18, 51:5
**obligation** [3] - 38:20, 53:23, 53:24
**obviously** [3] - 21:18, 27:2, 59:17
**OF** [3] - 1:1, 1:1
**offered** [1] - 41:6
**offers** [1] - 44:8
**officer** [3] - 24:14, 30:13, 36:11
**officer's** [3] - 16:2, 21:8, 30:9
**officers** [1] - 44:15
**Official** [1] - 2:23
**old** [1] - 27:22
**omissions** [1] - 8:20
**omnibus** [1] - 36:10
**Omnicare** [1] - 21:20
**once** [2] - 48:18, 48:23
**one** [52] - 4:21, 5:25, 7:9, 9:12, 10:2, 10:19, 10:24, 11:14, 12:17, 12:20, 14:24, 15:7, 16:23, 17:12, 17:13, 19:4, 19:14, 20:6, 20:23, 21:12, 21:15, 21:22, 24:2, 24:3, 26:5, 27:24, 29:8, 29:24, 33:5, 33:8, 36:19, 41:1, 42:22, 44:1, 44:14, 44:16, 46:16, 47:7, 47:10, 50:5, 50:22, 50:24, 51:21, 55:2, 55:3, 56:6, 58:9, 59:16, 60:17, 61:17, 62:12, 62:25
**ones** [1] - 27:23
**ongoing** [1] - 31:19
**open** [1] - 46:24
**opened** [1] - 36:21
**opinion** [7] - 15:11, 15:17, 21:21, 22:1, 26:14, 26:17, 49:12
**opinions** [2] - 37:11, 37:15

**Opportunistic** [1] - 1:5
**opportunities** [1] - 14:25
**Opportunities** [2] - 1:8, 1:9
**opportunity** [2] - 9:7, 61:21
**opposed** [1] - 11:22
**opposing** [5] - 27:9, 28:18, 28:21, 42:14, 51:13
**opposite** [1] - 30:2
**opposition** [2] - 9:4, 35:12
**optimistic** [2] - 14:1, 16:7
**oral** [1] - 52:1
**order** [6] - 5:16, 45:7, 53:18, 53:19, 53:20, 55:17
**original** [2] - 4:5
**originally** [1] - 49:5
**other"** [1] - 49:1
**otherwise** [8] - 18:22, 42:13, 45:14, 46:24, 47:17, 51:2, 52:8, 53:11
**out-of-state** [1] - 48:20
**outcome** [1] - 27:11
**outlook** [2] - 11:10, 22:12
**outside** [5] - 6:8, 25:23, 25:25, 42:7, 44:9
**over-reading** [2] - 51:20, 52:3
**overall** [2] - 36:3, 36:4
**owe** [1] - 38:15
**owed** [1] - 10:10
**own** [7] - 7:9, 7:19, 8:8, 14:8, 27:2, 32:12, 62:25

## P

**P.L.L.C** [1] - 2:16
**page** [5] - 9:4, 10:2, 16:1, 51:10, 63:24
**pages** [2] - 16:6, 63:9
**paid** [1] - 41:6
**panic** [1] - 24:18
**panicked** [1] - 29:22
**Panther** [2] - 1:7, 44:18
**papers** [1] - 7:21
**Paragraph** [1] - 6:15
**paragraph** [3] - 15:25, 34:14, 45:16

**parameters** [1] - 60:13
**pardon** [1] - 61:9
**parse** [1] - 19:8
**parsing** [1] - 40:8
**PART** [1] - 1:1
**part** [9] - 6:16, 9:1, 9:2, 36:13, 37:14, 45:10, 59:6, 62:1, 63:10
**partial** [2] - 5:20, 34:9
**particular** [2] - 5:14, 60:10
**particularity** [1] - 40:6
**parties** [11] - 6:14, 10:7, 10:14, 42:3, 45:22, 46:7, 46:13, 46:14, 47:15, 51:16, 54:20
**parties'** [3] - 52:12, 52:15, 54:17
**partner** [1] - 44:18
**party** [3] - 5:8, 6:1, 46:16
**past** [3] - 8:1, 35:8, 40:2
**path** [3] - 22:19, 22:21, 55:8
**Paulson** [1] - 52:21
**pause** [2] - 4:14, 51:24
**paved** [2] - 22:18, 22:21
**pay** [4] - 19:6, 19:19, 19:22, 51:11
**payments** [1] - 41:16
**PC** [1] - 56:25
**peculiarly** [1] - 8:22
**pending** [3] - 56:5, 56:15, 57:8
**pension** [1] - 44:20
**Pension** [1] - 1:6
**penultimate** [1] - 9:20
**people** [16] - 7:12, 13:25, 14:12, 22:10, 22:22, 22:25, 23:22, 32:14, 32:20, 32:22, 32:23, 33:6, 33:21, 34:10, 58:12
**per** [1] - 11:25
**percent** [2] - 10:11, 13:11
**Peregrine** [1] - 1:8
**perfect** [2] - 61:7, 62:17
**performance** [3] - 52:6, 52:19, 52:25
**perhaps** [1] - 61:19
**period** [9] - 23:5, 23:6, 24:7, 26:24, 32:12, 33:20, 34:2, 46:9, 59:1

