UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLIVER JIANG, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

JAMES M. CHIRICO, JR., and KIERAN J. McGRATH,

Defendants.

**MEMORANDUM**
**OPINION & ORDER**

23 Civ. 1258 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a putative class action brought under federal securities laws on behalf of those who purchased or otherwise acquired the common stock of Avaya Holdings Corp. ("Avaya" or the "Company") between May 10, 2022 and December 15, 2022 (the "Class Period"). The Amended Complaint alleges that Defendant James M. Chirico, Jr. – Avaya's former Chief Executive Officer ("CEO") – and Defendant Kieran J. McGrath – Avaya's former Chief Financial Officer ("CFO") – issued false and misleading statements during the Class Period regarding Avaya's transition "from a traditional office hardware business into a subscription-based software company." (Am. Cmplt. (Dkt. No. 93) ¶ 2)[1] According to the Amended Complaint, Avaya was "doomed to fail . . . [and] Defendants knew Avaya was not on track to meet its [third quarter] 2022 and [fiscal year] 2022 guidance." (Id.)

The Amended Complaint asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange

[1] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

Commission ("SEC") Rule 10b-5 in connection with several of Defendants' public statements during the Class Period.

Defendants have moved to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). (Dkt. Nos. 108, 110) Defendants contend that the Section 10(b) claims should be dismissed for failure to plead facts showing that they made false or misleading statements (Chirico Br. (Dkt. No. 108-1) at 16-27); McGrath Br. (Dkt. No. 110-1) at 14-25) and for failure to plead facts establishing a strong inference of scienter. (Chirico Br. (Dkt. No. 108-1) at 27-31; McGrath Br. (Dkt. No. 110-1) at 25-29)

For the reasons stated below, Defendants' motions will be granted, and the Amended Complaint will be dismissed in its entirety.

## BACKGROUND

## I. FACTS[2]

### A. The Parties

Lead Plaintiff Paul Sweatt purchased Avaya common stock during the Class Period. (Am. Cmplt. (Dkt. No. 93) ¶ 21)

---

[2] The Court's factual statement is drawn primarily from the allegations in the Amended Complaint. In deciding a motion to dismiss, however, a court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which [plaintiff] relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Here, the Amended Complaint quotes and relies upon SEC filings and statements made during analyst calls. "[T]he Court may properly consider the full transcripts of [the analyst] calls . . . in connection with the Rule 12(b)(6) motion without converting it to one for summary judgment." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232 n.3 (S.D.N.Y. 2009). Moreover, where the Amended Complaint relies on documents that "contradict the allegations of the [Amended Complaint], the documents control." In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

Defendant James M. Chirico, Jr. is the former chief executive officer of Avaya and a former member of Avaya's board of directors. (Id. ¶ 22)

Defendant Kieran J. McGrath is Avaya's former chief financial officer. (Id. ¶ 23)

## B. Pre-Class Period Events

### 1. Avaya's Business Transition

Avaya is a public company headquartered in Durham, North Carolina. Avaya began as a telecommunications company that sold hardware – such as "handsets, video conferencing units, and headsets" – and offered certain professional services. (Id. ¶ 24) Prior to the Class Period, Avaya began making a transition to becoming "a software and services company." (Id. ¶ 25) At this time, Avaya described itself as "a global leader in digital communications products, solutions and services for businesses of all sizes, delivering its technology predominantly through software and services." (Id. ¶ 24)

In making this transition, Avaya "shifted its entire 'comprehensive software portfolio to Avaya OneCloud,' a cloud-based communications solution." (Id. ¶ 25) Avaya marketed its OneCloud software to organizations as a "single app[lication] for all-channel calling, messaging, meetings, and team collaboration with the same ease of use as existing consumer apps." (Id.)

The shift in Avaya's business model caused a shift in its revenue streams. Whereas most of Avaya's revenue had previously been "non-recurring" – i.e., based on the sale of "hardware, non-recurring perpetual-based software and one-time professional services" – under the new business model, Avaya's revenue was increasingly "recurring" – i.e., based on the sale of "products and services that are delivered pursuant to multi-period contracts, including recurring subscription-based software revenue, maintenance, global support services and enterprise cloud and managed services." (Id. ¶¶ 26, 26 n.7) During fiscal year 2021, "Avaya

introduced Avaya OneCloud ARR ('Annualized Recurring Revenue')" to measure its performance under the new model. (Id. ¶ 26)

On February 9, 2022, Avaya filed a Form 10-Q for the first quarter of fiscal year 2022. (Id. ¶ 27) An accompanying press release included the following statement from CEO Chirico concerning Avaya's transition to a new business model:

> Our transition to the cloud continues to gain strength as our Avaya OneCloud [Annualized Recurring Revenue] grew by 137% year over year primarily driven by our enterprise segment and contact center solutions. . . . Market demand remains very strong, especially with large enterprises. This quarter, we yet again closed more than 100 deals with total contract value greater than $1 million. . . . [A]s we closed out the quarter, we landed one of the largest deals in our history, a $400 million OneCloud Public CCaaS deal with a large global financial services company.

(Id.) Analyst reports were similarly optimistic, with a J.P. Morgan analyst describing "a better than expected revenue mix heading into the back half of the year, which is supported by Avaya highlighting improving demand for OneCloud[.]" A Colliers Securities analyst reported "confiden[ce] in the company's ability to execute on its strategy to migrate its legacy premise based customers over to a hybrid/public/private cloud model." (Id. ¶ 28)

### 2. Avaya's Debt Obligations

The Amended Complaint alleges that "Avaya held a significant amount of debt that presented risks to the Company's ability to raise funds to support Avaya's transformation." (Id. ¶ 29) According to Avaya's November 2021 Form 10-K, the Company had $350 million of 2.25% convertible senior notes due June 15, 2023, and $1 billion of 6.125% senior first lien notes due September 15, 2028. (Id.)

Analyst reports from 2022 note "concern from investors [regarding Avaya's] convertible debt maturity next year," including that "liquidity considerations relative to repaying $350 mn of debt maturing in 2023 [would] drive investors to revisit the challenges for Avaya in

the past and wait for a longer track record of growth before considering [the debt] structural." (Id. ¶ 30)

### 3. Internal Concerns about Revenue During the Transition

The Amended Complaint includes statements from two individuals who worked at Avaya during the transition to a new business model. They are referred to as "Confidential Witness 1" ("CW-1") and "Confidential Witness 2" ("CW-2").

"CW-1 was a manager who ensured the accurate booking of revenue and revenue recognition." (Id. ¶ 78) CW-1 "reported to a finance director." (Id.) According to CW-1, in 2021 and early 2022, "Avaya was recognizing a significant portion of revenue upfront for 'new' contracts signed with existing customers who were enticed through steep discounts to cancel their existing 'maintenance' contracts." (Id.) "[N]ew contracts were signed at higher monthly rates than the existing contracts, which represented an increase in revenue to Avaya." (Id.) As a result, Avaya recognized a "one-time boost" in revenue at the time of signing. (Id. ¶ 79) "[O]nce Avaya recognized [that] large portion of revenue upon a contract signing, the recognizable revenue for those contracts would drop significantly to a pro rata amount each month over the life of the contracts." (Id.)

CW-2 was a "Regional Sales Leader" who left Avaya in April 2022, just before the onset of the Class Period. (Id. ¶ 80) CW-2 stated that during Avaya's transition period Avaya sales personnel felt "intense pressure to transition existing customers from perpetual software license agreements to software-as-a-subscription contracts." (Id. ¶ 81) According to CW-2, customers "would only agree to one-year subscription contracts, rejecting Avaya's contracts that had longer terms (i.e., three years), because they were considering leaving the Company." (Id.) "[C]ustomers were 'telling [Avaya] in black and white, plainly telling

[Avaya], I'm planning on leaving – why would I sign up for this [three-year subscription contract]?" (Id.)

During the transition, CW-2 attended "deal desk" meetings, "which sometimes took place twice a week." (Id. ¶ 82) McGrath "often" and Chirico "sometimes" attended these meetings, during which "sales team members would request approval for steeper discounts or greater concessions for customers than they were normally permitted to offer." (Id.) "Avaya sales managers recognized the 'margins were shitty' on many of the deals that existing customers demanded before agreeing to switch to the software subscription model." (Id. ¶ 83) But senior sales managers framed their customers' demands as "a 'take it or leave it' situation if [Avaya] wanted to close the deals and meet target numbers expected by Wall Street." (Id.) At that point, according to CW-2, "'[e]verybody would hold their nose and approve it.'" (Id.)

CW-2 also stated that Avaya's "Area Sales Managers" attended weekly "revenue forecast meetings" with Chirico, McGrath, and other Avaya executives. (Id. ¶ 87) CW-2 did not attend these meetings, but "understood" that Area Sales Managers would report on the status of pending deals at these meetings. (Id.) The Amended Complaint alleges that the Area Sales Managers' reports at these meetings "would have highlighted how close to or far off each territory was to its quarterly revenue targets as the quarter progressed." (Id.) CW-2 further stated that "McGrath had a 'spreadsheet'" that listed existing customers viewed as "targets" for switching to subscription contracts, with the expected conversion rate. (Id. ¶ 88) According to the Amended Complaint, McGrath "would have been able to plainly see how many existing customers were left who could be converted to subscription contracts." (Id.)

In an effort to show that "Defendants ignored warnings . . . that the rosy financial projections and public pronouncements of 'strength' and 'momentum' of the Company's

business were not supported by the current state of Avaya's business," the Amended Complaint cites certain internal communications among "Avaya executives and employees." (Id. ¶ 54) For example, in an April 11, 2022 email to Stephen Spears, Avaya's Executive Vice President and Chief Revenue Officer, and other finance team members, Avaya's Senior Director of Sales Finance expressed doubts about Avaya's projection of $451 million in North American revenue for the third quarter of 2022, and stated that the "right starting point" for Avaya's projected North American revenue for the third quarter was $415 million: "'The number of 415M for Q3 revenue inclusive of 45.5M in revenue judgment . . . is scary but I believe the right starting point for us to build back to where you need/want to be through the set of actions items resulting from the off-site this week.'" (Id. ¶¶ 55-56) Spears responded that "[g]iven the very broad audience here, I won[']t share the 415 in this meeting. . . . I believe your adjustments and concerns are spot on, but I will need to raise this in the much smaller audience." (Id. ¶ 57)

Neither Chirico nor McGrath were included on this email thread (see id. ¶¶ 55–57), but the Amended Complaint alleges that the "'much smaller audience[] [Spears refers to]' . . . likely included senior management like Chirico and McGrath." (Id. ¶ 57)

### C. Events During the Class Period

#### 1. The May 10, 2022 SEC Filings

On May 10, 2022, Avaya filed a Form 8-K with the SEC announcing revenue of $716 million and "Adjusted EBITDA[3]" of $145 million for the second quarter of 2022.[4] (Hull

[3] EBITDA refers to "earnings before interest, taxes, depreciation, and amortization." Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 312 (S.D.N.Y. 2022).

[4] During the time period discussed in this Opinion, Avaya's fiscal year ran from October 1 to September 30. (See Han Decl., Ex. 3 (Sept. 30, 2021 Form 10-K) (Dkt. No. 110-5) at 2 ("For the Fiscal Year Ended September 30, 2021")) Accordingly, under Avaya's fiscal year, the first quarter 2022 ran from October 1, 2021 to December 31, 2021, and the second quarter 2022 ran

Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 6); Am. Cmplt. (Dkt. No. 93) ¶ 31) With respect to the third quarter of 2022, the May 2022 Form 8-K projected $685-$700 million in revenue and $140-$150 million in Adjusted EBITDA. (Am. Cmplt. (Dkt. No. 93) ¶ 31) For fiscal year 2021-22, the May 2022 Form 8-K projected $2.815-$2.855 billion in revenue and $580-$600 million in Adjusted EBITDA. (Id.)

According to the Amended Complaint, "the second-quarter financial results were below the Company's previously issued guidance." (Id. ¶ 32) CEO Chirico nonetheless expressed optimism about Avaya's future performance in the press release attached to the May 2022 Form 8-K:

> We drove record growth for Avaya OneCloud [Annualized Recurring Revenue] with a $130 million quarter over quarter increase and an over $400 million year over year increase, to $750 million. The path to hit the $1 billion [Annualized Recurring Revenue] mark by the end of calendar year 2022 is well paved[.] . . . We are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud. Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business.

(Id.; Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 6)[5]

---

from January 1, 2022 to March 31, 2022. (See Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 6 ("[T]he second quarter of fiscal [year] 2022 ended [on] March 31, 2022.")

[5] Plaintiff complains that Defendants improperly "ask the Court to accept the *truth* of the matters asserted in certain exhibits to undermine Lead Plaintiff's well-pled factual allegations." (Pltf. Opp. (Dkt. No. 112) at 26 (emphasis in original) (citing Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)).

While a court may take judicial notice of SEC filings "to determine what statements [they] contained," it cannot rely on such documents "for the truth of the matters asserted." Roth, 489 F.3d at 509 (emphasis omitted). Documents that are integral to a complaint or incorporated by reference may be considered "in full," however. Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 352 n.3 (2d Cir. 2022). And where, as here, it is alleged that "a document filed with the SEC failed to disclose certain facts," a court can "examine the document to see whether or not those facts were disclosed," Roth, 489 F.3d at 509 (2d Cir. 2007).

Avaya also released an investor presentation at this time that included a slide entitled "A Different Company." (Am. Cmplt. (Dkt. No. 93) ¶ 33) Beneath the subheading "Growth and Relevance," the slide projects Avaya's growth in revenue from $500 million to $1 billion in fiscal year 2021-22 as a result of the switch to the OneCloud Annualized Recurring Revenue business model. (Id.)




Another slide – entitled "2Q FY22 Update" – refers to "Continued large deal activity with 97 deals over $1 million, 18 over $5 million, 8 over $10 million and 2 over $25 million." (Id. ¶ 34)



## 2Q FY22 Update

| $M | 2Q22 | 1Q22 | 2Q21 |
|---|---|---|---|
| Revenue | $ 716 | $ 713 | $ 738 |
| Non-GAAP Gross Margin* | 56.7 % | 57.6 % | 61.8 % |
| Non-GAAP Operating Expense* (% of revenue) | 40.6 % | 43.3 % | 41.7 % |
| Non-GAAP Operating Margin* | 16.1 % | 14.3 % | 20.1 % |
| Adjusted EBITDA* | $ 145 | $ 129 | $ 177 |
| Adjusted EBITDA Margin* | 20.3 % | 18.1 % | 24.0 % |

**2Q Financial Highlights**

- Continued large deal activity with 97 deals over $1 million, 18 over $5 million, 8 over $10 million and 2 over $25 million
- Remaining Performance Obligations (RPO) of $2.3 billion
- Added over 1,400 new logos
- Cash used for Operations was $2 million

- Westpac, the second largest bank in Australia, has extended their partnership with Avaya and chose Avaya OneCloud Subscription for their 9,700+ Contact Center Agents. This 3 year deal will see the bank compose new solutions around the Avaya Media Processing Core ("MPC"), including the ability to build new experiences on-demand, and the introduction of AI-based channel automation that will reduce both the time and cost of change dramatically. Westpac chose Avaya based on the strength of our relationship with our partner Optus, the flexibility of our subscription model, and the intelligent cloud ecosystem they now have access to.
- Finanz Informatik, the central service provider for savings banks in Germany, providing data center, applications, networks and related IT services, has chosen to place the Avaya Media Processing Core at the heart of its environment, operating a private UC cloud platform powered by Avaya technology for 313 banks, representing 230,000 seats and 2 million calls per day. The partnership between Finanz Informatik and Avaya is underpinned by a 5 year ARR deal that utilizes all aspects of Avaya's expertise. Finanz Informatik will be able to compose flexible, unique experiences for their customers wherever and whenever they are needed.
- Carter Machinery, the third largest Caterpillar dealership network in North America, has selected Avaya Cloud Office, OneCloud CCaaS, Avaya Devices as a Service, and OneCloud CPaaS Virtual Agent for a five-year deal that will reach more than 2,000 users spanning 34 sites. This was a competitive new customer win for Avaya, displacing Cisco. Carter Machinery chose Avaya specifically because of the strength of its AI, automation, and strong partnership with ConvergeOne.
- Avaya launched the Avaya Virtual Agent, a ready-to-deploy, configurable service that delivers the full benefits of virtual, AI-based communication experiences to businesses – Immediately elevating their customer experience and dramatically reducing the complexity associated with virtualizing customer interactions. Avaya Virtual Agent removes this complexity, enabling organizations to quickly deploy Avaya-designed, pre-built, cloud-based self-service agents instead of building them from scratch. This solution leverages the Avaya OneCloud Experience Platform, which reimagines communications composability, providing customers with the option of constructing their own workflows or subscribing to pre-built experiences.
- Avaya also announced we are expanding our strategic partnership with Microsoft, building on the success of our current CCaaS go-to-market initiatives. We will add the Avaya OneCloud portfolio to the Microsoft Azure Marketplace, giving customers the agility to create communications and collaboration experiences with the broadest range of options for public, private or hybrid cloud delivery approaches to fit their needs. Avaya CCaaS customers also gain access to the power of Nuance's Contact Center AI technology integrated with OneCloud. The combined capabilities of Microsoft and Nuance give our customers flexibility to create and deliver intelligent, personalized, and impactful consumer interactions with long-term investment protection and control of their data. This represents a tremendous opportunity for customers to accelerate their cloud journey, and for Avaya to expand its go-to-market reach through collaboratively selling with Microsoft.
- Avaya and Alcatel-Lucent Enterprise (ALE) entered into a strategic partnership that extends the availability of Avaya's OneCloud CCaaS (Contact Center as a Service) composable solutions to ALE's global base of customers while also making ALE's digital networking solutions available on a global basis to Avaya customers.