**perspective** [1] - 22:2
**petition** [1] - 42:15
**phone** [1] - 3:25
**phrase** [1] - 46:23
**Piccirillo** [1] - 2:23
**picked** [1] - 27:22
**picking** [1] - 29:23
**piece** [2] - 27:15, 53:15
**pieces** [1] - 43:22
**place** [3] - 13:10, 39:11, 44:7
**placed** [1] - 13:7
**placement** [1] - 8:11
**plain** [1] - 34:15
**plainly** [1] - 31:11
**plaintiff** [6] - 3:3, 4:24, 7:18, 19:15, 54:8, 55:20
**plaintiff's** [5] - 17:15, 30:12, 31:3, 49:4, 54:10
**plaintiffs** [14] - 5:10, 5:19, 14:9, 15:9, 17:1, 26:11, 31:9, 31:14, 31:22, 38:22, 40:20, 42:17, 48:21, 49:9
**Plaintiffs** [3] - 1:14, 2:4, 3:5
**plane** [1] - 27:3
**Platinum** [1] - 1:7
**playground** [1] - 32:15
**Plc** [1] - 1:9
**plead** [1] - 14:9
**pleading** [1] - 57:8
**pleadings** [1] - 25:23
**pled** [2] - 40:6, 40:11
**Plimpton** [1] - 3:5
**PLIMPTON** [1] - 2:4
**point** [23] - 9:16, 9:17, 15:8, 17:12, 23:11, 26:14, 27:21, 28:4, 28:23, 37:10, 37:16, 38:13, 38:15, 39:14, 42:23, 46:13, 49:2, 50:4, 50:5, 50:7, 50:23, 61:13
**pointed** [2] - 51:2, 51:6
**points** [5] - 16:21, 17:20, 28:18, 36:17, 51:18
**policing** [1] - 44:8
**policy** [2] - 41:20, 56:12
**portion** [3] - 48:9, 63:9, 63:11
**position** [2] - 33:9,

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 74 of 77

9

59:10
**positioned** [5] - 21:16, 22:1, 22:2, 22:3, 22:16
**possessed** [1] - 13:4
**possibility** [1] - 29:20
**possibly** [1] - 35:18
**post** [1] - 31:17
**potential** [1] - 24:10
**power** [1] - 59:4
**PowerPoint** [1] - 16:14
**pre** [1] - 27:16
**pre-discovery** [1] - 27:16
**preclude** [5] - 8:18, 43:18, 43:25, 44:25, 55:10
**precluded** [1] - 8:21
**precludes** [2] - 16:8, 29:11
**precluding** [3] - 44:3, 44:11, 54:20
**preclusion** [3] - 18:22, 50:7, 50:8
**predictions** [2] - 11:4, 11:9
**prefer** [1] - 60:2
**prejudice** [3] - 49:18, 49:20, 60:5
**prepared** [2] - 28:17, 31:20
**present** [7] - 18:24, 19:1, 20:24, 21:15, 23:10, 29:15, 30:8
**president** [1] - 26:3
**presumably** [1] - 25:14
**pretty** [2] - 50:11, 60:24
**priced** [1] - 13:11
**Pro** [1] - 2:18
**pro** [1] - 31:19
**probable** [2] - 31:7, 31:12
**problem** [3] - 14:13, 33:2, 38:7
**proceed** [4] - 51:14, 54:25, 55:5, 60:9
**proceeding** [1] - 56:12
**proceedings** [1] - 56:9
**process** [1] - 33:17
**production** [1] - 17:2
**profits** [1] - 31:17
**projected** [1] - 22:7
**projection** [1] - 15:4
**projections** [41] - 10:22, 11:2, 11:8, 12:10, 12:11, 12:13, 12:16, 12:18, 13:3,