The investor presentation also includes a slide entitled "ESG – Enhancing Sustainable Value in an Evolving Landscape." (Id. ¶ 38) Beneath the subheading "Governance," the slide lists "Tone at the Top Culture" and "Robust Risk Management Framework." (Id.)



On May 10, 2022, Avaya filed a Form 10-Q with the SEC that includes the following statements regarding Avaya's disclosure controls and procedures:

> As of March 31, 2022, the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, that evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on this evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of March 31, 2022 to provide reasonable assurance that information required to be disclosed by the Company in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (ii) accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

(Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 67; see Am. Cmplt. (Dkt. No. 93) ¶ 42). The Chief Executive Officer and Chief Financial Officer referenced in the above paragraph are Chirico and McGrath, respectively. (See Am. Cmplt. (Dkt. No. 93) ¶ 42)

With respect to Avaya's assets, the 10-Q states:

> We believe that our existing cash and cash equivalents and borrowings available under the [Asset-Based Loan] Credit Agreement will be sufficient to meet our future cash requirements for at least the next twelve months from the filing of this quarterly report on Form 10-Q. We expect to seek incremental financing to fund the maturity of the $350 million Convertible 2.25% Senior Notes due June 15, 2023. There can be no assurance we will be able to obtain such financing on acceptable terms.

(Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 11; see Am. Cmplt. (Dkt. No. 93) ¶ 44)

### 2. The May 10, 2022 Earnings Call

Avaya conducted an earnings call on May 10, 2022. (Am. Cmplt. (Dkt. No. 93) ¶ 41) According to the Amended Complaint, "Defendants gave further assurances [during this

earnings call] that the Company had proper procedures to provide accurate projections and [that] its guidance could be trusted." (Id.)

During the earnings call, an analyst asked the following question regarding Avaya's transition to a "cloud" model:

> If you're going with a cloud-first sales approach, why [are] your projections always faltering as when you report quarterly results. Why can't you have a stable outlook?

(Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9; see Am. Cmplt. (Dkt. No. 93) ¶ 150) Chirico responded that "a couple of dynamics" explained Avaya's inaccurate revenue predictions, including the "negative effect" that "Ukraine" had during Avaya's fiscal second quarter, as well as "the migration of our customer base" to OneCloud. (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9) With respect to the "migration of [the] customer base" to OneCloud, Chirico acknowledged that Avaya had seen "a rather significant point in time decrease [in revenue]," but he assured listeners that, over time, Avaya would realize an "overall revenue increase" over the lifetime of the new OneCloud contracts. (Id.) McGrath further explained that Avaya had "had 2 quarters in a row now where we've seen lower realization rates, and that's what we've built into our model going forward." (Id.)

With respect to "Avaya's long-term stability" (Am. Cmplt. (Dkt. No. 93) ¶ 45), Chirico stated during the earnings call that the company was "committed to delivering business impacting innovation, maintaining our competitive edge, and we continue to focus on the long game, investing in growth drivers and doing so profitably." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 5; see Am. Cmplt. (Dkt. No. 93) ¶ 45) Chirico also stated that he was "excited about Avaya's future and . . . ability to deliver on the opportunity in front of us." (Id. at 7; see Am. Cmplt. (Dkt. No. 93) ¶ 45)

With respect to Avaya's cash position and debt obligations, McGrath cited "a series of actions taken by Avaya over the last 2.5 years to strengthen our capital structure and enhance our financial flexibility, including the measures taken to improve our weighted average debt maturity profile." (Id. at 6; Am. Cmplt. (Dkt. No. 93) ¶ 46) He added that Avaya was "evaluating options to boost liquidity and to address the convertible notes, which come due in June of 2023":

> [W]e are well aware that in June of '23, we had the $350 million convert coming due. We're working with our banking colleagues to address the convert. We expect to actually act here in the reasonably near future on doing that. I should also just also point out that we also have the [asset-based loan] of $100 million to $150 million that we also have on hand to leverage it. But I think that we should be able to address the prepayment of the convert, if you will, or the prefunding of the convert coming up in the next several months.

(Id. at 9; Am. Cmplt. (Dkt. No. 93) ¶ 149)

### 3. Analyst Reaction to SEC Filings and Earnings Call

Following Avaya's May 10, 2022 SEC filings and earnings call, a number of analysts expressed concern about the Company's ability to meet its debt obligations. For example, on May 10, 2022, a Barclays analyst reported "concern from investors on [Avaya's] convertible debt maturity next year." (Am. Cmplt. (Dkt. No. 93) ¶ 30) And on May 11, 2022, a J.P. Morgan analyst observed that "liquidity considerations relative to repaying $350 mn of debt maturing in 2023 [would] drive investors to revisit the challenges for Avaya in the past and wait for a longer track record of growth before considering it structural." (Id.)

### 4. Avaya Employees React to the May 10, 2022 Announcements

According to the Amended Complaint, "Chirico and McGrath received information conveying doubts surrounding the Company's third-quarter revenue projections." (Id. ¶ 58) For example, in a May 11, 2022 email to Avaya's Global Vice President of Financial Planning and Analysis and Vice President of Sales Finance, the Senior Director of Sales Finance

expressed frustration that Avaya had announced $430 million in projected North American revenue for the third quarter of 2022. (Id. ¶¶ 58-59) In particular, the Senior Director states that "***80M of [revenue] judgment in Q3 i[s] not acceptable***," and that "***everyone knows we should not load 430M with 80M of revenue judgment in Q3***."[6] (Id. ¶ 58 (emphasis in Am. Cmplt.)) Avaya's Global Vice President of Financial Planning and Analysis responds, in part, that "[t]he walk to $430M was identified and shared with Stephen and [redacted] – and ultimately made its way to Jim [Chirico]." (Id. ¶ 59) In the same email thread, Avaya's Vice President of Sales Finance also expresses doubts about the Company's projected earnings for the third quarter of 2022. (Id. ¶ 60) Neither Chirico nor McGrath were included in this email thread, however. (Id. ¶¶ 58-61)

According to the Amended Complaint, this email thread and the April 11, 2022 email thread discussed above "demonstrate that by May 10, 2022" Chirico and McGrath "knew certain revenue projections were based on dubious assumptions." (Id. ¶ 61)

**5. Chirico and McGrath Discuss Avaya's Debt Obligations**

In a June 3, 2022 discussion with a Barclays analyst concerning Avaya's convertible debt coming due in June 2023, McGrath told the bank that the "best option would be a $450-$500 million term loan add-on, which would 'provid[e] additional liquidity beyond the $350 mil. due.'" (Id. ¶ 47)

In a June 4, 2022 email to Stephen Spears, Avaya's Executive Vice President and Chief Revenue Officer, and other Avaya executives, Chirico states that, "***simply put, we can't afford to miss Q3***." (Id. ¶ 62 (emphasis in Am. Cmplt.)) Chirico also states that Avaya is "at

---

[6] The Amended Complaint does not explain the term "revenue judgment" or why the author of the email believed that $80 million in "revenue judgment" for the third quarter of 2022 was "not acceptable."

29m in TCV [total contract value forward][7] bookings and ***need[s] to be [at] 160***," and that a "list of [bulk deals] ***must equal 30m dollars of revenue***." (Id. (emphasis in Am. Cmplt.))

On June 7, 2022, in anticipation of a board of directors meeting, "McGrath told Spears that Avaya needed to acknowledge risk around its $700 million revenue projection for the third quarter, with $430 million of that coming from North American sales." (Id. ¶ 64) Later that day, Spears sent an email to the board of directors stating that "***North America [had] experienced an unusually slow start to the quarter,***" and projecting $410 million in North American revenue for third quarter of 2022. (Id. (emphasis in Am. Cmplt.))

### 6. The June 8, 2022 SEC Filing

On June 8, 2022, Avaya filed a Form 8-K with the SEC. (Id. ¶¶ 48, 63) The June 2022 Form 8-K announces that Avaya is

> seeking to raise $500.0 million aggregate principal amount of new secured debt, which will be used to prefund the refinancing of the Company's existing $350.0 million of 2.25% Convertible Notes due June 15, 2023 and for general corporate purposes.

(Id. ¶ 48) According to the Amended Complaint, the investor presentation attached to the June 2022 Form 8-K contains "annual guidance that was entirely on track with the guidance provided on May 10, 2022." (Id. ¶ 49) The investor presentation includes a slide entitled "Positive Shift of Installed Base Seats to OneCloud," which states that "~12% of Seat base [was] on OneCloud."[8] (Id. ¶ 50)

---

[7] The Amended Complaint does not explain the acronym "TCV." The complaint filed in Brigade Cavalry Fund Ltd., et al., v. James M. Chirico, Jr. and Kieran J. McGrath, No. 655678/2024 (N.Y. Sup. Ct.). (June 3, 2025 McGrath Ltr., Ex. B (Brigade Cmplt.) (Dkt. No. 121-2) at 2) states that "TCV" refers to "total contract value forward."

[8] The Amended Complaint does not explain the terms "Base Seats" and "Seat base."

### 7. Internal Concerns at Avaya Regarding Third Quarter Revenue

In a June 12, 2022 email to Spears and other Avaya executives, Chirico states that Avaya's "recent revenue projections were '***clearly not good at all***,' [] that the '***number for [North American revenue] must be 420*** [***million,***]' [and that] a revenue number of '***404 [million] (which []now appears to be a stretch) doesn't get it done***.'" (Id. ¶ 62 (emphasis in Am. Cmplt.))

In a June 14, 2022 email thread among Avaya executives (not including Chirico and McGrath) regarding third-quarter revenue, a director comments that it looks "***like another tight quarter running to the wire with high volume at the end***." (Id. ¶ 66 (emphasis in Am. Cmplt.)) The Vice President of Sales Finance responds that "***[t]ight is an understatement***." (Id. (emphasis in Am. Cmplt.)) The director replies that "[it] ***looks like the numbers still don't add all up***," and that "***another miracle quarter***" would be necessary to meet Avaya's revenue projections. (Id. ¶ 67 (emphasis in Am. Cmplt.)) The Vice President of Sales Finance agrees, remarking that Avaya would need "'***more than one miracle***' to close the '***quite substantial***' gap and meet the guidance." (Id. ¶ 68 (emphasis in Am. Cmplt.))

### 8. Sales Team Meetings at the End of the Third Quarter of 2022

According to CW-1, toward the end of the third quarter of 2022, the sales team met weekly to "discuss the status of contracts they hoped to close before the quarter ended." (Id. ¶ 85) CW-1 attended some of these meetings, for which McGrath was present. (Id. ¶¶ 85-86) Sales managers presented reports generated from a database that held "all the contracts that had closed in the quarter and [also listed all contracts] which remained open." (Id. ¶ 85) At these meetings, the sales team sometimes sought approval to offer additional discounts to customers. (Id. ¶ 86) There were also discussions about "how much revenue could be recognized for the [third] quarter." (Id.)

### 9. Avaya Announces New Financing

In a June 27, 2022 press release, Avaya announced $600 million in aggregate financing commitments. (Id. ¶ 51) According to the press release, "[t]he combined principal amount of the offerings was raised from the previously announced offering size of $500 million due to increased demand." (Hull Decl., Ex. D (June 27, 2022 Press Release) (Dkt. No. 108-7) at 3) In the press release, McGrath states that the "funding supports and accelerates our business model transformation and addresses our convertible notes maturing in June of next year." (Id.)

According to the Amended Complaint, Defendants obtained the new financing by telling lenders that Avaya was on track to meet the revenue projections it had issued. (Am. Cmplt. (Dkt. No. 93) ¶ 53) In support of this allegation, the Amended Complaint cites to a complaint filed in North Carolina Superior Court by lenders who had purchased the convertible notes issued by Avaya in June 2022 in connection with the new financing. (Id. (citing Cmplt. (Dkt. No. 1) ¶¶ 54-60, Brigade Calvary Fund Ltd., et al. v. James M. Chirico Jr. and Kieran J. McGrath, 23 Civ. 031948-590 (N.C. Super. Ct., October 26, 2023)))

The North Carolina complaint alleges that – in attempting to persuade lenders to provide the new funding –

> McGrath reiterated Avaya's publicly disclosed guidance, stated that the Company remained on track to achieve $1 billion [Annualized Recurring Revenue] for OneCloud, noted Avaya just completed its two strongest quarters on subscription signings, and explained that the second half of [2022] should see a 3% improvement in EBITDA margins, among other statements detailing his confidence in Avaya's business and improving financial position.

(Am. Cmplt. (Dkt. No. 93) ¶ 53)

On June 30, 2022 – the last day of the third quarter – the Senior Director of Sales Finance estimated that North American revenue for the third quarter would be approximately

$350 million (as opposed to the projected $410 million). (Id. ¶ 69) According to the Amended Complaint, McGrath received the new estimate. (Id.)

On July 1, 2022, high-level Avaya employees received a report indicating that global third-quarter gross revenue was $604 million (as opposed to the projected $685-$700 million). (Id. ¶ 70) That same day, "Chirico directed Spears to draft an email" to Avaya's board of directors regarding the discrepancy between the Company's projected and actual earnings for the third quarter. (Id. ¶ 71) Spears' draft includes the following:

> ***I am writing to let you know that we had a significant fallout across the globe that will prevent us from achieving the objectives or prognosis I shared just a few short weeks ago. I am clearly disappointed, and I take accountability for the challenges in execution, as well as those shortfalls*** that are the result of organizational shifts and recent changes to the GTM. I am fully cognizant of the strain caused by our inability to execute, and will look to you for further guidance on how we alter the course ahead. I would like to report on four major categories of the business and its impact upon the qtr. . . .
>
> ***We saw significant gaps in execution and leadership. . . .***
>
> We saw significant and direct fall out in our International and Latin America businesses ***as a result of questions around our liquidity***. . . .
>
> ***We witnessed unprecedented aggravation from the channel in Q3. This is a result of at least two major factors. 1) accelerated shifts to the cloud are leaving our partners out of future revenue streams. 2) changes to product mix, and continued erosion of hardware is changing partnering behavior.***

(Id. ¶ 71 (emphasis in Am. Cmplt.))[9] The draft email was never sent to the board. (Id. ¶ 72) "[T]he Board, investors, and lenders did not receive any other notification regarding the Company's under performance [during the third quarter]." (Id.)

### 10. The Whistleblower Letter

On July 3, 2022, Avaya's board of directors received a whistleblower complaint from a "senior and longtime employee of Avaya" alleging that senior management, including

[9] The Amended Complaint does not define "GTM."