13:4, 13:20, 14:18, 16:9, 16:11, 16:14, 16:16, 17:6, 17:8, 17:9, 22:12, 23:12, 23:24, 23:25, 26:21, 27:13, 28:8, 28:13, 28:15, 28:16, 28:17, 29:10, 30:1, 37:11, 38:16, 38:18, 39:3, 39:11, 39:13, 39:17, 39:21
**prong** [3] - 19:16, 19:21, 36:5
**prospectus** [1] - 7:22
**protection** [2] - 17:6, 18:12
**Protections** [1] - 55:5
**protects** [1] - 54:3
**prove** [4] - 22:4, 22:5, 43:12, 43:13
**provide** [1] - 62:23
**provided** [5] - 8:11, 8:13, 9:7, 24:12, 37:20
**provides** [2] - 41:5, 48:4
**providing** [1] - 41:15
**provision** [32] - 8:7, 9:5, 40:21, 41:3, 41:24, 42:12, 42:19, 44:23, 44:24, 45:1, 45:10, 45:16, 45:20, 47:12, 47:16, 47:19, 48:20, 48:23, 48:25, 50:23, 51:15, 51:20, 52:4, 52:11, 52:24, 53:8, 53:17, 54:9, 54:22, 62:21
**provisions** [2] - 9:10, 41:21
**public** [1] - 18:7
**publicly** [1] - 38:20
**published** [2] - 7:23, 7:25
**purchase** [3] - 43:20, 45:8, 51:12
**purchaser** [3] - 8:9, 8:12, 8:21
**Purchaser** [3] - 7:8, 9:21, 10:3
**purposes** [1] - 8:2
**pursue** [2] - 44:7, 48:22
**pursuing** [1] - 14:25
**put** [12] - 4:15, 4:17, 13:2, 29:13, 32:6, 32:10, 47:7, 51:22, 52:1, 55:19, 56:25, 61:25
**puts** [2] - 21:2, 27:17

**putting** [1] - 3:20

### Q

**qualified** [1] - 10:3
**quarter** [11] - 11:17, 12:12, 13:16, 24:19, 26:5, 27:10, 31:1, 31:18, 33:16, 33:22, 33:24
**quarterly** [2] - 11:22, 13:14
**quarters** [3] - 11:23, 12:11, 34:1
**questions** [5] - 9:7, 40:22, 40:23, 41:16, 51:8
**quick** [1] - 11:24
**quite** [2] - 24:9, 26:6
**quote** [8] - 11:8, 11:9, 15:11, 15:12, 23:3, 34:19, 36:23, 38:19
**quotes** [1] - 49:7
**quoting** [1] - 11:9

### R

**RACHEL** [1] - 2:9
**Rachel** [2] - 3:23, 4:19
**Ragsdale** [1] - 5:6
**raise** [1] - 14:7
**raised** [1] - 23:23
**raises** [2] - 29:20, 51:8
**raising** [2] - 17:22, 40:23
**re** [1] - 39:4
**read** [4] - 7:11, 17:14, 31:4, 54:11
**readily** [1] - 22:5
**reading** [4] - 8:7, 31:3, 51:20, 52:3
**reads** [1] - 52:5
**reaffirmed** [2] - 39:12, 50:14
**really** [14] - 13:21, 17:4, 17:7, 18:5, 18:6, 23:7, 28:14, 36:20, 49:2, 49:19, 50:7, 52:17, 62:4, 63:11
**reason** [8] - 27:4, 37:15, 41:2, 41:4, 42:1, 46:7, 46:25, 59:23
**reasonable** [6] - 16:9, 20:15, 23:8, 25:14, 26:11, 29:11
**reasonably** [4] - 15:10, 22:11, 37:13, 37:24