Chirico and McGrath, had committed fraud. (Id. ¶ 73) Among other things, the whistleblower described Avaya's "transition to a subscription revenue model" as "***a blatant financial engineering ploy that bought Chirico time.***" (Id. ¶ 75 (emphasis in Am. Cmplt.) (internal brackets omitted)) According to the whistleblower, however, "Chirico and his executives totally failed in all of their investments in R&D and products to deliver the streams that cover for the dip in revenue. . . ." (Id. (internal brackets omitted))

In response, Avaya's management team assured the whistleblower that the allegations would be investigated. (Id. ¶ 76) On July 10, 2022, the whistleblower replied: "The consensus [among employees] is that, despite all of the massive problems and issues, the shameless 4 [presumably including Chirico and McGrath] continue to live in denial while arrogantly keep bullying their way thru." (Id. (alteration in Am. Cmplt.))

**11. July 28, 2022 SEC Filings**

On July 28, 2022, Avaya filed a Form 8-K with the SEC. The attached press release announced Avaya's expectations for the third quarter of 2022, including expected global revenue of $575-$580 million (as opposed to the projected $685-$700 million) and Adjusted EBITDA of $50-$55 million (as opposed to the projected $140-$150 million). (See id. ¶ 89) Avaya's press release states that "prior financial guidance should no longer be relied upon," and warns that the Company is "finalizing testing of its goodwill and intangible assets that is expected to result in significant non-cash impairment charges as of June 30, 2022." (Id. ¶¶ 90-91)

The July 2022 Form 8-K also announces that Chirico will be "removed . . . from his role as President and Chief Executive Officer of the Company, effective as of August 1, 2022," and is "resigning from his role as a member of the Board." (Hull Decl., Ex. E (July 28, 2022 Form 8-K) (Dkt. No. 108-8) at 4; see Am. Cmplt. (Dkt. No. 93) ¶ 91)

On July 29, 2022, "Avaya's stock price fell approximately 57%, or $1.19 per share, from its close of $2.09 per share on July 28, 2022 to a close of $0.90 per share on July 29, 2022." (Am. Cmplt. (Dkt. No. 93) ¶ 92)

### 12. August 9, 2022 SEC Filings

On August 9, 2022, Avaya filed a Form 8-K with the SEC. (Id. ¶ 94 n.88) The attached press release announces Avaya's financial results for the third quarter of 2022: $577 million in global revenue (as opposed to the projected $685-$700 million) and EBITDA of $54 million (as opposed to the projected $140-$150 million). (Id. ¶ 94) The press release further states that

> [t]he Company is currently engaging with its advisors to assess its options with respect to addressing the 2023 convertible notes, but there can be no assurance as to the certainty of the outcome of that assessment. As a result of the foregoing, in addition to the Company's decline in revenues during the third quarter, which represented substantially lower revenues than previous Company expectations, and the negative impact of significant operating losses on the Company's cash balance in the year to date, as of the date of this release, the Company has determined that there is substantial doubt about the Company's ability to continue as a going concern.

Avaya Holdings Corp., Current Report (Form 8-K) (August 9, 2022). (See Am. Cmplt. (Dkt. No. 93) ¶ 96) The press release further states that the board of directors' Audit Committee has launched an internal investigation into the circumstances surrounding the Company's financial results for the third quarter of 2022. (Id.)

That same day, Avaya filed a Form 12b-25 with the SEC announcing that the Company was investigating "matters related to potential material weaknesses in the Company's internal control over financial reporting with respect to the appropriate maintenance of its whistleblower log and the proper dissemination of materials and correspondences related thereto to certain parties other than its Board of Directors." (Am. Cmplt. (Dkt. No. 93) ¶ 98)

Avaya also conducted an earnings call on August 9, 2022. During the call, the new CEO, Alan Masarek, acknowledged that "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities." (Id. ¶ 96) Masarek expressed optimism that Avaya could "improve the performance going forward," however. (Id. ¶ 95)

After the August 9, 2022 SEC filings and announcements, "Avaya's stock price fell another 45%, from its close of $1.12 per share on August 8, 2022 to a closing price of $0.61 per share on August 9, 2022. (Id. ¶ 100)

### 13. November 2022 Announcements and SEC Filings

On November 7, 2022, Avaya announced McGrath's retirement, characterizing his departure as part of the Company's plan to "execut[e] on its transformation to subscription and cloud-delivered services." (Id. ¶ 107)

On November 30, 2022, Avaya filed a Form 8-K with the SEC that described the results of the Audit Committee's investigation of the whistleblower letter. (Id. ¶ 108-09) While "the investigation concluded [that] the claims in the [whistleblower] email were unsubstantiated," investigators also concluded that the Company had not "appropriately log[ged] the [whistleblower's] email" and had not informed "certain members of management or the Company's independent registered public accounting firm [of] the existence of the email" or the subsequent investigation. (Id. ¶ 109) According to the November 2022 Form 8-K, Avaya's "disclosure controls and procedures were not effective as of September 30, 2021, which continues to be the case." (Id. ¶ 112)

That same day, Avaya filed a Form 12b-25 with the SEC. Both the Form 12b-25 and the November 2022 Form 8-K indicate that the Company was continuing to investigate

potential material weaknesses in the Company's internal controls regarding financial reporting. (See id. ¶¶ 113–14)

Following the November 30, 2022 filings, "Avaya's stock price fell approximately 14%, from its close of $1.12 per share on November 29, 2022 to a closing price of $0.96 per share on November 30, 2022." (Id. ¶ 115)

**14. December 2022 SEC Filings**

On December 13, 2022, Avaya filed a Form 8-K with the SEC that contained "financial disclosures that it had provided confidentially to certain of its lenders between October 2022 and December 2022 in an effort to negotiate a settlement of Avaya's obligations with the lenders." (Id. ¶ 116)

Attached to the December 2022 Form 8-K is an investor presentation entitled "Form 8-K Cleansing Materials." Avaya Holdings Corp., Current Report (Form 8-K), Ex. 99.1 (Dec. 13, 2022). The presentation attributes Avaya's disappointing third-quarter performance to "[h]istorically low funnel (pipeline) conversion rates" that led to "lower Perpetual software revenue" and "[s]lower customer migration from maintenance to subscription coupled with shorter contract duration." (Am. Cmplt. (Dkt. No. 93) ¶ 118) These factors "negatively impacted recognizable revenue." (Id.)

After the December 13, 2022 SEC filings and announcements, "Avaya's stock price fell 40%, from its close of $1.16 per share on December 12, 2022 to a closing price of $0.69 per share on December 13, 2022. (Id. ¶ 119) Shortly thereafter, Avaya's stock price "fell an additional 54% from its closing price of $0.52 per share on December 15, 2022 to $0.24 per share on December 16, 2022." (Id.)

**D. Post-Class Period Events**

On February 10, 2023, Avaya filed a Form 12b-25 with the SEC disclosing that the Company was "assessing a potential material weakness related to designing and maintaining an effective control environment and to the setting of an appropriate 'tone at the top.'" (Id. ¶ 121) In connection with these issues, the February 2023 Form 12b-25 notes that

> on July 28, 2022, Avaya removed James M. Chirico, Jr. as Chief Executive Officer and appointed Alan Masarek as new Chief Executive Officer, effective August 1, 2022; [and that]
>
> Kieran McGrath, stepped down as Chief Financial Officer, effective November 9, 2022, and retired from the Company, effective December 1, 2022.

Avaya Holdings Corp., Notification of Late Filing (Form 12b-25) (February 10, 2023).

On September 8, 2023, Avaya filed a Form 10-Q with the SEC disclosing the results of the Audit Committee investigation. (See Am. Cmplt. (Dkt. No. 93) ¶ 122-27) The Audit Committee identified "several contributing factors for the significant differences between the Company's forecasts and actual financial results for the third quarter of fiscal 2022," including: (1) an "[i]nappropriate tone at the top among certain members of senior management"; (2) "[a] declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription model"; (3) "[a] business model in which a significant portion of quarterly revenue is generated at the end of each quarter, making it difficult to accurately forecast revenue"; (4) "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, which negatively influenced customer sentiment"; and (5) "additional material weaknesses" resulting from the "ineffective control environment," including a lack of "effective controls over the information and communication . . . which led to an additional material weakness with respect to

the ethics and compliance program." Avaya Holdings Corp., Quarterly Report (Form 10-Q) (Sept. 8, 2023).

The Form 10-Q also includes a section on Avaya's "Remediation Plan," which lists "enhancements to [the Company's] internal control over financial reporting." Id. The changes include Chirico's removal and McGrath's retirement. Id.

On September 8, 2023, Avaya also filed a Form 10-K with the SEC reiterating the disclosures made in the September 2023 10-Q, as well as "management['s] conclu[sion] that the Company did not maintain effective internal control over financial reporting as of September 30, 2022." (Am. Cmplt. (Dkt. No. 93) ¶ 130) The Form 10-K also reported Avaya's Annualized Recurring Revenue for the 2022 fiscal year as $896 million, a sum "well below the [Company's] $1 billion target." (Id. ¶ 131)

On February 14, 2023, Avaya filed a Chapter 11 bankruptcy petition. (Id. ¶ 132 (citing Petition for Bankruptcy (Dkt. No. 1), In re: Avaya, Inc., et al., 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 21, 2023)). On March 22, 2023, the bankruptcy court approved Avaya's reorganization plan. (Id. (citing Order Approving and Confirming the Joint Prepackaged Plan of Reorganization (Dkt. No. 350), In re: Avaya, Inc., et al., 23-90088 (DRJ)) Pursuant to the reorganization plan, investors who owned Avaya securities before the Company entered Chapter 11 will "not receive any distribution." (Id.) On May 1, 2023, Avaya emerged from bankruptcy. (Id. ¶ 132)

## II. PROCEDURAL HISTORY

The Complaint in this securities fraud class action was filed on February 14, 2023, and names Avaya, Chirico, and McGrath as defendants. The Complaint pleads claims under the Securities Exchange Act of 1934 "on behalf of all purchasers of the securities of Avaya between October 3, 2019 and November 29, 2022." (Cmplt. (Dkt. No. 1) ¶ 1)

On February 16, 2023, Plaintiff moved to voluntarily dismiss his claims against Defendant Avaya, without prejudice. (Pltf. Notice of Mot. (Dkt. No. 6)) On February 24, 2023, this Court granted Plaintiff's application. (Feb. 24, 2023 Order (Dkt. No. 7) at 3)

On March 5, 2024, this Court appointed Paul Sweatt as Lead Plaintiff. (Mem. Op. & Order (Dkt. No. 89) at 1)

On May 6, 2024, Plaintiff filed the Amended Complaint, which asserts claims against Chirico and McGrath under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) on behalf of "all those who purchased or otherwise acquired Avaya securities during the period from May 10, 2022 to December 15, 2022, inclusive, and who were damaged thereby." (Am. Cmplt. (Dkt. No. 93) ¶¶ 17, 190)

On July 8, 2024, Chirico and McGrath moved to dismiss the Amended Complaint. (Chirico Mot. to Dismiss (Dkt. No. 108) at 1; McGrath Mot. to Dismiss (Dkt. No. 110) at 1)

On September 6, 2024, Plaintiff submitted its opposition to the motions to dismiss (Omnibus Opp. to Mots. to Dismiss (Dkt. No. 112)), and on October 21, 2024, Defendants submitted their replies. (Chirico Reply (Dkt. No. 109); McGrath Reply (Dkt. No. 113))

On May 16, 2025, Plaintiff filed a Notice of Recent Decision, attaching the transcript of an oral argument held on May 6, 2025 regarding a motion to dismiss in Brigade Cavalry Fund Ltd., et al., v. James M. Chirico, Jr. and Kieran J. McGrath, No. 655678/2024 (N.Y. Sup. Ct.) ("Brigade"). (Pltf. Not. of Recent Decision (Dkt. No. 119) at 2 (attaching Transcript of Oral Argument, Brigade, No. 655678/2024 (N.Y. Sup. Ct. May 6, 2025)) On May

22, 2025, McGrath replied to Plaintiff's Notice of Recent Decision. (McGrath May 22, 2025 Ltr. (Dkt. No. 120) at 1)

In a June 3, 2025 letter, McGrath asks the Court to schedule a pre-motion conference for the purpose of seeking leave to move to stay discovery in Brigade pending this Court's rulings on Defendants' motions to dismiss. (McGrath June 3, 2025 Ltr. (Dkt. No. 121) at 1)

In a June 4, 2025 letter, plaintiffs' counsel in Brigade gives notice of their intent to file "a motion seeking to intervene in this matter for the limited purpose of opposing a stay of discovery in the Brigade action, along with a letter stating . . . grounds for that opposition." (O'Connor June 4, 2025 Ltr. (Dkt. No. 123))

In a June 5, 2025 letter, Chirico states that he joins in McGrath's request for a pre-motion conference and for leave to file a motion to stay discovery in Brigade. (Chirico June 5, 2025 Ltr. (Dkt. No. 126))

On June 6, 2025, a number of proposed intervenors filed a motion for leave to intervene for the purpose of filing a letter opposing Defendants' request to stay discovery in Brigade.[10] (Mot. to Intervene (Dkt. No. 130))

---

[10] The proposed intervenors are Brigade Cavalry Fund Ltd.; Brigade Collective Investment Trust - Brigade Diversified Credit CIT; Brigade Credit Fund II Ltd; Brigade High Yield Fund Ltd.; Brigade Leveraged Capital Structures Fund Ltd.; Brigade Loan Fund Ltd.; Brigade Opportunistic Credit LBG Fund Ltd., Brigade-SierraBravo Fund LP; FedEx Corporation Employees' Pension Trust; Los Angeles County Employees Retirement Association; Panther BCM LLC; Platinum Peregrine A 2012 RSC Limited; SAS Trustee Corporation; SC Credit Opportunities Mandate, LLC; SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund; SEI Institutional Investments Trust - High Yield Bond Fund; SEI Institutional Managed Trust - High Yield Bond Fund; SEI Institutional Managed Trust - Multi-Strategy Alternative Fund; TCorpIM High Yield Fund; The Coca-Cola Company Master Retirement Trust; and U.S. High Yield Bond Fund (collectively the "Brigade Plaintiffs"). (Mot. to Intervene (Dkt. No. 130) at 1-2)

In a June 11, 2025 letter, McGrath states that he does not oppose the Brigade Plaintiffs' motion to intervene and requests (1) leave to move for a stay of discovery in Brigade pending resolution of Defendants' motions to dismiss in Jiang; and (2) an interim stay of discovery in Brigade. (McGrath June 11, 2025 Ltr. (Dkt. No. 133) at 1, 3)

In a June 20, 2025 letter, Lead Plaintiff Paul Sweatt states that he "takes no position" regarding the proposed intervenors' motion to intervene. (Sweatt June 20, 2025 Ltr. (Dkt. No. 134))

In a September 26, 2025 letter, Defendant McGrath reports that on September 11, 2025, the Appellate Division of the New York Supreme Court, First Department, granted the defendant-appellant's motion for an interim stay of discovery in Brigade "pending hearing and determination of [an appeal of an order of the New York State Supreme Court, New York County]." (McGrath Sept. 26, 2025 Ltr., Ex. A (Brigade, No. 2025-03695, 2025 WL 2621399 (1st Dept. Sept. 11, 2025)) (Dkt. No. 135-1)) In a December 4, 2025 letter, Defendant McGrath states that the First Department has ruled that discovery be stayed in Brigade pending this Court's determination of the instant motions to dismiss. (McGrath Dec. 4, 2025 Ltr. (Dkt. No. 136) (citing Brigade, No. 2025-03695 (1st Dept. Dec. 4, 2025))

In a December 10, 2025 letter, plaintiffs' counsel in Brigade requests that this Court grant their motion to intervene and set an expedited briefing schedule for Defendants' request for leave to file a motion to stay discovery in Brigade. (Dkt. No. 137)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle N.E., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish entitlement to relief. Iqbal, 556 U.S. at 678.

In resolving a motion to dismiss, a court may "consider . . . the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily." Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir. 2012) (citation and quotation marks omitted)

**B. Section 10(b)**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j.

Under SEC Rule 10b-5, it is unlawful

(a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)).

"Pure omissions" "are not actionable under Rule 10b–5(b)." Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 266 (2024). "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." Id. at 263.