**reasons** [3] - 37:21, 46:6, 46:14
**recalling** [1] - 59:2
**receive** [1] - 9:7
**received** [6] - 14:4, 16:12, 17:1, 28:17, 29:24, 34:16
**recent** [1] - 50:14
**receptive** [1] - 50:4
**recission** [1] - 41:7
**reckless** [3] - 20:18, 26:20, 28:8
**recklessness** [1] - 21:6
**recognize** [4] - 30:14, 32:1, 39:5, 39:16
**recognized** [3] - 11:21, 12:6, 39:15
**record** [4] - 6:16, 7:20, 24:2, 55:19
**red** [1] - 50:7
**reduce** [1] - 39:6
**reference** [1] - 50:25
**referenced** [6] - 14:19, 24:22, 29:8, 41:3, 47:18, 59:4
**references** [3] - 14:5, 42:13, 51:13
**referencing** [1] - 24:3
**reflects** [1] - 24:25
**refund** [2] - 41:5, 41:16
**regard** [1] - 54:12
**region** [1] - 14:22
**regional** [1] - 15:2
**registered** [3] - 3:16, 3:17, 3:23
**regulates** [1] - 54:2
**regulatory** [1] - 39:7
**reiterated** [1] - 38:9
**related** [5] - 54:5, 56:7, 56:9, 56:12, 57:5
**relating** [3] - 45:14, 45:17, 53:18
**relationship** [18] - 4:25, 5:11, 5:12, 5:14, 5:25, 6:9, 8:4, 9:18, 10:9, 10:14, 45:21, 52:13, 52:15, 53:2, 53:9, 53:13, 54:6, 54:17
**relevant** [1] - 54:7
**reliance** [7] - 8:7, 8:18, 8:19, 8:22, 9:12, 9:16, 43:13
**relied** [5] - 8:10, 8:13, 18:9, 37:24, 38:2
**relief** [2] - 4:22, 10:12
**relies** [3] - 11:7, 30:10,

32:3
**reluctant** [2] - 53:3, 53:4
**rely** [7] - 5:8, 5:18, 5:19, 6:17, 9:10, 37:14, 38:3
**relying** [4] - 6:1, 6:5, 7:11, 7:19
**remain** [1] - 42:3
**remains** [1] - 16:6
**remedy** [3] - 41:4, 41:13, 41:15
**remember** [2] - 21:2, 58:10
**remind** [1] - 47:9
**remote** [1] - 36:16
**removed** [1] - 56:8
**rendered** [3] - 30:22, 31:25, 36:12
**renewal** [1] - 12:5
**rep** [3] - 35:19, 35:22, 35:25
**repeat** [1] - 61:18
**repeated** [2] - 16:11, 39:12
**reply** [1] - 47:23
**report** [2] - 22:25, 29:24
**reported** [1] - 22:10
**Reporter** [1] - 2:23
**reporting** [1] - 16:3
**representation** [5] - 7:15, 31:5, 31:16, 31:21, 37:5
**representations** [3] - 38:6, 39:10, 45:6
**request** [1] - 57:16
**required** [4] - 12:3, 14:17, 19:19, 21:11
**requirement** [1] - 12:19
**rescissory** [1] - 41:15
**research** [1] - 62:25
**reserve** [1] - 13:15
**respect** [3] - 29:10, 51:13, 57:4
**respectfully** [1] - 34:12
**respond** [4] - 27:7, 35:12, 46:2, 51:17
**response** [3] - 34:18, 60:21, 61:24
**rest** [1] - 39:20
**resulted** [2] - 20:13, 49:6
**results** [3] - 11:12, 13:14, 13:16
**Retirement** [2] - 1:7, 1:12
**retroactive** [1] - 21:1

BP

**revenue** [8] - 11:22, 12:6, 12:10, 16:2, 22:7, 22:19, 24:14, 26:4
**revenues** [1] - 11:17
**reversed** [1] - 59:23
**review** [1] - 12:4
**revise** [1] - 38:20
**rights** [3] - 12:5, 47:15, 60:6
**rise** [1] - 5:12
**risk** [6] - 9:25, 10:8, 21:4, 22:13, 24:23, 32:12
**risks** [3] - 9:23, 11:11, 24:15
**roles** [1] - 6:7
**roll** [3] - 33:16, 33:18, 33:21
**rollup** [2] - 34:5
**route** [1] - 59:7
**row** [1] - 12:11
**RSC** [1] - 1:8
**rule** [1] - 12:15
**rules** [1] - 11:20
**run** [2] - 27:16, 63:2
**run-of-the-mill** [1] - 27:16

## S

**sale** [2] - 43:20, 44:8
**sales** [16] - 11:18, 14:21, 14:23, 14:24, 14:25, 16:3, 24:18, 25:21, 26:3, 27:25, 28:19, 29:25, 34:19
**SAS** [2] - 1:8, 1:8
**saw** [2] - 25:14, 25:15
**SC** [2] - 1:8, 1:9
**scattered** [2] - 17:14, 32:7
**scienter** [4] - 14:10, 18:16, 21:1, 43:12
**screen** [1] - 63:6
**SDNY** [1] - 63:7
**SEC** [1] - 63:6
**second** [8] - 4:12, 10:24, 16:1, 19:14, 19:21, 47:11, 51:21, 52:1
**Second** [1] - 52:23
**secondly** [2] - 8:16, 20:10
**section** [7] - 6:23, 6:25, 7:2, 7:5, 7:6, 7:10, 47:19
**Section** [9] - 8:2, 9:16, 9:20, 10:2, 10:6, 38:21, 45:12, 49:25,