"'A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards.'" In re Cannavest Corp. Sec. Litig., 307 F. Supp. 3d 222, 236 (S.D.N.Y. 2018) (quoting In re Gen. Elec. Co. Sec. Litigs., 857 F. Supp. 2d 367, 383 (S.D.N.Y 2012)). "First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" Id. (quoting Fed. R. Civ. P. 9(b)). This requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99.

Accordingly, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'") (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). "To qualify as 'strong' within the intendment of [the PLSRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PLSRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). As discussed above, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## II. ALLEGED FRAUDULENT STATEMENTS AND MISLEADING OMISSIONS

The Amended Complaint alleges that Defendants issued more than twenty false statements or misleading omissions during the Class Period. The statements at issue were made in or during (1) a press release attached to Avaya's May 10, 2022 Form 8-K; (2) an investor presentation attached to Avaya's May 10, 2022 Form 8-K; (3) Avaya's May 10, 2022 Form 10-Q; (4) the May 10, 2022 Avaya earnings call; (5) McGrath's remarks to a Barclays analyst on June 3, 2022; (6) Avaya's June 8, 2022 investor presentation; and (7) a June 27, 2022 Avaya press release. (Am. Cmplt. (Dkt. No. 93) ¶¶ 134-36, 138-40, 143-51, 153-54, 156, 158)

The Amended Complaint alleges that the cited statements of Chirico and McGrath are materially false or misleading because they

> misled investors into believing the Company was successfully transforming itself from a traditional office hardware business into a subscription-based software company by claiming that the momentum of Avaya's new business model "remain[ed] very strong" and the Company was on track to earn at least $685 million in revenue and EBITDA of $140 million in the third quarter fiscal year 2022 and $1 billion in annual recurring revenues by the end of the calendar year 2022.

(Am. Cmplt. (Dkt. No. 93) ¶ 2)

Plaintiff further alleges that Chirico and McGrath "falsely touted Avaya's internal governance . . . and certified that the Company's 'disclosure controls and procedures were effective.'" (Id. ¶ 3) "In reality, Defendants Chirico and McGrath were setting an unethical culture within the organization by pressuring employees to come up with and meet impossible short-term sales projections." (Id.)

In moving to dismiss, Defendants contend that the statements cited in the Amended Complaint are not false or misleading. (Chirico Br. (Dkt. No. 108-1) at 23-27; McGrath Br. (Dkt. No. 110-1) at 17, 21-25) According to Defendants, many of the statements

cited by Plaintiff constitute non-actionable opinion, forward-looking statements, or puffery. (Chirico Br. (Dkt. No. 108-1) at 17-22; McGrath Br. (Dkt. No. 110-1) at 23-24)

### A. Applicable Law

Rule 10b-5 makes it unlawful for any person to make an "untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b).

"'A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement.'" Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co., No. 15 CIV. 5999 (PGG), 2017 WL 4403314, at *11 (S.D.N.Y. Sept. 30, 2017) (quoting In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677 (S.D.N.Y. 1990)). "In general[,] there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks and citations omitted). "[D]isclosure is required," however, "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Id. (internal quotation marks and citations omitted). In other words, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Id.

"'[T]hat duty is not boundless,' however." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (quoting Christine Asia Co. v. Alibaba Grp. Holding Ltd., 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016)). "'[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject.'" Id. (quoting Richman v. Goldman Sachs Group, Inc., 868 F.Supp.2d 261, 274 (S.D.N.Y. 2012)). "'[T]he proper inquiry requires an examination of defendants' representations, taken together and in context.'" Meyer, 761 F.3d at

250 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)). "In other words, [courts] look to the total mix of available information." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citation omitted).

**B. Analysis**

**1. Statements About Missing Earnings Targets for the Second Quarter of 2022**

The Amended Complaint challenges several statements made by Defendants regarding Avaya's failure to meet its projected earning goals for the second quarter of 2022.

As to the May 10, 2022 earnings call, the Amended Complaint challenges Chirico's statement that "[two] dynamics" contributed to Avaya's inability to meet its projected earning goals. The two factors cited by Chirico were (1) "the shift away from onetime and point-in-time revenue to recurring revenues," which caused a "$40 million impact on revenue for the quarter"; and (2) Avaya's "significant customer base in Russia" and the war in Ukraine, which "creat[ed] top line pressure" that reduced "revenue by roughly $5 million for the quarter." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3-4 (emphasis added in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 145 (emphasis added in Am. Cmplt.)) [11]

As to the first factor, Chirico stated that

> [subscription] deals of this magnitude, more times than not, it's not unusual to have increased contract flexibility as part of the solution for the contract. We've learned this over the last couple of quarters in fairness as we've been accelerating the move to cloud. And as I mentioned, we had record bookings last quarter. ***So we saw that hit us a bit, if you will, in the first quarter. And as we pointed out here, a rather significant point in time decrease, not an overall revenue increase just that their revenue is not ratable over the life of the contract, but not point in***

[11] When quoting what Plaintiff alleges are false or misleading statements, the Court cites to language in the underlying document, with a parallel cite to the relevant paragraph of the Amended Complaint.

> ***time***. So we had historically have had roughly around 60% or so ability to recognize that revenue in the quarter.
>
> Going forward, we've taken that percentage and we've now aligned it more to the larger deals and really what we're seeing as far as some of the flexibility we need in these larger contracts and have lowered that percentage down, to the lower 50% range. So that has had a result in lower revenue attainment. Again, revenues that are not lost, but just the rebalancing of the portfolio and the profile moving further as we continue to increase our overall recurring revenues as a percentage of the Avaya revenue profile. ***So again, it's really more of a reflection of what we -- is the flexibility we're building into these long-term contracts with our enterprise customers, but not a loss of demand. So we've taken it, we've rebalanced it, we've repositioned it, and that's worked with the guidance update that Kieran provided to you all.***

(Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 150 (emphasis in Am. Cmplt.))

The Amended Complaint similarly challenges the following statements made by McGrath during the May 10, 2022 earnings call:

> Shifting to revenue. Q2 revenue of $716 million was below our guidance ***due to [two] primary reasons***. First, in spite of our record OneCloud subscription bookings, the percentage of revenue recognized in the quarter from those subscription bookings was lower again this quarter. It's important to note that this revenue is not lost. Instead, it will be recognized in future periods.
>
> . . . .
>
> The second revenue impact versus our guidance was related to the crisis and conflict in Ukraine, which impacted our Q2 revenue in Eastern Europe by approximately $5 million. This is expected to have a much more significant second half impact to Avaya's business due to the announced sanctions and the adverse economic conditions created in Eastern Europe.

(Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 4-5 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 146 (emphasis in Am. Cmplt.))

Later in the earnings call, McGrath stated the following concerning Avaya's shift to a subscription-based model:

> [I]f this migration for us had been done back, pre 606 this would have been a much more predictable, much easier transition, because you're not going to have all of this point-in-time related to these longer-term subscription and cloud deals that we're signing. It's a complication that . . . we need to get a better arm around []. And I think we have now, if you will, we've had [two] quarters in a row now where we've seen lower realization rates, and ***that's what we've built into our model going forward. I think the real point here is that we are signing significant deals both on the subscription hybrid contracts as well as in our public and private cloud, and they will start to roll out as we go through time, and we'll see much more of our business become more ratable and less of these point-in-time fluctuations.*** So I understand that we need to do a better job of getting insight into this. And I do think this 606 accounting has unnecessarily complicated things, but that's the rules we have to live by.

(Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9-10 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 151 (emphasis in Am. Cmplt.))[12]

The Amended Complaint alleges that the above statements regarding Avaya's failure to meet its earnings goals for the second quarter of 2022 "downplay[ed]" the significance of the miss and "[gave] the impression that the miss was unrelated to any fundamental issues with the business and the Company's execution." (Am. Cmplt. (Dkt. No. 93) ¶ 145) Plaintiff argues that these statements were misleading because they do not disclose that "Avaya was not well-positioned to execute on its growth strategy," "that the Company could not [accurately] project revenue into future quarters consistent with the boosted revenue numbers," and that it would be "impossible" for Avaya to meet it projected earnings targets for the third quarter of 2022. (Id. ¶ 152) According to Plaintiff, Defendants should have disclosed that (1) the nature of Avaya's new subscription-based contracts rendered Avaya unable to accurately "forecast revenue"; (2) the subscription-based contracts "were short in duration and had poor margins

[12] The Court understands "606" to refer to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, which was released on May 28, 2014. Topic 606 provides guidance concerning "the recognition of revenue from contracts with [a company's] customers." IASB and FASB Issue Converged Standard on Revenue Recognition, FASB, (May 28, 2014), https://www.fasb.org/page/getarticle?uid=fasb_NewsRelease05-28-14Body_0228221200.

given the variety of discounts and incentives Avaya had to offer . . . legacy customers"; (3) the number of "existing legacy customers . . . eligible for migration to the Company's subscription model" was declining; and (4) Avaya had an "inappropriate 'tone at the top.'"[13] (Id.)

Defendants respond that the Amended Complaint does not (1) plead facts demonstrating that the above-cited statements were "'false when made'" (Chirico Br. (Dkt. No. 108-1) at 24 (quoting Gissin v. Endres, 739 F. Supp. 2d 488, 501 (S.D.N.Y. 2010)) (emphasis in brief omitted); McGrath Br. (Dkt. No. 110-1) at 24-25)); (2) "explain why the statement[s] [were] misleading" (Chirico Br. (Dkt. No. 108-1) at 24 (citing 15 U.S.C. § 78u-4(b)(1); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)), and (3) "establish that disclosure of the allegedly omitted fact was required under the Exchange Act." (Id. at 25 (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)).

As an initial matter, Plaintiff does not dispute that (1) historically, Avaya "had roughly around 60% or so ability to recognize [new contract] revenue within quarter"; and (2) Avaya has a "significant customer base in Russia," and the war in Ukraine led to a $5 million loss in revenue for the second quarter. (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3-5, 9; Am. Cmplt. (Dkt. No. 93) ¶¶ 145, 146)

As to Plaintiff's argument that the challenged statements are false and misleading because they create the false impression that Avaya would meet its guidance for the third quarter, Plaintiff ignores the broader context. The challenged statements address Avaya's long-term financial performance, and are not specific to the third quarter. For example, Defendants say that revenue will "materialize over the life of these long-term contracts"; "revenue . . . will be

[13] The Court will address Plaintiff's "inappropriate 'tone at the top'" claim in connection with Avaya's statements regarding its compliance efforts.

recognized in future periods"; and the effect of "signing significant deals . . . will start to roll out as we go through time." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 4, 5, 9; Am. Cmplt. (Dkt. No. 93) ¶¶ 146, 146, 151) "[T]aken together and [considered] in context," a reasonable investor would have understood Defendants' statements to address Avaya's long-term financial performance – now tied to the lifespan of the new recurring contracts – not Avaya's expected third quarter performance. See City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc., 153 F.4th 288, 298 (2d Cir. 2025) ("A reasonable investor would have understood [the] statement[s] to address long-term growth trends rather than sequential quarter-over-quarter changes.").

In arguing that Avaya could not accurately "forecast revenue" premised on its new subscription-based contracts, Plaintiff relies on the following allegations from CW-1:

> Avaya's revenues got a one-time boost during a quarter when the Company recognized a large portion of the new contract upon signing. This one-time boost, however, meant that Avaya could not project revenue into future quarters consistent with the boosted revenue numbers. Specifically, once Avaya recognized a large portion of revenue upon a contract signing, the recognizable revenue for those contracts would drop significantly to a pro rata amount each month over the life of the contracts.

(Am. Cmplt. (Dkt. No. 93) ¶ 79) Acknowledging that much of the revenue from a subscription contract would be recognized in the quarter that the contract was signed – with the remaining revenue recognized over subsequent months – neither CW-1 nor Plaintiff explain why these circumstances made it impossible for Avaya to accurately forecast its revenue. CW-1's ipse dixit assertion that Avaya's new revenue model made it impossible to forecast revenue merely repeats the allegations set forth in the Amended Complaint, and is insufficient to demonstrate that the challenged statements were false and misleading. Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("[A]s is obvious, confidential sources cannot be used to 'merely parrot [ ] . . . conclusory allegations contained in the complaint.'").

In challenging these revenue-related statements, Plaintiff also ignores Defendants' disclosures concerning the revenue-related effects of the migration to subscription contracts. For example, during the May 10, 2022 earnings call, Chirico acknowledged the "rather significant point in time decrease," which he attributed to the fact that "revenue is now ratable over the life of the contract and not point-in-time." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9; Am. Cmplt. (Dkt. No. 93) ¶ 150 (emphasis in Am. Cmplt. omitted)) McGrath also highlighted the negative impact of the "migration" to "cloud deals" on Avaya's revenue during the second quarter of 2022. (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9) He explained that the second-quarter miss was due in part to "all of this point-in-time related to these longer-term subscription and cloud deals that we're signing," and that "we need to get a better arm around that." (Id.) He acknowledged that Avaya saw "lower realization rates [in the second quarter of 2022], and that's what we've built into our model going forward." (Id.) And in the May 2022 Form 10-Q, Defendants acknowledged that Avaya's cash flow "continues to be negatively impacted by our transition from an ownership model with an existing on-premise solution, to a usage model with our OneCloud portfolio." (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 60) In sum, when Defendants' statements are considered in context, a reasonable investor would have understood that Avaya's shift from non-recurring contracts to recurring subscription-based contracts had negatively impacted Avaya's revenue.

In asserting that the new subscription contracts "were short in duration and had poor margins," Plaintiff relies on CW-1's allegation that Avaya offered existing customers "steep discounts" of "about 50 percent" to cancel their existing "maintenance" contracts and sign new subscription-based contracts. (Am. Cmplt. (Dkt. No. 93) ¶ 78) Plaintiff also cites CW-2's

description of "deal desk" meetings – which McGrath "often" and Chirico "sometimes" attended – during which "sales team members would request approval for steeper discounts . . . than they were normally permitted," and "sales managers recognized [that] the 'margins were shitty' on many of the deals." (Id. ¶¶ 82-83) CW-2 also purports to describe discussions among Avaya executives and Area Sales Managers – for which CW-2 was not present – that "would have highlighted how close to or far off each territory was to its quarterly revenue targets." (Id. ¶ 87)

Neither CW-1 nor CW-2 communicated with Defendants about these matters, however, and neither witness provides specific information about the "margins" of the new contracts or the "discounts" offered to existing customers.[14] Moreover, neither witness asserts that specific information about margins and discounts was presented to Defendants. And given that CW-2 left Avaya prior to the Class Period and did not attend the Area Sales Manager meetings that he purports to describe, his account has little probative value.

In sum, the allegations made by CW-1 and CW-2 do not demonstrate that Avaya's new subscription-based contracts were so "short in duration" and had such "poor margins" that Avaya was not well-positioned to meet its third quarter projections when the challenged statements were made. See In re Doral Fin. Corp. Sec. Litig., 563 F.Supp.2d 461, 466 (S.D.N.Y. 2008) ("former Doral internal auditor" "stated that he personally attended [Doral] Audit Committee meetings where representatives from defendant PwC were in attendance and the reports of the Internal Audit Department [which raised questions about the sufficiency of Doral's internal control] were discussed"; court concluded that information provided by the former internal auditor was "so vague as to be meaningless"); see also Local No. 38 Int'l Bhd. of

[14] CW-1 "estimated that the discounts for existing contracts were about 50 percent" (id. ¶ 78), but the Amended Complaint does not explain what the basis is for CW-1's estimate.

Elec. Workers Pension Fund v. Am. Exp. Co., 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (confidential sources' allegations insufficient to support securities fraud claim where "Plaintiff identifies no specific report . . . showing that the Individual Defendants were aware their public statements were contradicted by adverse . . . data"), aff'd , 430 F. App'x 63 (2d Cir. 2011).