51:10
**secured** [1] - 13:12
**securities** [14] - 39:7, 41:6, 43:21, 44:16, 45:8, 54:3, 54:19, 54:24, 56:3, 56:13, 56:15, 56:21, 57:8, 58:19
**Securities** [5] - 40:18, 41:5, 42:11, 45:5, 57:6
**see** [6] - 16:19, 18:22, 30:5, 50:4, 57:21, 57:22
**seeing** [1] - 62:25
**seek** [3] - 57:5, 57:9, 57:17
**seeking** [9] - 41:7, 41:11, 41:13, 51:7, 53:25, 57:23, 58:2, 58:25
**seem** [1] - 3:24
**sees** [2] - 25:12, 25:13
**SEI** [5] - 1:9, 1:10, 1:10, 1:11
**seller's** [2] - 8:19, 8:23
**send** [2] - 4:13, 62:15
**sense** [2] - 18:21, 35:24
**sent** [3] - 14:5, 48:13, 49:15
**sentence** [7] - 8:10, 9:16, 9:19, 9:20, 17:13, 42:22, 47:24
**separate** [2] - 19:23, 50:19
**September** [1] - 18:12
**set** [2] - 28:16, 46:7
**setting** [1] - 24:16
**settled** [2] - 41:20, 50:11
**setup** [2] - 47:23, 48:8
**shall** [3] - 47:12, 48:6, 53:19
**sheet** [11] - 19:5, 19:17, 19:20, 19:25, 20:2, 31:14, 31:16, 31:17, 31:20, 35:18, 36:2
**SHER** [1] - 2:13
**short** [2] - 22:15, 32:4
**shortly** [1] - 18:9
**shortness** [1] - 23:6
**show** [4] - 13:2, 28:5, 29:15, 33:11
**showing** [3] - 3:24, 11:15, 25:6
**shows** [5] - 7:20, 11:7, 14:20, 27:25, 31:11
**sic** [2] - 7:13, 7:18

**side** [2] - 6:10, 18:4
**SierraBravo** [1] - 1:6
**signed** [4] - 6:14, 30:14, 30:16, 38:17
**significant** [1] - 23:19
**signing** [1] - 13:9
**signs** [1] - 24:8
**Silvercreek** [3] - 44:1, 55:2
**similar** [2] - 47:7, 47:15
**simply** [5] - 8:8, 33:14, 34:8, 46:21, 47:1
**single** [3] - 5:22, 17:18, 33:18
**situation** [2] - 6:4, 26:22
**skilled** [1] - 32:22
**sky** [7] - 27:4, 43:20, 43:25, 44:4, 46:20, 51:14, 54:21
**SLUSA** [1] - 59:5
**small** [1] - 38:12
**snowballing** [1] - 13:21
**sole** [1] - 44:18
**solely** [1] - 41:13
**solvency** [10] - 18:25, 19:3, 19:17, 20:2, 31:14, 31:21, 31:23, 35:14, 35:19, 36:2
**solvent** [6] - 19:5, 19:12, 20:20, 21:4, 26:9
**someone** [1] - 27:7
**sometimes** [1] - 6:2
**soon** [1] - 55:16
**sophisticated** [5] - 10:7, 10:14, 43:3, 46:14, 47:2
**sorry** [12] - 7:18, 10:24, 10:25, 14:14, 26:12, 37:9, 47:4, 51:21, 52:1, 57:13, 58:18, 63:5
**sort** [3] - 26:24, 37:10, 54:10
**sound** [1] - 40:25
**speaker** [1] - 12:17
**speaking** [1] - 37:19
**Spears** [1] - 24:13
**special** [9] - 4:24, 5:12, 5:25, 6:9, 8:3, 9:18, 10:9, 10:13, 37:11
**specialized** [1] - 6:6
**specific** [13] - 8:21, 15:11, 15:21, 16:20, 16:22, 27:19, 28:9, 28:15, 29:5, 30:23,