The Amended Complaint also asserts that Defendants' statements concerning future revenue were misleading because they omit Avaya's "declining pipeline of existing legacy customers" eligible to switch to the OneCloud service. (Am. Cmplt. (Dkt No. 93) ¶ 125) But the Amended Complaint does not provide any data as to the number of existing legacy customers before the challenged statements were made, at the time the challenged statements were made (between May 10, 2022 and June 27, 2022), or after the challenged statements were made. Absent data demonstrating the significance of the decline, Plaintiff's conclusory allegation is not sufficiently particular to show that the number of existing eligible customers was declining at such a rate that – at the time Defendants made the challenged statements regarding future revenue – Avaya was not "well-positioned" to meet its quarterly projections. See Local No. 38, 724 F. Supp. 2d at 461; see also City of Hialeah Employees' Retirement System, 153 F.4th at 296 (finding that "plaintiffs failed to plead with particularity that demand had softened" by the time the challenged statements were made; complaint "relied primarily on confidential witness accounts [that] were inconsistent regarding when demand began to decline").

In sum, the Amended Complaint does not plead facts demonstrating that the above-challenged statements regarding future revenue were false or misleading.

### 2. Statements Regarding the $350 Million in Convertible Notes Due in June 2023

The Amended Complaint asserts that McGrath made the following false and misleading statements regarding Avaya's debt obligations during the May 10, 2022 earnings call:

- "In the [second] quarter, cash flow from operations was aided by a restructuring of our interest rate swap contracts, which extended our interest rate protection for an additional 3 years now extended to cover the periods from 2024 to 2027 and resulted in net cash proceeds of $52 million. ***This is the most recent in a series of actions taken by Avaya over the last 2.5 years to strengthen our capital structure and enhance our financial flexibility, including the measures taken to improve our weighted average debt maturity profile. We are also currently evaluating options to boost liquidity and to address the convertible notes, which come due in June of 2023.***" (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 6 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 147 (emphasis in Am. Cmplt.))

- "Sure. So I mean, obviously, we are well aware that in June of '23, we had the $350 million convert coming due. ***We're working with our banking colleagues to address the convert. We expect to actually act here in the reasonably near future on doing that. I should also just also point out that we also have the [asset-based loan] of $100 million to $150 million that we also have on hand to leverage it. But I think that we should be able to address the prepayment of the convert, if you will, or the prefunding of the convert coming up in the next several months.***" (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 9 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 149 (emphasis in Am. Cmplt.))

The Amended Complaint also asserts that McGrath's statement in Avaya's June 27, 2022 press release announcing the $600 million in financing was false and misleading: "***[t]his funding supports and accelerates our business model transformation*** and addresses our convertible notes maturing in June of next year." (Hull Decl., Ex. D (June 27, 2022 Press Release) (Dkt. No. 108-7) at 3 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 158 (emphasis in Am. Cmplt.))

According to Plaintiff, these statements are false and misleading because they omit the fact that "Avaya was not well-positioned to execute on its growth strategy," and that it

would be "impossible" for Avaya to meet the earnings it had projected for the third quarter of 2022. (Am. Cmplt. (Dkt. No. 93) ¶¶ 152, 159) In so alleging, Plaintiff repeats the same arguments addressed above, including that the nature of Avaya's new subscription-based contracts rendered it impossible for the Company to accurately forecast revenue, and that the "short [] duration and [] poor margins" of the new contracts and the declining number of legacy customers meant that the Avaya would not meet its earnings targets for the third quarter of 2022. (Id.)

These arguments are rejected for the same reasons discussed above. The Amended Complaint does not allege with sufficient particularity that the challenged statements made by McGrath during the May 10, 2022 earnings call and in the June 27, 2022 press release were false and misleading as to whether Avaya would meet its projections for the third quarter of 2022.

### 3. Statement Concerning Avaya's "Installed-Base"

The Amended Complaint challenges McGrath's statement to a Barclays analyst that "[a]pproximately 12% of AVAYA's overall installed-base has been moved to part of its OneCloud offering." (Am. Cmplt. (Dkt. No. 93) ¶ 154 (emphasis omitted)) The Amended Complaint also challenges a similar statement in a June 2022 investor presentation that *"~12% of [the installed] Seat base [was] on OneCloud."* (Am. Cmplt. (Dkt. No. 93) ¶ 156 (emphasis in Am. Cmplt.)) Plaintiff argues that these statements are false and misleading because they "create the impression that the Company still had the opportunity to transition a significant percentage of its legacy customers to OneCloud." (Id.)

The Amended Complaint does not plead facts suggesting that the 12% figure for transitioned Avaya customers was false, however, nor does the Amended Complaint allege how many legacy customers – at that time – were eligible to transition to OneCloud. The conclusory

allegation that there was a declining number of legacy customers eligible for transition – and that these circumstances rendered it impossible for Avaya to meet its third quarter projections – is not sufficient to support a claim. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so.").

**4. Statements About Avaya's Disclosure Controls and Procedures**

The Amended Complaint challenges a statement in the May 10, 2022 Form 10-Q asserting that "***the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of March 31, 2022 to provide reasonable assurance that information required to be disclosed by the Company***" would be disclosed. (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 67 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 139 (emphasis in Am. Cmplt.)) The Amended Complaint also challenges a slide in the investor presentation attached to the May 10, 2022 Form 8-K that highlights "Avaya's '***Tone at the Top Culture***' and '***Robust Risk Management***' as key factors '***Enhancing Sustainable Value.***'" (Hull Decl., Ex. A (May 10, 2022 Investor Presentation) (Dkt. No. 108-4) at 35; Am. Cmplt. (Dkt. No. 93) ¶ 135 (emphasis in Am. Cmplt.))

According to Plaintiff, Avaya's statements regarding "tone at the top" are false and misleading, because Avaya does not disclose that it had an "inappropriate 'tone at the top.'" (Am. Cmplt. (Dkt. No. 93) ¶ 142) In this regard, Plaintiff cites the Audit Committee's 2023 finding to that effect. (Id.; September 8, 2023 Form 10-Q, Han Decl., Ex. 12 (Dkt. No. 110-14) at 11)

The statement that Defendants had "concluded" that Avaya's "disclosure controls and procedures were effective" as of March 31, 2022 is not actionable, because "Plaintiff[] offer[s] no allegation that management had not so concluded, nor any other reason to believe that

[this] statement[] [was] false when [it was] made." Schiro v. Cemex, S.A.B. de C.V., 396 F.Supp.3d 283, 299 (S.D.N.Y. 2019) ("Although Cemex later disclosed that its financial controls had not been effective during this time period, the 2014 and 2015 statements did not state that the Company's internal controls were effective – they stated only that management had concluded as much.") (internal citations omitted) (emphasis in Schiro)).

Moreover, Defendants' statements regarding Avaya's internal controls are "too general to cause a reasonable investor to rely upon [them]." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009) ("ECA") (internal citation omitted). "[M]ere[ ] generalizations regarding [a defendant's] business practices . . . are 'precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable.'" Id. (quoting Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996); see also In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31, *36 (S.D.N.Y. Sept. 28, 2012) (general statements "concerning [defendant's] compliance with legal and ethical standards" were mere puffery where defendant did not "assert[ ] that its financial success was attributable to its adherence to laws or to a particular advantage it had over its peer institutions"). A reasonable investor would not rely on such statements because they "do not purport to guarantee that [the company's] controls will perform perfectly in every instance; instead, they speak to 'reasonable assurance' [. . .]." In re Banco Bradesco S.A. Sec. Litig., 277 F.Supp.3d 600, 648 (S.D.N.Y. 2017).

## III. WHETHER CHALLENGED STATEMENTS ARE SUBJECT TO THE PSLRA SAFE HARBOR

### A. Applicable Law

#### 1. Forward-Looking Statements

"The PSLRA established a statutory safe-harbor for forward-looking statements." Slayton v. Am. Exp. Co., 604 F.3d 758, 765 (2d Cir. 2010). Under the PSLRA, where a

> private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a [defendant] shall not be liable with respect to any forward-looking statement . . . if and to the extent that –
>
> (A) the forward-looking statement is –
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement –
>
> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>
> (ii) if made by a business entity; was –
>
> (I) made by or with the approval of an executive officer of that entity; and
>
> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1); see also In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245-46 (2d Cir. 2016) (Under the PSLRA's safe harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" "Because

'[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." (internal citation omitted) (quoting Slayton, 604 F.3d at 766)).

The PSLRA defines "[t]he term 'forward-looking statements'" broadly to include, inter alia, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items"; "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." 15 U.S.C. §§ 78u-5(i)(1)(A), (B), (C). "Forward-looking statements" also include "any statement of the assumptions underlying or relating to any statement described" in the definition. 15 U.S.C. § 78u-5(i)(1)(D). A "statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." Vivendi, 838 F.3d at 246 (internal quotation marks and citations omitted).

### 2. Mixed Present and Future Statements

"Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." Maverick Fund, L.D.C. v. Comverse Tech., Inc., 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011) (citing, inter alia, Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.")); see also Vivendi, 838 F.3d at 246. "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection

attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." Maverick Fund, 801 F. Supp. 2d at 59 (citing Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255-56 (3d Cir. 2009)) (holding that a company's statements that it was "on track" to meet a future projection did "not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor"). This is because "'[s]uch an assertion is necessarily implicit in every future projection.'" Id. (quoting Avaya, 564 F.3d at 255); see also Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'") (quoting Avaya, 564 F.3d at 255).

### 3. Meaningful Cautionary Language

"The safe harbor protects forward-looking statements that are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Slayton, 604 F.3d at 770 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "'To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.'" Vivendi, 838 F.3d at 247 (quoting Slayton, 604 F.3d at 772). Moreover, "[t]he cautionary language must be 'extensive and specific' and 'tailored to the specific future projections, estimates, or opinions' in the statements that plaintiffs challenge." Bettis v. Aixtron SE, No. 16 CIV. 00025 (CM), 2016 WL

7468194, at *13 (S.D.N.Y. Dec. 20, 2016) (quoting Slayton, 604 F.3d at 772). "'Vague' disclaimers are inadequate." Vivendi, 838 F.3d at 247 (quoting Slayton, 604 F.3d at 772).

"[A] defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor[, however]." Slayton, 604 F.3d at 773. To satisfy the "meaningful" requirement, cautionary language need only "identif[y] with specificity the types of risks that might lead [ ] estimates to be inaccurate." In re Barrick Gold Sec. Litig., No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015); see also In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) ("[A] projection may benefit from the PSLRA safe harbor for forward-looking statements so long as defendants also 'point[ed] to the principal contingencies that could cause actual results to depart from the projection.'") (quoting Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004)).

Moreover, where – as here – a company's earnings call refers to SEC filings containing cautionary statements, the statements in the earnings calls may qualify for protection under the safe harbor based on the contents of the corporate filings. See In re Avon Prods., Inc. Sec. Litig., No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at *18 (S.D.N.Y. Feb. 23, 2009), report and recommendation adopted, No. 05 Civ. 06803 (LAK), 2009 WL 10698359 (S.D.N.Y Mar. 18, 2009) ("[O]ral statements . . . will come within the safe harbor provision if cautionary language is found in a 'readily available written document,' 15 U.S.C. § 78u–5(c)(2), [such as] 'SEC filed documents, annual reports and other widely disseminated materials, such as press releases,' H.R. Rep. 104-369, at 45 (1995) (Conf. Rep.)."); Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232-33 (S.D.N.Y. 2009) (forward-looking statements made during conference calls with analysts were protected under the first prong of the safe harbor

because, during these calls, a corporate representative referred investors to meaningful cautionary language included in a press release).

## B. Analysis

### 1. Alleged Forward-Looking Statements

The Amended Complaint challenges Chirico's statement in the press release attached to the May 2022 Form 8-K that "[t]he path to hit the $1 billion [Annualized Recurring Revenue] mark by the end of calendar year 2022 is well paved." (Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 6; Am. Cmplt. (Dkt. No. 93) ¶ 134 (emphasis in Am. Cmplt. omitted)) Chirico largely repeats this statement during the May 10, 2022 earnings call. (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3; Am. Cmplt. (Dkt. No. 93) ¶ 143)

This statement about future earnings is forward-looking because it "contain[s] a projection of revenues, income (including income loss), [or] earnings (including earnings loss) per share." 15 U.S.C. § 78u-5(i)(1)(A); see also Slayton, 604 F.3d at 769 (statement that "[t]otal losses . . . for the remainder of 2001 are expected to be substantially lower than in the first quarter" is "plainly forward-looking" because "it projects results in the future"). This statement also constitutes non-actionable puffery, because "a reasonable investor would not have been misled" by this "expression of corporate optimism." City of Hialeah Employees' Retirement System, 153 F.4th at 299-300 (characterization of company's inventories as "healthy" is puffery) (citing Leadersel Innotech ESG v. Teladoc Health, Inc., No. 23-1112, 2024 WL 4274362, at *3 (2d Cir. Sept. 24, 2024) ("These 'vague positive statements' regarding the integration – including phrases like 'going really great,' 'continues to progress,' 'well on the way,' and 'on track' – are 'too general to cause a reasonable investor to rely upon them and therefore are precisely the type

of puffery that this and other circuits have consistently held to be inactionable.'") (alterations omitted))).

Plaintiff also complains that "Defendants certified a statement that the Company would remain solvent through the end of 2022 with the knowledge that due to the state of Avaya's business, it would be 'impossible' to meet the 3Q FY 2022 guidance." (Am. Cmplt. (Dkt. No. 93) ¶ 142) Again, such "projection[s] of revenues, income (including income loss), [or] earnings (including earnings loss) per share" are forward-looking. 15 U.S.C. §§ 78u-5(i)(1)(A) Moreover, as discussed below, the Amended Complaint does not adequately allege that Defendants' certification "was made with actual knowledge that it was false or misleading." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016).

**2. Cautionary Language**

"To be protected under the first prong of the safe harbor, . . . a forward-looking statement must be both identified as such and 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Slayton, 604 F.3d at 769. Defendants argue that the challenged statements regarding expected revenue growth and solvency in the May 2022 Form 8-K, the May 10, 2022 earnings call, and the May 2022 Form 10-Q fall within the safe harbor because they are accompanied by cautionary language. (Chirico Br. (Dkt. No. 108-1) at 17; McGrath Br. (Dkt. No. 110-1) at 16-17)

The May 10, 2022 press release contains language specifically warning that the "release contains certain 'forward-looking statements'" that are based on Avaya's "current expectations, assumptions, estimates and projections." (Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 16) The press release goes on to say that "such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of

which are beyond [the Company's] control." (Id.) The press release then lists a number of "[r]isks and uncertainties that may cause these forward-looking statements to be inaccurate," including, "among others":

> termination or modification of current contracts which could impair attainment of our OneCloud [Annualized Recurring Revenue] metric; the duration, severity and impact of the coronavirus pandemic ("COVID-19")[; and] the impact of the Russia/Ukraine conflict on the global economy and our business . . . .

(Id.)

The press release also refers investors to "other [risk] factors discussed in the Company's Annual Report on Form 10-K and subsequent quarterly reports on Form 10-Q filed with the [SEC]." (Id.) The May 2022 Form 10-Q states that Avaya's "cash flow from operations continues to be negatively impacted by our transition from an ownership model with an existing on-premise solution, to a usage model with our OneCloud portfolio." (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 60)

During the May 10, 2022 earnings call, the Company informed listeners that "[w]e may make forward-looking statements that are based on current expectations, forecasts and assumptions, which remain subject to risks and uncertainties that could cause actual results to differ materially," and advised investors to read more about the relevant "risks and uncertainties" in Avaya's SEC filings. (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3)

In sum, Avaya issued cautionary language concerning its revenue projections, and warned that the "termination or modification of current contracts" (Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 16) and the Company's "transition from an ownership model . . . to a usage model" (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 60) could render its revenue projections inaccurate. Because these cautionary statements "did

more than refer to the most general of economic risks," and "point[ed] to the principal contingencies that could cause actual results to depart from the projection[s]," they "effectively secure[ ] the protection of [the] safe harbor for [Defendants'] forward-looking statements." Gissin, 739 F. Supp. 2d at 509, 511 (internal quotation marks and citations omitted)

**3. Statements of Opinion**

**a. Applicable Law**

Statements of opinion "include subjective statements that reflect judgments as to values that [are] not objectively determinable." In re Gen. Elec. Co. Sec. Litig., 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). For example, "[s]tatements that 'express expectations about the future rather than presently existing, objective facts' are . . . statements of opinion." In re Aratana Therapeutics Inc. Sec. Litig., 315 F.Supp.3d 737, 758 (S.D.N.Y. 2018) (quoting Fialkov v. Alcobra Ltd., No. 14 CIV. 09906 (GBD), 2016 WL 1276455, at *6 (S.D.N.Y. Mar. 30, 2016)). "Such statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." Id. (citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 183-84 (2015)).