31:4, 32:21, 32:22
**specifically** [7] - 6:16, 7:7, 9:11, 11:11, 36:22, 49:18, 54:2
**spectacular** [1] - 23:15
**speculations** [2] - 15:22, 28:9
**speed** [1] - 18:14
**spend** [1] - 33:10
**spent** [1] - 19:9
**spitting** [1] - 32:16
**split** [4] - 55:17, 58:10, 59:15, 62:25
**stage** [1] - 57:9
**stand** [1] - 47:2
**standard** [4] - 33:1, 33:7, 35:4
**Standards** [1] - 57:6
**stands** [1] - 16:25
**start** [1] - 4:16
**started** [3] - 4:16, 6:14, 18:23
**starting** [4] - 3:2, 13:25, 23:16, 40:14
**starts** [1] - 13:21
**STATE** [1] - 1:1
**state** [12] - 14:4, 14:8, 34:18, 44:9, 44:17, 48:20, 55:10, 56:7, 56:12, 57:6, 59:5, 62:21
**State** [3] - 44:19, 48:14, 54:4
**state's** [4] - 42:2, 43:20, 43:25, 44:4
**statement** [13] - 15:16, 20:13, 20:24, 21:21, 22:1, 22:17, 22:20, 26:12, 26:15, 28:14, 30:21, 32:5
**statements** [18] - 5:9, 5:15, 5:17, 8:10, 8:13, 11:4, 15:18, 18:11, 18:24, 19:1, 21:14, 21:15, 23:11, 23:13, 23:18, 34:11, 38:21
**states** [2] - 44:11, 51:14
**states'** [3] - 5:7, 54:21, 54:24
**status** [1] - 56:2
**statute** [3] - 43:9, 50:1, 55:5
**statutory** [10] - 40:25, 41:15, 41:25, 48:20, 48:21, 48:24, 50:2, 51:7, 62:20, 62:21
**stay** [22] - 57:5, 57:9,

57:10, 57:11, 57:14, 57:16, 57:19, 57:24, 57:25, 58:2, 58:15, 58:22, 58:25, 59:5, 59:7, 59:13, 59:20, 59:21, 59:24, 59:25, 60:14, 61:1
**stayed** [4] - 56:1, 56:16, 59:8, 59:10
**staying** [1] - 57:7
**step** [1] - 18:3
**still** [6] - 15:5, 31:18, 34:4, 56:14, 59:10, 61:22
**story** [2] - 10:17, 24:9
**straight** [1] - 18:18
**Strategy** [1] - 1:12
**Street** [4] - 1:18, 2:11, 2:14, 2:17
**stretching** [1] - 18:5
**strong** [3] - 44:13, 44:21, 56:11
**stronger** [1] - 44:22
**Structures** [1] - 1:5
**stunning** [1] - 18:14
**sub** [1] - 63:7
**subject** [1] - 25:23
**submit** [2] - 19:13, 56:16
**submitted** [2] - 56:19, 56:20
**subscription** [3] - 11:19, 11:25, 12:1
**substantial** [2] - 17:1, 26:6
**successfully** [3] - 39:22, 40:2, 40:11
**suffices** [1] - 21:6
**sufficient** [4] - 13:2, 15:20, 39:18, 40:2
**sufficiently** [1] - 8:20
**suggest** [3] - 18:5, 45:25, 50:12
**suggesting** [1] - 9:12
**suggests** [2] - 17:24, 22:22
**Suite** [1] - 2:17
**summary** [7] - 30:6, 32:25, 33:11, 35:4, 39:25, 40:12, 40:13
**summary-judgment** [2] - 32:25, 35:4
**super** [1] - 25:17
**supervisor** [1] - 33:15
**support** [3] - 27:21, 28:4, 31:22
**supported** [7] - 15:12, 15:21, 16:20, 16:22, 28:9, 29:6, 32:2
**supporting** [2] -

30:17, 40:14
**supports** [3] - 18:14, 23:7, 26:10
**supposed** [4] - 3:22, 20:10, 32:12, 38:3
**Supreme** [2] - 21:20, 21:22
**SUPREME** [1] - 1:1
**surrounding** [1] - 21:25
**sustaining** [1] - 29:14
**switching** [1] - 3:12