To adequately allege that a statement of opinion was misleading because of the omission of material information, an

> investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (quoting Omnicare, 575 U.S. at 194).

Establishing liability on such a theory "'is no small task.'" Id. (quoting Omnicare, 575 U.S. at 194). "'[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts'"; therefore, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" Id. at 210 (quoting Omnicare, 575 U.S. at 189). Moreover, "'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" Id. (quoting Omnicare, 575 U.S. at 190). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id. (quoting Omnicare, 575 U.S. at 189).

**b. Analysis**

The Amended Complaint challenges the following statements of Defendants as set forth in Avaya's May 2022 Form 10-Q:[15]

- "***We believe that our existing cash and cash equivalents of $324 million as of March 31, 2022 and borrowings available under the [Asset-Based Loan] Credit Agreement will be sufficient to meet our future cash requirements for at least the next twelve months from the filing of this quarterly report on Form 10-Q.*** Our ability to meet these requirements will depend on our ability to generate cash in the future, which is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our cash flow from operations continues to be negatively impacted by our transition from an ownership model with an existing on-premise solution, to a usage model with our OneCloud portfolio." (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 60 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 140 (emphasis in Am. Cmplt.))

- "Customers purchasing a solution in our OneCloud portfolio generally pay cash over time rather than upfront. ***We believe that our financial resources, along with appropriate management of discretionary expenses, will allow us to manage the temporary impacts of our business transformation, COVID-19 and the Russia/Ukraine conflict on our business operations, and specifically our liquidity, for the foreseeable***

[15] As noted above, Defendants do not dispute that these statements are attributable to both Defendants. (Chirico Br. (Dkt. No. 108-1) at 24; McGrath Br. (Dkt No. 110-1) at 13)

> ***future***. We expect to seek incremental financing to fund the maturity of the $350 million Convertible 2.25% Senior Notes due June 15, 2023. There can be no assurance we will be able to obtain such financing on acceptable terms." (Hull Decl., Ex. B (May 10, 2022 Form 10-Q) (Dkt. No. 108-5) at 60-62 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 140 (emphasis in Am. Cmplt.)

As an initial matter, the Amended Complaint pleads no facts contesting the statements of historical fact contained in the above. For example, Plaintiff does not dispute that – as of May 10, 2022 – Avaya had $324 million in cash and cash equivalents, as well as $350 million in convertible 2.25% senior notes due on June 15, 2023. Nor does Plaintiff dispute that Avaya's ability to meet its debt obligations would depend on the Company's "ability to generate cash in the future, which is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond [the Company's] control." Plaintiff also does not dispute that Avaya's "business transformation" to OneCloud, the COVID-19 pandemic, and the conflict between Russia and Ukraine all affected Avaya's business operations. Finally, the Amended Complaint alleges no facts suggesting that Defendants did not subjectively believe that the Company's existing cash, cash equivalents, and borrowings would be sufficient to meet future cash requirements for the 2022-2023 fiscal year, notwithstanding the Company's transition to OneCloud, the COVID-19 pandemic, and the conflict between Russia and Ukraine.

As to the statements Plaintiff does challenge, they are prefaced with the phrase "[w]e believe." Statements of belief constitute an opinion because they "express expectations about the future." In re Aratana Therapeutics, 315 F.Supp.3d. at 758 (statements of opinion, "often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading"); see also Frankfurt-Trust Inv. Luxemburg AG v. United Tech. Corp., 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018) (statements that company "see[s] topline

momentum," "still expect[s] . . . high single-digit growth," "expect[s] stronger commercial aftermarket," is "on the right track," and that "operationally . . . things [are] moving along exactly in line with what we thought" were statements of opinion).

The Amended Complaint also challenges the following statements made by McGrath on June 3, 2022 to a Barclays analyst:

- Avaya "management discussed ***progress on their path to refinancing 2023's $350 mil. in convertible debt coming due. They noted the company believes the 'best option' is a $450-$500 mil. term loan add on (providing additional liquidity beyond the $350 mil. due).***" (Am. Cmplt. (Dkt. No. 93) ¶ 153 (emphasis in Am. Cmplt.))

- "[R]emoving the convert overhang (without dilution) would be a positive for [shareholder] equity." (Am. Cmplt. (Dkt. No. 93) ¶ 153)

McGrath's expressed belief that an additional loan of $450-$500 million would assist the Company in meeting its debt obligations is a statement of opinion. See In re Aratana Therapeutics, 315 F.Supp.3d. at 758. Likewise, the statement that addressing the convertible debt issue "would be a positive" for shareholder equity reflects a subjective belief or opinion. See Gray v. Wesco Aircraft Holdings, Inc., 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021) (statement that "the Board believed that the fairness opinions . . . were a 'positive factor[]' . . . [is a] classic statement[] of opinion"). Finally, the Amended Complaint does not plead facts demonstrating that McGrath did not genuinely believe that an additional loan of $450-$500 million would assist the Company in satisfying its debt obligations, and that addressing the convertible debt issue would have a positive impact on shareholder equity.

For all these reasons, the above statements from Avaya's May 2022 Form 10-Q are non-actionable opinion.

### 4. Puffery

#### a. Applicable Law

"Puffery" includes "statements [that] are too general to cause a reasonable investor to rely upon them," ECA, 553 F.3d at 206, and thus "cannot have misled a reasonable investor." San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996). Such statements "lack the sort of definite positive projections that might require later correction." Id. (quoting In re Time Warner, 9 F.3d at 259, 267 (2d Cir. 1993)). It is well-settled that

> "expressions of puffery and corporate optimism do not give rise to securities violations. Up to a point, companies must be permitted to operate with a hopeful outlook: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."

Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018), vacated in part on other grounds sub nom. Abramson v. NewLink Genetics Corp., 965 F.3d 165 (2d Cir. 2020)), (quoting Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (alteration in Nguyen omitted)).

"On the other hand, pollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant," id., "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015) (internal quotation marks and citations omitted). Although there is no definitive test to determine how vague a statement must be to qualify as puffery, "statements expressing a general view that 'things are going well,' that the company is 'well positioned,' or that a year was 'successful' are generally not

actionable." In re Nevsun Res. Ltd., No. 12 CIV. 1845 (PGG), 2013 WL 6017402, at *10 (S.D.N.Y. Sept. 27, 2013).

**b. Analysis**

The Amended Complaint challenges the following statements made by Chirico during the May 10, 2022 earnings call and in the May 10, 2022 press release:

- "***We are successfully repositioning the company from our historic one-time revenue model to a recurring one, in fact 75% of our new bookings were Avaya OneCloud. Our strategy is clearly taking hold faster than we anticipated leading to a significant and fundamental shift in our business***." (Hull Decl., Ex. A (May 10, 2022 Press Release) (Dkt. No. 108-4) at 6 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 134 (emphasis in Am. Cmplt.))

- "***Let me begin by thanking our global team as they continue to exceed expectations in implementing and driving the strategy we've laid out.*** We are delivering Avaya OneCloud solutions to our customers at an accelerated rate and continue to make significant headway on our multi-year transformational journey to a cloud and SaaS [Software as a Service] business model." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 143 (emphasis in Am. Cmplt.))

- "***These metrics serve [as proof] positive that we are successfully repositioning the company from our historic onetime revenue model to a recurring one. Our strategy is taking hold faster than we had anticipated, leading to a significant shift in our fundamental business model***." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 3 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 143 (emphasis in Am. Cmplt.))

- "Now I'd like to emphasize some key performance highlights ***that will further demonstrate the underlying strength of our business***. Avaya OneCloud [Annualized Recurring Revenue] is our most important performance metric. It holistically measures the overall strength of our cloud portfolio, whether delivered in a hybrid[,] private[,] or public model. Our OneCloud [Annualized Recurring Revenue] grew 21% sequentially and is up 118% year-over-year. In addition, we yet again signed over 1,400 new logos this quarter. There is no better proof that Avaya is well positioned to be the brand of choice for digital communication solutions. ***This impressive growth underscores the strength of our solutions and the commitment of our customers as we move them to cloud-based solutions***." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No.

108-6) at 4 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 144 (emphasis in Am. Cmplt.))

- "***We have increased confidence in the momentum of our business. We are committed to delivering business impacting innovation, maintaining our competitive edge, and we continue to focus on the long game, investing in growth drivers and doing so profitably***." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 5 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 144 (emphasis in Am. Cmplt.))

- "[T]he significant progress we saw this quarter signifies our strategy is taking hold and this shift is reflected in our revised second half guidance." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 7; Am. Cmplt. (Dkt. No. 93) ¶ 148)

- "I'm excited about Avaya's future and even more excited about our team's ability to deliver on the opportunity in front of us." (Hull Decl., Ex. C (May 10, 2022 Earnings Call) (Dkt. No. 108-6) at 7; Am. Cmplt. (Dkt. No. 93) ¶ 148)

The Amended Complaint also challenges a statement contained in the investor presentation attached to the May 10, 2022 Form 8-K that highlights Avaya's "***[c]ontinued large deal activity***."[16] (Hull Decl., Ex. A (May 10, 2022 Investor Presentation) (Dkt. No. 108-4) at 47; Am. Cmplt. (Dkt. No. 93) ¶ 136 (emphasis in Am. Cmplt.))

The Amended Complaint does not plead facts contradicting the statements of historical fact set forth above. For example, Plaintiff does not dispute that (1) "75% of [Avaya's] new bookings were Avaya OneCloud"; (2) Avaya was "delivering Avaya OneCloud solutions to [its] customers at an accelerated rate"; (3) Avaya's "OneCloud [Annualized Recurring Revenue] grew 21% sequentially and is up 118% year-over-year"; and (4) Avaya "signed over 1,400 new

[16] As set forth in the investor presentation, the full sentence cited by Plaintiff reads as follows: "Continued large deal activity with 97 deals over $1 million, 18 over $5 million, 8 over $10 million and 2 over $25 million." (Hull Decl., Ex. A (May 10, 2022 Investor Presentation) (Dkt. No. 108-4) at 47) The Amended Complaint does not plead facts contradicting any of the historical facts referenced in this sentence.

logos this quarter."[17] In other words, Plaintiff does not challenge the grounds upon which Defendants based their optimistic view of Avaya's second quarter performance. Plaintiff instead repeats his claim that Defendants knew – when they made these statements – that "Avaya was not well-positioned" to meet its third quarter projections. (Am. Cmplt. (Dkt. No. 93) ¶¶ 137, 152)

Chirico's statements regarding the "successful[] repositioning," "strength," "momentum," "growth," and "progress," of Avaya's business constitute puffery, however, as these statements are "too general to cause a reasonable investor to rely upon them." ECA, 553 F.3d at 206 (statements regarding "'highly disciplined' risk management and [] standard-setting reputation for integrity" are puffery); see also City of Hialeah Employees' Retirement System, 153 F.4th at 299 ("[A] reasonable investor would not have been misled because the characterization of the inventories as 'healthy' was the type of expression of corporate optimism that we consider non-actionable puffery."). Statements about (1) Avaya's global sales team "exceed[ing] expectations"; (2) Avaya's "ability to deliver"; (3) Avaya's "strategy . . . taking hold"; (4) the "commitment of [Avaya's] customers," and (5) Avaya's "continued large deal activity" are likewise puffery. See id. (citing Teladoc, 2024 WL 4274362, at *2 ("'[V]ague positive statements' . . . like 'going really great,' 'continues to progress,' 'well on the way,' and 'on track' . . . are precisely the type of puffery that this and other circuits have consistently held to be inactionable'"); see also Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc., 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (statements such as "we think the future of fitness is in the home"; "we think 2022 is going to be a fantastic year";

[17] The term "logos" is not explained in the Amended Complaint or the documents referenced in the Amended Complaint.

"[we] feel like [at home fitness] is a trend that's here to stay"; and "COVID has been a tailwind for our demand" and "we see continued momentum in [the] foreseeable future," "are 'textbook cases' of corporate optimism"). These broad generalizations do not "amount to a guarantee that [the Company's] choices would prevent failures in its [business] practices." ECA, 553 F.3d at 206. Nor do they "convey concrete and verifiable information about [the Company's] operations." In re AppHarvest Sec. Litig., 684 F.Supp.3d 201, 260 (S.D.N.Y. 2023) (distinguishing statements of puffery from "'testable binary proposition[s,]'" such as "COVID has not in any way impacted our operation") (quoting Duran v. Henkel of Am., Inc., 450 F. Supp. 3d 337, 348 (S.D.N.Y. 2020)).

In sum, the challenged statements listed above constitute non-actionable puffery.

## IV. SCIENTER

The Amended Complaint alleges that Defendants "intended to mislead the investing public or were reckless as to the possibility of misleading the investing public." (Am. Cmplt. (Dkt. No. 93) ¶ 160) Defendants contend that the Amended Complaint does not adequately plead scienter as to either Defendant. (Chirico Br. (Dkt. No. 108-1) at 27-31; McGrath Br. (Dkt. No. 110-1) at 25-29)

### A. Applicable Law

To plead scienter, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324). "In determining whether a strong inference

exists, the allegations are not to be reviewed independently or in isolation"; rather, "the facts alleged must be 'taken collectively.'" Id. (quoting Tellabs, 551 U.S. at 322-23).

"The plaintiff may satisfy [this pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." ECA, 553 F.3d at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

"Motive to commit fraud entails 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Cannavest, 307 F. Supp. 3d at 244 (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). In alleging motive, "[a] plaintiff may not rely on 'motives possessed by virtually all corporate insiders,' . . . [and] instead must allege 'that defendants benefitted in some concrete and personal way from the purported fraud.'" Id. (quoting Novak, 216 F.3d at 307-08). Generic motives, such as "'the desire for the corporation to appear profitable,' as well as 'the desire to keep stock prices high to increase officer compensation,' are 'insufficient[.]'" Id. (quoting Kalnit, 264 F.3d at 139).

To plead conscious misbehavior or recklessness, Plaintiff must allege conduct that is, "at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (internal quotation marks and citation omitted). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Chill v. Gen.

Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (citation and quotation marks omitted). "The plaintiff may allege that the defendants 'knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor.'" Blank v. TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 214 (S.D.N.Y. 2018) (quoting Nathel v. Siegal, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008)). "Although this is a highly fact-based inquiry, . . . '[s]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" Kalnit, 264 F.3d at 142 (quoting Novak, 216 F.3d at 308).

The scienter standard for forward-looking statements is, however, higher than for statements of current fact. Under the safe harbor provision of the PSLRA, forward-looking statements are actionable only if they are made with actual knowledge of falsity. See Slayton, 604 F.3d at 773 ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.") (internal quotation marks and citation omitted).

## B. Analysis

### 1. Motive and Opportunity

The Amended Complaint alleges that Defendants were motivated "to secure financing commitments from third-parties to address $350 million in debt coming due in June 2023, hold off impending insolvency, and avoid bankruptcy." (Am. Cmplt. (Dkt. No. 93) ¶ 161) The Amended Complaint further alleges that Defendants "had incentive to inflate Avaya's

common stock price," because a portion of their compensation was in the form of Avaya stock. (Id. ¶ 162)

An executive's motive to secure financing for his or her company, or to increase the executive's compensation, is the type of motive possessed by most corporate officers, however, and such common motives are not sufficient to demonstrate "motive" for scienter purposes. See, e.g., ECA, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); In re Aratana Therapeutics, 315 F.Supp.3d. at 765 ("'[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden . . . are insufficient to raise a scienter inference.'" (quoting In re GeoPharma, Inc. Sec. Litig., 399 F.Supp.2d 432, 450 (S.D.N.Y. 2005)) (alterations in In re Aratana Therapeutics Inc.)).