**T**

**table** [1] - 32:11
**target** [1] - 21:17
**targets** [3] - 25:7, 30:4, 34:17
**TCorpIM** [1] - 1:12
**team** [7] - 14:20, 14:24, 24:18, 25:6, 25:21, 34:16
**team's** [4] - 14:21, 14:23, 15:1, 28:19
**Teams** [1] - 3:12
**TEAMS** [1] - 1:20
**tend** [1] - 52:15
**TERM** [1] - 1:1
**term** [1] - 12:6
**termination** [1] - 12:5
**terms** [8] - 12:4, 12:5, 12:7, 19:6, 34:4, 47:14, 48:9, 56:13
**text** [2] - 17:3, 31:22
**textual** [1] - 31:3
**THE** [94] - 1:1, 3:2, 3:6, 3:11, 3:15, 3:20, 3:25, 4:3, 4:7, 4:10, 4:15, 4:22, 5:21, 6:10, 6:19, 6:23, 7:1, 7:8, 8:1, 8:24, 10:11, 10:24, 13:6, 13:18, 14:7, 14:15, 17:11, 17:21, 19:1, 19:11, 21:8, 27:7, 29:1, 29:13, 30:11, 32:25, 33:13, 34:13, 35:2, 35:8, 35:14, 36:7, 36:24, 37:8, 38:5, 39:18, 41:9, 42:5, 42:10, 42:20, 43:5, 46:1, 46:17, 47:3, 47:9, 49:14, 49:17, 49:24, 50:15, 51:1, 51:4, 51:21, 55:11, 55:24, 56:17, 56:23, 57:11, 57:14, 57:18, 57:21, 58:2, 58:5, 58:8, 58:19, 58:22,

59:2, 59:12, 60:12, 60:20, 60:23, 61:4, 61:7, 61:10, 61:16, 61:18, 61:23, 62:3, 62:11, 62:14, 62:17, 62:24, 63:4, 63:13, 63:16
**themselves** [2] - 7:12, 49:23
**theory** [5] - 30:10, 30:17, 31:3, 31:25, 42:8
**thereafter** [1] - 18:9
**thereby** [1] - 45:18
**therefore** [4] - 9:8, 17:9, 41:23, 42:7
**they've** [2] - 34:25, 39:22
**thinking** [1] - 58:14
**third** [1] - 40:18
**THOMAS** [1] - 2:10
**three** [6] - 7:24, 17:10, 24:19, 33:5, 33:9, 33:12
**timeframe** [1] - 25:17
**today** [4] - 4:21, 20:9, 61:17, 61:21
**TODD** [1] - 2:16
**together** [5] - 13:2, 25:3, 26:10, 29:2, 32:6
**Tom** [2] - 3:21, 6:11
**took** [3] - 13:10, 39:11, 56:18
**tort** [15] - 40:22, 40:25, 41:2, 42:16, 45:13, 47:17, 48:23, 49:1, 50:24, 50:25, 52:18, 52:20, 62:22
**total** [6] - 11:21, 12:2, 19:19, 31:5, 31:6, 31:12
**totally** [1] - 36:25
**toward** [1] - 22:19
**towards** [1] - 33:24
**transaction** [6] - 5:1, 5:22, 7:17, 10:5, 10:16, 38:16
**transactions** [3] - 44:8, 45:18, 52:16
**transcript** [1] - 55:17
**transform** [1] - 5:21
**transformation** [2] - 11:18, 11:20
**treasurer** [1] - 44:19
**TREMONTE** [1] - 2:13
**TRIAL** [1] - 1:1
**trial** [1] - 35:5
**tried** [2] - 24:11, 55:8
**triggered** [3] - 11:20,

20:17, 35:21
**truck** [4] - 18:18, 18:19, 25:12, 27:5
**true** [6] - 20:3, 20:9, 25:24, 36:11
**trust** [1] - 9:18
**Trust** [6] - 1:3, 1:7, 1:10, 1:11, 1:11, 1:13
**Trustee** [2] - 1:8, 1:8
**truth** [1] - 26:19
**truths** [1] - 5:20
**try** [5] - 20:5, 49:9, 55:16, 60:16, 61:18
**trying** [4] - 19:9, 44:6, 54:10, 54:11
**turn** [2] - 10:15, 53:24
**turned** [1] - 53:23
**Twinlab** [4] - 52:21, 52:22, 53:7, 53:12
**two** [13] - 10:14, 12:1, 12:10, 12:22, 18:7, 20:21, 28:16, 29:17, 33:5, 33:9, 42:25, 47:2, 56:9
**two-year** [1] - 12:1
**type** [3] - 31:21, 53:21, 55:8
**types** [1] - 6:3