The inference of scienter is especially weak where, as here, neither Defendant is alleged to have sold company shares during the Class Period. See In re DraftKings Inc. Sec. Litig., 650 F.Supp.3d 120, 175 (S.D.N.Y. 2023) (inference of scienter undermined where defendants did not sell stock during the class period); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) ("[T]he fact that neither [the chief financial officer] nor [the chief executive officer] sold stock during the putative class period undermines plaintiffs' motive allegations against defendants."); San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996) ("In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the

company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.")

The Court concludes that the Amended Complaint does not plead facts demonstrating that Defendants had a motive to commit fraud.

### 2. Conscious Misbehavior and Recklessness

The Amended Complaint alleges that Defendants knew that (1) "Avaya's business model was doomed to fail as the Company was experiencing a declining pipeline of existing legacy customers (with expiring maintenance contracts) eligible for migration to the Company's subscription product"; and (2) "Avaya was not on track to meet" its third quarter projections. (Am. Cmplt. (Dkt. No. 93) ¶ 2) In arguing that Defendants exhibited conscious misbehavior and recklessness, Plaintiff cites the following:

#### a. The Content of Defendants' Statements and Their Positions at Avaya

The Amended Complaint alleges that a strong inference of scienter arises from (1) the content of Defendants' alleged misstatements, because they "concerned the most significant initiatives and issues in Avaya's business"; (2) Defendants' "sophisticat[ion]"; and (3) Defendants' "positions" at Avaya. (Am. Cmplt. (Dkt. No. 93) ¶¶ 163, 166)

As to the content of the alleged misstatements, Plaintiff appears to invoke the "core operations" doctrine, under which "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." In re AppHarvest Sec. Litig., 684 F. Supp. 3d at 246 (citing Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc., 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023) (quoting City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020)).

Although "the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, [] it is not independently sufficient to raise a strong inference of scienter." In re Rockwell Med., Inc. Sec. Litig., No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (internal quotation marks and alterations omitted). Accordingly, Defendants' positions as CEO and CFO are not sufficient – standing alone – to support an inference of scienter. See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010). ("Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."); In re Turquoise Hill, 625 F. Supp. 3d at 240 (citing Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may not infer scienter 'solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'" (quoting In re Winstar Commc'ns, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006))).

Plaintiff argues, however, that "[t]he content and context of Defendants' statements are themselves 'powerful evidence of scienter.'" (Pltf. Opp. (Dkt. No. 112) at 54 (quoting Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 269 (3d Cir. 2009). In Avaya, Inc., however, the defendant CFO "did not simply make statements inconsistent with the existence of widespread and unusual discounting; he explicitly denied the existence of such discounting in response to repeated questions about pricing by analysts." Id. Here, the Amended Complaint does not contain the sort of "confident, unhedged denials" made by the defendant CFO in Avaya, Inc. And in the remaining cases cited by Plaintiff (see Pltf. Opp. (Dkt. No. 112) at 55-56), the court's scienter finding rests on more than merely the content of the defendants'

statements. See Pontiac Gen. Emps.' Ret. Sys., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (finding that complaint plausibly alleged scienter as to two defendants in part because they received their information directly from a third defendant, for whom scienter was adequately alleged); Stadium Cap. LLC v. Co-Diagnostics, Inc., 22 Civ. 6978 (AS), 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024) (finding scienter adequately pled in part because the company "flagged that it was varying from its usual practice of 'providing quarterly guidance'"; "[o]ne cogent and compelling inference to draw from this change is that they knew demand was down, but hoped they could mask that fact until it rebounded"); Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2019) (finding scienter adequately pled where plaintiffs alleged that defendants reviewed "specific numbers in [the] CEO Call slide decks" that showed "spiraling inventory levels" indicative of channel-stuffing, and where plaintiffs "enumerate[d] [contradictory] statements by each Individual Defendant regarding channel inventory"). Absent additional allegations of scienter, the content of Defendants' statements is not sufficient to raise a strong inference of scienter.[18]

---

[18] Citing In re Cannavest Corp. Sec. Litig., Dobina v. Weatherford Intern. Ltd., and In re Insys Therapeutics, Inc. Sec. Litig. (see Pltf. Opp. (Dkt. No. 112) at 55-56), Plaintiff also argues that "Defendants could not have monitored and attested to the efficacy of Avaya's controls without noticing and disregarding the blatant deficiencies." (Pltf. Opp. (Dkt. No. 112) at 44) According to the Amended Complaint, and as reported in Avaya's November 30, 2022 Form 8-K, those deficiencies include ineffective "controls related to the information and communication component of the [Committee of Sponsoring Organizations of the Treadway Commission] framework. . . . More specifically, the Company did not design and maintain effective controls to ensure appropriate communication between certain functions within the Company." (Am. Cmplt. (Dkt. No. 93) ¶ 110) The Amended Complaint further alleges that the Remediation Plan set forth in Avaya's September 8, 2023 Form 10-Q "appear[s] to correct the internal control deficiencies caused by Chirico's and McGrath's conduct" by (1) providing training on the proper internal communication of information related to SEC filings and Avaya's financial statements; (2) requiring "[b]oard level participation in messaging across the organization that reinforces a safe environment for raising concerns without fear of retaliation"; (3) providing training for those "involved in the forecasting process regarding the importance of the Company establishing

**b. Internal Emails at Avaya**

The Amended Complaint alleges that certain emails Avaya employees exchanged in April and May of 2022 "indicate that Chirico was informed before the announcement of the May 10, 2022 guidance that [Avaya's] revenue projections were inflated." (Am. Cmplt. (Dkt. No. 93) ¶ 164) The Amended Complaint does not allege that Chirico actually received or knew about these email communications, however. Plaintiff instead argues that this Court should infer – from a comment by Avaya's Senior Director of Sales Finance that he would "raise" the issue

---

and maintaining effective disclosure controls"; and (4) "enhanc[ing] [] future employee engagement surveys to monitor for negative indicators of tone at the top." (Id. ¶ 129)

Although "[c]ourts in this District have repeatedly held that weak internal controls will support an inference of scienter," In re Cannavest Corp. Sec. Litig., 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018), a finding of scienter premised on statements about the adequacy of internal controls generally involves direct or circumstantial evidence that the defendant was aware of weakness in the internal controls. See id. (finding scienter in part because "a financial consultant who joined the Company in May 2013, [] knew 'right away' that CannaVest had misapplied its accounting and [that] the Company's financial statements would need to be restated") (internal quotation marks omitted); Dobina v. Weatherford Intern. Ltd., 909 F.Supp.2d 228, 246 (S.D.N.Y. 2012) (finding "scienter adequately [alleged] with regard to [the defendant's] statements about internal controls" where (1) the defendant personally participated "in designing and evaluating the internal controls," (2) "the discrepancies between the admissions of the March 2011 restatement and the repeated certifications that continued from the beginning of the class period until as late as November 2010 are stark," and (3) the complaint "allege[d] that [the defendant] was aware of at least some problems with internal controls in the tax department during the class period" (emphasis omitted); In re Insys Therapeutics, Inc. Sec. Litig., 17 Civ. 1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (finding scienter adequately pled where allegations were sufficient to show motive and opportunity, and where "extensive allegations of circumstantial evidence of recklessness and misconduct [] strongly buttress[ed] the motive alleged," including (1) the pharmaceutical company's "fail[ure] to maintain sufficient internal controls to avoid fraud," (2) the fact that executives were "aware of the rate of [the drug's] prescriptions and the actual return history, yet they failed to properly account for them in the financial statements," and (3) management's inappropriate "tone at the top").

Here, Plaintiff has not offered evidence that Defendants designed Avaya's internal controls or were aware of weaknesses in those internal controls. And Avaya's later finding that its internal controls were ineffective is – without more – insufficient to raise a strong inference that Defendants were aware of weaknesses in the internal controls at the time that they signed the relevant certification. (See Am. Cmplt. (Dkt. No. 93) ¶ 141)

of the Company's inflated projections to a "much smaller audience" – that Chirico was informed of this issue. According to Plaintiff, the "smaller audience" referenced in the email "likely included . . . Chirico and McGrath." (Am. Cmplt. (Dkt. No. 93) ¶ 57). This allegation is too vague to raise a "strong inference of fraudulent intent." Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc., No. 09 Civ. 6966, 2011 WL 1198712, at *23 (S.D.N.Y. Mar. 30, 2011) ("vague allegations" against unnamed "senior . . . employees" and "executives" "simply do not give rise to a 'strong inference of fraudulent intent'") (internal citation omitted).

The one email that Plaintiff contends mentions Chirico was sent by the Global Vice President of Financial Planning and Analysis to the Senior Director of Sales Finance, and includes the following:

> I really need your guidance on next steps here. The walk to $430M was identified and shared with Stephen and [redacted] – and ultimately made its way to Jim: we can choose to align to this… very specifically: put $10M from [redacted] to the "NW" line, the [redacted] 50K to the [redacted] line, the Product upsides to Product, the [redacted] 2.7M to product, the [redacted] $1.8M to APS, the [redacted] PIT upside to the Subscription line, etc. But we made a conscious effort to not do that, and instead, plug to "Other/Judge". I'm trying to understand this…is this our way of saying "I don't believe we'll get any of this upside?" If so, then why the plug to $430M? I am just not sure how to proceed with this OL. Please advise.

(Am. Cmplt. (Dkt. No. 93) ¶ 59)

This email is largely unintelligible. Assuming arguendo that "Jim" refers to Chirico, the statement that "[t]he walk to $430M . . . made its way to Jim" does not demonstrate that Chirico was aware that Avaya's revenue projections were inflated, and thus does not support an inference of scienter as to Chirico. See In re Loral Space & Comm'ns Ltd. Sec. Litig., No. 01 Civ.4388 (JGK), 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("The plaintiffs' general allegation that internal company reports contradicted the defendants' projections of Globalstar's eventual subscribers is insufficient to raise an inference that the defendants were reckless in

making those projections."); see also In re Alstom SA, 406 F. Supp. 2d 433, 471-72 (S.D.N.Y. 2005) (allegation that a defendant "traveled to Paris to inform the company about cost overruns" – absent any allegation as to "the extent of the conversation," "the degree of costs described by [the defendant]," "who [the defendant] met with" or that "upon hearing the news of cost overruns [the defendants] conspired [] to hide the costs in ATI's accounting" – was "too lacking in specificity to support a finding of scienter").

To the extent that Plaintiff's allegations could be read to suggest that it was common knowledge at Avaya that the Company's revenue projections were inflated, any such inference is "too vague and conclusory" to demonstrate scienter on the part of Defendants. See In re AppHarvest Sec. Litig., 684 F. Supp. 3d at 243 ("[C]onclusory allegations that everyone was aware of specific information are the types of allegations that courts regularly find 'are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.'") (emphasis in original) (collecting cases).

In asserting that Chirico "understood that Avaya would not be able to meet its publicly disclosed guidance," Plaintiff also cites three emails that Chirico sent or received in June 2022. (Am. Cmplt. (Dkt. No. 93) ¶ 165)

In a June 4, 2022 email to certain Avaya executives and employees, Chirico states that, "***simply put, we can't afford to miss Q3***." (Id. ¶ 62 (emphasis in Am. Cmplt.)) On June 7, 2022, Chirico received an email authored by Spears stating that "***North America [had] experienced an unusually slow start to the quarter***." Spears projected $410 million in North American revenue for the third quarter of 2022. (Id. ¶ 64 (emphasis in Am. Cmplt.)) And in a June 12, 2022 email to certain Avaya executives, Chirico states that Avaya's "recent revenue

projections were '***clearly not good at all,***' [] that the '***number for [North American revenue] must be 420*** [***million,***]' [and that] a revenue number of '***404 [million] (which []now appears to be a stretch) doesn't get it done.***'" (Id. ¶ 62 (emphasis in Am. Cmplt.))

While Chirico sent or received these emails on June 4, 7, and 12, 2022, the Amended Complaint challenges statements Chirico made in May 2022. The Amended Complaint does not challenge statements Chirico made in June 2022 or thereafter.[19] To raise an inference of scienter as to Chirico, Plaintiff's must plead "'(1) specific contradictory information

---

[19] The Amended Complaint challenges McGrath's statement in Avaya's June 27, 2022 press release announcing $600 million in financing in which he states that "***[t]his funding supports and accelerates our business model transformation*** and addresses our convertible notes maturing in June of next year." (Hull Decl., Ex. D (June 27, 2022 Press Release) (Dkt. No. 108-7) at 3 (emphasis in Am. Cmplt.); Am. Cmplt. (Dkt. No. 93) ¶ 158 (emphasis in Am. Cmplt.)) Plaintiff does not argue that Chirico is a "maker" of this statement, however. (See Pltf. Opp. (Dkt. No. 112) at 44-46; see also Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011) ("[A]ttribution within a statement is strong evidence that a statement was made by – and only by – the party to whom it is attributed."). Accordingly, McGrath's statement does not bear on Chirico's scienter at the time he sent and received the above-described emails. And, in any event, this Court has found the June 27, 2022 statement of McGrath non-actionable.

The Amended Complaint also challenges a statement in a June 2022 investor presentation that "***~12% of [the installed] Seat base [was] on OneCloud.***" (Am. Cmplt. (Dkt. No. 93) ¶ 156 (emphasis in Am. Cmplt.)) The Amended Complaint does not allege whether this investor presentation was prepared before or after the above-described email communications. Nor does the Amended Complaint allege that Chirico played any role in drafting, reviewing, or disseminating this investor presentation. See e.g., City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F.Supp.2d 395, 417 (S.D.N.Y.2011) (holding that individual defendants "cannot be held liable for any alleged misstatements" in a registration statement that they did not sign and where there was "no indication . . . that [the individual defendants] had any authority over its contents, aside from consenting to being listed as director-nominees"); Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP, 1:17-cv-1235-GHW, 2018 WL 1627266, at *10 (S.D.N.Y. March 30, 2018) (finding that allegations did not establish that defendant corporate officer – who did not sign company's SEC filings – had "ultimate authority" over the statements in the SEC filings, even though defendant had "drafted" one Form 8-K, "reviewed" challenged statements in other SEC filings, and "assisted" in the submission of the SEC filings). Accordingly, the challenged statement in the June 2022 investor presentation is not sufficient to support an inference of scienter as to Chirico. Finally, and in any event, this Court has found the statement cited by Plaintiff non-actionable.