**U**

**U.S** [1] - 1:13
**unambiguous** [1] - 48:11
**unambiguously** [1] - 48:5
**uncertainties** [1] - 11:12
**under** [27] - 5:2, 5:3, 5:7, 20:12, 23:8, 26:8, 27:3, 32:25, 35:21, 36:24, 41:10, 43:19, 44:3, 45:4, 52:16, 52:25, 54:1, 54:18, 54:20, 54:24, 55:4, 55:10, 57:6, 58:5, 58:20, 59:4, 59:24
**understood** [1] - 24:25
**undertakes** [1] - 38:20
**underwent** [1] - 11:17
**Unfortunately** [1] - 25:9
**unfortunately** [2] - 7:4, 34:19
**Uniform** [1] - 57:6
**unless** [1] - 8:20
**unnecessarily** [1] -

60:9
**unnecessary** [1] - 60:3
**unrealistic** [1] - 13:24
**unreasonable** [1] - 17:5
**unsettled** [1] - 50:17
**untoward** [1] - 18:5
**up** [19] - 3:24, 17:17, 17:21, 17:23, 22:10, 22:15, 29:19, 32:18, 33:2, 33:10, 33:16, 33:18, 33:21, 36:21, 44:23, 46:8, 48:19, 57:2, 62:20
**update** [10] - 34:18, 36:22, 38:14, 38:16, 38:18, 38:20, 39:3, 39:5, 39:15, 39:17
**updated** [1] - 38:2
**updates** [2] - 13:15, 13:17
**uses** [2] - 33:17, 46:23
**utter** [1] - 18:14
**utterly** [1] - 38:7

**V**

**valid** [1] - 45:12
**validity** [10] - 40:23, 40:24, 41:17, 45:2, 45:14, 46:18, 47:13, 51:9, 52:6, 52:24
**valuation** [1] - 10:8
**value** [12] - 11:21, 12:2, 19:18, 30:15, 31:5, 31:6, 31:7, 31:10, 31:12, 36:3, 36:4
**various** [2] - 44:2, 44:10
**VCAP** [1] - 51:23
**venue** [5] - 45:10, 45:16, 47:19, 48:9, 49:5
**versus** [10] - 12:23, 12:24, 21:21, 21:23, 26:16, 36:3, 37:18, 52:21, 55:3
**VIA** [1] - 1:20
**vice** [2] - 2:18, 26:3
**view** [2] - 27:3, 59:15
**visibility** [1] - 14:24

**W**

**wait** [1] - 4:11
**waiting** [1] - 56:23
**wants** [2] - 55:18, 59:22

**warning** [1] - 11:8
**Washington** [2] - 2:12, 2:18
**week** [7] - 57:1, 60:18, 60:20, 61:17, 61:20, 61:23
**weeks** [7] - 7:24, 15:17, 18:7, 20:14, 20:21, 24:19, 26:8
**well-developed** [1] - 39:1
**well-paved** [2] - 22:18, 22:21
**well-settled** [2] - 41:20, 50:11
**well-tried** [1] - 55:8
**whole** [2] - 10:16, 53:2
**wide** [1] - 15:4
**willing** [1] - 10:15
**winds** [1] - 33:10
**won** [1] - 32:16
**wondering** [1] - 61:19
**word** [2] - 49:1, 50:24
**worded** [1] - 42:24
**wording** [1] - 42:18
**words** [1] - 23:3
**workers** [2] - 48:15
**works** [2] - 25:22, 35:1
**worldwide** [1] - 15:4
**worried** [1] - 51:23
**write** [6] - 30:14, 30:25, 32:2, 45:18, 45:20, 47:20
**write-down** [1] - 30:25
**write-off** [2] - 30:14, 32:2
**writes** [2] - 20:2, 32:9
**writing** [1] - 17:16
**written** [4] - 15:19, 20:1, 44:25, 47:1
**wrote** [3] - 15:15, 28:23, 46:8

**Y**

**year** [4] - 12:1, 12:13, 21:17, 56:22
**Yellowstone** [1] - 55:3
**yesterday** [1] - 38:10
**Yield** [7] - 1:4, 1:10, 1:10, 1:11, 1:12, 1:13, 8:16
**York** [28] - 1:19, 2:5, 2:9, 2:14, 5:3, 40:19, 41:20, 41:23, 42:3, 44:3, 44:10, 44:22, 46:9, 48:14, 48:15, 48:16, 49:25, 50:11, 51:14, 52:25, 53:3, 53:20, 54:19, 55:1,

Case 1:23-cv-01258-PGG   Document 119-1   Filed 05/16/25   Page 77 of 77

12

**YORK** [2] - 1:1, 1:1
**York's** [1] - 46:10
**York-based** [1] - 48:15

BP