[that] was available to [Chirico] (2) at the same time [he] made the[] misleading statements.'" Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (quoting In re PXRE Group, Ltd., Sec. Litig., 600 F.Supp.2d 510, 536 (S.D.N.Y. 2009) (emphasis in In re PXRE Group, Ltd.)). Because the emails Plaintiff cites were sent weeks after Chirico's alleged May 2022 false and misleading statements, they cannot support an inference that Chirico knew of specific contradictory information when he made the challenged May 2022 statements.[20]

The Amended Complaint also alleges that on July 1, 2022, "Chirico directed Spears to draft an email" to Avaya's board of directors regarding the discrepancy between Avaya's projected and actual earnings for the third quarter of 2022. (Am. Cmplt. (Dkt. No. 93) ¶ 71) The draft email – which was never sent to the board – acknowledges that Avaya "had a significant fallout across the globe that will prevent us from achieving the objectives or prognosis [that Chirico had] shared just a few short weeks ago." The draft email also

---

[20] Plaintiff does not contend that McGrath received the June 2022 emails. (See Pltf. Opp. (Dkt. No. 112) at 18) But the Amended Complaint does plead that on June 7, 2022 "McGrath told Spears that Avaya needed to acknowledge risk around its $700 million revenue projection for the third quarter, with $430 million of that coming from North American sales." (Am. Cmplt. (Dkt. No. 93) ¶ 64) Later that day, Spears sent an email to the board of directors stating that "North America [had] experienced an unusually slow start to the quarter," and that $410 million in North American revenue was projected. (Id. (emphasis in Am. Cmplt. omitted)) But Plaintiff does not explain how McGrath's alleged comment to Spears establishes scienter as to McGrath. (Pltf. Opp. (Dkt. No. 112) at 18) And, as to the June 2022 emails, Plaintiff's allegations as to McGrath amount to the conclusory assertion that McGrath must have been aware of the information that Chirico had received. But such speculation is not sufficient to support an inference of scienter as to McGrath. See Glaser, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient.").

acknowledges "unprecedented aggravation from the channel in Q3."[21] (Id. ¶ 71 (emphasis omitted))

As discussed above – as to Chirico – the Amended Complaint challenges only statements he made on May 10, 2022. The draft email prepared approximately two months later, cannot support an allegation of scienter as to Chirico's May 10, 2022 statements. See Glaser, 772 F. Supp. 2d at 588.

c. **Access to Avaya Data and Internal Information**

Citing information provided by CW-1 and CW-2, Plaintiff contends that Defendants had "access to information tracking Avaya's financial performance, including revenue," and that McGrath attended "sales meetings where revenue projections were discussed." (Am. Cmplt. (Dkt. No. 93) ¶¶ 84, 164)

CW-1 describes sales meetings that McGrath attended at the end of the third quarter of fiscal year 2022, during which the sales team discussed "revenue projections" (Am. Cmplt. (Dkt. No. 93) ¶ 164); "reports . . . that showed all the contracts that had closed in the [third] quarter and which remained open" (id. ¶ 85); and "efforts to secure contracts before the end of the [third] quarter." (Id. ¶ 86) CW-2 describes "deal desk" meetings that McGrath "often" attended and that Chirico "sometimes" attended, during which "sales team members would request approval for steeper discounts . . . than they were normally permitted." (Id. ¶ 82) "[S]ales managers recognized the 'margins were shitty' on many of the deals." (Id. ¶ 83) CW-2 also says that McGrath "had access to a spreadsheet listing Avaya customers who were targets for switching to subscription contracts." (Id. ¶ 164; see also id. ¶ 88) According to Plaintiff,

---

21 According to the draft email, Avaya's customers' "accelerated shifts" to OneCloud resulted in "unprecedented aggravation from the channel in Q3," because Avaya's hardware business partners were left "out of future revenue streams." (Am. Cmplt. (Dkt. No. 93) ¶ 71 (emphasis in Am. Cmplt. omitted))

"[b]y looking at the spreadsheet, McGrath would have been able to plainly see how many existing customers were left who could be converted to subscription contracts." (Am. Cmplt. (Dkt. No. 93) ¶ 88)

Acknowledging the information provided by CW-1 and CW-2, neither witness identifies "'what specific contradictory information [Defendants] received or when [they] received it,'" Glaser, 772 F. Supp. 2d at 591 (quoting Local No. 38, 724 F. Supp. 2d at 461), or whether Defendants "'actually accessed or reviewed the reports'" regarding the closing of contracts or the spreadsheet showing existing customers who could be converted to subscription contracts. Id. (quoting Campo v. Sears Holdings Corp., 371 F. App'x 212, 217 (2d Cir. 2010)). "Mere access to information does not provide strong circumstantial evidence of recklessness where the complaint fails to specify exactly what information was contained in [the data to which a defendant had access] or how said information contradicted Defendants' public statements[.]" In re Vroom, Inc. Sec. Litig., 21 Civ. 2477 (PGG), 2025 WL 862125, at *36 (S.D.N.Y. Mar. 18, 2025) (quoting Maloney v. Ollie's Bargain Outlet Holdings, Inc., 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021)) (internal quotation marks omitted).

CW-2 also describes weekly "revenue forecasting meetings" among sales employees and executives, including Chirico and McGrath. (Am. Cmplt. (Dkt. No. 93) ¶ 87) CW-2 "did not personally attend these meetings," however, and thus has no personal knowledge of what was discussed at these meetings. (Id.) Given these circumstances, CW-2's discussion of what likely took place at these meetings is "too vague, speculative, and conclusory" to support an inference of scienter as to either Defendant. Schiro, 396 F.Supp.3d at 305 (witness's allegations did not demonstrate scienter where witness stated that he "accompanied" unidentified

executives to an event where bribe payments were allegedly made, but did not observe money changing hands and was not told that bribes were being paid).

As to McGrath, Plaintiff alleges that "[w]hatever information was provided to Chirico . . . presumably made its way to McGrath." (Am. Cmplt. (Dkt. No. 93) ¶ 164) Allegations that information "presumably" made its way from one Defendant to another are vague, conclusory, and wholly insufficient to support an inference of scienter. See AppHarvest Sec. Litig., 684 F.Supp.3d at 243.

**d. Audit Committee Findings and Remediation Plan**

Plaintiff also contends that Audit Committee findings and remediation efforts made after Defendants left Avaya demonstrate that Defendants knew – when they made the challenged statements – that Avaya would not meet its third-quarter guidance. These findings and remediation efforts – which took place months after the challenged statements were made – include (1) Avaya's August 9, 2022 disclosure that the Company had "'substantial doubt' about 'its ability to continue as a going concern'"; (2) the new CEO's August 9, 2022 statement that "customers became cautious on making longer-term commitments to Avaya, perhaps due to concerns about Avaya's near-term debt maturities"; (3) the Audit Committee's November 30, 2022 determination that "[a]dverse market conditions, as well as concerns that arose during the third quarter about the Company's financial health, [] negatively influenced customer sentiment." (Am. Cmplt. (Dkt. No. 93) ¶¶ 142, 152, 155, 159)

Avaya's disclosures in August and November of 2022 regarding the Company's declining "financial health" do not demonstrate that Defendants were aware in May and June of 2022 that Avaya would not meet its revenue projections for the third quarter of 2022. See, e.g., Lopez v. CTPartners Exec. Search, Inc., 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) ("The fact of a later correction, made a short time after an initial statement is made, does not connote that [] the

Company's earlier statement about its earnings expectations was false or misleading when made."); Novak, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Plaintiff argues, however, that the Audit Committee's November 30, 2022 finding that Avaya's internal controls were ineffective as of September 30, 2021 demonstrates that Defendants knew that Avaya's internal controls were ineffective when they issued their certification to the contrary in May 2022. (Am. Cmplt. (Dkt. No. 93) ¶¶ 112, 139, 142) But the Audit Committee's findings in November 2022 that the Company's internal controls were ineffective does not demonstrate that Defendants knew that the internal controls were deficient in May 2022. See Schiro, 396 F.Supp.3d at 307 ("[t]he fact that [a defendant] had a duty to review [the Company's] internal controls is not a substitute for specific allegations that [he was] provided with information that demonstrated the inadequacy of [those] internal controls.") (internal citation omitted) (emphasis in original).

Plaintiff also argues that the Audit Committee's findings support an inference of scienter because the Audit Committee "explicitly identified Chirico and McGrath's departure as part of" Avaya's "enhancements to our internal control over financial reporting." (Am. Cmplt. (Dkt. No. 93) ¶ 167) "[T]here are any number of reasons that an executive might resign, [however,] most of which are not related to fraud." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (citing Stambaugh v. Corrpro Cos., Inc., 116 F. App'x 592, 598 (6th Cir. 2004) (resignations of a number of chief financial officers most likely were caused by a long period of corporate mismanagement, not by fraud); Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) (successive resignation of key officials did not create an inference

of scienter because it was "more likely probative only of the fact that the company was failing"); Kurtzman v. Compaq Computer Corp., No. Civ. A. H–99–779, 2002 WL 32442832, at *10 (S.D.Tex. Mar. 30, 2002) ("[T]here are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by anything besides 'a sense of inadequacy for the job in the face of [the company's] troubles.'").

"For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." Schiro, 396 F. Supp. 3d at 303 (quoting Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017); see also Glaser, 772 F. Supp. 2d at 598 ("[R]esignations, without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter.") (collecting cases). To plead fraudulent intent, "a complaint must allege facts that link a resignation to the alleged fraud." Damri v. LivePerson, Inc., 772 F.Supp.3d 430, 469 (S.D.N.Y. 2025) (quoting In re Hebron Tech. Co., Ltd. Sec. Litig., No. 20 Civ. 4420 (PAE), 2021 WL 4341500, at *23 (S.D.N.Y. Sept. 22, 2021)).

Here, Avaya's Audit Committee identified "several contributing factors for the significant differences between the Company's forecasts and actual financial results for the third quarter of fiscal 2022," none of which include fraud or misconduct by Chirico or McGrath. (Han Decl., Ex. 12 (September 8, 2023 Form 10-Q) (Dkt. No. 110-14) at 11; Am. Cmplt. (Dkt. No. 93) ¶ 122) Indeed, Avaya's "Remediation Plan" references the departure of Chirico and McGrath's retirement not as a consequence of fraud, but as two of several "enhancements to our internal control over financial reporting." (September 8, 2023 Form 10-Q, Han Decl., Ex. 12 (Dkt. No. 110-14) at 54) Where, as here, a plaintiff can "at best . . . connect [the executives']

resignation [or departure] to allegedly 'inadequate internal controls over financial reporting,'" the allegations fall short of establishing the "highly unusual or suspicious circumstances" necessary to support an inference of fraudulent intent.[22] Glaser, 772 F. Supp. 2d at 598.

#### e. **Whistleblower Letter**

To the extent that Plaintiff's scienter allegations are premised on the whistleblower's June 3, 2022 email, Avaya's November 30, 2022 Form 8-K concludes – and Plaintiff does not dispute – that "the claims in the [whistleblower] email were unsubstantiated." (Am. Cmplt. (Dkt. No. 93) ¶ 109) The unsubstantiated, vague, and conclusory allegations of an anonymous third party are insufficient to raise an inference of scienter in this action.

#### f. **Holistic Assessment of Scienter Allegations**

Although the Court has considered and rejected all of Plaintiff's scienter arguments individually, it must go on to determine whether the allegations "give rise to a strong inference of scienter" when "taken collectively." Tellabs, 551 U.S. at 322-23. As noted above, Plaintiff's Section 10(b) claim "will survive [Defendants' motion to dismiss] . . . only if a

---

[22] Plaintiff further argues that Avaya's "Remediation Plan" supports an inference of scienter because the plan "address[es] issues directly related to Chirico and McGrath's inappropriate conduct," including:

> Board level participation in messaging across the organization that reinforces a safe environment for raising concerns without fear of retaliation;
>
> Conducting in-depth special training courses for the Company's entire sales team and personnel involved in the forecasting process regarding the importance of the Company establishing and maintaining effective disclosure controls. [. . .]; and
>
> Enhancement of future employee engagement surveys to monitor for negative indicators of tone at the top.

(Han Decl., Ex. 12 (September 8, 2023 Form 10-Q) (Dkt. No. 110-14) at 54; see Am. Cmplt. (Dkt. No. 93) ¶ 168) But these post hoc recommendations calling for enhanced training and better communication with staff do not support an inference that Chirico and McGrath acted with fraudulent intent.

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

Here, Plaintiff's allegations do not raise a strong inference that Defendants had a motive to commit fraud, and Plaintiff's allegations of conscious misbehavior and recklessness are similarly lacking. Even when Plaintiff's allegations are considered collectively, they do not demonstrate that the inference of scienter is more cogent and compelling than the non-culpable inference – namely, that Chirico and McGrath had a reasonable, good faith belief that the Company would meet its projections for the third quarter of fiscal year 2022.

Because the inference that Defendants acted recklessly is less plausible than the non-culpable inference, Plaintiff has not sufficiently alleged scienter with respect to Defendants' statements. Tellabs, 551 U.S. at 324.[23]

* * * *

For all of the reasons discussed above, the Amended Complaint's Section 10(b) claim will be dismissed.

---

23 Having concluded that Plaintiff has not adequately alleged scienter as to Chirico or McGrath, the Court does not reach the question of whether McGrath – by signing the May 10, 2022 Form 8-K – was the "maker" of actionable statements for purposes of Janus Capital Group Inc. v. First Derivative Traders, 564 U.S. 135 (2011).

Similarly, because Plaintiff has not adequately pled (1) materially false or misleading statements or (2) scienter, the Court does not reach the issue of loss causation. See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc., 333 F.Supp.3d 338, 349 (S.D.N.Y. 2018) (citing In re UBS AG Sec. Litig., No. 07 Civ. 11225, 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) ("Because the issue of scienter . . . proves fatal to Plaintiffs' Section 10(b) claims[,] . . . the Court need not reach the UBS Defendants' arguments regarding . . . loss causation. . . ."), aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014).

## V. SCHEME LIABILITY

Plaintiff contends that "Defendants are liable for their schemes under Rule 10b-5(a)&(c) for any false statements regarding Avaya's business, financial health, and governance, regardless of who the 'makers' were." (Pltf. Opp. (Dkt. No. 112) at 46)

### A. Applicable Law

"To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (quoting In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005)).

"'Scheme liability [. . .] hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'" In re Aegean Marine Petroleum Network, Inc. Sec. Litig., 529 F.Supp.3d 111, 147 (S.D.N.Y. 2021) (quoting In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)). In Lorenzo v. Sec. & Exch. Comm'n, the Supreme Court made clear that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5," even where "the disseminator did not 'make' the statements" within the meaning of Rule 10b-5(b). Lorenzo v. Sec. & Exch. Comm'n, 587 U.S. 71, 78 (2019). Accordingly, "misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." Sec. & Exch. Comm'n v. Rio Tinto PLC, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original). As with other claims that sound in fraud, a plaintiff must "state with particularity 'what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'" Menaldi, 164 F. Supp. 3d at 577

(quoting In re Parmalat Sec. Litig., 383 F.Supp.2d 616, 622 (S.D.N.Y. 2005)) (citing Fed. R. Civ. P. 9(b)).

"Scheme liability claims are [. . .] subject to the PSLRA pleading standard with respect to scienter." Menaldi, 164 F. Supp. 3d at 577. Accordingly, "a plaintiff must plead facts demonstrating 'a strong inference that the defendant acted with the required state of mind.'" Id. (quoting Tellabs, 551 U.S. at 321).

**B. Analysis**

Here, Plaintiff argues that Defendants participated in a scheme to "deceive the market" by "failing to disclose the true state of Avaya's business and operations." (Am. Cmplt. (Dkt. No. 93) ¶ 170) Through this "fraudulent course of conduct," Defendants "disseminated or approved" false statements that "presented a misleading picture of Avaya's condition and value, which had the intended effect and caused Avaya's stock to trade at artificially inflated prices during the Class Period." (Id. ¶¶ 170, 198)

Plaintiff's allegations of scheme liability are premised on the same alleged false statements that underlie his Rule 10b-5 claims. In such circumstances, scheme liability claims fail, because no inherently deceptive act distinct from the alleged false and misleading statements has been pled. See In re Turquoise Hill, 625 F. Supp. 3d at 253 (finding no scheme liability where plaintiff did not allege that "defendants performed an inherently deceptive act that was distinct from an alleged misstatement"); Genesee Cnty. Emps.' Ret. Sys. V. DocGo Inc., 773 F.Supp.3d 62, 92 (S.D.N.Y. 2025) (finding no scheme liability where plaintiff relied solely on the "alleged misstatements or omissions, and therefore fail[ed] to state that [defendants] committed an 'inherently deceptive act that is distinct from an alleged misstatement'") (quoting In re Electrobras Sec. Litig., 245 F. Supp. 3d 450, 471 (S.D.N.Y. 2017)).

Even if Plaintiff had adequately pled an inherently deceptive or manipulative act distinct from the alleged false and misleading statements, any such claim would fail for lack of scienter. See Lorenzo, 587 U.S. at 78 (the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5"). As discussed above, Plaintiff's allegations do not raise a strong inference of fraudulent intent within the meaning of the PSLRA.

## VI. CONTROL PERSON LIABILITY

The Amended Complaint asserts control person claims under Section 20(a) of the Exchange Act. Such claims are "necessarily predicated on a primary violation of the securities laws." Rombach, 355 F.3d at 177-78. Because Plaintiff has not adequately pled an underlying violation of the securities laws, the Section 20(a) claims will likewise be dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss (Dkt. Nos. 108, 110) are granted. Given this determination, the Brigade plaintiffs' motions for leave to intervene (Dkt. Nos. 130) and for an expedited briefing schedule concerning Defendants' request for leave to file a motion to stay discovery in Brigade (Dkt. No. 137) are denied as moot.

While the Court grants leave to move to amend, in any such motion, Plaintiff will explain in detail how each defect cited in this Opinion has been satisfied by new factual allegations in the proposed second amended complaint. Any motion for leave to amend is to be filed by **September 30, 2026**. The proposed second amended complaint is to be attached as an exhibit to the motion.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 108, 110, 130, 137).

Dated: New York, New York
September 1, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge